# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G.,<br><br>        Plaintiffs,<br><br>            v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity,<br><br>        Defendants. | Case No. 25-cv-10676 |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND STAY OF ADMINISTRATIVE ACTION

## INTRODUCTION

Plaintiffs and proposed class members are noncitizens with final removal orders at risk of grave harm after being removed, or threatened with removal, to a third country—a country other than the country or alternative county of removal designated and identified in writing in their prior immigration proceedings—without being provided any notice or an opportunity to apply for protection from removal to that country as required by the Immigration and Nationality Act (INA), the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), the Due Process Clause of the Fifth Amendment, and the United States' treaty obligations. They seek immediate injunctive relief to protect them from ongoing and imminent harm caused by Defendants' willful violation of controlling law.

Subparagraphs 1231(b)(1) and (b)(2) of Title 8 authorize Defendants to remove noncitizens with final removal orders to a third country if a noncitizen cannot be removed to the designated country (usually their country of origin) or alternatively designated country (usually a country of citizenship or where they hold status). However, § 1231(b)(3) expressly mandates that "[n]otwithstanding paragraphs (1) and (2)," DHS may not remove noncitizens to any country if their "life or freedom would be threatened in that country" on the basis of a protected ground. Similarly, the statute and regulations implementing the United States' obligations under the Convention Against Torture (CAT), separately instruct that Defendants may not remove a noncitizen to a country where they are likely to be tortured. Yet, under increasing pressure to fulfill President Trump's campaign promises to deport record numbers of noncitizens, that is precisely what Defendants are doing: Defendants have resorted to violating noncitizens' clear statutory rights to apply for protection from removal to countries where they face persecution or torture. Defendants' actions also violate Plaintiffs' constitutional rights to due process.

1

Defendants' unlawful conduct is causing direct and irreparable harm to Plaintiffs and proposed class members. For example, Plaintiff O.C.G. fled Guatemala where he had been persecuted and tortured on account of his sexual orientation. He was detained upon entering the United States and, because he had previously been ordered removed, was not eligible to apply for asylum. However, an immigration judge (IJ) granted his application for withholding of removal, finding it was more likely than not that he would be persecuted if returned to Guatemala. Defendant Department of Homeland Security (DHS) did not appeal that decision. Instead, two days later, they covertly deported him to Mexico without any notice to him or his counsel, and without any opportunity to apply for protection from removal to Mexico. Defendants did this even though O.C.G. had testified that he had been targeted and raped in Mexico. Plaintiffs M.M. and E.C.F. and hundreds of proposed class members who also were granted withholding of removal and/or CAT protection now face similar threats of removal to third countries where they may experience persecution or torture without ever being provided an opportunity to assert their statutory right to apply for protection of removal from that country.

Defendants have been in longstanding violation of their obligation to create a system to provide notice and an opportunity to apply for protection before deporting noncitizens to a third country. That failure has now been dramatically magnified with devastating results because of an avalanche of pressure from the current administration to deport record numbers of noncitizens. A secret directive from Defendants that was recently leaked to the press (hereinafter, the February 18, 2025 directive) expressly instructs DHS officers to review the cases of noncitizens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the [noncitizen] should be re-detained" and, in the case of those who previously could not be removed because their countries of citizenship were unwilling to

accept them, to "review for re-detention . . . in light of . . . potential for third country removals." Dkt. 1-4; Dkt. 1 ¶¶53-61.

Consequently, Defendants are now re-detaining and removing Plaintiffs and proposed class members to third countries without notice and an opportunity to apply for any protection from that third country. For these reasons, Plaintiffs ask this Court to provide immediate relief, enjoining Defendants from removing Plaintiffs and proposed class members to a third country, unless and until they and their counsel, if any, have first been provided written notice and a meaningful opportunity to have an IJ review any application for protection, and setting aside the February 18, 2025 directive. Further, Plaintiff O.C.G. asks this Court to order that Defendants immediately facilitate his return to the United States.

## STATEMENT OF FACTS

### I.    Legal Background

#### A.    Section 240 Removal Proceedings

Some individuals whom Defendants seek to deport to third countries had full immigration court proceedings, commonly referred to as Section 240 proceedings, where the noncitizen is entitled to select a country of removal. 8 U.S.C. §§ 1229a, 1231(b)(2)(A); 8 C.F.R. § 1240.10(f). The IJ will designate the country if the noncitizen does not do so and may also designate alternative countries. 8 U.S.C. § 1231(b)(2)(D)-(E). Other requirements apply to individuals placed in proceedings immediately upon arrival. *Id.* § 1231(b)(1); 8 C.F.R. § 1240.10(f).

