## DECLARATION OF DANIELLE STRANDBURG-PESHKIN

I, Danielle Standburg-Peshkin, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a practicing attorney licensed to practice before the State of New York, Second Judicial Department since September of 2019. I have been employed by the Newark, New Jersey-based Immigrant Rights Program of the American Friends Service Committee (AFSC) since March of 2019 – initially as a law graduate and then as a staff attorney. My business address is 570 Broad Street, Suite 1001, Newark, New Jersey 07102. I am over the age of 18 and am competent to testify regarding the matters detailed below.

2.     Since September of 2019, I have practiced exclusively immigration law. Over the past six years I have thus provided *pro bono* legal counsel and/or representation to hundreds of noncitizens in a range of immigration matters, including in removal proceedings before the Executive Office for Immigration Review (EOIR), in petitions before the federal circuit courts, in advocacy and coordination with U.S. Immigration and Customs Enforcement (ICE) in regards to custody and detention status, and in applications and petitions for immigration benefits, relief, or protection with U.S. Citizenship and Immigration Services (USCIS).

3.     During the past years I have provided representation or legal counsel to over fifty detained non-citizens with final orders of removal. Over forty of these individuals with final orders raised fear-based claims for relief or protection from removal.

**Y-M-R-**

4.     My client Y-M-R- is Venezuelan. In 2023, he fled Venezuela because of fear of harm on account of his actual and imputed political opinion opposing the current national government, and because of direct threats made against him by an officer in the Venezuelan military. En route to the United States, Y-M-R- traveled through Mexico, arriving in about October of 2023. Pursuant to United States policy at that time, Y-M-R- waited near the US-Mexico border for over a month, at the outset of which time he registered for an appointment via the "CBP One" phone application but did not receive an appointment. While in Mexico, YMR was aware of frequent kidnappings of other Venezuelans and migrants by border-area Mexican criminal organizations and also of the complicity of Mexican authorities in this violence. In addition, YMR had no manner to retain shelter or support himself as he had no legal status in Mexico or manner to seek lawful employment. Y-M-R- thus crossed the US-Mexico border without admission on or about November 14, 2023. He was apprehended by immigration officers shortly after entering the United States and seeking to present himself.

5. While detained in Laredo, Texas, Y-M-R- requested and was given a fear interview. At the time of the interview, the law restricted asylum relief for individuals who crossed the U.S.-Mexico border and did not meet a limited set of exceptions, one of which was if they faced an extreme and imminent threat to their life and safety in Mexico. During his interview with the asylum officer while detained in Texas in November of 2023, Y-M-R- was asked questions

<div style="text-align: right; color: red;">**EXHIBIT O**</div>

about his experiences in Mexico, but he was never given a full fear interview with respect to his fear of persecution and/or torture in Mexico.

6. Shortly after the interview, Y-M-R- was informed that he had not made a threshold fear showing. He was not given a copy of the officer's determination. As required, he was given the opportunity to request review by an Immigration Judge. At the review, on November 27, 2023, the Immigration Judge, sitting in Laredo, Texas, issued a decision affirming the asylum officer's negative fear finding and affirming YMR's order of removal to Venezuela.

7. Following the decision, Y-M-R- was transferred to several additional ICE facilities over the course of the next nearly five months. In or around the first week of April of 2024, Y-M-R- was one of several Venezuelans in comparable procedural posture transferred to the Elizabeth Contract Detention Facility ("ECDF") located in Elizabeth, New Jersey.

8. I engaged in an initial interview and legal consultation with Y-M-R- shortly after his arrival at ECDF, on April 11, 2025. I then agreed to represent Y-M-R- in advocacy to ICE regarding his custody status and to request that the Department consider the regulatory violations in his fear process as basis for the issuance of a Notice to Appear in removal proceedings, as an exercise of discretion. At the time, and since February of 2024, Venezuela had not accepted deportation flights from the United States.

9. Within an email sent to ICE Enforcement and Removal Operations Supervising Deportation Officer Ian Patel on April 14, 2024, I stated that "[a]s in the cases of numerous other Venezuelans in comparable procedural posture, the credible fear process which Y-M-R- was given towards the outset of his detention was rife with regulatory and legal violations. *That said, he fears return to Mexico*, and his deportation to Venezuela is far from imminent where that country has not accepted US deportations for over two months at this time" (emphasis added).

