# DECLARATION OF PATRICK TAUREL

I, Patrick Taurel, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of New York and the District of Columbia. I am also admitted to practice before numerous federal courts, including the U.S. Courts of Appeals for the Fourth, Ninth, and Tenth Circuits, and several U.S. district courts. My business address is 4922 Fairmont Ave., Suite 200, Bethesda, MD 20814. I have been employed as a Partner at Grossman Young & Hammond, LLC since April 2022. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have been practicing exclusively immigration law for approximately fifteen years. My practice focuses on the immigration consequences of criminal convictions, immigration-related federal court litigation, and removal defense. I have represented approximately 100 noncitizens in proceedings before the Executive Office for Immigration Review ("EOIR"). I also help noncitizens apply for affirmative benefits before U.S. Citizenship and Immigration Services and U.S. consulates abroad.

3. I represent numerous individuals subject to final orders of removal. Most of these individuals were issued removal orders following proceedings conducted under 8 U.S.C. § 1229a. Some of my clients, however, are subject to final orders of removal issued pursuant to 8 U.S.C. §§ 1231(a)(5) and 1228(b).

4. I am concerned that numerous individuals I represent with upcoming check-ins with U.S. Immigration and Customs Enforcement ("ICE") who have been granted deferral or withholding of removal under the Convention Against Torture ("CAT") or withholding of removal under 8 U.S.C. § 1231(b)(3) will be summarily removed to third countries where they could well face persecution or torture. I discuss three of these cases below.

**Andres Barajas (a pseudonym) ("Mr. Barajas")**

5. Mr. Barajas is a native and citizen of Mexico who was granted withholding of removal under the CAT by an immigration judge ("IJ") following removal proceedings conducted under 8 U.S.C. § 1229a held at the Otay Mesa Immigration Courft.[1] He has no criminal history. He is married to a U.S. citizen. The IJ denied Mr. Barajas's applications for asylum and for statutory withholding of removal not because he was criminally barred from asylum or did not merit asylum in the exercise of discretion or anything of that sort, but because he did not establish that he was persecuted or feared persecution "on account of" a protected ground.

---

[1] His order of removal designates Mexico as the country of removal. No alternative countries of removal appear in the IJ's decision.

1

6.  Mr. Barajas's CAT claim stemmed from an altercation that occurred a decade ago in Mexico involving Mr. Barajas and the son of a wealthy and influential man. The man's father proceeded to use his power and influence to manipulate Mexico's judicial system into an apparatus to punish Mr. Barajas for the altercation. He hired a notorious lawyer with connections to drug cartels who is known for fabricating criminal charges against defendants and using dangerous tactics such as murder, kidnappings, and torture to win his cases. Ultimately, the IJ granted Mr. Barajas's application for withholding of removal under the CAT because he concluded that Mexican authorities were certain to detain Mr. Barajas upon return to Mexico in a prison where corrupt guards would look the other way as paid-off henchmen inflicted brutal violence upon Mr. Barajas.

7.  The IJ's decision contains a remarkable passage. The decision describes how two agents of the notorious lawyer showed up during one of Mr. Barajas's hearings at the Otay Mesa Immigration Court pretending to be members of Mr. Barajas's family. It wasn't until a private hearing was requested and the two agents were singled out, that they were escorted out of the courthouse/detention facility, but then apparently waited in the parking lot for a member of Mr. Barajas's family to emerge from the facility where they proceeded to intimidate her. The following day, Mr. Barajas's family member discovered that her vehicle had a flat tire, which she replaced with a spare. While parked at the facility to visit Mr. Barajas, the spare tire was flattened. That same day, suspected agents of the notorious lawyer were spotted walking away from the home Mr. Barajas's family was renting.

8.  This case illustrates that Mr. Barajas's would-be persecutors are willing and able to cross borders to find and harm him. That they had the wherewithal to find out the date, time, and location of Mr. Barajas's removal hearing, and that they had the audacity to come to the United States to intimidate Mr. Barajas underscores how dangerous and capable these people are. If Mr. Barajas were to be removed to a third country, there is good reason to believe that such information would become known to his would-be persecutors, that his would-be persecutors would locate him there, and that once they tracked him down, they would do unspeakable things to him.

