## DECLARATION OF AMBREEN WALJI

I, Ambreen Walji, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of New York. I have been employed as attorney and then Managing Attorney at an immigration non-profit since September 30, 2019. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since 2019, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts and with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS). In my current role, I also supervise and mentor volunteer attorneys representing noncitizens on a pro bono basis.

3. Among other types of cases, I represent individuals with final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and also those with final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders).

4. Before I represented him, Mr. BC had been in Section 240 removal proceedings at the immigration court within the Otay Mesa Detention Center in San Diego, California, the Otay Mesa Immigration Court. The Immigration Judge (IJ) designated his country of removal as Venezuela. No alternative countries were identified. Mr. BC's relief from removal was based on his fear of persecution in Venezuela on account of his anti-Venezuelan government political opinion. Mr. BC's asylum application testified to the fact that members of the Venezuelan National Guard and a paramilitary group kidnapped, tortured, and beat Mr. BC after he protested the Venezuelan government.

5. On January 22, 2025, the IJ granted Mr. BC withholding of removal. While the government reserved its right to appeal the withholding of Mr. BC's removal, it never filed a Notice of Appeal, and the appeal deadline has since expired. After his proceedings were complete, Mr. BC remained detained at the Otay Mesa Detention Center, where he had been detained for the duration of his removal proceedings.

6. On February 21, 2025, DHS notified Mr. BC that it intended to pursue removal to Mexico, a country not designated for removal. DHS officers told Mr. BC that if he did not sign documents consenting to be removed to Mexico, he would be transferred to an ICE facility in Guantanamo or El Salvador. Despite the threats, Mr. BC refused to sign and expressed a fear of persecution in Mexico.

7. Mr. BC fears for his life if he were to be deported to Mexico. Prior to entering the United States, Mr. BC testified that he spent some time in Mexico. He asserts that, while he was there, he was beaten, kidnapped, and suffered injuries. Mr. BC believes he runs a risk of death if removed to Mexico.

8. On March 6, 2025, I took on representation of Mr. BC. On March 7, 2025, Mr. BC was abruptly transferred to Webb County Detention Center, Laredo, Texas without notice to him.

9. On March 13, 2025, I requested DHS release Mr. BC from custody and provided a copy of the order granting him withholding of removal.

10. On this date, I also sent a declaration that Mr. BC feared persecution in Mexico to the ICE Harlingen office. In addition, I called the ICE Harlingen office and requested a return phone call, spoke to a clerk at this office requesting to speak to a supervisor and left a message with the Laredo Sub Field Office providing my information and explaining that Mr. BC feared removal to Mexico and also Venezuela, and that there was a final order withholding his removal to Venezuela. I received no return phone calls despite leaving messages beginning at 9 am PDT. That day, DHS officers informed Mr. BC to gather his belongings as he would be removed to Venezuela. I filed a Motion for an Emergency Stay of Removal and Motion to Reopen challenging his deportation to Venezuela or another country.

11. On March 14, at around 10 am CDT, Mr. BC was put on a bus with several other Venezuelans. He was told that he was being taken to the airport, 3 hours away. The bus was turned around within 15 minutes and Mr. BC, along with around 50 other ICE detainees returned to Webb County Detention Center. When he returned to the detention center, the tablets the detainees normally used to communicate with ICE had been removed from the dorms.

12. At around 4:55 pm PDT on March 14, the IJ issued an emergency stay of removal in Mr. BC's case. I then forwarded a copy of that order to the Harlingen Field office and several Assistant United States Attorneys. The IJ's clerk assured me that the order had been communicated to the Office of the Chief Counsel for DHS.

13. On Sunday March 16, 2025, at around 8 am CDT, Mr. BC was put on a plane. Mr. BC believed, and was told, he was going to Venezuela. However, based on news reports indicating El Salvador was accepting Venezuelan suspected Tren de Aragua members, he feared he would be deported to El Salvador, although he is not a member of Tren de Aragua.

14. After buckling his seatbelt, Mr. BC and four other Venezuelan individuals were called off the plane. Mr. BC's belongings remained on the plane. Mr. BC told me the

2

cellphone of an individual who was also pulled off the plane GPS confirms that the plane landed in El Salvador. This cellphone is being tracked by that individual's family. Mr. BC was then transported to El Valle Detention Center in Raymondville, Texas.

15. Mr. BC was provided with no advance notice of deportation to El Salvador.

16. Until March 20, 2025, Mr. BC had been provided with no advance notice of deportation to El Salvador, and it remained unclear if DHS intended to remove him to El Salvador. On March 20, 2025, an ICE officer came to Mr. BC's dorm area and asked if he was one of the five individuals who were taken off the flight to El Salvador on Sunday, March 16, 2025. The officer then told Mr. BC that if his attorney had not filed the motion for a stay of removal, he would have already been in El Salvador. He told Mr. BC that he would be deported to El Salvador, along with the others who had been taken off the plane. He did not give Mr. BC an opportunity to ask any questions and told Mr. BC that he had nothing to say to him, and that if his attorney had anything to say, they could contact him. Mr. BC wanted to ask for an email address, but the officer left before he had the opportunity. Mr. BC himself had no opportunity to articulate fear of persecution or torture he would face if he was removed to El Salvador.

17. After speaking with Mr. BC on March 20, 2025, I sent a letter articulating Mr. BC's fear of persecution in El Salvador to the ICE Harlingen office.

18. Although there is at present an order staying his removal, Mr. BC is extremely fearful he would be removed to El Salvador. He has stated to me that he is not a gang member and has no criminal history, but since his transfer to El Valle Detention Center, DHS has reclassified him as a high-level security risk, giving him a red uniform to wear while in custody. When he asked his deportation officer why, the officer said it was because DHS believed that he had gang affiliations, and because he was from Venezuela. Mr. BC told me that he'd rather die in his own country than in El Salvador. Additionally, Mr. BC is not aware of any other country that DHS might seek to deport him to, but he fears deportation to other countries that might imprison him or deport him back to Venezuela.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 20 day of March 2025 at San Diego, CA.

S:// Ambreen Walji

3