1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
2
                                        )
3    D.V.D.; M.M.; E.F.D.; and          )
     O.C.G.,                            )
4                                       )
             Plaintiffs,                )
5                                       )    Civil Action
     v.                                 )    No. 1:25-cv-10676-BEM
6                                       )    Pages 1 to 71
     U.S. Department of Homeland        )
7    Security; Kristi Noem,             )
     Secretary, in her official         )
8    capacity; Pamela Bondi, U.S.       )
     Attorney General, in her          )
9    official capacity; and            )
     Antone Moniz, Superintendent,)
10   Plymouth County Correctional      )
     Facility, in his official         )
11   capacity,                         )
                                        )
12           Defendants.                )
                                        )
13

14            BEFORE THE HONORABLE BRIAN E. MURPHY
                 UNITED STATES DISTRICT JUDGE
15
                        MOTION HEARING
16

17                      March 28, 2025
                        12:00 p.m.
18

19
              John J. Moakley United States Courthouse
20                   Courtroom No. 12
                     One Courthouse Way
21              Boston, Massachusetts 02210

22
              Jessica M. Leonard, CSR, FCRR
23                 Official Court Reporter
            John J. Moakley United States Courthouse
24                   One Courthouse Way
                Boston, Massachusetts 02210
25              JessicaMichaelLeonard@gmail.com

```
 1    APPEARANCES:

 2   On Behalf of the Plaintiffs:

 3        NATIONAL IMMIGRATION LITIGATION ALLIANCE
          By: Trina Realmuto
 4        10 Griggs Terrace
          Brookline, MA 02446
 5        617-819-4447
          trina@immigrationlitigation.org
 6
          NATIONAL IMMIGRATION LITIGATION ALLIANCE
 7        By: Kristin Macleod-Ball
          10 Griggs Terrace
 8        Brookline, MA 02446
          617-506-3646
 9        kristin@immigrationlitigation.org

10        NORTHWEST IMMIGRANT RIGHTS PROJECT
          By: Matt Adams
11        615 Second Avenue
          Suite 400
12        Seattle, WA 98104
          206-957-8611
13        Matt@nwirp.org

14        HUMAN RIGHTS FIRST
          By: Anwen Hughes
15        75 Broad Street
          31st Floor
16        New York, NY 10004
          212-845-5200
17        Hughesa@humanrightsfirst.org

18
     On Behalf of the Defendants:
19
          U.S. DEPARTMENT OF JUSTICE,
20        OFFICE OF IMMIGRATION LITIGATION
          By: Mary Larakers
21        PO Box 868
          Washington, DC 20044
22        202-353-4419
          mary.l.larakers@usdoj.gov
23
          U.S. DEPARTMENT OF JUSTICE,
24        OFFICE OF IMMIGRATION LITIGATION
          By: Mark Sauters
25        One Courthouse Way
          Ste 9200
```

1          Boston, MA 02169
           617-748-3347
2          Mark.sauter@usdoj.gov

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
                   Proceedings reported and produced
25                  by computer-aided stenography.

```
1                    P R O C E E D I N G S
2              THE CLERK:  Civil Action No. 1:25-cv-10676, *D.V.D. et*
3    *al. v. The U.S. Department of Homeland Security.*
4              If Counsel can please identify yourselves for the
5    record, starting with Plaintiff's counsel.
6              MS. REALMUTO:  Trina Realmuto from the National
7    Immigration Litigation Alliance along with Kristin Macleod-Ball
8    from the National Immigration Litigation Alliance, Matt Adams
9    from Northwest Immigrant Rights Project, and Anwen Hughes from
10   Human Rights First.
11             THE COURT:  Good afternoon.
12             MS. LARAKERS:  Mary Larakers on behalf of the United
13   States.
14             THE COURT:  Good afternoon.
15             So we're here on the temporary restraining order.
16   We're not going to be addressing the class certification today.
17   We'll schedule a date for that at the end of this.
18             I'm going to let you start, but I have a few
19   preliminary questions that I was hoping I could address to make
20   sure I'm on the right page in terms of what is and is not
21   agreed upon.
22             And so the first question I have is:  D.V.D. was
23   supposed to report today.  Do we know what happened?
24             MS. REALMUTO:  We do.  He reported for check-in and
25   has a next check-in in September.
```

1          THE COURT:  In September.  Okay.

2          So I want to make sure that I'm under the same

3     understanding that both of you are under.  And the first is

4     that the -- both of the named plaintiffs here and all potential

5     class members have an order of removal that specifies a certain

6     country.  Correct?

7          MS. REALMUTO:  Correct.

8          THE COURT:  And just one country.

9          MS. REALMUTO:  Correct.

10          THE COURT:  And do orders of removal often specify

11     more than one country?

12          MS. REALMUTO:  Orders of removal can specify an

13     alternative removal country.  They don't have to.  It's not so

14     common, and that's why in our pleadings, we refer to third

15     country deportations, because we account for the possibility of

16     an alternative country of removal for people who are in

17     Section 240 proceedings.

18          THE COURT:  And am I correct in understanding that you

19     are not contesting the validity of the orders of removal at

20     all?

21          MS. REALMUTO:  You're a hundred percent correct in

22     that.

23          THE COURT:  And if they were being removed to the

24     country named in the order, you would have no objection?

25          MS. REALMUTO:  We are not challenging that whatsoever.

1          THE COURT:  And do you agree that the Government has

2     the authority to change the country to which someone is being

3     removed?

4          MS. REALMUTO:  We agree that the statute provides for

5     alternatives countries for which they could be removed in

6     8 U.S.C. 1231, and that both provisions of the statute that

7     allow for that other country are subject to 8 U.S.C.

8     1231(b)(3), which is the withholding provision.

9          And we also submit that they cannot be removed unless

10    they have CAT protection.

11         THE COURT:  That's what I thought you were going to

12    say.

13         Do you disagree with any of that -- that the source of

14    your authority comes from that statute; that the statute limits

15    the authority to countries that would not result in death or

16    torturing; and that that removal is still subject to CAT

17    protections?

18         MS. LARAKERS:  Well, with a slight wrinkle.

19    1231(b)(3) says they can't be removed to that country that they

20    will face torture if the Attorney General makes a finding.  So

21    that's consistent with our pleading.  But that is the framework

22    that we'll be talking about today.

23         THE COURT:  Okay.  So I want to make sure I -- I've

24    not spent a lot of time on immigration cases, and, obviously,

25    all of you have, and so I want to make sure that I understand

1  it.

2           You agree that the source of authority is from the

3  same statute that she was referring to?

4           MS. LARAKERS:  Yes.

5           THE COURT:  That that authority is limited by the

6  subprovision that says you can't knowingly deport someone to a

7  country where they would be killed or tortured?

8           MS. LARAKERS:  Not exactly.  It says where the

9  Attorney General has made a finding.  So if the Attorney

10 General had made a finding that the individual would be subject

11 to torture in any country, then, yes; the authority to remove

12 to a certain country would be limited by that.

13          THE COURT:  And so -- and that includes the CAT

14 protections, too, then?  You understand that the discretionary

15 authority of DHS to remove to a third party is limited?  That

16 they cannot remove to a place where they know torture will

17 occur?

18          MS. LARAKERS:  Where the Attorney General has made a

19 finding, yes.  It's limited by (b)(3) to the extent that --

20 (b)(3).

21          THE COURT:  Right.  I understand.  I just want to make

22 sure I understand the --

23          MS. LARAKERS:  I'm trying to be careful, Your Honor.

24 You understand.

25          THE COURT:  I completely understand.

```
 1              It seems to me, as I understand it, there are two
 2     questions before me.
 3              The first is what process someone is entitled to when
 4     a new country is being designated that is not part of their
 5     removal order.  And I'm going to give you an opportunity to
 6     talk about that.
 7              And the second question -- the one I suspect that the
 8     Government wants to focus on -- is whether or not I have
 9     jurisdiction to hear whether or not the process that's been
10     used is sufficient at all.
11              Is that a fair summary of the question that's before
12     me?
13              MS. REALMUTO:  Yes, Your Honor.
14              THE COURT:  And then, I guess, finally, if I find that
15     I do have jurisdiction, what order should I issue today?
16              MS. LARAKERS:  Your Honor, I would add one third
17     question, and that's:  If this Court has jurisdiction and if
18     some process is required, then what is the remedy that this
19     court should order?
20              THE COURT:  You're one step ahead.  That's my next
21     bullet, so, yes.  Excellent.  Thank you.
22              With that, I'll -- I've set the table for my own
23     benefit; I'll let you begin however you deem fit.
24              MS. REALMUTO:  Okay.  Thank you, Your Honor.
25              So, as we mentioned before, today we're seeking to
```

1    enjoin defendants from continuing to fail to provide plaintiffs

2    and proposed class members with mandatory procedural

3    protections noticed in the opportunity to raise a fear-based

4    claim before DHS deports them to a country that was never

5    designated in their prior proceedings.

6          And, as Your Honor mentioned, we're not challenging

7    the final removal order and we're not challenging the execution

8    of final removal orders to their countries, rather we're just

9    seeking to enforce the protections that the Government has now

10   twice told the Supreme Court that it provides.

11         Indeed, just this past Monday, in the *Riley v. Bondi*

12   argument, the Solicitor General's office stated that the

13   Government has authority to deport to a third country, but, I

14   quote, "with the following caveat:  We would have to give the

15   person notice of the third country and give them the

16   opportunity to raise a reasonable fear of torture or protection

17   [sic] in that third country."

18         And so, as I've said --

19         THE COURT:  Can I pause you for one second?

20         MS. REALMUTO:  Yes.

21         THE COURT:  And I'm going to occasionally interrupt

22   you and ask for a quick response -- and don't feel the need to

23   give me a response on everything.  I'll give you a full

24   opportunity to be heard at the end.

25         Her last sentence -- that it is the position of the

1    Government that to switch the third-party country designation

2    requires that the deportee who is going to be moved be given an

3    opportunity to be told that that third-party designation is

4    going to be changed and an opportunity to be heard as to the

5    dangerousness of that removal -- do you agree that that's the

6    Government's position?

7           MS. LARAKERS:  I don't agree with their

8    characterization of it.  The statement was made with regard to

9    required in removable proceedings; so when that individual is

10   before the immigration court.  And we're outside of that

11   context here.  We're in post-final order.

