# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G.,<br><br>　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY;<br>Kristi NOEM, Secretary, U.S. Department of<br>Homeland Security, in her official capacity; Pamela<br>BONDI, U.S. Attorney General, in her official<br>capacity; and Antone MONIZ, Superintendent,<br>Plymouth County Correctional Facility, in his official<br>capacity,<br><br>　　　　　Defendants. | Case No. 25-cv-10676-BEM |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR AN INDICATIVE RULING UNDER FEDERAL RULE OF CIVIL PROCEDURE 62.1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION…………………………………………………….     1

II.     LEGAL STANDARD……………………………………………….     3

III.    ARGUMENT………………………………………………………     4

    A.  Defendants' Memo Does Not Eliminate the Basis for the TRO………………     4

    B.  The Memo Does Not Protect Plaintiffs or Individuals with Final Orders…….     5

        1. The Law Requires Individualized Notice and a Meaningful Opportunity to
        Apply for Protection, which Only the TRO Provides……………………...     5

        2. Blanket Diplomatic Assurances Do Not Safeguard Against Torture………     7

            a. *Blanket Assurances Do Not Protect Against Torture by State and
            Non-State Actors or Chain Refoulement*…………………………....     7

            b. *The Government Knows of—and Regularly Documents—Torture by
            State and Non-State Actors in the Countries to Which it Likely Seeks
            to Remove Individuals with Final Orders*……………………………     8

            c. *Diplomatic Assurances Must Be Individualized*.................................     11

            d. *Even Individualized Assurances Are Unreliable*..…………………...     13

        3. The Screening Process Is Wholly Inadequate………………………………     14

    C.  Defendants' Actions Underscore the Need to Keep the TRO in Place……….     18

IV.     CONCLUSION………………………………………………………...     20

# I.     INTRODUCTION

This Court should deny Defendants' Motion for an Indicative Ruling (Mot.), ECF 43, because the memorandum issued late Sunday evening in response to this Court's temporary restraining order (TRO) and supporting memorandum, ECF 34 and 40, does not address, let alone assuage, the concerns Plaintiffs raise. To the contrary, the Memorandum, entitled Guidance Regarding Third Country Removals (Memo), ECF 43-1, significantly exacerbates them.

The Memo lacks the protections provided by the TRO, including written notice to individuals and counsel, the opportunity to submit an application under the Convention Against Torture (CAT) to an immigration judge (IJ), and the ability to seek further review of the IJ's determination. ECF 34. The TRO is in keeping with the Immigration and Nationality Act (INA), the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), implementing regulations, and the Due Process Clause of the Fifth Amendment, all of which require these protections to ensure that the Department of Homeland Security (DHS) does not remove noncitizens to countries where they face persecution, torture, and/or death. In contrast, the Memo fails to provide *any* meaningful or individualized notice or opportunity to apply for CAT protection and thus violates these rights.

The Memo provides *no* notice and *no* opportunity to apply for protection to noncitizens whom DHS seeks to remove to a country that has provided generalized "diplomatic assurances." ECF 43-1 at 1-2. Such blanket diplomatic assurances do not safeguard against torture by state or non-state actors or against chain *refoulement*, removal by the country providing the assurances to the noncitizen's country of origin, such as in Plaintiff O.C.G.'s case.

All such blanket assurances fail to provide, among other things, the individualized fear analysis required to comply with the statutory protections provided by FARRA and the INA.

1

Further, any diplomatic assurances ring especially hollow with respect to the countries to which DHS reportedly is seeking to deport individuals with final removal orders. Country conditions reports issued by the Department of State directly contradict any such diplomatic assurances, documenting systemic human rights abuses committed by, or acquiesced to, by the governments of these countries.

For individuals whom DHS seeks to send to countries that have not provided diplomatic assurances, the Memo instructs DHS officers only to "inform" them of removal to a third country but fails to ensure meaningful notice—written notice to the individual and their counsel sufficiently in advance of deportation—leaving serious questions as to its efficacy. In addition, these individuals are subjected to a woefully inadequate screening procedure that erroneously places the burden of manifesting fear on the noncitizen (allegedly in line with regulations that are actively being challenged in separate litigation), fails to inform noncitizens of their rights, applies an impermissible, heightened fear standard, and curtails administrative and judicial review.

