# El Salvador 2023 Human Rights Report

## Executive Summary

Under the state of exception, reports of gang violence decreased significantly, allowing citizens to exercise their right to life, liberty, and security of person, and to engage in daily activities and commerce without the constant threat of violence and extortion. Arbitrary arrests and mass pretrial hearings, however, undermined due process and exacerbated historically difficult conditions in overcrowded prisons.

Significant human rights issues included credible reports of: unlawful or arbitrary killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; extensive gender-based violence, including domestic and sexual violence, and femicide; substantial barriers to sexual and reproductive health services access; trafficking in persons, including forced labor; and crimes involving violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons.

The government took credible steps to identify and punish officials who may have committed human rights abuses.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

EXHIBIT D

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison, either from medical neglect or physical abuse.  The human rights nongovernmental organization (NGO) Socorro Jurídico Humanitario recorded the deaths of 79 detainees as of August 16 and determined that 33 of the deaths were violent.  The human rights organization Cristosal confirmed 71 deaths of detainees and determined that 13 of the deaths showed signs of violence, including beatings by a club or baton.  In March the newspaper *El Pais* interviewed several released detainees, one of whom stated prison guards beat his cellmate to death.  Socorro Jurídico Humanitario reported that 21 detainees died from a lack of medical attention.  Cristosal reported two of the detainees who died had anemia and 11 died of complications from illnesses such as diabetes to chronic kidney disease.

On June 13, the attorney general announced his office had investigated 143 deaths in prison during the state of exception and that his office, in conjunction with the Institute for Legal Medicine, had determined the 143 deaths resulted from pre-existing conditions or illness.

The government reported that widespread killings by criminal gangs decreased significantly in comparison with previous years. The Attorney General's Office reported intentional homicides of a criminal nature (excluding ones resulting from a family or social dispute) decreased from 366 during the first half of 2022 to 32 during the first half of 2023. The government and observers widely attributed the decrease to the government's policies under the state of exception, declared in March 2022 and extended monthly. As of December, it continued in effect. Despite the reduction, the Observatory for Human Rights at the University of Central America, a human rights think tank, argued the government homicide figures could have been undercounted, as they did not take into consideration the number of human remains located or disappearances reported.

## b. Disappearance

There were regular reports that security and law enforcement officials arrested persons and did not inform their families of their whereabouts. Socorro Jurídico Humanitario reported that as of August, it was tracking 1,376 cases in which the families of those detained under the state of exception did not receive confirmation that their relatives were in the prison system, information regarding their whereabouts, or confirmation that they were alive. Socorro Jurídico Humanitario also reported that in three cases, detainees' bodies were interred before their families were notified of their

deaths.  The Human Rights Ombudsperson's Office (PDDH) received 17 complaints regarding the lack of information on detainees under the state of exception.

Media and human rights groups reported cases of disappearances and missing persons continued to occur, although it was often impossible to distinguish between a "disappearance" and a "missing person," due to limited law enforcement resources to investigate.  In June the Foundation of Studies for the Application of Law calculated there were 2,397 unresolved cases of missing persons first reported between January 2019 and June 2022.  The National Civil Police (PNC) reported that of the missing persons reported from January to August, 143 cases remained unsolved as of August 11.

On March 27, the minister of justice and public security announced that investigations into disappearances would remain suspended, as authorities continued to prioritize capturing gang members.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The law prohibited such practices, but there were credible reports that government officials employed them.

Human rights organizations and media outlets reported complaints of abuse

and mistreatment of detainees by prison guards. On July 14, a coalition of human rights organizations at an Interamerican Human Rights Commission public audience stated they collectively interviewed more than 100 released detainees, many of whom reported systemic abuse in the prison system, including beatings by guards and the use of electric shocks. The coalition alleged the treatment of prisoners constituted torture.

On March 25, the newspaper *El País* reported a man released from Izalco prison said guards beat one of his cellmates to death with batons and the butts of their rifles. He also said guards activated electric stun guns against the prison's wet floors to deliver electric shocks to all the prisoners in a cell.

Cristosal spoke with the family of a prisoner who died of stomach cancer on February 10, after being released from Zacatecoluca prison on January 28. Cristosal reported his body showed signs of torture, including significant bruising on his back and stomach, as well as signs of malnutrition and gastrointestinal hemorrhaging.

There were sporadic complaints of mistreatment by police and members of the armed forces. As of July 26, the PNC registered 48 complaints of threats committed by police officers. As of July 31, 129 victims registered complaints with the PDDH regarding the violation of physical integrity, mistreatment, or physical abuse by the PNC, and seven registered complaints of the same abuses committed by members of the armed forces. Five victims registered complaints with the PDDH concerning torture or

cruel and inhuman punishment at the hands of PNC officers, and one victim registered a complaint of the same treatment committed by members of the armed forces.

The judiciary continued prosecuting several cases from the civil war against members of the armed forces. The judge in the 1981 El Mozote massacre case continued to hear witness testimony. The government, however, continued to deny expert witnesses access to military archives to determine criminal responsibility for the massacre, in defiance of a 2020 judicial order. On February 7, a judge opened trial proceedings against three former soldiers who allegedly belonged to a death squad that kidnapped, tortured, and killed civilians in San Miguel during the civil war. This was the first time a case involving death squad members had come to trial.

