# Mexico 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Mexico during the year.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including violence against journalists and enforcement of or threat to enforce criminal libel laws to limit expression; serious government corruption; extensive gender-based violence, including domestic or intimate partner violence, sexual violence, workplace violence, child, early, and forced marriage, femicide, and other forms of such violence; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; crimes involving violence or threats of violence targeting persons with disabilities; and significant or systematic restrictions on workers' freedom of association, including crimes of violence and intimidation against workers.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
EXHIBIT E

The government generally took credible steps to identify and punish officials who may have committed human rights abuses.

Criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, bribery, intimidation, and other threats, resulting in high levels of violence and exploitation. The government investigated and prosecuted some of these crimes, but the majority remained uninvestigated and unprosecuted.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports that government entities or their agents committed arbitrary or unlawful killings, including extrajudicial killings, during the year.

On February 26, members of the Secretariat of National Defense's (SEDENA) 16th Motorized Calvary Regiment shot at a vehicle in Nuevo Laredo, Tamaulipas, killing five civilians and wounding one other. On April 10, a civilian federal judge ordered the detention of four SEDENA soldiers on charges of attempted homicide in the incident. Additional SEDENA soldiers could face lesser charges for not preventing the incident.

On June 6, a media outlet published an article and video in which soldiers appeared to commit extrajudicial killings of five civilians in Nuevo Laredo on May 18.  According to sources, the civilians, who were members of the transnational criminal organization Cartel del Noreste, shot at the soldiers in a vehicle chase.  SEDENA confirmed the soldiers were members of the 3rd Special Forces Section.  Sixteen soldiers, including the commanding officer, were confined in a military prison while military and civilian judicial authorities conducted investigations.

On March 18, authorities found the body of Jose Portillo Gil "El Chueco," who had been shot and killed in Sinaloa.  Portillo Gil allegedly killed two Jesuit priests and a tour guide in Cerocahui, Chihuahua State, in June 2022.  As of October, authorities had not arrested the individuals who killed Portillo Gil, and the investigation continued.

The Mexican Center for Environmental Law 2022 report noted a rise in violence against environmental defenders, who were victims of intimidation, kidnapping, and homicide.  In April, attackers kidnapped and killed environmental defender, activist, and legal representative Naua don Eustasio Alcalá in Michoacán State.  Alcalá had advocated against mining exploitation in his community San Juan Huitzontla, Michoacán, without prior consultation.  The community previously obtained a favorable ruling that suspended mining concessions in 2022.

On October 25, a judge sentenced 11 security officials to 50 years in prison

for the killing of 19 persons, many of whom were migrants, in Camargo, Tamaulipas State, in 2021.  The officers were found guilty of aggravated homicide, abuse of authority, and committing crimes while performing administrative duties.

## b. Disappearance

There were reports of numerous enforced disappearances by criminal groups, sometimes with allegations of collusion with authorities. Investigations, prosecutions, and convictions of enforced disappearance crimes were rare.  Enforced disappearance was a persistent problem throughout the country, especially in areas with high levels of cartel- or gang-related violence.

Federal and state databases tracking enforced disappearances were incomplete and had data-sharing problems; forensic systems were highly fragmented among the local, state, and federal levels; and the volume of unsolved cases was far greater than the forensic systems were capable of handling.  In its data collection, the government often merged statistics on forcibly disappeared persons with missing persons not suspected of being victims of enforced disappearance, making it difficult to compile accurate statistics on the extent of the problem.

On August 24, the Interior Secretariat's National Commission for the Search of Persons published the official registry of victims of enforced

disappearance, totaling 113,188 victims between 1964 and August 2023. The registry, published in 2013 by the Enrique Peña Nieto administration, was removed from public access in 2019 after President Andrés Manuel López Obrador classified the information as "reserved."  The registry reported police or military members had deprived 733 registered victims of liberty since the registry was first published, including 33 others who were seen in a public ministry agency before their enforced disappearance.  The registry also reported 522 migrants disappeared while traveling through the country.

The government made efforts to prevent, investigate, and punish acts of enforced disappearance involving government agents.  From January to August 2022, the National Human Rights Commission (CNDH) received seven complaints accusing government agents of enforced disappearances, including three against the army and three against the Attorney General's Office.

In August 2022, Undersecretary of Human Rights Alejandro Encinas released a report confirming the 2014 enforced disappearances of 43 students from the Ayotzinapa Rural Teachers' College in Iguala, in the state of Guerrero, was a "state" crime.  The report found various local, state, and federal officials – by commission or omission – were involved in carrying out or covering up crimes in conjunction with the atrocities.  Following several arrests in 2022, the Attorney General's Office reissued 17 arrest warrants in

June for additional suspects who were previously suspended in October 2022. Sixteen warrants were issued for military personnel and one for a suspect who had asylum in a neighboring country. On June 25, authorities arrested Gualberto Ramírez, who oversaw the initial investigation of the students' enforced disappearances in 2014 as the former head of the antikidnapping unit of the former Special Prosecutor's Office for Organized Crime Investigation. Ramírez was charged with torture and investigation mismanagement. On July 6, the Attorney General's Office arrested retired General Rafael Hernández Nieto, the second-highest-ranking detainee and former commander of the 41st Infantry Battalion in Iguala, for enforced disappearance and participation in organized crime, but on August 22, a judge released him. As of November, no suspects had been convicted for their involvement.

In July, the Interdisciplinary Group of Independent Experts, appointed by the Inter-American Commission on Human Rights (IACHR), presented its sixth and final report on Ayotzinapa. The report determined the 43 students were not involved with criminal groups and stated members of the former Center for Investigation and National Security, former Prosecutor General's Office antikidnapping unit, SEDENA, and the Secretariat of the Navy withheld key information during the investigation, including their presence at the scene when the students were forcibly disappeared. The report determined SEDENA refused to comply with President López Obrador's order to provide crucial information, including telephone and message

records.

On September 27, Undersecretary Encinas presented the Presidential Ayotzinapa Truth and Justice Commission's second report, which outlined areas controlled by criminal organizations in Guerrero and pointed to possible student locations. Encinas stated there was no evidence linking any of the students to the criminal organization Guerreros Unidos and confirmed SEDENA's involvement in the students' enforced disappearance.

The National Search Commission reported carrying out 5,194 exhumations as of July 21; 2,404 bodies were identified and 1,437 were returned to their families. In May, authorities reported finding 30 clandestine graves in Tecoman, Colima, that contained at least 53 bodies and hundreds of bone fragments.

Since 2020, perpetrators killed seven relatives of disappeared victims in alleged retaliation for their efforts to find family members. On May 2, Teresa Magueyal, who was searching for her son, was killed in Guanajuato. The Attorney General's Office opened an investigation into the case, but no suspects were charged as of October.

On August 21, government authorities reportedly violently removed relatives of disappeared persons who participated in a protest outside the Queretaro Attorney General's Office. The protesters demanded the government allow access to government services, including Forensic

Medical Services and Social Reintegration Centers, to search for the disappeared.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Federal law prohibited torture or cruel, inhuman, or degrading treatment or punishment, as well as the admission of confessions obtained through illicit means as evidence in court. Despite these prohibitions, there were reports that security forces tortured detainees.

