# Honduras 2023 Human Rights Report

## Executive Summary

The human rights situation in Honduras was problematic, due to the prolonged *estado de excepción* (state of emergency) and an increase in gender-based violence.  The Office of the UN High Commissioner for Human Rights raised concerns regarding illegal detentions, excessive use of force, and abuses committed during warrantless home searches committed in the context of the estado de excepción.  Violence and extortion persisted at high levels, due to competition among gangs.

Significant human rights issues included credible reports of:  arbitrary or unlawful killings; torture or cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including threats against media members by criminal elements; serious government corruption; extensive gender-based violence, including domestic violence, sexual violence, and femicide; and crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons.

The government took credible steps to identify and punish officials who may

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
EXHIBIT F

have committed human rights abuses or engaged in corruption, but a weak judicial system and corruption were major obstacles to obtaining convictions.

Criminal groups, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, intimidation, and other threats and violence directed against human rights defenders, judicial authorities, lawyers, business community members, journalists, bloggers, women, and other vulnerable populations. The government investigated and prosecuted some of these crimes, but impunity was widespread.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed one arbitrary or unlawful killing within the National Penal Institute. No further information was publicly available regarding the incident.

The Public Ministry reported eight killings of human rights activists as of September. For example, unknown assailants shot and killed Aly Domínguez on January 7 and Oquelí Domínguez on June 15. Both men were members

of the Municipal Committee in Defense of Common and Public Goods of Tocoa, in the department of Colón.  Their family was one of the most prominent environmental defenders of the Guapinol River and surrounding area, in the northern part of the country.  The government continued to investigate the killings.

In July, the government signed an agreement establishing a tripartite commission to investigate human rights abuses in the Bajo Aguan area and provide reparations to victims.

Criminal groups, such as drug traffickers and local and transnational gangs including MS-13 and the 18th Street gang, committed killings.

## b. Disappearance

There were no reports of disappearances by or on behalf of government authorities.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Although the law prohibited such practices, there were credible reports of abuses by members of the security forces.

The National Human Rights Commission (CONADEH) reported 66 cases of alleged torture or cruel and inhuman treatment of detainees and prisoners

by security forces through August, while the Public Ministry received five such reports through July. The quasi-governmental National Committee for the Prevention of Torture, Cruel, Inhuman, or Degrading Treatment (CONAPREV) received 41 complaints of the use of torture or cruel and inhuman treatment through September.

Corruption, a lack of investigative resources, and judicial delays led to widespread impunity, including for members of security forces.

## Prison and Detention Center Conditions

Prison conditions were harsh and at times life threatening due to gross overcrowding, malnutrition and lack of medical care, and abuse by prison officials. The government's failure to control criminal activity and pervasive gang-related violence contributed significantly to insecurity.

**Abusive Physical Conditions:** Prisons were severely overcrowded. CONAPREV reported that as of March 31, the prison population was more than 19,500, in a system designed for approximately 13,000 inmates.

Prisoners suffered from malnutrition, lack of adequate sanitation and medical care, and, in some prisons, lack of adequate ventilation and lighting.

CONADEH and CONAPREV reported more than 100 cases of alleged torture or cruel and inhuman treatment of detainees and prisoners by security forces.

The government failed to control pervasive gang-related violence and criminal activity within the prisons. Many prisons lacked sufficient security personnel. Prisoners had access to weapons and other contraband, inmates attacked other inmates with impunity, and inmates and their associates outside prison threatened prison officials and their families.

On June 21, members of the 18th Street gang attacked members of a rival gang, MS-13, in the Tamara women's prison, San Pedro Sula. Forty-six women were killed. Following the attack, President Castro transferred control of the prison system to the military police.

**Administration:** The judicial system was legally responsible for monitoring prison conditions. The government tasked CONAPREV with visiting prisons and making recommendations for protecting the rights of prisoners.

