# Libya 2023 Human Rights Report

## Executive Summary

The UN Independent Fact-Finding Mission on Libya concluded its three-year mandate in March and found reasonable grounds to believe state and nonstate actors committed crimes against humanity in Libya.  The Fact-Finding Mission's final report identified the Libyan Coast Guard, the Tripoli-based interim Government of National Unity and its aligned armed groups, the Government of National Unity's Department for Combatting Illegal Migration, and the Benghazi-based nonstate actor known as the Libyan National Army and its aligned armed groups as perpetrators of abuses against Libyans and migrants.  The conclusion of the Fact-Finding Mission's mandate without establishing a follow-on mechanism raised questions about addressing abuses documented in the report and holding perpetrators accountable.  Amid increased pressure on civil society across the country, the Government of National Unity revived a Gaddhafi-era law restricting the registration and operation of civil society organizations.  Following objections from civil society and the international community, the Prime Minister's Office of the Government of National Unity issued new rules in March allowing local and foreign organizations to operate temporarily until they were registered.  In addition to worsening repression in areas under its control in the east and south, the Libyan National Army

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
EXHIBIT G

launched a campaign to oust Chadian rebel groups.  Critics characterized the campaign as a pretext for targeting members of the marginalized Tebu community.

Significant human rights issues included credible reports of:  arbitrary or unlawful killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment perpetrated by the government and armed groups on all sides; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; political prisoners or detainees; arbitrary or unlawful interference with privacy; punishment of family members for alleged offenses by a relative; serious abuses in a conflict, including reportedly widespread civilian deaths or harm; unlawful recruitment or use of children in armed conflict; serious restrictions on freedom of expression and media, including violence against journalists and enforcement of or threat to enforce criminal libel laws to limit expression; serious restrictions on Internet freedom; substantial interference with freedom of peaceful assembly and freedom of association; refoulement of refugees to a country where they would face torture or persecution; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government corruption; extensive gender-based violence, including domestic violence and sexual violence; crimes involving threats of violence targeting members of ethnic minority groups, including

the Tebu and Tuareg communities; trafficking in persons, including forced labor; laws criminalizing consensual same-sex sexual conduct between adults, which the government enforced; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; and significant restrictions on workers' freedom of association.

The Government of National Unity took limited steps to investigate, prosecute, and punish officials who committed human rights abuses within areas it controlled, but its limited resources, lack of political will, and inability to control significant portions of the country reduced its ability to do so.

Reports of human rights abuses committed by groups aligned with the government, the Libyan National Army, other nonstate actors, and foreign actors, including mercenaries from various countries, were widespread throughout the year.  These included abuses involving killings, arbitrary detention, unlawful recruitment or use of children, and torture.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were numerous reports that armed groups aligned with the Government of National Unity ("the government"), as well as with the

Libyan National Army (LNA) and other nonstate actors, including foreign fighters and mercenaries, committed arbitrary or unlawful killings. Shifting alliances between government officials, nonstate actors, and former or active officers in the armed forces participating in extralegal campaigns made it difficult to ascertain the role of the government in attacks by armed groups.

The final report of the UN Independent Fact-Finding Mission on Libya (FFM), released in March at the conclusion of the FFM's three-year mandate, documented the arbitrary killing of hundreds of persons in the country since 2016, including during hostilities and violent clashes.

In April, nongovernmental organizations (NGOs) Lawyers for Justice in Libya and Libya Crimes Watch documented abuses in the LNA-controlled al-Kwaifiya prison's Military Police wing in Benghazi. According to witness testimonies, at least 16 detainees died between 2017 and 2022 of causes ranging from torture to medical neglect.

In June, government authorities identified the remains of al-Khoms primary court judge Mohamed Bin Amer in one of the mass graves discovered in the western town of Tarhouna. Bin Amer was kidnapped in 2020 in Tripoli during the al-Kaniyat militia's attack on Castleverde.

The government continued to discover mass graves throughout the year. In January, the General Authority for Search and Identification of Missing

Persons announced the discovery of 18 unidentified bodies in Sirte.  In July, the organization announced the discovery of 12 unidentified bodies in a grave near al-Jufra Airbase, south of Sirte.

## b. Disappearance

Government-and LNA-aligned armed groups, other nonstate armed groups, criminal gangs, and tribal groups committed an unknown number of forced disappearances.  Domestic and international human rights organizations reported security services or armed groups throughout the country forcibly disappeared or detained dozens of civil society activists, politicians, judges, and journalists for making comments or pursuing activities perceived as disloyal to the government or the LNA.  The FFM final report noted that a victim's family origin or ties were also factors in some cases of forced disappearance.  According to the UN Support Mission in Libya (UNSMIL), the whereabouts of thousands of men, women, and children remained unknown.  Some were illegally detained and later released, while the bodies of other missing and disappeared persons were found in locations throughout the country, including in mass graves.  Authorities made few effective efforts to prevent, investigate, or penalize forced disappearances, although a military court in February convicted 30 persons of murder for their role in the 2019 mass killings in Tarhouna.  Prison terms ranged from six years to life in prison.  As of year's end, the whereabouts of Siham Sergiwa, a parliamentarian abducted from her home in 2019 after criticizing

the LNA's Tripoli offensive in a televised interview, remained unknown.

In February, local media reported masked gunmen kidnapped Tarhouna member of parliament Hassan Jaballah al-Ferjani as he exited the headquarters of the Administrative Control Authority in Tripoli.  Local media alleged the gunmen were members of a Tarhouna militia led by Feraj Keshar, working under the direction of the government-aligned Security Deterrence Force (SDF or Rada).

In June, gunmen allegedly affiliated with the eastern Internal Security Agency (ISA East) kidnapped activist, university professor, and parliamentary candidate Belgasem Mohamed al-Jared from his home in Benghazi and took him to an undisclosed location, according to local NGO Libya Crimes Watch.

Migrants, refugees, and other foreign nationals were especially vulnerable to kidnapping.  UNSMIL received reports that hundreds of migrants and refugees intercepted or rescued at sea by the Libyan Coast Guard (LCG) and other entities went missing after disembarking at Libyan ports.  The International Organization for Migration (IOM) reported such individuals remained vulnerable to seizure by armed groups engaged in human trafficking or migrant smuggling.  In July, the UN Panel of Experts expressed serious concern regarding the situation of 120 migrants and refugees allegedly released by the Libyan Directorate for Combating Illegal Migration (DCIM) from a warehouse in the southeastern oasis of Tazirbu in February.  According to the Panel of Experts, the migrants and refugees were taken to

an undisclosed location and continued to be detained without access to lawyers, assistance, or protection.

The International Commission on Missing Persons estimated that up to 10,000 missing-person cases in the country remained unresolved, dating back to the Gaddhafi era.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The 2011 Constitutional Declaration and postrevolutionary legislation prohibited such practices.  The FFM final report documented widespread instances of torture, and cruel, inhuman, or degrading treatment in all prisons it investigated, irrespective of prison location or the entity in control of the detainees.

An unknown number of individuals, including refugees, asylum seekers, and other migrants, were held in facilities under the control of armed groups affiliated with either the government or the LNA, or in extralegal facilities run by smugglers and other nonstate actors.  The criminal and nonstate armed groups controlling extralegal facilities routinely tortured and abused detainees, subjecting them to arbitrary killings, rape and sexual violence, beatings, electric shocks, burns, forced labor, and deprivation of food and water, according to dozens of testimonies shared with international aid agencies and human rights groups.  In many instances, the purpose of this

abuse was reportedly to extort payments from detainees' families.

