# Rwanda 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Rwanda during the year.

Significant human rights issues included credible reports of arbitrary or unlawful killings, including extrajudicial killings; harsh and life-threatening prison conditions; arbitrary arrest or detention; political prisoners or detainees; transnational repression against individuals in another country; arbitrary or unlawful interference with privacy; punishment of family members for alleged offenses by a relative; serious abuses in a conflict, including reportedly unlawful or widespread civilian deaths or harm, enforced disappearances or abductions, forcible transfers of civilian populations, torture, physical abuses, and conflict-related sexual violence or punishment; unlawful recruitment or use of children in armed conflict by government-supported armed groups; serious restrictions on free expression and media freedom, including threats of violence against journalists, unjustified arrests or prosecutions of journalists, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental and civil society organizations; serious and unreasonable

EXHIBIT H

restrictions on political participation; and serious government restrictions on or harassment of domestic and international human rights organizations.

The government took steps to identify and punish officials who may have committed human rights abuses, including within the security services, but impunity involving civilian officials and some members of the state security forces was a problem.

A nongovernmental armed group, the March 23 Movement, operated in the eastern part of the Democratic Republic of the Congo with government support and committed numerous human rights abuses including widespread civilian deaths or harm, enforced disappearances or abductions, forcible transfers of civilian populations, torture, physical abuses, and conflict-related sexual violence or punishment. The government did not investigate and prosecute such abuses.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports the government committed arbitrary or unlawful killings, including extrajudicial killings, during the year.

There were local press and social media reports that police killed several

persons while attempting to resist arrest or escape police custody. Observers reported cases of police and military personnel killing individuals suspected of theft.  In October police shot and killed Vincent Nsengimana, a resident of Bugesera District suspected of stealing electrical wires while allegedly attempting to escape custody.  There were no public reports of investigations into this or other similar killings.

## b. Disappearance

There were no new reports of disappearances by or on behalf of government authorities, but the government did not take action to investigate past high-profile cases.

Domestic organizations cited a lack of independence and will for government officials to investigate security sector abuses effectively, including reported enforced disappearances.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The constitution and law prohibited such practices and there were no new reports of abuse of detainees by police and corrections service officials.  The law prescribed 20 to 25 years' imprisonment for any person convicted of torture and lifetime imprisonment for public officials who committed torture in the course of their official duties.  In September, the government

charged nine prison officials including a prison director for torture in Rubavu prison. The case continued at the end of the year.

There were no reports of judges ordering an investigation into allegations of torture raised at trial regarding coerced confessions or dismissing evidence obtained under torture.

The government took some steps to prosecute or punish members of security services who committed abuses or for misconduct. Impunity, however, was a problem, particularly in cases where government opponents were the apparent victims of abuses. Human rights groups alleged intelligence officials acted with impunity. Security services maintained an influential role in the government. The National Commission for Human Rights (NCHR), a government-funded body mandated to investigate abuses, functioned as a National Preventive Mechanism mandated to monitor and implement the country's obligations under the UN Convention Against Torture, including through site visits to prisons and other detention facilities.

## Prison and Detention Center Conditions

Conditions at prisons and unofficial detention centers ranged widely among facilities but could be harsh and life-threatening due to gross overcrowding, food and water shortages, and inadequate sanitary conditions.

**Abusive Physical Conditions:** Reports indicated conditions were generally harsh and life threatening in unofficial or intelligence service-related

detention centers, where individuals suffered from limited access to food, water, and health care. Conditions were also often harsh and life threatening due to overcrowding at regular prisons and National Rehabilitation Service-operated district transit centers holding street children, street vendors, suspected drug abusers, persons engaged in commercial sex work, homeless persons, and suspected petty criminals.

**Administration:** The government investigated and prosecuted reported abuses by corrections officers in some limited cases, but generally failed to investigate reports of abuses from previous years.

**Independent Monitoring:** The government restricted monitoring of prison conditions by independent nongovernmental observers. In some cases, the government placed specific prisoners under additional access restrictions. The government permitted monitoring of prison conditions and trials of individuals whom the UN International Residual Mechanism for Criminal Tribunals (IRMCT) had transferred to the country's jurisdiction for trials related to the 1994 genocide, per agreement with the IRMCT. Journalists could access prisons with a valid press card but required permission from the prison service commissioner to take photographs or interview prisoners or guards. Some civil society organizations were able to visit prisons for monitoring purposes, with the government's approval.

# d. Arbitrary Arrest or Detention

The constitution and law prohibited arbitrary arrest and detention and provided for the right of any person to challenge in court the lawfulness of their arrest or detention, but in some cases the government did not observe these requirements.  State security forces arrested and detained persons arbitrarily and without due process, and there were no reports of any detainees receiving compensation for unlawful detention.

## Arrest Procedures and Treatment of Detainees

The law required authorities to investigate and obtain a warrant before arresting a suspect.  Authorities were required to serve arrest warrants during daylight hours, but there were reports of police conducting searches and arrests outside of these hours.  Police could detain suspects for up to 72 hours without an arrest warrant.  Prosecutors were required to submit formal charges within five days of arrest.  Police could detain children a maximum of 15 days in pretrial detention but only for crimes that carried a penalty of five years or more imprisonment.  Police and prosecutors frequently disregarded these provisions and held individuals, sometimes for months and often without charge, particularly in security-related cases.

The law permitted investigative detention if authorities believed public safety was threatened or the accused might flee, and judges interpreted these provisions broadly.  A judge was required to review such a detention

every 30 days.  By law it could not extend beyond one year; however, authorities sometimes held suspects indefinitely at the behest of state prosecutors after the first authorization of investigative detention and did not always seek reauthorization every 30 days.

After prosecutors formally filed a charge, detention could be indefinite unless bail was granted.  Bail existed only for crimes for which the maximum sentence if convicted was five years' imprisonment or less, but authorities could release a suspect pending trial if satisfied the person would not flee or become a threat to public safety and order.  Detainees were generally allowed access to attorneys of their choice.  The government at times violated the right to habeas corpus.  Observers reported state security forces sometimes held individuals incommunicado and subjected them to interrogation and threats to curtail their exercise of freedoms of speech and association.

