**Diplomatic Assurances**

**Statement for the Record
By
John B. Bellinger, III
Legal Advisor to the Secretary of State**

**Before the House Foreign Affairs Subcommittee on International Organizations, Human Rights, and Oversight**

**June 10, 2008**

Chairman Delahunt and distinguished members of the Committee, I welcome the opportunity to appear before you today to discuss the United States' use of diplomatic assurances to protect individuals against torture in other countries.

The use of diplomatic assurances in the practice of the Department of State arises in three different contexts: (1) in the surrender of fugitives by extradition from the United States; (2) in immigration removal proceedings initiated by the Department of Homeland Security, and (3) in the transfer of terrorist combatants from detention at the Department of Defense detention facility at Guantanamo Bay, Cuba. My testimony today will describe the use of diplomatic assurances in these contexts, and explain the reasons why we believe diplomatic assurances, in appropriate cases, can be an important tool for protecting individuals against torture.

EXHIBIT I

**Article 3 and the Related Policy Against Transfers to Torture**

First, it is important to understand the United States' legal obligations and related policies with respect to the sending of individuals to countries where they there is a risk they may be tortured. The touchstone of our legal obligations is Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, ("Convention" or "Convention Against Torture"). As a party to the Convention, the United States has undertaken an international legal obligation under Article 3 not to expel, return ("refouler") or extradite a person from the territory of the United States to a country where there are substantial grounds for believing that person would be subjected to torture. Pursuant to the formal treaty understanding approved by the Senate and included in the U.S. instrument of ratification, the United States interprets the phrase, "where there are substantial grounds for believing that he would be in danger of being subjected to torture," as used in Article 3 of the Convention Against Torture, to mean "if it is more likely than not that he would be tortured." According to the August 30, 1990 Report from the U.S. Senate Committee on Foreign Relations, this understanding sought to apply the same legal standard under Article 3 that is used in determinations under the 1967 Protocol Relating to the Status of Refugees ("Refugee Protocol"). Under the Refugee Protocol,

an individual may not normally be expelled or returned if it is more likely than not that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. It is important to note that, by expressing the "more likely than not" standard as an Understanding to Article 3, the United States deemed it to be merely a clarification of the definitional scope of Article 3, rather than a standard that would modify or restrict the legal effect of Article 3 as it applied to the United States.

The non-refoulement obligations in Article 3 apply only with respect to individuals who are *in the territory of the United States*. This accords with our interpretation of similar language in the Refugee Protocol. Neither the text of the Convention, its negotiating history, nor the U.S. record of ratification supports a view that Article 3 of the Convention applies to persons outside the territory of the United States. By its terms, Article 3 applies only to expulsion, to what is described as "returns ('refouler')", and to extradition. "Expulsion" and "extradition" clearly describe conduct taken to remove individuals from a State Party's territory.

Likewise, the U.S. Supreme Court has concluded that the term "return ('refouler')," in the context of Article 33 of the Convention Relating to the Status of Refugees (incorporated by reference into the Refugee Protocol),

"was not intended to have extraterritorial effect."[1] There is no basis for attaching a different meaning to "refouler" in Article 3 of the Convention Against Torture. This reading is further supported by the Convention's negotiating record.[2] In addition, the record of proceedings related to U.S. ratification of the Convention demonstrates that at the time of ratification in 1994, the United States did not interpret Article 3 to impose obligations with respect to individuals located outside of U.S. territory.

Although the reach of Article 3 itself is limited, it is nevertheless the policy of the United States not to send *any* person, no matter where located, to a country in which it is more likely than not that the person would be subjected to torture. This policy applies to all components of the U.S. Government and applies with respect to individuals in U.S. custody or control regardless of where they may be detained. It has been set forth in statute and articulated at the highest levels of the United States Government.

---

[1] *Sale* v. *Haitian Centers Council, Inc.*, 509 U.S. 155, 179 (1993). In examining the text of Article 33, the Supreme Court found that the legal meaning of the term "return," as modified by reference to the French "refouler" (English translations of which included "repulse," "repel," "drive back," and "expel"), implied that "'return' means a defensive act of resistance or exclusion at a border rather than an act of transporting someone to a particular destination."

