## DECLARATION OF AIMEE L. MAYER-SALINS

I, Aimee L. Mayer-Salins, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I make this affidavit based upon my own personal knowledge in support of the Plaintiffs in *D.V.D. v. DHS*, No. 1:25-cv-10676-BEM (D. Mass), and would be competent to testify thereto.

2. I am an attorney licensed to practice law in the state of Massachusetts. I am also an associate member of the Virginia State Bar. In addition, I am admitted to practice before the United States Courts of Appeals for the First, Fourth, and Eleventh Circuits, as well as the United States Supreme Court. I was first admitted to the Virginia State Bar in 2013. I was admitted to the bar in Massachusetts in 2016.

3. I have practiced immigration law for my entire career. I began my career at the United States Department of Justice (DOJ), entering on duty through the Attorney General's Honors Program in 2013. At DOJ, I served at the Board of Immigration Appeals within the Executive Office for Immigration for Review. I then completed a fellowship at the Post-Deportation Human Rights Project at Boston College. After that, I was an associate attorney at Rubin Pomerleau, P.C. and then at Fragomen, Del Rey, Bernsen, & Loewy, LLP. I then worked at the Catholic Legal Immigration Network, Inc. (CLINIC) from 2019 through 2022, first as a staff attorney and then as a supervisory senior attorney. Since September of 2022, I have served as the managing appeals attorney at the Amica Center for Immigrant Rights.

4. As part of my responsibilities at CLINIC, I led a Remote Motions to Reopen Project. Through that project, I mentored attorneys across the country representing noncitizens with final order of removal who sought to reopen their proceedings. In addition, I created webinars, practice advisories, and other training materials for attorneys on complex issues surrounding motions to reopen. I also had my own caseload of motions to reopen cases, focusing on motions on behalf of people subjected to the Remain in Mexico and the Zero Tolerance Family Separation policies, as well as detained individuals who had been subjected to egregious harm in ICE detention, including victims of nonconsensual gynecological procedures.

5. The Amica Center for Immigrant Rights—formerly known as Capital Area Immigrants' Rights (CAIR) Coalition—engages in unwavering legal defense and strategic litigation for immigrant children and adults facing detention and deportation. The majority of our clients are currently detained in the custody of U.S. Immigration and Customs Enforcement (ICE).

6. Since joining the Amica Center for Immigrant Rights, I have trained attorneys on motion to reopen practice, supervised staff filing motions to reopen, and mentored staff handling complex motions.

*Most Noncitizens Are Unaware That a Motion to Reopen Is a Viable Option*

7. According to the Vera Institute the majority of noncitizens facing deportation are pro se. *See, e.g.,* Vera Immigration Court Legal Representation Dashboard, available at https://www.vera.org/ending-mass-incarceration/reducing-incarceration/detention-of-immigrants/advancing-universal-representation-initiative/immigration-court-legal-representation-dashboard. Even though removal may mean permanent family separation, persecution, torture, or even death, noncitizens in removal proceedings have no right to appointed counsel. Instead, noncitizens are only representation "at no expense to the government." 8 U.S.C. § 1229a(b)(4)(A); 8 C.F.R. § 1240.10(a)(1).

8. Pro se noncitizens usually are wholly unaware of the complicated procedural mechanisms that may allow a judge to consider new evidence after they have been ordered removed. *E.g., Lugo-Resendez v. Lynch,* 831 F.3d 337, 345 (5th Cir. 2016) (explaining that many noncitizens "are poor, uneducated, unskilled in the English language, and effectively unable to follow developments in the American legal system—much less read and digest complicated legal decisions.").

9. Even those pro se noncitizens savvy enough to figure out that a motion to reopen is available to present new evidence are unlikely to be able to present an approvable motion to reopen to the adjudicator. For most people, there are simply too many barriers placed in their way. A motion must be presented in English and, as further explained below, must address timeliness, prima facie eligibility for relief, and explain why evidence is material and previously unavailable. The evidence must be attached with the motion, along with any application for relief. For a detained noncitizen without an attorney, putting together such a motion is nearly impossible. This is especially true for those noncitizens with limited formal education, limited English proficiency, or mental health disabilities.

