# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity,<br><br>    Defendants. | Case No. 25-cv-10676-BEM |

**PLAINTIFFS' BRIEF IN SUPPORT OF JOINDER OF THE DEPARTMENT OF DEFENSE (DKT. 93)**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................. 1

    A. DoD's Involvement in Immigration Enforcement Operations............................................. 1

    B. DoD's Involvement in Class Members' Removals and Attempted Removals ................... 4

III. THE COURT SHOULD JOIN DoD AS A PARTY ................................................... 6

    A. Joinder Is Necessary under Rule 19......................................................................... 6

        1. Defendants rely on DoD for carrying out third-country removals ................................. 7

        2. Defendants' own statements demonstrate DoD's interest in the subject of Plaintiffs' claims which may be impeded or impaired by DoD's absence ........................................ 8

    B. Joinder Is Appropriate under Rule 20 ................................................................. 9

IV. CONCLUSION ............................................................................................................. 10

## I.   INTRODUCTION

Pursuant to the Court's May 7, 2025, order, Dkt. 93, Plaintiffs submit that this Court should join the Department of Defense (DoD) as a party to this action. This case challenges removing class members to a third country without affording them meaningful notice and opportunity to present a fear-based claim before an immigration judge. Because Defendants have submitted evidence that DoD plays a central and independent role in carrying out these third-country removals, including by detaining class members at Guantánamo Bay and/or deporting them via military aircraft, joinder is necessary pursuant to Federal Rules of Civil Procedure 19 and, alternatively, appropriate under Rule 20.

Defendants' submissions in this case, as well as a Memorandum of Understanding between the Department of Homeland Security (DHS) and DoD regarding Guantánamo Bay, evidence DoD's significant involvement in third country removals, rendering it necessary and appropriate for DoD to be bound by any preliminary injunctive relief and any ultimate declaratory and permanent injunctive relief.

## II.   BACKGROUND

### A.   DoD's Involvement in Immigration Enforcement Operations

The evolving facts in this case have amply demonstrated DoD's emerging role in immigration enforcement, extending beyond logistical support to direct participation in detention and removal operations. Such involvement encompasses the expansion of immigration detention at Naval Station Guantánamo Bay (NSGB) and the utilization of military aircraft and personnel for removal flights. Moreover, Defendants themselves have declared that DoD now plays a significant role in immigration enforcement, averring that DoD has taken custody of class members and removed them to a third country without DHS's direction. *See* Declaration of

Tracy J. Huettl, Dkt. 72-1 ¶¶ 12, 18, 27, 51; *see also* Dkt. 72 at 2; Dkt. 86.

On January 29, 2025, President Trump issued an executive order "direct[ing] the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at [NSGB] to full capacity" for the detention of "high-priority criminal aliens unlawfully present in the United States." The White House, *Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity* (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/. The executive order also tasked both DoD and DHS with "address[ing] attendant immigrant enforcement needs identified" by both agencies. *Id.* In response, DoD swiftly deployed over 1,000 active-duty military personnel from the Army, Navy, Marine Corps, and National Guard to manage detention facilities. *See* Press Release, U.S. Southern Command, *U.S. Military Troops Arrive at Naval Station Guantanamo Bay for Illegal Alien Holding Operations* (Feb. 3, 2025), https://www.southcom.mil/News/PressReleases/Article/4050872/us-military-troops-arrive-at-naval-station-guantanamo-bay-for-illegal-alien-hol/ (announcing deployment of "[m]ore than 150 service members"); Drew F. Lawrence, *More Troops Sent to Guantanamo Bay as Court Testimony Shows One-Third of Detainees Were "Low Threat,"* Military.com (Feb. 21, 2025), https://www.military.com/daily-news/2025/02/21/more-troops-sent-guantanamo-bay-court-testimony-shows-one-third-of-detainees-were-low-threat.html (reporting that the number of troops deployed for immigration detention "continues to swell, with approximately 1,100 service members now deployed").

