MEMORANDUM OF UNDERSTANDING BETWEEN

THE U.S. DEPARTMENT OF HOMELAND SECURITY (DHS)

AND

THE U.S. DEPARTMENT OF DEFENSE (DOD)

FOR

DOD SUPPORT AT NAVAL STATION GUANTANAMO BAY (NSGB) TO U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) FOR DHS/ICE DETENTION OF ILLEGAL ALIENS SUBJECT TO FINAL ORDERS OF REMOVAL

This is a memorandum of understanding (MOU) between DHS, through ICE, and DoD. When referred to collectively, DHS and DoD are referred to as the "Parties."

1. BACKGROUND: On January 20, 2025, the President, in Executive Order (EO) 14165, "Securing Our Borders," directed the Secretary of Homeland Security to "take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States."[1] On January 29, 2025, President Trump directed the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at NSGB to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States.

2. AUTHORITIES AND REFERENCES: 8 U.S.C. § 1231(g); EO 14165, "Securing Our Borders," January 20, 2025; EO 14159, "Protecting the American People Against Invasion," January 20, 2025; Memorandum for the Secretary of Defense and the Secretary of Homeland Security, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity," January 29, 2025.

3. PURPOSE: This MOU clarifies the Parties' respective roles and responsibilities related to custody and detention at NSGB of illegal aliens with final orders of removal (NSGB IAs). Consistent with DoD's authority to provide base of operations support for the purpose of facilitating counterdrug activities or activities to counter transnational organized crime of any Federal law enforcement agency within or outside the United States (10 U.S.C. § 284(b)(4)), DHS/ICE will detain at NSGB illegal aliens with a nexus to a transnational criminal organization (TCO) or criminal drug activity. This nexus can be satisfied by an alien being a member of a TCO or paying a TCO to be smuggled into the United States. Aliens subject to a final order but for whom no clear connection or nexus to TCOs or criminal drug activity exists (e.g., those who overstay their visa) will not be moved to NSGB. When the nature of an

---

[1] Additionally, Executive Order 14159 provides:
In Section 9: "[T]he Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States."
In Section 10: "Detention Facilities. The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law."

EXHIBIT A

alien's entry into the United States is uncertain, DHS/ICE may assert a nexus where DHS/ICE reasonably believes the alien to have paid a TCO to be smuggled into the United States if the alien is from a country where the preponderance of aliens from that country enter the United States in that fashion.

4. UNDERSTANDINGS OF THE PARTIES:

4.1. DHS/ICE——

4.1.1. Consistent with the Immigration and Nationality Act (INA), has legal custody of NSGB IAs and is responsible for the custody of detained aliens for administrative purposes related to immigration law violations and will fulfill these responsibilities through the direction of DHS personnel and DHS contractor personnel. This includes ensuring custody conditions for NSGB IAs are appropriate and determining which NSGB IAs are considered "high threat" for housing at Camp VI.

4.1.2. Accepts the conditions at NSGB detention sites (JTF Building VI and the Migrant Operations Center) as adequate for holding and DHS/ICE exercising legal custody and detention of NSGB IAs. (ICE representatives have assessed these sites as suitable for adults only; minors will not be moved to NSGB at any point).

4.1.3. Will provide necessary DHS/ICE guidance and training to DoD personnel at NSGB assisting DHS/ICE in fulfilling DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

4.1.4. Understands that DoD will use as standards, as an interim solution, for support to DHS/ICE detention of NSGB IAs as contained in DoD Instruction 1325.07, "Administration of Military Correctional Facilities and Clemency and Parole Programs," and Army Regulation 190-47, "The Army Corrections System," with appropriate exceptions, and adjusted by USSOUTHCOM's Joint Task Force Southern Guard (JTF-SG) based on capabilities and assets currently present. Within 15 days from the effective date of this MOU, the Parties will agree to standards for detention under DHS/ICE legal custody, to be set forth in an addendum to this MOU. The interim standards shall not apply to the following topics: (1) in person visitation; (2) mandatory work for detained aliens; (3) vocational, training, or other prisoner rehabilitate activities; and (4) public affairs, public access, media relations, requests for information and photography. ICE shall provide guidance related to these topics as needed, consistent with section 4.1.19 and other provisions of this MOU.

4.1.5. Will provide an appropriate ratio of DHS/ICE officers to NSGB IAs as mutually determined between the Parties to achieve the responsibilities indicated in this memorandum, and at a minimum, will provide at least two DHS/ICE law enforcement officers or contractors in accordance with DHS/ICE standard operating procedures at the Camp VI detention facility on a 24/7 basis and will provide an appropriate number of DHS/ICE law enforcement officers and interior security in accordance with DHS/ICE standard operating procedures at the hard-sided Migrant Operations Center facility on the leeward side on a 24/7 basis depending on the size of the NSGB IA population.

