**DECLARATION OF JOHNNY SINODIS**

I, Johnny Sinodis, hereby declare as follows:

1.    I am a partner at Van Der Hout LLP, which is located at 360 Post Street, Suite 800, San Francisco, CA 94108. I have personal knowledge of the matters stated herein.

2.    I represent the person identified in the email correspondence filed on May 7, 2025, with the Court. Dkt. 90-4.  I can confirm that my client has a final order of removal to the Philippines, which was issued on March 11, 2025.

3.    The information in this declaration is based on (1) notes that I took during two phone calls with my client on May 7, 2025, at approximately 1:00 p.m. Pacific Standard Time (the first call lasted about ten minutes before the call ended due to time limits, and my client called me back a few minutes later) and (2) calls I have had with various U.S. Immigration and Customs Enforcement (ICE) officers.

4.    As background, my client is currently detained at the South Texas ICE Processing Center, a facility run by The GEO Group. He was previously detained at the Northwest ICE Processing Center (NWIPC) in Tacoma, Washington. While at NWIPC, he was issued an order of removal on March 11, 2025. He thereafter was told by his deportation officer (DO) that he was scheduled to be on a removal flight to the Philippines on either April 27 or 28, 2025.

5.    Approximately two weeks before April 27, my client was transferred to Texas. He was told by an ICE officer in Tacoma that the decision to transfer him came from "headquarters." He has been detained at the South Texas ICE Processing Center for about three weeks, and he spent some amount of time (he is unsure as to the total number of days) in another facility in Texas prior to being transferred to the South Texas ICE Processing Center. Contrary to what he was told by the ICE officer in Tacoma, he was not put on a flight to the Philippines on April 27 or

EXHIBIT B

April 28.

6.    On May 5, 2025, my client called me in the middle of the day to say that he was
scheduled to be interviewed by ICE. That night, around 7:00 p.m. Pacific Standard Time, my
client called me and said that two ICE officers informed him during his interview that he would
be removed to Libya. The officers at some point showed him a one-page document saying he
would be removed to Libya, which shocked my client. The officers said it would be the quickest
way for him to get out of custody. My client asked whether he had a choice, and the officers told
him that he did not. The officers then took the one-page document and said it would be in my
client's possessions, which would be returned to him once removed from the United States.

7.    To date, I have not received any notification from ICE regarding the decision to send my
client to Libya.

8.    On May 6, 2025, my client called me in the middle of the day to say that the money in his
commissary account had been "zeroed out," which usually occurs before someone is transferred
from the facility and/or prior to removal from the United States.

9.    On the evening of May 6, 2025, at around 6:00 p.m., I, along with another attorney at my
office, contacted the South Texas ICE Processing Facility by phone to request a copy of the
notice that my client had received informing him he would be removed to Libya and to request
that he be provided a reasonable fear interview. We were told by a front-line ICE officer that my
client's assigned DO was not present at the facility, and that he was unable to access complete
information about him on the computer system. He informed us, however, that there was no
notation that my client was scheduled to be removed to Libya. The officer claimed to be
surprised to hear that my client had been informed he would be removed to Libya and repeatedly
stressed that, because my client is Filipino, he should be removed to the Philippines. The officer

assured me that my client would not be removed to Libya or anywhere else before the following day (May 7), and said he was not scheduled for any "commercial" or "chartered" flight. He used the words "commercial" and "chartered."

10. Before and after this phone call on May 6, 2025, I sent a series of emails to ICE, which were filed with the Court on May 7, 2025.

11. On May 7, 2025, in the morning, I along with my colleague again contacted the South Texas ICE Processing Center. The officer we spoke with said that the South Texas facility had no control over my client's removal, and that those decisions were made by ICE in Tacoma. He stated that we needed to contact ICE in Tacoma to request a reasonable fear interview. He further informed me that my client was not scheduled for removal on May 7, 2025. He stated several times that he had no idea why our client was informed he would be removed to Libya, and that he was Filipino and set to be removed to the Philippines.

12. At this point, I emailed counsel in the instant matter to provide them an update as to my communications with ICE.

13. I, along with my colleague, then contacted the Tacoma ICE Processing Center and requested to speak to the officers assigned to my client's case. The officer we spoke with was not the officer assigned to my client. This officer was also shocked to hear that our client had been informed he would be removed to Libya. When we requested to speak to a supervisor and the officer assigned to my client given the emergency situation, the officer replied "I can assure you this is not an emergency because that emergency does not exist," referring to the potential of a flight to Libya. The officer then transferred the call to the officer assigned to my client, who did not answer the phone. We repeatedly attempted to contact the officer assigned to my client and the supervisor at the facility between 9:00 a.m. and 12:30 p.m. Pacific Standard Time but

received no response.

