## DECLARATION OF TIN THANH NGUYEN

I, Tin Thanh Nguyen, hereby declare as follows:

1. I am an attorney in private practice at the Law Office of Tin Thanh Nguyen, PLLC, which is located at 6769 Albermarle Rd, Suite B, Charlotte, NC 28212. I have personal knowledge of the matters stated herein.

2. I represent a person identified in the email correspondence filed on May 7, 2025, with the Court. Dkt. 90-2. I can confirm that my client has a final order of removal to Vietnam, which was issued by the San Francisco Immigration Court in May 2014. He has been reporting regularly to U.S. Immigration and Customs Enforcement (ICE) on an Order of Supervision since about July 2014.

3. The information in this declaration is based on telephone calls I had with my client on May 8 and May 9, 2025, in which he informed me about what had happened to him earlier in the week and also confirmed information I learned from attorneys and advocates who spoke to my client's partner on or about May 6 and May 7. I also directly spoke to his partner on May 7, 2025.

4. As background, my client is currently detained at the South Texas ICE Processing Center, a facility run by GEO Group. Immigration officers took him into custody when he appeared at a yearly ICE check-in in Los Angeles, California, on March 20, 2025. He spent a night in Los Angeles and then ICE transferred him to Adelanto Detention Center where he was detained for about three weeks. ICE then transferred him to Phoenix, Arizona via a van where he then took a flight to Seattle, WA so that ICE could pick up other detainees. Then ICE flew him to Texas and detained him in a county jail for 3-4 days before transporting him to San Antonio, Texas before finally arriving at the South Texas ICE Processing Center on or about April 18, 2025.

5. On Monday, May 5, 2025, ICE officers brought my client and approximately 22 other men to an office area within the South Texas ICE Processing Center, and then the men were brought into an office one by one to meet with approximately three immigration officers. My client believes he was the first of the men to be brought into the office. My client speaks some

English but does not understand technical and legal jargon and is not comfortable reading or writing in English. He was given a document, written only in English, which the officers told him would allow him to become a free man, but then they told him that he would be free in Libya. My client did not understand the form itself or how he could be free in a country that he knew nothing about and had no permission to reside in. As a result, he refused to sign the document. The ICE officers kept trying to convince him to sign the paper and told him that he would be deported to Libya no matter what he did. However, he never signed the paper. He still has the document. He was forced by ICE officers to sign another paper, which had his photograph and fingerprints on it, while he was handcuffed. They grabbed his hand and moved it with the pen so that he would sign the document. The officers never told him that he could raise a claim that he was afraid to go to Libya because he would be tortured there. He did not have a lawyer at this time.

6. After he continued to refuse to sign the document referencing deportation to Libya, the ICE officers handcuffed him and brought him into a different room, which appeared to be a medical office. He believes that they checked his blood pressure at this point. After all of the men had been interviewed, he was placed in solitary confinement for approximately 24 hours. He believes that some of the other men who did not sign the paperwork were also placed in solitary confinement after their interviews.

7. My client called his partner to inform her what had occurred. I learned about the situation after my client's partner contacted a community organization who contacted attorneys, including me. One of the attorneys attempted to schedule a time to meet with my client on May 7, 2025, at 7 pm CST, but was told by an administrator at 6 am on May 7 that he was no longer at the detention facility.

8. At approximately 2:30 am on May 7, 2025, my client was abruptly woken up by guards in camouflage tactical gear, who told him to put his hands through the food slot in the cell door and handcuffed him. The guards had on their backpacks and client said that they appeared like they were going to war. He, along with 12 other men, were placed in a containment cell together. They all remained in the detention center jumpsuits and their feet were shackled and hands

cuffed. My client believes he saw between 20 to 30 guards in riot gear, and there were about four officers involved with moving each person. He stated that the guards treated him roughly, like he was a military enemy or an animal. If any of the men spoke, the guards yelled aggressively at them to shut up.

9. My client and the other men were moved from the containment cell to a white bus with metal screens on the windows. There was a bus driver and one other individual on the bus with the men, neither of whom appeared to be wearing DHS uniforms.

10. Soon after they boarded the bus, the bus left the detention center and drove for what he believes was more than one hour. They arrived at a military base, which my client believes was Lackland Air Force Base in San Antonio. Throughout the base, there were people in military uniform and military vehicles. My client and the other men on the bus were silent; my client was extremely scared and unsure of what was happening.

11. The bus stopped next to a large airplane, which appeared large enough to transport tanks and military vehicles. The hatch or cargo door of the C-17 airplane was open so he could see military personnel loading the airplane. At some point, the bus moved to a different side of the airplane, and my client saw what appeared to be a military vehicle fueling up the airplane. In addition to the military personnel, my client also saw people, who he thinks were ICE officers, standing outside of the airplane and bus. Additionally, he saw someone setting up to take pictures near the plane.

12. Approximately 3 or 4 hours later, the bus left the military base and returned to the South Texas ICE Processing Center. My client and the other men were released from the bus in the same way that they boarded: with approximately 20 to 30 military soldiers in riot gear removing them from the bus. My client and the other men were brought to segregated cells in the detention center and left there for approximately 24 hours; while in the cells they could not talk to each other, make telephone calls, or shower. Subsequently, all of the men were released into another housing unit at the detention. At this point, they could again make telephone calls, and he contacted his partner to inform her what had happened to him.

13. On May 7, 2025, I submitted a notice of entry of appearance as counsel (Form G-28) electronically on behalf of my client and was able to speak with him about his experiences by telephone both after he returned to the detention facility on May 8 and 9 and via video conference on May 12.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 13th day of May 2025 at Charlotte, North Carolina.

_____
Tin Thanh Nguyen
Declarant

13. On May 7, 2025, I submitted a notice of entry of appearance as counsel (Form G-28) electronically on behalf of my client and was able to speak with him about his experiences by telephone both after he returned to the detention facility on May 8 and 9 and via video conference on May 12.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 13th day of May 2025 at Charlotte, North Carolina.

_____
Tin Thanh Nguyen
Declarant