# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity,<br><br>    Defendants. | Case No. 25-cv-10676-BEM |

**PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON BEHALF OF CLASS MEMBERS N.M. AND T.T.P. AND ALL OTHER SIMILARLY SITUATED CLASS MEMBERS**

## I. INTRODUCTION

Plaintiffs seek an emergency order enjoining Defendants from effectuating the removal of class members N.M. and T.T.P., and any other class member, to South Sudan because, prior to making them board a plane for removal to that country, Defendants failed to comply with this Court's Preliminary Injunction (PI), Dkts. 64, 86, 91. Specifically, with respect to class member N.M., Defendants failed to provide an opportunity for him to apply for protection under the United Nations Convention Against Torture (CAT) as to South Sudan. On information and belief, class member T.T.P. was denied the same opportunity. Although it should not be necessary, in light of Defendants' continued intransigence, *see* Dkt. 89, Plaintiffs seek also an emergency order reaffirming that Defendants may not remove N.M., T.T.P., or any other class member to a third country unless they comply with this Court's PI.

Last night N.M.'s attorneys were notified that the Department of Homeland Security (DHS) intended to remove him to South Sudan. *See* Exhibit 1, Declaration of Jacqueline Brown, Exhibit D (email to counsel); Exhibit E (notice provided to N.M.). N.M., a Burmese national with limited English proficiency, refused to sign the notice of removal to South Sudan which was provided to him only in English. *Id*. This morning, they learned from a detention officer via email that N.M. was removed this same morning to South Sudan. Exhibit F. As with the motion for temporary restraining order that Plaintiffs filed not even two weeks ago, on May 7th, Dkt. 89, and which this Court agreed ought to not be necessary, Dkt. 91 at 1, this motion should also not be required as it blatantly defies this Court's PI to remove class members without a reasonable fear screening and a 15-day opportunity to submit a motion to reopen after any negative reasonable fear determination. Earlier this morning, class counsel received notification of a second class member, T.T.P., a national of Vietnam, who appears to have suffered the same fate

1

as N.M., as well as information that there were likely at least 10 other class members on the plane to South Sudan. *See* Aldana Madrid Decl., Exhibit A.

Given that N.M., T.T.P., and other class members will be or have been removed to South Sudan in violation of the PI, Plaintiffs ask this Court for an immediate order ordering the immediate return of any class members removed to South Sudan. The Court should further restrain all flights carrying class members to South Sudan or any other third country until Defendants provide the Court and Class Counsel with evidence that Defendants have complied with all terms of the PI, including, but not limited to, evidence of written notices provided to class members' (and their counsel, if any) in their native language, written notice provided to class members (and their counsel, if any) on how to request and obtain a reasonable fear screening, notice of outcome of reasonable fear determinations, and evidence documenting that fifteen days have elapsed after any negative reasonable fear determination in which class members could file a motion to reopen with the immigration court.

As evidenced by the attached exhibits, class counsel sent Defendants' counsel two emails today informing them of the identities of N.M. and P.P.T. and informing them of the instant motion.

**II. STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY**

On March 23, 2025, Plaintiffs filed a Complaint, a Motion for Temporary Restraining Order and Preliminary Injunction and Stay of Administrative Action, and a Motion for Leave to Appear under Pseudonyms. *See* Dkt. 1; Dkt. 2-3; Dkt. 6–8.

On April 18, 2025, this Court granted Plaintiffs' motions for class certification and a preliminary injunction. Dkt. 64. The Court required Defendants to "provide written notice to the [class member]—and the [class member's] immigration counsel, if any—of the third country to

which the [class member] may be removed, in a language the [class member] can understand." *Id*. at 46 (footnotes omitted). Moreover, Defendants must "provide meaningful opportunity" for the class member to raise a fear of return prior to any such removal, including the opportunity to demonstrate a reasonable fear of removal and a minimum of 15 days to move to reopen, even if the individual does not establish a reasonable fear. *Id*. at 46-47.

