# South Sudan 2023 Human Rights Report

## Executive Summary

There were no changes in the human rights situation in South Sudan during the year.

Significant human rights issues included credible reports of: arbitrary or unlawful killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces, opposition forces, armed militias affiliated with the government and the opposition, and ethnically based groups; harsh and life-threatening prison conditions; arbitrary detention; serious problems with the independence of the judiciary; political prisoners or detainees; transnational repression against individuals in other countries; arbitrary or unlawful interference with privacy; serious abuses in a conflict, including unlawful civilian deaths, enforced disappearances or abductions, torture, physical abuses, and conflict-related sexual violence or punishment; unlawful recruitment or use of children in armed conflict by the government and nongovernment armed groups; serious restrictions on freedom of expression and media freedom, including violence against journalists, unjustified arrests or prosecutions of journalists, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive

laws on the organization, funding, or operation of nongovernmental and civil society organizations; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government corruption; serious government restrictions on or harassment of domestic and international human rights organizations; extensive gender-based violence, including domestic or intimate partner violence, child, early, and forced marriage, female genital mutilation/cutting, and other forms of gender-based violence; trafficking in persons, including forced labor; laws criminalizing consensual same-sex sexual conduct between adults, although these laws were largely not enforced; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; and existence of any of the worst forms of child labor.

The government did not take credible steps to identify and punish officials who may have committed human rights abuses, despite isolated examples of prosecution for human rights abuses.

Nongovernment armed groups, including the forces of peace-agreement signatories and other opposition armed groups alike, perpetrated serious human rights abuses, which, according to the UN Commission on Human Rights in South Sudan, included unlawful killings, abduction, rape, sexual slavery, and forced recruitment of children and adults into combat and noncombat roles.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were numerous reports that the government or its agents committed arbitrary or unlawful killings, including extrajudicial killings, during the year. Security forces, opposition forces, armed militias affiliated with the government and the opposition, and ethnically based groups were responsible for widespread extrajudicial killings. The security services sometimes investigated alleged abuses by members of their respective forces, although impunity remained endemic and prosecutions were infrequent.

According to a Small Arms Survey report, the governor of Warrap State, Manhiem Bol Malek, was responsible for approximately 20 extrajudicial killings during the year. The report stated that members of the South Sudan People's Defense Forces (SSPDF) extrajudicially killed a man on September 23 for a crime he allegedly committed on September 18.

In January armed youth from the White Army, composed of ethnic Lou Nuer and Bor Dinka groups, assaulted Murle villages in the Greater Pibor Administrative Area (GPAA), resulting in the abduction and deaths of Murle women and children. The assailants reportedly targeted Gumuruk and

Lekyangole in GPAA in response to intermittent raids that also included abductions at Lou Nuer and Bor Dinka villages by armed Murle youth.  The Jonglei State governor reportedly organized the rescue of some women and children, reuniting them with their families.  Health facilities, civilian property, and humanitarian warehouses were looted and destroyed.  The state and national governments had not arrested any perpetrators of the attacks by year's end.

On February 2, at least 27 persons were killed in Kajo-Keji County, Central Equatoria State, when members of a Bor Dinka clan launched a revenge attack on villages they accused of attacking cattle camps and killing humans and animals.  President Kiir condemned the raid and appointed a committee to investigate the incident.  The committee had not published its findings, and no one had been held accountable by year's end.

In January the UN Panel of Experts collected testimony of apparent extrajudicial killings in Lakes State, including the killing of a local chief.  The UN reported an increase in the number of extrajudicial killings and unlawful detentions in Lakes State under Governor Rin Tueny Mabor, whose strategy encouraged local officials to use lethal force and the death penalty to subdue violence.  Some local county commissioners considered this strategy an endorsement of extrajudicial killings.

## b. Disappearance

There were reports of disappearances by or on behalf of government authorities.

Security and opposition forces, armed militias affiliated with the government or the opposition, and ethnically based groups abducted an unknown number of persons, including women and children.

In August the International Committee of the Red Cross reported it tracked more than 5,900 cases of missing persons since the conflict began.

The government did not make efforts to prevent, investigate, and punish disappearances.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Although prohibited under law, security forces mutilated, tortured, beat, and harassed political opponents, journalists, and human rights activists. Government and opposition forces, armed militia groups affiliated with both, and fighting ethnic groups committed torture and abuses in conflict zones.

According to the UN Security Council Panel of Experts and several independent human rights advocates, the National Security Service (NSS)

Operations Division maintained at least three facilities where it detained, interrogated, and sometimes tortured civilians. At least one detainee reportedly died due to injuries sustained in NSS detention. Most NSS facilities were not publicly known. According to the panel, there were numerous reported abuses at NSS-run sites, including gender-based violence, beating and torture of detainees, and harassment and intimidation of human rights defenders and humanitarian workers. The Small Arms Survey documented that International Monetary Fund assistance to the transitional government went to pay NSS salaries. Human Rights Watch, the United Nations, and other organizations documented cases of torture and other mistreatment during arrest and while in NSS custody. Detainees described being beaten with sticks, whips, pipes, and wires; subjected to electric shocks; burned with melted plastic; raped; and subjected to other forms of sexual violence.

Impunity within the security services remained a serious problem. Although the NSS created an internal disciplinary tribunal to conduct investigations of alleged abuses by its members, neither the results of such investigations nor any disciplinary actions taken were made public. The UN Commission on Human Rights in South Sudan reported the existence of police special protection units to investigate gender-based violence, operating with financial and logistical support from the United Nations. Some members of the army and police were investigated for misconduct.

## Prison and Detention Center Conditions

Prison conditions were harsh and life threatening.  Overcrowding and inadequate medical care at times resulted in illness and death.  There were reports of abuse by prison guards.

**Abusive Physical Conditions:**  Significant prison problems included gross overcrowding and inadequate access to food, potable water, sanitation, heating, ventilation, lighting, or medical care.  Authorities sometimes kept prisoners confined in cells for long periods without an opportunity for movement, exercise, or use of showers or sanitary facilities.

**Administration:**  The South Sudan National Police Service (SSNPS) allowed prisoners to submit complaints to judicial authorities without censorship and to request investigation of allegations of inhuman conditions.  Prison authorities sometimes investigated such allegations, although they seldom acted on complaints.

**Independent Monitoring:**  The SSNPS and National Prison Service of South Sudan permitted visits to police and prison detention facilities by independent human rights observers.  Authorities sometimes permitted monitors to visit military detention facilities operated by the SSPDF.  International monitors were denied permission to visit facilities operated by the NSS, which held both military prisoners and civilians without legal authority.

# d. Arbitrary Arrest or Detention

The transitional constitution prohibited arbitrary arrest and detention and provided the right of any person to challenge the lawfulness of their arrest or detention in court. The government did not observe these requirements.