An IJ must provide sufficient notice and opportunity to apply for protection from a designated country to individuals who fear persecution or torture if deported. 8 C.F.R. §§ 1240.10(f), 1240.11(c)(1). These forms of protection include asylum, *see* 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A), which generally protects against deportation to an individual's

country of origin *and* any other country absent certain exceptions. *See generally Id.* § 1158(c)(2);

8 C.F.R § 208.24. Individuals determined to be ineligible for asylum are generally entitled to

apply for withholding of removal, a mandatory form of protection preventing deportation to the

country or countries where the IJ finds that the individual is more than likely to be persecuted.

*See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16. Those who are ineligible for both asylum *and*

withholding under § 1231(b)(3)(A) remain entitled to seek CAT protection, a mandatory

protection against deportation to a country where the IJ finds that the individual is likely to be

tortured. *See* FARRA, Pub. L. No. 105-277, div. G, Title XXII, § 2242(a), 112 Stat. 2681 (1998)

(codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16(c), 208.17, 1208.16(c), 1208.17; 28

C.F.R. § 200.1. An IJ may only terminate CAT protection based on evidence that the person will

no longer face torture and doing so requires DHS and the IJ to follow procedures, including a

new hearing and notice. *See* 8 C.F.R. § 1208.17(d)(1), (d)(2).

### B.    Sections 241(a)(5) and 238(b) Proceedings, Including Reasonable Fear and Withholding-Only Proceedings

Certain individuals Defendants seek to deport to a third country may instead have

received summary removal orders issued by DHS officers. These include reinstatement orders,

issued to noncitizens who DHS determines have previously been deported and subsequently

unlawfully returned, *see* 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8, and Section 238(b)

administrative removal orders, issued to individuals whom DHS determines are not lawful

permanent residents and who have an aggravated felony conviction, *see* 8 U.S.C. § 1228(b); 8

C.F.R. § 238.1. In both processes, individuals are barred from nearly all relief from removal.

However, consistent with the United States' commitment to *nonrefoulement*, critical

protections from removal remain available: withholding of removal under 8 U.S.C. § 1231(b)(3)

and CAT protection, 8 C.F.R. §§ 241.8(e), 238.1(f)(3). Individuals must demonstrate a

reasonable fear of persecution or torture in an interview before an asylum officer or, if the asylum officer finds no reasonable fear, on review before an IJ. *Id.*; 8 C.F.R. § 208.31(g). If either the asylum officer or IJ finds their fear is reasonable, the individual is placed in withholding-only proceedings before an IJ where they can seek withholding of removal and/or CAT protection. 8 C.F.R. §§ 208.31(e), (g)(2), 208.16.

### C.    Statutory Scheme for Removal to a Third Country

The statutory process for designating countries to which noncitizens may be removed includes processes for noncitizens "arriv[ing] at the United States" and for all other noncitizens. 8 U.S.C. § 1231(b)(1), (b)(2).[1] The processes set forth how to designate countries and alternative countries to which the groups may be removed. *Id*. Critically, both processes have a specific carve-out prohibiting deportation to countries where the noncitizen faces persecution or torture:

> **Notwithstanding paragraphs [b](1) and [b](2)**, the Attorney General **may not remove** [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1231(b)(3)(A) (emphasis added). Similarly, under FARRA, codifying the United States' obligations under CAT, a noncitizen may not be removed to any country where they would be tortured. *See* 28 C.F.R. § 200.1; 8 C.F.R. 1208.17(a).

## II.    Pressure to Deport Noncitizens to Third Countries

On January 20, 2025, President Donald J. Trump issued Executive Order (EO) 14165, entitled "Securing our Borders." 90 Fed. Reg. 8467. The EO follows several other EOs targeting noncitizens who may be subject to removal. Among other implementing actions, on February 18,

---

[1]    References to the Attorney General in § 1231(b) refer to the DHS Secretary for functions related to carrying out a removal order and to the Attorney General (delegated to IJs and Board of Immigration Appeals) for functions related to designations and decisions about fear-based claims. 6 U.S.C. § 557; *see also* 8 C.F.R. §§ 1208.16, 1208.17, 1208.31,1240.10(f), 1240.12(d).

2025, Defendant DHS issued a directive to the Enforcement and Removal Operations (ERO) division of Immigration and Customs Enforcement (ICE) instructing officers to review the cases of noncitizens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the [noncitizen] should be re-detained" and, in case of persons who previously could not be removed because the designated countries are unwilling to receive them, "review for re-detention . . . in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third country removals." Dkt. 1-4. Consequently, Defendants are now actively seeking to re-detain and deport Plaintiffs and putative class members.