10. While ICE did not respond substantively to the request for discretionary intervention in regards to Y-M-R-'s procedural posture, because of the agency's inability to deport Y-M-R- to Venezuela, he was released from ICE custody just over a month later, on or around May 18, 2024, on an Order of Supervision (OSUP).

11. To my knowledge, in the nine-month period following Y-M-R-'s release he complied with the terms and conditions in the OSUP, including reporting requirements. On about February 26, 2025, I learned from Y-M-R-'s sister that Y-M-R- had been re-detained at a routine ICE check in appointment and had since been deported to Mexico.

12. On February 27, 2025, I communicated directly with Y-M-R- who confirmed that he had been deported to Mexico. He said that he was taken with a group of about 50 other detainees who were citizens of a range of countries in Central and South America, including El Salvador, Honduras, Colombia, and Venezuela. He said they were first transferred to Arizona and then, from Arizona, they were put into three buses and driven to the US-Mexico border. He said that they were given no documents and were not notified of the Department's intention to deport them all to Mexico until the buses had reached the US-Mexico border. They were then driven to Villahermosa, Mexico, where they were told to disembark the buses and were left without any

identification or other forms of documentation. Y-M-R- had entered the United States with his Venezuelan identity card and had had that identification confiscated by ICE upon his 2023 apprehension. The card was not returned to him upon his deportation.

13. As noted, ICE provided Y-M-R- with no notice that he was to be deported to Mexico. Had Y-M-R- been provided notice, he would have re-asserted his fear of deportation to that country – a fear he had already expressed in his interview with an asylum officer in November of 2023, to an Immigration Judge in that same month and year, and to an ICE officer via counsel in email correspondence prior to his release on OSUP, in April of 2024.

14. Because Y-M-R- was left in Mexico without identity documents – a situation he stated was shared by many of the other third country nationals transported with him – he found himself in a situation where he felt endangered by criminal organizations in Villahermosa and was unable to travel to Mexico City to seek identity documents that might assist him in travelling to any other location or otherwise beginning to seek shelter and safety or rebuild any type of life.

*C-V-*

15. C-V-, a former client, is also from Venezuela and was also recently removed to Mexico without notice. CV and his family fled Venezuela after being threatened and assaulted by Venezuelan intelligence officials both for their actual and imputed anti-government political opinion and for his wife's work with a United States-based nongovernmental organization.

16. *En route* to the United States, CV traveled through Mexico on a bus which was stopped by armed men who demanded payment of $500 from the passengers and, for those who could not pay, held the individuals, including CV, against their will alongside the bus for approximately 8 hours before eventually releasing them. In light of this experience and having witnessed others kidnapped, CV did not wait to obtain an appointment but crossed the US-Mexico border on or about September 20, 2023.

17. After entering the United States, CV presented himself to US immigration authorities in the South. He was transferred to ECDF on or about October 2, 2023. On or about October 18, 2023, CV was interviewed telephonically by a USCIS asylum officer regarding his fear of persecution and/or torture in Venezuela.

18. Under the heightened standard of review in effect at that time, like Y-M-R-, CV was not successful in proving to the asylum officer that he had a credible fear of persecution in Venezuela. On October 31, 2023, an immigration judge in Elizabeth, New Jersey affirmed the asylum officer's decision. Because ICE was not able to deport CV to Venezuela at the time, he remained detained for the next five months. During this time, he was transferred to Florida and then back to New Jersey. Prior to his release, in about March or April of 2024, ICE officials presented CV with what they communicated was a document, in English, declaring that CV did *not* have a fear of removal to Mexico. CV refused to sign this document.

19. In light of the inability to remove CV, in April of 2024 CV was released on an order of supervision, with an address and plan for supervision by ISAP in Miami, Florida.

20. For the entirety of his time on OSUP, CV was entirely compliant, including by participating in in-person ISAP appointments approximately once every three weeks in addition to approximately weekly photographic and/or telephonic check-ins.

21. During this time, CV's family, who were in Colombia, completed processing for refugee resettlement in the United States, which they were granted in January of 2025. Accordingly, CV informed the ICE agents supervising his release of his intended move to New Jersey to reunify with his family, who would be arriving there. In or around early January of 2025 CV received ICE permission to move and traveled to New Jersey on January 26, 2025.