9.  Mr. Barajas was detained throughout the duration of his proceedings. Neither party appealed the IJ's decision. Mr. Barajas was released on an order of supervision following the IJ's grant of withholding of removal under the CAT. To the best of my knowledge, Mr. Barajas is in full compliance with his order of supervision.

**M.N.**

10. M.N. is a fifty-two-year-old Moroccan national who has resided in the United States since he was brought here as a child. In 2022, M.N. was granted deferral of removal under the CAT. His proceedings were conducted in the first instance by an IJ sitting at the now-closed York Immigration Court. The IJ denied relief to M.N. He appealed. The Board of Immigration Appeals sustained his appeal and remanded the case to the IJ (who, at this point, had been transferred to the Baltimore Immigration Court) to grant relief

upon completion of background checks. M.N.'s proceedings were conducted under 8 U.S.C. § 1229a.[2]

11. The Board of Immigration Appeals instructed the IJ to grant M.N. deferral of removal under the CAT on the basis of the following. The Board determined that M.N. satisfactorily established that Morocco is a police state in which it is impossible to avoid interacting with law enforcement. The Board further found that M.N. was likely to have an aggravated encounter with the authorities because he suffers from antisocial personality disorder, which prevents him from being able to control his behavior and from complying with authority, and because he will be subject to additional scrutiny by authorities as a deportee. Moreover, according to the Board, M.N. established that torture is used routinely by law enforcement in Morocco and that he would be tortured following a negative encounter with Moroccan authorities.

12. A forensic psychologist who conducted a risk assessment of M.N. and who formally diagnosed him with antisocial personality disorder determined that he was at high risk of recidivating in a place like Morocco, because he would have no support network, did not speak the language, would likely not be able to obtain identification, housing, or a job, and was unfamiliar with the customs. He has not recidivated in the United States, as the forensic psychologist predicted, because he enjoys family support, speaks the language, possesses identification, and is familiar with the customs.

13. If M.N. were to be removed to a third country, given his diagnosis and the myriad challenges he would face, it is highly foreseeable he would recidivate. If he were to recidivate, the evidence in his trial reflects that there is a high likelihood he would have particularly hostile interactions with abusive law enforcement officials.

14. M.N. was held in ICE custody the entire time his case was pending before the Executive Office for Immigration Review, including throughout the duration of his appeal and remand. He was released on an order of supervision following the IJ's decision granting him deferral of removal under the CAT. To the best of my knowledge, M.N. is in full compliance with his order of supervision.

**M.R.A.**

15. M.R.A. is a 25 year-old Salvadoran national who has resided in the United States since the age of three. He is married to a U.S. citizen and is the father of two U.S. citizen children. In 2024, he was granted statutory withholding of removal by an IJ sitting at the Elizabeth Immigration Court. Neither party appealed the IJ's decision.[3]

16. The IJ granted M.R.A. statutory withholding of removal because he determined it was more likely than not that if M.R.A. were returned to El Salvador, he would be subject to government-inflicted persecution on account of his suspected gang membership. Although M.R.A. is not in a gang, he has numerous tattoos that law enforcement officials

---

[2] M.N. was ordered removed to Morocco. No alternative country of removal is listed in the IJ's decision.
[3] M.R.A. was ordered removed to El Salvador. No alternative country of removal is listed in the IJ's decision.

could conclude are gang-related, and he acquired several controlled substance convictions.[4] An expert on contemporary Salvadoran human rights violations testified that in light of M.R.A.'s profile, if he were to be removed to El Salvador, he would highly likely be immediately remanded to a Salvadoran prison without trial where he would face a severe risk of harm and even death from prison guards and gang members.

17. As a young Salvadoran man with tattoos and a criminal history, if M.RA. were to be removed to any number of countries, particularly countries where gangs like MS-13 are prevalent, he would be at considerable risk of persecution or death, because he would likely be perceived as a would-be rival. Similarly, if he were removed to a country with a track record of operating with an iron fist when it comes to suspected gang members, he could well face government persecution.

18. M.R.A. was held in ICE custody for the entire duration of his removal proceedings before the IJ. Following the IJ's decision to grant him relief, M.R.A. was released from ICE custody on an order of supervision. To my knowledge, M.R.A. has been fully compliant with that order of supervision.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 20th day of March 2025 at Bethesda, MD

Patrick Taurel

---

[4] To my knowledge, M.R.A. has not recidivated since his release from ICE custody.