12          THE COURT:  Given that we're -- does that apply at

13   all?  So I understand that they're not asking to go back to

14   immigration.

15          I don't think you're going to ask me that.

16          MS. REALMUTO:  We are not.

17          THE COURT:  In this posture, where it is the

18   discretionary decision of the department that's changing the

19   third-party designation, does the person who's going to be

20   deported have a right to be informed and be given an

21   opportunity to be heard as to the dangerousness of that third

22   country designation?

23          MS. LARAKERS:  DHS's position is no.

24          THE COURT:  They don't have to be told anything and

25   given no opportunity to be heard?

1          MS. LARAKERS:  DHS's position is no.

2          THE COURT:  Okay.  Thank you.

3          MS. REALMUTO:  Plaintiff's position is yes.  A strong

4     yes.  Because, in order to afford the protections provided by

5     the statute implied in the Convention Against Torture, a person

6     has to be notified of the country to which they are -- the

7     Government is seeking to deport them.

8          The State Department recognizes some 197 countries.

9     They cannot be guessing what country the Government is seeking

10    to deport them to.  The Government is not providing them with

11    notice, and it is not providing them with an opportunity to

12    make their fear-based claim before the immigration court.

13         And what happened, we think, to Plaintiff O.C.G.

14    illustrates the urgency of the situation.  There an immigration

15    judge granted him protection from removal to Guatemala.

16         He thought he was being released from detention and,

17    two days later, he was put on a bus and deported to Mexico

18    without the Government notifying him or his counsel and without

19    a chance to make his claim of fear of deportation to Mexico

20    based on the fact that he had been raped and held hostage in

21    that country.

22         THE COURT:  I'm familiar with that.  The one thing I

23    was somewhat unclear on is that -- I forget if it was in the

24    declaration from O.C.G. or in the initial briefing, but there

25    was an indication that in the immigration proceeding -- that

1    O.C.G. had raised a credible fear of Mexico, and that had been

2    part of the discussion.

3         But it was unclear to me -- it was unclear to me what,

4    if anything, the immigration judge had said about it other

5    than -- it was unclear to me what happened there.

6         So I was given the impression that this had been

7    discussed in front of the immigration court as -- and

8    contemplated that he would be removed to Mexico --

9         MS. REALMUTO:  No.  Mexico -- sorry to interrupt.

10        THE COURT:  Straighten me out.  Because I very much

11   wanted to know what happened there.  I've gotten a sentence

12   about that and I didn't understand what the outcome was.

13        MS. REALMUTO:  So Mexico was never designated as the

14   country of removal.  It just so happened that testimony came

15   up, putting the Government on notice that he had been targeted

16   for persecution in Mexico, in those proceedings.

17        And at the conclusion of the proceedings, after the

18   immigration judge granted him protection to Guatemala, the

19   Government attorney asked, Are you designating Mexico as an

20   alternate country?

21        And the immigration judge said point-blank, No.  It's

22   too late to designate Mexico.

23        The Government attorney leaves the room, comes back,

24   waives appeal, and then they deport him to Mexico anyway,

25   without any notice or opportunity.

1          Now, I will say, the Government has put in a
2     declaration claiming that he was told that he was going to
3     Mexico and he said he didn't have a fear.
4          That, first of all, is complete hearsay because it's
5     by a declarant who didn't talk to him.  We would love to depose
6     that person.  He happens to be the same person who swore up and
7     down in a 30(b)(6) deposition that the Government has no policy
8     and no obligation to inform people that they're being deported
9     to third countries.
10         But besides the fact that it's hearsay, it's also just
11    implausible based on what I've just told you about what
12    happened in immigration proceedings.  And it contradicts the
13    allegations in the complaint as well as his sworn declaration.
14         I'd like to move on to the relief that we're seeking
15    and also answer any question the Court has about the
16    jurisdictional bar the Government has raised.
17         THE COURT:  As to the jurisdictional bar, what would
18    be most helpful for me is if I let the Government explain.  The
19    crux of their argument is that I'm jurisdictionally barred from
20    hearing the substance at all, and so I'd like to give them an
21    opportunity to present their argument, and then I'll give you
22    an opportunity to respond to it.
23         MS. REALMUTO:  Would you like me to say what relief
24    we're seeking?
25         THE COURT:  Sure.

1           MS. REALMUTO:  We're seeking an order for O.C.G.'s

2       return.

3           THE COURT:  Let me pause you on that.  I understand

4       broadly -- the relief that you're seeking, in terms of most of

5       the temporary restraining order, I understand that you want to

6       have an order that people have to be given an opportunity to be

7       heard.  That certainly seems -- if I find that I have

8       jurisdiction, that seems like relief that I could offer.

9       Getting O.C.G. back does not.  How could I -- how could this

10      Court have authority to do anything about O.C.G., who resides

11      in Guatemala?

12          MS. REALMUTO:  Because the Court has inherent and

13      equitable authority to do so.  And that is in

14      *Califano v. Yamasaki*, which is 442 U.S. 682, and

15      *Peacock v. Thomas*, 516 U.S. 349.

16          I'd also like to mention that this Court, like the

17      First Circuit, could exercise jurisdiction.  The First Circuit

18      in two cases has exercised jurisdiction under its equitable

19      authority to order somebody returned who was improperly

20      deported.  And those cases are:

21          *Guerra-Castaneda*.  It's First Circuit, case number

22      19-1736.  The order was issued sua sponte by the First Circuit

23      because they were so troubled by the fact that he had been

24      deported in violation of stay in September, 2019.

25          And *Paye v. Garland*, Case No. 23-1426 in September --

1    sorry, July 17, 2024.  And, importantly, it's not part of the

2    published opinion in that case, but the Court issued a separate

3    order compelling the Government to return the petitioner in

4    that case.  And so --

5            THE COURT:  But how could -- I mean, how could the

6    Government -- how could the United States Government be

7    compelled to return someone who doesn't reside in the United

8    States?

9            MS. REALMUTO:  They do it all the time when the

10   deportation is improper in violation of the stay.  They

11   absolutely know how to return somebody.  They put them on a

12   flight.

13           And, when people win their cases at the Court of

14   Appeals, we have arranged for the Government to bring those

15   individuals back.

16           THE COURT:  So I guess I'm going to give you a chance

17   to respond just on this point, because I'm curious what you

18   have to say, but has that ever happened when someone is under

19   an unquestioned -- an order of removal?

20           So I understand if there's a different scenario where

21   the Board of Immigration Appeals reverses and says, You, in

22   fact, have a right to be here.

23           I can see that as warranting an order saying you

24   should return.  But if you're already under an order of

25   removal, that seems --

1          MS. REALMUTO:  Sure.  So we think it's analogous to

2     the fact that there was an impediment to the removal.  Because

3     he hadn't been provided with the procedural protections to make

4     that execution lawful.

5          And so it's no different than when a federal court

6     issues a stay of removal and the Government goes ahead and

7     deports them anyway.  The stay means that there was no

8     authority to execute the order.  The failure to provide

9     mandatory procedural protections in advance of that deportation

10    means there was no authority to execute that deportation order.

11         So it is a wrongful deportation, and courts have

12    inherent equitable authority and often exercise it when there

13    has been a wrongful deportation.

14         THE COURT:  Okay.  I'm going to let you finish on the

15    rest of the relief you're seeking, but I'll give the Government

16    an opportunity to respond just as to O.C.G., if that's okay.

17         MS. LARAKERS:  It's distinguishable on several points.

18    As Your Honor noted, the fact that there was a stay in the case

19    means that there had already been a finding that the removal

20    order was not valid and was not executable.  So that's one

21    difference.

22         Second, the difference is -- and I would venture to

23    guess that those orders were done by a Court of Appeals in the

24    petition for review process, in the petition for review

25    context, which the Government, as you saw in our pleadings, you

1    know, concedes that there's jurisdiction here in the Court of

2    Appeals and the BIA through the administrative process.

3            Without reading the cases, I can't say that for

4    100 percent certain.

5            THE COURT:  But spit it out.  If that's true -- All

6    right.  So if this was -- if you're right -- right? -- if your

7    view of the jurisdiction was right and this case was instead

8    raised in the First Circuit, and the First Circuit says the

9    removal of O.C.G. was wrong, could you then be ordered to bring

10    O.C.G. back?  Conceding that he would still be subject to an

11    order of removal.

12            MS. LARAKERS:  Yes, Your Honor.  There are procedures

13    for that.

14            THE COURT:  Okay.  Okay.  Thank you.

15            MS. REALMUTO:  Can I just respond to that?  Because

16    the *Guerra-Castaneda* case was not a petition for review case.

17    That was an appeal of a District Court's decision in the

18    context of a stay violation.  So it's 100 percent on point.

19            And then, in addition -- let's see.  If the Court

20    would like, after the hearing we could provide examples of

21    court orders compelling return.

22            And, quite frankly, it's the same issue that

23    Judge Boasberg is grappling with the *J.G.G.* case versus Trump,

24    in terms of:  The lack of process before deportation has

25    occurred.

1           And that's an issue that the D.C. Circuit has agreed

2    with him on and affirmed the provisional class cert grant on,

3    and hasn't yet decided the issue of return.  But it

4    certainly -- we're talking about one individual here named

5    plaintiff, who was deported under egregious circumstances.

6           THE COURT:  So I would certainly welcome some more

7    briefing on it.  I think it is unlikely that I'm going to

8    include O.C.G. in the TRO today, but we have the preliminary

9    injunction which we will schedule at the end of this, which

10   will be in just a couple weeks.

11          So, to the extent that you want to address this issue,

12   it was not one that was briefed very fulsomely -- because I

13   don't think it was in the front of mind, in terms of what you

14   thought would be considered, and correctly so -- but it is

15   something that I would like some more support for.  So, to the

16   extent that you want to add to your briefing, feel free.

17          MS. REALMUTO:  Right.

18          Well, then, I would most strenuously urge this Court

19   to consider provisionally certifying the class and enjoining

20   the defendants from failing to provide the procedural

21   protections that we're seeking.

22          Since filing this lawsuit, all of our organizations

23   have been inundated with phone calls and e-mails from attorneys

24   and individuals terrified of re-detention to a third country,

25   of attorneys grappling to figure out if their clients are going

1    to be deported to a third country without advanced notice and

2    without giving them the opportunity to say that they're afraid,

3    and without giving them time to present their fear-based claim

4    of removal.