Moreover, Defendants' actions over the past week underscore the need to keep the TRO in place (and convert it to a preliminary injunction). Defendants refuse to provide assurances that Defendants are not violating the TRO or applying the new Memo while this Court and the First Circuit review the pending motions before them. Defendants have engaged in actions demonstrating a startling lack of accountability, including declaring in other litigation that they have no authority to secure the release from a Salvadoran prison of at least one person whom they acknowledge unlawfully deporting there.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 62.1, a district court may defer a ruling, deny the motion, or state that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue. Fed. R. Civ. P. 62.1(a). The court's decision to make such a ruling is discretionary. *See, e.g.*, *Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1206 (8th Cir. 2015); *Dice Corp. v. Bold Techs.*, 556 F. App'x 378, 384 (6th Cir. 2014).

When considering the motions merits, the Court should assess Defendants' motion by reference to the standard for dissolving a TRO. In the related context of preliminary injunctions, the First Circuit has indicated that district courts should apply Rule 60(b)(1) or (b)(5) to assess such a motion. The latter most clearly applies here and requires Defendants to show "it is no longer equitable that the judgment should have prospective application, and that there has been the kind of significant change in circumstances that the Rule requires." *Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33, 38 (1st Cir. 2006) (quotation omitted); *see also Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 16 (1st Cir. 2008) (noting that a court should look to Rule 60(b)(5) in context of a motion to dissolve a preliminary injunction). District courts have broad discretion when ruling on such motions, which allows them "to forestall unwarranted attempts to alter [temporary] orders." *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 242 (3d Cir. 2003) (cited favorably in *Concilio de Salud*, 551 F.3d at 15-16). Ultimately, Defendants must show that Plaintiffs are no longer likely to have success on the merits or suffer irreparable harm. *See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1225 (1st Cir. 1994).

### III.    ARGUMENT

**A.    Defendants' Memo Does Not Eliminate the Basis for the TRO.**

The Memo does not come remotely close to ensuring the procedural protections this Court found were required to "comport with due process." ECF 40 at 4; ECF 34. Nor does the Memo provide the procedural protections that the Solicitor General's Office represented to the U.S. Supreme Court Defendants must provide. *See* ECF 40 at 4-5 nn.8 & 10; *see also* ECF 1 at ¶ 43.[1]

The TRO provides two sets of protection. First, it protects Plaintiffs D.V.D., M.M. and E.F.D. against deportations to a third country without *written* notice to them and their immigration counsel of the country and a meaningful opportunity to submit an *application* for withholding of removal under 8 U.S.C. § 1231(b)(3) and/or protection under the Convention Against Torture (CAT) *to the immigration court* (until a final agency decision, if such an application is submitted). ECF 34 at 1-2. Defendants cannot dispute that the TRO's application to the named Plaintiffs includes protections under § 1231(b)(3) that are not addressed by the Memo. Second, the TRO also protects all individuals subject to a final order of removal against deportations to third countries unless DHS provides *written* notice to them and their immigration counsel, if any, and a *meaningful* opportunity to *submit an application* for CAT protection *to the immigration court*; if an application is filed, protection lasts until the agency makes a final

---

[1]    Defendants claim that the "existing procedures" which the Solicitor General's Office assured the Supreme Court that DHS provides when it designates a new country apply only to individuals in "ongoing proceedings." Transcript of March 28, 2025 Hearing (Transcript), at 9-11; *see also* ECF 43-1 at 1 n.2. But this Court has found that there is no "meaningful distinction" between pending and post-final order proceedings, reasoning that the "[t]he introduction of a *new* country of removal is, according to the government in *Bondi v. Riley*, what triggers the right to receive notice and be heard." ECF 40 at 4-5 n.8; *see also id*. at 5 n.10. Nothing in the Memo or Defendants' motion addresses, let alone undermines, the Court's finding.

decision. *Id*. at 2.

The Memo provides none of these protections, failing to fulfill Defendants' legal obligations to ensure that persons are not removed to a third country where they are likely to be tortured or killed. The Memo does not require any notice —let alone individualized or written as required by the TRO —to either the noncitizen or their counsel if the receiving country gives generalized diplomatic assurances. *See infra* § III.B.1. And, absent diplomatic assurances, the Memo requires only that the noncitizen be "inform[ed]" but does not explain when or how. ECF 43-1. The Memo does not afford a meaningful opportunity for a noncitizen to articulate a fear claim, let alone submit an application for CAT protection to the immigration court as required by the TRO; indeed, immigration officers will not even affirmatively ask about fear. *See infra* §§ III.B.1, 3. Finally, the Memo does not permit a stay pending review of an IJ's decision by the Board of Immigration Appeals (BIA), which the TRO provides. Nor does it provide any path to judicial review. Instead, for those DHS seeks to deport to countries that have provided diplomatic assurances, the Memo states that there is no "need for further procedures." ECF 43-1 at 2. And for countries from which no diplomatic assurances have been obtained, the Memo provides a screening mechanism with no procedural protections on an accelerated basis which can only result in DHS, in its discretion, electing either to move to reopen "as appropriate" or to designate another country.