Impunity was a problem in the General Directorate of Penal Centers, particularly for prison guards. Human rights organizations noted the Attorney General's Office had not opened any complaints into the allegations of torture, abuse, or mistreatment by prison guards.

Some concerns remained regarding impunity in the PNC and armed forces. The state of exception empowered security forces to make arrests without meeting traditional evidentiary standards, and media and civil society reported some security officials might have used that authority to extract bribes, sexual favors, or other concessions from citizens. Some members of the security forces were convicted, however, and were facing criminal

proceedings for misconduct, such as sexual assault.

## Prison and Detention Center Conditions

Prison conditions before the state of exception were harsh and life threatening due to gross overcrowding; inadequate sanitary conditions; insufficient food and water shortages; a lack of medical services in prison facilities; and physical attacks.  The addition of 72,000 detainees under the state of exception exacerbated the problem.  Human rights organizations reported that as of August 22, more than 70 detainees died in prisons from violence, insufficient medical care, and chronic health conditions.

**Abusive Physical Conditions:**  Prisons were severely overcrowded, as the number of detainees increased and only a limited number were released. As of July, the government reported that 71,776 persons were detained under the state of exception.  In 2021, the prison system had a capacity of 30,000 and was already overcrowded.  The government inaugurated a new prison with a reported capacity for 40,000 on January 31, but as of September, only 12,000 detainees had been moved into it.  A prisoner released from the Izalco prison reported that 100 prisoners were held in a cell built for 50.

Detainees released from the Izalco and La Esperanza prisons reported a lack of food and potable water and being limited to two tortillas, one spoonful of beans, and one glass of water per day.  They also reported limited water for

sanitation.  Human rights organizations noted released prisoners reported severe heat and lack of ventilation in the cells and prolonged confinement, without the opportunity for movement or the use of sanitary facilities.

Released prisoners and their families reported a lack of access to medical care or medicine in prison.  One released prisoner reported to *El País* that his diabetic cellmate received insulin only two or three times during his period of incarceration and died suddenly in his sleep.  Although families of prisoners were often instructed to bring medicine to the prison for the prisoner, the medicine often did not reach the prisoner.  Human rights organizations reported communicable diseases such as tuberculosis and scabies were widespread in the prisons.

Human rights groups and news outlets reported unsanitary conditions and limited food and medical care in women's prisons.  There were reports of life-threatening lack of medical care or sanitation for detained pregnant women and young children held with their mothers.  On July 24, the newspaper *El Faro* published an interview with a released prisoner who gave birth while in prison.  She reported being held in a unit with 150 other pregnant women in the Izalco prison farm, with two doctors assigned to them.  She reported receiving only sporadic prenatal care and extremely limited access to medicine.  Cristosal published a statement from a released prisoner who reported many pregnant women miscarried due to a lack of medical care.

Young babies often stayed with their mothers in prison and received limited medical care, despite widespread scabies and other communicable diseases. The newspaper *El Diario de Hoy* reported that on May 17, a girl, age one, died of pneumonia after being held in Apanteos prison with her mother for six months. Socorro Jurídico Humanitario reported a baby, age six months, born while his mother was held in Izalco, died of kidney failure, liver failure, and pneumonia on June 26, six days after he was transferred from the prison to the care of other members of his family.

**Administration:** The PDDH had the authority to investigate allegations of abusive conditions in prison; however, the human rights ombudsperson reported the PDDH did not receive access to visit prisons during the year. PDDH representatives conducted 32 visits to jails in the Ahuachapan Department, where they found the detainees' basic needs were provided for but detainees were transferred to prisons within five days of their arrest, without the ability to contact their families.

**Independent Monitoring:** The International Committee of the Red Cross had access to prison facilities.

## d. Arbitrary Arrest or Detention

The constitution prohibited arbitrary arrests, and the law provided for the right of any person to challenge the lawfulness of their arrest or detention in court. The state of exception, itself a legal mechanism, suspended the right

to legal defense, as well as the requirement that persons be informed of the reason of their arrest at the time of their detention, and increased the number of days an individual could be held in detention before being formally charged.  The government did not always observe the requirements of the law and constitution.

## Arrest Procedures and Treatment of Detainees

The constitution required a written warrant for arrest, except in cases where an individual was caught in the act of committing a crime.  The language of the state of exception decree did not detail changes to enforcement procedures.

Security forces arrested suspected gang members or collaborators "in the act" of being a gang member or collaborator without a warrant and entered homes without warrants, ostensibly with verbal permission of the residents. The state of exception decree suspended the right to legal counsel, and law enforcement agents did not wait for suspects to obtain counsel before questioning them.

A July 2022 change in the law provided that hearings for gang membership charges could proceed without the detainees' physical presence, although with defense counsel participating in person.  Many detainees' hearings were conducted virtually and en masse, often with one defense lawyer in the courtroom representing hundreds of persons appearing by video, unable

to consult with their defense lawyers in real time or hear the proceedings because of technical problems, complicated by the number of participants.

In July the Legislative Assembly approved legislation for the prosecution of detainees under the state of exception cases, eliminating the previous provision that a criminal process could not exceed 24 months. As of November, no case from the state of exception had gone to trial.