Civil society groups reported torture was a generalized practice. In 2022, the Mexican Commission for the Defense and Promotion of Human Rights stated that human rights organizations received approximately 9,500 complaints for torture and inhuman treatment. Victims most often accused municipal police, public security, and state attorney general's offices of torture or inhuman treatment. Between January and April, the CNDH registered 20 complaints of torture and 94 of arbitrary detention committed by personnel in the Secretariat of Security, National Guard, Attorney General's Office, armed forces, and the National Migration Institute.

There were accusations of sexual abuse committed by authorities during arrest and detention. In March, authorities published new guidelines for the Mechanism for Monitoring Cases of Sexual Torture against Women, in response to a recommendation from the Inter-American Court of Human

Rights. Civil society organizations reported that despite publishing the new guidelines, the mechanism was not operating sufficiently, administrators had met only once, and no new cases had been reviewed as of July 31.

On July 13, authorities detained Adolfo Karam, the former judicial police director of Puebla, accused of torturing Lydia Cacho, who exposed former Puebla Governor Mario Marín and several business leaders' involvement in a child sex trafficking ring in 2005. Marín remained in detention as of October.

Impunity for torture was prevalent among the security forces. Nongovernmental organizations (NGOs) stated that authorities failed to investigate torture allegations adequately. As of August 14, the Attorney General's Office was investigating more than 2,600 torture-related inquiries and conducting 700 investigations.

## Prison and Detention Center Conditions

Conditions in prisons and detention centers were often harsh and life threatening.

**Abusive Physical Conditions:** According to the NGO Legal Assistance for Human Rights, some federal and state prisons were grossly overcrowded. The state of Mexico had the highest rate of overcrowding at 242 percent capacity.

Authorities reportedly transferred individuals from one prison to another without prior notice and without the possibility of prisoners or family members challenging the transfers. Women inmates said transfers to a prison in the state of Morelos left them without the possibility of receiving visits. The CNDH and the National Mechanism reported human rights abuses of women in that prison, particularly their rights to physical and mental health, and made recommendations to prison authorities to reduce the prison population and provide adequate health, education, work, and exercise resources for inmates. Access to sleeping and medical areas was limited.

Civil society organizations stated that individuals in migratory detention reported cases of threats and degrading treatment, spoiled food, generally bad conditions, and sensory deprivation, deprivation of vital needs, and difficulty sleeping due to lights being turned on full time.

On March 27, 40 migrants died and 27 were seriously injured after a fire at a migrant detention center in Ciudad Juarez, Chihuahua, administered by the National Institute of Migration. The fire allegedly started after detained migrants set fire to their mattresses to protest overcrowded detention conditions, lack of sufficient food, and water shortages. Video footage showed migration agents failed to unlock doors of the holding cell where migrants were trapped.

Criminal groups reportedly continued to oversee illicit activities from within

penitentiaries, and rival drug cartel members often fought in prisons. In January, during a violent prison break, armed criminal gunmen opened fire in a Ciudad Juarez prison, resulting in the deaths of seven prisoners, 10 guards, and two gunmen. During the confrontation, 25 prisoners escaped.

The CNDH found many prisons did not provide sufficient care for elderly persons, women and minors living with them, Indigenous persons, persons with disabilities, persons with HIV or AIDS, and lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) persons.

**Administration:** Authorities did not always conduct investigations into credible allegations of mistreatment.

**Independent Monitoring:** The government permitted independent monitoring of prison conditions by the International Committee of the Red Cross, the CNDH, and state human rights commissions.

# d. Arbitrary Arrest or Detention

Federal law prohibited arbitrary arrest and detention and provided for the right of any person to challenge the lawfulness of their arrest or detention in court; however, the government sometimes failed to observe these requirements.

## Arrest Procedures and Treatment of Detainees

The constitution allowed any person to arrest another if a crime was

committed in their presence. A warrant for arrest was not required if an official detained a person in the act of committing a crime. Bail was available for most crimes, except 22 crimes, including violent offenses, and crimes involving criminal groups. In most cases, the law required detainees to appear before a judge for a custody hearing within 48 hours of arrest, during which authorities had to produce sufficient evidence to justify continued detention. This requirement was not followed in all cases, particularly in remote areas of the country. In cases involving criminal groups, the law allowed authorities to hold suspects up to 96 hours before requiring them to seek judicial review.

The procedure known in Spanish as *arraigo* (a constitutionally permitted form of pretrial detention employed during the investigative phase of a criminal case before probable cause was fully established) allowed, with a judge's approval, for certain suspects to be detained prior to filing formal charges.

Detainees complained police made arrests arbitrarily without a warrant, denied them access to family members and to counsel, and held them in isolation for several days. Police occasionally failed to provide impoverished detainees access to counsel during arrests and investigations as provided for by law.

**Arbitrary Arrest:** Allegations of arbitrary detentions occurred throughout the year. The IACHR, the UN Working Group on Arbitrary Detention, and

NGOs expressed concerns regarding arbitrary detention and the potential for it to lead to other human rights abuses.

**Pretrial Detention:** Lengthy pretrial detention was a problem, and authorities did not always promptly release those detained unlawfully. The law provided time limits and conditions on pretrial detention, but federal authorities sometimes failed to comply with them since caseloads far exceeded the capacity of the federal judicial system. Abuses of time limits on pretrial detention were endemic in state judicial systems. In November 2022, the Supreme Court eliminated automatic pretrial detention for fraud and tax crimes. Activists claimed the decision did not go far enough to protect habeas corpus rights, while local legal experts noted the decision could hinder the government's ability to curb financial crimes. The UN Office of the High Commissioner for Human Rights documented cases in the states of Mexico and Chiapas in which detainees remained in pretrial detention for more than 12 years.

In May, authorities rearrested Daniel García Rodríguez, who was accused of murder in 2001. Rodríguez was previously arrested and held in pretrial detention for more than 17 years before being released with an ankle monitor in 2019. He remained in pretrial detention as of October.

As of August 9, Verónica Razo had been in pretrial detention for 12 years, awaiting trial for allegedly kidnapping and participating in criminal group activities. In 2022, the UN Working Group on Arbitrary Detention called for

her release, and the Federal Defense Public Institute maintained that police sexually tortured her and forced her to plead guilty. Brenda Quevedo Cruz remained in pretrial detention as of October, despite a 2020 announcement by authorities they would release her. Quevedo Cruz had been detained without trial since 2007 for allegedly participating in organized crime activities and for kidnapping.

## e. Denial of Fair Public Trial

Although the constitution and law provided for an independent judiciary, court decisions were susceptible to improper influence by both private and public entities, particularly at the state and local level, as well as by transnational criminal organizations. Authorities sometimes failed to respect court orders, and arrest warrants were sometimes ignored, consistent with the lack of judicial independence and rule of law throughout the legal system. Across the criminal justice system, many actors lacked the necessary training and capacity to carry out their duties fairly and consistently in line with the principle of equal justice.

President López Obrador and other government actors verbally attacked the judiciary, particularly the Supreme Court, criticizing judges who ruled against the administration on numerous occasions. In March, during a massive rally in Mexico City, government supporters burned an effigy of Chief Justice Norma Piña, accusing her of corruption. In May, Veracruz Governor

Cuitlahuac Garcia led a demonstration in Mexico City where supporters carried coffins with the names of seven of the 11 Supreme Court justices and accused them of siding with conservative opponents and ruling against administration priorities.