**Independent Monitoring:** After the government ordered an emergency military takeover of prisons following a deadly riot in June in the women's prison, the government generally permitted prison visits by independent local and international human rights observers, including the International Committee of the Red Cross, with some exceptions.

## d. Arbitrary Arrest or Detention

The law prohibited arbitrary arrest and detention and provided for the right of any person to challenge the lawfulness of their arrest or detention in court. While no official statistics were provided, there were allegations of

arbitrary detention and unlawful arrest as a result of the imposed estado de excepción.

## Arrest Procedures and Treatment of Detainees

By law, police could make arrests only with a warrant unless they made the arrest during the commission of a crime, there was strong suspicion that a person had committed a crime and might otherwise evade criminal prosecution, or they encountered a person in possession of evidence related to a crime.  The law required police to inform persons of the grounds for their arrest and bring detainees before a competent judicial authority within 24 hours.  It stipulated that a prosecutor had 24 additional hours to decide if there was probable cause for indictment, whereupon a judge had 24 more hours to decide whether to issue a temporary detention order.  Such an order could be effective for up to six days, after which the judge was required to hold a pretrial hearing to examine whether there was probable cause to continue pretrial detention.  The law allowed bail for persons charged with some felonies and gave prisoners the right of prompt access to family members.  The law allowed the release of other suspects pending formal charges, on the condition that they periodically reported to authorities, although management of this reporting mechanism was often weak.  The government generally respected these provisions.

Persons suspected of any of 21 specific felonies remained in custody, pending the conclusion of judicial proceedings against them.  Some judges

ruled that such suspects could be released on the condition they report periodically to authorities. The law granted prisoners the right to prompt access to a lawyer of their choice and, if indigent, to government-provided counsel, although the public defender mechanism was weak, and authorities did not always abide by these requirements.

**Arbitrary Arrest:** CONADEH and the Public Ministry did not report any statistics on cases of illegal detention or arbitrary arrest. Nongovernmental organizations (NGOs) reported three cases of arbitrary arrest. There were also allegations of arbitrary detention and unlawful arrest as a result of the imposed estado de excepción.

Guapinol defender Arnol Aleman was detained for 26 hours, despite having a provisional release letter.

**Pretrial Detention:** Judicial inefficiency, corruption, and insufficient resources delayed proceedings in the criminal justice system, and lengthy pretrial detention was a serious problem. For crimes with minimum sentences of six years' imprisonment, the law authorized pretrial detention of up to two years. The prosecution could request an additional six-month extension, but many detainees remained in pretrial detention much longer, including for more time than the maximum period of incarceration for their alleged crime. The law did not authorize pretrial detention for crimes with a maximum sentence of five years or less.

The law mandated that authorities release detainees whose cases had not yet come to trial and whose time in pretrial detention already had exceeded the maximum prison sentence for their alleged crime.  Nonetheless, many prisoners remained in custody after completing their full sentences, and sometimes even after an acquittal, because officials failed to process their releases expeditiously.

# e. Denial of Fair Public Trial

The law provided for an independent judiciary, but the justice system was poorly staffed, inadequately equipped, often ineffective, and subject to intimidation, corruption, politicization, and patronage.  Low salaries and a lack of internal controls rendered judicial officials susceptible to bribery.  Powerful special interests, including criminal groups, exercised influence on the outcomes of some court proceedings.

## Trial Procedures

The law provided for the right to a fair and public trial; however, the judiciary was often slow to enforce this right.

Credible observers noted problems in trial procedures, such as a lack of admissible evidence, judicial corruption, witness intimidation, and an ineffective witness protection program.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

# f. Transnational Repression

Not applicable.

# g. Property Seizure and Restitution

Not applicable.

# h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

Although the law generally prohibited such actions, a legal exception allowed government authorities to enter a private residence to prevent a crime or in case of an emergency. On December 6, the Office of the UN High Commissioner for Human Rights expressed concerns regarding illegal detentions, excessive use of force, and abuses committed during warrantless home searches committed in the context of the estado de excepción.