In April, Lawyers for Justice in Libya and Libya Crimes Watch documented torture, rape, medical neglect, arbitrary detention, lack of access to family and legal counsel, and other mistreatment inside the al-Kwaifiya prison's military wing in Benghazi. Witnesses stated that the center's staff routinely administered severe beatings to detainees and committed harassment and rape. Male detainees testified they often heard screaming coming from the women's wing. They reported one woman detainee attempted to climb over the detention center wall to commit suicide.

In April, protests erupted in the northwestern city of Zawiya after a video posted to social media purported to show sub-Saharan African mercenaries torturing young Libyan men inside the headquarters of a local unnamed militia. According to local media, the videos showed the apparent mercenaries flogging, burning, and suspending the youths by their limbs from the ceiling.

Impunity was a significant problem in the security forces. The government took limited steps to investigate, prosecute, and punish officials who committed human rights abuses and acts of corruption within its area of reach; however, its limited resources, as well as political considerations, reduced its ability and willingness to prosecute and punish perpetrators.

## Prison and Detention Center Conditions

Prisons and detention facilities were often overcrowded, and conditions were harsh and life threatening.

In its final report, the FFM found reasonable grounds to believe the SDF elements in control of Mitiga detention complex in Tripoli committed crimes against humanity, as did the LNA, LNA-aligned Tarek Ben Ziyad (TbZ) Brigade, and ISA East elements in control of Gernada and al-Kwaifiya prisons in Benghazi. According to the FFM, no detainee it interviewed during its three-year mandate had been held in acceptable conditions of detention.

**Abusive Physical Conditions:** Prisons were grossly overcrowded. The FFM final report found detainees were denied adequate access to water, food, toilets, sanitation, light, exercise, medical care, legal counsel, and communication with family members. Poor and unsafe infrastructure was common and exacerbated sanitation problems, which contributed to the spread of communicable diseases. The ratio of detainees and prisoners to guards varied significantly during the year. Monitoring and training of prison staff by international organizations remained largely suspended, although training of judicial police continued. There was a lack of adequate gender-sensitive training for male guards.

Although there were often separate facilities for men and women, women were almost universally guarded by male prison guards. UNSMIL and

international NGOs received numerous reports of women subjected to forced prostitution in prisons or detention facilities in what amounted to sexual slavery.

Communicable diseases, including tuberculosis, scabies, and HIV and AIDS, affected detainees in some prisons and detention centers. Most prisons lacked functioning health units, and inmates depended on family members for medicine. Inmates needing medical attention were sometimes transferred to public hospitals within the jurisdiction of whichever police unit or militia controlled the prison; these transfers often depended on the availability of private vehicles, as most prisons lacked ambulances. In February, a local NGO reported the death of Fathi Mohammed, age 72, Khawaja in SDF-controlled Mitiga prison as a result of illness and deliberate medical neglect throughout his six-year detention.

There were reportedly no functioning juvenile detention facilities in the country.

**Administration:**  There was no credible information available as to whether authorities conducted investigations of credible allegations of mistreatment.

**Independent Monitoring:**  Multiple independent monitoring organizations reported difficulties gaining access to prison and detention facilities, particularly those administered by the LNA. The government permitted limited, chaperoned independent monitoring of its detention facilities by

international organizations, including the International Committee of the Red Cross, but controlled these movements tightly. UN and international aid organization sources reported DCIM officials repeatedly denied access requests. Although some international organizations received permission to visit DCIM-administered migrant detention facilities, the responsiveness of government authorities and level of access varied widely from visit to visit. As of October, the United Nations High Commissioner for Refugees (UNHCR) and its partners had conducted 486 monitoring visits to DCIM facilities during the year to administer aid and register refugees and asylum seekers.

## d. Arbitrary Arrest or Detention

Neither the 2011 Constitutional Declaration nor the Gaddhafi-era criminal code prohibited arbitrary arrest and detention, nor did they provide for the right of any person to challenge the lawfulness of their arrest or detention in court. The government had weak control over police and armed groups providing internal security, and some armed groups carried out illegal and arbitrary detentions unimpeded. The low level of international monitoring meant there were no reliable statistics on the number of arbitrary detentions.

As of March, the government reported there were 18,523 detainees in prisons across the country. The FFM assessed the true number of individuals arbitrarily detained was likely much higher. An unknown number

of individuals were arbitrarily held without judicial authorization, for extended periods, without legal charges, in unknown locations, in prisons nominally controlled by the Ministry of Interior or the Ministry of Defense, or in extralegal facilities controlled by government-affiliated armed groups, LNA-affiliated armed groups, and other nonstate actors.

## Arrest Procedures and Treatment of Detainees

The law required an arrest warrant for a formal arrest, but authorities could detain persons without charge for as long as six days and could renew detention for up to three months, provided there was "reasonable evidence." The law also specified that authorities were required to inform detainees of the charges against them and have a detainee appear before a judicial authority every 30 days to renew a detention order, although these rights were not respected, according to UNSMIL. Detainees often faced prolonged and sometimes indefinite detention, without judicial oversight, procedural guarantees, or consideration of individual protection needs.

The law gave the government power to detain persons for up to two months if considered a "threat to public security or stability," based on their "previous actions or affiliation with an official or unofficial apparatus or tool of the former regime."

Although the 2011 Constitutional Declaration recognized the right to counsel, most detainees did not have access to a lawyer. Government

authorities and armed groups held detainees incommunicado for protracted periods in official and unofficial detention centers.

According to the FFM final report, detainees were almost never informed of the reason for their arrest or provided with information on the charges against them.  Some detainees were imprisoned for years without appearing before a judge, and release orders were frequently ignored.

**Arbitrary Arrest:**  Various government-aligned and nonstate armed groups arrested and detained persons arbitrarily throughout the year.

In July, local media reported elements of the government-aligned ISA West detained former Finance Minister Faraj Bomtari, allegedly in response to his bid to replace Central Bank of Libya Governor Sadek Elkaber.  Bomtari was released after his tribe shut down crucial oil fields.

In October, local media and rights groups reported the LNA-aligned ISA East detained former member of the National Transitional Council and former ambassador to Canada Fathi Bajaa and two colleagues on charges of seeking to overthrow the LNA.  ISA East personnel reportedly detained the three men for participating in a discussion at a Benghazi-based think tank regarding the collapse of two dams during the September 10-11 floods in Derna, a city in the eastern region under LNA control.

The UN Panel of Experts on Libya reported state and nonstate actors detained migrants and refugees arbitrarily in official and unofficial detention

centers.

UNICEF reported authorities continued to arbitrarily detain migrant children in detention centers in and around Tripoli. These children lacked access to legal assistance, due process, and basic protection and health services, according to UNICEF. UNSMIL called for the release of all arbitrarily detained individuals and stressed the imperative to conduct any security operations in full respect of the rights and freedoms of the population.

**Pretrial Detention:** While authorities had to order detention for a specific period not exceeding 90 days, an ambiguity in the language of the law permitting judges to renew the detention period if the suspect was of "interest to the investigation" resulted in extended pretrial detentions. In addition, limited resources and court capacity caused a severe backlog of cases. According to international NGOs, many pretrial detainees were held for periods longer than the sentences for the minor crimes they allegedly committed. UNSMIL continued to call on the Ministry of Justice to apply international standards for pretrial detention. The number of persons held in pretrial detention in Ministry of Interior, Ministry of Defense, and extralegal detention facilities was not publicly known.

Armed groups held most of their detainees without charge and outside the government's authority. With control of the security environment divided among various armed groups and a largely nonfunctioning judiciary, circumstances prevented most of these detainees from accessing due

process.