The law allowed judges to impose detention of equivalent duration and fines on state security forces and other government officials who unlawfully detained individuals, but there were no reports that judges exercised this authority.

**Arbitrary Arrest:**  There were reports of arbitrary arrests, at times accompanied by police beatings.  The government reportedly used arbitrary arrests (or the threat of arbitrary arrest) as a tool to intimidate government critics, independent voices, and political opposition members.

Unregistered opposition political parties previously reported authorities detained their officials and supporters, including for lengthy periods (see also section 1.e, Political Prisoners). Christopher Kayumba, an opposition leader who was previously acquitted of charges of assault and rape, was convicted on appeal and was serving a suspended sentence. Kayumba previously claimed government officials threatened to "destroy" him criminally if he did not cease his political activities.

Human rights advocates reported police regularly rounded up homeless and other needy individuals and subjected them to abusive treatment and unsanitary detention conditions in transit centers before major international events or conferences in the country. Although there was no legal requirement for individuals to carry an identification document (ID), police and the District Administration Security Support Organ regularly detained street children, vendors, suspected petty criminals, and beggars without IDs and sometimes charged them with illegal street vending or vagrancy. Authorities released adults who could produce an ID and transported street children to their home districts, to shelters, or for processing into vocational and educational programs. As in previous years, authorities held detainees without charge at transit centers for weeks or months at a time before either transferring them to a National Rehabilitation Service rehabilitation center without judicial review or forcibly returning them to their home areas. Detainees held at transit or rehabilitation centers could contest their detentions before the centers' authorities but did not have the right to

appear before a judge. Advocates raised concerns that detainees at transit centers were not adequately screened for human trafficking indicators.

**Pretrial Detention:** Lengthy pretrial detention was a serious problem, and authorities often detained prisoners for months without arraignment, in large part due to administrative delays caused by case backlogs and prosecutors favoring imprisonment over alternatives, even if available in a case. During the year, the government accelerated its use of alternative dispute resolution and plea bargaining, which helped reduce the backlog of cases in court and eased the burden of overcrowding in prisons. The law permitted detention of genocide and terrorism suspects until trial. The law provided pretrial detention, illegal detention, and administrative sanctions be fully deducted from sentences imposed. There were reports of individuals being subjected to pretrial detention for periods exceeding the maximum sentence for the alleged offense. The law did not provide for compensation to persons who were acquitted.

# e. Denial of Fair Public Trial

The constitution and law provided for an independent judiciary, and the government generally respected judicial independence and impartiality. Authorities generally respected court orders. Domestic and international observers noted outcomes in high-profile genocide, security, and politically sensitive cases appeared predetermined.

## Trial Procedures

The constitution and law provided for the right to a fair and public trial, and the judiciary generally enforced this right.

Defendants had the right to a trial without undue delay.  Human rights advocates and government officials noted shortages of judges, prosecutors, and defense attorneys as well as resource limitations within the criminal justice system resulted in delays for many defendants, particularly those awaiting pro bono government-provided legal aid.

By law detainees were allowed access to lawyers, but the expense and scarcity of lawyers limited access to legal representation.  Some lawyers were reluctant to work on politically sensitive cases, fearing harassment and threats by government officials, including monitoring of their communications.  Detainees in such cases reported prison authorities did not allow them to have confidential consultations with their lawyers.

Defendants had the right to communicate with an attorney of their choice, but many defendants could not afford private counsel.  The law provided for legal representation of juveniles.  The bar association and civil society provided legal assistance to some indigent defendants but lacked the resources to provide defense counsel to all in need.

The law provided for a right to free interpretation, although interpreters were more difficult to access in rural areas.  By law defendants could not be

compelled to testify or confess guilt. Judges generally respected these rights during trial, but previous reports indicated state security forces coerced suspects into confessing guilt in security-related cases and judges tended to accept confessions allegedly obtained through torture, failing to order investigations of alleged torture. The law provided for the right to appeal, and authorities respected this provision, although lack of access to computers necessary to file such appeals impeded defendants' ability to exercise that right.

In May, South African authorities arrested Fulgence Kayishema, a genocide fugitive subject to international tribunal indictments, and detained him on fraud and immigration charges. The process to transfer Kayishema's case to the IRMCT continued at year's end. The cases of the last two remaining genocide fugitives still wanted by the IRMCT were transferred to government jurisdiction.

## Political Prisoners and Detainees

Local officials and state security forces continued to detain and imprison individuals who had previously disagreed with government decisions or policies. Numerous individuals affiliated with unregistered political opposition parties remained in detention without trial. Six members of the unregistered Dalfa-Umurinzi party were arrested in 2021 for alleged "publication of rumors intended to cause uprising or unrest among the population" and remained in detention without trial at the end of the year.

In December 2022 a court convicted Théophile Ntirutwa, another Dalfa-Umurinzi member, of "spreading false information or harmful propaganda with intent to cause a hostile international opinion of the Rwandan government" and sentenced him to seven years imprisonment.  Some government critics faced indictment under broadly applied charges of genocide incitement, genocide denial, inciting insurrection, rebellion, or attempting to overthrow the government.  Others faced apparently unrelated criminal charges.  Political prisoners were generally afforded the same protections as other detainees, including visitation rights, access to lawyers and doctors, and access to family members.  The government did not generally give human rights or humanitarian organizations access to specific political prisoners.

In March, the government commuted the sentence of Paul Rusesabagina and released him from prison (see the 2021 Country Report on Human Rights Practices).

# f. Transnational Repression

There were credible reports that the government – directly and through others – exhibited a pattern of intimidating or exacting reprisal against individuals outside its sovereign borders, including political opponents and members of the diaspora.

**Extraterritorial Killing, Kidnapping, Forced Returns, or Other Violence or**

**Threats of Violence:** The government was alleged to have killed or kidnapped persons, or used violence or threats of violence against individuals in other countries for politically motivated reprisal in previous years and did not publicize any investigations into such allegations.

**Threats, Harassment, Surveillance, and Coercion:** Advocates reported that citizens living overseas experienced digital threats, spyware attacks, and family and personal intimidation and harassment. Advocates claimed the government applied these measures to put pressure on individuals who threatened government interests.