[2] The original Swedish proposal spoke only of expulsion or extradition, and did not employ the term "return ('refouler')." However, when the draft was revised to expand the prohibition to include "return ('refouler')," considerable discussion ensued over the advisability of including the term, including references to ambiguity surrounding the extraterritorial reach of the provision. At no point was there agreement that the term was intended to apply to individuals located outside the territory of a State Party. Additionally, both the text and the negotiating history make clear that negotiators used explicit language applying certain provisions of the Convention extraterritorially when they intended those provisions to have extra-territorial effect (See, e.g. Articles 2(1), 5, 12, 13, and 16). The negotiators' failure to do so in Article 3 further confirms that there was no express intent to apply Article 3 extraterritorially.

4

*See* Section 2242 of the 1998 Foreign Affairs Reform and Restructuring Act (PL 105-277).

I want to make clear that U.S. commitments under Article 3 and our related policy are absolute. There are no exceptions based on national security or the criminality of an individual, as there are regarding the non-refoulement obligation under the Refugee Protocol. Nor is the likelihood that an individual will be tortured weighed against the threat he or she poses to the safety and security of the American people.

**The Role of Diplomatic Assurances**

Let me now explain where diplomatic assurances fit in the context of our obligations under Article 3 and related policies. When confronted with a dangerous foreign national – such as a serious criminal or terrorist – our Article 3 obligations may seriously constrain our options for removing or extraditing that individual from the United States. On the one hand, we may not have the ability to detain the individual. For example, even though we have reliable information that the individual poses a terrorist threat, we might lack admissible evidence to support charging the individual with anything more than a minor crime or immigration violation. Even if we could detain the individual under the laws of war or in immigration

detention, there are legal restrictions on holding the individual for an extended period of time.  A better option might therefore be to send the individual to his home country, or to a third country that is seeking to have him extradited for prosecution.  But as I have explained, the Article 3 prohibition is categorical: no matter how dangerous the individual, he cannot be sent from the United States to any country if it is more likely than not that the individual will face torture there.  In fact, it is often the case that very dangerous individuals may be nationals of, or sought for prosecution by, States with poor human rights records, giving rise to a concern about torture.  This presents the United States – and all governments that, like ours, respect the rule of law – with a serious problem.

In such situations, diplomatic assurances can be a way to protect U.S. national security and public safety while still complying with relevant international law and policy not to send people to countries where they will be tortured.  Credible diplomatic assurances from the receiving state may *reduce the risk of torture* such that the individual can be safely and appropriately transferred consistent with our Article 3 obligations.  In other words, diplomatic assurances and the senior level communications with the foreign government on which they are based can be the vehicle by which the United States Government can reasonably find that it would not be more

6

likely than not that the individual would be tortured by the receiving country if transferred.

To reduce the risk of torture, it is of course essential that diplomatic assurances be credible. This requires direct engagement with the potential receiving country. In such cases, where appropriate, the U.S. Government can change the facts on the ground by directly engaging with the receiving country regarding the treatment that a particular individual will receive and securing explicit, credible assurances that the individual will not be tortured.[3]

The seeking of diplomatic assurances is, of course, not appropriate in all cases. We would not rely upon assurances unless we were able to conclude that with those assurances, an individual could be expelled, returned, extradited, or otherwise transferred consistent with our treaty obligations and stated policy. The efficacy of assurances must be assessed on a case-by-case basis and can depend on a number of factors related to the particular country involved, including the extent to which torture may be a pervasive aspect of its criminal justice, prison, military or other security

---

[3] Of course, the United States also engages in bilateral and multilateral efforts to assist other countries in improving their human rights records. This policy is fully consistent with longstanding U.S. human rights policy, which strives to encourage countries around the world to improve their human rights performance to protect a broad array of civil and political rights. While we hope that such efforts will produce sustainable improvements in the conditions in those countries over the long term, they are inadequate for addressing the immediate problem of removing a charged or convicted criminal or suspected terrorist alien who is unlawfully present in the United States.

system; the ability and willingness of that country's government to protect a potential returnee from torture; and the priority that government would place on complying with an assurance it would provide to the United States government (based on, among other things, its desire to maintain a positive bilateral relationship with the United States government). But in cases where credible assurances could be effective in permitting removal or extradition consistent with our non-refoulement obligations, such assurances are a critical and valuable tool.