*General Legal Landscape Applicable to Motions to Reopen*

10. To understand why filing a motion to reopen is so difficult for a pro se noncitizen, and frankly, even for a noncitizen with counsel, it is important to understand the legal framework governing motions to reopen. After a final removal order has issued, a person can present evidence that is new and was unavailable at the prior removal hearing through a motion to reopen. Through 8 U.S.C. § 1229a(c)(7)(C)(i), Congress authorized the filing of motions within 90 days of a final administrative removal order, and courts of appeals have affirmed this deadline may be equitably tolled. *See, e.g., Mata-Reyes v. Lynch*, 576 U.S. 143, 147 n.1 (2015) (citing cases); *Lugo-Resendez v. Lynch*, 831 F.3d 337 (5th Cir. 2016). The 90-day deadline does not apply to individuals seeking protection from persecution and torture and whose motion is based on changed conditions *in the country to which removal was ordered*. 8 U.S.C. § 1229a(c)(7)(C)(ii). If an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) grants reopening, the noncitizen is

2

not automatically granted protection from removal. Rather, the person still must demonstrate eligibility for such protection in an individual merits hearing before an immigration judge.

11. In general, the venue and process for filing motions to reopen is as follows:
    a. If the final order was issued by an IJ, and the noncitizen did not previously appeal that final order, then any motion to reopen must be filed with the immigration court that issued the order. If the IJ denies reopening, the noncitizen may appeal the denial to the BIA. If the BIA affirms the IJ's decision, the noncitizen may file a petition for review of the BIA's decision with the appropriate court of appeals.
    b. If the final order was issued by an IJ, the noncitizen previously appealed the IJ's decision to the BIA, and the BIA was the agency adjudicator to rule substantively in the case, then any motion to reopen must be filed with the BIA. This is true even if the person previously filed a petition for review of the BIA's decision to the court of appeals and the court of appeals ruled on the petition. However, if the BIA dismissed the appeal for lack of jurisdiction or untimeliness, the motion must be filed with the IJ. If the BIA denies reopening, the person may file a petition for review of the BIA's decision with the appropriate court of appeals. However, if the motion to reopen is based on the IJ's or BIA's *sua sponte* authority under the regulations, judicial review is either entirely unavailable or limited to legal and constitutional questions. If the BIA denies the motion solely in an exercise of discretion, no review is available, regardless of the basis of the individual's claim.

12. A motion to reopen must include "the appropriate application for relief and all supporting documentation." 8 C.F.R. § 1003.2(c)(1), 1003.23(b)(3). Additionally, to prevail on a motion to reopen, the individual must show prima facie eligibility for relief. *Matter of L-O-G-*, 21 I&N Dec. 413 (BIA 1996). In practical terms, this means that the pro se individual or an attorney must fill out a lengthy and detailed application form. Additionally, counsel usually will need to work with the client to draft a declaration as such declarations play a critical role in adjudicating fear-based claims. The individual or attorney will also need to gather other supporting evidence, which may include corroborating declarations from other individuals, medical records, psychological evaluations, newspaper articles, and reports from human rights organizations. Where relief is based on fear of persecution and/or torture, the application and evidence must be specific to the country to which the noncitizen may be removed.

*Competent preparation of a motion to reopen is a time-consuming task.*

13. Investigating the viability of a claim for reopening can be a complicated endeavor for a pro se individual or for an attorney, including gathering new and previously unavailable evidence.

14. For an attorney, the process must comply with the ethical obligation to fully and competently assess the merits of a claim which, for clients facing persecution and torture,

3

may make the difference between being sent to one's death and safety in this country. For example, where counsel did not represent the person previously, counsel needs to obtain the complete record of proceedings. Moreover, by statute and regulations, motions to reopen require substantial new evidence, which takes time to gather and assemble. *See generally* 8 U.S.C. § 1229a(c)(7)(B); 8 C.F.R. § 1003.2(c)(1). Additionally, the practical realities of representing people in ICE custody—including frequent transfers between distant facilities and communication barriers— make it substantially more difficult to gather necessary information and evidence.

15. Simply communicating with a person in ICE custody is a complex task. Attorneys must reach out to the facility where the person is detained to schedule privileged calls or virtual video visits. At some facilities, there is a process just to have an attorney's phone number listed as privileged that can take several days. Due to the overcrowding of most facilities housing ICE detainees and the limited space available for confidential communication, there is often a lengthy wait to be scheduled for a timeslot for a privileged call or video visit. Plus, the staff assigned to schedule such calls are often overwhelmed with requests and it can take a few days for them to even respond to the attorney's request for a call. Alternatively, an attorney might go visit the client in person, but that typically involves driving very long distances. Most ICE facilities are in rural areas far from most attorneys. For example, most clients served by the Amica Center for Immigrant Rights are housed in detention facilities that are between 2 and 5 hours driving from our office in Washington, DC. Attorneys also face significant delays communicating with detained clients by mail.