DoD has continued to play an increasingly direct role in the detention of immigrants at NSGB. *See generally* Ex. A (Memorandum of Understanding Between DHS & DoD for DoD Support at Naval Station Guantanamo Bay (NSGB) to U.S. Immigr. & Customs Enf't (ICE) for

2

DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal (Mar. 7, 2025)) (MOU). Under the MOU, DoD is responsible not only for providing the facilities themselves, *id.* ¶¶ 4.2.1-4.2.2, but also for key functions such as determining detention capacity, *id.* ¶ 4.2.5; providing health services, first aid, and emergency medical care for detained individuals, *id.* ¶ 4.2.3, facility access and security, ¶ 4.2.4, hygiene and sanitation, ¶ 4.2.6, transportation of personnel and contractors, *id.* ¶ 4.2.7, and support with detained individuals' access to counsel, *id.* ¶ 4.2.8. As recently as early May, "the task force in charge of migrant detention" at NSGB consisted of "about 725 staff members, *mostly uniformed Army and Marine forces*, with 100 employed by ICE as security officers or contractors." Carol Rosenberg, *Guantánamo Migrant Operation Has Held Fewer Than 500 Detainees, and None in Tents*, N.Y. Times (May 5, 2025) (emphasis added), https://www.nytimes.com/2025/05/05/us/politics/guantanamo-migrants-trump.html ("The military says it can pivot and expand migrant operations at Guantanamo, depending on need.").

   Individuals transported for detention at Guantánamo Bay undoubtedly include class members—i.e., individuals subject to final removal orders, including those who "have been ordered deported because of civil immigration violations . . . ." Camilo Montoya-Galvez, *U.S. Sending Nonviolent, "Low-Risk" Migrants to Guantanamo, Despite Vow to Detain "the Worst" There*, CBS News (Feb. 12, 2015), https://www.cbsnews.com/news/guantanamo-bay-migrants-trump/; Carol Rosenberg, *What We Know About the Month-Old Migrant Mission at Guantánamo Bay*, N.Y. Times (Mar. 10, 2025), https://www.nytimes.com/2025/03/10/us/politics/deportations-migrants-guantanamo.html ("[A]ll of those held there this past weekend had final deportation orders and were from 20 different countries . . . ."). The MOU between DHS and DoD further explains that NSGB will be used to detain noncitizens who are subject to final orders of removal

3

and with a "nexus to a transnational criminal organization (TCO) or criminal activity," but defines such "nexus" broadly to include individuals "from a country where the preponderance of [noncitizens]" pay a smuggler from an alleged TCO to enter the United States. Ex. A ¶ 3.

Even more concerning, DoD has participated in executing removals by military aircraft. *See, e.g.*, Idrees Ali & Phil Stewart, *U.S. Military Aircraft Deport Migrants as Pentagon Readies More Troops for Border*, Reuters (Jan. 24, 2025), https://www.reuters.com/world/americas/us-military-aircraft-deport-migrants-pentagon-readies-more-troops-border-2025-01-24/; Eric Schmitt & Helene Cooper, *Hegseth Promises "Shift" at Pentagon and a Focus on Immigration*, N.Y. Times (Jan. 27, 2025), https://www.nytimes.com/2025/01/27/us/politics/hegseth-defense.html (quoting Defense Secretary Pete Hegseth's statement that "the Pentagon would 'absolutely continue' to use military aircraft to deport undocumented migrants"). Some of these flights have operated without DHS agents on board, as Defendants have submitted in this case. *See* Dkt. 72-1 ¶¶ 12, 18, 27, 51; *see also* Dkt. 72 at 2. Further, multiple news outlets and individual class members recently reported that the government intended to use a military aircraft to deport individuals to Libya, prompting Plaintiffs to file an emergency TRO motion. *See generally* Dkt. 89; *see also, e.g.*, Kimmy Yam & Laura Strickler, *Why Asian and Mexican Immigrants, Moments Away from Being Deported to Libya, Never Left the U.S.*, NBC News (May 8, 2025), https://www.nbcnews.com/news/us-news/asian-mexican-migrants-libya-sat-texas-military-plane-rcna205668 (reporting noncitizen had been "told he was being sent to Libya, and then waiting for hours on a bus at a military base outside a military plane"); Ex. B (Decl. of Johnny Sinodis) ¶¶ 32-33; Ex. C (Decl. of Tin Thanh Nguyen) ¶¶ 10-11.