4.1.6. Will conduct any necessary searches of NSGB IAs while recognizing DoD personnel may also undertake searches and other necessary actions for the safety of DoD personnel or facility integrity.

4.1.7. Will maintain custody of NSGB IAs' funds, valuables, and other personal property.

4.1.8. Will be responsible for providing internal security of NGSB IA holding areas, including determining whether to use restraints on NSGB IAs and placing restraints on NSGB IAs, while recognizing that DoD personnel also may take actions necessary for the safety of DoD personnel, for

facility integrity, or to prevent the detainee from harming self or others, or from causing serious property damage.

4.1.9. Will be responsible for the physical custody and directing the movements of NSGB IAs, including movement between detention sites, medical facilities, and airfield/port facilities.

4.1.10. Will be responsible for any necessary questioning of NSGB IAs related to immigration matters or offenses not committed on NSGB. Will be responsible for determining and imposing disciplinary actions.

4.1.11. Will be responsible for translation, interpretation, and language access for NSGB IAs with limited English proficiency.

4.1.12. Will be responsible for NSGB IA transfers, releases, and removals, as well as NSGB IA tracking and records (i.e., will provide a DHS/ICE Operations Center on the leeward side of NSGB for reception, processing, tracking of detention duration, legal status, medical status, and repatriation), and will ensure transfer from NSGB no later than 180 days from the date of final order of removal. This includes transfer for ordered court appearances related to immigration or federal court litigation.

4.1.13. Will be responsible for inspection of and restrictions on NSGB IAs' correspondence.

4.1.14. Understands DoD will use DoD rules for the use of force unless the Parties agree to another standard. Applicable and agreed-upon rules for the use of force will be shared between the Parties, to ensure DHS/ICE awareness of DoD operational rules.

4.1.15. Will be responsible for any involuntary medical treatment, including in response to hunger strikes, or similar measures.

4.1.16. Will provide a full-time liaison officer (capable of accepting and responding to ICE/Enforcement and Removal Operations (ERO) standards reporting and decision-making requirements) to JTF-SG.

4.1.17. Will be responsible for having contingency plans, coordinated with JTF-SG, for medical evacuation and follow-on care for detainees who require a higher level of care than is available at NSGB.

4.1.18. Will promptly provide information to DoD concerning inquiries from relevant congressional committees.

4.1.19. Will approve and coordinate any press access subject to concurrence of the JTF-SG commander and taking into account appropriate security protocols. Due to security and legal concerns, there will be no press access to Camp VI.

4.1.20. Will determine the appropriate level of access by NSGB IAs to legal representation, including when, to whom, and under what circumstances such access is granted, in consultation with the JTF-SG commander and taking into account NSGB physical security protocols.

4.1.21. Will assign a DHS/ICE officer to collect and communicate grievances and requests from NSGB IAs. DHS/ICE and JTF-SG will concurrently agree upon resolution of grievances and requests, taking into account DHS/ICE policies, procedures, and JTF-SG security protocols.

4.1.22. Will coordinate with DoD before deployment of contractor personnel to execute any portion of this MOU.

4.1.23. Will provide JTF-SG with a daily update on the number of NSGB IAs, including the number received, the number repatriated, a 72-hour repatriation schedule as feasible, and duration information (total days in DHS/ICE custody/detention and total days since arrival at NSGB).

4.1.24. Will provide select services to NSGB IAs (e.g., recreation, religious services) in accordance with DHS/ICE policy and as practicable within the existing infrastructure at NSGB.

4.2. **DoD, through U.S. Southern Command (USSOUTHCOM)—**

4.2.1. Will provide an existing secure facility on the windward side of NSGB to DHS/ICE for holding "high threat" NSGB IAs ("Camp VI").

4.2.2. Will provide DHS/ICE with soft structures (tents) to hold other NSGB IAs. These tents do not have power, lighting, or heating/air conditioning. DoD will provide lighting in the common areas outside the tents and at appropriate locations near perimeter fencing. Climate control requirements will be developed as agreed upon by the Parties.

4.2.3. Will provide preventative health services and first aid along with additional emergency medical care, as appropriate and subject to capability and availability, for DHS and ICE personnel and NSGB IAs.

4.2.4. Will provide perimeter security and facility access/security.

4.2.5. Will be responsible for determining the maximum number of NSGB IAs who can be accommodated at all locations on NSGB, taking into account DHS/ICE legal custody requirements.