14. During this period of time, I emailed the Office of the Principal Legal Advisor in Tacoma, Washington, and asked (1) that my client be provided with a reasonable fear interview and (2) that I be provided notice of the decision to remove him to Libya. A true and correct copy of that email is attached hereto.

15. Just before 12:30 p.m. Pacific Standard Time on May 7, 2025, Supervisory Deportation and Detention Officer Garza from San Antonio ICE called me. He told me that he had received my emails and was looking into the situation. He stated that he had "no explanation" for what my client had been told and said something along the lines of "I cannot guarantee that did not happen" but that it "is not right and it makes no sense." Officer Garza then told me that he would give me another call, hopefully by the end of the day. I have not heard from Officer Garza since that time.

16. Several minutes before 1:00 p.m. on May 7, 2025, my client called me from the South Texas ICE Processing Center. He stated that he was woken up by officers at around 2 a.m. on May 7, 2025. Shortly thereafter, GEO Group Correctional Emergency Response Team (CERT) members dressed in full riot gear entered his pod and told him that he would be leaving in five minutes.

17. Between 2:40-2:50 a.m., the CERT Team members returned to transfer him and twelve other individuals out of his pod.

18. At one point, my client heard a GEO employee say, out loud, "Really, CERT?," as if in disbelief of the display of force.

19. The CERT Team took my client to the facility's intake space, where he was held for around thirty minutes to an hour.

Declaration of Johnny Sinodis          4          Case No. 1:25-cv-10676-BEM

20. The facility did not allow him to change into his regular clothes, which they normally would do when removing someone from the facility for any reason, including for a deportation flight. Instead, he and the twelve other individuals were processed out of the facility in jumpsuits.

21. My client states that one other individual is Mexican, and another is Bolivian. My client informed me that both of these individuals have removal orders to their home countries and had been told that their countries will accept them.

22. As to the Mexican national, my client told me that, after he was informed that he would be removed to Libya, he called the Mexican Consulate to explain what was happening. The Mexican consul responded that ICE could not send him to Libya.

23. During the process of being processed out of the facility, my client recognized that the two ICE officers who had interviewed him on Monday were present for his transfer.

24. My client's belongings were packed for him, as if the CERT Team and ICE officers were trying to move him out of the facility quickly.

25. My client asked one of the ICE officers if the group was still going to Libya and the officer said yes.

26. While being processed out of the facility, my client and the rest of the group were placed in shackles. The shackles were fixed around their ankles and waist.

27. My client was then placed on to a bus outside the facility with the twelve other members of the group. The bus resembled a school bus. It was all white and had an image of a bird on it.

28. My client observed that two people on the bus had logos that read "G4S." One of the characters in the logo is red. On information and belief, G4S is a British multinational private security firm.

29. When my client and the other individuals asked these G4S employees for information as to what was happening, the G4S employees said that they did not know and did not have any information.

30. On the bus, my client and the rest of the group remained shackled at the ankles and waist.

31. ICE officers did not board the bus with my client. Instead, ICE vehicles served as an escort for the bus.

32. My client states that the bus was driven to what appeared to be a military airport where a large military plane was waiting.

33. My client and the rest of the group were never taken off the bus. They remained on the bus, sitting next to the large military plane, for approximately three to four hours.

34. At some point in the morning, rather than being shuffled off the bus and onto the large military plane, the bus drove back to the South Texas ICE Processing Facility. My client says that they arrived back at the facility around 11:00 a.m. Central Standard Time on May 7.

35. My client and the rest of the group were taken off the bus and placed into the Special Housing Unit (SHU—also known as solitary confinement). Officers informed the group that they were not in trouble but that they could be held in SHU for twenty-four hours.

36. My client added that, if he had to interpret how the officers were acting once the bus returned to the facility, he would say they looked "peeved," as if they were disappointed by what was occurring.

37. My client has since been returned to the dorm where he was housed prior to being woken up abruptly and transferred out of the facility in the early morning hours of May 7. Nobody at the facility has communicated to my client whether they will attempt to remove him to Libya again or at any point in the future. I also have not received any further correspondence from ICE.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge.  Executed this 12th day of May 2025 at San Francisco, California.

_____
Johnny Sinodis
Declarant