On May 7, 2025, after media reports and reports from immigration attorneys indicated that Defendants were seeking to deport class members to Libya and Saudia Arabia, Plaintiffs filed an emergency motion for a TRO with the evidence that it had gathered by the time of filing. *See* Dkt. 89. After the Court clarified its PI order, *see* Dkt. 91 at 2, Plaintiffs received further information that N.M. was a class member and among the thirteen men Defendants attempted to deport to Libya. *Cf.* Dkt. 99-4 (confirming the nationalities and dates of final removal orders for at a minimum of eleven of the men); Declaration of Jacqueline Brown.[1] The men were not provided the notice and opportunity to seek CAT protection required by the PI. Dkt. 99-2 ¶¶ 6-7; Dkt. 99-3 ¶¶ 5-6. The men were ultimately transported back to an immigration detention center after remaining on a bus on the base's tarmac for three or four hours. Dkt. 99-2 ¶¶ 33-34; Dkt. 99-3 ¶ 12.

Class member N.M. is originally from Myanmar. He speaks very limited English, and his best language is Karen. He received a final order of removal from the Omaha, Nebraska Immigration Court in August 2023. On May 17, 2025 at 4:49 PM CT, Johnathan Ryan, one of the immigration attorneys for N.M., received a notification via ICE's e-File Portal that N.M. had been transferred to the Port Isabel Detention Center, in Port Isabel, Texas. On May 19, 2025, at

---

[1]   Ms. Brown's declaration accompanies this motion as Exhibit 1 and includes as attachments (exhibits) communications pertaining to class member N.M. Both the declaration and the attachments support the facts in this motion related to N.M. Additional citations to the declaration are not provided as this motion is filed on an emergency basis.

3

4:44 CT, Mr. Ryan received an email from a Supervisory Detention and Deportation Officer at the Harlingen Field Office, Port Isabel Detention Center providing a document that the officer alleged had been served on N.M. The document stated that it was a "Notice of Removal" to inform N.M. that ICE intended to remove him to South Africa. The certificate of service stated that the contents of the notice were read to N.M. in English without an interpreter at 10:59 and that N.M. refused to sign the document. N.M. has limited English proficiency. Approximately ten minutes later he received a notification that the sender sought to recall the email message attaching the notice of removal to South Africa.

Then, at 6:35 PM CT, Mr. Ryan received a second email from the Supervisory Detention and Deportation Officer, providing a document that the officer alleged had been served on N.M. The attachment, utilizing the same form as was used for the notice to South Africa, stated that it was a "Notice of Removal" to inform N.M. that ICE intended to remove him to *South Sudan*. The certificate of service stated that the contents of the notice were read to N.M. in English without an interpreter at "1748" and that N.M. refused to sign the document. N.M. has limited English proficiency.

On the evening of May 19, 2025, Ms. Brown contacted Plaintiffs' counsel to inform them that N.M. received the notice of removal to South Sudan and that she intended to meet with N.M. at 9 a.m. CT the next day (May 20). The next morning (today, May 20), Ms. Brown emailed the Port Isabel Detention Center Law Visit email address to confirm whether N.M. was located at the facility because he no longer appeared in the ICE detainee locator. At 8:27 AM PT, a Port Isabel Detention Center Detention Officer responded that N.M. had been removed "this morning." Ms. Brown emailed to ask to which country N.M. was removed, and the officer responded, at 8:36 AM PT, "South Sudan."

4

After learning the news from N.M.'s counsel on the morning of May 20, 2025, Plaintiffs' Counsel asked Defendants to request a halt to N.M.'s deportation and/or return him to the United States. *See* Exhibit X, emails between counsel (May 20, 2025). Following this communication, Plaintiffs' Counsel also received a report regarding another individual, T.T.P., a national of Vietnam and also likely a class member who is or was on the same flight as N.M. *See* Exhibit 3, Aldana Madrid Dec. and attachments. Plaintiffs' counsel subsequently alerted Defendants' counsel of T.T.P.