## Arrest Procedures and Treatment of Detainees

While the law required police to present arrested persons before a public prosecutor, magistrate, or court within 24 hours, judges assigned to statutory courts were not always present, and poor coordination with other justice officials contributed to case backlogs. Court dockets often were overwhelmed, and cases faced long delays before coming before a judge. Police could detain individuals for 24 hours without charge. A public prosecutor could authorize an extension of up to one week, and a magistrate could authorize extensions of up to two weeks. Authorities did not always inform detainees of charges against them and regularly held them past the statutory limit without explanation. Police sometimes ignored court orders to take arrested persons before the court. Police, prosecutors, defense lawyers, and judges were often unaware of the statutory requirement that detainees appear before a judge as quickly as possible. The UN Mission in South Sudan (UNMISS) reported cases taking months or even years to be brought to court.

Police commonly conducted arrests without warrants, and warrants were

often irregular, handwritten documents. Warrants were commonly drafted in the absence of investigation or evidence. There were multiple reports of arrests, including of foreigners, in civil cases where a complainant exerted influence upon police to arrest someone as a negotiation tactic. The government routinely failed to notify embassies when detaining citizens of other countries, even when the detainee requested a consular visit.

According to Human Rights Watch, the NSS effectively operated outside the law and without proper legal authority. Detainees were held at sites not designated as detention facilities under the law. They did not conduct arrests based on warrants or court orders and routinely held detainees for long periods without charge and without access to lawyers or visitors. Detention periods lasted from hours to years.

The law allowed bail, but this provision was widely unknown or ignored by authorities, and they rarely informed detainees of this possibility. Because pretrial appearances before judges often were delayed far past statutory limits, authorities rarely had the opportunity to adjudicate bail requests before trial. Those arrested had a right to an attorney, but the country had few lawyers, and detainees were rarely informed of this right. The transitional constitution mandated access to legal representation without charge for the indigent, but defendants rarely received legal assistance if they did not pay for it. Authorities sometimes held detainees incommunicado.

**Arbitrary Arrest:**  Security forces arbitrarily arrested opposition leaders, civil society activists, businesspersons, journalists, and other civilians due to possible affiliation with opposition forces.  Many citizens were arbitrarily arrested for being in the vicinity when crimes occurred, being of a certain ethnicity, or being relatives of suspects.

**Pretrial Detention:**  Lengthy pretrial detention was a problem, due largely to the lack of lawyers and judges; the difficulty of locating witnesses; misunderstanding of constitutional and legal requirements by police, prosecutors, and judges; and the absence of a strong mechanism to compel witness attendance in court.  The length of pretrial detention commonly equaled or exceeded the sentence for the alleged crime.

## e. Denial of Fair Public Trial

The transitional constitution provided for an independent judiciary and recognized customary law.  The government did not generally respect judicial independence and impartiality.  While the law required the government to maintain courts at federal, state, and county levels, lack of infrastructure and trained personnel made this impossible, and few statutory courts existed below the state level.  The formal justice sector remained weak and concentrated in a few urban centers.

In many communities, customary courts remained the principal providers of judicial services, adjudicating most criminal cases other than murder.

Customary courts could deal with certain aspects of murder cases if judges remitted the cases to them.  Government courts heard cases of violent crime and acted as appellate courts for verdicts issued by customary bodies. Legal systems employed by customary courts varied, with most emphasizing restorative dispute resolution and some borrowing elements of sharia (Islamic law).

During the year, the United Nations supported a joint special mobile court with South Sudanese professionals to adjudicate serious crimes and mitigate cattle-migration-related violence in Western Bahr el-Ghazal State.  The courts included traditional leaders and addressed compensation claims according to local customs.  During the year, the United Nations continued to support civilian and military mobile courts, trying rape, robbery, and assault cases, among others, in Upper Nile, Western Bahr el-Ghazal, and Central Equatoria States.

Political pressure, corruption, discrimination toward women, and the lack of a competent investigative police service undermined both statutory and customary courts.  Patronage priorities or political allegiances of traditional elders or chiefs commonly influenced verdicts in customary courts.

## Trial Procedures

The transitional constitution provided for the right to a fair and public trial, but the judiciary generally did not enforce this right.

Despite protections provided under the transitional constitution, law enforcement officers and statutory and customary court authorities commonly presumed suspects' guilt, and suspects faced serious infringements of their rights.  Free interpretation was rarely offered, and when it was, it was of low quality.  Most detainees were not promptly informed of the charges against them.  Prolonged detentions often occurred, and defendants generally did not have adequate access to facilities to prepare a defense.  While court dates were set without regard for providing adequate time to prepare a defense, long remands often meant detainees with access to a lawyer had sufficient time to prepare. Magistrates frequently compelled defendants to testify, and the absence of lawyers at many judicial proceedings often left defendants without recourse.

Public trials were the norm both in customary courts, which usually took place outdoors, and in statutory courts.  Some high-level court officials opposed media access to courts and asserted media should not comment on pending cases.  The right to be present at trial and to confront witnesses was sometimes respected, but in statutory courts, the difficulty of summoning witnesses often precluded exercise of these rights.  No government legal aid structure existed.

Defendants did not necessarily have access to counsel or the right of appeal, and discrimination against women was common.

Defendants accused of crimes against the state were usually denied these rights.

## Political Prisoners and Detainees

There were reports of political prisoners and detainees held by authorities from a few hours to several weeks without access to a judge or clearly spelled out charges.  The number of political prisoners was unknown.

# f. Transnational Repression

**Extraterritorial Killing, Kidnapping, Forced Returns, or Other Violence or Threats of Violence:**  There were credible reports of persons killed and kidnapped in other countries, and persons forcibly returned from other countries, for purposes of politically motivated reprisal.  Individuals in other countries continued to receive threats of violence during the year.  Civil society reported South Sudanese intelligence officials were active in neighboring countries and harassed critics there.

On February 4, Morris Mabior Awikjok, a South Sudanese human rights defender and government critic, reportedly was forcibly returned from his home in Nairobi, Kenya.  According to reporting by Amnesty International and Human Rights Watch, as well as a letter written by the UN special rapporteur on human rights defenders and other UN experts, five armed persons wearing Kenyan police uniforms and a plain-clothed South

Sudanese man forcibly entered Awikjok's home, took laptops and phones, and took him away without disclosing his next location. He was allegedly being held without charges at an NSS detention center.

**Threats, Harassment, Surveillance, and Coercion:** There were credible reports the government continued to target specific individuals for politically motivated reprisal outside the country, including in Kenya and Uganda. The UN Commission on Human Rights in South Sudan reported on the "ongoing pervasiveness of extra-territorial operations by State security forces," targeting journalists, civil society members and advocates, and their family members, as well as other critics and opponents of the government.

## g. Property Seizure and Restitution

The government rarely provided proportionate and timely restitution for the government's confiscation of property. Human rights organizations documented instances of government forces systematically looting abandoned property in conflict areas where the population was perceived to be antigovernment.

## h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The transitional constitution prohibited interference with private life, family, home, and correspondence, but the law did not provide for the right to

privacy. Authorities, however, reportedly disregarded these prohibitions. To induce suspects to surrender, officials at times held family members in detention centers. The law gave the NSS sweeping powers outside the constitutional mandate of arrest, detention, surveillance, search, and seizure. The NSS utilized surveillance tools, at times requiring telecommunications companies to hand over user data that could be used to tap telephone numbers or make arrests. The UN Panel of Experts recommended to the Security Council in April that, "In the context of threats to journalists and civil society actors, including growing cyberthreats, the Security Council consider adding the supply of digital surveillance tools and other offensive cybertools, including training in their use, to the scope of the arms embargo"; the Security Council rejected the recommendation. The NSS monitored social media posts. Widespread surveillance led many human rights defenders to avoid discussing sensitive topics over the telephone. The NSS carried out physical surveillance and embedded agents in organizations and media houses and at events. Some individuals were subject to physical and telephonic surveillance prior to arrest and detention without warrants, with such surveillance continuing after detainees were released.