### III. Plaintiffs' Cases

#### A. Plaintiff D.V.D.

Plaintiff D.V.D. has a history of severe mental illness which currently are controlled by psychiatric treatment. In February 2017, he was ordered removed to Cuba and only Cuba. ICE released him from detention in May 2017. D.V.D. consistently has checked in with ICE as required since that time. On March 7, 2025, D.V.D. completed a check-in with ICE's ERO office in Burlington, Massachusetts by email through his attorney. Three days later, ICE instructed him to report in person on March 28, only three weeks from the date of his last check-in. On March 12, his attorney asked ICE why he needed to check-in again and why it needed to be in person. On March 15, ICE responded that it was requiring all people to report in person and more frequently on a case-by-case basis. On information and belief, ICE intends to re-detain D.V.D. at the March 28 check-in pursuant to the February 18, 2025 directive. D.V.D. fears deportation to any third country without notice and a meaningful opportunity to apply for protection—especially with respect countries where he will be deprived of access to psychiatric treatment and

will therefore be at risk of persecution due to his mental health conditions or where he will be

imprisoned upon arrival. *See* Dkt. 1 ¶¶10, 62-67; Exh. A ¶¶4, 6-7, 9-13.

**B.    Plaintiff M.M.**

Plaintiff M.M. is a citizen of Honduras who fled the country after severe persecution and

torture by her husband and father of her three eldest children, who had beaten her and the

children after having been released from prison. M.M. previously had fled to Mexico and her

husband found her there and threw her out a second-floor window. In 2014, DHS issued a

reinstatement order against her but, after she expressed a fear of return to Honduras, an asylum

officer determined her fear was reasonable. In withholding-only proceedings, in 2021, an IJ

granted M.M.'s withholding of removal application, blocking her deportation to Honduras.

Following the IJ's decision, M.M. reported to ICE in Dallas once a year.

This year, at her regularly scheduled check-in on February 21, ICE told M.M. to report

again on March 7, 2025, and placed an ankle shackle on her. On March 7, an ICE officer told

M.M. that she needed to leave the United States because she was on a list of people who would

be deported on March 21. The officer made a copy of her passport. M.M. was terrified. Then, on

March 17, an ICE officer telephoned M.M. and told her she needed to report in person on April

4, 2025, to the same ICE office that had put on the ankle shackle and where she was told that she

is on a list of people whom ICE is going to deport. On information and belief, ICE intends to re-

detain M.M. at the April 4, 2025 check-in pursuant to the February 18, 2025 directive. M.M. is

afraid that, if deported to a third country, they would send her back to Honduras, where her

husband will hurt or kill her. She also fears that her husband would find her in a third country

through his connections, like he previously found her in Mexico, or through his connections in

other countries, including El Salvador. She is afraid that her children would be in danger if she

cannot continue to protect them. *See* Dkt. 1 ¶¶11, 68-73; Exh. B ¶¶3-4, 6-13.

### C.    Plaintiff E.F.D.

E.F.D. is a citizen of Ecuador who fled the country after he was threatened and beaten by Ecuadorian police for refusing to transport drugs for them in his taxi. The police smashed his taxi's windshield and windows, robbed him, and promised to come back to "finish" him and his family. During his journey to the United States, E.F.D. was kidnapped and robbed in both Guatemala and Mexico. He arrived in the United States in 2015, demonstrated to an asylum officer that his fear was credible, and was placed in removal proceedings.

In 2018, an IJ granted E.F.D.'s application for CAT protection, preventing his deportation to Ecuador. Subsequently, ICE released E.F.D. from immigration custody and he has been regularly reporting to ICE in Burlington, Massachusetts in compliance with the terms of his release. On March 18, 2025, ICE arrested E.F.D. and his co-coworkers when agents were conducting a search for a different person. E.F.D. has been detained at the Plymouth County Correction Facility since. On information and belief, ICE re-detained E.F.D. pursuant to the February 18, 2025 directive with the intention of deporting to him to a third country. E.F.D. fears deportation to any third country without notice and a meaningful opportunity to apply for protection—especially with respect to countries that will deport him back to Ecuador where he won protection, and with respect to El Salvador, Colombia, or Peru, where he fears individuals in the drug trade will mark him, and to Mexico and Guatemala based on his past experiences of being robbed and kidnapped. *See* Dkt. 1 ¶¶12, 74-77; Exh. C ¶¶3-16.