22. CV's wife and children arrived in New Jersey on or about January 17, 2025. After just two days of reunification with his wife and two minor children, CV attended his scheduled post-move appointment with the ICE-ERO field office in Newark on or about January 28, 2025. He was accompanied by his 10-year-old daughter and was given no advance notice of the possibility of re-detention. CV was detained directly from this appointment – a family friend had to be called to collect his daughter from the waiting area of the ICE-ERO floor of the Newark Federal Building.

23. Upon re-detention, CV was held in Elizabeth, New Jersey, for two days, after which he was transferred to Virginia, where he was held for 19 days, to Louisiana, where he was held for about one day, and then to Port Isabel, Texas, where he was held until February 22, 2025.

24. On or about February 23, 2025, CV recalled that officers entered the dorm in Port Isabel in the early morning hours and yelled for him and others to get up and told them they'd be moving. CV asked where he would be going and did not get a response. Officers restrained CV and the other detainees also transported with him and put them into buses.

25. In the buses, CV recalls that there were people of nationalities including Honduran, Nicaraguan, Venezuelan, Haitian, and Salvadoran. He recalls that the passengers asked questions as to where they were being taken and were not given answers until they arrived to the bridge leading to Reynosa. He recalls that people on the buses saw what was happening and started to shout that they didn't want to be sent to Mexico, that they are not Mexican, and that they were afraid. He recalls that there were women and children on the buses, as well as people in poor medical condition. Of the Venezuelans with CV, one stated that he had United States work authorization and a social security number. Another woman said she had a United States citizen 1-year-old.

26. Had officers told CV he was to be deported to Mexico with sufficient notice to allow him to request a fear interview, CV would have done so. CV's wife had reached out to numerous advocates and had retained separate *pro bono* counsel for him and for the family by the time of CV's removal, but due to the lack of notice of the planned removal to Mexico, neither CV's counsel, nor my organization, nor his family or other advocates were able to intervene.

27. CV states that he and 84 other third country nationals removed on United States buses were left in Villahermosa, Tobasco, Mexico. CV's Venezuelan identity card was returned to him, but he, as well as the 83 others, were not left with any money or manner to sustain them. He recalls

that they were shown a paper stating that they could not re-enter the United States for a period of time, but the paper was then taken from them.

28. CV states that the area where they were left – and the manner in which they arrived – placed the third country nationals, including CV, at extreme risk of violence by Mexican criminal organizations who targeted the group in the days thereafter. Among those targeted were two young Venezuelan men, one of whom had been in CV's dorm with him in Port Isabel. The men were kidnapped by a Mexican criminal organization.

***L-R-M-***

29. I provided a limited *pro bono* consultation to a third Venezuelan man, L-R-M-, on or about February 25, 2025, during which time L-R-M-, previously a New Jersey resident, had been transferred to the South Texas ICE Detention Facility.

30. Like Y-R-M- and C-V-, L-R-M- was detained by ICE in Newark when he appeared for a check-in appointment, despite his full compliance with the terms of his supervised release for nearly the entire year prior. By the time I spoke with L-R-M- I had already become aware of the possibility of third-country deportation, and was informed by L-R-M- of his fear of the possibility of being deported to Mexico. In light of this, and because I was not representing L-R-M-, I advised that he write to ICE to expressly state his fear of removal to Mexico and any other potential country of removal about which he had fear.

31. On about February 28, 2025, I communicated with L-R-M-'s relative in Trenton, New Jersey, who stated that, in response to attempts by L-R-M- and another Venezuelan detainee to contest their potential removal to Mexico and expressly state fear, they had been told by an official that if they did not consent to removal to Mexico, they would be sent to Guantanamo.

32. I have not spoken with L-R-M- since that time but my understanding from communication with his relative is that--in light of this threatened punishment, which he understood to indicate potential indefinite detention – and in light of pressing health concerns, he consequently withdrew his fear claim in regards to Mexico.

33. I last checked the ICE detainee locator for L-R-M-'s status on March 17, 2025, at which time he had been transferred to the federal detention facility in Lasalle, Louisiana.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 19th day of March, 2025, in Brooklyn, New York.

_____
Danielle Standburg-Peshkin