5         And so the provisional certification of the class and

6    the injunction ordering the Government to provide that notice

7    is critical to the ability of thousands of people in this

8    country today to remain in the United States and to have fair

9    process.

10        THE COURT:  Thank you.

11        You can address whichever matter you would like to go

12   first.  I suspect you're most interested in jurisdiction, and

13   I'm very interested in what you have to say.

14        MS. LARAKERS:  Yes, Your Honor.  Before I do that --

15   or, like, related -- my co-counsel here does have a note on the

16   case they cited, *Guerra-Castaneda*, because he's read it and I

17   have not.

18        MR. SAUTER:  Yes, Judge.  I've both read it and been

19   involved in that case.

20        Mr. Guerra-Castaneda is challenging a removal order

21   and then filed a petition order for review with the

22   First Circuit.

23        The First Circuit entered a stay order on the Friday

24   before the Labor Day holiday.  That order was not provided to

25   the Government until the Tuesday after the Labor Day holiday.

1    And at that point, Mr. Guerra-Castaneda had already been

2    returned to El Salvador in violation of the First Circuit's

3    stay order.

4         So that stay order was issued as part of the petition

5    for a review process.  And the First Circuit did then order the

6    United States to make its efforts to bring Mr. Guerra-Castaneda

7    back to the United States.

8         THE COURT:  But it was only because they

9    inadvertently -- the United States had either inadvertently or

10   negligently failed to pass that order on to the right person.

11   And if that person had been deported in violation of the order

12   that, if it had been properly passed on in a timely way, that

13   wouldn't have happened?

14        MR. SAUTER:  Correct.

15        THE COURT:  Thank you.  I appreciate that.

16        MS. LARAKERS:  And that provides a perfect segue into

17   our discussion about Section 1252(g), which is that the only

18   exception that's been recognized here to 1252(g) strictures is

19   when a Court of Appeals has issued a stay order through the

20   administrative process that the Government has, for some

21   reason, not followed or when the final order of removal isn't

22   valid for some reason.

23        So there's a case, I think, out of the Seventh

24   Circuit, called Madu [phonetic] where there was a genuine

25   concern that the individual who was removed was not the

1    individual whose name was on the final order of removal.

2         So the person claimed that, That's not my final order

3    of removal; I don't have one.  So that would go to Your Honor's

4    point that you made earlier:  There is no valid executable

5    order of removal.

6         Now, if Your Honor would like, I can provide a general

7    overview of Section 1252 and what it is, because I think it's

8    something very niche to this area of law.

9         THE COURT:  Absolutely.

10    MS. LARAKERS:  Section 1252 was first -- well, there

11   were versions of it, but we're going to start our story in 1996

12   with IIRAIRA.  People say it different ways, but that's how I'm

13   going to say it.

14        THE COURT:  I've only read it, but I'll take your

15   pronunciation.

16        MS. LARAKERS:  And that was done in a response to this

17   claim splitting that was happening all over the place, right?

18   So you have these final orders of removal -- at the time they

19   were called deportation.  People were challenging them in

20   habeas courts, in District Courts, and they also were going

21   through the administrative process.

22        So there was clearly a problem with claim splitting

23   and with multiple courts having jurisdiction over these issues.

24   So Congress enacts Section 1252 which puts all sorts of

25   jurisdictional limits on, primarily, the District Court,

1    Your Honor, and then also on courts of appeals in all courts.

2         I'd like to split that up in two boxes:  First, you

3    have limitations on District Court review.  And then you have

4    limitations on discretionary review.

5         Here we're really just talking about the limits on

6    District Court review and then how the legal claims and

7    Constitutional claims here can be brought in the administrative

8    process.  So we're not really talking about the discretionary

9    portion of 1252 here today.

10        So moving on to the section that we are talking about.

11   Back in 1996, Congress passes this law.  And then yet --

12   despite the fact that 1252 exists, claim splitting still

13   happens.

14        What happens is people are bringing in habeas

15   challenges, challenges to their orders of removal, and the

16   habeas courts are like, Well, if there's no clear removal of my

17   habeas jurisdiction, I need to do something here and now

18   because this person is going to be removed.

19        So Congress goes back in 2005 and makes it very clear:

20   No habeas jurisdiction; no jurisdiction whatsoever.

21        And then the First Circuit in 2007 addressed all this

22   history and explanation of what 1252 did in 2007.  So it gives

23   great background, and that's largely where this background is

24   coming from.

25        THE COURT:  Which case are you talking about?

```
1              MS. LARAKERS:  That's Aguilar v. ICE, Your Honor.
2     That's a First Circuit decision, pretty foundational.  The
3     First Circuit doesn't have a lot of case law on, like, this
4     issue, but that's, like, the foundational case.
5              THE COURT:  I've looked at it.  Thank you.
6              MS. LARAKERS:  So that's the statutory framework in
7     which we're working.
8              Here the Government, like, is making two primary
9     arguments under Section 1252.  First is under Section 1252(g).
10    And that, straightforward, prevents the District Court from
11    entering orders that would interfere with three discrete
12    actions of DHS, namely here, any action or decision taken to
13    execute a removal order.
14             And that's what plaintiffs want here.  They want this
15    court to interfere, at least temporarily, in the execution of
16    their removal orders to a third country -- which even
17    Plaintiffs concede that authority is given in 1231.  They just
18    attested that that authority is limited also by 1231, right?
19             So -- but fundamentally, what they're asking for is
20    for this Court to temporarily stay the removal of individuals.
21    And that is what every court -- nearly every Court of Appeals
22    has said that the District Court can't do.
23             And that's even in the face of some real
24    Constitutional and legal challenges.  That's in the face of an
25    individual who claimed that they had a fear of return based on
```

1  threatening text messages that they had just received the week

2  before.

3          And the individual claimed, I need a stay of removal

4  or else I'm going to be removed to a country that -- where I'm

5  going to be tortured.

6          And he asked just for a brief stay of removal so that

7  his claim could work its way up into the PFR, so that he'd get

8  review in the Ninth Circuit.  And the District Court said, I

9  don't have jurisdiction over that.  And then the Ninth Circuit

10  Court of Appeals, which is has been pretty liberal in this

11  context, said, I don't have jurisdiction over that.

12          Same thing back in 2020 with the *Hamama* case that we

13  also cited in our brief.  They wanted very similar relief -- "I

14  need time to file a motion to reopen because I had no idea that

15  the Government was going to remove me right now."  And they

16  claimed that they had real claims, that they had meritorious

17  claims, but they just need the time to make them.

18          And the District Court said -- well, the District

19  Court said 1252(g) didn't apply and then -- before the Sixth

20  Circuit -- the Sixth Circuit said, 1252 applies.  Regardless of

21  the nature or claim.

22          And so that's what the District Court is left with

23  here:  A whole bunch of case law that asserts the same type of

24  claim that Plaintiffs assert here.  And, simply, this District

25  Court just doesn't have jurisdiction over that claim.

```
1            THE COURT:  So the fact that -- I've spent a lot of
2     time looking at those, including both of the cases you just
3     cited.  And it seems very clear to me that, if the Department
4     is acting on an order of removal and they're following the
5     orders of removal, you're 100 percent right, which is what, I
6     think, the plaintiffs conceded at the outset -- which is if the
7     order of removal says, Your removal to Mexico, there's nothing
8     that the District Court can do about that.
9            But I think they're trying to distinguish -- and what
10    I'm struggling to fit into this analysis is -- when you're
11    changing the removal using the discretion that's, admittedly,
12    given within statute to the Department to change to a third
13    country, since I'm not reviewing the removal itself, the
14    document itself -- I'm saying it's valid; I'm not questioning
15    that.  I'm just reviewing what's being done with that document
16    -- does that in any way put me outside of the jurisdiction
17    stripping provisions of 1231?
18            MS. LARAKERS:  So yes.  And the answer is because of
19    the nature of the type of removal order that Plaintiffs have
20    here.  Right?
21            So even if Plaintiffs have a removal order that, like,
22    prevents them from being removed to a certain country, they
23    still have a removal order that is valid as with regard to
24    every other country unless and until the Attorney General makes
25    a finding that they have -- that they are going to be subject
```

1    to torture.  So --

2          THE COURT:  So what I'm struggling with is what's the

3    remedy?  Now, their named plaintiffs have some unique

4    situations.  I'm sure you've read the declarations for their

5    class petition, which offers some more examples, including --

6    let me spit out an example:

7          Someone is subject to deportation.  They're sitting in

8    custody in Texas.  They have an order that says they cannot be

9    deported to El Salvador.  They have a claim that would qualify

10   under CAT that they can't go to Mexico.  They are told they're

11   going to Mexico at 6:00 a.m.  They leave at 6:30, and they're

12   in Mexico at 7 o'clock.

13         What's the -- what is the remedy for that individual?

14   Knowing -- because I think you conceded, and you can correct me

15   if I'm wrong, but CAT does prohibit the -- in addition to some

16   of the regulations of 1231 itself, prohibit the deportation of

17   someone to a place where they will be killed or tortured.

18         So in this scenario, where they've changed without

19   giving someone any notice and they're moving to a new country

20   where that person will be killed or tortured, how does the

21   United States live up to its obligations under CAT?

22         MS. LARAKERS:  Well, so it's important to know that

23   CAT is not a self-executing treaty.  So whatever relief,

24   whatever plaintiffs are entitled to under CAT, is limited by

25   the regulations and the statutes that we have here.

1          So I think we're doing what a lot of -- this colloquy

2     is bordering on what courts of appeals have generally, like,

3     warned against, and that's mixing the merits question with the

4     jurisdictional question.  And I want to address that first.

5          So under -- because we have two different

6     jurisdictional stripping statutes here.  Right?  We have

7     1252(g), which is really specific to this Court in this

8     context.  And then we have (a)(5), (b)(9).  And I can talk

9     about the remedies that are available for individuals to get

10    some sort of review.

11         But when we're talking about 1252(g) and whether

12    1252(g) applies, Your Honor's line of questioning, if

13    Your Honor were to hold in the way that you've articulated just

14    now, that would be a fundamental problem because that would be

15    tantamount to saying, Well, there's some additional right to

16    judicial review in the District Court.  And no court -- the

17    Supreme Court has not held that there's any additional right to

18    judicial review.