Because the Memo does not provide the protections required by law nor those represented by the government to the Supreme Court, dissolution of the TRO is not warranted.

**B.    The Memo Does Not Protect Plaintiffs or Individuals with Final Orders.**

**1.    The Law Requires Individualized Notice and a Meaningful Opportunity to Apply for Protection, Which Only the TRO Provides.**

Instead of the TRO's protections, i.e., written notice and a meaningful opportunity to

apply for protection, Defendants propose accepting generalized diplomatic assurances from countries that claim they will not persecute or torture individuals removed to their territories. ECF 43-1 at 1. Such blanket assurances fail to comply with Defendants' obligations not to remove noncitizens to any country where they would likely be tortured or killed.

These protections are enshrined in statute, regulation, and treaty. *See, e.g.*, *Nasrallah v. Barr*, 590 U.S. 573, 580 (2020); FARRA, Pub. L. No. 105-277, Div. G, Title XXII, 112 Stat. 2681 (1998) (codified as Note to 8 U.S.C. § 1231). Moreover, Defendants must ensure that noncitizens are not removed to *any* country where they are likely to be tortured. *See, e.g.*, 8 C.F.R. § 1208.17(b)(2) (requiring IJs to inform an individual granted CAT deferral that they "may be removed at any time to another country *where he or she is not likely to be tortured*") (emphasis added).[2]

But these rights are meaningless unless those who hold them receive meaningful notice and an opportunity to present their claims for protection against torture. Meaningful notice and an opportunity to be heard are the cornerstones of due process. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (holding that "[t]he fundamental requisite of due process of law is the opportunity to be heard," which includes "timely and adequate notice.") (quotations omitted); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) (holding that due process requires "at a minimum . . . that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case"); *Oakes v. United States*, 400 F.3d 92, 98 (1st Cir. 2005) ("The ubiquity of the 'notice and opportunity to be

---

[2] Similarly, 8 U.S.C. § 1231(b)(3) expressly mandates that "the Attorney General may not remove [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country . . . ." Likewise, 8 U.S.C. §§ 1231(b)(1) and (b)(2) only permit removal to a designated country "subject to" the protection provided in § 1231(b)(3).

heard' principle as a matter of fundamental fairness is deeply engrained in our jurisprudence."). Unsurprisingly, then, the CAT regulations implementing FARRA make clear that *individualized* CAT protections are mandatory. *See, e.g.*, 8 C.F.R. § 1208.16(c) (discussing IJs' individualized assessment of applicants' CAT claims); 8 C.F.R. § 1208.17 (same, as well as individualized notice to individuals with CAT protection).

Defendants attempt to elude these obligations, claiming that any legal obligation to provide individualized notice of a third country designation and an opportunity to be heard on a fear claim in ongoing proceedings ceases after proceedings have concluded. Transcript at 9-11; *see also* ECF 43-1 at 1 n.2. But this Court has already correctly rejected such dereliction of duty. *See* ECF 40 at 4-5, n.8 & 10; *cf. supra* n.2. It is nonsensical for Defendants to acknowledge to the Supreme Court that noncitizens in removal proceedings are entitled to meaningful notice and an opportunity to submit applications for relief with respect to any third country, but then argue here that, as long as Defendants wait until after immigration court hearings conclude to target removal to a third country, they are relieved of the very same obligations.

### 2.    Blanket Diplomatic Assurances Do Not Safeguard Against Torture.

#### a.    *Blanket Assurances Do Not Protect Against Torture by State and Non-State Actors or Chain Refoulement.*

Blanket diplomatic assurances amount to a restatement by the receiving country of its general obligations under international human rights law. They offer no protection against either chain *refoulement,* whereby the third country proceeds to return an individual to their country of origin, as Plaintiff O.C.G. experienced, or torture by state or non-state actors. Yet all these abuses are contrary to the United States' obligations under its statutes, regulations, and international treaty obligations. *See, e.g.*, *supra* § III.B.1 (discussing obligations under FARRA and the laws governing withholding of removal). CAT protections apply to torture committed

directly by the state or by third parties "with the consent or acquiescence of[] a public official." 8

C.F.R. § 1208.18(a)(1); *see also Murillo Morocho v. Garland*, 80 F.4th 61, 71 (1st Cir. 2023)

(vacating decision denying CAT protection where the BIA failed to properly consider risk of

torture by non-state actors). Chain *refoulement* similarly runs contrary to the United States'

obligation not to return individuals to countries where they are at substantial risk of torture. *Cf.*

UNHCR, Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum-

Seekers ¶ 3(vi) (May 2013) (requiring protection against *refoulement* in transfer agreements

governing asylum seekers); *accord* United Nations Human Rights Committee, General Comment

No. 31 ¶ 12, 2004, The Nature of the General Legal Obligation Imposed on States Parties to the

International Covenant on Civil and Political Rights, CCPR/C/21/Rev.1/Add. 13 (May 26, 2004)

(explaining obligation against chain *refoulement* in ICCPR). No government, especially not

governments whose patterns of human rights violations the Department of State has documented,

can credibly provide such sweeping guarantees with respect to an entire class of persons of

unknown and varied circumstances and nationalities, and for an indefinite period of time.