The court system was slow to respond to habeas corpus petitions filed by those challenging their detention under the state of exception. In July Socorro Jurídico Humanitario submitted 1,285 requests for habeas corpus and received 28 responses, of which 25 were declared inadmissible.

**Arbitrary Arrest:** As of July 31, the PDDH reported 738 complaints of arbitrary detention, compared with 283 from January to July 2022. Civil society entities also received complaints from the public regarding arbitrary arrests during the state of exception, although fewer than in 2022. Cristosal reported that as of August 9, it received 348 complaints of arbitrary arrest, compared with 3,110 such complaints in 2022. Several human rights organizations asserted that many detainees who remained in pretrial detention were arrested arbitrarily in 2022, without evidence of gang affiliation and only for having tattoos or living in a gang-controlled area. Leaked arrest files of 690 persons detained in March-April 2022 showed 50 were charged with being a gang member based on a suspicious or nervous appearance, and 50 for having a tattoo, with no indication if the tattoo was

gang-related.

The government established an anonymous tip line to provide information about gang members.  Media reported cases in which detainees, or their families, believed they had been arrested on the basis of anonymous complaints.  On March 30, in an interview with the BBC, the vice president declared police did not carry out arrests based on tattoos or being named in an anonymous call.  He stated the government maintained a database of profiled gang members and carried out arrests based on that database.  The vice president acknowledged it was possible persons with no gang ties were arrested but noted that courts released more than 3,000 detainees after determining they had no such ties.  On August 22, the minister of justice and public security reported that of the more than 71,000 persons arrested under the state of exception, approximately 7,000 had been released.

On July 28, the PNC reported four police officers were arrested on charges of detaining civilians and extorting their relatives for money in exchange for their release.

**Pretrial Detention:**  Lengthy pretrial detention was a significant problem. COVID-19 pandemic closures had already severely delayed trial and hearing dates, and the sharp increase in cases during the state of exception further exacerbated the situation.  For example, in the majority of hearings, judges ordered defendants to remain in detention even when the Attorney General's Office failed to provide sufficient evidence demonstrating

defendants were affiliated with a gang.

In March the Foundation for the Study of the Application of Law noted prosecutors often requested extensions to the six-month evidence-gathering period due to their large caseload resulting from the state of exception. This further prolonged pretrial detention.

# e. Denial of Fair Public Trial

The law provided for an independent judiciary. The government held approximately 72,000 detainees to try under the state of exception but presented no plan to accomplish this. The government indicated it likely would resort to mass trials, calling into question the availability of a fair public trial for these detainees.

## Trial Procedures

The law provided for the right to a fair and public trial, but the state of exception suspended the right to be informed promptly of charges and the right to defense. Other rights were not always respected. The law allowed for trials for gang membership charges to proceed without the defendants' physical presence, although with defense counsel participating in person. On July 26, the Legislative Assembly approved amendments to the law that would allow collective trials with up to 900 defendants for those who were already detained under the state of exception and were charged as gang

members.  No case of persons detained under the state of exception had gone to trial as of November.

After implementation of the state of exception, the demand for public defenders exceeded the capacity of the Public Defender's Office.  One public defender noted in 2022 that his caseload had grown from 45-50 new cases a month to 95 new cases a day.  In March the Foundation for the Study of the Application of Law reported that defense lawyers continued to be overwhelmed by cases.

## Political Prisoners and Detainees

The government arrested or continued to detain sitting and former politicians from opposition parties and the governing party.  Media questioned the legitimacy of the detentions, but the government declared the charges against them were legitimate.  The detainees were generally subjected to the same harsh prison conditions as convicted prisoners.

As of August 24, Ernesto Muyshondt, former mayor of San Salvador and a prominent opposition politician, had been detained for more than two years and two months, even though the criminal code prior to the state of exception did not allow for defendants to be held for more than two years in pretrial detention without a sentence.  Arrested in 2021, he was acquitted of misappropriation of tax withholdings and breach of duty on August 9.  The remaining charges against him were for appropriation of five million dollars

in labor contributions and also electoral fraud and illicit associations for allegedly negotiating with gangs in exchange for votes in the 2015 legislative elections.

Muyshondt developed serious health problems during his detainment and in 2022 said that while detained he was beaten and tied up. In January he was hospitalized after a four-week hunger strike. Prison officials did not comply with seven subsequent orders issued by a judge for Muyshondt to be taken to a hospital. During a preliminary hearing on April 23, Muyshondt said prison officials planned to kill him and that the Director of Penitentiaries, Osiris Luna, had denied him access to a hospital for 63 days.

Two former Farabundo Marti National Liberation Front (FMLN) party officials, charged in 2021 with money laundering and illicit enrichment, remained in detention. Three other former FMLN officials also charged in the same case were under house arrest. Defenders of the three claimed they were detained for political reasons, while the government asserted the charges against them were legitimate. Investigations continued as of October.