On June 16, the National Guard detained Judge Angélica Sánchez Hernández without an arrest warrant in Mexico City for alleged crimes against public faith and influence peddling after she ordered the release of murder suspect Itiel Palacios from pretrial detention. A federal judge ordered her immediate release after concluding local authorities violated the suspension of an injunction Hernández obtained on July 9. Authorities previously arrested Sánchez Hernández on June 5 for allegedly shooting at police officers, which she denied, and was later released. She remained under house arrest while the investigations continued.

## Trial Procedures

The law provided for the right to a fair and public trial, and the judiciary generally enforced the right.

Defendants had the right to an attorney of their choice at all stages of criminal proceedings. By law, attorneys were required to meet professional qualifications to represent a defendant. Not all public defenders were qualified, however, and often the state public defender system was understaffed. According to the Center for Economic Research and Teaching,

most criminal suspects did not receive representation until after their first custody hearing, thus making individuals vulnerable to coercion to sign false statements prior to appearing before a judge.

Defendants had the right to free assistance of an interpreter, if needed, although interpretation and translation services for speakers of Indigenous languages were not always available. According to the Indigenous Professional Center for Advice, Advocacy, and Translation, Indigenous defendants who did not speak Spanish sometimes were unaware of the status of their cases and were convicted without fully understanding the documents they were instructed to sign.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

# f. Transnational Repression

Not applicable.

# g. Property Seizure and Restitution

Not applicable.

# h. Arbitrary or Unlawful Interference with Privacy, Family,

# Home, or Correspondence

The law prohibited arbitrary or unlawful interference with privacy, family, home, or correspondence and required search warrants.  There were some complaints that authorities conducted illegal searches or illegal destruction of private property.

# Section 2. Respect for Civil Liberties

# a. Freedom of Expression, Including for Members of the Press and Other Media

The law provided for freedom of expression, including for members of the press and other media, and the government generally respected this right. The government continued exerting significant pressure due to being a source of advertising revenue for many media organizations, which at times influenced coverage.

**Freedom of Expression:**  Independent media were active and expressed a wide variety of views without restriction but often self-censored due to fear of reprisals from government officials and transnational criminal organizations.

Official discrediting of press workers continued.  Politicians, including President López Obrador, publicly discredited and criticized such journalists,

presenting them as biased, partisan, and corrupt. The administration continued to showcase a weekly "Who's Who in Lies" segment in the president's morning press conference to expose journalists who allegedly reported fake news. In 2022, the NGO Article 19 registered at least 176 disparaging comments from the President's Office directed toward media outlets, journalists, and civil society organizations. Several journalists cited constant threats. Reyna Haydee Ramírez, a journalist for the news agency Communication and Information on Women (CIMAC), said the president's discourse caused listeners to interpret his words as an "order to attack." Ramírez was subsequently barred from attending the president's morning conferences.

**Violence and Harassment:** Journalists were killed or subjected to physical attacks, cyberattacks, harassment, and intimidation (especially by state agents and transnational criminal organizations) in response to their reporting. This limited media's ability to investigate and report, since many of the reporters who were killed covered crime, corruption, and local politics. High levels of impunity, including for killings or attacks on journalists, resulted in self-censorship and reduced freedom of expression and the press.

According to civil society representatives, as of September 25, at least four journalists were killed: Marco Aurelio Ramírez (Puebla), Luis Martín Sánchez (Nayarit), Nelson Matus (Guerrero), and Jesús Gutiérrez Vergara (Sonora).

In addition, on July 8, journalist Luis Marín Sánchez Íñiguez was found dead in Tepic, Nayarit. The correspondent for the daily newspaper *La Jornada* and media site *Crítica Digital Noticias* disappeared from his home on July 5. The state attorney general's office confirmed he was killed possibly due to his work in journalism. Two of his colleagues, who were also reported missing, were found alive on July 8-9.

On July 6, journalist Juan Carlos Hinojosa disappeared in Nanchital, Veracruz; the case remained unsolved as of October.

On July 15, unidentified attackers shot at independent journalist María Luisa Estrada and her daughter in Guadalajara, Jalisco. Estrada and her daughter were unharmed, but Estrada said a police officer at the crime scene cautioned her regarding her crime and corruption reporting and described the attack as a warning.

The Interior Secretariat registered 72 verbal and physical attacks against journalists in 2022, 42 percent of which the secretariat attributed to public servants. The most common aggressions were intimidation and harassment, followed by threats and physical attacks, according to civil society groups. In November 2022, CIMAC reported a 210 percent increase in attacks against women in journalism from January 2019 to July 2022, compared with 2012-18, which CIMAC noted was the period of the previous presidency. CIMAC found most common attacks against women in journalism were stigmatization, intimidation, and harassment online and in person.

Between 2019 and June 2022, the Office of the Special Prosecutor for Crimes against Journalists, a unit in the Attorney General's Office, charged 186 persons with crimes against journalists.  As of October, the Attorney General's Office prosecuted only 16 cases.  Since its inception, the Special Prosecutor's Office took to trial only 21 percent of the 1,629 cases it opened.  Digital media journalists covering stories such as crime, corruption, and human rights violations experienced physical violence and online abuse.  Online discrimination, harassment, and threats were problems particularly for women journalists and politicians, as well as any individual and organizations advocating for women's rights.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  Human rights groups reported that some state and local governments censored media.  Journalists reported altering their coverage due to a lack of government protection, attacks against members of media and newsrooms, and threats or retributions against their families, among other reasons.  There were reports of journalists practicing self-censorship due to threats from criminal groups and government officials.

Freedom of expression advocacy groups reported the government, despite reductions in its advertising budgets, continued to have a strong financial impact and influence on the largest media companies.  The civil society groups Fundar and Article 19 underscored a lack of federal government

transparency in selecting media outlets for public advertising, noting that 55 percent of its budget went to only 10 media outlets in 2022.

**Libel/Slander Laws:** There were no federal criminal laws against defamation, libel, or slander; however, nine states had criminal laws regarding these three acts. In four states, the crimes of defamation and libel were prosecuted, with penalties ranging from three days to five years in prison and fines for committing defamation or slander, both considered "crimes against honor." Slander was punishable under the criminal laws of five states, with sentences ranging from three months to six years in prison and fines. Twenty-five states had laws protecting authorities from alleged insults. Five states had laws that restricted the publishing of political caricatures or "memes" but seldom enforced them. In addition to criminal libel and defamation laws, civil law defined "moral damage" as similar to defamation concerning harm to a person's "feelings, affections, beliefs, dignity, honor, reputation, and privacy," according to the NGO Committee to Protect Journalists.

On April 25, President López Obrador repealed the 1917 Law on Printing Crimes, which previously increased punishments for insults against the president, congress, army, and other institutions.

**Nongovernmental Impact:** Criminal groups exercised grave influence over media outlets and reporters, threatening individuals who published critical views of criminal groups. Concerns persisted regarding criminal groups' use

of physical violence in retaliation for information posted online, which exposed journalists, bloggers, and social media users to the same level of violence faced by traditional journalists. According to organizations defending journalists, the number of attacks against the press by organized crime groups continued to increase. A civil society organization registered at least 86 attacks by criminal organizations and reported at least 13 of the 16 journalist homicides from 2022 to July were possibly linked to criminal groups.