# Section 2. Respect for Civil Liberties

# a. Freedom of Expression, Including for Members of the

# Press and Other Media

The law provided for freedom of expression, including for members of the press and other media, with some restrictions, and the government generally respected this right.  Although many press outlets were politically aligned, the press and prevailing democratic norms combined to promote freedom of expression, including for media members.

**Freedom of Expression:**  Senior government representatives criticized civil society and members of the international community for comments perceived as critical of the government.  Civil society groups reported these statements had a chilling effect on freedom of expression.

**Violence and Harassment:**  Journalists and other members of civil society reported they self-censored due to fear of criticism, harassment, and retribution by the government and its supporters.  Others reported direct acts of intimidation or threats of violence from government officials or supporters for being critical of the government.  For example, National Police agents intimidated journalist Orlin Martinez, claiming he was an informant for criminal groups.  Civil society organizations criticized the government's failure to investigate threats and incidents of violence adequately.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  Media members and NGOs stated the

press self-censored due to fear of retaliation from criminal groups, drug trafficking organizations, or criticism by government officials. Media also engaged in self-censorship to avoid losing lucrative advertising contracts with the government.

**Libel/Slander Laws:** Libel and slander were criminal offenses. No cases were reported during the year.

**Nongovernmental Impact:** Some journalists and other members of civil society reported threats from members of criminal groups. It was unclear how many of these threats were related to the victims' professions or activism. For example, on January 30, unknown assailants shot and killed television media editor Carlos Barahona in Tegucigalpa. On December 22, unknown assailants shot and killed social communicator Javier Ramírez Amador in the city of Danlí. Ramírez worked for Channel 24 primetime television and the Public Prosecutor's Office and had been receiving police protection since May under the National Protection Mechanism. The police officer protecting Ramírez was also shot during the attack. NGOs believed the killing was reprisal for Ramirez's work investigating criminal activities. The government continued to investigate the killing.

Several anonymous social media sites criticized journalists (as well as activists and civil society organizations) who were critical of the government or of opposition party policies.

## Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content.

# b. Freedoms of Peaceful Assembly and Association

The constitution provided for the freedoms of peaceful assembly and association, but the government did not always respect the right of peaceful assembly, due to a continued estado de excepción beginning in November 2022, in which these rights were suspended.

## Freedom of Peaceful Assembly

On May 9, citizens marched in a peaceful protest in the southern city of Choluteca against tax law reforms proposed by the governing LIBRE party. In response, the Castro administration convened a meeting of the National Defense and Security Council, condemned the protest, and ordered an investigation, claiming the protesters had been coerced by business owners into participating in the protest.  The government promised to prosecute those involved, based on the allegation the march organizers coerced protesters to participate.  As of September, police and other justice sector officials had yet to publicly identify any of the protest leaders as having committed a crime.

In another instance, in July supporters of the ruling party chased peaceful

protesters while throwing objects at them to disrupt their demonstration. The government also reportedly used its control of the Honduran Transportation Institute to arbitrarily enforce intercity bus travel rules in August to reduce numbers of protesters at another opposition-led protest in Tegucigalpa.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

**In-country Movement:** There were areas where authorities could not assure freedom of movement due to criminal activity and a lack of significant government presence.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing

protection and assistance to refugees, returning refugees, or asylum seekers, and other persons of concern.

**Access to Asylum:**  The law provided for granting asylum or refugee status. The government had a nascent system to provide legal protection to refugees.  Its operations to receive and process cases relied on substantial support from UNHCR.  UNHCR's support focused on providing training to officers of the National Institute for Migration, supporting decisions on submitted claims, and improving reception conditions for asylum seekers.