The law allowed a detained suspect to challenge pretrial detention before the prosecutor and a magistrate judge.  If the prosecutor did not order release, the detained person could appeal to the magistrate judge.  If the magistrate judge ordered continued detention following review of the prosecutor's request, and despite the detainee's challenge, there was no further right to appeal the assigned detention order.  A breakdown in the court system, intimidation of judges, and difficulties in securely transporting prisoners to the courts effectively limited detainee access to the courts.  For persons held in migrant detention facilities, there was no access to immigration courts or due process.

## e. Denial of Fair Public Trial

The government generally did not respect judicial independence and impartiality.  The 2011 Constitutional Declaration provided for an independent judiciary and stipulated every person had a right of recourse to the judicial system.  Nonetheless, thousands of detainees lacked access to lawyers and information concerning the charges against them.  In some cases, trials were held without public hearings.  Judges and prosecutors, lacking resources and facing threats, intimidation, and violence from armed groups, cited concerns regarding the overall lack of security in and around the courts in various parts of the country, further hindering the rule of law.

UNSMIL and local NGOs documented several cases, especially in LNA-controlled areas, in which military "judicial authorities" tried cases that would normally fall under the jurisdiction of civilian courts; according to UNSMIL, these "trials" did not meet international standards. UNSMIL also received reports of the unlawful deprivation of liberty and the issuance of sentences by so-called courts operating outside national and international legal norms.

## Trial Procedures

The 2011 Constitutional Declaration provided for the right to a fair trial, the presumption of innocence, and the right to legal counsel, provided at public expense for the indigent. Government and nonstate actors did not respect these standards. There were multiple reports of individuals denied fair and public trials, choice of attorney, language interpretation, the ability to confront witnesses, protection against forced testimony or confessions, and the right to appeal.

According to reports from international and domestic NGOs, arbitrary detention and torture by armed groups, including those operating nominally under government oversight, contributed to a climate of lawlessness that made fair trials elusive. Armed groups and families of the victims or the accused regularly threatened lawyers, judges, and prosecutors.

Amid threats, intimidation, and violence against the judiciary, the

government did not take steps to screen detainees systematically for prosecution or release. The courts were more prone to process civil cases, which were less likely to invite retaliation, although capacity was limited due to a lack of judges and administrators.

## Political Prisoners and Detainees

There were reports of political prisoners and detainees. Armed groups, some of which were nominally under government authority, held persons on political grounds, particularly former Gaddhafi regime officials and others accused of subverting the 2011 revolution, in a variety of temporary facilities. As of December, UNSMIL and local and international NGOs reported the government continued to prohibit access by human rights or humanitarian organizations to such facilities.

Due to the lack of international monitoring, there were no reliable statistics on the number of political prisoners.

In February, former Gaddhafi Internal Security chief Abdalla Mansour was released from prison, after nine years in detention, as part of the Presidential Council's national reconciliation process. It was the only known case of a released political prisoner during the year.

# f. Transnational Repression

Not applicable.

# g. Property Seizure and Restitution

Past government policy actions and a weak regulatory environment complicated property rights in the country. The government eliminated all private property rights and most private businesses in 1978. This step, in addition to the destruction of some official files at the property registrar in 1986, greatly complicated any subsequent effort to prove clear title to property throughout the country. There was no clear pathway for restitution or compensation for property seized during the Gaddhafi period. The national property register remained frozen since 2011.

In March, UNSMIL and local media reported forced evictions and demolition of cultural sites in central Benghazi, purportedly as part of the LNA's campaign to restore parts of the city damaged by fighting. As of September, the UN Panel of Experts reported TbZ members, functionally under the control of LNA commander Khalifa Haftar's son Saddam, and Brigade 20/20 evicted more than 20,000 Benghazi residents on short notice and forced them to surrender their property or ownership documents. According to reports received by the Panel of Experts, there were no prior consultations with concerned residents nor any publicly communicated decision-making process. According to the reports, there was no compensation scheme in place and evicted residents were not offered assistance to secure new housing of equal value. Residents who opposed or protested the eviction plans were pressured into compliance or silence, including through power

cuts, harassment, and violence.

# h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The 2011 Constitutional Declaration considered correspondence, telephone conversations, and other forms of communication inviolable unless access, collection, or use was authorized by a court order.  Nonetheless, media reports, including on social media, indicated government-aligned groups violated these prohibitions by monitoring communications without judicial authorization, imposing roadside checks, and entering private homes.

Domestic human rights organizations continued to protest authorities' searches of cell phones, tablets, and laptops at roadside checkpoints, airports, and border crossings.  These organizations noted the practice was widespread across both western and eastern regions of the country to target activists, lawyers, media professionals, bloggers, and migrants.

Invasion of privacy left citizens vulnerable to targeted attacks based on political affiliation, ideology, and identity.  Extrajudicial punishment extended to targets' family members and tribes.  Armed groups arbitrarily entered, seized, or destroyed private property with impunity.

# i. Conflict-related Abuses

Civil society and media reports documented abuses by government-aligned

groups, LNA-aligned groups, nonstate groups, foreign actors including mercenaries from various countries, and terrorist organizations.  Conflict-related abuses committed by armed groups reportedly included killings, kidnapping, arbitrary detention, and torture.

**Killings:**  There were numerous reports members of government-aligned groups, LNA-aligned groups, foreign actors, mercenaries, and other nonstate actors committed arbitrary and unlawful killings of civilians.  According to the FFM final report, evidence obtained by the FFM established reasonable grounds to believe elements of the LNA and its affiliated groups killed members of the Tebu community in 2019.  Video footage showed eight bodies, two of them handcuffed, of alleged Tebu members off a main road north of the city of Murzuq.  The FFM also found reasonable grounds to believe Tebu men killed two children, ages five and 14, from the al-Ahaali community with gunshots to the head in the presence of their relatives in a family home in Murzuq in 2019, allegedly because their father was fighting for the LNA.

**Abductions:**  Government-aligned groups, LNA-aligned groups, and other armed groups were reportedly responsible for the disappearance of civilians, although few details were available.  Kidnappings targeted activists, journalists, government officials, migrants, and refugees.  Kidnappings for ransom, including of migrants and other foreign workers, remained a frequent occurrence in many cities.

The FFM final report documented 21 cases of alleged disappearances and abductions of al-Ahaali community members around Murzuq, mostly in 2019.

**Physical Abuse, Punishment, and Torture:**  According to UN and NGO reporting, guards at both government and extralegal detention centers tortured prisoners, although the law prohibited torture.

Child Soldiers:  The Secretary of State determined Libya had government-supported armed groups that recruited or used child soldiers during the reporting period of April 2022 to March 2023.  See the Department of State's annual Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

The United Nations reported an LNA-affiliated armed group recruited or used children in support roles.

# Section 2. Respect for Civil Liberties

# a. Freedom of Expression, Including for Members of the Press and Other Media

The 2011 Constitutional Declaration provided for freedom of opinion, expression, and press, but censorship was pervasive by all sides and various armed groups, including those aligned with the government, exerted

significant control over media content. Unidentified assailants targeted journalists as reprisal for their reporting.

**Freedom of Expression:** Freedom of expression was limited in law and practice. The law criminalized acts that "harm the February 17 revolution," which was the start of protests in 2011. The House of Representatives, since its election in 2014, and the government, since taking power in Tripoli in 2021, did little to reduce restrictions on freedom of expression. Observers reported individuals censored themselves in everyday speech. Civil society organizations (CSOs) practiced self-censorship because members of armed groups previously threatened or killed activists. Skirmishes in major urban areas deepened the climate of fear and provided cover for armed groups to target vocal opponents with impunity.

Press freedoms were limited in all forms of media, creating an environment in which virtually no independent media existed.