Advocates continued to report the government used surveillance tools to target critics both at home and abroad. According to the NGO Pegasus Project, disappeared opposition figure Cassien Ntamuhanga's phone number was on a list of numbers selected for targeting through Pegasus spyware.

Human Rights Watch reported authorities regularly harassed and threatened family members of persons located outside the country to exert pressure or to exact reprisal for their relatives' political activities (see section 1.h.).

**Misuse of International Law Enforcement Tools:** There were credible reports the government attempted to misuse international law enforcement tools for politically motivated purposes against specific individuals located

outside the country. Human Rights Watch reported Interpol confirmed in an August letter that it had withdrawn a 2020 Red Notice issued at government request seeking the arrest of Richard Eugene Gasana, a former government official turned opposition figure resident in the United States, on charges of rape and sexual harassment. An Interpol commission reportedly found there was a predominant political dimension to the case and withdrew the request.

**Bilateral Pressure:** There were credible reports that for politically motivated purposes, the government exerted bilateral pressure on another country to take adverse action against specific individuals and to pressure refugees to return home.

# g. Property Seizure and Restitution

Reports of expropriation of land for the construction of roads, government buildings, and other infrastructure projects without due process or adequate restitution were common, in each case the government was obligated to provide timely compensation.

The government forcibly evicted individuals from dwellings across the country (primarily in Kigali) deemed to be in swamp land or other zones at high risk of flooding or landslides. Some of those who were evicted stated government officials said the dwellings should never have been constructed in those locations and therefore refused to offer them compensation.

Others reported being offered compensation that was of inadequate value or not timely.

There were reports of irregular application of laws related to abandoned properties.  Some property owners (especially those based overseas who leased their land to others) reported the government declared their properties abandoned so it could seize and sell the property at auction to others.

# h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution and law prohibited such actions, but the government failed to respect these prohibitions.  The government continued to monitor homes, movements, telephone calls, email, internet chat rooms, as well as personal and institutional communications arbitrarily, unlawfully, or without appropriate legal authority.  Individuals and groups could engage in the peaceful expression of views online, including by email and social media, but were subject to monitoring.  The government continued to work within internet and telephone companies, international and local NGOs, religious organizations, media, and other social institutions, and used sophisticated technical tools to gain access to electronic devices.

The law required police to obtain authorization from a state prosecutor prior to entering and searching citizens' homes.  According to human rights

organizations, state security forces at times entered homes without obtaining the required authorization or did so outside the legal hours for conducting searches and arrests. Authorities punished family members for offenses allegedly committed by relatives (see section 1.f, Threats, Harassment, Surveillance, and Coercion).

# i. Conflict-related Abuses

Violence continued in the eastern Democratic Republic of the Congo (DRC) along the Rwandan and Ugandan border between the DRC armed forces (FARDC) and the March 23 Movement (M23). UN and credible independent analyses indicated Rwanda continued to support M23. There were reports the FARDC collaborated with the Democratic Forces for the Liberation of Rwanda (FDLR), an armed group which had previously carried out attacks against the country and had long been linked to 1994 genocide crimes.

There were reports of national army incursions into DRC territory ostensibly to take actions against the FDLR, although there were no indications of deliberate killings of civilians or noncombatants. Reports indicated during hostilities M23 deliberately targeted and summarily executed civilians and committed rape. (For additional details, see the Democratic Republic of the Congo report.)

**Child Soldiers:** The Secretary of State determined Rwanda provided support to the M23, an armed group that recruited or used child soldiers during the

reporting period of April 2022 to March 2023.  See the Department of State's annual Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provided for freedom of expression, including for members of the press and other media "in conditions prescribed by the law," but the government severely restricted this right.  Journalists reported government officials questioned, threatened, and at times arrested journalists who expressed views deemed critical of the government on sensitive topics.  Government failure to investigate or prosecute attacks on human rights defenders and journalists led to de facto restrictions on freedom of expression.

**Freedom of Expression:**  There were no official restrictions on individuals' right to criticize the government publicly or privately on policy implementation and other topics, but broad interpretation of provisions in the law had a chilling effect on such criticism.  The government generally did not tolerate criticism of the presidency and government policy on security, human rights, and other matters it deemed sensitive.

Laws prohibiting divisionism, genocide ideology, and genocide denial were broadly applied and discouraged citizens, residents, and visitors to the country from expressing viewpoints that could be construed as promoting societal divisions.

The law prohibited making use of speech, writing, or any other act that divided the populace or might set them against each other or caused civil unrest because of discrimination. The crime of "instigating divisions" was punishable by five to seven years' imprisonment and a substantial monetary fine.

Authorities applied the laws broadly, including to silence political dissent and to shut down investigative journalism. The law also prohibited spreading "false information or harmful propaganda with intent to cause public disaffection against the government," which was punishable by seven to 10 years' imprisonment. The government generally investigated individuals accused of threatening or harming genocide survivors and witnesses or of espousing genocide ideology.

A revised law enacted in 2018 incorporated international definitions of genocide and outlined the scope of what constituted genocide ideology and related offenses. Specifically, the law provided any person convicted of denying, minimizing, or justifying the 1994 genocide was liable to a prison term of five to seven years and a substantial monetary fine. Authorities applied the statute broadly, and there were reports of its use to silence

persons critical of government policy.

In October, the government requested a 14-year sentence for a resident of Kangondo Village charged with divisionism and genocide minimization for claiming government efforts to compensate and move villagers from Kangondo to another location were a kind of "genocide." The trial continued at year's end.

**Violence and Harassment:** Media professionals reported the government continued to use lengthy interrogations and threats of arrests and physical violence to silence media outlets and journalists. Several journalists who fled in prior years remained outside the country. Failure to investigate or prosecute threats against journalists resulted in self-censorship.