**Procedures for Implementing Article 3 and the Related Policy**

In 1999, the United States government promulgated regulations to implement its Article 3 obligations, including regulations addressing diplomatic assurances. In the extradition context, the Secretary of State is the U.S. official responsible for determining whether to surrender a fugitive to a foreign country and decisions on extradition where there is a potential issue of torture are presented to the Secretary (or, by delegation, to the Deputy Secretary) pursuant to regulations at 22 C.F.R. Part 95. The decision to surrender a fugitive occurs only after a fugitive has been found extraditable by a United States judicial officer. In order to implement our Article 3 obligations, in cases where the issue arises, the Secretary or Deputy

Secretary, in making the determination whether to surrender, considers the question of whether a person facing extradition from the U.S. `is more likely than not' to be tortured in the State requesting extradition.  In each case in which allegations relating to torture are made or the issue is otherwise brought to the Department's attention, appropriate policy and legal offices review and analyze information relevant to the case in preparing a recommendation to the Secretary or Deputy Secretary as to whether or not to sign the surrender warrant.  Based upon the analysis of the relevant information, surrender may be conditioned on the requesting State's provision of specific assurances relating to torture or aspects of the requesting State's criminal justice system that protect against mistreatment.  In addition to assurances related to torture, such assurances may include, for example, that the fugitive will have regular access to counsel and the full protections afforded under that state's constitution or laws.  Assurances specifically against torture have been sought in only a small number of extradition cases. In this regard it is important to note that prior to negotiating new extradition treaties the United States undertakes a review of the potential treaty partner's human rights record to determine if they will respect both the rule of law and an extradited individuals human rights, including protections against torture. Consequently, extradition cases

generally do not pose legitimate concerns about torture and such claims are rare. The use of assurances, however, is part of a longstanding and effective international practice in the extradition context, and assurances are often directly referenced in extradition treaties themselves.

In the immigration context, regulations codified at 8 C.F.R. 208.18(c) and 8 C.F.R. 1208.18(c) provide that the Secretary of State may forward to the Secretary of Homeland Security assurances that the Secretary of State has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country. In practice, the Department of State seeks assurances upon the request of the Department of Homeland Security and exercises discretion in deciding in particular cases whether or not to seek assurances upon receiving such a request. Under these regulations, if the Secretary of State obtains and forwards such assurances to the Secretary of Homeland Security, the Secretary of Homeland Security shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention. If the Secretary of Homeland Security determines that the assurances are sufficiently reliable, he or she may then terminate any deferral of removal the alien had been granted as to that country and the alien's torture claim

may not be considered further by an immigration judge, the Board of Immigration appeals or an asylum officer.

Section 2242(c) of the 1998 Foreign Affairs Reform and Restructuring Act, the statute pursuant to which these regulations were promulgated, expressed Congress' concern with the possibility that terrorists, persecutors, and serious criminals will be released on our streets, and mandated that the regulations issued by the Executive Branch to implement the Convention against Torture provide for the removal of such aliens to the maximum extent possible consistent with our Art 3 obligations. The regulations regarding the use of diplomatic assurances in the immigration context are a reasonable and permissible response to this congressional mandate.

Since these regulations were promulgated in 1999, they have been used in less than a handful of cases. This is in contrast to the approximately five thousand individuals who have enjoyed protection in immigration proceedings through the withholding or deferral of removal on grounds that it was more likely than not that they would be tortured. This is in addition to the approximately 300,000 individuals who were granted asylum, either affirmatively or defensively during that same time period. This latter number includes individuals who may have been eligible for Article 3

protection, but whose claims for protection on that basis were never reached because they were granted asylum.  This is a point worthy of some emphasis: in the vast majority of immigration cases where our obligations under Article 3 of the CAT are implicated, diplomatic assurances are never even considered, let alone pursued.

The issue of diplomatic assurances also arises in the context of the transfer of enemy combatants from detention at the Department of Defense detention facility at Guantanamo Bay, Cuba.  Although Article 3 of the CAT does not as a matter of treaty law apply to Guantanamo transfers, the United States government nevertheless adheres to a policy that we will not transfer individuals from Guantanamo to countries where we determine that it is more likely than not that they would be tortured.  With regard to Guantanamo transfers, the Department of State is also involved in seeking diplomatic assurances from a potential receiving government as to the treatment the individual will receive if transferred or returned to that country. Specifically, the Department of State's Office of War Crimes Issues (which generally has responsibility to communicate on transfer-related matters, in the Guantanamo context, as between the United States and foreign governments) seeks those diplomatic assurances, including assurances that they will be treated humanely and in accordance with the

receiving country's international obligations when detention by the receiving government is foreseen.