16. These steps to communicate with the client are necessary before an attorney can even really begin work on a case and start the process for obtaining the client's immigration file through the Freedom of Information Act, which requires a client's signature. All of these delays are exacerbated when ICE transfers individuals from one facility to another which happens frequently, in my experience.

17. Gathering evidence can also be a time-consuming endeavor when a client is detained. For example, working with a detained client to draft a declaration or obtaining a psychological evaluation on their behalf requires hours and hours of work. In addition to the time needed to actually do the declaration or psychological evaluation, often it takes many hours just to coordinate the logistics of getting interpreters, psychologists, or others approved by the facility and travel to the facility.

18. Every case is different, but it would not be unreasonable for obtaining and reviewing a client's record to require between 15-30 hours of work, even before research and writing can begin.  Additional time also would be needed in circumstances where it is difficult for the attorney and client to communicate, for example, if the client is detained far from the attorney, is transferred multiple times, has a mental health disability or physical disability that makes communicating more challenging, or is not proficient in English.

19. Where a noncitizen is pro se, especially if they are detained, they must try to obtain evidence and connect with potential witnesses despite even more barriers. Even making a

simple phone call to a potential witness can be an unachievable task for a detained person. In overcrowded detention facilities, it can be difficult to have any privacy to discuss sensitive matters relevant to a person's fear of removal. Jail calls can be prohibitively expensive. *See, e.g.,* Wendy Fry, *ICE Detention: Where a day's work might buy you a 14-minute phone call,* CAL MATTERS, July 26, 2024, available at https://calmatters.org/newsletter/ice-detention-where-a-days-work-might-buy-you-one-14-minute-phone-call/#:~:text=According%20to%20the%20California%20Collaborative,a%20minute%20for%20international%20calls. Plus, detainees typically lack internet access and therefore cannot easily research country conditions in an unfamiliar country themselves. .

*Generally there is no automatic stay when a motion to reopen is filed.*

20. Despite all of the time-consuming work necessary to competently prepare a motion to reopen, attorneys and their clients also must race against the clock to get a motion to reopen filed as quickly as possible. This is not simply because there is a 90-day filing deadline applicable to most motions; it is also because a client with a final order of removal is at risk of being deported at any time.

21. Even the filing of the motion to reopen does not automatically stay removal in most instances. (Indeed, removal is *only* automatically stayed for motions to rescind and reopen in absentia orders. *See* 8 U.S.C. § 1229a(b)(5)(C); 8 C.F.R. § 1003.23(b)(4)(ii)). Instead, an attorney must also prepare a stay motion, often addressing the likelihood of success on the merits, irreparable harm, and the public interest / harm to government, although the BIA does not have a precedential decision indicating what factors it considers. The IJ or BIA has the sole discretion to decide whether to grant such a stay.

*Motions to Reopen are Not a Realistic Option Where ICE is Attempting to Remove Someone to a Third Country.*

22. As detailed above, preparing a motion to reopen is a complex and time-consuming process even in the normal course. Putting together a motion to reopen any time a person fears he might be removed to a random third country selected by the government with no notice whatsoever to the noncitizen is utterly unworkable. In addition to the practical difficulties of preparing a motion discussed above, the noncitizen or their representative would have the added burden of researching country conditions and the treatment of similarly situated individuals in a country that might be wholly unfamiliar to the noncitizen, even assuming that the noncitizen is informed of what country to which they may be removed. For example, a gay noncitizen may have no idea how people who are gay are treated in an unfamiliar country. But of course, their lack of familiarity does not mean that they would not be at risk. Similarly, a person belonging to a religious or ethnic minority group may have no idea how people belonging to that group are treated in an unfamiliar country, but again this lack of familiarity does not equate to lack of risk. Thus, the noncitizen or their counsel would need to do in depth research into country conditions on a totally unfamiliar country.

23. Moreover, requiring motions to reopen to multiple countries, without notice, or on a condensed timeline turns the process into motion to reopen whack-a-mole and is directly at odds with the motion to reopen statute, which generally permits the filing of only one motion to reopen. 8 U.S.C. § 1229a(c)(7)(A). Under this framework, the noncitizen may have to file a new motion to reopen every time the government suggests another country where they might be removed, necessarily exceeding the one motion limit.

24. In short, motions to reopen are not realistic where ICE is attempting to remove someone to a third country, especially where ICE does so without even providing notice of which country a person might be removed to and without an automatic stay.

Signed under penalty of perjury this 7th day of April, 2025 at Newton, Massachusetts.

_____
Aimee L. Mayer-Salins