**B.    DoD's Involvement in Class Members' Removals and Attempted Removals**

On April 10, 2025, this Court ordered Defendants to provide information regarding

4

reported violations of its March 28, 2025 Temporary Restraining Order (TRO). *See* Dkt. 62. Defendants have put forth sworn testimony that four individuals, who were deported to third countries likely without provision of the protections required by the TRO, were "removed to El Salvador by the [DoD] on a flight where no DHS personnel were onboard" and that "DHS did not direct the [DoD] to remove" these individuals. Dkt. 72-1 ¶¶ 12, 18, 27, 51; *see also* Dkt. 72 at 2. Defendants added that "DHS did not violate" the TRO, and that DoD "is not a defendant in this action." Dkt. 72 at 2, 3.

Defendants rearticulated that DoD separately and independently deported class members at the April 28, 2025 status conference before this Court. *See* Dkt. 86 ("Defendants have represented to this court that that removals from Guantanamo Bay to third countries have been executed by the [DoD] without the [DHS]'s direction or knowledge"). As a result, this Court amended its preliminary injunction (PI) to expressly provide that "prior to removing, *or allowing or permitting another agency to remove*, [a noncitizen] from Guantanamo Bay to a third country, Defendants must comport with the terms of the April 18, 2025 preliminary injunction." *Id*. (emphasis added).

However, DoD has continued its involvement in facilitating the removal of class members covered by the PI from the contiguous United States to third countries. On May 7, 2025, after media reports and reports from immigration attorneys indicated that Defendants were seeking to deport class members to Libya and Saudia Arabia, Plaintiffs filed an emergency motion for a TRO with the evidence that it had gathered by the time of filing. *See* Dkt. 89. After the Court clarified its PI order, *see* Dkt. 91 at 2, Plaintiffs received further evidence that thirteen men, not from Libya and never ordered removed to Libya, were transported from the South Texas Immigration and Customs Enforcement (ICE) Processing Center to the Lackland Airforce

5

Base in San Antonio, Texas, where a military plane was waiting to deport them to Libya. *See* Dkt. 90-6; *see also* Ex. B. ¶ 32 ("My client states that the bus was driven to what appeared to be a military airport where a large military plane was waiting."); Ex. C ¶ 11 ("Throughout the base, there were people in military uniform and military vehicles."); Ex. D (Decl. of Kristin Macleod-Ball) ¶¶ 5-16 (confirming that a minimum of eleven of the men had final removal orders issued by an immigration court and, thus, are class members). Critically, the men were not provided the notice and opportunity to seek CAT protection required by the PI. Ex. B ¶¶ 6-7; Ex. C ¶¶ 5-6.[1]

### III. THE COURT SHOULD JOIN DOD AS A PARTY

#### A. Joinder Is Necessary under Rule 19

Under Federal Rule of Civil Procedure 19(a)(1), an absent party must be joined to litigation if:

> (A) in that [party]'s absence, the court cannot accord complete relief among existing parties; or
>
> (B) that [absent party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the [absent party]'s absence may:
> (i) as a practical matter impair or impede the [absent party]'s ability to protect the interest; or
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1)(A)-(B). Application of the rule requires a fact-based, case-specific inquiry. *See, e.g.*, *Bacardi Int'l Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d 1, 9 (1st Cir. 2013). DHS' actions and attestations since this case was filed indicate that Rule 19 joinder of DoD is now warranted.