4.2.6. Will provide a sufficient number of toilets and hygiene facilities to ensure the clean, safe, and sanitary operation of camps depending on the number of NSGB IAs.

4.2.7. Will make adequate facilities and access to such facilities available, as agreed to in an addendum to this memorandum, for the transportation of DHS/ICE personnel and contractors supporting execution of this memorandum to and from NSGB, and make available lodging/berthing for DHS/ICE personnel and contractors once at NSGB.

4.2.8. Will support DHS/ICE in the provision of an appropriate level of access by NSGB IAs to legal representation as determined by DHS/ICE in coordination with DoD under 4.1.20.

5. **PERSONNEL:** Each Party is responsible for all personnel costs, including pay and benefits, support, and travel. Each Party is also responsible for supervising and managing its personnel, except as necessary for DHS/ICE to provide guidance to DoD personnel as part of DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

6. **GENERAL PROVISIONS:**

6.1. POINTS OF CONTACT (POCs). The Parties will use the following POCs to communicate matters concerning this MOU. Each Party may change its POC upon reasonable notice to the other Party.

6.1.1. For DHS/ICE—

6.1.1.1 Position, office identification, phone number, and email of primary POC: ▇▇▇▇ Deputy Under Secretary, DHS Office of Strategy, Policy, and Plans, ▇▇▇▇

6.1.1.2. Position, office identification, phone number, and email of alternate POC: ▇▇▇▇ Acting Deputy Assistant Secretary for Border and Immigration Policy, DHS Office of Strategy, Policy, and Plans, ▇▇▇▇.

6.1.2. For DoD—

6.1.2.1 Position, office identification, phone number, and email of primary POC: ▇▇▇▇, Performing the Duties of the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ▇▇▇▇

6.1.2.2. Position, office identification, phone number, and email of alternate POC: ▇▇▇▇ Acting Principal Deputy Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ▇▇▇▇

6.2. CORRESPONDENCE. All correspondence to be sent and notices to be given pursuant to this MOU will be addressed, if to the ICE, to—

6.2.1. ▇▇▇▇ and, if to the DHS POLICY, to—

6.2.2. ▇▇▇▇

6.3. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds or manpower between the Parties, nor does it commit funds or resources. No provision in this MOU will be interpreted to require obligation or payment of funds. Reimbursable expenses will be addressed separately. No provision of this MOU shall be interpreted to require obligation or payment of funds in violation of the Anti-deficiency Act, 31 U.S.C. § 1341, or any other applicable law. All activities contemplated by this MOU are subject to the availability of funds.

6.4. MODIFICATION OF MOU. This MOU may be modified at any time in response to a written request from authorized representatives of one of the Parties. Otherwise, it will be reviewed no less often than every six months of its effective date in its entirety. For DoD, the Under Secretary of Defense for Policy may approve modifications to, addendums to, and extensions of this MOU. For DHS, the Under Secretary of Strategy, Policy, and Plan may approve modifications to, addendums to, and extensions of this MOU.

6.5. DISPUTES. Any disputes relating to this MOU will subject to any applicable law, Executive Order, or DoD issuances, and will be resolved by consultation between the Parties.

6.6. TERMINATION OF UNDERSTANDING. This MOU may be terminated in writing by mutual agreement of the Parties or with 90 days' advance written notice by either Party.

6.7. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

6.8. EFFECTIVE DATE. This MOU takes effect on the day after the last Party signs.

6.9. EXPIRATION DATE. This MOU expires on March 15, 2026.

6.10. NO THIRD-PARTY BENEFICIARIES. Nothing in this MOU, express or implied, is intended to

give to, or will be construed to confer upon, any person, not a party, any remedy or claim under or because of this MOU, and this MOU will be for the sole and exclusive benefit of the Parties.

7. DEFINITIONS:

7.1. "High threat" is a security category determined by DHS and is synonymous with other terms such as Maximum security, High-risk.

7.2 Detention Sites

7.2.1. "Hard Structure" detention facility on the Windward side is referred to as Camp VI.

7.2.2. The Migrant Operations Center is a DHS "Hard Structure" facility, not designed for high threat detention, on the Leeward side.

7.2.3. "Soft structure" detention facilities refer to Philips, Macalla, and Golf Course Camps and respective sub-camps.

APPROVED:

FOR DHS—                                        FOR DoD—

*[signature]*                                   *[signature]*

Signature                                       Signature

Troy D. Edgar, Deputy Secretary of Homeland Security    Robert G. Salesses, Performing the Duties of
The U.S. Department of Homeland Security                Deputy Secretary of Defense

7 March 2025 (Date)                             7 March 2025 (Date)