### III. ARGUMENT

To obtain temporary and preliminary injunctive relief, Plaintiffs must demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Brox v. Hole*, 83 F.4th 87, 91 (1st Cir. 2023). Irreparable harm and likelihood of success are the factors that "weigh heaviest in the analysis." *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010). When the government is a party, the balance of equities and public interest merge. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021); *Nken v. Holder*, 556 U.S. 418, 435 (2009). The TRO is requested to preserve the status quo and ensure the protections provided by the PI. Thus, it does not qualify as a mandatory injunction. However, even if it were considered a mandatory injunction Plaintiffs satisfy that standard as "[w]hether a mandatory preliminary injunction should issue typically depends on the exigencies of the situation, taking into account [the] four familiar factors" under the *Winters* test. *W. Holding Co., Inc. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014).

**Plaintiffs Satisfy the Requirements for a TRO.**

**A.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

**1. Defendants forced N.M., T.T.P., and other class members to board the removal flight to South Sudan in violation of this Court's Preliminary Injunction.**

Plaintiffs are likely to prevail on their allegations that Defendants' flight removing class member N.M., T.T.P., and likely other class members, violate the Court's PI as Defendants, at a minimum, 1) failed to provide a meaningful opportunity to request and obtain a reasonable fear screening, the first step to being able to apply for CAT protection; and 2) failed to provide written determinations of the outcome of any reasonable fear screening, thus denying an opportunity for N.M., T.T.P., and any other class members to submit motions to reopen with the immigration court within 15 days of any negative reasonable fear determination.[2]

Class counsel has received a copy of the Notice of Removal issued to N.M. notifying him of DHS' intention to remove him to South Sudan. Exhibit 1. This notice fails to comply with this Court's order as it provides no instructions as to the process to obtain a reasonable fear interview and is only in English (class member N.M. has limited English proficiency), *see* Exhibit 1. T.T.P. and other class members likely received similarly deficient notices..

This Court already has held that Defendants' failure to provide notice and a meaningful opportunity to apply for CAT protection violates class members' statutory and regulatory rights as well as their Due Process rights. *See* Dkt. 64. Similarly, this Court found it necessary to modify the PI to ensure that Defendants did not seek to elude their obligations by arranging for other agencies to effectuate removals to third countries from Guantánamo Bay, Dkt. 86, and to enjoin an imminent removal of class members to Libya that would have violated the PI, Dkt. 91

---

[2]     Because the circumstances surrounding the removal of any other potential class members are unknown to class counsel at this time, it is also possible that Defendants also failed to provide written notice of the third country removal in their native language (and failed to provide counsel written notice for those class members with immigration counsel).

6

("If there is any doubt—the Court sees none—the allegedly imminent removals, as reported by news agencies and as Plaintiffs seek to corroborate with class-member accounts and public information, would clearly violate this Court's Order.").

Accordingly, any third country removal to South Sudan (or any other country), that fails to comply with the terms laid out by this Court's PI is unlawful.

**2.    Class members N.M. and T.T. P. have demonstrated that they did not receive notice or an opportunity to be heard prior to removal to South Sudan.**

Class members N.M. and T.T.P. did not receive sufficient notice of their imminent deportation to South Sudan, nor any opportunity to seek CAT protection. The notice allegedly provided to N.M., of which he did not acknowledge receipt, was provided less than twenty-four hours before his immigration counsel was informed that he already had been removed to South Sudan. Moreover, it was provided exclusively in English, although N.M.'s proficiency in English is limited and he refused to sign. Class member T.T.P. also refused to sign. Finally, the notice includes *no* information about whether or how he could seek protection based on fear of deportation to South Sudan, a country currently experiencing civil war and which Defendants themselves have designated for Temporary Protected Status. *See infa* Section II. As the Supreme Court recently stated, "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *A.A.R.P. v. Trump*, No. 24a-1007, slip. op. at 4 (May 16, 2025). Likewise, being told that a person is being deported as they are being placed on a bus carrying out deportation "does not pass muster." *Id.*

Because class members N.M. and T.T.P. have established that DHS did not provide them with notice or the opportunity to present a claim for CAT protection, Plaintiffs ask this Court to order that Defendants immediately halt their deportations (and the deportations of similarly situated class members) or, to the extent they already have been deported, to facilitate the

7

immediate return to the United States of N.M. and T.T.P. and any similarly situated class members.