## i. Conflict-related Abuses

According to the United Nations and international NGOs, security forces, opposition forces, armed militias affiliated with the government and the

opposition, and nongovernmental armed groups, including signatories and nonsignatories to the peace agreement, were responsible for a significant range of conflict-related abuses. Government and opposition forces harassed civilians and looted and destroyed property during military operations against the National Salvation Front.

**Killings:** Government forces and armed militias affiliated with the government, frequently prompted by opposition ambushes of government soldiers, engaged in a pattern of collective punishment of civilians perceived to be opposition supporters, often based on ethnicity.

UN agencies and international NGOs that interviewed victims reported widespread killings, mutilations, and sexual violence committed by government forces, rebel groups, and irregular militias.

Remnants of war led to the killing and maiming of civilians. Military items such as grenades were often left behind in schools used by government and opposition forces and by armed actors affiliated with both.

In December a UN investigation found fighting between armed groups that split from the Sudan People's Liberation Army-In-Opposition (SPLA-IO) in the Greater Upper Nile region between August and December 2022 – mainly the Kitgwang faction and Agwelek forces – led to at least 884 civilian casualties, of which 594 were killed, 290 injured, 258 abducted, and 75 women and girls subjected to sexual violence, engendering a humanitarian crisis that

displaced more than 62,000 civilians and led to significant destruction of civilian property.

**Abductions:** The United Nations and international NGOs reported multiple accounts of government soldiers or other security service members arbitrarily detaining or arresting civilians, sometimes leading to unlawful killings.

SSPDF Major General James Nando was responsible for at least 64 instances of rape and sexual slavery against civilians between June and September 2021, and he directly or through his subordinates oversaw the abduction of at least 505 women and 63 girls during attacks. Forces under Western Equatoria Governor Alfred Futuyo, affiliated with the Sudan People's Liberation Movement-in-Opposition (SPLM-IO), carried out numerous attacks in Western Equatoria that resulted in the abduction of 887 civilians, of which at least 43 were raped or gang-raped.

Between February and April 2022, government-aligned forces and allied militias under the command of Koch County Commissioner Gordon Koang Biel and Mayendit County Commissioner Gatluak Nyang Hoth used sexual slavery, including rape and gang rape, of abducted women and girls as an incentive and reward for combatants, actions often accompanied by other human rights violations perpetrated against women and girls during armed attacks in Leer County of Unity State. Unity State Governor Joseph Mantiel Wajang appointed Biel and Hoth as county commissioners and was aware of

the attacks but did not prevent, discourage, or institute any form of sanction against Biel and Hoth for their role in crimes committed.

**Physical Abuse, Punishment, and Torture:**  Government forces, opposition forces, other armed groups and armed militias affiliated with the government and the opposition tortured, raped, and otherwise abused civilians in conflict areas.  Gender-based violence, including rape, gang rape, sexual slavery, and forced marriage, was a common tactic of conflict employed by all parties.  A lack of accountability continued for five officials responsible for systemic rape of women and girls during attacks in Leer County.

**Child Soldiers:**  There were reports government and nongovernment forces continued to recruit forcibly and use child soldiers, although reports of government recruitment dropped considerably from prior years.  Since 2013 the United Nations had verified more than 13,000 serious violations that included 6,300 cases of recruitment and use of children.  During the same period, more than 3,700 children associated with armed forces and armed groups were released.

The 2018 peace agreement mandated specialized international agencies work with all warring parties to demobilize and reintegrate child soldiers from the SSPDF, the SPLA-IO, elements of the South Sudan Opposition Alliance, the Nuer White Army, and other groups, usually those involved in community defense.  There were reports of child soldier recruitment

associated with intercommunal and intertribal violence carried out by splinter groups and smaller factions of larger, well-established groups.

The Secretary of State determined South Sudan had governmental armed forces, police, or other security forces that recruited or used child soldiers from April 2022 to March 2023. See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

**Other Conflict-related Abuse:** According to media reports, SSPDF and allied armed youth militias attacked a SPLA-IO outpost in Leer county (Unity State) in November, resulting in the alleged displacement of more than 100,000 civilians. The late November clashes followed an outbreak of fighting in October between rival factions of the SPLA-IO (Kitgwang) and Agwelek militia, reportedly supported by SSPDF, in Tonga, Panyikang County in Upper Nile State.

There were also human rights abuses reported in the Abyei Administrative Area, a region that Sudan and South Sudan both claimed. These abuses generally stemmed from intercommunal clashes between the Ngok Dinka and Misseriya Indigenous groups regarding cattle and land. In December, the United Nations issued a statement of grave concern over retaliatory violence between Twic Dinka and Ngok Dinka groups that claimed 75 lives in southern Abyei and in Warrap State in November, and 10 lives in Abyei in early December, and which reportedly involved SSPDF elements.

Throughout the year, the environment for humanitarian operations remained difficult and dangerous.  Armed actors, including government, opposition forces, and other armed groups, continued to restrict the ability of the United Nations, other international organizations, and NGOs to deliver humanitarian assistance safely and effectively to populations in need.  Access was impeded by direct denials, bureaucratic barriers, occupation of humanitarian spaces including education centers, and renewed fighting in areas of the country where humanitarian needs were highest.  Despite repeated safety assurances, armed elements harassed and killed relief workers, looted, and destroyed humanitarian assets and facilities, and government and rebel authorities imposed bureaucratic and economic impediments on relief organizations.  Government and SPLA-IO forces continued to occupy civilian structures.

On multiple occasions, fighting between government and opposition forces and other violence put the safety and security of humanitarian workers at risk, prevented travel, forced the evacuation of relief workers, and jeopardized humanitarian operations, including forcing organizations to suspend lifesaving operations entirely in areas of active conflict.  Delayed flight safety assurances, insecurity, and movement restrictions often prevented relief workers from traveling to conflict and nonconflict areas. Humanitarian personnel, independently or through the UN Office for the Coordination of Humanitarian Affairs Access Working Group, negotiated with government and SPLA-IO forces as well as other armed groups to

address access problems; however, these negotiations were often protracted and caused significant delays in the delivery of assistance.

The humanitarian operating environment remained volatile despite improvements in some areas of the country, and the country remained very dangerous for aid workers. The most common forms of violence against humanitarian workers included robbery and looting, harassment, armed attacks, commandeering of vehicles, and physical detention. On multiple occasions, insecurity prevented travel and jeopardized relief operations. In almost all cases, investigations were limited, and perpetrators were not held accountable. A Small Arms Survey report highlighted, "In 2023, 120 metric tons of food aid were taken in only three incidents (though around 30 metric tons were recovered by the government). These attacks often use dozens of motorbikes and rapidly remove the looted items from the area of the attack." The same report emphasized that, "At every opportunity the government attempts to divert funds into its patrimonial system." On September 23, two trucks contracted by UNICEF were attacked while returning to Juba after delivering aid supplies for children and their families in need in Yei, Central Equatoria State. Two contracted drivers were killed and another injured. Both empty trucks were burned and destroyed. A total of 143 humanitarian workers were killed since 2013.