### D.    Plaintiff O.C.G.

Plaintiff O.C.G. is a gay man from Guatemala who fled that country after facing multiple death threats on account of his sexuality. In March 2024, DHS denied him a credible fear

interview and deported him to Guatemala pursuant to 8 U.S.C. § 1225(b). Still unsafe, he again

fled Guatemala and entered Mexico in April 2024, where he was kidnapped and raped. O.C.G.

eventually made it to the United States in May 2024 and was issued a reinstatement order

pursuant to 8 U.S.C. § 1231(a)(5), but an asylum officer found he had a reasonable fear of

persecution in Guatemala. DHS placed him in withholding-only proceedings before an IJ. The IJ

granted his application for withholding of removal, preventing his deportation to Guatemala.

DHS waived appeal. About two days later, DHS removed O.G.C. from immigration detention

without explanation and deported him to Mexico. He was taken by bus to Nogales, Mexico and

then to Tabasco, Mexico. There, he was forced to choose between being shipped to another

detention facility in Mexico where he would wait for several months to apply for asylum and

where he also feared persecution or be deported from Mexico to Guatemala. On February 25,

2025, Mexican authorities deported Plaintiff O.C.G. to Guatemala. To date, Plaintiff O.C.G.

remains in hiding in Guatemala. *See* Dkt. 1 ¶¶13, 78-89; Exh. D ¶¶2-10.

## ARGUMENT

To obtain temporary and preliminary injunctive relief, Plaintiffs must demonstrate that

(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the

absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction

is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Brox v.*

*Hole*, 83 F.4th 87, 91 (1st Cir. 2023). Irreparable harm and likelihood of success are the factors

that "weigh heaviest in the analysis." *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622

F.3d 36, 41 (1st Cir. 2010). When the government is a party, the balance of equities and public

interest merge. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021); *Nken v. Holder*, 556 U.S. 418,

435 (2009). The standard for relief under 5 U.S.C. § 705 is the same as that required for a

temporary restraining order (TRO) or preliminary injunction (PI). *See, e.g.*, *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020); *Seafreeze Shoreside, Inc v. U.S. Dep't of Inter.*, No. 1:22-CV-11091-IT, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023); *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020). With respect to return of O.C.G. to the United States, "[w]hether a mandatory preliminary injunction should issue typically depends on the exigencies of the situation, taking into account [the] four familiar factors" under the *Winters* test. *W. Holding Co., Inc. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014).

I.    **Plaintiffs Satisfy the Requirements for a TRO and PI.**

    A.    **Plaintiffs are likely to succeed on the merits of their claims.**

Plaintiffs are likely to prevail on their challenge to Defendants' policy or practice of deporting, or seeking to deport, them to a *third* country—a country *never* designated or identified for removal by an IJ—without first providing them with notice or opportunity to contest removal on the basis that they have a fear of persecution, torture, or even death if deported to that third country, and their challenge to DHS' February 18, 2025 directive with respect to re-detention without cause. These policies already have led to unlawful deportations, have placed and are placing noncitizens at serious risk of persecution, torture, and/or death, and are depriving them of their liberty by subjecting them to re-detention that is not tied to a lawful removal process.

**First**, DHS's policy or practice of failing to afford meaningful notice and an opportunity to present a fear-based claim prior to removal to a third country violates INA, FARRA, the Due Process Clause, and the United States' treaty obligations. Indeed, the Office of the Solicitor General recognized these legal obligations when it informed the Supreme Court that DHS will not deport noncitizens with final orders who have already been granted protection by an IJ to a

third country until after the individual receives meaningful notice and the opportunity to assert a fear-based claim against removal to that third country. *See* Transcript of Oral Argument at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021); *see also* Dkt. 1 ¶43.

Critically, both 8 U.S.C. § 1231(b)(1) and (b)(2), which provide Defendants with authority to remove noncitizens to alternate or third countries, expressly prohibit removal of persons to countries where they face persecution or torture. Specifically, § 1231(b)(3)(A), entitled "Restriction on removal to a country where [noncitizen's] life or freedom would be threatened," mandates that "[n]otwithstanding paragraphs (1) and (2)," DHS may not remove noncitizens to any country if their "life or freedom would be threatened in that country . . . ."[2]

Similarly, FARRA, codified as Note to 8 U.S.C. § 1231, mandates that Defendants cannot remove Plaintiffs to a country where they are likely to be tortured. *See also* 8 C.F.R. § 1208.16(c); 8 C.F.R. § 1208.17(a); 28 C.F.R. § 200.1. Like statutory withholding, CAT withholding and deferral of removal are mandatory. *See* 8 C.F.R. §§ 1208.16(c) (withholding under CAT), 1208.17(a) (deferral of removal under CAT). The regulations provide that DHS can deport persons granted CAT deferral to a third country "at any time" provided it is a "country *where he or she is not likely to be tortured*." 8 C.F.R. § 1208.17(b)(2) (emphasis added).