19         So Your Honor's question, What's the remedy? -- there

20    is a remedy here, and I'll explain that.  But even if there

21    wasn't, there is no right to further judicial review in the

22    immigration context other than what the statutes provide.

23         THE COURT:  So as a threshold matter, I will tell you

24    you're right:  The jurisdictional question precedes the merits

25    question.  And I recognize that I can't blend those two, and

```
 1   I've spent a lot of time struggling with these very complicated

 2   jurisdiction-stripping statutes.

 3           But I would very much like to hear the answer.  What

 4   is the remedy, then?  Because the answer can't be "no remedy."

 5           MS. LARAKERS:  Well, Your Honor, I think in some

 6   limited circumstances -- and I don't think that's here -- it

 7   can be.  There may not be judicial review.  The Supreme Court

 8   has never recognized that an alien has a right to judicial

 9   review of anything and everything whenever they want.

10           So aside from that, though --

11           THE COURT:  To be honest, I came out here and the

12   first question I had for you, which I thought you were going to

13   answer differently, was that, in the example of the O.C.G. --

14   O.S.G.?  O.S.G. --

15           MS. LARAKERS:  O.C.G.

16           THE COURT:  O.C.G.  Sorry.  Not having the names, it

17   doesn't stick in my head as well.

18           I thought you were going to say, We did give him

19   notice -- and rely on my declaration -- we told him; he said he

20   didn't mind going, and so we sent him off.

21           That presents a very different question, right, and it

22   doesn't address the jurisdictional question, but, if your

23   position today is that we don't have to give them any notice

24   and we can send them to any country other than the country for

25   which the immigration court has said no, that's a very
```

1    surprising thing to hear the Government say.

2          And so, if that is your -- I want to make sure that I

3    understand your position correctly, that, if the Government is

4    saying, We can deport people to any country that is not

5    prohibited on the notice of removal, and we are not obligated

6    to listen to anything that the deportee has to say about the

7    danger of torture or death that they may face there -- if

8    that's your position, okay.  Great.  I understand your

9    position.

10          But I don't want to mischaracterize your position; so

11    that's why I'm saying it back to you, to make sure.

12          Is your position that the Government can decide right

13    now that someone who is in their custody is getting deported to

14    a third country, give them no notice and no opportunity to say,

15    I will be killed the moment I arrive there, and, as long as the

16    Department doesn't already know that there's someone standing

17    there waiting to shoot him, that that's fine?

18          MS. LARAKERS:  In short, yes.

19          THE COURT:  Okay.

20          MS. LARAKERS:  And that merits argument about O.C.G.

21    That's alternative arguments down the road.

22          THE COURT:  I didn't want to get too far into that

23    because, obviously, I can't resolve it.

24          MS. LARAKERS:  Right.  But I will say -- shortly --

25    that just because that's, like, the legal position doesn't mean

1    that individuals may not receive some process as O.C.G. did.

2          I think this goes back to what the removal order says

3    and whether it's valid.  And we know that the removal order

4    here is valid and that the removal order allows for removal to

5    a third country because the only thing that the removal order

6    says is that they can't -- if they've been granted CAT relief,

7    which some of them haven't -- says they can't be removed to

8    that third country.

9          And Plaintiffs don't contest that; they just say that

10    they need notice and opportunity to be heard.

11          THE COURT:  And your position is there is no

12    procedural due process right to someone who has been found

13    removable?  There's no due process right to where they're going

14    to be removed to?  No procedural due process right applies to

15    people who are being removed to a new country that has not

16    previously been introduced?

17          MS. LARAKERS:  In this context, that's right,

18    Your Honor.

19          THE COURT:  Okay.

20          MS. LARAKERS:  So let's move on to the remedy,

21    1252(a)(5) and (b)(9), which is separate from 1252(g); so they

22    do have to be addressed separately.

23          So 1252(a)(5) and (b)(9) is another jurisdictional

24    stripping -- well, it's a jurisdictional-channeling provision,

25    Your Honor.  So (g) is a jurisdictional stripping; (a)(5)(b)(9)

1  channels.

2          So what does it channel?  Judicial review of any law

3  or fact, including constitutional and statutory provisions,

4  arising from any action taken or proceeding brought to remove

5  an alien from the United States.

6          That's pretty broad.  The First Circuit has raised in

7  *Aguilar* that that's very broad.  So the First Circuit has also

8  said if the claim can be raised in removal proceedings, (a)(5)

9  and (b)(9) apply.

10          So let's talk about how they can be raised in removal

11  proceedings.  The simple answer is via a motion to reopen,

12  that -- there are a lot of different types of motions to

13  reopen.  Essentially, was that allows is for Plaintiffs to make

14  a new claim based on fear of return to a third country.

15          There are motions to reopen for a change of country

16  conditions.  There are motions to reopen sua sponte upon the

17  judge's own motion, but it's a bit of a misnomer because

18  plaintiffs -- even though it's sua sponte motions to reopen,

19  aliens move for that sua sponte all the time, saying:  Judge,

20  please exercise your authority here because the situation is

21  exceptional.

22          So we have a bunch of different types of motions to

23  reopen in the class.  There are people who would -- some of

24  them would not be time-barred to bring a statutory motion to

25  reopen, some of them would.

1          So there are all these procedural rules and mechanisms

2    governing motions to reopen, but what I can say here today is

3    that, generally, the broadest motion to reopen, the one that

4    encompasses basically any one at any time, is this sua sponte

5    motion to reopen, which is -- the regulation says that the BIA

6    or immigration judge at any time can reopen proceedings.

7          THE COURT:  I understand that.  But if this happens at

8    6:00 a.m., that's not really present, right?

9          MS. LARAKERS:  So that goes the other point,

10   Your Honor, and that is that individuals know when they're put

11   in removal proceedings that -- they're given notice in their

12   removal proceedings that they could be returned to a third

13   country.

14         THE COURT:  Understood.  But they're not told which

15   third country, right?

16         MS. LARAKERS:  Not necessarily.  But they are told.

17   And then, in the I-589 -- which is the application for asylum,

18   withholding removal, CAT -- it asks specifically --

19         THE COURT:  -- which are the alternative countries?

20         MS. LARAKERS:  No, it doesn't say -- it says do you

21   have a fear of return to -- "Are you afraid of being subjected

22   to torture in your home country or any other country to which

23   you may be returned."

24         THE COURT:  And I'm sorry.  What document is that in?

25         MS. LARAKERS:  This is the I-589.  I can give you my

1  copy.

2          THE COURT:  I'm sure you have another one.

3          MS. LARAKERS:  I actually don't, but that's really the

4  only thing I need out of it.

5          THE COURT:  I assume they know what this is.

6          MS. LARAKERS:  Yes, they do.  Sorry.  I should have

7  printed out three.  That's my fault.

8          THE COURT:  And this is what is filled out at the very

9  beginning?  When you're seeking -- with order of removal.

10         MS. LARAKERS:  Yes.

11         THE COURT:  Okay.

12         MS. LARAKERS:  So it's not like there's no notice,

13  Your Honor.  An alien is given notice that third country

14  removal is possible, sufficient that the Government's position

15  is that they should be making that claim then and now and that

16  if at any point in time, while they're in the United States,

17  there's a third country that they have a fear of returning to,

18  they should make that claim here and now.

19         THE COURT:  So this document is done on -- is this

20  done on day one?

21         MS. LARAKERS:  This is how you apply for a withholding

22  of removal -- this is -- when you get put in immigration

23  proceedings, this is what an alien is going to file.

24         THE COURT:  Okay.  When I -- and, again, you spend a

25  lot of time in this area and I don't; so forgive me if this is

1   an obvious question, but I know, because there's case law,

2   about people being removed to third countries that pre-date the

3   last several months.  So this is not entirely a new policy, but

4   is the frequency -- can you give me an idea if the frequency

5   has changed in a dramatic way?

6           Because I suspect that's what they're going to say --

7   is that this used to be an extraordinarily rare remedy that was

8   never used and so nobody maybe -- I didn't know this.  If this

9   was in your briefings, I missed it.

10          MS. LARAKERS:  It wasn't, Your Honor, and that's our

11  fault.

12          THE COURT:  It raises an interesting point to me.

13  Because it seems -- it seems impossible that the United States

14  could be fulfilling its statutory obligations, its treaty

15  obligations, any of its moral obligations by saying, We're

16  going to not give you any opportunity to tell us, if you go to

17  a certain country, that you're going to be killed.

18          That -- for me -- and I'm not saying that that is what

19  I think, that is certainly what the law says at the moment,

20  but I can't believe that in the United States of America we can

21  say, We can drop you off a plane and you can get shot in the

22  head, and you know full well it's going to happen, and we don't

23  have to care.  That doesn't seem like a conclusion I'm likely

24  to get to.

25          But you raise a different point which is, all right,

1    we give you an opportunity to say, All right.  If you're from

2    Guatemala but you know that there's a gang in El Salvador

3    that's going to kill you as soon as you get off the plane,

4    you've got to tell us.  And we're given you an opportunity to

5    tell us.

6         And so this isn't something that I've given great

7    thought to, and it does -- it seems like a salient point that

8    deserves some consideration.

9         And so the only caveat is that -- did this ever used

10   to happen before?  Or is this so unusual that even an

11   experienced immigration practitioner would not have taken this

12   box seriously?

13        Or, alternatively, is this something that an

14   experienced -- all of their, sort of, named plaintiffs are

15   represented -- is this something that an experienced

16   immigration practitioner would know? -- that, if you came from

17   Guatemala and you had trouble in Mexico and then you applied

18   for asylum in the United States, they would have listed both of

19   them here?

20        MS. LARAKERS:  Your Honor, I think that depends on the

21   individual circumstance, which gets into a whole thing about

22   why class isn't appropriate here.  But it's not just this

23   notice.  It's this notice plus the regulatory required notice,

24   which requires, generally, immigration -- the immigration judge

25   to give a notice that they could be returned to a third country

1    as well.

2              THE COURT:  That's a statutory notice.

3              MS. LARAKERS:  It's a regulatory, about, like, when an

4    individual is given CAT relief.  It's, like, Your withholding

5    of removal is only to this country; you could be removed to a

6    third country.