     **b.**    ***The Government Knows of—and Regularly Documents—***
               ***Torture by State and Non-State Actors in the Countries to***
               ***Which it Likely Seeks to Remove Individuals with Final Orders.***

The flaws in Defendants' diplomatic assurances proposal, and the need for individualized

assessments, are demonstrated by the government's reports regarding the countries to which it

proposes removing putative class members. These countries include Mexico, El Salvador,

Honduras, Libya, Rwanda, and others. *See* Ortega Decl. ECF 31-1 ¶ 12 (identifying Mexico as

third country of removal for O.C.G.); Exh. A, (X Post by Secretary of State Marco Rubio) (after

issuance of this Court's TRO, United States deported 17 individuals including non-Salvadorans

to El Salvador to be detained there); Exh. C (Decl. of Robert Cerna, *J.G.G. v. Trump*, No. 1-25-

cv-00766-JEB, ECF 28-1 ¶ 6 (D.D.C. Mar. 18, 2025)) (explaining that the government removed a plane full of Venezuelans with final orders of removal to El Salvador); Alexander Ward et al., *U.S. Looks for More Countries to Take Migrants*, Wall Street J. (Apr. 1, 2025) (identifying Honduras as a third country to which Defendants will soon begin removing people, and Mexico, Libya, and Rwanda (among others) as potential options).

This list of countries underscores why individualized CAT assessments are necessary and why diplomatic assurances are insufficient. For example, in El Salvador—to which Defendants are already removing non-Salvadorans—the Department of State recognizes the many reports of "the [Salvadoran] government or its agents commit[ing] arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison, either from medical neglect or physical abuse." Exh. D at 1 (2023 El Salvador Human Rights Report). Notably, Defendants are deporting people, including third-country nationals, *to be detained* in a prison system marked by "gross overcrowding; inadequate sanitary conditions; insufficient food and water shortages; a lack of medical services in prison facilities; and physical attacks." *Id.* at 7. Even after this Court's TRO, Defendants are removing non-Salvadorans with final orders to El Salvador to be detained in the country's prison system, where it appears they will be detained indefinitely. Exh. A (**Rubio X Post**); Exh. B (X Post by Salvadoran President Nayib Bukele).

Conditions in other countries to which DHS is deporting people who are not their citizens make blanket diplomatic assurances equally untenable. For example, in Mexico, where O.C.G. was deported, the State Department notes "credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention." Exh. E at 1 (2023 Mexico Human Rights Report). The

Department's Human Rights report explains that "[c]ivil society groups reported torture was a generalized practice," including by "municipal police, public security, and state attorney general's offices." *Id.* at 8. Moreover, "[c]riminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, bribery, intimidation, and other threats, resulting in high levels of violence and exploitation." *Id.* at 2. The same report documents "targeting and victimization of migrants and asylum seekers" in Mexico both by state agents and by non-state armed actors. *Id.* at 26. The White House recently declared that in certain parts of Mexico criminal cartels "function as quasi-governmental entities, controlling nearly all aspects of society." 90 Fed. Reg. 8439 (Jan. 20, 2025). This reality underscores that even if a central government provides a generalized (and unenforceable) assurance as to its own conduct, there are still serious issues as to whether the government acquiesces to other actors who inflict torture. Honduras is the same. *See* Exh. F at 1, 4 (2023 Honduras Human Rights Report) (detailing "credible reports of: arbitrary or unlawful killings; torture or cruel, inhuman or degrading treatment or punishments by government agents; harsh and life-threatening prison conditions; [and] arbitrary arrest or detention," as well as "more than 100 cases of alleged torture or cruel and inhuman treatment of detainees and prisoners by security forces").