On January 11, six former FMLN guerrillas were arrested in Santa Marta, Cabañas, for the 1989 kidnapping, torture, and killing of Maria Inés Alvarenga during the civil war. Many in the Santa Marta community recalled the accused parading Alvarenga's body around town as a warning and few denied the allegations, but they said the government was pursuing the

charges for possibly political reasons.  Five of those arrested were members of an FMLN-linked community organization that advocated against mining. Defenders of those arrested claimed authorities chose to prosecute the case to silence their environmental activism.  The repeal of the civil war amnesty law in 2016 allowed for the prosecution of cases from the civil war.  The government declared the charges against the former guerrillas were legitimate and based on testimony from multiple witnesses.

## f. Transnational Repression

Not applicable.

## g. Property Seizure and Restitution

Not applicable.

## h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution prohibited such actions.  Reforms to the criminal code introduced in 2022 allowed the Attorney General's Office to carry out a wide range of undercover digital monitoring activities without a warrant, with no restrictions on scope or duration.  There were allegations the government tracked journalists, members of NGOs, and political opponents and collected information from private messages on their cell phones.  There were reports

security forces entered homes without warrants.

As of August, the Association of Journalists of El Salvador (APES) reported two cases of government officials monitoring of journalists, two cases of surveilling journalists, and one case of illegally accessing the telephone of a journalist.

The PNC reported that as of July 26, they received nine complaints that police officers entered homes without a warrant.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provided for freedom of expression, including for members of the press and other media, and the government generally respected this right. Journalists, media and civil society organizations, and opposition figures criticized the government's online harassment of critics and rhetoric towards journalists. There were sporadic reports of monitoring and threats against journalists.

**Freedom of Expression:** In November the government repealed a 2022 amendment to the criminal code that prohibited creating, reproducing, or transmitting any visual content (texts, images, graffiti, or other forms of

visual expression) that related to gangs, and stipulated a penalty of 10 to 15 years in prison.  Media organizations and NGOs stated this had served as a threat to journalists and had created a chilling effect on the independent media for the duration of time it was active.  The government stated the legislation was designed to prevent persons from relaying gang messages to the public.  No one was arrested under this law while it was in effect.

**Violence and Harassment:**  As of August, the APES Center for Monitoring Attacks on Journalists reported 14 acts of intimidation against journalists committed by government officials, six cases in which government officials threatened journalists, and two instances in which government officials issued threats of legal action against journalists.

APES and other media outlets reported one journalist was detained arbitrarily.  The journalist, Victor Barahona, host of a local television show, was arrested in June 2022 on charges of gang associations and released on parole on May 19.  Barahona said his arrest was either because he interviewed a guest on his show who criticized local government leaders for corruption or because of his involvement in a community organization in a gang-controlled neighborhood.  In July he gave an interview regarding prison conditions to national media.  After the interview, he was summoned to a hearing to review his conditions of release, during which he was warned to keep the process confidential, according to his lawyer.

APES reported that from January to August, five journalists left the country.

Two left pre-emptively after publishing investigative pieces, and three cited threats as their reason for leaving.  One other journalist moved internally after publishing an investigative piece, and another moved internally after he reported he was followed to his residence by police and military officials.

APES raised concerns that in 10 separate instances, government officials arbitrarily stopped journalists and prevented them from carrying out their work, restricting their access into certain areas and demanding that they delete photographic or video footage.  In one such instance, on March 31, five soldiers prevented two journalists from *El Diario de Hoy* from entering a section of a neighborhood and said they needed a permit to enter.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  In April *El Faro*, an investigative online newspaper, moved its administrative headquarters and legal registration to Costa Rica, citing primarily the multiple audits it faced from the Ministry of Finance and fabricated criminal accusations, as well as surveillance, threats, harassment of advertisers, and defamation by public officials.  Its journalists remained in the country and continued to report.

There were reports that other news outlets also experienced harassment of advertisers and chose to self-censor or reduce operations.

**Nongovernmental Impact:**  Unlike in previous years, there were no reports that journalists who reported on gangs and narcotics trafficking were

subject to threats from criminal groups.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content.

There were reports that government-backed bots and troll accounts were used to manipulate social media discourse. On July 14, the investigative digital magazine *Revista Factum* tracked the activity of a network of progovernment accounts they determined to be trolls. The site's reporters determined the most prolific account tweeted up to 700 times per day and had 61,000 followers. *Revista Factum* reported that in one case, the network generated more than 2,000 negative tweets against a target in 24 hours.

# b. Freedoms of Peaceful Assembly and Association

The constitution provided for the freedoms of peaceful assembly and association, and the government generally respected these rights.

# c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

# d. Freedom of Movement and the Right to Leave the

# Country

The constitution provided for freedom of internal movement, foreign travel, emigration, and repatriation.  As part of Phase V of the administration's "territorial control plan," security forces occasionally restricted movement around and into certain, mostly low-income, neighborhoods with a history of gang activity.

In contrast with previous years, gangs did not restrict movement between neighborhoods and areas.  In February *El Faro* visited 14 previously gang-controlled communities.  The residents interviewed reported gangs no longer restricted movement between communities or the circulation of outside service providers in their neighborhoods.  The residents reported having access for the first time to services such as ride-hailing apps and food delivery.  Communities were able to use communal spaces, including soccer fields and cemeteries, without restriction; previously only gang members were allowed access.

# e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and assistance to refugees or asylum seekers, as well as other persons of concern.