In June, Chiapas press outlets reported alleged members of criminal groups hung banners in various places around the state to intimidate media.

## Internet Freedom

The government did not restrict or disrupt access to the internet or block or filter online content.

According to Freedom House's *Freedom on the Net Report 2023*, state and nonstate actors increasingly used legal threats and other methods to pressure social media platforms, web-hosting providers, and individual users to remove content. Article 19 recorded 12 removals of journalistic content in 2022. In April, Supreme Court Judge Yasmín Esquivel Mossa filed a complaint against journalist Lourdes Mendoza, who tweeted photographs of Mossa vacationing in Canada, accompanied by critical comments regarding the judge. Mossa asked a court to order the removal of the photographs

and to delete Mendoza's account on X (formerly called Twitter), on the grounds that her minor son appeared in one of them and the comments allegedly incited hatred. The court ordered Mendoza and other journalists to remove or blur the photographs to protect the identity of Mossa's son but did not force Mendoza to delete her account.

NGOs alleged provisions in laws threatened the privacy of internet users by forcing telecommunication companies to retain data for two years, providing real-time geolocation data to police, and allowing authorities to obtain metadata from private communications companies without a court order. While the Supreme Court upheld the provisions, it noted the need for authorities to obtain a judicial warrant to access user metadata.

Unidentified users and bots on X posted threats against journalists who asked "difficult" questions of government officials during press engagements and in some cases disseminated the journalists' identities and media outlets and made veiled threats.

The *Freedom on the Net 2023* reported online campaigns amplified support for President López Obrador and trolled his perceived rivals or users who questioned or criticized him. In March, the digital news site *Animal Político* reported that pro-López Obrador accounts disseminated more than 20,000 tweets in an online smear campaign against the recently elected president of the Supreme Court, Norma Lucía Piña Hernández, who often ruled against López Obrador's government in judicial decisions. Many of the tweets used

the hashtag #PiñaMadrinaDeLosNarcos (#PiñaGodmotherOfTheNarcos) to make unsubstantiated links between Piña and drug trafficking.

## b. Freedoms of Peaceful Assembly and Association

The law provided for the freedoms of peaceful assembly and association, and the government generally respected these rights, with some exceptions. Twelve states had laws restricting public demonstrations. There were reports of security forces using excessive force against demonstrators. Government failures to investigate and prosecute attacks on protesters and human rights defenders resulted in impunity for these crimes, consistent with high impunity rates for all crimes. Amnesty International and other NGOs reported that acts of excessive use of force and arbitrary detention occurred against women protesters, especially those protesting gender-based violence.

On August 5, the National Guard allegedly removed and seized property from protesters in front of the Secretariat of the Interior. The protesters had participated in a sit-in for months, and during their removal, police confiscated a protester's camper and a car.

In February, President López Obrador criticized demonstrators who gathered peacefully in Mexico City to protest cuts to election funding. According to news sources, the president called the demonstrators "allies of drug cartels" and accused them of pickpocketing in the capital's main plaza.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at
https:www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Federal law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

**In-country Movement:**  There were numerous instances of armed groups limiting the movements of migrants, including by threats and acts of kidnapping, extortion, and homicide.  Criminal groups dominated migrant smuggling operations and often kidnapped, threatened, and extorted migrants to pay a fee for facilitating northbound travel.  On August 17, international organizations in Ciudad Juárez reported an increase in extortion and kidnappings by smugglers.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, and other persons of

concern.

**Access to Asylum:** Federal law provided for granting asylum, refugee status, or complementary protection to those fleeing persecution or facing possible threats to their life, security, or liberty in their country of origin.  The government had an established procedure for determining refugee status and providing protections.  The government worked with UNHCR to improve access to refugee status determinations, improve shelter and reception conditions for vulnerable migrants and asylum applicants, and support local integration programs (including access to school, work, and other social services) for those approved for refugee and complementary protection status.

**Abuse of Refugees and Asylum Seekers:** The press, international organizations, and NGOs reported targeting and victimization of migrants and asylum seekers by criminal groups and in some cases by police, immigration officers, and customs officials.  There were numerous instances of criminal groups extorting, threatening, or kidnapping asylum seekers and other migrants.  In many parts of the country, human smuggling organizations wielded significant power, and media alleged frequent collusion among local authorities.  There were credible reports of gender-based violence against migrants.  There were also credible reports of officially recognized asylum seekers being denied movement across the country and detained by migration authorities.  Civil society groups reported

migration authorities did not provide information regarding access to request asylum and migratory regularization and, in some cases, dissuaded migrants from pursuing such alternatives.

The government did not detain migrant children and generally exempted accompanying adults from detention to preserve family unity. Child protection authorities lacked sufficient capacity to shelter and process migrant children and families, but the government made progress to improve shelter space for children and strengthen child protection authorities. During the year, the National System for Integral Family Development transferred 1.1 billion pesos ($67 million) to 26 states to strengthen their capacity to respond to child migration. In May, the government declared it had completed the construction of 58 of the 90 shelters planned.

The government increased efforts to target human smuggling organizations, with limited results. In November 2022, the Attorney General's Office arrested the Los Panchos human smuggling leader and main collaborators. The Attorney General's Office carried out arrests in Ciudad Juarez, Chihuahua; Silao, Guanajuato; and the state of Mexico. In May, the Attorney General's Office arrested three alleged smugglers in the state of Nuevo León. Authorities found 17 migrants with the smugglers and identified 11 others at a safe house.

Obstacles to accessing international protection related most closely to

capacity limitations and lack of coordination among the relevant agencies, as opposed to official government policy.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

There were 386,000 IDPs as a result of conflict and violence in 2022, according to NGOs. The states of Chiapas, Michoacan, and Zacatecas together accounted for almost 90 percent of the total number of IDPs. Of the IDPs in Chiapas, Indigenous peoples in Chenalhó and Frontera Comalapa represented a significant number.

Land conflicts, social and ethnic violence, or local political disputes also caused significant displacement. Forced internal displacement disproportionately affected Indigenous communities.

The Mexican Commission for the Defense and Promotion of Human Rights recorded the highest incidence of forced internal displacement in 2022 in Frontera Comalapa and La Trinitaria, Chiapas, where 4,250 IDPs across seven communities fled criminal gang violence. On May 25, the news outlet *Aristegui Noticias* reported families fled these regions to escape violence between Sinaloa and Jalisco Nueva Generación cartels vying for control of the border with Guatemala.

The government, in conjunction with international organizations, made

efforts to promote the safe, voluntary return, resettlement, or local integration of IDPs.  The National Institute for Indigenous People had a program to assist displaced Indigenous and Afro-Mexican women.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center:  https://www.internal-displacement.org.

# Section 3. Freedom to Participate in the Political Process

Federal law provided citizens the ability to choose their government through free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:**  International observers considered the most recent national elections to be generally fair and free of abuses and irregularities.

# Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials.  The government generally enforced the law effectively, but there were

numerous reports of government corruption.

**Corruption:** In February, the Federal Commission for the Protection against Sanitary Risks announced it fired 11 public servants for alleged collusion with private entities, after finding they had destroyed evidence and shared confidential information regarding the institution's internal deliberations with outside parties. This resulted from an investigation of allegations against commission officials for corrupt operations awarding pharmaceutical bids alleged to have occurred in 2021.