**Abuse of Refugees and Asylum Seekers:**  Transiting migrants, forcibly displaced populations, and asylum seekers with pending cases were vulnerable to abuse and sexual exploitation by criminal organizations. Women, children, and lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) individuals were especially vulnerable to abuse.  Transiting migrants, refugees, and other vulnerable populations faced acute security risks in border zones.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

The Internal Displacement Monitoring Center estimated that between 2004 and 2018 (most recent data available), there were approximately 247,000 IDPs due to violence in the country.  Gang activity, including attacks on and exploitation of nonmembers, was the primary contributor to violence-

related internal displacement. Official data on forced displacement, especially displacement due to violence, was limited in part because gangs controlled many of the neighborhoods where individuals were forced from their homes and communities. NGOs reported IDPs were at increased risk of victimization and exploitation by criminal groups.

The government maintained the Interinstitutional Commission for the Protection of Persons Displaced by Violence and created the Directorate for the Protection of Persons Internally Displaced by Violence within the Ministry of Human Rights. Despite incremental progress, government capacities to respond to the needs of IDPs was limited.

In March President Castro enacted the Law for the Prevention, Care, and Protection of Internally Displaced People, created to provide a legal framework to protect the rights of IDPs.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center at https://www.internal-displacement.org.

# Section 3. Freedom to Participate in the Political Process

The law provided citizens the right to choose their government in free and fair periodic elections held by secret ballot and based on nearly universal

and equal suffrage.  The law did not permit active members of the military or civilian security forces to vote.  The constitution prohibited practicing clergy from running for office or participating in political campaigns.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:**  The most recent national elections, held in November 2021, were generally considered to be fair and free of abuses and irregularities.  Some NGOs and political parties reported irregularities, but international observers reported they were not systematic and not widespread enough to affect the outcome of the presidential election.

# Section 4. Corruption in Government

The law provided for criminal penalties for corruption by officials, but authorities did not implement the law effectively, and officials continued to engage in corrupt practices with impunity.  There were numerous reports of government corruption.

**Corruption:**  On May 23, the Special Prosecutor's Office for the Protection of Children reported it had received official complaints filed against the former director of the Directorate for Children, Adolescents, and the Family, Dulce Villanueva, for irregular adoption proceedings and alleged collection of bribes.  On May 26, President Castro accepted her resignation.

For additional information regarding corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report,* which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A wide variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings.  Government officials were somewhat cooperative and responsive to the views of these groups, but some human rights organizations criticized government officials for lack of access and responsiveness.

**Retribution against Human Rights Defenders:**  The Public Ministry reported eight killings of human rights and environmental activists as of September. For example, on January 7, Aly Domínguez and Jairo Bonilla were shot and killed by unknown assailants.  Domínguez and Bonilla were cofounders of a grassroots resistance protesting a controversial open-pit iron oxide mining project that was polluting a river that runs through the Bajo Aguán valley in northern part of the country.  On June 15, Oqueli Domínguez, Aly's brother,

was shot and killed in similar circumstances.  The government continued to investigate the killings.

**Government Human Rights Bodies:**  A semiautonomous commission for human rights, CONADEH, investigated complaints of human rights abuses. NGOs and other civil society groups generally considered the commission independent but at times ineffective.

The Ministry of Human Rights served as an advocate for human rights within the government.  The Public Ministry's Office of the Special Prosecutor for Human Rights handled cases involving charges of human rights abuses by government officials.  The Public Ministry also had a Special Prosecutor's Office for the Protection of Human Rights Defenders, Journalists, Social Communicators, and Justice Officials.  There was also a Human Rights Commission in the national congress.  The Ministries of Security and of Defense both had human rights offices that coordinated human rights-related activities with the Ministry of Human Rights.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalized all forms of rape, including spousal rape and domestic or intimate partner rape and other forms of domestic and sexual violence, as well as so-called corrective rape of

LGBTQI+ persons. The government considered rape a crime of public concern, and the state prosecuted suspected rapists even if survivors did not press charges. The penalties for rape ranged from nine to 13 years' imprisonment. The law was not effectively enforced; weak public institutional structures contributed to the inadequate enforcement.