**Violence and Harassment:** The international NGO Reporters Without Borders reported all sides used threats and violence to intimidate journalists. Harassment, threats, abductions, violence, and killings made it nearly impossible for media to operate in any meaningful capacity in several areas of the country. Freedom House's annual report on internet freedom found activists and journalists continued to experience physical insecurity, with several individuals kidnapped in retaliation for online content.

Impunity for attacks on members of media exacerbated the problem, with no monitoring organizations, security forces, or functioning judicial system to constrain or record these attacks.

Many armed groups aligned with the government or the LNA maintained databases of persons being sought for their alleged opposition activities or due to their identity. Some journalists and human rights activists chose to depart the country rather than remain and endure harassment.

Armed groups reportedly used social media to monitor and target political opponents, incite violence, and engage in hate speech.

In April, Euro-Med Human Rights Monitor reported a TbZ unit arrested Benghazi municipality media office director Maher Elgheryani after he criticized the campaign to demolish buildings and forcibly evict residents in Benghazi.

In September, local media reported armed men associated with the government-aligned Joint Operations Force (JOF) kidnapped journalist and activist Abdulmalik al-Madani in Misrata after he shared a Facebook post criticizing Prime Minister Dabaiba concerning Foreign Minister Mangoush's meeting with Israeli Foreign Minister Eli Cohen. Closed-circuit television footage posted on social media purportedly showed JOF vehicles surrounding al-Madani's car before armed men forced the journalist into a JOF vehicle.

According to UNSMIL, various news publications and television stations published calls to violence, intentionally spread false news, and permitted defamation.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** Journalists practiced self-censorship due to intimidation and the lack of security. The unstable security situation created hostility towards civilians and journalists associated with opposing armed groups or political factions. International news agencies reported difficulties obtaining journalist visas, encountered refusals to issue or recognize press cards, and were barred from reporting freely in certain areas, especially eastern cities. UNSMIL documented restrictions imposed by the Foreign Media Department at the Ministry of Foreign Affairs seriously affecting the operations of journalists in Tripoli.

**Libel/Slander Laws:** The penal code criminalized a variety of political speech, including speech considered to "insult constitutional and popular authorities" and "publicly insulting the Libyan Arab people." The penal code and other laws provided criminal penalties for defamation and insults to religion; these were generally applied only to cases involving alleged defamation of Islam.

**National Security:** The penal code criminalized speech considered to "tarnish the [country's] reputation or undermine confidence in it abroad," but the government did not enforce this provision.

**Nongovernmental Impact:**  Members of nongovernmental armed groups, terrorist groups, and civilians regularly harassed, intimidated, or assaulted journalists.

## Internet Freedom

The government and LNA occasionally restricted or disrupted access to the internet and continued to censor online content.  According to the Freedom House report, internet freedom continued to decline.  Selective filtering or blocking of access existed, although no reliable public information identified those responsible for censorship.  There were reports elements of government-aligned groups monitored private online communications without appropriate legal authority.  Activists on social media reported Facebook pages were regularly hacked by unknown actors or overwhelmed by a deluge of critical comments.

In February, local media reported security forces affiliated with the Benghazi-based "Government of National Stability Ministry of Interior" arrested two women, Ahlam al-Yamani and Hanin al-Abdali, in Benghazi for "violations of moral turpitude" under the cybercrime law, which gave government authorities broad remit to remove digital content deemed offensive to the country's culture and values.

In October, Benghazi faced an eight-day telecommunications outage that coincided with local media reports of fighting between LNA-aligned armed

groups and supporters of former Government of National Accord Defense Minister Mahdi al-Barghati. UNSMIL called on "eastern authorities" to urgently restore telecommunications, emphasizing that "obtaining and sharing information is a human right, and communications represent a lifeline for civilians in conflict zones."

A significant body of evidence suggested foreign actors sought to influence domestic opinion and incite violence in the country by spreading deliberate misinformation on social media and other platforms.

Many bloggers, online journalists, and citizens reported practicing self-censorship due to intimidation by armed groups and the uncertain political situation. The online space reportedly became less diverse as internet users increasingly self-censored and online activists ceased their activities in response to harassment from authorities. Journalists, activists, and bloggers continued to face online harassment, arbitrary detention, and, in some cases, physical violence relating to their online activity.

## b. Freedoms of Peaceful Assembly and Association

The 2011 Constitutional Declaration provided for the freedoms of peaceful assembly and association, but in practice the government limited these freedoms.

## Freedom of Peaceful Assembly

The 2011 Constitutional Declaration provided for a general right to peaceful assembly, and the government generally respected this right.  The law on peaceful demonstrations, however, failed to include relevant assurances and severely restricted the exercise of the right of assembly.  The law required protesters to inform the government of any planned protest at least 48 hours in advance and permitted the government to ban a protest on as little as 12 hours' notice.

In August, local media reported government-affiliated security forces at the al-Khoms port fired live ammunition into a crowd of approximately 1,000 protesters who were chanting antigovernment and anti-Turkish slogans following the spread of rumors that the government had signed a 99-year lease with the Turkish government to operate the port.  Media reported injuries among protesters.

## Freedom of Association

The 2011 Constitutional Declaration included freedom of association for political and civil society groups.  The government lacked capacity, however, to protect freedom of association.  Targeted attacks on journalists, activists, and religious figures by state and nonstate actors severely undermined this freedom and caused some activists to seek sanctuary abroad.  Numerous CSO staff members received threats, including death threats, because of

their human rights activities, and several of them believed they were under surveillance by intelligence services; they also reported being unjustly detained for short periods.

In March, the Supreme Judicial Council declared that all civil society organizations not registered were illegal, under a Ghaddafi-era civil society law that had not been used since 2011.  The Prime Minister's Office issued a memorandum supporting the council's opinion and confirming the illegality of unregistered organizations.  According to the Cairo Institute for Human Rights Studies, the law reimposed an executive approval process to establish CSOs; gave authorities broad latitude to close, dissolve, or merge organizations; and prohibited the establishment of organizations working on human rights.  Following objections from civil society and the international community, the Prime Minister's Office issued another memorandum in March allowing local and foreign organizations to operate temporarily until they were registered.

In May, the Government of National Unity created a new committee under the auspices of the Prime Minister's Office to oversee CSOs.  In August, the committee began soliciting registration applications from local and international civil society groups.  The mandate of the newly established committee overlapped significantly with the existing civil society commission, whose Benghazi and Tripoli branches reunified in August.  As a result, local and international civil society organizations reported significant

confusion in registering or renewing registrations, including in clarifying if registrations issued by one body would be respected by the other.

In May, the Benghazi-based General Intelligence Service published a warning to local CSOs and public institutions receiving foreign funding that they would be subject to prosecution and security measures if they did not disclose their finances, activities, and the movement of foreign employees.

## c. Freedom of Religion

See the Department of State's International Religious Freedom Report at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The 2011 Constitutional Declaration recognized freedom of movement, including foreign travel, emigration, and repatriation, although the law provided the government with the power to restrict a person's movement if it viewed that person as a "threat to public security or stability," based on the person's "previous actions or affiliation with an official or unofficial apparatus or tool of the former regime."

The law criminalized irregular migration and required the detention of irregular migrants. As of the end of October, IOM and UNHCR reported authorities had intercepted at sea and disembarked more than 12,600

migrants in 178 operations.  The largest groups were from Bangladesh, Syria, and Egypt, although nationalities for the vast majority of disembarked individuals remained unrecorded due to lack of UNHCR access to disembarkation points.

**In-country Movement:**  The government did not restrict internal movement in the west, although armed groups aligned with it established some internal checkpoints.  The LNA established checkpoints restricting movement in the east and south.