On January 19, journalist John Williams Ntwali died in a late-night motorbike accident in Kigali. Ntwali had published articles and YouTube videos on topics perceived as sensitive including the jailing of YouTube journalists, disappearances, police abuse, and land expropriation. A court accepted a guilty plea from the driver involved in the crash to charges of manslaughter and unintentional bodily harm, but there were no independent monitors at the proceedings, which reportedly took place behind closed doors. Rights groups called for independent, impartial, and effective investigation into what they called the suspicious circumstances surrounding Ntwali's death. Another journalist, Nuhu Bihindi, went missing shortly after speaking to a press outlet regarding the circumstances of Ntwali's death. His

whereabouts remained unknown at year's end.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** The law explicitly prohibited censorship of information, but observers reported censorship occurred. The laws restricted these freedoms if journalists "jeopardize the general public order and good morals, an individual's right to honor and reputation in the public eye and to the right to inviolability of a person's private life and family." Observers stated the government used ambiguities in these statutes to threaten journalists and suppress reporting deemed critical of the government. By law authorities could seize journalists' material and information if a "media offense" occurred, but only under a court order. Courts could compel journalists to reveal confidential sources in the event of an investigation or criminal proceeding. Persons wanting to start a media outlet were required to apply with the "competent public organ." All media rights and prohibitions applied to persons writing for websites. Independent YouTube journalists reported the government used media laws and registration requirements to criminalize citizen reporting and threatened individuals producing content deemed sensitive or critical of the government. The government refused to recognize as journalists unaccredited persons who conducted interviews and posted them on personal YouTube channels, denying them protections afforded accredited journalists under the law. The law allowed the government to restrict access to some government documents and information, including

information on individual privacy and information or statements deemed to constitute defamation.

Observers reported harassment, suspicious disappearances, and the fear of prosecution pushed many journalists to engage in self-censorship. Journalists reported government officials frequently pressured them to produce news stories that presented the government favorably. Radio stations broadcast criticism of government policies, including on popular citizen call-in shows; however, criticism tended to focus on provincial leaders and local implementation of policies rather than on the president or ruling party leadership.

**Libel/Slander Laws:** The law did not criminalize the use of words, gestures, writings, or cartoons to humiliate members of parliament, members of the cabinet, security officers, or any other public servant, including the president. Defamation of foreign and international officials and dignitaries remained illegal under the law, with sentences, if convicted, of three to five years' imprisonment. The law did not contain provisions criminalizing public defamation and public insult in general. The law contained provisions that criminalized "humiliation" of religious rites, symbols, objects, or religious leaders, but there were no reports of prosecutions under these provisions during the year.

**National Security:** Under media laws, journalists were required to refrain from reporting items that violated "confidentiality in the national security

and national integrity" and "confidentiality of judicial proceedings, parliamentary sessions, and cabinet deliberations in camera."  Authorities in the past used these laws to intimidate critics of the government and journalists covering politically sensitive topics and matters under government investigation.

## Internet Freedom

The government restricted and censored online content.  The government cited genocide denial, divisionism, and incitement statutes in some cases while taking legal action against digital content creators, particularly YouTube users, whom it accused of promoting hatred and disrupting national unity.

The law included the right of all citizens to "receive, disseminate, or send information through the internet," including the right to start and maintain a website.  All provisions of media law applied to web-based publications.

According to a 2010 law relating to electronic messages, signatures, and transactions, intermediaries and service providers were not held liable for content transmitted through their networks.  Nonetheless, service providers were required to remove content when handed a takedown notice, and there were no avenues for appeal.

Government-run social media accounts were used to debate and at times intimidate individuals who posted online comments considered critical of

the government. Advocates reported the government often enlisted purportedly independent individuals as proxies to harass government critics online. In some cases, these proxies threatened critics' safety or called on the government to take law enforcement action against them.

The government blocked access within the country to several websites critical of its policies, including websites of diaspora communities.

# b. Freedoms of Peaceful Assembly and Association

The government restricted freedoms of peaceful assembly and association, and government failure to investigate or prosecute attacks on human rights defenders also acted as de facto restrictions.

## Freedom of Peaceful Assembly

The constitution and law provided for freedom of peaceful assembly, but the government did not always respect this right. The law criminalized demonstrating in a public place without prior authorization. Violating this provision was punishable by a prison sentence of eight days to six months or a substantial fine. The penalties increased for illegal demonstrations deemed to have threatened security, public order, or health. Although there were no reports of denial of meeting permits, the severe penalties for violating assembly rules deterred most persons from engaging in protests.

## Freedom of Association

While the constitution provided for freedom of association, the government limited the right.  The law required private organizations to register with the government.  Civil society organizations collaborating with the government's political and development plans were able to act relatively freely while those that did not faced difficulties.   Although the government generally granted licenses to private organizations, it delayed or denied registration to local and international NGOs seeking to work on human rights, media freedom, or political advocacy (see section 3).  In addition, the government imposed burdensome NGO registration and renewal requirements, to include delays for groups which explicitly committed to work in human rights or other areas considered sensitive, and time-consuming requirements for annual financial and activity reports (see section 5).  The law required faith-based organizations to obtain legal status from the government before beginning operations.  It also called for their legal representatives and preachers with supervisory responsibilities to hold academic degrees.

# c. Freedom of Religion

See the Department of State's International Religious Freedom Report at https://www.state.gov/religiousfreedomreport/.

# d. Freedom of Movement and the Right to Leave the

## Country

The constitution and law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights. The government accepted former combatants who returned from conflict in the DRC.

**Exile:** The government reportedly denied passports for travel to the country to some citizens living abroad (see section 1.f., Transnational Repression, Efforts to Control Mobility).

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to internally displaced persons, refugees, returning refugees, and asylum seekers, as well as other persons of concern.

**Access to Asylum:** The law provided for the granting of asylum or refugee status, and the government had a system for providing protection to refugees. An interagency committee convened to make individual status determinations on refugee's claims. During the year, the government hosted thousands of newly arrived Congolese refugees at a transit center and other refugee camps but did not provide them with a refugee status determination.

**Freedom of Movement:** The law did not restrict freedom of movement of asylum seekers, and the government provided refugees with identity cards and travel documents, if required.

**Employment:** No laws restricted refugee employment, and the government continued to support internationally funded employment programs and financial inclusion initiatives benefitting both refugees and their host communities.

**Durable Solutions:** The government assisted the safe, voluntary return of refugees to their countries of origin and sought to improve local inclusion of refugees. In 2019 the government, UNHCR, and the African Union signed a memorandum of understanding to set up an "Emergency Transit Mechanism" for evacuating refugees from Libya. The mechanism provided a framework for the country to temporarily host these individuals, who would eventually be resettled in third countries, helped to return to countries where asylum had previously been granted, helped to return to their home countries, or granted permission to remain in Rwanda. More than 1,300 refugees were in the country under the auspices of the transit mechanism as of December. In cooperation with UNHCR and the government of Burundi, the government continued to facilitate the voluntary repatriation of refugees to Burundi.