In all contexts, evaluations as to the likelihood of torture require a particularized determination in each individual case. Generalizations about the overall human rights situation in a country or even a country's record with respect to torture do not necessarily provide a clear or obvious answer. Likewise, evaluations as to whether assurances should be sought and whether any assurances that are obtained are sufficiently reliable such that with such assurances it is more likely than not that the individual would not be tortured are also made on a case-by-case basis. When evaluating assurances provided by another country, Department officials may consider many factors including, but not limited to, the identity, position or other relevant information concerning the official relaying the assurances; information concerning the judicial and penal conditions and practices of the country providing assurances; political or legal developments in that country that would provide context for the assurances provided; that country's track record in complying with similar assurances previously provided to the U.S. or another country; and that country's capacity and incentives to fulfill its assurances to the United States.

As part of an assurance we receive from a foreign government, the Department may obtain arrangements by which U.S. officials or an agreed upon third party will have physical access to the individual during any period in which he or she is in the custody of the foreign State for purposes of verifying the treatment he or she is receiving. In addition, in instances in which the United States extradites, removes, returns, or transfers an individual to another country subject to assurances, we have and will continue to pursue any credible report and take appropriate action if we have reason to believe that those assurances will not be, or have not been, honored.

In many cases, the Department's ability to seek and obtain assurances from a foreign government depends in part on the Department's ability to treat dealings with the foreign government with discretion. The very fact that the United States would not consider removing an individual in the absence of an assurance on torture can itself be an embarrassment to the country in question. The delicate diplomatic exchange that is often required in these contexts typically cannot occur effectively except in a confidential setting. In such cases, consistent with the sensitivities that surround the Department's official diplomatic communications, the Department typically does not make public the details of the communications involved. If such

details were regularly divulged, countries would likely prove far less willing to provide reliable assurances. In addition, making the details of these communications public would be inconsistent with the expectations of the government that have provided us assurances in the past, and would seriously undermine our ability to obtain similar assurances in the future.

**Criticisms**

Several criticisms have been made of our practice of obtaining assurances. Some have claimed that the confidentiality of assurances renders them suspect, or that assurances are inherently unreliable. Such challenges, to assurances *as such*, have been rejected by courts in the both the United States and in Europe. Rather, courts have found that, in appropriate circumstances, diplomatic assurances may be sufficient to enable a State to return an alien to a country, in compliance with its Article 3 obligations, even if that country has a recent history of human rights abuses. In this regard it should be noted that Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms subjects State Parties to a much broader non-refoulement obligation than the

Convention Against Torture.[4]   Faced with the additional challenges this broader obligation imposes, governments in Europe have utilized diplomatic assurances to reduce the risk that aliens will face not only torture but other abuses and conditions as well.

Another criticism often leveled against the practice of utilizing diplomatic assurances is that the practice undermines the international human rights framework.  We find the opposite to be true.  Seeking assurances does not mean ignoring or condoning torture.  On the contrary, when they seek assurances, countries signal the importance of, and their commitment to, their international human rights obligations and directly confront the country in question with their concerns.  These discussions serve to bolster, not undermine, the international human rights framework.  If successful, they lead to renewed commitments to and compliance with international human rights obligations by the country from which assurances are sought.  In some cases, interest in reinforcing bilateral law enforcement relationships may serve as an incentive for receiving countries to improve their practices.  Bilateral discussions regarding assurances may also lead to improved access to detention facilities in the receiving country on the part of

---

[4] As interpreted by the European Court of Human Rights, State Parties are prohibited under Article 3 of the European Convention from sending an individual to a country where he or she would face a "real risk" of being subjected to torture or to inhuman or degrading treatment or punishment.  The scope of risks protected against under this non-refoulement obligation is greater than those protected against under the Convention Against Torture, and the standard of 'real risk' is substantively lower than 'more likely than not.'

the requesting state, or to a greater role for a particular domestic human rights institution and/or independent human rights group in the receiving country.

**Conclusion**

Diplomatically these are not easy discussions, but they are sometimes necessary and valuable in our efforts to protect our citizens from criminal and terrorist threats and, at the same time, to comply with our international human rights obligations. Assurances, if properly used, are a means of fulfilling, not avoiding, non-refoulement obligations. As such, those who categorically oppose the practice need to consider if they are content with the idea of dangerous criminals or unlawful aliens being released onto the streets of the United States, even though, with appropriate assurances, they could be sent to face justice in another country or otherwise expelled or removed consistent with U.S. treaty obligations. For its part, the Department of State is not content with that idea. Thus, the Department will continue to seek to utilize, where appropriate, assurances to assist in ensuring that we both protect our citizens and uphold our international legal obligations.

I thank the Committee for its interest in this issue and am happy to discuss with you any additional questions you may have.