---

[1] The men were ultimately transported back to an immigration detention center after remaining on a bus on the base's tarmac for three or four hours. Ex. B ¶¶ 33-34; Ex. C ¶ 12. It is unclear whether undersigned counsel's inquiry to opposing counsel was the reason that the flight did not take off.

### 1. Defendants rely on DoD for carrying out third-country removals

To the extent that Defendants attest and acknowledge that DoD is responsible for key aspects of class members' removal and that they have no control over DoD's actions, joinder is necessary to "accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). Joinder is appropriate where the practical effect of a judgment may be incomplete due to the absence of an entity identified as a key actor in the challenged scheme. *See, e.g.*, *Citizen Potawatomi Nation v. Salazar*, 624 F. Supp. 2d 103, 112-13 (D.D.C. 2009) ("The Court of Appeals has broadly characterized necessary parties as "those 'affected by the judgment and against which in fact it will operate . . . .'" (alteration in original) (citation omitted)). By contrast, where "[t]he court's remedial scheme" requires "no action" by a party, the party is not indispensable. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Mun. of San Juan*, 773 F.3d 1, 14 (1st Cir. 2014); *see also, e.g.*, *J & J Sports Prods. Inc. v. Cela*, 139 F. Supp. 3d 495, 504-05 (D. Mass. 2015) (concluding absent parties are not indispensable because "no other party is needed to provide [the plaintiff] the relief it seeks from Defendants").

The same principles apply here. DoD's active participation in both immigration detention and carrying out removals results from directives by both President Trump and Defense Secretary Hegseth and confirmed by media reports at large, *see supra* Section II.A. And critically, as this Court recognized, Defendants themselves have pointed to DoD's role in "conducting third country removals, allegedly without any involvement of DHS." Dkt. 93; *see also supra* Section II.B. At a minimum, Defendants' position injects uncertainty into the question of who holds operational authority and who would be bound by relief. If DHS disclaims responsibility for, or control over, the removal of certain class members to third countries because they were undertaken by DoD, and if Plaintiffs seek to prevent removals without first

7

providing "meaningful notice and opportunity to present a fear-based claim to an immigration judge," Dkt. 1 ¶¶ 107, 110, 117, the Court's ability to grant the requested relief may be frustrated unless DoD is bound by it.

In short, joinder is necessary because Defendants' own position—that DoD executed key aspects of the challenged enforcement—risks leaving Plaintiffs without an effective remedy.

### 2. Defendants' own statements demonstrate DoD's interest in the subject of Plaintiffs' claims which may be impeded or impaired by DoD's absence

Similarly, Defendants' statements demonstrate DoD's "interest relating to the subject of the action" and that the agency's "absence may . . . impair or impede [DoD's] ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). Here, DoD, by Defendants' admission, has acted to deport class members without regard to protections required by this Court's TRO, purportedly absent any direction from Defendants; DoD's actions with regard to the anticipated flight to Libya similarly impact class members covered by the PI. *See supra* Section II.B. Defendants have suggested they have no obligation to defend or justify these actions. *See* Dkt. 72 at 2-3. Thus, DoD should be joined as a Defendant in order to protect its interests.

In determining whether existing parties will adequately protect the interests of an absent entity, a court considers whether "the interests of [the] absent party are aligned closely enough with the interests of an existing party" and whether "the existing party [will] pursue[] those interests in the course of the litigation." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden*, 11 F.4th 12, 17 (1st Cir. 2021); *see also Bacardi*, 719 F.3d at 10-12 (examining whether existing and absent party had "virtually identical interests"). Additionally, the court should consider whether the impact of judgment in a case would be a "direct and immediate" impediment to those separate interests. *Massachusetts v. Wampanoag Tribe of Gay Head*, 98 F.

Supp. 3d 55, 71 (D. Mass. 2015).