Plaintiffs request the same for all other class members similarly situated: who have been deported to South Sudan and/or are facing imminent deportation to South Sudan (or any other country) without meaningful notice and opportunity to seek CAT protection.

### 3. This Court has authority to order the return of N.M., T.T.P., and any other class member.

Given that the plane carrying N.M., T.T.P., and any other class member has likely departed the United States, this Court has the authority to order their return and that of any other class members as part of its inherent equitable authority. *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."); *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (holding that courts' authority would be "entirely inadequate to the purposes for which it was conferred by the Constitution" if they did not have the power to enforce their judgments). The Court's equitable authority is especially strong here, where N.M., and likely T.T.P. and other class members, were wrongfully deported without an opportunity to seek protection from deportation to South Sudan, in violation of this Court's PI.

Courts routinely order return, or the facilitation of return, of individuals wrongly removed. *See Arce v. United States*, 899 F.3d 796, 799 (9th Cir. 2018) (describing unlawful deportation in violation of judicial stay and later return pursuant to court order); *Nunez-Vasquez v. Barr*, 965 F.3d 272, 286 (4th Cir. 2020) ("[W]e are ordering Nunez-Vasquez's return because his presence is necessary to effectuate judicial relief" (internal quotations omitted)); *Orabi v. Att'y Gen.*, 738 F.3d 535, 543 (3d Cir. 2014) (granting petition for review and ordering return); *cf. Samirah v. Holder*, 627 F.3d 652, 665 (7th Cir. 2010) (ordering return to allow individual to

pursue pending application to adjust status); *Umba v. Garland*, No. 19-9513, 2021 WL 3414104, at *10 n.2 (10th Cir. Aug. 5, 2021).[3] In many other cases, where DHS initially refused to facilitate return, the agency did so after a complaint was filed in district court.[4] If the flight on which class members are being removed is still in the air, this Court has the authority to order its return to the United States. *See e.g.* Memorandum Opinion re: 80 Probable Cause Order at 8, J.G.G. V. Trump, No. 1:25-cv-00766 (D.D.C. Apr. 16, 2025) (documenting the issuance of a verbal order requiring return).

Returning persons unlawfully deported is also in keeping with Congressional instruction that DHS agencies "shall leverage all mechanisms provided by current law to facilitate the return to the United States of those whose removal was contrary to law, whose removal order has since been overturned or reopened by judicial order, where the return of an individual would correct an