The United Nations reported, "South Sudan continues to be the deadliest place for aid workers, with in total 24 aid workers killed since the beginning

of 2023."

Restrictions on humanitarian operations took other forms as well. Authorities operating at Juba International Airport arbitrarily denied humanitarian workers permission to travel for a constantly changing variety of reasons, including for lack of work permits, permission from the Ministry of Foreign Affairs, travel approval from the South Sudan Relief and Rehabilitation Commission, or failure to have at least six blank pages in their passports.  Staff at Juba International Airport harassed and solicited bribes from humanitarian workers.  Interference in recruitment and hiring by local labor officials was reported by international NGOs.  Security forces and irregular armed groups routinely solicited payments from aid workers for safe passage on land and river routes using official and unofficial checkpoints.  These restrictions were implemented inconsistently, without notice or consultation, prompting confusion regarding the required travel procedures.

Humanitarian organizations experienced delays, some up to six months or longer, and denials of tax exemptions, and were forced to purchase relief supplies on the local market, raising quality concerns.  Government authorities required international NGO staff members to pay income taxes and threatened national staff members into paying income tax at the state level.

Continuing conflict and denial of access to humanitarian actors contributed

to households facing acute food insecurity.  It was difficult to accurately gather information and assess some conflict-affected areas due to insecurity and lack of access.

The UN Conduct and Discipline portal listed four instances of sexual exploitation and abuse by UNMISS personnel as of September.  Of the four cases, two investigations were underway while two were being substantiated.  From 2021 to 2022, UNMISS investigated six allegations of sexual exploitation and abuse, determining one allegation to be substantiated, two as unsubstantiated; three cases were in progress.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The transitional constitution provided for freedom of expression, including for members of the press and other media.  The government and its agents, however, frequently violated these rights in the name of national security. In a report published during the year, a UN Commission found the transitional government "treats journalists and civil society members who voice critique as enemies of the ruling political party, reflecting its extreme intolerance of all forms of public scrutiny and critical views."

**Freedom of Expression:**  The government regularly attempted to impede

criticism by monitoring, intimidating, harassing, arresting, or detaining members of civil society who criticized the government.

**Violence and Harassment:**  Security forces routinely intimidated or detained journalists whose reporting they perceived was unfavorable to the military or government.  Security forces confiscated or damaged journalists' equipment and restricted their movements.  During the year, security forces threatened with death, interrogated, harassed, detained, and imprisoned journalists, forcing some to go into hiding.  NSS representatives frequently harassed journalists by detaining them at NSS headquarters or local police stations without formal charges.  Journalists and media agencies that reported on news of the opposition could expect questioning, arrest, and possible closures.  Journalists in Juba frequently experienced threats and intimidation and routinely practiced self-censorship.  On several occasions, high-level officials used intimidating language directed toward media outlets and representatives.

On January 3-4, six journalists employed by state-owned South Sudan Broadcasting Corporation Television were detained for allegedly circulating video of President Kiir apparently urinating on himself.  The journalists spent up to 3.5 months in detention without charges and were later released.  According to the UN Commission on Human Rights in South Sudan, Garang John, the last journalist to be released, appeared to have been subjected to mistreatment and possibly torture.  There were reports that he later fled the

country.

In May political reporter Woja Emmanuel announced he had left journalism. In 2022 the NSS had abducted him at gunpoint and interrogated him, and reportedly threatened him with death.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** The government maintained strict control of media, both print and electronic. The government suppressed dissenting voices, forcing some journalists to flee the country. Government officials or individuals close to the government regularly interfered in the publication of articles and broadcasting of programs, and high-level government officials stated press freedom should not extend to criticism of the government or soliciting views of opposition leaders. Nonetheless, some print and radio media regularly reported on international and domestic criticism of the transitional government.

Although approval was not required under the Media Authority Act, the Media Authority instituted a requirement for organizers to obtain a letter of clearance prior to any media-related event, including press conferences. The accepted practice was for organizers to obtain a letter of clearance and NSS stamp prior to a media event. Journalists were also required to obtain prior approval from the Media Authority to cover events hosted by the government. It was common practice that only journalists who had registered with the Media Authority would be granted access to

government-hosted media events.  The Media Authority mandated
accreditation for freelance journalists, requiring the provision of a work
identification card, educational certifications, a curriculum vitae, and
recommendation letters from an employer or professional organization.

Most organizations practiced self-censorship to ensure their safety.
Authorities directly reprimanded publishers and removed articles deemed
critical of the government.  The minister of information divulged to media
that the government regularly censored articles it deemed harmful to
security in order to protect journalists from costly legal action.  Many print
media outlets reported NSS officers forced the removal of articles at the
printing company where all newspapers were printed, often inserting a
government announcement, advertisement, or recycled or international
news where the article was originally meant to appear.

The Media Authority continued to advise international journalists not to
describe clashes in the country in tribal terms and deemed such references
as "hate speech."  The NSS regularly harassed, intimidated, and summoned
journalists for questioning.  The environment for media workers remained
precarious throughout the year.

## Internet Freedom

The government's South Sudan National Communication Authority at times
blocked access to certain websites, such as two popular news websites,

*Radio Tamazuj* and *Sudans Post*, as well as social media personalities and other online news generators. There were credible reports the government monitored private online communications without appropriate legal authority. The government also targeted and intimidated individuals, especially those outside of Juba, who were critical of the government in open online forums and social media.

## b. Freedom of Peaceful Assembly and Association

The government increasingly restricted freedom of peaceful assembly and restricted freedom of association.

### Freedom of Peaceful Assembly

The transitional constitution provided for freedom of peaceful assembly, but the government in many cases did not respect this right. Many citizens did not gather for planned demonstrations due to fear of targeted violence. Security officials lacked nonviolent crowd control capabilities and at times fired live ammunition into the air to disperse crowds.

### Freedom of Association

The transitional constitution provided for freedom of association, but the government did not respect this right for those suspected of associating with or having sympathies for opposition figures. Some civil society leaders interpreted a 2012 law as an attempt to suppress opposition to the SPLM.

The NSS and other security actors widely enforced a 2016 law strictly regulating the activity and operations of civil society.  The law focused particularly on NGOs working in the governance, anticorruption, and human rights fields.  The law imposed a range of legal barriers, including limitations on the types of activities in which organizations could engage, onerous registration requirements, and heavy fines for noncompliance.  Human rights groups and civil society representatives reported NSS officials continued intimidation, surveillance, and threats against civil society organizations.  Civil society organizations reported extensive NSS scrutiny of proposed public events; the NSS reviewed every proposed event and sometimes denied permission, rejected proposed speakers, or disrupted events.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The transitional constitution provided for freedom of internal movement, foreign travel, and repatriation.  The transitional constitution did not address emigration.