Notably, CAT protection may be terminated based on evidence that the person will no longer face torture, but only if DHS moves for a new hearing with evidence "relevant to the possibility that the [noncitizen] would be tortured in the country to which removal has been

---

[2]    In *Jama v. ICE*, the Supreme Court addressed the designation procedure under 8 U.S.C. § 1231(b)(2). 543 U.S. 335, 338-41 (2005). Critically, the Court stated that noncitizens who "face persecution or other mistreatment in the country designated under § 1231(b)(2), . . . have a number of available remedies: asylum, § 1158(b)(1); withholding of removal, § 1231(b)(3)(A); relief under an international agreement prohibiting torture, *see* 8 C.F.R. §§ 208.16(c)(4), 208.17(a) . . . ." *Id.* at 348.

deferred and that was not presented at the previous hearing." 8 C.F.R. § 1208.17(d)(1). If a new hearing is granted, the IJ must provide notice "of the time, place, and date of the termination hearing," and must inform the noncitizen of the right to "supplement the information in his or her initial [CAT] application . . . within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail)." 8 C.F.R. § 1208.17(d)(2). Thus, the noncitizen receives both notice and an opportunity to document their protection claim.

Contrary to the statute and the regulations, Defendants fail to afford any protections with respect to those granted either withholding under 8 U.S.C. § 1231(b) or CAT subject to third country removal. This is true even though, pursuant to § 1231(b)(3)(A), courts have held repeatedly that individuals cannot be removed to a country that was not properly designated by an IJ if they have a fear of persecution or torture. *See Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999); *Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998); *El Himri v. Ashcroft*, 378 F.3d 932, 938-39 (9th Cir. 2004); *cf. Protsenko v. U.S. Att'y Gen.*, 149 F. App'x 947, 953 (11th Cir. 2005). Providing such notice and opportunity to present a fear-based claim prior to deportation also implements the United States' obligations under international law. *See* Dkt. 1 ¶39 (citing United Nations documents, *INS v. Stevic*, 467 U.S. 407, 421 (1984), and FARRA).

These protections are also fundamental under the Fifth Amendment. *See Andriasian*, 180 F.3d at 1041; *Protsenko*, 149 F. App'x at 953; *Kossov*, 132 F.3d at 408; *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1010 (W.D. Wash. 2019). Similarly, a "last minute" IJ designation during removal proceedings that affords no meaningful opportunity to apply for protection "violate[s] a basic tenet of constitutional due process." *Andriasian*, 180 F.3d at 1041.

Concerningly, DHS knows how to provide notice and an opportunity to present a fear-based claim but fails to do so. Not only did it do so in the CAT regulations discussed above, but

DHS and its predecessor agency have gone so far as to draft forms providing these protections and then elected not to publish them. *See* Dkt. 1 ¶41 (addressing 2001 draft Form I-913 and 2020 model notice); *see also* Dkt.1-2; Dkt. 1-3.[3] But Defendants have failed to implement a mechanism to ensure that removal proceedings are reopened to allow DHS to designate a new country of removal and allow an IJ to adjudicate any fear-based claim.[4]

As a matter of policy or practice, DHS violates this statutory, regulatory, and due process framework by depriving Plaintiffs of any notice or opportunity to present a fear-based claim prior to deportation to a third country. DHS has no written policy to provide or guarantee provision of either of these protections. Dkt. 1 ¶49 (discussing FOIA litigation), ¶50 (discussing admissions in *Ibarra-Perez v. United States*, No. 2:22-cv-01100-DWL-CDB (D. Ariz. filed Jun. 29, 2022)). This is true despite DHS's nondiscretionary duty to provide these protections.[5]

**Second,** Plaintiffs are likely to prevail on their claim that the February 18, 2025 directive

---

[3]     The draft forms fell short of providing meaningful protections because they placed the burden on noncitizens to file a motion to reopen without ensuring a viable opportunity to do so, especially given that many noncitizens are unrepresented and detained when these situations arise and do not have capacity to do so. Notice is only meaningful if it is presented sufficiently in advance to stop deportation, is in a language the person understands, and stays removal for a sufficient time to permit the filing of the motion. *Andriasian*, 180 F.3d at 1041; *Aden*, 409 F. Supp. 3d at 1009 ("A noncitizen must be given sufficient notice of a country of deportation [such] that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation."); *id.* at 1010 (holding that merely giving petitioner an opportunity to file a discretionary motion to reopen "is not an adequate substitute for the process that is due in these circumstances").