7              So it's this opportunity, right?

8              And then there's the opportunity that, like, really

9    kicks in (a)(5) and (b)(9) here, which is that -- that the

10   named plaintiffs have right now, which is that they can file a

11   motion to reopen sua sponte telling the immigration judge:

12   This -- what is happening to me, what is happening right now,

13   is so exceptional -- which Plaintiffs plainly say that this is

14   exceptional -- that this is so exceptional and that the

15   Government is not giving me notice of where I'm going to be

16   removed, but I have fear to assert.  And you, Immigration

17   Judge, you, BIA, should reopen my proceedings so I can assert

18   that claim --  or, potentially, require -- try to make a claim

19   requiring the Government to give them notice.

20             All these claims, they can all be asserted right now.

21   And -- they can all be asserted right now, Your Honor.  And so,

22   along with that assertion of claims, they can seek a stay.

23             THE COURT:  Right.

24             MS. LARAKERS:  An emergency stay.  And if they're

25   given an emergency stay, then the Government wouldn't be able

1    to remove them.

2         So plaintiffs -- that being said, plaintiffs are going

3    to get up and say that there are procedural hurdles to doing

4    that, I'm sure.  But those procedural hurdles don't -- that

5    they're going to claim exist don't really make sense with what

6    they've said in this complaint.  They're claiming in this

7    complaint that it is a clear constitutional violation, that

8    there are serious constitutional concerns here, that these are

9    exceptional circumstances.

10        Those are all reasons that they can raise in

11   immigration court before the BIA that make it more likely that

12   they're going to be successful there.  And importantly, those

13   procedural hurdles that they raise -- they're like, Oh, an

14   immigration practitioner wouldn't know this, or, I think that

15   we should have done this earlier, all of those things -- those

16   hurdles are merely procedural in nature.  They're not

17   jurisdictional in nature; and here this Court is faced with

18   determining whether it has subject matter jurisdiction.

19        And as between the two, what we have between

20   procedural hurdles and this Court's jurisdiction, it's clear

21   that Congress wanted aliens to pursue the administrative

22   process route first and go there first and go there to get a

23   relief that they seek from this Court.

24        And that has to be done on an individualized basis,

25   which Congress also clearly preferred through its enaction of

1    Section 1252(f)(1) prohibiting class-wide relief.  All -- the

2    statutory scheme here -- to the extent that Your Honor believes

3    that it points to some additional process being needed, the

4    statutory scheme also points aliens and immigration court --

5    for that to be done on an individualized basis.

6          And ultimately, Your Honor -- let's say individuals

7    get removed and they get up to the Court of Appeals and they're

8    finally able to make the alleged exceptional statutory and

9    constitutional arguments that they're making, before a

10   three-judge panel.  That three-judge panel can order them to

11   come back.

12         So -- and all of this can also be done on an expedited

13   basis, can be requested to be done on an expedited basis.

14         So the crux of the Government's argument is when the

15   Court is faced with procedural hurdles that plaintiffs are

16   going to raise and this Court's jurisdiction, it has to follow

17   what the Congress intended.  And Congress could have

18   provided -- easily could have provided additional procedures

19   for removal to the third countries.  They didn't.  So I think

20   all -- all of the statutes point to:  There may be relief

21   available in immigration court.

22         And that's the crux of our (a)(5) and (b)(9) argument.

23         THE COURT:  Thank you.

24         I want to stop there because, like, I think -- I

25   didn't know if you wanted us to get into the merits first.  I

1    think they had gotten into the merits, but -- they got into the

2    merits a bit, and then I dragged you into them, away from your

3    jurisdictional argument a little bit.  But if I could ask --

4    I'll turn back to you on the merits argument and let her

5    respond as to the jurisdictional argument.

6           MS. REALMUTO:  I'm going to respond to the

7    jurisdictional argument because, you know, quite frankly, I'm a

8    bit flabbergasted that they're talking about 1252(g) without

9    talking about the seminal Supreme Court decision interpreting

10   1252(g), which is *AADC v. Reno*, [verbatim] which clearly says,

11   in no unclear terms, that those three discrete actions -- that

12   1252(g) only bars discretionary actions.  It does not bar

13   nondiscretionary actions, which is exactly what we have here

14   and is exactly what the First Circuit interpreted in the case

15   of *Kong v. United States*.  That's 62 F.4th 604 ^ [verbatim].

16          *Kong* takes on 1252(g) and reaches the conclusion that

17   the Supreme Court reached.  And in that case it's very

18   instructive, because that case was a Cambodian man who was

19   challenging his redetention after a final removal order -- in

20   the context of an FTCA claim, but, nonetheless, challenging the

21   lack of procedural -- the lack of probable cause prior to his

22   detention.

23          And so in *Kong*, I think you want to look at what the

24   First Circuit said because they said that claims that arise

25   after entry of a final removal order -- and in our case they

1    are after a final order and they arise from DHS's failure to

2    provide mandatory protections -- are not barred by 1252(g).

3          And in making that analysis, the First Circuit in *Kong*

4    looked at the Supreme Court's definition in *Jennings* with

5    respect to the other provision that they cite, which is

6    1252(b)(9), which has some -- no jurisdiction over claims

7    "arising from."  And they said, That language is not as broad

8    as the Government is reading it to be.

9          And so the other cases are *Guerra-Castaneda v. U.S.,*

10   which is a D. Mass decision, an FTCA case as well --

11   656 F.Supp. 3d 356 -- as well as *Devitri v. Cronin*,

12   290 F. Supp. 3d 86.

13         Those are all decisions that came up in *Kong* and --

14   you know, a First Circuit decision -- that are involving the

15   same type of claims that we have here.  And 1252(g) simply does

16   not bar claims that arise after the removal order and claims

17   that involve nondiscretionary issues.  And here we have

18   nondiscretionary mandatory protections.

19         THE COURT:  When you say "nondiscretionary," you don't

20   mean the decision to deport someone to the third country?  You

21   say the prohibition to not deport someone to a country that is

22   dangerous.

23         MS. REALMUTO:  I apologize.  Thank you.  The

24   obligation is mandatory, to provide the protections.

25         THE COURT:  Right.  It is a discretionary decision to

```
 1    try and deport someone to a third country.  That's squarely
 2    within the discretion.
 3              MS. REALMUTO:  Correct.
 4              THE COURT:  I understand.  Thank you.  I just wanted
 5    to make sure that I understood where you're coming.
 6              MS. REALMUTO:  Absolutely.  So it's discretionary to
 7    decide to do that; it's mandatory to provide protections before
 8    you do that.
 9              THE COURT:  Right.
10              MS. REALMUTO:  And that mandatory nature comes from
11    the FARRA CAT statute.  We talked about that.
12              With respect to 1252(a)(5) and (b)(9) --
13              THE COURT:  If I could pause you for one sentence, I
14    think she wants to respond on that exact point; so I'm going to
15    give her a chance.
16              MS. LARAKERS:  I think it may be helpful, just so we
17    stay on the same page, to allow me to address that 1252(g)
18    part, and then we can move on to (a)(5), (b)(9).
19              THE COURT:  Sure.  Okay.
20              MS. LARAKERS:  So on AADC, if you remember, Your Honor
21    and I, we talked about pre-REAL ID Act.  AADC's
22    pre-REAL ID Act.  So in the context of AADC, the Supreme Court
23    is looking at a decision where there is, like, broader habeas
24    jurisdiction, and a lot of courts had said that.
25              Separately, I believe, if Your Honor reads AADC, it
```

1    does not support Plaintiff's point.  It was written by

2    Justice Scalia, if that gives a hint.

3            Second, the discretionary versus nondiscretionary

4    issue has been litigated in the Court of Appeals quite a bit.

5            So, like, 1252(g) doesn't apply when we have a

6    meritorious claim or where we can state a claim that there's

7    been a violation of the law.  And that's where Courts went

8    first.  And the Courts of appeals have consistently rejected

9    that in all the cases that I cited in my brief.

10            *Kong*, moving on to the Kong, the First Circuit

11    decision:  That was in the context of an FTCA claim.  So the

12    question is --

13            THE COURT:  What's the FTCA?

14            MS. LARAKERS:  The Federal Torts Claims Act.

15            THE COURT:  Okay.

16            MS. LARAKERS:  So we have a very different context in

17    FTCA.  And there is a circuit split as to whether an alien

18    who's claiming unlawful removal -- right?  You would think that

19    that would fall under 1252(g).  You're talking about removal --

20    whether they can bring that claim of unlawful removal related

21    to damages that they suffered as with regard to that allegedly

22    unlawful removal in an FTCA claim.  Not asking for any

23    immigration relief.

24            THE COURT:  That was just seeking financial relief?

25    Damages --

1           MS. LARAKERS:  He had filed a habeas, Your Honor.

2     It's a messy -- it's a messy case.  I just wanted to provide

3     that context, though, because there wasn't -- it wasn't

4     strictly an immigration case.

5           THE COURT:  Okay.

6           MS. LARAKERS:  We were talking about the FTCA, and

7     that's what the claims were brought under.  And I know the AUSA

8     who handled it.  It was a big mess.  But that's the context of

9     that decision.

10          So I think when we're -- I don't think this Court is

11    bound by anything that was set in *Kong* because it was in a very

12    different context and seeking very different relief.

13          And then, if the Court wants a better discussion about

14    this discretionary versus nondiscretionary dichotomy that

15    Plaintiffs have raised -- and have raised in every circuit

16    court across the country -- it should look at the Courts that

17    have addressed that in the immigration context, which are --

18    *Rauda* addressed it.  *Camarena* addressed it.

19          The decisions that were cited in the brief,

20    Your Honor, I think a lot of them addressed that discretionary.

21          That's it.

22          Oh, and the District Court decisions.  Sorry,

23    Your Honor.  We disagree with those.  The Courts of appeals

24    decisions that addressed the same thing, the same types of

25    claims, have said no; the District Court said yes.  The

1    Government would disagree with the analysis in the District

2    Court decisions because they conflict with the Courts of Appeal

3    decisions.

4              THE COURT:  Thank you.

5              MS. REALMUTO:  With respect to *Kong*, I'm not going to

6    belabor the point, but take a look at page 617 where the

7    First Circuit expressly says that the text of 1252(g) cannot be

8    interpreted differently depending on whether a detention-based

9    challenge is brought as a habeas or an FTCA claim.