Defendants' proposal to remove people to Libya or Rwanda is equally shocking. The Department of State's most recent report for Libya notes "reasonable grounds to believe state and nonstate actors committed crimes against humanity in Libya." Exh. G at 1 (Libya 2023 Human Rights report) (emphasis added); *id.* at 2 ("Significant human rights issues included credible reports of: arbitrary or unlawful killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment perpetrated by

the government and armed groups on all sides; harsh and life-threatening prison conditions"). Migrants from other countries in Libya are particular targets for violence and other forms of abuse by both state and non-state actors, including torture, disappearance, and sexual slavery. *Id.* at 20, 33-38. As for Rwanda, there were "several reports the government committed arbitrary or unlawful killings, including extrajudicial killings." Exh. H at 2 (Rwanda 2023 Human Rights Report). And Rwanda is currently engaged in an aggressive armed conflict against its neighbor, the Democratic Republic of the Congo. *See* Elain Peltier, *Despite Congo Offensive, Rwanda Lures Athletes, Investors, and Tourists*, N.Y. Times, Mar. 11, 2025.

### c. *Diplomatic Assurances Must Be Individualized.*

The Memo violates the implementing CAT regulations that require individualized diplomatic assurances. *See* 8 C.F.R. § 1208.18(c). Indeed, the regulation makes clear this is an extraordinary process, relating to a specific individual, where a select few high-level officers are sufficiently involved to provide a diplomatic assurance in an individual case. The regulation states that "[t]he Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that *an* alien would not be tortured there if *the* alien were removed to that country." *Id*. § 1208.18(c)(1) (emphasis added); *see also id*. § 1208.18(c)(2), (c)(3) (referencing "the alien"). The references to a singular individual ("an alien," "the alien") show that any diplomatic assurance must be specific to the individual and cannot be a categorical diplomatic assurance, covering all individuals deported to a particular country. *See, e.g.*, *Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (examining the "ordinary meaning" of statutory text and finding that "[t]o an ordinary reader—both in 1996 and today—'a' notice would seem to suggest just that: 'a' single document"). The Memo provides no such individualized assurance.

Moreover, even if an individualized assurance is provided to a single individual in accordance with § 1208.18(c)(1), the regulation further instructs that one of only three officials, the Attorney General, Deputy Attorney General, or Commissioner of the Immigration and Naturalization Service,[3] must independently "determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable" to allow deportation consistent with CAT. 8 C.F.R. § 1208.18(c)(2). The Memo provides no such individualized determination. Finally, though the regulation indicates that compliance with subsections (c)(1) and (c)(2) precludes further consideration of a CAT claim by an IJ, the BIA, or an asylum officer, *see* 8 C.F.R. § 1208.18(c)(3), it does not limit or eliminate judicial review regarding any such CAT claim. Indeed, a path to judicial review must be provided. *See* 8 U.S.C. § 1252(a)(4); *see also Nasrallah*, 590 U.S. at 585 ("[Section] 1252(a)(4) now provides for direct review of CAT orders in the courts of appeals."). In contrast, the Memo forecloses all access to IJ, BIA, *and* judicial review. ECF 43-1 at 2 (providing noncitizens "will be removed without the need for further procedures").

The Department of Justice has recognized the importance of a case-by-case, individualized process for seeking and assessing the reliability of diplomatic assurance determinations. At a hearing before the Senate Judiciary Committee, in response to questioning by then Senator Patrick Leahy, former U.S. Attorney General Alberto Gonzales testified:

> LEAHY: What do you think that the assurances we get from countries that are known to be torturers, when they say, "Well, we won't torture this person you're sending back" – do you really think those assurances are credible?
> GONZALES: I think, Senator, that's a difficult question that requires, sort of, a case-by-case analysis.
> . . . .
> GONZALES: Well, again, Senator, we take this obligation very, very seriously. And we know what our legal obligations are. We know what

---

[3]    This position no longer exists.

the directive of the president is. And each case is very fact-specific.

*Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong.

10 (2005); *see also* Exh. I (Statement of John B. Bellinger, III, Legal Adviser, U.S. Dep't of

State on June 10, 2008) (emphasizing need for direct engagement "with the receiving country

regarding the treatment that a *particular individual* will receive") (emphasis added).

### d.    *Even Individualized Assurances Are Unreliable.*

Diplomatic assurances, even in individualized cases, have proven unreliable in the

immigration context. In *Aguasvivas v. Pompeo*, the court cited to "critical analys[es] of how

often [] diplomatic assurances actually work to prevent torture." 984 F.3d 1047, 1050 n.3 (1st

Cir. 2021) (citing Katherine R. Hawkins, *The Promises of Torturers: Diplomatic Assurances and

the Legality of "Rendition"*, 20 Geo. Immigr. L.J. 213 (2006)); Ass'n of the Bar of the City of

New York & Center for Human Rights and Global Justice, *Torture by Proxy: International and