**Access to Asylum:** The law provided for the granting of asylum or refugee status, and the government had a system for providing protection to refugees, but the law had major regulatory and operational gaps. The legal framework required persons with international protection needs to file their claim within five days of entering the country and asylum seekers to renew their status every 30 days.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

The Internal Displacement Monitoring Center estimated there were 52,000 new IDPs due to violence in 2022 (most recent data available), noting the causes included threats, extortion, and killings perpetrated by criminal gangs. The center also reported an additional 4,600 IDPs in 2022, affected mostly by Tropical Storm Julia.

# Section 3. Freedom to Participate in the Political Process

The constitution provided citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

# Elections and Political Participation

**Abuses or Irregularities in Recent Elections:** National elections were widely reported to be fair and free of abuses and irregularities.

**Political Parties and Political Participation:** On March 15, the Legislative Assembly repealed a section of the electoral code that prohibited changes to election laws within one year of elections.  In June the Legislative Assembly approved laws to reduce the number of deputies in the assembly from 84 to 60 and the number of municipalities from 262 to 44.  The law also changed the formula for calculating party seat distribution in the assembly.  Some opposition politicians and political analysts argued these reductions were designed to consolidate the power of the president's party, Nuevas Ideas (New Ideas).  The NGO Acción Ciudadana (Citizen Action) stated several small minority parties risked losing representation in the Legislative Assembly altogether under the new formula.  President Nayib Bukele and Nuevas Ideas legislators asserted the change would return the number of deputies to the same number that existed in 1991 prior to the signing of the peace accords, which added deputies to increase FMLN representation, and that reducing the number of municipalities was necessary to streamline government administration and to save money.  The reforms were passed quickly, but in line with democratic requirements per the constitution.

**Participation of Women and Members of Marginalized or Vulnerable Groups:** Some transgender persons reported difficulties registering to vote and voting because their gender identities did not match the gender stated on their identification cards.

# Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials, and the government implemented the law, prosecuting officials from both the opposition and the governing party.

**Corruption:** President Bukele touted his government's enforcement actions against corrupt officials, declaring a "war on corruption" on June 1. The Attorney General's Office filed civil and criminal charges against, and courts convicted, high-ranking officials from past administrations. Charges were also filed against sitting officials in municipal governments as well as several lower-level sitting Nuevas Ideas officials and one Nuevas Ideas Legislative Assembly member. Courts convicted former high-ranking officials from several past administrations on charges of corruption. Allegations of corruption among sitting officials persisted, however. Opposition critics argued the government selectively prosecuted corruption charges to persecute political opponents.

As of July 26, the Attorney General's Office opened investigations into 285 cases involving corruption, including embezzlement, extortion, illicit

negotiations, illicit enrichment, and bribery.  As of August 10, the Government Ethics Tribunal reported it opened 178 administrative proceedings against 290 public officials.  The tribunal imposed sanctions in 25 cases and referred eight cases to the Attorney General's Office.

On May 29, a court sentenced former President Mauricio Funes to 14 years in prison for arranging a gang truce during his administration.  Funes, who resided in Nicaragua, called the trial unjust and politically motivated.  On August 10, court proceedings began against Funes' former wife and nine other former high-level members of his administration for money laundering, embezzlement, and tax evasion.

As part of President Bukele's "war on corruption," the Attorney General's Office seized the assets of former President Alfredo Cristiani on June 1, alleging he stole public funds while in office and used those funds to enrich himself and family members.  Cristiani did not reside in the country. Corruption-related charges were brought against a former Supreme Electoral Tribunal president and a former president of the Legislative Assembly.  A former minister of defense, a former minister of justice, a former Legislative Assembly deputy, a former state intelligence agency director, and a former vice minister of commerce and industry were convicted of corruption-related charges.

Municipal officials were also the subject of corruption charges and investigations.  On August 11, the mayors of two municipalities, Conchagua

and Tacuba, along with various other municipal officials and council members, were arrested on unrelated corruption charges.  The mayor of Conchagua and two associates charged with him remained under arrest as of August 22, while the remaining officials were released pending their initial hearing.

Although most officials investigated for or charged with corruption were from the ARENA party, FMLN, or minor opposition parties, several sitting members of the Nuevas Ideas party also faced corruption investigations.  On January 11, the Attorney General's Office charged the mayor of Soyapango, Nercy Patricia Montano De Martínez, and four other officials in the mayor's office with misappropriation and embezzlement of public funds.  Montano, a member of the Nuevas Ideas party, had been the subject of municipal unrest and protests due to her mismanagement of funds.  In February a waste disposal company filed a complaint with the Attorney General's Office against the Nuevas Ideas mayor of Mejicanos, Saúl Antonio Meléndez, accusing the mayor of embezzlement and breach of duty for nonpayment of services rendered totaling more than $896,000, plus interest.  On August 9, the attorney general accused Nuevas Ideas deputy Erick Garcia of fraud relating to election campaign expenses and requested the Legislative Assembly strip Garcia of his immunity.  The Legislative Assembly voted to do so on August 17, and Garcia was arrested the same day.  Garcia's alternate deputy, Nidia Aracely Turcios Anaya, was also arrested.

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings.  Several domestic human rights groups, including Cristosal, accused the government of opening excessive audits into their operations as an intimidation tactic and using the revocation of tax-exempt status as a tool to punish organizations critical of the government.