In June, the Secretariat of Public Administration announced an audit had found irregularities amounting to $550 million regarding transactions by the Mexican Food Security Agency under the Secretariat for Agriculture and Rural Development. The case continued under investigation as of August.

Between December 2018 and June, the Secretariat of Public Administration received more than 127,000 complaints related to failure to comply with regulations and duties, misuse and authority abuse, and negligence or lack of attention in the performance of duties, of which approximately 114,000 were resolved.

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings.  Government officials were mostly cooperative and responsive to the views of these groups.  President López Obrador, however, chastised civil society groups at the morning press conferences he hosted daily.  Some NGOs alleged individuals who organized campaigns to discredit human rights defenders at times acted with tacit support from government officials.

**Retribution against Human Rights Defenders:**  On January 15, human rights defenders Ricardo Lagunes and Antonio Díaz disappeared in Colima after advocating against mining company Ternium.  While searching for her brother who disappeared in 2020, Esthela Guadalupe Estrada Ávila, an activist and member of a collective of relatives of disappeared persons, disappeared on March 29 in Tlajomulco de Zúñiga, Jalisco.  On April 21, Indigenous human rights defender Alejandro Ortiz Vázquez was forced into a vehicle with four armed men in Metlatónoc, Guerrero; as of October, his whereabouts remained unknown.

**Government Human Rights Bodies:** The CNDH was a semiautonomous federal agency funded by the legislature to monitor and act on human rights abuses. The CNDH could call on government authorities to impose administrative sanctions or pursue criminal charges against officials, but it was not authorized to impose penalties or legal sanctions. Civil society groups questioned the CNDH's independence and effectiveness. They noted the CNDH failed to speak out regarding pressing concerns such as the role of the military in public security activities.

All states had their own human rights commissions. The state commissions were funded by state legislatures and were semiautonomous. Some civil society groups, however, asserted that state commissions were subservient to the state executive branch. State commissions did not have uniform reporting requirements, making it difficult to compare state data and therefore compile nationwide statistics. The CNDH could take on cases from state-level commissions if it received a complaint that the state commission did not adequately investigate the case. The independence and effectiveness of the commissions varied widely.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** Federal law criminalized the rape of men and women, including spousal rape and domestic or intimate partner rape and

other forms of domestic and sexual violence, as well as so-called corrective rape of LGBTQI+ persons.  Conviction carried penalties of up to 20 years' imprisonment.  Spousal rape was criminalized in 27 of the 32 states.  The government did not enforce the law effectively.  There were high rates of impunity for these crimes, consistent with high impunity rates for all crimes.

Federal law prohibited domestic violence, including gender-based violence, and stipulated penalties between six months' and four years' imprisonment. The law included media and digital violence as a form of gender-based violence.  Of the 32 states, 29 stipulated similar penalties, although sentences were often more lenient.  Federal law criminalized spousal abuse. State and municipal laws addressing domestic violence largely failed to meet the required federal standards and often were unenforced.

The National Commission to Prevent and Eradicate Violence against Women was responsible for leading government programs to combat domestic violence.  In addition to shelters, women's external assistance centers provided services including legal, psychological, and protective; however, the number of cases far surpassed institutional capacity.  Legal experts said the country lacked sufficient psychological and anthropological experts to issue the appropriate expert reports that judges required in femicide and domestic violence cases.  Federal funding assisted the operation of more than 69 shelters, external attention centers, emergency houses, and transition houses.  NGOs operated 85 percent of the facilities, and

government organizations operated the remaining 15 percent.

**Other Forms of Gender-based Violence or Harassment:** Femicide was a federal offense punishable by 40 to 70 years in prison. It was also a criminal offense in all states. The Executive Secretariat of the National Public Security System reported more than 1,290 killings of women, including 426 femicides, from January to June.

On May 27, Guillermo "N" was arrested for burning his girlfriend Guadalupe "N" alive using gasoline in Tonala, Chiapas, and was awaiting trial as of August. According to a report by *Animal Político*, in 2022 at least 90 women were attacked with acid or gasoline. On March 2, Puebla became the first state to approve the "Malena Law," which considered acid attacks as femicide attempts and punishable by up to 40 years in prison.

In the case of the death of Debanhi Escobar in Monterrey, Nuevo León, in 2022, in January authorities arrested two persons who managed the motel where Escobar was found.

In the case of the death of Cecilia Monzón in Cholula, Puebla, in 2022, as of August 8, three of the alleged conspirators were awaiting trial, and one was released due to lack of evidence.

On March 2, Puebla's congress approved the "Monzon Law," in honor of femicide victim Cecilia Monzon. The law suspended parental rights for men under investigation for femicide. The law also introduced penalties for

officials who failed to act or who hindered investigations. Mexico City, Sinaloa, Colima, and Aguascalientes adopted similar laws.

Federal law prohibited sexual harassment and provided for fines from 250 to 5,000 times the minimum daily wage, but the law was not effectively enforced. Of the 32 states, 24 criminalized sexual harassment, and all states had provisions for punishment when the perpetrator was in a position of power.

**Discrimination:** The law provided women the same legal status and rights as men and "equal pay for equal work performed in equal jobs, hours of work, and conditions of efficiency." The government did not enforce the law effectively. Women tended to earn substantially less than men did for the same work. Women were more likely to experience discrimination in wages, working hours, and benefits. Afro-Mexican and Indigenous women reported structural inequality in their daily lives. Job announcements specifying desired gender, age, marital status, and parental status were common.

**Reproductive Rights:** There were no confirmed reports of coerced abortion or involuntary sterilization on the part of government authorities.

The CNDH observed recurrent cases of obstetric violence during childbirth in the forms of neglect and physical abuse, sometimes with serious consequences on women's sexual and reproductive health. As of October,

the CNDH issued 51 recommendations to improve or address the denial of health services, including physical and psychological abuse, performance of risky procedures, and inadequate neonatal evaluation, diagnosis, and treatment for diseases.

Federal authorities supported access to contraceptive methods, including for the purpose of family planning, but states' efforts varied widely. Barriers to accessing contraceptives stemmed from lack of knowledge, poverty, lack of access to health services, and sexual violence from family members, strangers, or friends.

Government health service providers in 21 states said they were obligated by law to offer sexual and reproductive emergency health services for survivors of sexual violence within 120 hours of the sexual assault. Emergency contraception and postexposure prophylaxis were available in all states, including for survivors of sexual assault. Nevertheless, women nationwide faced obstacles to accessing emergency services due to health providers' personal objections to emergency contraception or misunderstanding of their legal obligations to provide services.

Authorities reported the cause of most maternal deaths nationwide was obstetric hemorrhage (21 percent), followed by hypertension (15 percent), and abortion (8 percent). Factors associated with maternal deaths included parents with lower levels of education, inadequate hospital infrastructure and human capacity, and lack of access to maternity care, especially for

pregnant women living in rural areas.  Southern states reported the lowest access to skilled health care during pregnancy due to geographic, financial, and cultural barriers.