The law did not specifically criminalize domestic violence but provided penalties of up to 12 years in prison for violence against a family member, depending on the severity of the assault and aggravating circumstances. If a victim's physical injuries did not reach the severity required to categorize the violence as a criminal act, the legal penalty for a first offense was a sentence of one to three months of community service.

Survivors of domestic violence were entitled to certain protective measures, such as removing the abuser from the home and prohibiting the abuser from visiting the victim's workplace or other frequently visited locations. Persons who disobeyed the prohibition could be detained for up to 24 hours as a preventive measure. The law provided a maximum sentence of three years in prison for disobeying a restraining order connected with the crime of violence against a woman.

Civil society groups reported women often did not report domestic violence or withdrew charges because they feared, or were economically dependent on, the aggressor. In addition, women experienced delays in accessing justice due to police who failed to process complaints in a timely manner or

judicial system officials who deferred scheduling hearings.

**Other Forms of Gender-based Violence or Harassment:** The Ministry of Security reported 229 violent women deaths from January to June, a nearly 49 percent increase compared with the same period in 2022. The Human Rights Observatory of the Center for Women's Rights registered 341 violent deaths of women as of October 31.

The law criminalized sexual harassment, including in employment. The law stipulated penalties of one to three years in prison and possible suspension of offenders' professional licenses, but the government did not effectively enforce the law.

**Discrimination:** Although the law accorded women and men the same legal rights and status, including property rights in divorce cases, many women did not fully enjoy such rights due to barriers in access to justice and lack of information regarding legal protections. Most women in the workforce engaged in lower-status and lower-paying informal occupations, such as domestic service, without the benefit of legal protections. The law did not mandate equal pay for equal work. The law prohibited employers from requiring pregnancy tests as a prerequisite for employment. The law stated a woman's employment should be appropriate to her physical state and capacity. Many employers discriminated against women. For example, it was common in job announcements that only male applicants should apply.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The government did not provide government-sponsored access to sexual and reproductive health services for survivors of sexual violence, and emergency contraception and postexposure prophylaxis were not available as part of clinical management of rape.  President Castro signed an executive order in March allowing the sale, distribution, and use of emergency contraception, but it was not widely available.  The government's ability to provide health-care services to survivors of sexual violence was limited.  Survivors relied on assistance from NGOs such as Doctors Without Borders.

In 2019 (most recent data available), 94 percent of births were attended by skilled health-care personnel; however, NGOs reported significant gaps in obstetric care, especially in rural areas.  The United Nations reported the adolescent birth rate was 89 births per 1,000 girls ages 15 to 19.  UN human rights experts stated the difficulty of access to contraception, particularly in rural areas, contributed to a high rate of adolescent pregnancy.

The Ministry of Health estimated that there were 86 maternal deaths per year and that the vast majority of the leading causes were preventable.

# Systemic Racial or Ethnic Violence and Discrimination

The law criminalized discrimination based on race and ethnicity and

included crimes committed against individuals due to race or ethnicity as aggravating circumstances to increase penalties for other criminal offenses. NGOs reported the government did not effectively combat discrimination or promote equal access to government services and employment opportunities.

The government's National Policy to Combat Racism and Racial Discrimination sought to promote equality and combat discrimination related to the country's two Afro-descendent groups, with a focus on social and political participation; access to education, health care, justice, and employment opportunities; and rights to ancestral lands and natural resources. NGOs reported the government did not make sufficient efforts to comply with Inter-American Court of Human Rights rulings, specifically cases related to territorial rights for Garífuna communities.

## Indigenous Peoples

Indigenous groups had limited representation in the national government and consequently little direct input into decisions affecting their lands, cultures, traditions, and the allocation of natural resources.

Indigenous communities continued to report threats and acts of violence against them and against community and environmental activists. Violence was often rooted in a broader context of conflict regarding land and natural resources, corruption, lack of transparency and community consultation,

other criminal activity, and limited state ability to protect the rights of vulnerable communities.