There were reports armed groups controlling airports within the country conducted random checks on departing domestic and international travelers, including of their personal electronic devices.  The country lacked a unified customs and immigration system.

**Foreign Travel:**  In May, the government-affiliated ISA West began requiring women traveling without a male escort to complete a detailed form about the reasons for their travel, past travel, and why they were traveling alone. Human Rights Council Special Procedures mandate-holders expressed in a July public statement deep concern regarding a discriminatory policy issued by the Government of National Unity in April that effectively restricted the rights of women and girls to travel abroad without a mahram (male guardian).  According to the UN Panel of Experts, the policy was systematically implemented without formal or prior announcement.  In July, the Panel of Experts reported attempts by ISA West personnel to intimidate

human rights defenders, including women, who spoke out against these policies.  Women and girls who refused to complete or submit the form were reportedly denied exit.

In July, local media reported ISA West confiscated the passports of five High State Council members at Mitiga Airport in Tripoli, allegedly to prevent them from traveling to Turkey for a work trip.

**Citizenship:**  The law stated citizens could lose citizenship if they obtained a foreign citizenship without receiving permission beforehand from authorities, but there was no process for obtaining such permission.  The state lacked the capacity to investigate the authenticity of citizenship applications.

If a father's citizenship was revoked, his children lost theirs as well.  The law did not specify whether a wife lost her citizenship if her husband's was revoked, or whether minors and adult children could lose their own citizenship due to the revocation of their mother's.

# e. Protection of Refugees

Government cooperation with UNHCR, IOM, and other international agencies operating within the country was inconsistent, and government-imposed restrictions often prevented humanitarian access and movement. These agencies were allowed to assist refugees and migrants in some geographic areas and facilities across the country.  UN agencies monitored

and publicly reported on refugees and migrants in the country, including those in government detention centers.  International aid organizations provided basic services directly and through domestic implementing partners to refugees and asylum seekers.  This report uses the term "migrant" to refer also to refugees and asylum seekers.

**Access to Asylum:**  Libya was not party to the 1951 Refugee Convention or its 1967 Protocol, although the 2011 Constitutional Declaration recognized the right of asylum and forbade forcible repatriation of asylum seekers.  The government had not established a system for protecting refugees or asylum seekers by year's end.  Absent an asylum system, authorities could detain and deport asylum seekers without giving them the opportunity to request asylum.  The government did not legally recognize asylum seekers without documentation as a class distinct from migrants without residency permits.

As of October, UNHCR put the number of registered refugees and asylum seekers in the country at 50,986.  The vast majority of these were from the nine registered nationalities, among whom Sudanese and Syrians were the largest groups.  UNHCR registered 53 refugees and asylum seekers from other nationalities as of September.  Each adult asylum seeker was issued a printed UNHCR asylum seeker certificate that included a photograph and basic biodata serving as evidence that the bearer was entitled to protection and assistance under the UNHCR mandate.

Authorities made no progress in the registration of migrants and refugees at

disembarkation points after interception operations, or in detention facilities.  Due to the complexity of direct resettlement out of the country, UNHCR relied on processes such as the Emergency Transit Mechanism to resettle vulnerable populations of concern.

**Abuse of Refugees and Asylum Seekers:**  The country's unique political, security, and economic landscape made distinguishing between migrants, refugees, and asylum seekers all but impossible; all were highly vulnerable to abuse.  As of June, IOM reported there were 704,369 migrants in the country.  According to UNICEF, 74,797 of the migrants were children, of whom approximately 21,000 were unaccompanied.

According to various UN agencies and rights groups, migrants routinely experienced unlawful killings, arbitrary detention, torture, sexual exploitation, and other abuses.  Perpetrators included state officials, armed groups, smugglers, traffickers, and criminal gangs.  The FFM observed that perpetrators profited financially from the exploitation of migrants.

Various UN entities documented human rights abuses committed against migrants in detention centers throughout the year.  Specifically, the FFM final report stated the Ministry of Interior, DCIM, and armed groups in de facto control of migrants in Tariq al-Matar, Abu Isa, Gharyan, Tariq al-Sikka, Zawiya, Salah al-Din, Mabani, and al-Shwarif committed crimes against humanity.  According to the FFM, the systematic and widespread character of documented crimes strongly implicated DCIM personnel and officials at

all levels.  The FFM also found reasonable grounds to believe the Stability Support Apparatus (SSA) elements committed crimes against humanity in detention facilities under their control in Ayn Zarah and Abu Salim. According to the FFM, conditions in government and extralegal migrant detention facilities included severe overcrowding, insufficient access to toilets and washing facilities, malnourishment, lack of potable water, and spread of communicable diseases.  As of October, UNHCR estimated that over 4,900 migrants were in official detention centers across the country.

According to OHCHR, women migrants in detention centers were also routinely held in facilities without female guards and strip-searched by male guards.  Women and girls were vulnerable to sex trafficking and were routinely detained in houses in Tripoli and Sabha.  Migrant women and girls were forced into commercial sex in both official and unofficial detention facilities in conditions that sometimes amounted to sexual slavery.  The FFM final report found reasonable grounds to believe sexual slavery was present in detention facilities in Bani Walid and Sabratha under the actual or nominal control of the DCIM.

The FFM found the LCG responsible for crimes against humanity for returning migrants to detention centers where crimes against humanity were committed.  The FFM also found reasonable grounds to believe personnel on LCG ships shot at or near boats carrying migrants, causing migrants to jump into the water to seek temporary safety.  According to the

final report, LCG personnel and other security officials often physically and verbally assaulted and threatened migrants during their transfer onto Libyan LCG ships and forced them to return to Libya.  The FFM also found reasonable grounds to believe high-ranking LCG staff, the government-aligned SSA, and the DCIM colluded with traffickers and smugglers to intercept, detain, and exploit migrants.  The FFM did not assign responsibility to specific individuals or elements within the SSA.

A July report from the Global Initiative against Transnational Organized Crime documented a rise in migrant departures from the eastern part of the country, particularly Tobruk.  The report assessed that sophisticated, transnational human smuggling networks previously involved in drug trafficking contributed to the movement of large numbers of migrants through the eastern region.

IOM reported 13,611 migrants intercepted at sea by Libyan authorities as of November, as well as 938 deaths and 1,248 missing at sea.  As of June, IOM also reported 83 deaths and disappearances of migrants along land routes in the country.  In June, the migrant vessel Adriana departed Tobruk with approximately 700 passengers on board and sank off the coast of Greece, killing hundreds.  In August, the Ministry of Interior Border Guards reported recovering the bodies of 27 sub-Saharan African migrants among the hundreds of migrants whom Tunisian authorities expelled starting in July.

Numerous reports suggested migrant smugglers and human traffickers

caused the death and serious injury of migrants.  In July, the UN Panel of Experts reported an estimated 700 migrants, including victims of trafficking, were transferred to detention centers after suspected smugglers held them captive, tortured them for ransom, and subjected them to starvation and sexual violence, in various locations in Tazirbu during the past two years. Videos of torture and other abuses were reportedly sent to victims' families to demand ransom.  Graveyards containing the remains of at least 20 migrants and refugees who were victims of torture were reportedly found.

International organizations documented extensive cases of sexual and gender-based violence against women and girls, as well as against men and boys.  The FFM final report found instances of rape and gender-based violence in migrant detention facilities in Mabani, al-Shwarif, Zuwarah, Sabha, Sabratah, and Bani Walid.  Observers reported rape was often used as a form of torture and in some cases resulted in death.

The mistreatment of migrants resulted in long-term physical and emotional harm and could lead to suicide attempts, according to the FFM final report. In one incident the FFM documented, a boy hanged himself in Ayn Zarah after allegedly being tortured and suffering severe headaches.  His body was left hanging in front of other migrants for at least a day and a half before being taken down.