**Temporary Protection:** The government provided temporary protection to individuals who might not qualify as refugees. For example, after the

Taliban seized control of Afghanistan, the government allowed some Afghans (notably scholars and educators) to temporarily relocate to the country.

## f. Status and Treatment of Internally Displaced Persons

Not applicable.

## g. Stateless Persons

The government cooperated with international organizations to provide services to stateless persons. The law permitted stateless persons to acquire citizenship, provided they did not pose a threat to national security.

# Section 3. Freedom to Participate in the Political Process

The constitution and law provided citizens the ability to choose their government through free and fair periodic elections based on universal and equal suffrage and conducted by a secret ballot in presidential and parliamentary – but not local – polling that provided for the free expression of the will of the citizens, but government restrictions on the formation of opposition parties and harassment of critics and political dissidents significantly limited that ability. The Rwandan Patriotic Front and allied parties controlled the government and legislature, and its candidates

dominated elections at all levels.

# Elections and Political Participation

**Abuses or Irregularities in Recent Elections:** Observers noted irregularities and instances of ballot stuffing in the most recent national elections for parliament, conducted in 2018. Election observers noted irregularities in vote tabulation and consolidation, and independent candidates struggled against bureaucratic hurdles to effectively pursue their candidacies.

**Political Parties and Political Participation:** The constitution outlined a multiparty system but provided few rights for parties and their candidates. It was common for ruling party principles and values to receive prominent attention during civic activities, and government officials often privately encouraged citizens to join the party. Political parties allied to the ruling party were largely able to operate freely, but members faced legal sanctions if found guilty of engaging in divisive acts, destabilizing national unity, threatening territorial integrity, or undermining national security. Observers reported membership in the ruling party sometimes conferred advantages for obtaining certain types of employment and business opportunities, including obtaining government procurement contracts. Some opposition parties remained unregistered, and there were reports the government harassed their leaders and members. The government impeded the formation of political parties and restricted party activities.

The law no longer required – but the government strongly encouraged – all registered political parties to join the National Consultative Forum for Political Organizations. The forum sought to promote consensus among political parties and required member parties to support policy positions developed through dialogue. At year's end all 11 registered parties were members of the organization. Government officials praised it for promoting political unity, while critics argued it stifled political competition and public debate.

**Participation of Women and Members of Marginalized or Vulnerable Groups:** Lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) organizations reported barriers to open participation in the political process, noting that candidates and government officials were unwilling to engage openly on LGBTQI+ concerns (see section 6). Representatives of historically marginalized groups such as Batwa individuals reported prohibitions on the registration of civil society organizations to advocate for persons of a specific ethnicity had the effect of making it more difficult for persons in those groups to receive special recognition and inclusion in government and civil society activities.

# Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials and private persons transacting business with the government that included

imprisonment and fines, and the government generally implemented the law effectively.  There were isolated reports of government corruption.

**Corruption:**  The government investigated and prosecuted reports of corruption among police and government officials.  The law also provided for citizens who reported requests for bribes by government officials to receive financial rewards when officials were prosecuted and convicted.  Police frequently conducted internal investigations of police corruption, including sting operations, and authorities punished a significant number of offenders.  The Office of the Auditor General submitted a report to parliament's Public Accounts Committee covering the office's anticorruption efforts.

The National Public Prosecution Authority prosecuted civil servants, police, and other officials for fraud, petty corruption, awarding of public tenders illegally, and mismanagement of public assets.  The law stated corruption offenses were not subject to any statute of limitations.  Specialized chambers at the intermediate court level handled corruption cases.  During the year former Minister of State for Youth and Culture Edouard Bamporiki was sentenced to five years in prison and a substantial fine for bribery and corruption.  The government continued to pursue cases that had been initiated in previous years.

For additional information concerning corruption in the country, please see the Department of State's Investment Climate Statement for the country,

and the Department of State's International Narcotics Control Strategy Report, which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

Several domestic human rights groups operated in the country, investigating and publishing their findings on human rights cases, and international groups also published reports on human rights abuses. The government was often intolerant of public reports of human rights abuses and suspicious of local and international human rights observers, and it often impeded independent investigations and rejected criticism as biased and uninformed. Human rights NGOs expressed fear of the government and reported that state security forces monitored NGO activities, and NGOs self-censored their comments. NGOs working on human rights and deemed to be critical of the government experienced difficulties securing or renewing required legal registration. For example, Human Rights Watch had no representatives operating in the country after the government refused to renew its lapsed memorandum of understanding.

Regulations required NGOs to participate in joint action and development forums at the district and sector levels, and local governments had broad

powers to regulate activities and bar organizations that did not comply from operating in their jurisdictions.

The NGO registration process remained difficult, in part because it required submission of a statement of objectives, plan of action, and detailed financial information for each district in which an NGO wished to operate. The government sometimes used the registration process to delay programming and pressure organizations to support government programs and policies. During this process, officials often pressured organizations to change their proposed names or areas of work so they did not directly address topics such as human rights monitoring (see section 2.b., Freedom of Association).

**Retribution against Human Rights Defenders:** Individuals who contributed to international reports on human rights reported living under constant fear that the government could arrest and prosecute them for the content of their work.

**The United Nations or Other International Bodies:** The government sometimes cooperated with international organizations, but it criticized reports that portrayed it negatively as inaccurate and biased. For example, the government and government-aligned media criticized the UN Group of Experts for the Democratic Republic of Congo, accusing it of bias and an anti-Rwanda agenda.

In 2012 the International Criminal Tribunal for Rwanda, based in Tanzania, transferred its remaining genocide cases to the IRMCT, which maintained an office in Tanzania and continued to pursue genocide suspects. Two suspects remained fugitives as of December (see section 1.e.). The government cooperated with the IRMCT, but it remained concerned by the IRMCT's past practice of granting early release to convicts, especially when those released had not professed remorse for their actions.