Here, Defendants' claims demonstrate that DoD has a separate interest in this case and acted to carry out third country removals without DHS direction or personnel on board, *see* Dkt. 72, Dkt. 72-1, Dkt. 93, likely without the protections of the TRO, and was prepared to carry out removal of class members to Libya without providing the protections required by the PI, *see* Dkt. 89; Ex. B; Ex. C. Accordingly, Defendants should not be permitted to evade the requirements of the PI as well as any later-issued declaratory or permanent injunctive relief by placing responsibility for violations on DoD. *Cf.* Dkt. 91; Dkt. 86. Absent joinder as a party, DoD would have no opportunity to respond to these claims.

### B. Joinder Is Appropriate under Rule 20

Under the rule of permissive joinder, a party may be joined as a defendant where plaintiffs assert a "right to relief . . . against them jointly, severally, or in the alternative with respect to the . . . the same transaction, occurrence, or series of transactions or occurrences," and the action presents a "question of law or fact common to all defendants." Fed. R. Civ. P. 20(a)(2)(A)-(B). The rule also specifies that where joinder is permitted, "[t]he court may grant judgment . . . against one or more defendants according to their liabilities." Fed. R. Civ. P. 20(a)(3). Designed to promote judicial efficiency and "prevent[] multiple lawsuits," the rule permits claims "arising out of the same litigable event [to] be tried together, thereby avoiding . . . unnecessary loss of time and money to the court and the parties . . . ." 7 Charles Alan Wright et al., Federal Practice & Procedure § 1652 (3d ed. Apr. 2025 update); *cf. United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966) ("[T]he impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." (citing in part Fed. R. Civ. P. 20)).

9

Both requirements of Rule 20(a)(2) are satisfied here. First, given Defendants' sworn testimony that DoD is involved in carrying out third-country removals and Defendants' corresponding attempt to shirk responsibility for violations of this Court's orders, *see supra* Section II.B, Plaintiffs assert rights to relief against DoD with respect to "the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a)(2)(A). As the First Circuit has explained, "the 'transaction or occurrence' standard requires only a 'logical relation' between the claims." *Kress Stores of Puerto Rico Inc. v. Wal-Mart Puerto Rico, Inc.*, 121 F.4th 228, 245 (1st Cir. 2024). Here, such a logical relation exists because "the same aggregate of operative facts serves as the basis of" Plaintiffs' claims against both DHS and DoD. *Id.* (citation omitted). Any acts by DoD related to this case comprise part of the same third-country removal scheme that Plaintiffs challenge. Accordingly, the requirement of Rule 20(a)(2)(B) is also met because DoD would face the same factual and legal questions already presented in this case, concerning the government's practices with respect to third-country removal and the sufficiency of the process afforded to class members before such removals take place.

Given the intertwined roles of DHS and DoD in the detention and removal practices challenged here, and the common legal and factual questions their actions raise, joinder of DoD as a defendant under Rule 20(a)(2) is appropriate to promote judicial efficiency, avoid duplicative litigation, and ensure a comprehensive resolution of Plaintiffs' claims.

## IV. CONCLUSION

The Court should join DoD as a defendant in this action.

//

//

//

10

Respectfully submitted,

s/*Trina Realmuto*

| | |
|---|---|
| Trina Realmuto* | Matt Adams* |
| Kristin Macleod-Ball* | Leila Kang* |
| Mary Kenney* | Aaron Korthuis* |
| Tomas Arango | Glenda M. Aldana Madrid* |
| **NATIONAL IMMIGRATION LITIGATION ALLIANCE** | **NORTHWEST IMMIGRANT RIGHTS PROJECT** |
| 10 Griggs Terrace | 615 Second Avenue, Suite 400 |
| Brookline, MA, 02446 | Seattle, WA 98104 |
| (617) 819-4649 | (206) 957-8611 |
| trina@immigrationlitigation.org | matt@nwirp.org |

Anwen Hughes*
**HUMAN RIGHTS FIRST**
75 Broad Street, 31st Floor
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

*Attorneys for Plaintiffs*

\* *Admitted pro hac vice*

Dated: May 14, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

 s/ *Kristin Macleod-Ball*
Kristin Macleod-Ball

DATED: May 14, 2025