---

[3]  *See also* Dkt. 59-17 at 1 (*Turnbull v. Ridge*, No. 1:04-cv-392 (E.D. Ohio Apr. 22, 2004)) (ordering return "forthwith" after "willful[] and surreptitious[]" removal); Dkt. 59-1 (*Guerra-Castaneda v. Garland*, No. 19-1736 (1st Cir. Sept. 14 & Sept. 19, 2019)) (ordering "all necessary inquiries" regarding efforts to return an individual after deportation in violation of a stay); Dkt. 59-2 (*Paye v. Garland*, No. 23-1426 (1st Cir. July 17, 2024)) (instructing DHS to immediately locate petitioner and make efforts to return him to the United States "forthwith"); Dkt. 59-3 (*W.G.A. v. Sessions*, No. 16-4193 (7th Cir. Mar. 19, 2018)) (granting stay that becomes effective on "reentry to the United States pending resolution of [the] petition for review"); Dkt. 59-4 (*Herrera-Meza v. Sessions*, No. 18-70117 (9th Cir. Sept. 18, 2018)) (granting a late motion to reconsider a judicial-stay denial and ordering individual's return to restore status prior to deportation); Dkt. 59-5 (*Rodriguez Sutuc v. Att'y Gen.*, No. 15-2425 (3d Cir. June 19, 2015)) (ordering immediate return of mother and daughter seeking asylum whom DHS deported before the court could act on the stay); Dkt. 59-6 (*H.I.L. v. Barr*, No. 19-3053 (2d Cir. Oct. 2, 2019)) (requiring DHS to report on its efforts to return the individual to the United States); Dkt. 59-7 (*Ramirez-Chavez v. Holder*, No. 11-72297 (9th Cir. Apr. 10, 2012)) (directing DHS to locate and return petitioner in order to enforce order granting stay of removal); Dkt. 59-8 (*Singh v. Att'y Gen.*, No. 15-10136 (11th Cir. July 2, 2015)) (instructing DHS to locate petitioner and advise him of his "right pursuant to this Court's stay of removal to be returned to the United States").
[4]  *See, e.g.*, *Fedoshchuk v. CBP*, No. 23-cv-089210-ODW-SK (C.D. Cal., filed Oct. 23, 2023); *Apostolov v. DHS*, No. 19-cv-01309 (C.D. Cal., filed July 2, 2019); *Balthazar v. Nielsen*, No. 18-cv-10590-RWZ (D. Mass., filed Mar. 27, 2018); *Nicio Lopez v. Sessions*, No. 18-cv-5397 (N.D. Cal., filed Aug. 31, 2018); *Previl v. DHS*, No. 1:13-cv-23230-MGC (S.D. Fla., filed Sept. 6, 2013); *Hairo Garcia v. DHS*, No. 12-0354 (M.D. Tenn., filed Apr. 5, 2012); *Alcaraz v. Napolitano*, No. 11-3716 (N.D. Cal., filed July 29, 2011).

error or assist in an ongoing criminal or any other federal, state, tribal, or territorial investigation." Joint Explanatory Statement accompanying Div. F, FY 2022 Consol. Appropriations Act, Pub. L. No. 117-103 (Mar. 15, 2022), available at 168 Cong. Rec. H2402 (Mar. 9, 2022); *see also* ICE Policy Directive No. 11061.1, § 1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012), perma.cc/95AT-VN72, https://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return.pdf.

      Here, DHS deported N.M., T.T.P., and other class members without providing adequate notice of deportation to a third country nor any opportunity to express a fear of persecution. In this situation, granting a preliminary injunction ordering return is similarly warranted. Defendants' failure to provide class members a meaningful opportunity to assert fear is flatly contrary to their own repeated representations to the Supreme Court regarding what due process requires in a situation like this, as well as the specific protections this Court outlined in its preliminary injunction order. *See, e.g.*, Dkt. 64 at 46-47; Transcript of Oral Argument at 32–33, *Riley v. Bondi*, No. 23-1270 (S. Ct. Mar. 24, 2025); Transcript of Oral Argument at 20–21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) (No. 19-897).

      This right to due process and to simply receive an opportunity to apply for the protection federal law provides is one the Supreme Court has strongly affirmed in similar contexts, even in recent days. *See A.A.R.P. v. Trump*, No. 24A1007, 2025 WL 1417281, at *2 (U.S. May 16, 2025) (explaining that due process requires adequate notice and time to assert a claim in the context of removal). Return is imminently reasonable—and necessary—in such a situation, as the Supreme Court recognized in recent weeks. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (holding that district court "properly" required government to facilitate return where individual

was deported in violation of withholding of removal protections); *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112 (4th Cir. Apr. 17, 2025) (denying government request for stay pending appeal and reaffirming government must actively seek return of erroneously deported noncitizen, especially given the mistakes in the noncitizen's removal); Order Granting 227 Motion to Enforce Judgment, *J.O.P. v. DHS*, No. 8:19-CV-01944-SAG (D. Md. Apr. 23, 2025), ECF 254.