**In-country Movement:**  There were sporadic reports of county commissioners from one party being detained by persons from another political party despite the lack of provision in law for this.  Despite multiple pledges from the government to dismantle checkpoints, they remained a common problem.  Security forces manning these checkpoints routinely used them as opportunities to charge illegal fees.

Internally displaced persons (IDPs) remained in IDP camps and the remaining UNMISS POC site in Malakal due to Shilluk-Nuer ethnic tensions and related fear of retaliatory or ethnically targeted violence by government- and opposition-affiliated armed groups.  Subnational violence and persistent flooding pushed many of the camps beyond capacity.  The government often obstructed travel of members of humanitarian organizations seeking to provide protection and assistance to IDPs and refugees.  Continuing conflict between government and opposition forces and subnational violence restricted the movement of UN personnel and the delivery of humanitarian aid.

**Foreign Travel:**  Individuals, due to arbitrary restrictions, were sometimes prevented from leaving the country.  On April 19, officials confiscated the passport of People's Coalition for Civic Action member Kuel Aguer Kuel as he sought to leave the country.

# e. Protection of Refugees

The government cooperated with the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, and asylum seekers, as well as other persons of concern.  Overall, coordination with the government continued across all sectors, including with the Ministry of Interior, Ministry of Education, Ministry of Health, Ministry of Humanitarian Affairs and Disaster Management, and Relief and Rehabilitation Commission.  According to UNHCR, there were more than 330,000 registered refugees and asylum-seekers in the country as of September, most of whom were from neighboring Sudan.

**Access to Asylum:**  The law provided for protection of refugees as well as the granting of asylum and refugee status.  The government allowed individuals to access asylum processes, allowed refugees from neighboring countries to settle, and generally did not treat refugees differently from other foreigners.  While most refugees in the country were from Sudan, the government also granted asylum to refugees from Ethiopia, the Democratic Republic of the Congo, Eritrea, the Central African Republic, Burundi, and Somalia.  Credible reports indicated the transitional government charged as much as $1,420 in May to non-South Sudanese citizens at the Sudanese border who sought to enter the country after fleeing violence in Sudan.

**Abuse of Refugees and Asylum Seekers:**  While UNHCR could not confirm recruitment by armed groups in refugee camps, UNHCR remained concerned regarding the civilian character of certain elements in camps, particularly those close to the Sudanese border.

On June 7, clashes broke out between members of the Nuer and Chollo tribes at the UN Protection of Civilians (POC) site in Malakal, Upper Nile State, resulting in the deaths of at least 27 persons.

**Access to Basic Services:**  While refugees sometimes lacked basic services, this generally reflected a lack of capacity in the country to manage refugee issues and lack of sufficient funding rather than government practices of discrimination against refugees.  Refugee children had access to elementary education in refugee camps through programs managed by international NGOs and the United Nations.  Some schools were shared with children from the host community.  In principle, refugees had access to judiciary services, although a lack of infrastructure and staff meant these resources were often unavailable.

Due to continuing conflict and scarcity of resources, tension existed between refugees and host communities in some areas regarding access to resources.

**Durable Solutions:**  According to UNHCR, between 2018 and 2022, more than 600,000 South Sudanese had returned to the country since the signing

of the revitalized peace agreement.  Following the beginning of the Sudan conflict in April, UNHCR reported the country hosted an aggregate total of more than 1.2 million newly arrived refugees, asylum seekers, and returnees as of August.  Of the 1.2 million, UNHCR counted more than 365,000 total new arrivals who had crossed the border from Sudan since the outset of the conflict.  Of these, UNHCR reported that 314,000 were refugee returnees, i.e., South Sudanese who had been residing in Sudan.  The government accepted refugees and returnees for reintegration.  No national procedures were in place to facilitate the provision of identity documents for returnees or the naturalization of refugees beyond procedures that were in place for all citizens and other applicants.

## f. Status and Treatment of Internally Displaced Persons (IDPs)

Significant levels of subnational violence continued, particularly in Upper Nile, Unity, and Warrap States, and the Greater Equatoria region.  The result was sustained mass population displacement, both within the country and into neighboring countries, and high levels of humanitarian and protection needs, which strained the ability of UN and international humanitarian personnel to provide protection and assistance.  According to UNHCR, there were more than 1.6 million IDPs spread across all 10 states.  The increased violence, historic flooding, and food insecurity forced relief actors to delay plans for the safe return and relocation of some IDP populations.

UNMISS continued to provide physical protection to IDPs in the POC site in Malakal.

According to the UNMISS Human Rights Division and other organizations, violence and simmering ethnic conflict in areas such as Upper Nile, Jonglei, and Warrap States continued to result in dire humanitarian consequences, including significant displacement and serious and systematic human rights abuses, such as the killing of civilians, torture, arbitrary arrests, detentions, looting and destruction of civilian property, forced recruitment, and gender-based violence.

The government promoted the return and resettlement of IDPs but did not provide a safe environment for returns and often denied humanitarian NGOs or international organizations access to IDPs.

## g. Stateless Persons

Citizenship was derived through the right of blood (jus sanguinis) if a person had a South Sudanese parent, grandparent, or great-grandparent on either parent's side, or if a person was a member of one of the country's indigenous ethnic communities. Individuals also could derive citizenship through naturalization. Birth in the country was not sufficient to claim citizenship. While the country had a Nationality Act in place since independence, fewer than 10 percent of South Sudanese were believed to have obtained national identity documents. There were no official statistics

or estimates on statelessness;  however, a UNCHR survey estimated half a million persons were at risk of statelessness.   The Nationality Act did not include specific provisions for stateless persons, children whose parents were without nationality, or children born in the country who otherwise would be stateless.

According to a 2018 report from the National Dialogue, a government-sponsored initiative, it was more difficult for those from the southern region of Equatoria to rightfully claim citizenship due to discrimination from other ethnicities, which suspected them of being Ugandans or Congolese. According to UNHCR, certain nomadic pastoralist groups had difficulty accessing application procedures for nationality certification and experienced discrimination according to ethnic group or appearance that required UNHCR's intervention to address matters with the Directorate of Nationality, Passports, and Immigration.

# Section 3. Freedom to Participate in the Political Process

The transitional constitution provided that every citizen had the right to participate in elections in accordance with the constitution and the law. Since the 2011 referendum on South Sudanese self-determination, no elections had been held.  Elected officials were arbitrarily removed and others appointed to take their places.

# Elections and Political Participation

**Recent Elections:**  Due a lack of political will to address intense violence and insecurity starting in 2013, the government postponed elections several times.  Since independence, the president fired and appointed local government officials and parliamentarians by decree.  In 2015 and again in 2018, the legislature passed amendments to the transitional constitution extending the terms of the president, national legislature, and state assemblies for three years.  The peace agreement signed in 2018 allowed for the extension of all terms for a three-year transitional period from February 2020 until February 2023, with elections slated for December 2022.  In 2022, however, the government proposed an extension of the 2018 peace agreement by 24 months to February 2025.  Members of the Reconstituted Joint Monitoring and Evaluation Commission voted to approve the government's proposed extension, effectively postponing elections until December 2024.  As of the end of the year, UNMISS reported to the UN Security Council that "conditions for holding free, fair and credible elections are not yet in place."  A separate report submitted by UNMISS to the Security Council in October described continuing delays to the implementation of the peace agreement as, "principally rooted in the lack of political will, especially among the conventional parties to the Revitalized Agreement."