[4]     DHS and Justice Department regulations promulgated to implement § 1231(b) do not afford these protections; they *assume* noncitizens "will have the opportunity to apply for protection as appropriate from any of the countries that are identified as potential countries of removal under [§ 1231(b)(1) or (b)(2)]" and state *only* that where DHS seeks to deport a person to a nondesignated country, DHS would *join* motions to reopen "[i]n appropriate circumstances," which DHS does not define. *See* Dkt. 1 ¶42 (quoting 70 Fed. Reg. 661, 671 (Jan. 5, 2005)).

[5]     DHS has, in a small number of cases over the years, moved to reopen removal proceedings to designate a new country of removal and allow a noncitizen to pursue a fear-based claim, further demonstrating that Defendants are aware of what should be done to provide a meaningful opportunity to seek protection prior to removal to a third country. Dkt. 1 ¶51.

is unlawful and must be set aside. Because Defendants have no mechanism to ensure meaningful notice and an opportunity to present a fear-based claim prior to removal to a third country, re-detention under the directive is not tied to a lawful removal process. "[T]he Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). It extends to noncitizens who have been ordered removed from the United States and who face continuing detention or, in this case, re-detention. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Court's ruling in *Zadvydas* is rooted in the due process requirement that there be "adequate procedural protections" to ensure that the government's asserted justification for a noncitizen's physical confinement "outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id*. (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)). Here, the asserted justification for a noncitizen's physical confinement is unlawful. The February 18, 2025 directive instructs review for re-detentions for third country deportations but does not provide meaningful notice and opportunity to apply for protection. Thus, noncitizens are not being detained pursuant to a lawful removal process—they have no procedural protections, let alone "adequate procedural protections."

    **B.**    **Plaintiffs have suffered and will continue to suffer irreparable harm absent emergency injunctive relief.**

Defendants' failure to provide meaningful notice and opportunity to present a fear-based claim before deportation to a third country and its February 18, 2025 directive have caused, and are causing, irreparable harm. For example, after Plaintiff O.C.G. won protection from deportation to Guatemala, DHS deported him and approximately 20 other men to Mexico with no notice and no opportunity to present his claim that he feared persecution there and, indeed, had already been kidnapped and raped by individuals in Mexico. Exh. D ¶¶3, 10. In Mexico,

14

O.C.G. was given the Hobson's choice of waiting months in detention to apply for asylum in Mexico, where he had been persecuted and feared future persecution, or deportation to Guatemala, where an IJ had found he it was more likely than not that he would be persecuted. *Id.* He currently remains in hiding in Guatemala. *Id.* ¶1. Similarly, a Venezuelan man was deported to Mexico, a country not designated for removal and where he fears persecution, where he remains in hiding without access to his own identity documents. Exh. H ¶¶10-13.[6]

Other proposed class members face imminent deportation to similar harm without meaningful notice or opportunity to present a fear-based claim. Plaintiff M.M. fears deportation to Mexico, because her husband, whose abuse formed the basis of her grant of withholding, has previously located her and attacked her in that country. Exh. B ¶13. Plaintiff D.V.D., who has experienced years of homelessness when his mental health conditions were untreated, fears deportation to countries where those conditions will form the basis for persecution. Exh. A ¶13.[7] Others fear that they will be deported to countries that will deport them to the country from which they obtained protection, like Plaintiff O.C.G.[8] Some, again like Plaintiff O.C.G., already have experienced harm in third countries to which they may be deported.[9]

Moreover, Defendants' policy or practice harms class members by interfering with their right to seek protection and, for those with attorneys, to consult with counsel. For example, ICE officers repeatedly ignored outreach from an attorney representing a woman found incompetent to represent herself in immigration proceedings. Exh. M ¶¶4, 8-16. In another case, ICE delayed

---

[6]    *See also* Exh. L ¶¶ 8-9 (Venezuelan unlawfully deported to Mexico without money, phone, or notice); Exh V ¶¶6-7 (Venezuelan unlawfully deported to El Salvador without notice).
[7]    *See also* Exh. C ¶16; Exh. I ¶11; Exh. K ¶11; Exh. M ¶16; Exh. N ¶¶4-5; Exh. Q ¶8; Exh. S ¶¶7-8, 13, 17; Exh. T ¶18; Exh. W ¶3.
[8]    *See, e.g.*, Exh. B ¶13; Exh. C ¶16; Exh. I ¶11; Exh. J ¶7; Exh. K ¶11; Exh. M ¶16; Exh. N ¶¶4-5; Exh. T ¶18; Exh. W ¶3.
[9]    *See, e.g.*, Exh. C ¶16; Exh. H ¶13; Exh. I ¶11; Exh. T ¶7.

informing an attorney representing a client with intellectual disabilities about potential third country deportation and refused to provide her with copies of documents served on the client. Exh. I ¶¶8-10. Defendants repeatedly have declined to provide crucial information to class members facing third country deportation.[10] Attorneys may only learn where their clients may be deported, if at all, after taking emergency measures, which still do not provide them with adequate procedural protections. *See, e.g.*, Exh. Q ¶5 (habeas petition); Exh. T ¶¶10-16 (IJ issued emergency stay).