10             And then they cite the Supreme Court's decision in

11   *Clark v. Martinez*, which, as we know, stands for the

12   proposition that a statute can only be interpreted one way; you

13   can't interpret it differently for different types of claims.

14   So I'll leave you with that on 1252(g).

15             With respect to the Government's position about *Rauda*

16   and *Camarena* and *Silva* and all of those cases, as an initial

17   point all, all of those people were challenging their

18   deportation to the designated country and all of those people

19   were asking the court to hold off because of some discretionary

20   mechanism that it was waiting for the agency to take.

21             And in *Rauda* and *Hamama* and *Tazu*, they were asking for

22   a discretionary motion to reopen.  *Camarena* was waiting for

23   adjudication of a pending application for the provisional -- a

24   discretionary process to play out.

25             That is not the situation here.  We are not asking the

1    Court to wait for a discretionary process.  Our initial

2    position is notice and an opportunity to be heard, is not

3    discretionary.

4            And I will say that the *J.G.G.* decision that just came

5    down on March 26 at Westlaw, page 28, Note 8, also addresses

6    that point.

7            THE COURT:  I don't think I am familiar were that one.

8    I don't think I'm familiar with that case you just cited.  Can

9    you say it again?

10           MS. REALMUTO:  The *J.G.G.* decision is the

11   D.C. Circuit's affirmance of the Judge Boasberg's decision.

12           THE COURT:  Okay.  Thank you.  I am familiar with it;

13   I didn't remember the name.

14           MS. REALMUTO:  Sorry, there's a lot of acronyms thrown

15   around.

16           Okay.  Now, moving on to the channeling provisions of

17   1252(a)(5) and (b)(9), you know, I think it's pretty apparent

18   that our claims arise not from the order of removal previously

19   entered but against claims independent from the prior

20   proceeding.

21           And reliance on the provisions is based on the

22   erroneous presumption that Plaintiffs and class members could

23   somehow raise claims that they're being deprived procedural

24   protections after the removal order, in a petition for review

25   which, by the way, has a 30-day deadline.

1          And so, in order to file a petition for review, you
2     have to file it within 30 days of your final removal order.
3          Now, let's take the case of our plaintiff E.F.D.  You
4     know, his removal order was issued in 2018, and here he is
5     picked up in 2025.  How's he supposed to file a petition for
6     review now?  Years after the fact?
7          And so people who win their protection claims have no
8     cause or motivation to file a petition for review when they win
9     their cases.  To do so would just clog the courts with
10    unnecessary filings.
11         And, finally, I would point out that the Government's
12    position with respect to (a)(5) and (b)(9) also conflicts with
13    the discussion of (b)(9) in *Kong* and the Supreme Court's
14    decision in *Jennings* which said those cases can't go that far.
15         I'll also point out in 1252(a)(4), I believe, it says
16    a petition for review can only be decided on the administrative
17    record, and the administrative record is the record before the
18    agency at the time of the final removal order; so there's no
19    way to bring a petition for review.  And that position just
20    simply doesn't make sense.
21         I'd like to move on to the remedy, if I may.  I mean,
22    I find it remarkable that the Government's position is -- I'll
23    talk about the form in a second, but, staying on the motion to
24    reopen thing, how are they supposed to know where to move to
25    reopen if they don't have notice on where they're supposed to

1    be deported to?

2              Not only that, but how are pro se people supposed to

3    know that they're supposed to be able to do that?

4              And the Government relies on motions to reopen, but

5    there are statutory barriers to those.  They have to be filed

6    within 90 days.

7              And so even a catchall sua sponte motion is not a

8    viable remedy because it is a discretionary motion.  It can be

9    denied in the face of constitutional violations.  There's

10   limited judicial review of the denial of sua sponte motions --

11   and that's the First Circuit's decision in *Thompson*.  I don't

12   have a cite for you on that.

13             But also, you, just with respect to this idea that

14   people are supposed to file the motion to reopen, we've had

15   some of the declarations that we've put forward, motions to

16   reopen, denied.

17             And, in fact, one IJ said, Well, no, it's DHS that's

18   supposed to get involved in designating the country.

19             DHS has in the past, pre-February 18, on occasion

20   moved to reopen to designate a new country, which is what

21   they're supposed to do.  And we've cited case law in the

22   complaint of cases in which -- that Courts have said, This is

23   what you're supposed to do; you're supposed to designate the

24   country.

25             THE COURT:  But you agree they don't have to.  I mean,

1    I know you've cited the District Court case -- I think it was

2    called *Aden* -- where that was what the District Court judge

3    wanted the Department to do.

4          But you agree that that's not required?  The DHS --

5    even under your proposed preliminary injunction, you're not

6    saying the DHS wants to reopen an immigration proceeding to

7    change the designation?  You agree that the statutory provision

8    gives DHS discretion to change the country designation to a

9    third country?

10          MS. REALMUTO:  We do.  And we're saying, though, that

11    a meaningful opportunity to raise your protection --

12          THE COURT:  Oh, right.  No, I hear you on that.  Yes.

13          I just want to make sure that procedurally you're not

14    saying that -- you're not saying, for example, that the

15    District Court in *Aden* is right, that they have to go back --

16    the answer here is that DHS's discretion is not cabined by the

17    judgment of the immigration court.  They are, without going

18    back to the immigration court, when they have a judgment of

19    removal, able to change the country of designation?

20          MS. REALMUTO:  By asking the -- but if the person says

21    "I have a fear" --

22          THE COURT:  Right.  No, I understand.

23          MS. REALMUTO:  -- then they have to move to reopen the

24    proceedings so that the immigration judge can adjudicate that

25    fear claim.  Because only the immigration judge can adjudicate

1  that fear claim.

2        THE COURT:  Oh.  I take that back.  I didn't

3  understand what you were saying.

4        So your position is that -- so I understand we have no

5  agreement on what amount of procedural due process, if any,

6  might be required, but yours is saying that you have to give --

7  your position is that you have to give them both notice and an

8  opportunity to be heard in front of an immigration judge, not

9  just that they raised that fear to the Department itself.

10       MS. REALMUTO:  Correct.  That's what our TRO requests

11  as the procedural protection.  And, you know, we think that's

12  important because it is the immigration judge that heard the

13  vast majority of class members' claims --

14       THE COURT:  I understand that.

15       MS. REALMUTO:  -- and is the person qualified to make

16  that determination.

17       But, more importantly, that whatever the immigration

18  judge says about that fear, there is the availability of an

19  appeal to the BIA and ultimately to the Court of Appeals so

20  that people's claims that they are going to be killed or

21  tortured actually get proper review for the agency but also

22  through the federal courts.

23       THE COURT:  Okay.  But in your view, the duty to try

24  to reopen --

25       MS. REALMUTO:  -- falls on DHS.

1           THE COURT:  -- falls on DHS, not on the person who's

2    told, We're not sending you to Mexico; we're sending you to

3    Guatemala?

4           MS. REALMUTO:  Right.  Because for many people who are

5    pro se, they are not going to have the language skills or the

6    ability or the time to file a motion to reopen.

7           Motions to reopen, if you want to get them granted,

8    are pretty intense.  You have to also show a prima facie case

9    that you're eligible for the relief that you're asking for.

10   And if you have -- you know, you have to prepare that motion to

11   reopen.  And that's why the part of the remedy is a meaningful

12   amount of time in order to be able to do that.

13          But we're getting really into the remedy now, and, you

14   know, I really do want to respond to the Government's point

15   about the --

16          THE COURT:  Sorry.  I tend to ask a lot of questions

17   as we go along.

18          MS. REALMUTO:  Please, ask away.  I really want to

19   answer your questions.

20          But about the form, I mean, first of all, I think the

21   language was -- for the case where "you may be returned,"

22   right?

23          THE COURT:  It is.

24          MS. REALMUTO:  And so -- but I would point out that

25   the whole point of the designation and the regulations provided

1    for designations is that the individual knows that is the

2    country that they could be deported to and that the CAT

3    regulations specifically provide -- I think in

4    8 CFR 1208.17(b)(2), that the designation -- that, even though

5    the Government can change the country, they cannot be deported

6    to a country where they can be persecuted or tortured.

7              Let's see.  What else do I have here?  Let's see.

8              Okay.  The other thing is there's no reason for a

9    person in removal proceedings to have to name every single

10    country in the world where they could be persecuted.

11             If they do, right, what the IJ is supposed to do is

12    assess that fear claim.  That could make removal proceedings

13    take years.  If a person says, Well, I'm afraid of being

14    deported to any of these countries where I could be persecuted

15    on account of my sexual orientation, for example, what's going

16    to happen?

17             And the same thing with the motion to reopen thing.

18    Are we going to flood immigration judges with motions to reopen

19    that are speculative?  When the person has no idea where they

20    could be deported?  That's just going to clog up the

21    immigration system even further.

22             Oh, oh, also, and to the Government's point, Well,

23    they can seek an emergency stay from the immigration judge --

24    those are discretionary stays.  It's willy-nilly.  If the

25    removal is taking place on a weekend, the immigration judge

1    doesn't have the same kind of court set up that you can get to

2    a court on a Sunday, for example.

3            THE COURT:  Right.

4            MS. REALMUTO:  So the Government can just deport

5    people on a Friday after 5:00, and it's all over.

6            I think with that, I will sit down, unless the Court

7    has further questions.

8            THE COURT:  Not now, thank you.

9            MS. LARAKERS:  Thank you, Your Honor.

10           Briefly, on the motion to reopen point, as I said,

11   there are a lot of different motions to reopen, and the biggest

12   bucket is the sua sponte motion to reopen route.

13           And in BIA decision in the *Matter of J.J.*, it

14   articulated what the standard for that is.  And it provides

15   that the IJ should reopen proceedings because it's an

16   extraordinary remedy for exceptional circumstances.

17           So that's what plaintiffs allege here:  That this is

18   an extraordinary circumstance, an exceptional situation where

19   the Government, they allege, has not provided any notice.

20           So that's first --

21           THE COURT:  Can I ask you on that point -- so whether

22   or not it is extraordinary, I guess, depends on whether this

23   frequently occurs.  And so are you able to tell me -- and if

24   you're not, I completely understand that.  But is this

25   currently happening frequently?  Are people being given very,

1  very short windows of notice that they're going to be deported

2  to third countries and then being taken to these countries?  Or

3  is this still extraordinarily uncommon?