Domestic Law Applicable to "Extraordinary Renditions"* (New York: ABCNY & NYU School

of Law, 2004). In another case, the Third Circuit held that due process requires that a noncitizen

facing termination of CAT protection based on alleged individualized diplomatic assurances

must receive notice and a full and fair hearing, including the opportunity to challenge the

reliability of those assurances. *Khouzam v. Att'y Gen.*, 549 F.3d 235 (3d Cir. 2008). Khouzam,

an Egyptian citizen and Coptic Christian, challenged the termination of CAT protection to Egypt

based on Egypt's assurances that he would not be tortured. *Id.* at 238. The court held that the

government's failure to provide him with advance notice of the diplomatic assurances or any

opportunity to review and challenge them violated due process. *Id*. at 257. Specifically, the

federal defendants "failed to make any factfinding based on a record that was disclosed to

Khouzam," "did not permit Khouzam to see the written diplomatic assurances," and "provided

no information pertaining to [their] reasons for crediting those assurances." *Id*. Further, the court found that Khouzam had no opportunity to develop a record with his own evidence or make arguments on his own behalf and that he was denied an individualized determination before a neutral and impartial decisionmaker. *Id*. at 257, 258.

### 3.    The Screening Process Is Wholly Inadequate.

Finally, even the fortunate few individuals informed of the country to which they will be removed under the Memo will not receive a meaningful opportunity to seek fear-based protection that comports with the due process requirements and the governing statutes and regulations. As an initial matter, the Memo provides no assurance that notice will be provided in writing, in a language the person understands, in a time or manner sufficient to assert a fear-based claim, and no notice to counsel. Furthermore, requiring individuals to "affirmatively state[] a fear of removal," absent any indication that they have the right to seek protection from fear, let alone when or how to do so, *see* ECF 43-1 at 2, functionally ensures that people will *not* receive required protections against persecution and torture. Requiring individuals to meet a "more likely than not" standard at the screening stage, *see id*., is similarly contrary to law as addressed below. The screening is generally conducted within 24 hours of referral, *id.* at 2, rendering it all but impossible for detained individuals to gather and present sufficient evidence to satisfy this standard.[4]

Both the withholding of removal statute and FARRA were intended to bring U.S. law "into conformity with its obligations" under international treaties. *INS v. Stevic*, 467 U.S. 407,

---

[4]    The government appears to assume that a detainee will know on the spot whether he has reason to fear persecution or torture in any particular country not his own. This is not always true, particularly where the country in question is one where the detainee has never lived, or has not lived in some time, or where the risk is that the third country will return him to his country of origin where he has already established a risk of persecution or torture.

427 (1984); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 n.25 (1987) (explaining

requirements of withholding of removal were enacted "in order to comply with" Article 33 of the

1951 United Nations Convention Related to the Status of Refugees); FARRA § 1242(b)

(explaining that the CAT regulations are "to implement the obligations of the United States

under Article 3 of [CAT]," subject to the provisos of the U.S. Senate during ratification). These

treaties *require* nations to use procedures that will identify individuals entitled to these

mandatory forms of protection, including making inquiries as to individuals' need for

international protection, providing guidance regarding their rights, and affirmatively eliciting

relevant information.[5] Consistent with the international obligations they implement, both the

withholding statute and FARRA incorporate the requirement that Defendants inform individuals

of their rights and affirmatively ask about fear of persecution and torture prior to removal. *See*

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress

ought never to be construed to violate the law of nations if any other possible construction

remains . . . ."); *Garcia v. Sessions*, 856 F.3d 27, 42 (1st Cir. 2017) (finding that the *Charming*

*Betsy* doctrine applies even to "non-self-executing" international obligations). The Memo does

---

[5]     *See, e.g.*, United Nations High Comm'r for Refugees (UNHCR), Key Legal
Considerations on Access to Territory for Persons in Need of International Protection in the
Context of the COVID-19 Response ¶¶ 3, 4 (Mar. 16, 2020),
https://www.refworld.org/policy/legalguidance/unhcr/2020/en/122898 (explaining that states
should "make independent inquiries as to the persons' need for international
protection" and that individuals seeking protection "must have access to relevant
information in a language they understand and the ability to make a formal asylum claim with
the competent authority"); UNHCR, Handbook on Procedures and Criteria for Determining
Refugee Status ¶ 192 (reissued 2019), https://www.unhcr.org/us/media/handbook-procedures-
and-criteria-determining-refugee-status-under-1951-convention-and-1967 (explaining that
individuals seeking protection "should receive the necessary guidance as to the procedure to be
followed"); UNHCR, Asylum Processes (Fair and Efficient Asylum Procedures) ¶ 5, U.N. Doc.
EC/GC/01/12 (May 31, 2001), https://www.unhcr.org/us/media/asylum-processes-fair-and-
efficient-asylum-procedures (requiring "[f]air and efficient procedures").

not do so.