Human rights groups observed that the government increasingly declined to make public data for monitoring and analysis purposes.  *Gato Encerrado*, an investigative newspaper, noted the government continued to expand the types of information it classified as confidential and not subject to public disclosure requirements.

**Government Human Rights Bodies:**  The principal human rights

investigative and monitoring body was the autonomous PDDH, whose ombudsperson was chosen by the Legislative Assembly for a three-year term.  The PDDH had a constitutional duty to investigate human rights abuses and defend human rights conventions in the country.  Some NGOs believed the PDDH was not fully independent or effective.

On May 25, President Bukele created a Presidential Commission for Human Rights and Freedom of Speech and appointed Andrés Guzmán Caballero as the commissioner.  The responsibilities and duties of the commission were unclear.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalized rape of women or men, domestic or intimate partner rape, and other forms of domestic and sexual violence, including so-called corrective rape of lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) persons.  The law could apply to spousal rape, at the judge's discretion.  The law required the Attorney General's Office to prosecute rape cases whether or not the survivor pressed charges and did not permit the survivor to withdraw the charge. The penalty for rape was generally imprisonment for six to 10 years.  Laws against rape were not effectively enforced.

Violence against women, including domestic violence, remained a widespread and serious problem. The law prohibited domestic violence and generally provided for sentences ranging from one to three years in prison, although some forms of domestic violence carried higher penalties. The law also permitted restraining orders against offenders. The law against domestic violence was poorly enforced. The domestic NGO Feminist Network Against Violence Against Women analyzed cases of violence reported in the first half of 2021 and found the conviction rate was 6 percent. They attributed the low conviction rate to fear of aggressors, normalization of violence, a lack of understanding regarding survivors' rights, impunity, and an overall patriarchal system.

ORMUSA, a domestic women's rights organization, registered 26 femicides between January and May 31, 42 percent of which were committed by the partner of the victim and 54 percent of which were committed in the home of the victim. On February 21, the Legislative Assembly unanimously voted to remove the statute of limitations for prosecuting femicide.

**Other Forms of Gender-based Violence or Harassment:** The law prohibited sexual harassment and established sentences of five to eight years' imprisonment for the crime. Courts also could impose fines in cases in which the perpetrator held a position of trust or authority over the victim. By law, employers were required to create and implement programs to prevent sexual harassment. The government, however, did not consistently

enforce the law effectively. The Union of Seamstresses and Tailors asserted the Ministry of Labor lacked the will to investigate one such sexual harassment case it filed during the year.

As of August 26, the PNC registered 21 complaints of sexual harassment committed by police officers. On February 7, a police officer filed a complaint against the chief inspector of her division for sexual harassment.

**Discrimination:** The constitution granted women and men the same legal status. The law was generally respected, but with exceptions. Women faced discrimination in employment and occupation. Although the law provided for equal pay between men and women, women did not receive equal pay. In 2021, the United Nations reported that women made 18 percent less than men in the same jobs. The law established sentences of one to three years in prison for public officials who denied a person's civil rights based on gender, and six months to two years for employers convicted of discriminating against women in the workplace, but labor organizations noted that employees generally did not report such discrimination due to fear of employer reprisals.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The law banned abortion under all circumstances. Civil society advocates expressed concern the ban led to the wrongful incarceration of women who

suffered severe pregnancy complications, including miscarriages. As of July 26, the Attorney General's Office reported six women were under investigation for abortions and two for alleged feticide, which the legal system termed "homicide of a 'recently born' child," a charge often invoked for suspicions related to the cause of miscarriage. Charges were brought in one case of feticide.

Numerous factors served as barriers to access sexual and reproductive health services. In 2021, UN experts noted that there was "a systemic practice of discrimination against women who suffer obstetric emergencies or pregnancy losses." In 2022, the women's rights organization Las Dignas presented the results of a study on contraception access carried out in two rural districts. It found that 20 percent of the population studied had an active sex life but did not use contraceptives for reasons including dangerous or difficult conditions that prevented travel to health centers, not having required parental authorization for minors to obtain contraceptives, and a lack of availability of contraceptives in health centers.

The government provided access to sexual and reproductive health services for survivors of sexual violence, and emergency contraception and postexposure prophylaxis were available as part of clinical management of rape.

# Systemic Racial or Ethnic Violence and Discrimination

There were several laws to protect members of racial or ethnic minorities or groups from violence and discrimination. The government did not enforce the laws effectively, and the administration took no action to implement a 2018 policy designed to focus on the inclusion of ethnic groups in all social and economic aspects. Some civil society organizations and individuals reported instances of racial discrimination against Afro-descendent persons and Indigenous groups.

# Indigenous Peoples

The constitution recognized Indigenous peoples and stated the government was required to adopt policies to maintain and develop the ethnic and cultural identity, world view, values, and spirituality of Indigenous peoples. The law provided for the preservation of Indigenous languages and archeological sites. The municipalities of Cacaopera and Yucuaiquin, in the eastern part of the country, had special laws to recognize Indigenous cultural heritage.