A 2022 report based on a survey in five states pointed out the main barriers to menstrual health were stigma, lack of sanitation, and access to information.  It found 69 percent of menstruating persons had little or no information when their first period occurred, and 15 percent lacked access to menstrual products.

The National Population Council reported that in 2022, there were more than 350,000 pregnancies in women younger than age 19, of which approximately 9,200 were in girls ages 15 or younger (98 percent in girls ages 13-14).  The states with the majority of cases were Chiapas, Coahuila, Guerrero, and Veracruz.  Authorities attributed high adolescent birth rates to low economic status, social inequities, school dropout, low usage of contraceptives, sexual abuse, and child marriages.  Sometimes family members arranged marriages for girls younger than 18, although it was illegal nationwide.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution prohibited discrimination based on ethnicity, and a federal law prohibited all forms of discrimination.  Nonetheless, discrimination was common against racial and ethnic minorities, including Black and Afro-

Mexican persons. All states had additional laws against discrimination. A 2019 constitutional reform recognized Afro-Mexicans as an ethnic group. The government did not enforce the law effectively.

According to a 2021 report by the National Council to Prevent Discrimination (CONAPRED), in Mexico City dark-skinned individuals experienced the most discrimination, followed by Indigenous peoples.

The National Statistical Institute (INEGI) reported that 2 percent of the population (2.5 million) self-identified as Afro-Mexican. INEGI's 2022 National Survey on Discrimination found 36 percent of Afrodescendants older than 12 faced discrimination in the last 12 months. The survey also reported 38 percent of Afrodescendants older than 12 said their rights were respected "little" and 28 percent that their rights were denied in the past five years. A 2022 report from the Black Alliance for Just Immigration found Black migrants faced widespread racial discrimination from individuals and authorities, particularly in accessing employment and services. Black migrants reported migration authorities detained Black migrants for longer periods than other migrants.

## Indigenous Peoples

CONAPRED's 2017 national survey on discrimination found 65 percent of Indigenous persons considered their rights were respected "little or not at all." The CNDH reported Indigenous women were among the most

vulnerable groups in society. They often experienced racism and discrimination and were frequently victims of violence. Due at least in part to services offered only in the Spanish language, Indigenous persons generally had limited access to health care, education services, and legal means to seek justice. In 2022, the National Council for the Evaluation of Social Development Policy published a report that found 65 percent of Indigenous peoples lived in poverty and 26 percent in extreme poverty.

In mid-July, the government resumed construction of the Mayan Train, a dual cargo-passenger railroad to cross the Yucatán Peninsula through Indigenous lands, citing a 2021 decree deeming all public infrastructure to be a matter of national security, which limited the ability of civil society and Indigenous groups to use legal avenues to halt the project. Several Indigenous communities brought legal actions to oppose the construction, many of which were dismissed or denied. In December 2022, the United Nations published a press release citing concerns regarding the Mayan Train's construction impact on the rights of Indigenous peoples, land and natural resources, and cultural and health rights. On May 7, the civil society group El Sur Resiste (The South Resists) issued a statement describing how police and military agents threatened them while they raised awareness regarding megaprojects, such as the Isthmus of Tehuantepec Interoceanic Corridor and the Mayan Train.

On January 17, authorities arrested Indigenous leader David Hernández

Salazar for arson and attacks on roads and indicted 17 other Indigenous members of the Binniza community of Puente Madera in Oaxaca. According to civil society groups, including Front Line Defenders, Hernández was prosecuted for his work in opposition of megaprojects in the Isthmus of Tehuantepec, Oaxaca.

On April 23, Hugo Rolando Arévalo Abarca was sentenced to 25 years in prison for the 2021 killing of Simon Pérez, human rights activist and member of the Las Abejas de Acteal civil society organization in Chiapas, but family members continued advocating for authorities to find the suspect who ordered the killing.

The constitution provided Indigenous persons the right to self-determination, autonomy, and education. Conflicts arose from the interpretation of Indigenous communities' self-governing "normative systems." Uses and customs laws applied traditional practices to resolve disputes, choose local officials, and collect taxes, with limited federal or state government involvement. Communities and NGOs representing Indigenous groups criticized the government for failing to consult Indigenous communities adequately when making decisions regarding extractive industry and natural resource development projects on Indigenous lands.

On January 27, Indigenous persons in Xochimilco obtained an injunction to stop the construction of a National Guard base. The court asserted Mexico

City authorities failed to conduct a culturally appropriate consultation and infringed on their right to land and territory, their collective right to a territory free of militarization, and the right to a healthy environment.

On August 8, President López Obrador signed a decree to recognize and protect the sacred sites and pilgrimage routes of Indigenous peoples in the states of Jalisco, Nayarit, Durango, and San Luis Potosí.

## Children

**Birth Registration:** Failure to register births could result in the denial of public services such as education or health care.

**Child Abuse:** The law provided for protection against child abuse. There were numerous reports of child abuse. The government generally enforced the law effectively. The National Program for the Integral Protection of Children and Adolescents, mandated by law, was responsible for coordinating the protection of children's rights at all levels of government.

**Child, Early, and Forced Marriage:** The legal minimum marriage age was 18. Enforcement, however, was inconsistent across the states. With a judge's consent, children could marry at younger ages. According to a 2022 investigation by the news outlet *La Lista*, at least 153,000 child marriages took place between 2010 and 2021. On March 15, the senate approved legislation that criminalized forced child marriage and stipulated a penalty of up to 22 years in prison. On April 26, federal law authorities reformed the

federal penal code to prohibit forced cohabitation of minors and persons with intellectual disabilities, with punishments of eight to 15 years' imprisonment and possibly higher penalties if the victim identified as Indigenous or Afro-Mexican.

**Sexual Exploitation of Children:** The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking, and authorities generally enforced the law. Nonetheless, NGOs and media reported occurrences of sexual exploitation of minors, including child sex tourism in resort towns and northern border areas. Authorities estimated 21,000 children were kidnapped annually for sexual exploitation. The statute of limitations did not apply for sexual crimes against minors, including child pornography distribution, child sex tourism, corruption of minors, pederasty, sexual abuse, and rape.

## Antisemitism

The Jewish population numbered 58,876 (according to the 2020 INEGI survey). The community experienced low levels of antisemitism. In January, civil society organizations and activists protested against the Greek band Der Strumer, accused of being a neo-Nazi group, who was set to perform but later canceled its January 13 show in Guadalajara.

In June, local media reported multiple swastikas and Nazi insignias painted around Morelia, Michoacan.

Between January and June 30, the civil society organization Central Committee (Comité Central) found 3 percent of social media content mentioning Jewish persons was antisemitic.

Jewish community representatives reported good cooperation with the government in addressing instances of antisemitic acts.

For further information on incidents in the country of antisemitism, whether or not those incidents were motivated by religion, and for reporting on the ability of Jews to exercise freedom of religion or belief, please see the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** No laws criminalized consensual same-sex sexual conduct between adults, cross-dressing, or other sexual or gender characteristic-related behavior. There were no reports that neutral laws (e.g., on statutory

rape, immorality, or loitering) were disproportionately applied to LGBTQI+ persons.

**Violence and Harassment:** There were reports the government did not always investigate and punish those complicit in abuses against LGBTQI+ persons, especially outside Mexico City. Civil society groups claimed police routinely subjected LGBTQI+ persons to mistreatment while in custody.