Ethnic minority rights leaders, international NGOs, and farmworker organizations claimed the government failed to redress actions taken by security forces, government agencies, private individuals, and businesses to dislodge Indigenous persons from lands over which they claimed ownership based on land reform law or ancestral land titles.

Persons from Indigenous and Afro-descendant communities experienced discrimination in employment, education, housing, and health services.

As of September, there was no conclusion after evidence hearings in June regarding the November 2022 killing of Marcos Pineda Aguilar during a police raid in the community of El Encinal, department of La Paz. National Police agents allegedly killed the victim, a member of the Civic Council of Popular and Indigenous Organizations of Honduras. The hearings relied on police testimony.

## Children

**Birth Registration:** Failure to register births resulted in denial of public services, including access to health services or school enrollment.

**Child Abuse:** The law established prison sentences of up to two and one-half years for child abuse. The government did not enforce the law

effectively.

**Child, Early, and Forced Marriage:**  The minimum legal age of marriage was 18.  The government did not enforce the law effectively.  International NGOs reported 34 percent of girls and 12 percent of boys were married before age 18, with the practice more prevalent in rural areas.  Most unions were informal rather than a formal marriage.

**Sexual Exploitation of Children:**  The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking.  The commercial sexual exploitation of children, especially in sex trafficking, was a problem, and the government made efforts to enforce the law, but its measures were not effective.  The country was a destination for child sex tourism, particularly in the tourist area of the Bay Islands.  The legal age of consent was 18.  The law prohibited the use of children younger than 18 for exhibitions or performances of a sexual nature or in the production of pornography.

## Antisemitism

The Jewish community numbered approximately 150 members.  There were no known reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at

https://www.state.gov/trafficking-in-persons-report/.

# Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No laws existed to criminalize consensual same-sex conduct between adults, cross-dressing, or other sexual or gender characteristic-related behavior.  NGOs reported concern that the Public Ministry and government bodies lacked investigative processes to deal with cases of violence and hate crimes against LGBTQI+ persons, because investigative units did not receive training on gender and sexual diversity issues.  There was also a general lack of investigative personnel, contributing to a large number of unresolved cases.

**Violence and Harassment:**  NGOs reported police or other government agents incited, perpetrated, condoned, or tolerated violence against LGBTQI+ individuals.  Impunity for such crimes was high.  LGBTQI+ organizations reported they were the target of hate speech from media, public officials, and religious organizations.  The Public Ministry reported seven killings of LGBTQI+ persons as of September, while NGOs reported 47 violent deaths and 83 hate crimes against LGBTQI+ persons as of November.

On January 29, the Special Prosecutor's Office for Crimes Against Life

coordinated a raid in Roatán to capture Erick Gerardo del Arca, for the alleged rape and killing of Manuel Enrique Cruz, a member of the LGBTQI+ community.

In June police detained Miguel Ángel Cabrera Oviedo and Antonio Josué Medina Vargas for the February 19 killing of Maryuri Lizeth Pineda, a member of the LGTBQI+ community.

On May 18, a member of the National Police assigned to Intibucá Departmental Police Unit 13 of the municipality of Gracias, department of Lempira, reported Deputy Commissioner Jessica Aguilar for harassment regarding his sexual orientation.

**Discrimination:** The law prohibited discrimination based on sexual orientation and gender identity characteristics and included crimes committed against individuals because of their sexual orientation or gender identity as aggravating circumstances to increase penalties for criminal offenses. Nevertheless, discrimination against LGBTQI+ persons persisted. As of August, CONADEH received 25 reports of discrimination based on sexual orientation. Same-sex couples and households headed by same-sex couples were not eligible for the same legal protections available to opposite-sex married couples.

LGBTQI+ rights groups asserted government agencies and private employers engaged in discriminatory hiring practices. Transgender women were

particularly vulnerable to employment and education discrimination; many could find employment only as sex workers, increasing their vulnerability to violence and extortion.