The government conducted limited arrests and prosecutions of persons engaged in human trafficking or migrant smuggling.  In July, courts in Tripoli

and the eastern city of al-Bayda handed various sentences, including life in prison, to 38 defendants convicted of human trafficking.  The UN Panel of Experts expressed concerns in July that investigations into detention abuses were limited and often focused only on non-Libyan perpetrators.

**Freedom of Movement:**  Migrants were generally considered to be illegally present in the country and were subject to fines, detention, and expulsion. The government considered migrants intercepted by the LCG while attempting sea crossings on the Mediterranean to have violated the law and often sent them to migrant detention facilities in the west.  The FFM final report described an "ever-revolving door" of capture, release, recapture, escape, and interception.  Migrants who were able to pay a ransom to leave detention sites were often recaptured by the same actor or another group.

In January, a regional NGO reported the LNA expelled 600 migrants detained at the DCIM Al Kufra detention center, including Sundanese asylum seekers registered with UNHCR.

In June, local and international press reported the LNA expelled approximately 4,000 Egyptian migrants.  According to reports, LNA officials deported the migrants to Egypt on foot across the land border.

According to IOM, UNHCR, and UNSMIL, the country could not be considered a safe port for the return or disembarkation of migrants intercepted or rescued at sea.  Returns reportedly often violated the

principle of nonrefoulement, as migrants systematically and routinely faced the risk of death, disappearance, arbitrary detention, torture, mistreatment, gender-based violence, exploitation, and other human rights abuses by both state and nonstate actors.  UN agencies continued to express concern that thousands of migrants who remained unaccounted for after disembarkation had disappeared into informal detention by human trafficking networks.

**Access to Basic Services:**  Refugees registered with UNHCR could access basic protection and assistance from UNHCR and its partners, but the government did not provide refugees with reliable access to health care, education, or other services.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

Previously internally displaced persons continued to return to their places of origin.  According to IOM, there were 125,802 IDPs in the country as of April; Storm Daniel displaced an additional 43,421 individuals in September. Benghazi, Misrata, and Tripoli were the regions hosting the largest number of IDPs.  Limited access for local and international assistance organizations into areas affected by fighting among rival armed groups and to official and unofficial detention centers hampered efforts to account for and assist the displaced.

The government struggled to facilitate the safe, voluntary return of IDPs to

their place of origin. While the government made nominal efforts to promote return in certain cases, the lack of adequate laws, policies, or government programs prompted international organizations and NGOs to assist IDPs in the form of cash payments and provision of health services, including to those with disabilities.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center: https://www.internal-displacement.org/.

## g. Stateless Persons

The country contributed to statelessness, including through discrimination against women in nationality laws. Women generally could not transmit citizenship to their children. The law permitted women citizens to confer citizenship to their children only in certain exceptional circumstances, such as when fathers were unknown, stateless, or of unknown nationality. In contrast, the law provided for automatic transmission of citizenship to children born of a citizen father, whether the child was born inside or outside the country, and regardless of the citizenship of the mother.

The former Gaddhafi regime revoked the citizenship of some inhabitants of the Saharan interior of the country, including minorities such as the Tebu and Tuareg, resulting in many nomadic and settled stateless persons in the country.

According to some reports, up to 30 percent of the population in the south was of undetermined legal status, which fueled discrimination in employment and services.  Noncitizens without national identification numbers could not access basic services; register births, marriages, or deaths; hold certain jobs; receive state salaries; vote; or run for office.

Due to the lack of international monitoring and governmental capacity, there were no comprehensive data on the number of stateless persons.

# Section 3. Freedom to Participate in the Political Process

The 2011 Constitutional Declaration provided citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:**  The most recent national election took place in 2014.  Elections were scheduled for December 2021 but were not held.  A new date had not been set as of year's end.

**Participation of Women and Members of Marginalized or Vulnerable Groups:**  The 2011 Constitutional Declaration allowed for full participation of women and minorities in elections and the political process, but significant

social and cultural barriers – in addition to lack of security – prevented their proportionate political participation.

Ethnic minorities and Indigenous groups, including the Amazigh, Tebu, and Tuareg, expressed frustration with what they perceived as their deliberate marginalization from political institutions and processes.

# Section 4. Corruption in Government

The law provided criminal penalties for official corruption.  The government did not implement the law effectively.  There were numerous reports of government corruption.

There were many reports and accusations of official corruption due to the lack of transparency in the government's management of security forces, oil revenues, and the national economy.  There was no unified national budget. As a result, the government carried out public spending with "limited accountability and transparency," according to the World Bank's Economic Monitor report.

Divisions in economic and oversight institutions between the east and the west, including the Central Bank of Libya and the Audit Bureau, limited transparency and capacity for institutional oversight.  Efforts continued to reunify institutions.  In August, the central bank announced its reunification, although operational and technical divisions remained between the Tripoli

headquarters and the Benghazi branch, which split off in 2014.

There were allegations that government officials sometimes misused the letter of credit system to gain access to government funds.

**Corruption:**  Internal conflict and the weakness of public institutions undermined implementation of the law.  According to reports by the government's Audit Bureau, the country's highest financial regulatory authority, officials frequently engaged with impunity in corrupt practices such as graft, bribery, and nepotism.  There were also numerous reports of government corruption, including involvement in money laundering, human smuggling, and other criminal activities.

In June, the Attorney General's Office launched an investigation into allegations government officials had misappropriated scholarships intended for Libyan students to study in Turkey.  A leaked list of scholarship recipients included numerous relatives of government officials, such as two brothers, ages 57 and 70, accompanied by 10 relatives and a woman, age 74, allegedly related to the leader of a Tripoli armed group, according to local media.  A formal investigation by the attorney general, which reportedly revealed that 757 scholarships were misappropriated, resulted in the suspension of several Ministry of Higher Education officials.

Slow progress in implementing decentralization legislation, particularly regarding management of revenues from oil and gas exports and

distribution of government funds, led to accusations of corruption and calls for greater transparency.  In July, the Presidential Council created the High Financial Committee composed of western and eastern representatives, to develop a budget and a process for equitable revenue distribution.

The Audit Bureau made efforts to improve transparency by publishing annual reports on government revenues and expenditures, national projects, and administrative corruption, but it did not have oversight of eastern-based institutions due to the government's limited ability to exert control in the east.

For additional information about corruption in the country, please see the Department of State's Investment Climate Statement for the country, and the Department of State's International Narcotics Strategy Control Report, which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

Several human rights groups operated in the country but encountered government restrictions when investigating alleged abuses of human rights. The government and affiliated nonstate armed groups used legal and nonlegal means to restrict some human rights organizations from operating,

particularly organizations with an international affiliation.

**Retribution against Human Rights Defenders:**  International and domestic human rights organizations claimed human rights defenders and activists faced continuing threats – including physical attacks, detention, threats, harassment, and disappearances – by armed groups, both those aligned with and those opposed to the government.

**The United Nations or Other International Bodies:**  UNSMIL maintained its headquarters and staff in Tripoli.  The government was unable to assure the safety of UN officials, particularly in areas of the country not under its control, but generally cooperated with UN representatives in arranging visits within the country.

The FFM final report documented numerous access problems as an obstacle to its work.  According to the FFM, the LNA denied its requests to visit areas in the south under LNA control.  The government reportedly also denied the FFM permission to depart from Tripoli to enter southern areas.  During its mandate, the FFM submitted several requests to the Presidential Council, Ministry of Interior, Ministry of Justice, Ministry of Social Affairs, and Ministry of Public Health to visit prisons and detention facilities but did not receive official responses.  The FFM added that a "climate of fear" among witnesses and civil society frequently hindered its ability to document potential human rights abuses.