**Government Human Rights Bodies:** The Office of the Ombudsman was empowered to act on cases of corruption and other abuses, including human rights cases. During the year the office did not, however, report carrying out any major human rights investigations.

The government funded and cooperated with the NCHR. According to many observers, the NCHR did not have adequate resources or independence to investigate and act on reported abuses and remained biased in favor of the government. The NCHR performed investigations on human rights matters and drafted annual reports with their findings, but these reports usually concluded the government met standards for human rights protections in various fields, even when other organizations disagreed.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalized rape of men and women and spousal rape, and the government handled rape cases as a judicial priority. Penalties for rape ranged from 10 years to life imprisonment with substantial fines. Penalties for physical and sexual violence against one's spouse ranged from three to five years' imprisonment.

Domestic violence against women and children remained common. Authorities encouraged reporting of domestic violence cases, although most incidents remained within the extended family and were not reported or prosecuted.

Police headquarters in Kigali maintained a hotline for domestic violence. Several other ministries also had free gender-based violence hotlines. Police stations nationwide had their own gender desks, multiple officers trained in handling domestic violence and gender-based violence cases, and a public outreach program. The government operated one-stop centers throughout the country, providing free medical, psychological, legal, and police assistance to survivors of domestic violence.

Twenty-one percent of Rwandan girls and women between the ages of 15 to 49 reported experiencing physical or sexual violence in the previous 12

months.  According to the 2020 Demographic and Health Survey (DHS), 46 percent of women who have ever been married in Rwanda experienced spousal physical, sexual, or emotional violence.

The government continued its whole-of-government, multistakeholder campaign against gender-based violence, child abuse, and other types of domestic violence.  Gender-based violence training was required for police and military at all levels including for troops and police preparing for deployment to peacekeeping missions.

**Other Forms of Gender-Based Violence or Harassment:**  The law prohibited sexual harassment, but advocacy organizations reported sexual harassment remained common, and enforcement was lax.

**Discrimination:**  Women had the same legal status and were entitled to the same rights as men, including under family, labor, nationality, and inheritance laws.  The law allowed women to inherit property from their fathers and husbands, and couples could make their own legal property arrangements.  Women experienced difficulties pursuing property claims due to lack of knowledge, procedural bias against women in inheritance matters, multiple spousal claims due to polygamy, and the threat of gender-based violence.  The law required equal pay for equal work and prohibited discrimination in hiring decisions.  Women generally enjoyed equal pay for the same work as men, although pay varied across occupations.  There were no known legal restrictions on women's working hours or employment in

the same occupations, tasks, and industries as men. Studies in previous years indicated few persons reported gender-based discrimination in workplaces, and most individuals were either unaware of it or unwilling to discuss it. Experts concluded gender-based discrimination remained underreported, in part because victims of discrimination feared losing their employment.

After the 1994 genocide left many women as heads of households, women assumed a larger role in the formal sector, and many operated their own businesses. The law governing matrimonial regimes stipulated joint land title ownership for a husband and wife who were legally married. Nevertheless, men owned the major assets of most households, particularly those at the lower end of the economic spectrum, making bank credit inaccessible to many women and rendering it difficult for them to start or expand a business.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The government provided sexual and reproductive health services (including emergency contraceptives) for survivors of gender-based violence via the country's network of Isange One Stop Centers.

The country's most recent demographic health survey put the ratio at 203 maternal deaths per 100,000 live births. Major factors influencing maternal

mortality included hemorrhaging during or after birth as the main cause, followed by hypertensive disorders, low clinical capacity of health providers, absence of equipment and commodities, and patients delaying seeking timely care. UN reporting indicated 94 percent of births were attended by skilled health personnel.

The most recent DHS reported 58 percent using modern methods of family planning. Among married women, 14 percent had an unmet need for contraception. Adolescent girls younger than age 18 could not legally access contraception without parental consent, a hurdle one civil society leader deemed insurmountable because adolescent girls in this culture would never ask their parents for help getting contraception. Among sexually active teenage girls, 17 percent used modern contraception, and 4 percent had given birth.

The country's adolescent birth rate was 32 births per 1,000 women between 15 and 19 years of age, according to UN sustainable development goal datasets. While there was no policy restricting reproductive health service access for LGBTQI+ persons, there were no protections, and LGBTQI+ persons and organizations reported societal discrimination as a barrier when seeking services.

Some women and girls missed classes at school due to poverty, which made it difficult for them to access menstrual hygiene products. By law schools were required to ensure pregnant girls continue their education.

Nonetheless, some pregnant girls stopped attending school due to social stigma.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution provided for the eradication of ethnic, regional, and other divisions in society and the promotion of national unity. Long-standing tensions in the country culminated in the 1994 state-orchestrated genocide in which approximately three-quarters of the Tutsi population was killed. The genocide perpetrators also killed moderate Hutus who opposed the genocide. Since 1994 the government called for national reconciliation and abolished the policies of the former government that created and deepened ethnic cleavages. The government removed all references to ethnicity in official discourse except for references to the genocide, which was officially termed "the genocide against the Tutsi in Rwanda" in the country and at the United Nations, and eliminated ethnic quotas for education, training, and government employment.

The law protected all citizens regardless of ethnic affiliation, and the government did not recognize any ethnic affiliation. Genocide denial and divisionism statutes criminalized efforts to minimize or deny genocide crimes against the Tutsi population in 1994. The law made it illegal to discriminate against anyone based on ethnicity or country of origin or otherwise create fissures in the society along ethnic lines.

Some individuals claimed the government's reconciliation policies and programs failed to recognize Hutu victims of violence during the genocide or crimes committed by the ruling party after the end of the genocide, whereas others noted the government focused positive attention on Hutus who risked their lives to save Tutsis or members of mixed families during the genocide.

## Indigenous Peoples

After the 1994 genocide the government banned identity card references to Hutu, Tutsi, or Twa ethnicity and prohibited social or political organizations based on ethnic affiliation. As a result, the Twa, who numbered approximately 34,000, lost their official designation as an ethnic group, and the government no longer recognized groups advocating specifically for Twa needs, although favorable policies remained in place to assist individuals in poverty, including some Twa. Twa advocates believed this government policy denied them their rights as an Indigenous ethnic group in that it failed specifically to provide them with adequate economic and social protections (access to higher education opportunities, for example) commensurate with their historically marginalized status in society dating back to the precolonial period.