Preliminary injunctive relief is necessary to ensure Defendants do not unilaterally reject their obligations to N.M. and T.T.P. with respect to CAT protections. *See Lopez-Angel v. Barr*, 946 F.3d 527, 530 (9th Cir. 2019) (describing agency interpretation that would allow one party to unilaterally control proceedings as "strange" because "[i]t is unnatural to speak of one litigant withdrawing another's motion" (quoting *Marin-Rodriguez v. Holder*, 612 F.3d 591, 593 (7th Cir. 2010))); *Luna v. Holder*, 637 F.3d 85, 99-100 (2d Cir. 2011) (rejecting agency interpretation that could render a statutory right "'subject to manipulation' by the Government" (quoting *Boumediene v. Bush*, 553 U.S. 723, 765-66 (2008))); *Madrigal v. Holder*, 572 F.3d 239, 245 (6th Cir. 2009) ("To allow the government to cut off Madrigal's statutory right to appeal an adverse decision, in this manner, simply by removing her before a stay can be issued or a ruling on the merits can be obtained, strikes us as a perversion of the administrative process."); *cf. Boumediene*, 553 U.S. at 765-66 (rejecting argument that could allow the government to "manipulat[e]" "[t]he test for determining the scope of [the habeas corpus] provision"); *Kucana v. Holder*, 558 U.S. 233, 237 (2010) (holding that, absent a clear statement to the contrary, statutes should not be read "to place in executive hands authority to remove cases from the Judiciary's domain.")

B.  **Plaintiffs Are Able to Demonstrate Irreparable Harm Absent Emergency Injunctive Relief.**

11

The world's youngest country, South Sudan descended into civil war just two years after its independence in 2011. A 2018 peace deal, long flawed, finally collapsed this week, with the result that Defendants are flying N.M. into a country that is now returning to full-blown and catastrophic civil war.  Florence Miettaux, "*'They Came for Us, to Take our Shelters and Kill Us:' How Violence Returned to a Shattered South Sudan*," The Guardian, May 16, 2025.

Conditions in South Sudan have long been poor and dangerous even for the South Sudanese: the country is the source of one of the most significant refugee crises on the African continent, with 2.3 million of its own nationals currently refugees or asylum seekers in neighboring countries and an additional two million internally displaced. United Nations High Commissioner for Refugees, *South Sudan: Global Appeal 2025 situation overview* (Nov. 2011), https://reporting.unhcr.org/sites/default/files/2024-11/South%20Sudan%20Situation%20Overview.pdf. Protracted displacement in South Sudan "has been fueled by a prolonged civil war, compounded by food insecurity, climate change and large return movements from the crisis in Sudan," whose own bloody and ongoing civil war has driven 640,000 South Sudanese to flee back to South Sudan between April 2023 and October 2024. *Id.* South Sudan also hosts refugee populations, but these are from other African countries: primarily neighboring Sudan but also some from Ethiopia, the Democratic Republic of the Congo, Eritrea, the Central African Republic, Burundi, and Somalia. U.S. Dep't of State, *2023 Country Reports on Human Rights Practices: Sudan* at 30.

The United Nations Mission in South Sudan has documented numerous human rights violations there including "the killing, injuring and abducting of civilians, conflict-related sexual violence, arbitrary arrests and detention, extrajudicial executions and restrictions to fundamental freedoms. UNHCR, *Position on Returns to South Sudan—Update IV* at 7 (May 2024),

12

https://www.refworld.org/policy/countrypos/unhcr/2024/en/147589. "Across the country, governmental authorities use summary executions to punish persons accused of being involved in violent activities or of committing crimes," with a spike in extrajudicial executions in Warrap State in 2022. *Id.* at 7-8. Armed actors, including government forces "have beheaded civilians and burned homes while men, women, and children remained inside." *Id.* at 8. South Sudan's National Security Service (NSS), the country's intelligence agency, effectively operates outside the law, maintaining its own detention facilities separate from the National Prison Service where "detainees are subjected to torture and ill-treatment and kept in poor conditions. *Id.*; U.S. Dep't of State, *2023 Country Reports on Human Rights Practices: Sudan* 9. Based on these conditions, the UNHCR continues to call on States to refrain from forcibly returning South Sudanese nationals or habitual residents of South Sudan to any part of that country.  UNHCR, *Position on Returns to South Sudan—Update IV* 15 (May 2024).