**Political Parties and Political Participation:**  The SPLM enjoyed a near

monopoly of power in the government and continued to be the most broadly recognized political entity since the signing of the Comprehensive Peace Agreement in 2005. SPLM membership conferred political and financial advantages, and there was great reluctance by opposition parties to shed the SPLM name. For example, the main opposition party was referred to as the SPLM-IO, and most other political parties either were offshoots of the SPLM or affiliated with it. Members of the reconstituted parliament were appointed by presidential decree, and the parliament opened in 2021. Parliament continued to meet regularly and discuss legislation.

Opposition parties complained the government periodically harassed party members. An unfavorable environment for media and citizen expression hampered participation in political processes.

**Participation of Women and Members of Marginalized or Vulnerable Groups:** Women remained poorly represented in the judiciary, local governments, and among traditional leaders. Representation was particularly poor at the local level, where there was little to no implementation of the 2018 peace agreement provision mandating 35 percent of political leadership positions be reserved for women. The system also devolved substantial candidate selection power to political party leaders, very few of whom were women. The government also failed to meet the 35 percent women quota in appointing members to the National

Election Commission.

An entrenched culture of discrimination presented a major obstacle to women's political participation.  Women tended to be discouraged from assuming leadership positions because of the belief that such activities conflicted with their domestic duties.  Basic safety and security concerns, including high rates of gender-based violence, also limited women's ability to participate in government.

Several ethnic groups remained underrepresented or unrepresented in government.  Intercommunal and political violence exacerbated ethnic tensions and the imbalance in national- and state-level political institutions.

The absence of translations of the constitution in Arabic or local languages limited the ability of minority populations to engage meaningfully in political dialogue.

# Section 4. Corruption in Government

The transitional constitution provided for criminal penalties for acts of corruption by officials, but the government did not implement the law. There were numerous reports of government corruption.  Poor recordkeeping, lax accounting procedures, absence of adherence to procurement laws, and a lack of accountability and corrective legislation compounded the problem.

**Corruption:**  Corruption was endemic in all branches of government.  The UN Panel of Experts and independent analysis by, among others, Small Arms Survey, reported government security forces, including the National Security Service, maintained control of public and natural resources to generate off-budget sources of revenue.  The UN Panel of Experts further noted pervasive corruption in the country's critical petroleum industry, findings supported by a detailed study by The Sentry, an investigative NGO.  According to a report by Small Arms Survey, "at every opportunity the government attempts to divert funds into its patrimonial system."

In October independent audits revealed fraud in the construction of the Juba-Rumbek Road connecting the capital city Juba and Bahr El Ghazal region.  Reports found the construction of the highway, which began in 2019 and was financed by allocating 10,000 barrels of crude oil per day for infrastructure development to China Exim Bank, was only 16 percent complete as of February.

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

# Section 5. Governmental Posture Towards

# International and Nongovernmental Monitoring and

# Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups monitored and investigated human rights conditions and cases and published their findings, often while facing considerable government resistance.  Government officials were rarely cooperative and responsive to the views of these groups and were often actively hostile.  Reports outlining atrocities exacerbated tensions between the government and international organizations and NGOs.  Government and opposition forces often blamed each other or pointed toward militia groups or "criminal" actors.

**The United Nations or Other International Bodies:**  The government sometimes cooperated with representatives of the United Nations and other international organizations.  A planned visit by UN Special Rapporteur on the Human Rights of Internally Displaced Persons Paula Gaviria was abruptly canceled in October in protest of the release of a UN report detailing systematic repression of civil society and independent media.  A lack of security guarantees from the government and opposition on many occasions, as well as frequent government violations of the status of forces agreement, including the restriction of movement of UNMISS personnel, constrained UNMISS's ability to carry out its mandate, which included human rights monitoring and investigations.  Security forces generally regarded international organizations with suspicion.

UNMISS and its staff faced harassment and intimidation by the government, threats against UNMISS premises and POC sites, unlawful arrest and detention, abduction, and restrictions on the importation of goods and equipment. The SSPDF regularly prevented UNMISS from accessing areas of suspected human rights abuses in violation of the status of forces agreement that allowed UNMISS access to the entire country. The government did not formally inform UNMISS regarding arrest and detention incidents as required under the agreement.

There were credible reports the government harassed and intimidated civil society members cooperating with UN bodies, as well as those who sought to lobby foreign missions to pressure the government to respect civil liberties.

**Government Human Rights Bodies:** The president appointed members of the South Sudan Human Rights Commission, whose mandate included education, research, monitoring, and investigation of human rights abuses, either on its own initiative or upon request by victims. International organizations and civil society organizations considered the commission's operations to be generally independent of government influence. The commission cooperated with international human rights advocates and submitted reports and recommendations to the government.

While observers generally regarded the commission to have committed and competent leadership, severe resource constraints prevented it from

effectively fulfilling its human rights protection mandate. Salaries and office management accounted for the bulk of its funding, leaving little for monitoring or investigation. The commission had not produced any substantive reporting since 2015.

The National Committee for the Prevention and Punishment of Genocide remained largely inactive.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** Conviction of rape was punishable by up to 14 years' imprisonment and a fine. The government did not effectively enforce the law, and rape and other forms of sexual violence were widespread. The law defined forced or nonconsensual sexual intercourse within marriage as "not rape." No information was available on the number of persons prosecuted, convicted, or punished for rape, and convictions of rape seldom were publicized. According to observers, sentences for persons convicted of rape were often less than the maximum. Women and girls also faced the threat of rape while living in UN POC sites and IDP camps.

Although few statistics were available, the UN Commission on Human Rights [in South Sudan] reported in March 2022 that conflict-related sexual violence against women and girls was widespread and systematic

throughout the country, with one recent study finding that 65 percent of women and girls in conflict areas had experienced some form of gender-based violence.

The law did not prohibit domestic violence.  Intimate partner violence against women, including spousal abuse, was common, although there were no reliable statistics on its prevalence.  According to NGOs, some women reported police tried to charge them when they attempted to file criminal complaints of rape or abuse.  While not mandatory, police often told women they needed to complete an official report prior to receiving medical treatment.  Families of rape survivors encouraged marriage to the rapist to avoid public shaming.

In April a father, who served as a police officer, gouged the eyes of his daughter, age 17, when she married a man without his consent.  Police arrested the accused, charging him for violating provisions of laws that criminalized gender-based violence and protected the rights of children.  In August the defense counsel argued that Western-based laws undercut customary law and practice, violating the defendant's rights.  The court denied the defense motion to transfer the case to a customary court.

**Female Genital Mutilation/Cutting (FGM/C):**  FGM/C was a criminal offense under the law, but few data existed to determine its prevalence, and enforcement was largely nonexistent.  The law prohibited subjecting children to negative and harmful practices that affected their health,

welfare, and dignity.  UNICEF estimated the prevalence of FGM/C at 1 percent among girls and women between the ages of 15 and 49.  FGM/C was practiced in both Christian and Muslim communities in the northern regions of the country, including Bahr el-Ghazal and Upper Nile.  Several NGOs worked to end FGM/C, and the Ministry of Gender, Children, and Social Welfare raised awareness of the dangers of FGM/C through local radio broadcasts.