Class members and their families are experiencing anxiety and trauma. One attorney has two clients experiencing exacerbated Post-Traumatic Stress Disorder symptoms because of re-detention and potential deportation to a third country. Exh. W ¶4. Another class member began screaming upon learning that he was on a bus to be deported to Mexico, where he fears targeting by gangs and refoulement to his country of origin. Exh. K ¶¶11, 13. The stress is made acute where individuals are detained and/or aware of similar third country deportations. As Plaintiff E.F.D. explained, "I fear ICE is going to deport me to another country, including El Salvador or Mexico, because I know from my lawyer that ICE deported hundreds of people to those countries and also to Panama and Guantanamo." Exh. C ¶16. He has been detained since March 18 and is at imminent risk of deportation to a third country.

---

[10]     *See, e.g.*, Exh. A ¶¶11-12 (explaining that ICE did not provide Plaintiff D.V.D. or counsel a specific explanation for why he is required to attend a second check-in); Exh. B ¶12 ("The ICE officer did not explain anything else about why I needed to go back to the ICE office."); Exh. C ¶16 ("ICE will not tell me or my lawyer why I am detained."); Exh. J ¶7 (explaining that client "remains detained, unaware of whether ICE intends to remove him to an alternative country and, if so, which country that is"); Exh. K ¶9 (describing ICE officer refusing communication with attorney of client facing third country deportation); Exh. P ¶5 (describing ICE refusal to authorize telephone communication with client facing third-country deportation); Exh. W ¶3 ("I was informed that DHS would attempt a third country removal, most likely to Mexico, but they refused to provide me with further details.").

**C.      The Balance of Hardships and Public Interest Weigh Heavily in Plaintiffs'
Favor.**

The final two factors for a PI—the balance of hardships and public interest—"merge

when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, Plaintiffs face

weighty hardships: deprivation of statutory rights to protection, removal to a country where they

may face persecution, torture or even death, and re-detention with no lawful purpose. *See supra*

Argument §§ I.A-B. Re-detention is also traumatic for individuals and their families; it causes

people who are work-authorized by virtue of the protection granted to lose their jobs; it

frequently results in loss of property; and it separates families.

Defendants, by contrast, face minimal hardship: the administrative costs associated with

providing notice and an opportunity to contest deportation to a third country based on fear and,

only in cases where removal is contested, the need to litigate those cases. Defendants can

minimize the latter hardship by not pursuing third country deportations where it is clear from

existing records that the individual reported harm or where chain refoulement is possible. There

is a financial benefit to *not* re-detaining individuals, including those who have been regularly

reporting to ICE for years, where the purpose of that re-detention is unlawful because no

meaningful notice and opportunity to contest a third country deportation exists. "[T]he balance of

hardships tips decidedly in plaintiffs' favor" when "[f]aced with such a conflict between

financial concerns and preventable human suffering." *Hernandez v. Sessions*, 872 F.3d 976, 996

(9th Cir. 2017) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)). What is more,

Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice . . . ."

*Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The public interest is served by the

faithful execution of the immigration laws, and that interest includes respect for protections

Congress has enacted and to which the United States has committed itself by treaty.

*Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) (recognizing "the public interest in having the immigration laws applied correctly and evenhandedly"); *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (noting "the public's interest in ensuring that we do not deliver [noncitizens] into the hands of their persecutors").

## II.    Plaintiffs Have Demonstrated Eligibility for Provisional Class Certification for Purposes of Preliminary Injunctive Relief.

Plaintiffs seek a TRO and preliminary injunctive relief for themselves and for putative class members consisting of:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

Courts have noted that temporary injunctive relief cannot be granted to a class before an order has been entered determining that class treatment is proper. *Nat'l Ctr. for Immigrants Rights v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984); *Davis v. Romney*, 490 F.2d 1360, 1366 (3d Cir. 1974); *Berger v. Heckler*, 771 F.2d 1556, 1567 (2d Cir. 1985); *Tape Head Co. v. R C A Corp.*, 452 F.2d 816, 819 (10th Cir. 1971); *but see Westenfelder v. Ferguson*, 998 F. Supp. 146, 159 (D.R.I. 1998) (issuing preliminary relief without provisional class certification).