4         MS. LARAKERS:  I don't know the answer to that,

5  Your Honor.

6         THE COURT:  Okay.

7         MS. LARAKERS:  I know that in the past, the case law

8  would suggest that it was --

9         THE COURT:  -- uncommon.

10         MS. LARAKERS:  It was more rare, which goes to the

11  point of maybe that's why there wasn't a written policy,

12  because -- and, in that situation, perhaps DHS -- and I don't

13  know this, but perhaps DHS thought it made more sense to give

14  the procedures that it deemed were adequate in any given

15  situation, which may be more in some situation, may be less in

16  another.

17         THE COURT:  But even if the policy that's embodied in

18  the February 18th or 13th memo is, in fact, being adopted --

19  that doesn't necessarily lead to the conclusion that it's all

20  happening in the last minute.

21         So it could be that -- it's certainly imaginable that

22  there are far more deportations to third party countries but

23  you're still giving people several weeks of notice, right?

24         MS. LARAKERS:  Yes, Your Honor.  To that point, it's

25  pretty speculative.

1          THE COURT:  Okay.

2          MS. LARAKERS:  And that's, again, what the motion to

3     reopen point -- I told you they would raise procedural hurdles.

4     They did raise those procedural hurdles.

5          But let's look at the named plaintiffs.  They said one

6     of the named plaintiffs was given a report date in September.

7     So I don't see why that individual in the meantime can't file a

8     motion to reopen.  I think we'd be in a very different posture

9     here -- or could be in a different posture here -- if

10    plaintiffs had even tried.  But as of right now, there is no

11    allegation that they filed that motion to reopen.

12         And to their point saying that it's all over if they

13    were moved.  Not necessarily.  As we discussed, the PFR court

14    has just as much legal authority -- absent the jurisdiction

15    that this Court doesn't have.  Like, let's assume jurisdiction

16    for the minute -- has the same legal authority to order people

17    back, to provide remedies.  So it's not all over.  And the

18    emergency stay can be sought at the IJ level, at the BIA level,

19    and at the Court of Appeals level.

20         And the most salient point on these sua sponte motions

21    to reopen is *Charles v. Garland* -- it's in our brief --

22    113 F.4th, 20, where the First Circuit says, yes, sua sponte

23    motions to reopen are discretionary but -- as with the

24    discretionary -- discretion that this Court has -- it's limited

25    to violations of law, to abuse of discretion.

1          And what Plaintiffs are alleging here -- I don't think

2     that they would concede that if the PFR court or the BIA failed

3     to give them the remedy they asked for -- I don't think that

4     they would concede that that would be an abuse -- that it

5     wouldn't be an abuse of discretion.

6          THE COURT:  I'm not sure I follow that.

7          MS. LARAKERS:  Plaintiffs would certainly claim that,

8     if they weren't given the relief in immigration court that they

9     sought -- that that would be an abuse of discretion.

10         THE COURT:  I understand.  Thank you.

11         MS. LARAKERS:  And then, if the PFR Court agrees, they

12    can order that relief.

13         So let's move on to the merits.  I don't have too much

14    to say.

15         What we stated in our brief, we're in -- we're outside

16    what the statute and the regulations speak to.  There are steps

17    that DHS must follow with regard to when it's considering what

18    third country to remove someone to, but -- I think Plaintiffs

19    said -- there's nothing in the statute that directly speaks to

20    this.  So we're really in --

21         THE COURT:  When you say, "there are steps," that's

22    only when they say, First, you consider --

23         MS. LARAKERS:  Yes, that's right.

24         THE COURT:  But once you're in step three, which is a

25    and b didn't work, we're on to just pick another one; and

1  there's no procedures beyond that.

2          MS. LARAKERS:  There's no procedures beyond that.

3  Statutes don't speak to that.  As you see, statutes and

4  regulations speak to a lot of other scenarios, not this one.

5  So we're not in the Accardi doctrine world.

6          So what is DHS required to do outside of that?  You

7  know, our position is nothing.

8          That doesn't necessarily mean that individuals will

9  get no process.  Obviously, in the declaration, DHS stated that

10  O.C.G. did get some process.

11          I think the named plaintiffs here -- at least one

12  individual was told to report in September.  So if he came

13  before this Court in September saying that he had filed his

14  motion to reopen, that's process.  Right?

15          So there's all these different levels of process,

16  like, built in that Plaintiffs have already had.  It's -- as

17  Plaintiffs contend, it's not nothing.

18          The I-589 exists; the admonitions made by the

19  immigration court exist; and the motion to reopen process,

20  despite the procedural hurdles plaintiffs raise, exist.  And at

21  all levels in that motion to reopen the administrative process,

22  they can position for a stay of removal.

23          Including ICE, by the way.  That's also an option.

24  Not to say that ICE is required, but it's also an option to

25  tell ICE affirmatively:  I know you have the authority to

1    remove me to a third country, but I have a real fear of being

2    returned to this country because of x, y, and z.

3         And then ICE could decide, oh, well, maybe they put

4    them in additional screening.  Maybe they join a motion to

5    reopen depending on the circumstances.  I don't know what would

6    happen, but all of this goes to why it's clear Congress wanted

7    these claims brought individually, on an individual basis, and

8    why they should go to immigration court at least first before

9    we get here, and the recognition that the PFR Court has the

10   authority to craft an appropriate remedy.

11        Moving on to remedies.  Assuming for -- assuming this

12   Court were to find that DHS is required to do something more

13   here, the principles laid out in the Administrative Procedure

14   Act, general principles of separation of powers, would dictate

15   that this Court find that there would be a due process interest

16   and that the Court would at least provide DHS an opportunity to

17   come up with some process; and then the Court could judge that

18   process.

19        So if the Court is going to grant a TRO or a

20   preliminary injunction, it should at least remand to the agency

21   to allow the agency to come up with some sort of process, and

22   then the Court can judge that.

23        THE COURT:  On that point -- and this is something I

24   had just asked her about -- the proposed TRO that they're

25   asking for seems to give the Department a lot of leeway in

1    terms of how to set out due process.  Do you agree with that?

2          So in case you don't have it in front of you, I'll

3    summarize it, which is:  If you're going to move someone to a

4    third country, you have to give written notice that that will

5    occur and then provide a meaningful opportunity for the

6    plaintiffs to submit an application -- some more words, but

7    basically saying, an application to be reconsidered.

8          So that seems to give the -- that, I agree, I should

9    not -- if I adopt that deal, I'm not going to say what due

10   process is -- you have to provide written notice on an

11   8 1/2-by-11, you have to give 72 hours, you have to have --

12   Right?

13         Those level of detail would be inappropriate for me to

14   even get into.  But even their proposed order doesn't seem to

15   require that.

16         MS. LARAKERS:  The word "meaningful" looms large in

17   this context.  I think Plaintiffs would admit that they define

18   the word meaningful very different from the way the Government

19   defines the word meaningful, and we do know that just from

20   practice -- that that word meaningful means very different

21   things.

22         THE COURT:  Interesting.

23         MS. LARAKERS:  And we had whole hearings and

24   proceedings based on what -- if you were to issue this, that

25   relief, we would be in court tomorrow.  Because we're going to

1    disagree on that.

2          So I think it is -- I don't know what Plaintiffs'

3    version of meaningful is, and perhaps they can be asked.  But

4    it -- I can guarantee you we don't agree on that.

5          For example, I don't think -- the Government would --

6    let's say that the Government proposes -- Your Honor found that

7    DHS was required to do something.  Let's say that the

8    Government proposes what was done in O.C.G.'s case:  Told him

9    shortly before he was going to Mexico that he was going to be

10   removed to Mexico, which provided him an opportunity to say, I

11   have a fear of return to Mexico.

12          I don't know whether plaintiffs would agree that

13   that's meaningful.  I venture to say that they would not.

14          So I think the way to go about that is allow the

15   agency to draft a proposal.  Perhaps the parties can talk about

16   that, but I think we're starting with this O.C.G. case as an

17   example -- whether that would be enough process.

18          Okay.  And then on the class-wide, Your Honor said

19   that you're not going to issue a class-wide injunction today?

20          THE COURT:  I'm certainly not certifying provisional

21   class.  I did not ask you to come prepared to speak about

22   class.  You don't need to.  That doesn't mean that -- I am

23   considering a broad injunction, but it is not going to be

24   turning on class.

25          So my intention today is -- I'm going to let you

1    finish; I'm going to take a couple minutes; I'm going to come

2    back out; I will give you my provisional ruling; I will give

3    you my written ruling by, hopefully, the end of the day if not

4    midday tomorrow.

5         And then we will come back, hopefully, if it's

6    convenient for everybody, on the 10th to have a full hearing on

7    the preliminary injunction.  And at that point, I'll give you

8    an opportunity to address class.  So I'm not asking you to

9    address it now.

10         I do think, while we're on the topic, the two things

11   that I -- the two things that are worth thinking about in terms

12   of what I'm thinking about and in terms of the next hearing

13   are:

14         You raised some points about the representativeness of

15   the class and that people -- the named plaintiffs are in a

16   different position than perhaps O.C.G. was, for example, on the

17   morning that he was told he was going to Mexico.

18         So your point that someone right now who has a hearing

19   in September and has representative counsel and is out of

20   custody and knows that they might be moved to a third party

21   might be in a slightly different position than someone who was

22   told, "You're going to Mexico in 30 minutes."

23         I'm not asking anyone to talk about that.  I'm telling

24   you I'm thinking a lot about that.  Those two things seem

25   different to me.

1          And, secondly, what -- that remedy, if there is a

2    remedy -- it would look like.  The point that you just made, I

3    agree with:  that the Court is not in the first instance the

4    appropriate party to craft, if I find there is procedural due

5    process rights there.

6          And, whether it is somewhere between -- I'm sure

7    you're right that -- and I don't think I even need to ask

8    you -- that O.C.G.'s level of procedural due process they would

9    disagree with was meaningful, and that what they would ask for,

10   you would, I'm sure, respond with was excessive.

11         So where do we fall in the middle of those two things

12   is something I'm -- I'm wrestling with how one would deal with

13   that.  I'm not asking you to respond further today, but that's,

14   in terms of -- I think whatever I do today it's not going to be

15   terribly transformative in terms of the next two weeks.