Defendants attempt to justify failing to provide individuals with information regarding the opportunity to seek protection as "similar to" the screening mechanisms used in certain recent expedited removal cases and in screening under Title 42 of the U.S. Code, *see* ECF 43 at 2 n.1, but fail to mention that those procedures are the subject of ongoing litigation and/or are documented to *prevent* individuals from making fear-based claims. *See, e.g.*, *Las Americas Immigrant Advocacy Ctr. v. DHS*, No. 1:24-cv-1702 (D.D.C. filed Jun. 12, 2024); Center for Gender & Refugee Studies, *"Manifesting" Fear at the Border: Lessons from Title 42 Expulsions* 2 (2024)[6] (reporting that, under the Title 42 process, immigration officers repeatedly refused to refer even individuals who manifested a fear and instead verbally abused or ignored them). Moreover, expulsions were based on Title 42, which DHS invoked to suspend entry of individuals to prevent the spread of communicable diseases. Defendants have no such statutory authority to permit them to deviate from their statutory, regulatory, and constitutional obligations. Though Defendants assert that noncitizens are more likely to make false claims if asked about their fear of return, ECF 43-1 at 2 (citing *Securing the Border*, 89 Fed. Reg. 48710, 48743 (June 7, 2024) and *Securing the Border*, 89 Fed. Reg. 81156, 81235 (Oct. 7, 2024)), the cited records neither document evidence to support that assertion nor provide any indication that insufficient claims would ultimately prevail. *Cf. Zhang v. Holder*, 585 F.3d 715, 724 (2d Cir. 2009) (recognizing that screening interviews are *more* reliable where an individual "is notified prior to the interview that [i]t is very important that you tell the officer all the reasons why you have concerns about being removed") (quotation omitted; alteration in original).

---

[6]     *See* https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.

Instead, the Memo fails to account for any of the practical realities of individuals with fear of persecution or torture subject to immediate deportation: that noncitizens will have no idea that they need to affirmatively state a fear to avoid removal, or how, when and to whom they must make their fear claims. Indeed, they may not even be able to speak a language that officers purporting to screen for fear will understand. *Cf. Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1279 (11th Cir. 2009) (citing cases recognizing that, in an interview setting, individuals are "not represented by counsel and may be markedly intimidated by official questioning" and thus may be likely to omit information regarding fear).

These practical realities similarly demonstrate why applying a heightened "more likely than not" standard in screening for withholding and CAT claims is insufficient. It would require individuals in remotely conducted, rushed, and informal screenings before U.S. Citizenship and Immigration Services (USCIS) that include no ability to seek administrative review and may not permit access to attorneys or other assistance, *see* ECF 43-1 at 2, to meet the ultimate standard for protection eligibility applied in full proceedings before an IJ. Notably, in 2022, Defendant DHS itself recognized that there was "no evidence" that applying heightened screening standards "resulted in more successful screening out of non-meritorious claims while ensuring the United States complied with its nonrefoulement obligations." *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18078, 18092 (Mar. 29, 2022). Critically, a noncitizen who does not pass USCIS's initial, rushed screening "will be removed" without the opportunity for judicial review notwithstanding that Congress provided that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under [CAT]." 8 U.S.C. § 1254(a)(4).

17

DHS cannot functionally eliminate statutory entitlements to mandatory protection from deportation by denying individuals the most basic procedures necessary to obtain them. *See Califano v. Yamasaki*, 442 U.S. 682, 693 (1979) ("[T]his Court has been willing to assume a congressional solicitude for fair procedure, absent explicit statutory language to the contrary."); *Meachum v. Fano*, 427 U.S. 215, 226 (1976) (recognizing that minimum due process rights attach to statutory rights). Here, Defendants would render the right to seek withholding and CAT protection meaningless by depriving individuals of any information about their ability to seek such protection and requiring them to meet the final standard for eligibility in what purports to be an initial, expedited screening interview.

**C.    Defendants' Recent Actions Underscore the Need to Keep the TRO in Place.**

Defendants' recent actions (including their refusal to acknowledge conduct presumably violating this Court's order) and their unwillingness or inability to secure the release of an individual they acknowledge the United States unlawfully removed to El Salvador only underscore how inadequate the Memo is, why individual inquiries are necessary, and why motions to reopen *after* someone is removed do not provide a meaningful remedy.