Although the law provided for Indigenous groups to participate in decision making on issues that affected their rights, it did not include the right to be consulted regarding development and other projects envisioned on Indigenous land, nor did it provide Indigenous groups the right to share in revenue from exploitation of natural resources on historically Indigenous

lands. The government did not demarcate any lands as belonging to Indigenous communities. Because few Indigenous persons possessed title to land, opportunities for bank loans and other forms of credit were limited.

As of October, there was no progress in the case against the Attorney General's Office brought by victims' family members for failing to investigate the death of three Indigenous persons during "The Massacre of 1932."

## Children

**Child Abuse:** The law prohibited child abuse. Penalties for child abuse included losing custody of the child and three to 26 years' imprisonment, depending on the nature of the abuse. The government enforced the law effectively.

**Child, Early, and Forced Marriage:** The legal minimum age for marriage was 18. The law banned child marriage to prevent child abusers from avoiding imprisonment by marrying their underage victims, and the law likewise banned exceptions to child marriage in cases where the child was pregnant. The government enforced the law effectively.

**Sexual Exploitation of Children:** The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking. The law stipulated imprisonment of 16 to 20 years.

The minimum age for consensual sex was 18. The law classified statutory

rape as sexual relations with anyone younger than age 18 and included sentences of four to 13 years' imprisonment.

The law prohibited paying anyone younger than 18 for sexual services. The law prohibited participating in, facilitating, or purchasing materials containing child pornography and provided for prison sentences of up to 16 years. Despite these provisions, sexual exploitation of children remained a problem. The government did not enforce the law effectively.

## Antisemitism

The Jewish community totaled approximately 150 persons. There were no reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** The law did not criminalize consensual same-sex conduct between adults, cross-dressing, or other sexual or gender characteristic-related behaviors.

**Violence and Harassment:** COMCAVIS TRANS, a domestic NGO that promoted LGBTQI+ rights, found 43 percent of transgender women, 42 percent of cisgender men, and 14 percent of cisgender women had encountered problems with law enforcement officials.

Violence against LGBTQI+ persons was a problem. The Attorney General's Office reported that as of July 26, 13 LGBTQI+ persons were victims of sexual assault or harassment, and one was the victim of bodily harm.

The law allowed for stricter sentences for crimes committed on the basis of sex, gender identity, and gender expression, among other categories. The PDDH recorded and investigated complaints of violence and harassment against LGBTQI+ individuals. As of July 31, the PDDH received 20 complaints, involving 23 victims, ranging from five victims of acts of cruel and degrading punishment to five victims of insults.

**Discrimination:** The law prohibited discrimination by state and nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics. Discrimination against LGBTQI+ persons was widespread and hindered access to education and employment. Surveys conducted in 2021 by COMCAVIS TRANS found that 39 percent of LGBTQI+ individuals surveyed were unemployed, compared with 5 percent of the general population. Transgender persons regularly faced discrimination in health care, banking, and voting.

**Availability of Legal Gender Recognition:** The Legislative Assembly did not take steps to create a procedure allowing transgender persons to change their identity documents to reflect their gender, despite a 2022 Supreme Court ruling to do so by February.

**Involuntary or Coercive Medical or Psychological Practices:** There were no reports of the practice of so-called conversion therapy targeting LGBTQI+ individuals in an attempt to change their sexual orientation, gender identity, or expression. There were no reports that medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no restrictions on freedom of expression or association regarding LGBTQI+ matters.

# Persons with Disabilities

The law prohibited discrimination against persons with physical, sensory, intellectual, and mental disabilities, but the government did not enforce the law. Persons with disabilities did not have access to education, health services, public buildings, or transportation on an equal basis with others. Persons with disabilities faced discrimination in employment and occupation. No formal system existed for filing a discrimination complaint based on disability.

The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, was the agency responsible for protecting the rights of persons with a disability, but it lacked enforcement power. According to a CONAIPD representative, the government did not effectively enforce legal requirements for access to buildings or information and communications for persons with disabilities. Few access ramps or provisions for the mobility of persons with disabilities existed.

Disability advocates said children with disabilities faced access problems in school, including a lack of ramps and other accommodations. The government provided little support for schools to include accommodations, and there were few teachers trained to teach students with disabilities.

Persons with disabilities also faced discrimination in the public health-care system. Disabilities rights groups reported that women with disabilities were often instructed by their doctors to use birth control to avoid having children, believing the women would bear children with disabilities.

Persons with disabilities faced discrimination in employment and occupation. CONAIPD stated there was no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they were qualified. The

Network of Survivors and Persons with Disabilities Foundation noted the Special Law on Inclusion of Persons with Disabilities was never implemented or enforced. The Association of Blind Women added that companies preferred to pay fines instead of employing workers with disabilities.

## Other Societal Violence or Discrimination

The law prohibited discrimination based on HIV or AIDS status. As of August 11, the PDDH received three complaints of discrimination against persons with HIV or AIDS.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the right of most workers to form and join independent unions, in certain workplaces to bargain collectively, and after a lengthy regulated process, the right to strike. The government did not enforce these rights. Unions experienced lengthy delays in processing their credentials with the Ministry of Labor, some waiting nine months or longer. Without credentials, unions could not engage in collective bargaining or participate in tripartite entities that governed worker-related issues such as setting a minimum wage, health care, and housing. According to media reports and union representatives, the minister of labor rewarded unions

loyal to him and his party with expedited credentials and punished unions critical of the government by delaying their certifications.