In 2022, there were 87 killings of individuals who identified as LGBTQI+, of whom 48 were transgender, that could have been motivated by their sexual identity, according to civil society groups.

On July 15, assailants killed Ulises Nava Juárez, LGBTQI+ rights defender and head of the Department of Sexual Diversity at the Autonomous University of Guerrero, as he left the National Congress of Strategic Litigation for the Defense of Rainbow Quotas, in Aguascalientes. As of July 31, the UN Office of the High Commissioner for Human Rights documented seven killings of human rights activists, two of whom were LGBTQI+ advocates.

According to CONAPRED, the most frequent forms of aggression LGBTQI+ persons experienced were verbal violence; denial of entry, services, and rights; and killings.

**Discrimination:** Federal law prohibited discrimination against LGBTQI+ individuals. The government generally did not enforce the law. A Mexico City municipal law provided increased penalties for hate crimes based on

sexual orientation and gender identity. As of November 16, Mexico City and the states of Baja California, Campeche, Chiapas, Chihuahua, Coahuila, Colima, Guanajuato, Morelos, Querétaro, San Luis Potosí, and Yucatán allowed LGBTQI+ couples and families adoption rights.

The 2021 National Survey of Sexual Diversity and Gender found that of three million employed LGBTQI+ individuals, one-third reported experiencing discrimination in the past 12 months. In March, a professor who identified as gay was fired for alleged sexual misconduct in Álvaro Obregón, Durango, prompting student protests that the school's director had filed false charges against him. From January to August 23, CONAPRED registered 22 reports of discrimination against LGBTQI+ persons.

**Availability of Legal Gender Recognition:** Twenty states permitted adult individuals and eight states allowed children 12 years and older to update names and gender markers via a simple administrative process. In May, for the first time, the Secretariat of Foreign Affairs issued passports with "X" as a third sex designation option.

**Involuntary or Coercive Medical or Psychological Practices:** Sixteen states banned so-called conversion therapy practices. According to INEGI, 14 percent of transgender persons and 10 percent of lesbian, gay, and bisexual persons were subjected to so-called conversion therapy practices. Civil society organizations reported that, as part of the treatment process, LGBTQI+ persons undergoing so-called conversion therapy practices were

often isolated, beaten, given electroshocks, and made to undergo hormone or steroid therapies, among other actions.

Medically unnecessary surgeries and treatment continued to be done on infants and children born with sex characteristics that did not align with either a typical male or female body. There were no reports of such surgeries done on nonconsenting intersex adults.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no reports of restrictions on freedom of expression, association, or peaceful assembly related to LGBTQI+ matters.

## Persons with Disabilities

Public buildings and facilities often did not comply with the law requiring access for persons with disabilities. Federal law prohibited discrimination against persons with physical, sensory, intellectual, and mental disabilities. The government did not effectively enforce the law. According to the 2021 INGEI survey on the dynamics of household relationships, 73 percent of the six million women and girls older than 15 who identified having disabilities reported experiencing violence. On June 7, the government enacted the National Code of Civil and Family Procedures, championed by disability advocacy groups. The legislation established the right to independently decide and make decisions with appropriate support for persons with disabilities older than 18.

The law prohibited discrimination against persons with disabilities, and the government approved the *National Work and Employment Program for People with Disabilities 2021-2024*, aimed at strengthening labor inclusion of persons with disabilities and supporting the employment of persons with disabilities in decent work. Nevertheless, employment discrimination against individuals with disabilities continued.

The education system provided education for students with disabilities nationwide. Nevertheless, children with disabilities attended school at a lower rate than those without disabilities.

Voting centers for federal elections were generally accessible for persons with disabilities, and ballots were available with a braille overlay for federal elections in Mexico City, but these services were inconsistently available for local elections elsewhere in the country.

The law required the Secretariat of Health to promote the creation of long-term institutions for persons with disabilities in distress, and the Secretariat of Social Development was required to establish institutions to care for, protect, and house poor, neglected, or marginalized persons with disabilities. NGOs reported authorities had not implemented programs for community integration.

Abuses occurred in institutions and care facilities housing persons with mental disabilities, including those for children. Abuses included the use of

physical and chemical restraints; physical and sexual abuse; human trafficking, including forced labor; enforced disappearance; and the illegal adoption of institutionalized children. Persons with disabilities were vulnerable to abuse from staff members, other patients, or guests at facilities where there was inadequate supervision. Documentation supporting the identity and origin of those staying in the facilities was lacking, and access to justice was limited, according to NGOs. NGOs reported no changes in the mental health system to create community services or any efforts by authorities to have independent experts monitor human rights abuses in psychiatric institutions.

Institutionalized persons with disabilities often lacked adequate medical care and rehabilitation services, privacy, and clothing. They often ate, slept, and bathed in unhygienic conditions.

## Other Societal Violence or Discrimination

The Catholic Multimedia Center reported criminal groups harassed Roman Catholic priests and religious leaders of other denominations in some parts of the country and subjected them to extortion, death threats, and intimidation. On May 22, authorities found Catholic priest Javier Garcia Villafana shot and killed in his car on the Cuitzeo-Huandacareo highway in Michoacán. Government officials stated the harassment of Catholic priests and evangelical Protestant pastors reflected high levels of generalized

violence throughout the country and not targeted attacks based on religious beliefs.

According to Christian Solidarity Worldwide, Catholic-majority communities sometimes discriminated against, harassed, threatened, and displaced individuals who left Catholicism or belonged to other faith communities, in addition to denying them basic services and destroying their property. On August 20, authorities in Simojovel, Chiapas, detained Presbyterian pastor Gilberto Diaz Pérez for his work, and villagers allegedly threatened to set fire to Diaz if he did not pay a fine. Diaz was released on August 26 in exchange for three other members of the Presbyterian Church, including his wife, who were released the same day after the Chiapas Interior Ministry and municipal authorities reached an agreement that Diaz would not preach in the community.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the right of workers to form and join independent unions, collectively bargain, and conduct legal strikes, and it prohibited antiunion discrimination. The government continued to strengthen freedom of association protections, promote union democracy, and improve the

ability of workers to bargain collectively. By law, all groups, including agricultural and migrant workers, were protected equally.

Government efforts focused on implementation of the 2019 labor law reform that transformed the labor justice system. The reforms provided workers with the right to freely elect union representatives and approve or reject collective bargaining agreements through a secret ballot process before the agreements were registered. The reforms prevented the registration of collective bargaining agreements that nonrepresentative, undemocratic unions often negotiated and signed without the knowledge of workers as protectionist contracts, which undermined genuine collective bargaining. The reforms called for the creation of independent labor courts to replace the Conciliation and Arbitration Boards (CABs) that favored corporatist nonrepresentative unions in the resolution of disputes and facilitated the registration of protection contracts. The reforms also established an expedited and more transparent judicial process for unions to obtain collective bargaining rights.

In addition to a more impartial and streamlined judicial process for labor disputes, the reforms transferred the registration of unions and collective bargaining agreements from the CABs to a new independent Federal Center for Conciliation and Labor Registration (Federal Center). The Federal Center also carried out mandatory prejudicial conciliations at the federal level, with local conciliation centers performing the same function at the state level.