**Availability of Legal Gender Recognition:** The law prohibited transgender persons from changing their name and legal gender status. Other forms of legal gender recognition, such as nonbinary or intersex, were not available.

**Involuntary or Coercive Medical or Psychological Practices:** There were no documented cases of "conversion therapy," but NGOs reported there were known cases of conversion therapies. There were no reports medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no restrictions of freedom of expression, association, or peaceful assembly regarding LGBTQI+ matters or events.

## Persons with Disabilities

The law required that persons with disabilities have access to buildings, but few buildings were accessible, and the government did not effectively implement laws or programs to provide such access.

According to government estimates, children with disabilities attended school at a lower rate than the general population. The Institute for

National Statistics put net enrollment for primary school at 77 percent in 2021, but the National Center for Social Sector Information stated that in 2020, 43 percent of persons with disabilities received no formal education.

The government had an Office for Persons with Disabilities located within the Ministry of Development and Social Inclusion, but its ability to provide services to persons with disabilities was limited.

## Other Societal Violence or Discrimination

Persons with HIV and AIDS continued to be targets of discrimination, including in employment and occupation, and they suffered disproportionately from gender-based violence.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law granted workers the right to form and join unions of their choice, bargain collectively, and strike.  It prohibited employer retribution against employees for engaging in trade union activities.  The law placed restrictions on these rights, such as requiring that a recognized trade union represent at least 30 workers, prohibiting foreign nationals from holding union offices, and requiring that union officials work in the same substantive area of the

business as the workers they represented.  The law prohibited members of the armed forces and police, as well as certain other public employees, from forming labor unions.  The Ministry of Labor and Social Security also required that union leaders be employed under permanent contracts, limiting the ability of seasonal agricultural workers to exercise their right to freedom of association.

The law required an employer to begin collective bargaining once workers established a union, and it specified that if more than one union existed at a company, the employer had to negotiate with the largest.

The law allowed only local unions to call strikes, prohibited labor federations and confederations from calling strikes, and required that a two-thirds majority of both union and nonunion employees at an enterprise approve a strike.  The law prohibited workers from legally striking until direct negotiations and government-accompanied mediation and conciliation had failed.  The Ministry of Labor had the power to declare a work stoppage illegal and grant employers the ability to discipline employees consistent with their internal regulations, including by firing strikers.  In addition, the law limited strikes in sectors the government designated as essential services but did not necessarily meet the criteria for essential services.  The law required workers in public health care, social security, staple food production, and public utilities (municipal sanitation, water, electricity, and telecommunications) to provide basic services during a strike.  The law also

required that public-sector workers involved in the refining, transportation, and distribution of petroleum products submit their grievances to the Ministry of Labor.  The law permitted strikes by workers in export-processing zones and free zones for companies that provided services to industrial parks, but it required that strikes not impede the operations of other factories in such parks.

The government did not effectively enforce the law.  Employers frequently refused to comply with Ministry of Labor orders that required them to reinstate workers who had been dismissed for participating in union activities.  The Ministry of Labor could order a company to reinstate workers, but the ministry lacked the personnel and transportation resources to verify compliance.  By law, the ministry could fine companies that violated the right to freedom of association.  The law permitted fines, and the penalty was commensurate with those for other laws involving denials of civil rights, such as discrimination.  Penalties were sometimes applied against violators, but the failure of the government to collect fines facilitated continued violations.  During the year, the government issued the highest penalty ever against an employer in a long outstanding case of violation of freedom of association and other labor law violations.

Workers had difficulty exercising the right to form and join unions and to engage in collective bargaining.  Public-sector trade unionists raised concerns regarding government interference in trade union activities,

including its ignoring or suspending collective agreements and its dismissals of union members and leaders.

Some employers either refused to engage in collective bargaining or made it very difficult to do so.  Some companies also delayed appointing or failed to appoint representatives for required Ministry of Labor-led mediation, a practice that prolonged the mediation process and impeded the right to strike.  Unions also raised concerns that employers used temporary contracts to prevent unionization and to avoid providing full benefits.