**Government Human Rights Bodies:**  The National Council for Civil Liberties and Human Rights was unable to operate fully in the country due primarily to political divisions between the east and west.  The council, which had offices around the country, maintained limited engagement with other human rights organizations and the UN Human Rights Council.  Its ability to advocate for human rights and investigate alleged abuses was unclear.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalized rape, including of men, but did not address spousal rape.  The 2011 Constitutional Declaration prohibited domestic violence but did not contain reference to penalties for those convicted of violence against women.  Specialized courts in Tripoli and Benghazi addressed violence against women, men, and children.  As of December, sufficient information was not available to assess whether the government enforced the law effectively.

There were no reliable statistics on the extent of domestic violence.  Social and cultural barriers – including police and judicial reluctance to act and family reluctance to publicize an assault – contributed to lack of effective government enforcement.  Several domestic CSOs reported women continued to experience higher rates of domestic violence than men.

By law a convicted rapist could avoid a 25-year prison sentence by marrying the survivor, regardless of her wishes, provided her family consented. Rape survivors who could not meet high evidentiary standards could face charges of adultery.

Migrant women and girls remained particularly vulnerable to rape and sexual violence, including forced commercial sexual exploitation in conditions amounting to sexual slavery. There were reports of egregious acts of sexual violence against women and girls in government and extralegal detention facilities. Migrant women also reported being harassed when leaving their homes to search for work. Many migrant women who had been abused reported they could not return to their countries of origin due to stigmatization.

**Other Forms of Gender-based Violence or Harassment:** The law criminalized sexual harassment, but there were no reports on how or whether it was enforced. According to CSOs, there was widespread harassment and intimidation of women by armed groups, including harassment and arbitrary detention based on accusations of "un-Islamic" behavior.

There were reports armed groups harassed women traveling without a male "guardian" and that armed groups asked men and women socializing in public venues to produce marriage certificates to verify their relationships.

**Discrimination:**  The 2011 Constitutional Declaration stated citizens, regardless of gender, were equal under the law and enjoyed the same civil and political rights.  The government did not effectively enforce these declarations.

Women faced social discrimination that affected their ability to access employment, their workplaces, their mobility, and their personal freedom. Although the law prohibited discrimination based on gender, there was widespread cultural, economic, and societal discrimination against women.

The country lacked a unified family code.  Sharia (Islamic religious law) often governed family matters, including inheritance, divorce, and property rights. While civil law mandated equal rights in inheritance, women often received less due to interpretations of sharia that favored men.

In April, Libyan Women's Platform for Peace documented the arrests of sisters Ibtisam and Rabia Bin Omran, who ran an animal shelter in Benghazi. After their arrest, the eastern "Government of National Stability Deputy Minister of the Interior" reportedly posted a video on Facebook purporting to show evidence that the sisters had engaged in "suspicious activities," including "witchcraft."

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The UN Population Fund (UNFPA) noted family planning services were

significantly limited due to cultural and social norms favoring large families, as well as the absence of prioritization of the matter by the government. Access to information on reproductive health and contraception was also difficult for women to obtain due to social norms surrounding sexuality.

Women's access to maternal health-care services and contraceptive supplies remained limited due to continued political instability. According to the World Health Organization (WHO), the large number of IDPs and access restrictions in certain areas significantly affected the provision of reproductive health services. The WHO also reported lack of access to family planning services, obstetrical care, and treatment of sexually transmitted infections. Reliable data on maternal mortality, menstruation, contraception rates, and sex education remained unavailable as of December, according to UNFPA.

The government generally did not effectively provide access to sexual and reproductive health services for survivors of sexual violence, including access to emergency contraception or postexposure prophylaxis. Civil society actors provided limited legal assistance to survivors in the absence of the government.

## Systemic Racial or Ethnic Violence and Discrimination

The 2011 Constitutional Declaration provided equal protection for all Libyans before the law, without distinction on the grounds of tribal,

regional, or familiar adherence.  Nonetheless, there were multiple reports that marginalized racial or ethnic groups faced discriminations by government and nongovernmental actors.

Some members of the Tebu minority residing in the south reported their access to higher education was limited, since university campuses were in geographic areas controlled by Arab tribes that routinely harassed or denied them freedom of movement.  Universities reportedly did not provide offsite learning alternatives to these Tebu students.

The extent to which the government enforced official recognition of minority rights was unclear.  There were reports that teachers of minority languages faced discrimination in receiving accreditation and in being eligible for bonuses, training, and exchange opportunities provided by the Ministry of Education.

There were also reports individuals with non-Arabic names encountered difficulties registering these names in civil documents.

Ethnic minorities faced instances of societal discrimination and violence. Racial discrimination existed against dark-skinned citizens, including those of sub-Saharan African heritage.  Government officials and journalists often distinguished between "local" and "foreign" populations of Tebu and Tuareg in the south and advocated expulsion of minority groups affiliated with political rivals on the basis they were not truly "Libyan."

In August, the Cairo Institute for Human Rights Studies reported the LNA-affiliated TbZ Brigade detained hundreds of civilians, including members of the Tebu community, in "inhumane conditions" in the southern part of the country, at the LNA's Tamanhint military base, 120 miles away from their home of Umm al-Aranib.  The TbZ Brigade reportedly released the women and children but prevented them from returning to their homes.

Several Tebu and Tuareg communities received substandard or no services from municipalities, lacked national identity numbers, faced widespread social discrimination, and suffered from hate speech and identity-based violence.  In the south, if a member of one tribe or group attacked a member of another tribe or group, retribution against multiple members of the attacking group was not uncommon.

Some members of ethnic minority communities in the south and west reported being unwilling to enter certain courthouses and police stations due to intimidation and fear of reprisal.

There were numerous reports throughout the year of ethnic minorities being injured or killed in confrontations with other groups.

There were numerous reports migrants, particularly sub-Saharan Africans, experienced harassment or discrimination by citizens due to the perception that foreigners were transmitting communicable diseases.

# Children

**Birth Registration:**  By law, children derived citizenship from a citizen father.  The law permitted citizen mothers who marry foreign men to transmit citizenship to their children, although some contradictory provisions perpetuated discrimination against women married to foreign men.  There were also naturalization provisions for noncitizens.

**Education:**  The law granted the right for "all linguistic and cultural components to have the right to learn their language," and the government nominally recognized the right to teach minority languages in schools.  Minority and indigenous groups complained their communities were often allowed to teach their languages only as an elective subject within the curriculum.

**Child Abuse:**  The penal code included provisions outlawing the mistreatment of minors and protected children's rights in cases concerning custody, guardianship, care, and juvenile justice.  The government did not enforce those laws effectively, particularly regarding migrant children.

The FFM final report found reasonable grounds to believe some members of the SDF and ISA East, among other armed groups, tortured child detainees and that "numerous" children were held at al-Kwaifiya prison in Benghazi.  The FFM did not assign responsibility to specific elements within the SDF or ISA East.

**Child, Early, and Forced Marriage:** The minimum age for marriage was 18 for both men and women, although judges could permit those younger than 18 to marry. LNA authorities reportedly continued to impose a minimum age of 20 for both men and women. Early marriages were relatively rare, according to the most recent information from UN Women in 2019, although comprehensive statistics were not available due to the lack of a centralized civil registry system and the continuing conflict.

There were anecdotal reports of child marriage occurring in some rural and desert areas where tribal customs were more prevalent. There were also unconfirmed reports that civil authorities could be bribed to permit underage marriage.