## Children

**Child Abuse:** The law criminalized abuse, including violence against

children, child abandonment, and forced begging. Officials enforced the law, and the president made public remarks regarding the importance of prosecuting offenders. While statistics on child abuse were unreliable, such abuse was common within the family, in the village, and at school.

As in previous years, the government conducted a high-profile public awareness campaign against gender-based violence and child abuse. The government supported a network of one-stop centers and hospital facilities that offered integrated police, legal, medical, and counseling services to victims of gender-based violence and child abuse.

**Child, Early, and Forced Marriage:** The minimum age for marriage was 21; the government strictly enforced this requirement. Anecdotal evidence suggested child marriage sometimes occurred in line with traditional norms in rural areas and refugee camps but rarely in urban areas and not with government recognition.

**Sexual Exploitation of Children:** By law sexual relations with a child younger than 18 constituted child defilement (statutory rape), which was punishable by 20 years to life in prison, depending on the age of the victim.

The law prohibited sexual exploitation of children and child pornography, and the government enforced these laws.

# Antisemitism

There was a very small Jewish population, consisting entirely of foreigners; there were no known reports of antisemitic incidents.

# Trafficking in Persons

See the Department of State's Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

# Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** No laws criminalized same-sex conduct between adults, cross-dressing, or identity based on sexual orientation, gender identity or expression, or sex characteristics. LGBTQI+ individuals reported that authorities disproportionately accused LGBTQI+ persons of "deviant behaviors," and human rights monitors cited laws against prostitution, substance abuse, begging, informal street vending, and public drunkenness were disproportionately enforced against LGBTQI+ persons.

**Violence and Harassment:** There were reports the government did not adequately respond to reports of abuses and violence against LGBTQI+ persons. NGOs reported many LGBTQI+ individuals were afraid to report

abuses to authorities, either believing authorities would not take action or were complicit in the abuses. Advocates previously reported police abused LGBTQI+ persons in transit centers, with transgender persons targeted for physical and sexual violence as well as hate speech. There were no reports the government investigated such cases.

**Discrimination:** The law did not prohibit discrimination by state or nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics. There was significant discrimination against LGBTQI+ persons, particularly in employment, housing, and access to government services such as health care. The law did not recognize LGBTQI+ individuals, couples, or their families.

**Availability of Legal Gender Recognition:** Legal gender recognition was not available.

**Involuntary or Coercive Medical or Psychological Practices:** There were no reports of involuntary or coercive medical or psychological practices specifically targeting LBGTQI+ persons, but there was social pressure on individuals to conform to traditional gender norms. There were no reports of surgeries performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** LGBTQI+-focused civil society organizations reported barriers registering

with the government.  LGBTQI+ advocates commented government officials appeared reluctant to openly cooperate with LGBTQI+ organizations due to prevailing social stigma against LGBTQI+ persons.  Although LGBTQI+ persons could meet and held various events throughout the year, difficulty registering their own civil society organizations was a barrier to some activities.  LGBTQI+ groups conducted public activities in Kigali, including Pride festivities and a fashion show, indicating increasing tolerance and acceptance of LGBTQI+ persons in some parts of society.

## Persons with Disabilities

The law afforded persons with disabilities the right of access to education, health services, public buildings, and transportation on an equal basis with others, but the government did not always enforce the law.  Government information and communication was not usually available in accessible formats.

Despite a continuing campaign to create a barrier-free environment for persons with disabilities, accessibility remained a problem throughout the country, including in public buildings and public transport, although a limited number of public buses could accommodate persons with disabilities.

The law prohibited discrimination against persons with physical, sensory, intellectual, and mental disabilities, and the government sometimes enforced these provisions.  The law officially protected persons with

disabilities from employment discrimination, but they often faced discrimination in hiring and access to the workplace.

Many children with disabilities did not attend primary or secondary school. Few students with disabilities reached the university level because many primary and secondary schools did not provide reasonable accommodations.

Some citizens viewed disability as a curse or punishment that could result in social exclusion and sometimes abandoned or hid children with disabilities from the community.

There were no legal restrictions or extra registration steps for citizens with disabilities to vote, and registration could be completed online. Braille ballots were available for the 2018 parliamentary elections. Observers noted some polling stations were inaccessible to persons with disabilities and that some election volunteers appeared untrained on how to assist voters with disabilities.

**Institutionalized Children:** The country regulated and maintained facilities providing care for children with disabilities when needed. The government favored transferring orphans from institutional settings to host families for individual care.

# Other Societal Violence or Discrimination

Laws protecting persons with disabilities applied to persons with albinism, but they continued to experience persistent societal discrimination.

The law provided for imprisonment of up to six months, a fine, or both for persons convicted of stigmatizing a sick person without the intention to protect the sick person or others.  There were no reports of prosecutions under this statute.  In 2020 the country completed a survey to assess HIV-related stigma and discrimination and inform advocacy efforts and adjustments to program design.  The survey reported discrimination against persons with HIV and AIDS occurred, although such incidents remained rare.  The government actively supported relevant public education campaigns, including by establishing HIV and AIDS awareness clubs in secondary schools and making public pronouncements against stigmatization of those with the disease.

The law also provided stiffer penalties for rape and defilement in cases of transmission of an incurable illness.  In most cases of sexual violence, the survivor and alleged perpetrator both underwent HIV testing.  According to government policy and in keeping with UN guidelines, the military did not permit members with HIV and AIDS to participate in peacekeeping missions abroad but allowed them to remain in the military.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the right to form and join independent unions and employer associations, bargain collectively, and conduct legal strikes, but it placed restrictions on these rights.  For example, a union seeking registration was required to prove that its representatives had never been sentenced to prison terms of six or more months.  There was a 90-day waiting period before a union was fully registered.  The government required any union seeking majority representation in each sector to submit to an inspection of their membership registry and property by the labor administration.  Authorities prohibited military, police, and security personnel from joining unions.  An employer could refuse a recognized union access to the workplace, although the union could appeal this to the labor inspector.  A union had to include a majority of workers in the enterprise.  The law protected the right to unionize but did not automatically provide for reinstatement of workers fired for union activity.