      Over the past two months, in response to armed attacks by non-governmental forces, the South Sudanese government has intensified its aerial bombardment of Upper Nile State using improvised incendiary weapons that have killed and horribly burned civilians, including children, and destroyed civilian infrastructure. Human Rights Watch, *South Sudan: Incendiary Bombs Burn, Kill Civilians* (Apr. 9, 2025), https://www.hrw.org/news/2025/04/09/south-sudan-incendiary-bombs-kill-burn-civilians. As of today, the 2018 peace agreement that was supposed to have ended South Sudan's five-year civil war "has now totally collapsed," as the government of President Salva Kiir has arrested opposition leader and First Vice President Riek Machar and bombed the bases of Machar's SPLM-IO movement around the country. Augustine Passilly and Mamar Abraham, *"Army Barrel Bombs Spark Exodus as South Sudan Peace Deal Crumbles,"*

13

The New Humanitarian, May 20, 2025, https://www.thenewhumanitarian.org/news-feature/2025/05/20/army-barrel-bombs-spark-exodus-south-sudan-peace-deal-crumbles.

As a result, any Class Member who is removed to South Sudan faces a strong likelihood of irreparable harm.

C. **The Balance of Hardships and Public Interest Weigh Heavily in N.M.'s and T.T.P.'s Favor.**

The final two factors for a preliminary injunction—the balance of hardships and public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, N.M. and T.T.P. face weighty hardships: deprivation of statutory rights to protection, and removal to a country where he is likely to face imprisonment, torture or even death. "[T]he balance of hardships tips decidedly in plaintiffs' favor" when "[f]aced with such a conflict between financial concerns and preventable human suffering." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

This Court has already held that Defendants' failure to provide notice and a meaningful opportunity to apply for protection under CAT violates Class Members' statutory and regulatory rights as well as their Due Process rights. *See* Dkt. 64; *see also* Dkt. 91. And it is always in the public interest to enforce the law. Because Defendants' policy and practice "is inconsistent with federal law, . . . the balance of hardships and public interest factors weigh in favor of a preliminary injunction." *Moreno Galvez v. Cuccinelli*, 387 F. Supp. 3d 1208, 1218 (W.D. Wash. 2019) (*Moreno I*); *see also Moreno Galvez*, 52 F.4th at 831–32 (affirming in part permanent injunction issued in *Moreno II* and quoting approvingly district judge's declaration that "it is clear that neither equity nor the public's interest are furthered by allowing violations of federal law to continue"). This is because "it would not be equitable or in the public's interest to allow

14

the [government] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (citation omitted).

Accordingly, the balance of hardships and the public interest overwhelmingly favor injunctive relief to ensure that Defendants comply with federal law, this Court's ruling, and honor N.M. and T.T.P.'s statutory and constitutional rights.

## IV. CONCLUSION

Plaintiffs respectfully ask this Court to enjoin and restrain Defendants from removing, and if necessary, to order the immediately return of N.M., T.T.P., and all other similarly situated class members to South Sudan (and any other third country) until Defendants provide the Court and class counsel with evidence that Defendants have complied with all terms of the preliminary injunction, Dkt. Nos. 64 and 86. *See* Proposed Order.

Respectfully submitted,

s/*Trina Realmuto*

Trina Realmuto*
Kristin Macleod-Ball*
Mary Kenney*
Tomas Arango
**NATIONAL IMMIGRATION
   LITIGATION ALLIANCE**
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4649
trina@immigrationlitigation.org

Anwen Hughes*
**HUMAN RIGHTS FIRST**
75 Broad Street, 31st Floor
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

Matt Adams*
Leila Kang*
Aaron Korthuis*
Glenda M. Aldana Madrid*
**NORTHWEST IMMIGRANT
   RIGHTS PROJECT**
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org

*Attorneys for Plaintiffs*

15

\* *Application for admission pro hac vice forthcoming*

Dated: May 20, 2025

# CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

 s/ *Trina Realmuto*
Trina Realmuto

DATED: May 20, 2025