**Other Forms of Gender-based Violence or Harassment:**  Instances of girl compensation – compensating the family of a crime victim with a girl from the perpetrator's family – occurred.  Survivors were generally between ages 11 and 15, did not attend school, and often were physically and sexually abused and used as servants by their captors.  Local officials complained the absence of security and rule of law in many areas impeded efforts to curb the practice.  Harmful dowry practices were also common.  NGOs reported fathers often forced daughters, generally minors, to marry older men in exchange for cattle or money.

Conviction of sexual harassment was punishable by up to three years' imprisonment and a fine.  The government rarely enforced the law, and NGOs reported most women were unaware it was a punishable offense or feared retribution for reporting it, since women were often blamed for its occurrence.  Observers noted sexual harassment, particularly by military and police, was a serious problem throughout the country.

**Discrimination:** While the transitional constitution provided for gender equality and equal rights for women, including in labor markets and property inheritance, deep cultural prejudices resulted in widespread discrimination against women. High illiteracy rates also impeded women's ability to understand and defend their rights. Communities often followed customary laws and traditional practices that discriminated against women. For example, authorities arrested and detained women for adultery.

Despite statutory law to the contrary, under customary law a divorce was not final until the wife and her family returned the full dowry to the husband's family. As a result, families often dissuaded women from divorce. One NGO reported that husbands' families occasionally accused married women of adultery to recoup the dowry in times of hardship or due to interpersonal conflict. Traditional courts usually ruled in favor of the husband's family in most cases of child custody unless children were between ages three and seven.

Women also experienced discrimination in employment, pay, credit, education, inheritance, housing, and ownership and management of businesses or land. Although women had the right to own property and land under the transitional constitution, community elders often sought to prevent women from exercising these rights because they contravened customary practice.

**Reproductive Rights:** There were no reports of coerced abortion or

involuntary sterilization on the part of government authorities.

Cultural practices and economic barriers limited reproductive choices. Men who paid dowries often believed they had the right to make reproductive health decisions for their wives and daughters. High illiteracy rates among women limited their access to accurate information concerning the right to control their fertility. Many individuals did not have access to accurate information, modern contraceptive methods, or family planning services. For persons younger than age 18, permission from family was not required to access nonsurgical reproductive health services, including for contraception. Cultural practices and social stigma, however, often prevented minors from exercising their rights. Women needed to obtain their husbands' consent to access sexual and reproductive health services, such as antenatal care, facility delivery, and family planning, while also facing the threat of domestic violence for seeking medical care without the consent of their husbands.

An acute shortage of skilled professionals and nonpayment of staff salaries were the biggest deficiencies in the provision of quality health care. The country faced severe shortages in all categories of trained health professionals. Maternal health services were often provided by less-skilled health workers. On average, there was only one health facility per 10,000 inhabitants, and an estimated 72 percent of the population lived more than three miles from the closest clinic. Many of these facilities were not capable

of providing specialized care, and there were not enough qualified doctors, nurses, or midwives to treat survivors of sexual violence.

The maternal mortality rate was estimated to be between 789 and 1,150 deaths per 100,000 live births. The high maternal mortality rate was largely due to limited and low-quality medical care, as well as an extremely low rate of skilled birth attendants. More than 80 percent of women delivered at home, assisted by untrained attendants. The lack of access to skilled medical care during pregnancy and childbirth also resulted in maternal death and disability from treatable conditions such as infection, hemorrhage, and obstructed birth.

## Systemic Racial or Ethnic Violence and Discrimination

Inter- and intra-ethnic fighting and violence by government, opposition forces, and armed militias affiliated with the government and the opposition targeting specific ethnic groups resulted in human rights. The country had at least 64 ethnic groups and a long history of interethnic conflict. Ethnic groups were broadly categorized into the Nilotic (Dinka, Nuer, and Shilluk ethnic groups), Nilo-Hamitic, and Southwestern Sudanic groups. For all ethnic groups, cattle represented wealth and status. Competition for resources to maintain large cattle herds often resulted in violent clashes. Violence at the subnational level was often driven by political leaders and other actors in the capital.

Discrimination in employment based on ethnic groups was widespread.

Inter- and intra-ethnic clashes occurred throughout the year. Movements of Bor Dinka pastoralists from Jonglei State caused widespread dislocation and intercommunal clashes in Central and Western Equatoria States. There were numerous, corroborated reports of killings, abductions, cattle theft, cattle poisoning, and destruction of fixed and moveable property across communal lines. As a result of the inflow of refugees and returnee South Sudanese following the start of hostilities in Sudan in April, humanitarian workers reported heightened tensions within resettlement camps and reported self-segregation along ethnic lines.

## Children

**Birth Registration:** Citizenship was derived through birth if a person had any South Sudanese parent, grandparent, or great-grandparent on either the mother's or the father's side, or if a person was a member of one of the country's Indigenous ethnic communities. Individuals could also derive citizenship through naturalization. Birth in the country was not sufficient to claim citizenship. The government did not register all births immediately.

**Education:** Girls often did not have equal access to education. Many girls did not attend school or dropped out of school due to early and forced child marriage, domestic duties, and fear of gender-based violence at school.

**Child Abuse:** The law prohibited child abuse. Child abuse, including sexual

abuse, was reportedly widespread. Child rape occurred frequently in the context of child, early, and forced marriage, and armed groups also perpetrated it. Authorities seldom prosecuted child rape due to fear among survivors and their families of stigmatization and retaliation. Child abduction also was a problem. Rural communities often abducted women and children during cattle raids.

**Child, Early, and Forced Marriage:** The law provided that every child had the right to protection from early marriage but did not explicitly prohibit marriage before age 18. The government did not enforce the law effectively. Child marriage remained common. According to the Ministry of Gender, Children, and Social Welfare, nearly half of all girls and young women between ages 15 and 19 were married, and some brides were as young as 12. According to UNICEF, 9 percent of girls were married by age 15 and 52 percent by age 18. NGOs reported fathers often forced daughters, generally minors, to marry older men in exchange for cattle or money. Early marriage sometimes reflected efforts by men to avoid rape charges, which a married woman could not file against her husband. In other cases, families of rape survivors encouraged marriage to the rapist to avoid public shaming. Many abducted girls were often repeatedly subjected to rape or sexual slavery, or they were forced into marriage.

**Sexual Exploitation of Children:** The law designated 18 as the minimum age for consensual sex, although commercial sexual exploitation of children

occurred.  The law criminalized buying or selling a child for the purpose of prostitution and prescribed a punishment of up to 14 years' imprisonment and a fine.  The law also criminalized the procurement of a child for commercial sexual exploitation and the facilitation of commercial sexual exploitation of a child by the child's parent or guardian and prescribed penalties of up to 10 years' imprisonment and a fine.  The government (enforced/did not enforce) the law effectively.  Child sex trafficking was prevalent throughout the country, especially of young girls, who were bartered for cattle and other goods in some communities.