Thus, Plaintiffs request provisional class certification to allow the Court to provide the preliminary injunctive relief required to protect the status quo and to prevent irreparable harm to class members as well as named plaintiffs. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 328 (D.D.C. 2018) ("To achieve meaningful relief with respect to DHS's allegedly unlawful actions, Plaintiffs sensibly ask this Court to provisionally certify a class."); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1015 (9th Cir. 2020) (affirming order granting PI to provisionally certified class);

*Gomes v. DHS, Acting Sec'y*, 460 F. Supp. 3d 132, 136 n.3 (D.N.H. 2020) (noting court "provisionally certified the class for the limited purpose of holding expedited bail hearings").

The concurrently filed motion for class certification, along with the declarations and evidence filed in support of Plaintiffs' motions, demonstrates that Plaintiffs have satisfied Rules 23(a) and (23)(b). *See* Memorandum of Law in Support of Plaintiffs' Motion for Class Certification; Exhs. A-X. Moreover, provisional class certification analysis "is tempered . . . by the understanding that such certifications 'may be altered or amended before the decision on the merits.'" *Damus*, 313 F. Supp. 3d at 329 (quoting *Bame v. Dillard*, No. 05-1833, 2008 WL 2168393, at *5 (D.D.C. May 22, 2008)).

## III.  Section 1252(f) Does Not Preclude Individual Injunctive Relief for Named Plaintiffs Nor Classwide Injunctive Relief for CAT Protection.

Section 1252(f)(1) of Title 8 does not preclude the preliminary injunctive relief requested on behalf of a provisionally certified class. That provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the . . . statutory provisions [specified in that law]." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). But the relief Plaintiffs seek for the provisionally certified class is directed to statutory protections outside § 1252(f)(1)'s scope. *See Galvez v. Jaddou,* 52 F.4th 821, 830 (9th Cir. 2022) (clarifying that § 1252(f)(1) applies only to "the provisions of chapter 4 of title II [of the INA], as amended by" the Illegal Immigration Reform and Immigrant Responsibility Act of 1996).

Specifically, Plaintiffs seek an order enjoining Defendants from deporting class members to a third country without first providing meaningful notice and opportunity to seek CAT protection before an IJ. Because CAT protection, as enacted by FARRA and its implementing regulations, are not covered by § 1252(f)(1), the statute does not bar the relief requested. While

Plaintiffs also seek declaratory relief with respect to the right to apply for withholding under § 1231(b)(3), that provision is not the subject of Plaintiffs' motion for injunctive relief, other than for individual named Plaintiffs. With respect to the named Plaintiffs, § 1252(f)(1) does not bar individual relief as it expressly states that the prohibition applies "other than with respect to the application of such provisions to an individual [noncitizen] against whom proceedings under such part have been initiated." Thus, they seek the same relief *and* the opportunity to seek protection under § 1231(b)(3), as well as, for Plaintiff O.C.G., his immediate return.

Hence it is clear § 1252(f)(1) does not restrict this Court's authority to enjoin Defendants from violating Plaintiffs' and proposed class members' statutory rights under CAT, nor its authority to enjoin the ongoing violation of withholding protection granted under § 1251(b)(3) with respect to individual named Plaintiffs, and to order Plaintiff O.C.G.'s immediate return.

## CONCLUSION

Accordingly, as outlined in the accompanying proposed order, Plaintiffs request that the Court grant temporary injunctive relief to the named Plaintiffs, enjoining Defendants from effecting the removal of Plaintiffs D.V.D., M.M., and E.F.D without first providing written notice and an opportunity to apply for statutory withholding and CAT protection before an IJ, and ordering Defendants to immediately facilitate Plaintiff O.C.G.'s return to the United States.

Further, pursuant to the concurrently filed motion for class certification, Plaintiffs request that the court provisionally certify the proposed class and grant emergency preliminary relief enjoining Defendants from removing provisionally certified class members to a third country without first providing them and their counsel, if any, with written notice and an opportunity to apply for CAT protection before an IJ. Finally, Plaintiffs ask that this Court issue a temporary stay of the February 18, 2025 directive pursuant to 5 U.S.C. § 705.

20

Respectfully submitted,

s/*Tomás Arango*

---

Tomas Arango
Trina Realmuto*
Kristin Macleod-Ball*
Mary Kenney*
**NATIONAL IMMIGRATION
   LITIGATION ALLIANCE**
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4447
trina@immigrationlitigation.org

Anwen Hughes*
**HUMAN RIGHTS FIRST**
75 Broad Street, 31st Floor
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

Matt Adams*
Leila Kang*
Aaron Korthuis*
Glenda M. Aldana Madrid*
**NORTHWEST IMMIGRANT
   RIGHTS PROJECT**
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org

*Attorneys for Plaintiffs*

\* *Application for admission pro hac vice forthcoming*

Dated: March 23, 2025