16         And so I share that to say those are the things that I

17   struggle with, and so hopefully you can help me come to the

18   correct conclusion.

19         MS. LARAKERS:  So with that, Your Honor, I don't think

20   we need to address, obviously, class.  But we do need to

21   address what they've sought.  They've also sought an

22   administrative stay of what they have called, quote/unquote,

23   "the directive," which is the e-mail that they attached to

24   their complaint.

25         So that directive -- it just speaks to, like -- just

1    tells officers --

2            THE COURT:  I'm not going to do that.

3            MS. LARAKERS:  Okay.

4            THE COURT:  I'm not doing that today.  I'm not telling

5    you I won't consider that for next week.  But I'm not -- I

6    agree with you that exactly what a stay would do relative to a

7    directive that seems to be nonbinding isn't totally clear to

8    me.  So I'm not doing anything like that.

9            MS. LARAKERS:  It's our position that any relief

10   beyond the named plaintiffs has direct 1252(f)(1) concerns.

11   That's stated in our brief.

12           And let me make sure I don't have anything else, which

13   I don't think I do.

14           Oh.  Another case that this Court can look at about,

15   like, 1231(b)(2) -- it's cited in our brief -- is *Jama v. ICE*.

16   That's in our brief, just, if this Court wants more background.

17   And I have it printed out here.  It just provides more

18   background.

19           Thank you, Your Honor.

20           THE COURT:  All right.  I'll give you the last word.

21           MS. REALMUTO:  Thank you.  If I could just respond

22   briefly to a couple of points.

23           I think we would know what happens if a person asked

24   ICE for the stay -- the same thing that happened to O.C.G.

25           I think the Court asked, Is this happening frequently?

1   It is, because of the redetention directive.  We, like I

2   mentioned at the outset, are inundated with people who are

3   being redetained and are terrified.

4          THE COURT:  And I can tell you, I've read every one of

5   those declarations.  I understand why you gave them to me, and

6   the point is well made.

7          MS. REALMUTO:  Yeah.  And two of those declarations --

8   actually, two or three of them, people did try to file a motion

9   to reopen and it was denied.

10          And the way that process works is you don't get an

11   automatic stay when you appeal the denial of an IJ motion to

12   reopen.  You've got to ask for another discretionary stay

13   before the BIA.

14          And the decision about the standard for sua sponte

15   reopening:  As I mentioned, people with constitutional

16   violations, the agency has held that those are not

17   extraordinary circumstances.  It's a totally discretionary

18   motion.

19          And, again, to look at *Thompson v. Barr*, I think it

20   was, where there's limited judicial review of discretionary

21   decisions.

22          Also, you can't ask for emergency stay if you have no

23   notice of the country that you are going to be deported.  And,

24   certainly, that is happening.  People are in detention now

25   being told they're going to be deported to a third country but

 1    have no idea what that country is.

 2            And, finally, with respect to the named plaintiffs,

 3    M.M. and D.V.D., you know, that is not the situation for

 4    everyone.  These are named plaintiffs in a federal court action

 5    who have been told to report in September.  But there are -- he

 6    is representative of all our proposed class members who this

 7    Court does have jurisdiction to provisionally certify the class

 8    and grant some relief under CAT.

 9            And just with respect to the Government's position, I

10    mean, they don't really address 1252 but in a footnote.  And

11    they try to say that what we're asking the Court to do is

12    enjoin 1231, which is covered by 1252(f)(1).

13            That is not what we're asking for here.  And I want to

14    direct the Court's attention to the case that we cited in our

15    brief, *Galvez v. Jaddou.*

16            The CAT statute is a totally separate statute from the

17    Immigration and Nationality Act.  It is the Foreign Affairs

18    Reform and Restructuring Act.  It's in a separate statute.

19            But, most importantly, I would just like to explain

20    that 1252(f)(1) enjoins certain provisions of the Immigration

21    and Nationality Act that were in effect on September 30, 1996,

22    when IIRAIRA enacted that provision.

23            FARRA, the CAT statute, came about two years later.

24    And the implementing regulations came about afterwards.

25    Therefore, it is not covered by 1252(f)(1), and that is why the

 1    Court has authority to issue injunctive relief to provide CAT

 2    protection.

 3              And with that, thank you.

 4              THE COURT:  Thank you.  I'm going to take a ten-minute

 5    recess to put some of my thoughts together, and I'll be back

 6    out.

 7              (A recess was taken from 1:25 to 1:42 p.m.)

 8              Thank you all for both your extensive briefing and for

 9    the hour and a half you were willing to let me ask you

10    questions here today.  I know both of you have a lot more

11    experience in this area than I, and it was very helpful.

12              I'm issuing a temporary restraining order today.  The

13    temporary restraining order that the plaintiffs have sought is

14    granted in part.

15              The defendants, all of their agents, officers,

16    servants, employees, attorneys, successors, assignees, and

17    persons acting in concert or participation with them are hereby

18    enjoined and restrained from:

19              Removing the Plaintiffs D.V.D., M.M., and E.F.D. from

20    the United States to a third country -- i.e., any country other

21    than the country designated for removal in their prior

22    immigration proceedings -- unless and until the defendants

23    provide D.V.D., M.M., E.F.D., and their respective counsel with

24    written notice of the third country to which they will be

25    removed;

1      And until defendants provide a meaningful opportunity

2   for Plaintiffs D.V.D., M.M., and E.F.D. to submit an

3   application for protection, including withholding of removal

4   under 8 U.S.C., Section 1231, subsection (b)(3) and protection

5   under the Convention Against Torture to the immigration court;

6      And, if such application is filed, until Plaintiffs

7   D.V.D., M.M., and E.F.D. receive a final agency decision on any

8   such application.

9      In addition, the defendants are enjoined and

10  restrained from removing any individual subject to a final

11  order of removal from the United States to a third country --

12  i.e., a country other than the country designated for removal

13  in immigration proceedings -- unless and until the defendants

14  provide those individuals and their respective immigration

15  counsel, if any, with written notice of the third country to

16  which they will be removed;

17      And until defendants provide a meaningful opportunity

18  for those individuals to submit application for the Convention

19  Against Torture protection to the immigration court;

20      And, if any such application is filed, until those

21  individuals receive a final agency decision on any application.

22  That applies to any individual anywhere in the United States.

23      I find that no security bond is required under Federal

24  Rule of Procedure 65(c).

25      The order shall remain in effect until the Court rules

 1    on the motion for a preliminary injunction.

 2           As a reminder of the Court's previous order,

 3    Dkt. No. 12, remains in effect.

 4           I would like you to come back for a preliminary

 5    injunction hearing on --

 6           Ms. Beatty, did we say the 10th?

 7           THE CLERK:  The 10th at 11:45.

 8           THE COURT:  Are you able to come back on the 10th at

 9    11:45?

10           MS. REALMUTO:  Yes.

11           MS. LARAKERS:  Can I look at my calendar, please?

12           THE COURT:  Of course.

13           MS. LARAKERS:  Yes, Your Honor.

14           THE COURT:  On that day we will be addressing both

15    class certification and the issuance of a preliminary

16    injunction.

17           In terms of briefing, do you anticipate filing any

18    additional briefing?  Or will you be relying on what you've

19    already submitted?

20           MS. REALMUTO:  Just the opportunity to file a reply

21    brief on our class cert and on the -- if the Government is

22    going to respond further on the PI, obviously to the PI as

23    well.

24           THE COURT:  Sure.

25           Would giving you until the 2nd, that would be -- no,

1    that's not very long at all.  How about to the 4th?  Would that
2    be enough time for you to file an opposition to the class
3    certification and any additional briefing you'd like on the
4    opposition to the preliminary injunction.
5            MS. LARAKERS:  I obviously would love more time,
6    Your Honor, but it sounds like it's going to have to be the
7    4th.
8            THE COURT:  The 4th, I'm sorry, is only a week.  But
9    that kicks it back to them; they have only a couple of days.
10           And a reply brief by the 8th?  I recognize that gives
11   you only two work days, but the deadlines are short.
12           MS. REALMUTO:  We'll make it work.
13           THE COURT:  In the meantime, I take your point about
14   the Court ordering what "meaningful" means to heart.  And so I
15   would consider a motion to reconsider, if you wanted to narrow
16   what that procedure looked like, or you wanted come to an
17   agreement about what it looked like, or you wanted to tell me,
18   This is what we're defining as meaningful, and I would like you
19   to reconsider and adopt this.
20           I'm open to all of those things because you raise a
21   very good point.  And so, to the extent that the guidance that
22   the Court is giving you is nothing more than a meaningful
23   opportunity and you want some more direction or you want to
24   narrow that with some more specificity, I would welcome a
25   motion to consider.

1            If you file a motion to consider, I can hear you.  I

2     think you're in D.C.; so I can hear you, even by Zoom, within

3     24 hours.

4            MS. LARAKERS:  Thank you, Your Honor, for that

5     opportunity.

6            I do want to highlight that, in that motion to

7     reconsider that we may file, we may raise objections to the

8     issuing of a TRO in a nationwide context without a

9     provisional -- without even any certification of a class.

10           I just had to make sure I made that point.

11           THE COURT:  That's completely understood and I'm happy

12    to deal with that.  This is only for ten days; so if you want

13    me to deal with that in between, I'm happy to.

14           But if this prevents procedural challenges that I've

15    not anticipated, explain them to me, and I'm happy to try to

16    ameliorate that, to the degree that I can.

17           MS. LARAKERS:  No, thank you, Your Honor.

18           THE COURT:  With that is there anything else I can do

19    for you today?

20           MS. REALMUTO:  No, thank you, Your Honor.

21           THE COURT:  Is there anything else I can do for the

22    Government today?

23           MS. LARAKERS:  No, Your Honor.  Thank you.

24           THE COURT:  Thank you both.  I appreciated the

25    argument.

1          (Whereupon the hearing was adjourned.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3               I, Jessica Leonard, Certified Shorthand Reporter

4     and Federal Certified Realtime Reporter for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter, to the best of my skill and ability.

9               Dated this 30th day of March, 2025.

10

11

12               /s/ Jessica M. Leonard

13               Jessica M. Leonard, CSR, FCRR

14               Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25