 On Monday, March 31, 2025, Secretary Rubio announced that the night before Defendants had removed 17 noncitizens to El Salvador, including alleged members of the Tren de Aragua gang (a Venezuelan gang). Exh. A (Rubio X Post). At 4:10 pm that day Plaintiffs' counsel asked Defendants' counsel to confirm that none of the individuals were covered by this Court's order, i.e., that none of them were nationals of a country other than El Salvador, with final removal orders, who were now being removed to a third country (El Salvador). Exh. K at 1 (Counsel's Emails). In addition, Plaintiffs' counsel asked Defendants to confirm that no one was currently being removed pursuant to the March 30, 2025 Memo. *Id.* Finally, counsel requested an

immediate meet and confer if any of the 17 deported individuals were covered by the order, or any noncitizens were being subject to removal under the Memo. Counsel for Defendants promptly responded that they would look into the matter. *Id.* at 2.

After 24 hours passed with no response, in the evening of April 1, 2025, Plaintiffs' counsel again reached out to Defendants' counsel, and this time provided the name and identifying immigration number of a Venezuelan man reported to have been removed to El Salvador on the March 30 flight. *Id.* at 3. Plaintiffs' counsel requested that Defendants' counsel advise whether the man's removal violated the TRO and, if not, to communicate whether any of the information provided was incorrect or there was any other basis for asserting the TRO was not violated. *Id*. Plaintiffs' counsel also reiterated that they were awaiting Defendants' response regarding the other 16 individuals deported on March 30, 2025, as well as confirmation that no one was currently being removed pursuant to the Memo. *Id.*

On April 2, 2025, approximately 24 hours later, Defendants' counsel responded that they "have no information to share at this time." *Id.* at 4. Defendants thus have refused to address the alleged violation of this Court's order by removing this non-Salvadoran national with a final order to El Salvador on the night of March 30, 2025, and possibly others, two days after this Court's order. They also refuse to state whether they are currently applying the Memo despite the TRO, which provides additional protections.

Nor would this be an isolated incident: in litigation pending before the District Court in Washington, D.C., that court has remonstrated with Defendants for likely flouting a TRO by removing alleged Venezuelan gang members absent completion of removal proceedings. *J.G.G. v. Trump*, No. 25-cv-766, ECF 25 at 20-23 (D.D.C.) (Transcript of March 17, 2025 Hearing); *id*. ECF 47 at 2 (order requiring additional evidence and briefing from defendants). Similarly, in a

case involving a Salvadoran national who had been granted withholding of removal to El Salvador, Defendants acknowledged this week that the individual had been unlawfully removed to El Salvador. Exh. J (Defs' Mem. of Law, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX, ECF 11 at 3 (D. Md. Mar. 31, 2025)). However, they then asserted that, despite their direct involvement in his removal to El Salvador, they had no authority to demand his release from the Salvadoran prison. *Id.* at 7. Even worse, Defendants attempted to minimize the harm from their unlawful conduct, arguing that "there is no clear showing that Abrego Garcia himself is likely to be tortured or killed in CECOT [the Salvadoran prison]." *Id*. at 14. Thus, even where Defendants have engaged extensively in recent diplomatic negotiations to arrange for removals to, and detention of noncitizens in, El Salvador, and even where Defendants admit that an individual was wrongfully removed, they assert they cannot secure his release, dramatically illustrating the harm that results from third country deportations without adequate protections.

Finally, O.C.G., a citizen of Guatemala, testified in immigration court how he was raped and held hostage in Mexico. ECF 8-4 ¶¶ 3, 6. Yet Defendants insist they had no obligation to provide individuals in his situation with written notice or an opportunity to apply for protection from torture. Transcript at 28-29; ECF 40 at 4. Indeed, under the Memo, as long as there is a generic diplomatic assurance from a country that it will not engage in torture, persons such as O.C.G. would not be entitled to *any* notice or process. *See* ECF 43-1 at 1-2. And even if there were no diplomatic assurances, authorities would not be required to ask or document whether the individual sought protection. *See id.* at 2 ("Immigration officers will not affirmatively ask whether the [noncitizen] is afraid of being removed to that country."); *see also supra* § III.B.3.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

20

Respectfully submitted,

s/*Trina Realmuto*

Trina Realmuto*
Kristin Macleod-Ball*
Mary Kenney*
Tomás Arango
**NATIONAL IMMIGRATION
   LITIGATION ALLIANCE**
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4447
trina@immigrationlitigation.org

Anwen Hughes*
**HUMAN RIGHTS FIRST**
75 Broad Street, 31st Floor
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

Matt Adams*
Leila Kang*
Aaron Korthuis*
Glenda M. Aldana Madrid*
**NORTHWEST IMMIGRANT
   RIGHTS PROJECT**
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org

*Attorneys for Plaintiffs*

* *Admitted pro hac vice*

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF).

s/ *Trina Realmuto*
Trina Realmuto
National Immigration Litigation Alliance

Dated: April 4, 2025

21