The law prohibited antiunion discrimination, and workers were protected from firing or demotion for union organizing activity. If fired during this time, they could bring cases to court for reinstatement. Members of the military, judges, and high-level public officers could not form or join unions. Workers in private security firms could not form or join unions. The labor code did not cover public-sector workers and municipal workers, whose wages and terms of employment were regulated by law. Only citizens could serve on unions' executive committees. The labor code also barred individuals from holding membership in more than one trade union. Unions had to meet certain requirements to register, including having a minimum of 35 members. If the Ministry of Labor denied registration, the law prohibited any attempt to organize for up to six months following the denial.

Collective bargaining was strictly regulated. Unions representing fewer than 51 percent of the workers in an enterprise did not have the right to bargain, even on behalf of their own members. Provisions of the law allowed either party to a collective bargaining agreement, under some conditions, to seek to change its provisions after one year in force. Employees of most public institutions did not have the right to bargain collectively.

The law contained cumbersome and complex procedures for conducting a legal strike. The law did not recognize the right to strike for public and

municipal employees or for workers in essential services. The law did not specify which services met this definition, and courts therefore applied this provision on a case-by-case basis. The law required that 30 percent of all workers in an enterprise support a strike for it to be legal and that 51 percent support the strike before all workers were bound by the decision to strike. Unions could strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers. Unions were required to engage in negotiation, mediation, and arbitration processes before striking, although many unions often skipped or expedited these steps. Workers at times engaged in strikes that did not meet legal requirements. The law provided no way for workers to appeal a government decision declaring a strike illegal.

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining, and penalties were less than those for other laws involving denials of civil rights, such as discrimination. Penalties were rarely applied against violators. Judicial procedures were subject to lengthy delays and appeals. According to union representatives, the government inconsistently enforced labor rights for a wide range of workers, and enforcement was dependent upon the political affiliations of their labor unions.

Unions reported that their members sometimes faced violence or threats of violence and that viable legal recourse against such violence was

unavailable.  Public-sector union members reported public officials threatened to dismiss employees who made labor complaints.

On January 10, three members of the union of municipal workers in Soyapango were arrested on charges of public disorder and resisting arrest during a demonstration in which they demanded payment of salary owed. The charges against them were provisionally dismissed in June.

There were concerns the lowered standard of evidence required for an arrest under the state of exception allowed employers and municipal officials to retaliate against union members by alleging they were gang members.  The human rights NGO Socorro Jurídico Humanitario reported 21 union members were arrested during the state of exception, 40 percent on charges of gang associations and 60 percent on charges of public disorder or resisting arrest.  The NGO stated the individuals were arrested for their labor-related activities, but their cases were handled following the same procedures as other state-of-exception cases, as if the arrestees were members of illicit groups.  The NGO further reported that as of August 16, 10 union members remained in pretrial detention.

Although many unions were aligned with political parties, they functioned independently from the government and political parties.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at

https://www.state.gov/trafficking-in-persons-report/.

# c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

# d. Discrimination (see section 6)

# e. Acceptable Conditions of Work

**Wage and Hour Laws:** The law provided for a minimum wage for all sectors, to be set by the government. The minimum wage varied by sector; all were above poverty income levels. The law set a maximum normal workweek of 44 hours – limited to no more than six days per week and to no more than eight hours per day – but allowed overtime, which was to be paid at double the usual hourly wage. The law mandated that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek. The law prohibited compulsory overtime for all workers other than domestic employees, such as maids and gardeners, who were obligated to work on holidays if their employer made this request. In such cases, they were entitled to double pay.

**Occupational Safety and Health:** The Ministry of Labor set and enforced

occupational safety and health (OSH) standards, and the standards were appropriate for the main industries. The law established a tripartite committee to review the standards. The law required employers to take steps to meet OSH requirements in the workplace, including providing proper equipment and training and a violence-free environment. The law promoted occupational safety awareness, training, and worker participation in OSH matters.

Workers could legally remove themselves from situations that endangered health or safety without jeopardy to their employment.

**Wage, Hour, and OSH Enforcement:** The government did not adequately enforce wage, hour, or OSH laws. Penalties were less than those for similar crimes, such as fraud, and were rarely applied against violators. Some companies reportedly found it more cost-effective to pay fines than comply with the law. The Ministry of Labor was responsible for enforcing wage, hour, and OSH laws.

The government trained inspectors on legal standards. The number of inspectors was insufficient to enforce compliance. Inspectors did not have the authority to initiate unannounced inspections or sanctions. Inspections were scheduled according to a calendar set by the Inspections Directorate or to verify a complaint, and labor inspectors notified companies prior to their arrival. Allegations of corruption among labor inspectors continued.

The Ministry of Labor received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and the illegal withholding of benefits, including social security and pension funds.  Reports of overtime and wage violations occurred in several sectors.  According to the ministry, employers in the agricultural sector routinely violated the laws requiring annual bonuses, vacation days, and rest days.  Women in domestic service faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions.  Workers in the textile industry reportedly experienced violations of wage, hour, and safety laws.

The informal sector represented almost 75 percent of the economy.  The government did no enforce labor laws in this sector.