During the year, the new institutions completed their first year operating in all 32 states.  The reforms required unions to amend their bylaws to ensure union democracy and proportional gender equity in their leadership.  Most unions at the federal level had amended their bylaws, and the majority of unions at the local level had also done so.

The Federal Center continued to oversee a verification process, called the "legitimization process," which required unions to organize a secret ballot vote for workers to approve or reject existing collective bargaining agreements (CBAs) by July 1.

The Secretariat for Labor and Social Welfare provided support to the Federal Center's verification of legitimization votes.  July 31 marked the deadline for the Federal Center to schedule and verify all CBA legitimization votes.  The Federal Center reported that as of September 30, 31,186 CBAs had undergone the legitimization process, 30,510 CBAs were legitimized, while 676 CBAs were nullified.  The Federal Center noted not all collective bargaining agreements required legitimization because records were duplicated, worksites had closed, work had concluded, or the collective bargaining agreement was an illegal protection contract held by a nonrepresentative union that would not request a legitimization vote.

Federal labor law required a minimum of 20 workers to form a union.  To receive government recognition, unions and their leaders were required to file for registration with the Federal Center.

By law, a union could call for a strike or bargain collectively in accordance with its own statutes. Under the labor reform, to negotiate a collective bargaining agreement, the union had to first obtain a certificate of representativeness from the Federal Center demonstrating it had support from at least 30 percent of workers to be covered by the agreement, or 50 percent plus one as part of a secret ballot if there was a competing union. Before a strike could take place, a union had to file a "notice to strike" with the appropriate labor court. Workers, the employer, or an interested third party could request the court to rule on the legality of the strike, which could find the strike illegal.

Federal labor law prohibited antiunion discrimination and prohibited employers from intervening in union affairs or interfering with union activities, including through implicit or explicit reprisals against workers. The law allowed for the reinstatement of workers if the court found the employer fired the worker without just cause and the worker requested reinstatement; however, the law also exempted broad categories of employees from this protection, including so-called trusted employees and workers in the job for less than one year.

The government's failure to enforce labor laws left workers with little recourse for violations of freedom of association, poor working conditions, and other labor provisions. Penalties for these violations were commensurate with similar violations of civil rights. Penalties were rarely

applied against violators. Labor experts reported that sanctions against companies or unions were rarely applied, including in priority sectors covered by the United States-Mexico-Canada Trade Agreement.

According to several NGOs and unions, many workers faced violence and intimidation perpetrated by protection union leaders and employers supporting them, as well as other workers, union leaders, and vigilantes hired by a company to suppress opposition to an existing union in bargaining-rights elections. Some employers attempted to influence these elections through the illegal hiring of temporary or fake employees immediately prior to the election to vote for the company-controlled union. There were also reports of employers firing workers who attempted to organize independent unions.

From January to October, labor officials reviewed cases of alleged denial of freedom of association and collective bargaining rights at 10 facilities as part of the United States-Mexico-Canada Agreement's Rapid Response Mechanism. Some of these were resolved and resulted in the reinstatement of workers with backpay, recognition of an independent union as the legitimate representative of workers, or both.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

# c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

# d. Discrimination (see section 6)

# e. Acceptable Conditions of Work

**Wage and Hour Laws:** The labor law provided for a minimum wage for all sectors, with a tripartite National Minimum Wage Commission responsible for establishing minimum wages. The minimum wage was above the official estimated monthly poverty line's monetary level. More than 70 percent of formal-sector workers received between one and three times the minimum wage.

Federal law set six eight-hour days and 48 hours per week as the legal workweek. Any work of more than eight hours in a day was considered overtime, for which a worker was to receive double pay. After accumulating nine hours of overtime in a week, a worker earned triple the hourly wage. The law prohibited compulsory overtime. The law provided for 10 paid public holidays and one week of paid annual leave after completing one year of work. On January 1, the amount of paid annual leave was increased to 12 days after completion of the first year of work.

According to labor rights NGOs, employers in all sectors sometimes used the illegal "hours bank" approach – requiring long hours when the workload was heavy and cutting down hours when it was light – to avoid compensating workers for overtime. This was a common practice in the maquiladora sector, in which employers forced workers to take leave at low moments in the production cycle and obliged them to work in peak seasons, including the Christmas holiday period, without the corresponding triple pay mandated by law for voluntary overtime on national holidays.

News reports indicated poor working conditions in some factories. These included wages lower than what the law stipulated, contentious labor management, long work hours, unjustified dismissals, a lack of social security benefits, unsafe workplaces, and no freedom of association. Many women working in the industry reported suffering some form of abuse.

Observers from grassroots labor rights groups, international NGOs, and multinational apparel brands reported that employers in export-oriented supply chains increasingly used hiring methods that weakened job security. For example, manufacturers commonly hired workers on one- to three-month contracts and then waited a period of days before rehiring them on new short-term contracts to avoid paying severance and to prevent workers from accruing seniority. This practice violated federal law and restricted workers' rights to freedom of association and collective bargaining. Observers noted it also increased the likelihood of work-related illness and

injury. Outsourcing practices made it difficult for workers to identify their legally registered employer, thus limiting their ability to seek redress of labor grievances.

The situation of agricultural workers remained particularly precarious, with similar patterns of exploitation throughout the sector. Labor recruiters enticed families to work during harvests with verbal promises of decent wages and a good standard of living. Rather than receiving daily wages once a week, as mandated by law, day laborers had to meet certain harvest quotas to receive the promised wage. Wages were illegally withheld until the end of the harvest to ensure workers did not leave. Civil society organizations alleged workers were prohibited from leaving by threats of violence or by nonpayment of wages. Workers had to buy food and other items at the company store at high markups, at times leaving them with no money at the end of the harvest after settling debts. Civil society groups reported families living in inhuman conditions, with inadequate and cramped housing, no access to clean water or bathrooms, insufficient food, and without medical care. With no access to schools or childcare, many workers took their children to work in the fields.

**Occupational Safety and Health:** The law required employers to observe occupational safety and health (OSH) regulations appropriate for the main industries, issued jointly by the Labor Secretariat and Institute for Social Security. Legally mandated joint management and labor committees set

standards and were responsible for overseeing workplace standards in plants and offices.  Individual employees or unions could complain directly to inspectors or safety and health officials.  By law, workers could remove themselves from situations that endangered health or safety without jeopardy to their employment.

**Wage, Hour, and OSH Enforcement:**  The government did not effectively enforce the minimum wage, overtime, and OSH laws.  Civil society organizations reported the number of labor inspections was not sufficient to secure compliance.  Criminal cases related to such violations were rarely carried out.  Penalties for violations regarding hours and minimum wage were commensurate with those for other similar laws but were rarely enforced.

A voluntary reporting system allowed formally registered businesses to enroll and self-identify as compliant with the program's requirements related to working conditions.  Registered businesses deemed to be complying according to documentation submitted were exempt from routine labor inspections for one year, although this did not prevent the Labor Secretariat from conducting complaint-based labor inspections in these businesses.

The Labor Secretariat had the authority to order labor inspections at any time in the event of labor law violations, imminent risk to employees, or workplace accidents.  Penalties for violations of OSH regulations were

commensurate with those for other similar laws but were rarely enforced.

According to INEGI, informal-sector workers represented 55 percent of total workers in the country.  The government did not enforce labor laws in this sector.