The government investigated violence and threats of violence against union leaders.  Impunity for such crimes was high.

On June 24, unknown assailants shot and killed 13 persons in Choloma, department of Cortés.  Most of the victims were not union members; however, union leaders and maquila workers in Choloma, including the president of the Gildan San Miguel Workers' Union, were among the victims. The shooting was preceded by an announcement that Gildan Activewear planned to shut down its factory in Choloma, which led to threats against the union leaders from local gang members, who blamed the union for the closure and loss of employment.  The company noted the closure was strictly due to market conditions, reiterated its commitment to freedom of association and collective bargaining, and continued to engage with the union.  In June authorities arrested three suspects in relation to the shooting – Javier Antonio Colindres Hernández, José Andrés Hernández Gutiérrez, and

an unnamed minor member of the Barrio 18 gang.  It was unclear whether the shooting was related to union activity.

# b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

# c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

# d. Discrimination (see section 6)

# e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The law provided for a minimum wage for most sectors.  There were 45 categories of monthly minimum wage, based on the industry and the size of a company's workforce; minimum wages were above the poverty line.  The minimum wage law did not cover domestic workers, the vast majority of whom were women.

The law prescribed a maximum eight-hour shift per day for most workers, a 44-hour workweek, and at least one 24-hour rest period for every six days of

work.  It also provided for paid national holidays and annual leave.  The law required overtime pay, banned excessive compulsory overtime, limited overtime to four hours a day for a maximum workday of 12 hours, and prohibited the practice of requiring workers to complete work quotas before leaving their place of employment.

In some industries, including agriculture, domestic service, and security, employers did not respect maternity rights or pay minimum wage, overtime, or vacation.  In these sectors, employers frequently paid workers for the standard 44-hour workweek irrespective of any additional hours they worked.  In the security and domestic service sectors, workers were frequently forced to work more than 60 hours per week but were paid only for 44 hours.  Employers frequently penalized agricultural workers for taking legally authorized days off.  Employers paid the minimum wage inconsistently in other sectors.  Civil society continued to raise problems with minimum wage violations, highlighting agricultural companies in the south as frequent violators.

On July 25, the Ministry of Labor modified a 2018 agreement on Honduran Maquiladora Textile Sector and other Free Zone Companies to increase the minimum wage for maquila workers by 10 percent.

**Occupational Safety and Health:**  Occupational safety and health (OSH) standards were appropriate for the main industries in the country, and OSH experts actively identified unsafe conditions, in addition to responding to

workers' OSH complaints.  By law, workers could remove themselves from situations that endangered their health or safety without jeopardizing continued employment.  Under the inspection law, the Ministry of Labor had the authority to temporarily shut down workplaces where there was an imminent danger of fatalities.  Enforcement of OSH standards was particularly weak in the construction, garment assembly, and agricultural sectors, as well as in the informal economy.

**Wage, Hour, and OSH Enforcement:**  The Ministry of Labor was responsible for enforcing wage, hour, and OSH laws, but it did so inconsistently and ineffectively.  Penalties for violations of OSH law were commensurate with penalties for similar crimes but rarely applied against violators and rarely collected.

The law permitted fines for wage and hour violations; these were commensurate with the penalties for similar crimes, such as fraud.  The government sometimes applied penalties against violators, but failure to collect fines facilitated wage and hour violations.  The Ministry of Labor had an insufficient number of inspectors to enforce the wage, hour, and OSH laws effectively.  Inspectors had the authority to make unannounced inspections and initiate sanctions.

While all formal workers were entitled to social security, there were reports that both public- and private-sector employers failed to pay into the social security system.  The Ministry of Labor could levy a fine against companies

that failed to pay social security obligations, but the amount was not sufficient to deter violations.

According to 2021 Ministry of Labor data, approximately 75 percent of workers worked in the informal economy.  The government did not enforce the labor laws in this sector since these workers were not protected by the labor code.