**Sexual Exploitation of Children:** There were no laws prohibiting or penalties for the commercial sexual exploitation of children or for child pornography, nor laws regulating the minimum age of consensual sex.

## Antisemitism

The majority of the country's once-thriving Jewish community departed between 1948 and 1967. No members of the Jewish community were believed to remain in the country.

After reports leaked in September regarding a meeting between then Foreign Minister Najla Mangoush and her Israeli counterpart, a Libyan social media influencer described Mangoush as "the dog of the Jews" in a

Facebook post.

Following the start of the Israel-Hamas conflict in October, the Government of National Unity minister of Islamic affairs and endowments (Awqaf) posted a statement on Facebook requesting the country's imams to deliver a Friday sermon warning Muslims that "the danger of Jews and those who help the Jews is not without consequences; they want to colonize and expand and won't surrender Jerusalem without force." In the aftermath of Israeli airstrikes on Gaza in October, Government of National Unity-recognized Grand Mufti Sadiq al-Gharyani accused "the Jews and their allies" of knowingly "exterminating civilians."

For further information on incidents in the country of antisemitism, whether or not those incidents were motivated by religion, and for reporting on the ability of Jews to exercise freedom of religion or belief, please see the Department of State's International Religious Freedom Report at https://www.state.gov/religiousfreedomreport/.

## Trafficking in Persons

See the Department of State's Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or

# Sex Characteristics

**Criminalization:**  Same-sex sexual activity between consenting adults was criminalized with a penalty of three to five years' imprisonment.  The law was enforced.  Human Rights Watch reported punishment could include flogging in addition to imprisonment.

**Violence and Harassment:**  There were reports of physical violence, harassment (including by government agents), and blackmail based on sexual orientation and gender identity.  Armed groups often policed communities to enforce compliance with their commanders' understanding of "Islamic" behavior, harassing and threatening with impunity individuals believed to have lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) orientations, as well as their families.

The FFM final report documented the arbitrary arrest of two young men perceived to be gay.  Heavily armed men reportedly forced the individuals to unlock and provide access to their phones before transferring the individuals to SDF custody at the Mitiga airport prison complex.  According to the report, a man described as a "sheikh" tortured the young men and denigrated their perceived sexual orientation.  One of the men reported guards ordered him at gunpoint to strip and raped him, allegedly also asking him for information regarding other men perceived to be gay.

**Discrimination:**  The law did not prohibit discrimination by state and

nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics. Societal discrimination against LGBTQI+ persons was widespread, and official discrimination was codified in local interpretations of sharia. Disproportionate enforcement of public order laws against LGBTQI+ persons reportedly served to justify arbitrary arrest. Human rights groups reported punishment could include flogging and up to five years' imprisonment.

Little information existed on discrimination based on sexual orientation or gender identity in employment, housing, access to education, or health care. Observers noted the threat of possible violence or abuse could dissuade persons from reporting such discrimination.

**Availability of Legal Gender Recognition:** Legal gender recognition was not available.

**Involuntary or Coercive Medical or Psychological Practices:** Information on the existence or prevalence of the practice of so-called conversion therapy on adults or children to try to change a person's sexual orientation or gender identity or expression was not available by year's end. Information on the practice of performing unnecessary surgeries on intersex persons was also not available.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** The penal code indirectly restricted freedom of expression, association, and

peaceful assembly.  According to civil society activists, the ISA West increasingly relied on laws reportedly intended to criminalize actions undermining traditional Libyan culture and values as a pretext for arresting and detaining suspected LGBTQI+ individuals.  According to UN bodies and human rights organizations, such individuals were subjected to intimidation, harassment, forced confessions, and torture.

## Persons with Disabilities

The 2011 Constitutional Declaration addressed the rights of persons with disabilities by providing for monetary and other types of social assistance for the "protection" of persons with "special needs" with respect to employment, education, access to health care, and the provision of other government services, but it did not explicitly prohibit discrimination.  The government did not effectively enforce these provisions.  IDPs, migrants, and refugees with disabilities were especially vulnerable to poor treatment in detention facilities.

Years of postrevolutionary conflict led to a high incidence of persons maimed by shelling or explosive war remnants.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective

## Bargaining

The law did not provide for the right of workers to form and join independent unions. It provided for the right of workers to bargain collectively and conduct legal strikes, with significant restrictions. The penalties for violating these rights were less than those under other laws involving denials of civil rights. Information on how regularly violators faced penalties was not available. The law neither prohibited antiunion discrimination nor required reinstatement of workers fired for union activity. The government did not effectively enforce laws protecting freedom of association, collective bargaining, and the right to strike for workers.

By law workers in the formal sector were automatically members of the General Trade Union Federation of Workers, although they could elect to withdraw from the union. Only citizens could be union members, and regulations did not permit foreign workers to organize. The government was limited in its ability to enforce applicable labor laws. The requirement that all collective agreements conform to the "national economic interest" restricted collective bargaining. Freedom House found security conditions and weaknesses in the legal system prevented unions from conducting normal collective-bargaining activity. Workers could call strikes only after exhausting all conciliation and arbitration procedures. The government or one of the parties could demand compulsory arbitration, thus severely

restricting strikes.  The government had the right to set and cut salaries without consulting workers.  Employees organized spontaneous strikes, boycotts, and sit-ins at a number of workplaces, generally to protest unpaid salaries.

According to a February report, more than two dozen union representatives from across the country told UNSMIL the political and security situation meant that they were regularly discriminated against through nonpayment of salaries, had problems with poor equipment, and sometimes faced harassment from armed groups.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual Trafficking in Persons Report at
https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibited and criminalized the worst forms of child labor and provided for a minimum age of employment, prohibiting children younger than 18 from employment except in a form of apprenticeship.  The law stipulated employees, including those in apprenticeships, could not work more than 48 hours per week or more than 10 hours in a single day.  The law set occupational safety and health (OSH) restrictions for children.  The

government lacked the capacity to enforce the law. No information was available to determine whether abuses of child labor laws incurred penalties commensurate with those for other analogous serious crimes, such as kidnapping. There were reports of children forced into labor or military service by nonstate armed groups. These accounts were difficult to verify due to the absence of independent monitoring organizations and the continuing hostilities.

## d. Discrimination (see section 6)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** There was a national monthly minimum wage but no set official poverty income level. According to a 2021 needs assessment conducted by the humanitarian initiative REACH, "little information exists about income, expenditure, and poverty within Libya. Due to the fragmented governance system in Libya, income data is scarce and rarely covers all regions." The law stipulated a workweek of 40 hours, standard working hours, night shift regulations, dismissal procedures, and training requirements. The law did not specifically prohibit excessive compulsory overtime.

**Occupational Safety and Health:** The Ministry of Labor was responsible for OSH issues, but no information was available on enforcement and compliance. OSH standards were appropriate for the main industries, but

the government generally did not enforce them. Certain industries, such as the petroleum sector, attempted to maintain standards set by foreign companies. Responsibility for identifying unsafe situations remained with OSH experts and not the worker. The law provided OSH standards and granted workers the right to court hearings regarding abuses of these standards. The law did not provide workers the right to remove themselves from a hazardous workplace without jeopardizing their employment.

**Wage, Hour, and OSH Enforcement:** The government did not effectively enforce minimum wage, overtime, and OSH laws. Penalties were rarely applied against violators.

The Ministry of Labor was responsible by law for enforcing wage, hour, and OSH laws. The number of labor inspectors was not sufficient to enforce compliance. The law did not indicate whether inspectors had the authority to make unannounced inspections and initiate sanctions.

No accurate data on the size of the informal economy were available. The law did not provide for OSH standards for workers in the informal economy.