A ministerial order defined the implementation of the law and specified guidelines for labor inspections, provided the modalities of electing employee representatives, listed acts considered gross misconduct, determined the core elements of a written employment contract, and

defined essential services that could not be interrupted by a strike or lockout. Local and national labor inspectors mediated labor disputes before they could be referred to a court, which could refuse to hear the case. Labor officials encouraged dialogue between employees and employers before involving the labor inspectorate and courts. The law applied to all employees with contracts. The right to collective bargaining was recognized by the law but it was subject to restrictions. Collective bargaining was limited to fully registered unions that had published their articles of association in the official gazette before obtaining legal capacity. The law also gave the government authority to intervene in the settlement of collective labor disputes. In addition, in workplaces with multiple unions or employee organizations, authorities required all the available organizations to work jointly together to conduct collective bargaining. If they failed to agree, the union with the largest number of members automatically assumed the authority to collectively negotiate on behalf of all the workers.

The law and ministerial orders provided some workers the right to conduct strikes, subject to numerous restrictions. The law did not allow civil servants, military, police, and security officials to strike. The law stated that employees had the right to strike when the arbitration committee allowed more than 15 working days to pass without issuing a decision, the conciliation resolution on collective dispute was not implemented, or the court award was not enforced. The law further stated all strikes had to be preceded by a notice of four working days. The law stated that a strike or

lockout could not interrupt the continuity of "essential services" as defined by the Ministry of Public Service and Labor. The ministry defined essential services more broadly than International Labor Organization guidelines to include all modes of transportation and fuel sales, security, health, education, water and sanitation, and all forms of telecommunications, which severely restricted the right to strike in these fields. Employees and employers were prohibited from exercising a strike or lock-out within 10 days preceding or following elections in the country or during a state of national emergency. The law did not address strikes in the informal sector.

Labor unions were organized into three confederations: 17 trade unions represented by the Rwanda Confederation of Trade Unions, six by the Labor and Worker's Brotherhood Congress, and 10 by the National Council of Free Trade Union Organizations in Rwanda. All three federations were officially independent of the government, but some maintained close links with the government.

The right to collective bargaining generally was not respected by the government or employers. The government and employers pressured employees to settle grievances on an individual rather than collective basis. The government did not enforce applicable laws effectively. Penalties for violations were commensurate with those for similar offenses but were rarely applied. Many private-sector businesses did not allow collective bargaining negotiations. The government also controlled collective

bargaining with cooperatives and mandatory arbitration. No labor union had an established collective bargaining agreement with the government. Collective bargaining occasionally was practiced in the private sector, although there were few recent examples. The International Trade Union Confederation reported the government intervened in the settlement of collective bargaining disputes.

There were neither registered strikes nor reports of unlawful strikes; the most recent recorded strike was by textile workers in 2011. In some cases, the government acted to resolve labor disputes in workers' favor to avert the threat of a strike. National elections for trade union representatives occurred on regular cycles depending on the trade union. The government usually maintained a significant degree of influence with union leaders.

The law did not specifically protect workers from antiunion discrimination. There were no functioning labor courts or other formal mechanisms to resolve antiunion discrimination complaints, and labor disputes moved slowly through the civil courts.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for

# Employment

Please see the Department of Labor's Findings on the Worst Forms of Child Labor at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

# d. Discrimination (see section 6)

# e. Acceptable Conditions of Work

**Wage and Hour Laws:** There was no official minimum wage. The law stated the Ministry of Labor could establish a minimum wage by ministerial order, but as of September the ministry had not issued such an order.

The law provided a standard workweek of 40 hours (although many persons worked up to 45 hours per week) and 18 to 21 days of paid annual leave, in addition to official holidays. The same law, however, allowed employers to determine a work schedule depending on the nature of the work. Most workers in the formal sector worked five or six days per week. The law provided employers with the right to determine daily rest periods. Most employees received a one-hour lunch break. The law stated women employees who gave birth were entitled to a maternity leave of at least 12 consecutive weeks. A ministerial order stated overtime was accrued after 45 hours worked per week and was compensated by a "rest period equal to the extra hours performed" within the following 30 days. If employees were

not provided the rest period within 30 days, they were to be paid for hours worked. The rate for overtime work was the worker's regular salary.

**Occupational Safety and Health:** The law stated employers had to provide for the health, safety, and welfare of employees and visitors, and enterprises were to establish occupational safety and health (OSH) committees. OSH standards were generally appropriate for the main industries in the country. The government did not proactively identify unsafe conditions but at times responded to workers' OSH complaints. Authorities conducted public awareness campaigns to inform workers of their rights and highlight employers' obligation to register employees for social security and occupational health insurance and pay into those benefit systems. Orders from the Ministry of Labor determined appropriate OSH conditions and the establishment and functioning of OSH committees. Workers' right to remove themselves from dangerous situations without jeopardy to their employment was protected by law, but enforcement was lax.

**Wage, Hour, and OSH Enforcement:** The labor law did not include penalties for noncompliance with minimum wage laws. Employers were required to enter contracts with their employees, and these contracts had to be written in a language the employee understands. A ministerial order required employers to review their contracts with their employees to ensure those contracts complied with labor laws.

Workers in the subcontractor and business-process-outsourcing sectors were especially vulnerable to hazardous or exploitative working conditions. Statistics on workplace fatalities and accidents were not available, but ministry officials singled out mining as a sector with significant problems in implementing OSH standards. The Ministry of Labor maintained a list of dangerous professions subject to heightened safety scrutiny.

Wage, hour, and OSH laws applied both to the formal and informal sector and standards were generally appropriate for main industries in the country. The government did not effectively enforce the law. The number of labor ministry inspectors was not sufficient to enforce labor standards effectively. Violations of overtime and OSH standards were common in both the formal and informal sectors. Penalties for violations were commensurate with those for similar violations but were rarely applied against violators.

The law was seldom applied in the informal sector. Families regularly supplemented their incomes by working in small businesses or subsistence agriculture in the informal sector, which included more than 75 percent of all workers, according to the National Institute of Statistics. Employers in the informal sector frequently failed to register employees for social security or occupational health insurance and pay into those benefit systems. The law that provided for the creation of trade unions and collective bargaining did not apply to informal sector workers with no employer.