## Antisemitism

There were no official figures regarding the number of Jewish persons in the country.  There were no reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  The law criminalized consensual same-sex sexual conduct.

It prohibited "unnatural offenses," defined as "carnal intercourse against the order of nature," with punishment up to 10 years' imprisonment.  There were no reports that authorities enforced the law.  The law also criminalized "any male person who dresses or is attired in the fashion of a woman" in public, with a punishment of up to three months' imprisonment.

**Violence and Harassment:**  Lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons reported security forces routinely harassed and sometimes arrested, detained, tortured, and beat them.  LGBTQI+ community leaders reported state actors incited harassment and physical abuses of LGBTQI+ persons, including posting public flyers in resettlement camps seeking the location of LGBTQI+ persons.  Because of overtly hostile government rhetoric and actions, most openly LGBTQI+ citizens fled the country.

**Discrimination:**  The law did not prohibit discrimination by state or nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics.  Anti-LGBTQI+ sentiment was pervasive throughout the country, affecting all aspects of life for openly LGBTQI+ persons.  Human rights and LGBTQI+ activists reported no instances of official action to investigate or punish those complicit in discrimination, harassment, or abuse of LGBTQI+ persons.

**Availability of Legal Gender Recognition:**  Legal gender recognition was not available.

**Involuntary or Coercive Medical or Psychological Practices:** There were no reports of involuntary or coercive medical or psychological practices targeting LGBTQI+ persons. There were no official reports of medically unnecessary and irreversible "normalization" surgeries performed on children or nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** Human rights groups reported LGTBQI+ persons faced restrictions of freedom of expression, association, and peaceful assembly due to fear of violence, harassment, or other forms of retribution from state and nonstate actors.

## Persons with Disabilities

The law did not specifically prohibit discrimination against persons with physical, sensory, intellectual, and mental disabilities in employment, education, air travel and other transportation, access to health care, or the provision of other government services. NGOs reported community and family members routinely subjected persons with disabilities to discrimination. The government did not enact or implement programs to provide access to buildings, information, or communications public services.

The transitional constitution and the law stipulated that primary education be provided to children with disabilities without discrimination. Very few teachers, however, were trained to address the needs of children with

disabilities, and very few schools were able to provide a safe, accessible learning environment for children with disabilities. There were no legal restrictions on the right of persons with disabilities to vote and otherwise participate in civic affairs, although lack of physical accessibility constituted a barrier to effective participation. There were no mental-health hospitals or institutions, and persons with mental disabilities were often held in prisons. Limited mental-health services were available at Juba Teaching Hospital.

There were no reports of official action taken to investigate or punish those responsible for violence against persons with disabilities. Awareness of disability matters was low, negative social attitudes prevailed, and persons with disabilities had limited access to services and employment.

Persons with disabilities also faced disproportional hardship under conditions of crisis-level food insecurity and continuing violence.

## Other Societal Violence or Discrimination

Historical clashes intensified between cattle keepers and farmers, and between cattle keepers and persons attempting to raid and steal their herds. The level, scale, and sophistication of these attacks were significantly higher when compared with past clashes. Hundreds of individuals were killed and injured, and thousands were forced to flee their homes.

Civilian casualties and forced displacements occurred in many parts of the

country when raiders stole cattle, which defined power and wealth in many traditional communities. Land disputes often erupted when stolen cattle were moved into other areas, also causing civilian casualties and displacement. The SSPDF, NSS, and police sometimes engaged in revenge killings between and within ethnic groups.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the rights of every employee to form and join unions, bargain collectively, and strike with restrictions. The law prohibited antiunion discrimination. The law excluded from these protections military and police but also included a broader list of civil service occupations, including prison service, fire service and wildlife forces, than the international standard. While labor courts adjudicated labor disputes, the minister of labor could refer them to compulsory arbitration.

The law provided a regulatory framework to govern worker trade unions, but it restricted workers' rights to form and join organizations of their own choosing, allowing only one union per sector or geographical area, and restricted trade unions' rights to organize their own administration. The largest union, the South Sudan Workers' Trade Union Federation, had

approximately 65,000 members, working mainly in the public sector.  Unions were nominally independent of the governing political party, but there were reports of government interference in labor union activities.  In September worker organizations reported that armed police and the acting mayor of Juba city assaulted a woman street vendor and used violent means to remove vendors from public spaces.  Following a widely circulated video of the incident, the governor of Central Equatoria State removed the acting mayor from his position.  The government did not effectively enforce the law.  Administrative and judicial procedures were subject to lengthy delays and appeals, and penalties were not commensurate with those for other laws involving denials of civil rights.  Workers across the country were vulnerable to exploitation.  Years of conflict, political turmoil, climate shocks, and crime disrupted livelihoods and basic infrastructure in every sector.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at

https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

# d. Discrimination (see section 6)

# e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The law specified the Ministry of Labor could establish and publish a minimum wage, or wages, for different categories of employees.  There was no public information that this occurred.  Few workers were engaged in formal wage employment, with more than 80 percent of the population engaged in nonwage work, including subsistence or small-scale agriculture not covered by labor law.  The law specified normal working hours should not exceed eight hours per day and 40 hours per week and should provide premium pay for overtime.

Inspectors had the authority to make unannounced inspections and initiate sanctions.  Violations were common in all sectors.  Most employees, including public school teachers, earned less than the World Bank global poverty income level equivalent to two dollars per day.  In August, the government dismissed more than 300 civil servants, mostly teachers, for failure to report to their assigned workplaces.  The dismissed workers reported the government failed to follow notification procedures; some workers also stated they abandoned their positions because of low pay.

**Occupational Safety and Health:**  There were no occupational safety and

health (OSH) standards.  Workers could not remove themselves from situations that endangered their health or safety without jeopardy to their employment.  The Ministry of Labor had an Occupational Safety Branch, which consisted of an office director and no staff.

A civil service provisional order applied to the public sector and outlined the rights and obligations of public-sector workers, including benefits, salaries, and overtime.  The law provided the Ministry of Labor with authority to issue the schedule of salary rates, according to which all civil servants, officials, and employees were to be paid.  This pay scale had not been adjusted for several years, and due to recent inflation and the rapid depreciation of the South Sudanese pound, most civil servants did not receive enough income to support themselves, even when their salaries were delivered on time and in full, which was infrequent.  Under the law only unskilled workers were eligible for overtime pay for work more than 40 hours per week.  Civil servants, officials, and employees working at higher pay grades were expected to work necessary hours beyond the standard workweek without overtime pay.  When exceptional additional hours were demanded, the department head could grant time off in lieu of reimbursement.

**Wage, Hour, and OSH Enforcement:**  The government did not effectively enforce minimum wage, overtime, and OSH laws.  The government neither investigated nor prosecuted wage and hour violations.  Violations of wage

and hour laws were common.

Widespread oil spillages and other chemical pollution, exacerbated by sustained, multiyear flooding that damaged oil producing infrastructure, negatively affected the health of workers and others who lived nearby.

More than 66 percent of workers were in the informal sector in 2019, according to African Futures research from the Institute for Security Studies. Labor laws did not apply to informal and part-time workers.