UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| D.V.D., *et al.*, | ) | |
| | ) | |
| Individually and on behalf of all others similarly situated, | ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:25-cv-10676-BEM |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. Department of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, STAY PENDING APPEAL OF ECF NOS. 116, 118, 119**

**INTRODUCTION**

Defendants request that this Court reconsider its order finding that Defendants violated the preliminary injunction and its extraordinary follow-on orders imposing on Defendants additional and highly burdensome requirements. *See* ECF Nos. 116, 118, 119 ("Orders"). Because of this Court's Orders, Defendants are currently detaining dangerous criminals in a sensitive location without clear knowledge of when, how, or where this Court will tolerate their release. Ripa Decl. ¶¶ 19-21, 25, 29; Hegseth Decl. ¶¶ 3-6. This development has put impermissible, burdensome constraints on the President's ability to carry out his Article II powers, including his powers to command the military, manage relations with foreign nations, and execute our nation's immigration authorities.

These detained aliens have already enjoyed the benefit of full process under the laws of the United States and were lawfully removed from the country in accordance with this Court's prior order. To correct these challenged Orders' clear errors of law and prevent the manifest injustice they have caused and will continue to cause, the Court should grant reconsideration. In the alternative, Defendants request that the Court stay these Orders pending appeal pursuant to Federal Rule of Civil Procedure 62. Furthermore, in order to relieve these burdens or, in the alternative, allow for an expeditious appeal, Defendants respectfully request a prompt ruling on this motion.

**THE COURT'S ORDERS**

The Court's April injunction instructed Defendants to provide class members with a "meaningful opportunity" to raise a reasonable fear claim after being informed of removal to a third country. ECF No. 64 at 46-47. However, when the Court issued the preliminary injunction, it did not define or elaborate on what constitutes a "meaningful opportunity." On May 21, 2025, the Court found that Defendants violated the injunction when it provided some class members notice of third country removal (akin to the procedures followed in the longstanding expedited

1

removal process) and removed these class members when they did not make a reasonable fear claim. *See* ECF No. 118. The Court newly mandated a "minimum of ten days, to raise a fear-based claim for Convention Against Torture ("CAT") protection prior to removal." *See* ECF No. 118 at 2.

Furthermore, with respect to the six criminal alien class members the Court determined were not provided a "meaningful opportunity," the Court imposed additional burdensome requirements. Specifically, Defendants are required to continuously "maintain custody and control" of these individuals and provide each of them with a "reasonable fear interview in private, with the opportunity for the individual to have counsel of their choosing present during the interview, either in-person or remotely, at the individual's choosing." ECF Nos. 116, 118 at 1. Each alien must also be given the name and telephone number of class counsel, as well as "access to a phone, interpreter, and technology for the confidential transfer of documents that is commensurate with the access they would receive were they in DHS custody within United States borders." ECF No. 118 at 1. Moreover, each alien and class counsel must be given at least 72 hours' notice of the scheduled time for each reasonable fear interview. *Id.* For aliens whose claim falls short of the "reasonable fear" standard, DHS must provide them a minimum of 15 days to seek a reopening of their immigration proceedings in order to challenge the potential third-country removal. *Id.* at 2. During that 15-day period, DHS must maintain the aliens within the "custody or control" of DHS and the aliens must be afforded access to counsel. *Id.*

## ARGUMENT

It is well established that a federal court's reconsideration of its orders is warranted where necessary to correct a clear error of law or to prevent manifest injustice. *See Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 22-23 (1st Cir. 1985) (Breyer, J.) (noting a court's inherent power to provide relief from its decisions "as justice requires"). The Court's Orders are premised

on an erroneous conclusion that Defendants failed to provide "meaningful opportunity" for six class members to assert a claim for protection under CAT, despite having allowed the six class members an opportunity that is eminently reasonable in the removal context. Moreover, the Orders impermissibly infringe on the President's inherent Article II authority to conduct foreign affairs and serve as Commander-in-Chief. The Orders also improperly interfere with the President's ability to faithfully execute immigration laws. For all of these reasons, the Court should grant reconsideration of these Orders or, alternatively, stay these Orders pending appeal.

## I. The Court Erred in Concluding that Defendants Did Not Provide a "Meaningful Opportunity" to Raise a Fear Claim.

The Court erroneously concluded that Defendants violated the preliminary injunction by failing to provide six class members a "meaningful opportunity" to assert claims for CAT protection before initiating their removal to a third country. ECF No. 118 at 1. Contrary to the Court's Order, Defendants provided a meaningful opportunity for each of these six aliens to assert a fear claim. Prior to the Court's order on May 21, 2025, the preliminary injunction required that, prior to removing any alien to a third country, Defendants must provide class members with only a "meaningful opportunity" to raise a reasonable fear claim after being informed of removal to a third country. ECF No. 64 at 46-47. However, the Court did not specify what constitutes a "meaningful opportunity" even after the Government articulated that the Parties would certainly disagree about such a vague term. Tr. of Mar. 28, 2025 Hr'g. 58:16-25 (explaining that if the Court were to use the word "meaningful" when issuing relief, "we would be in court tomorrow. Because we're going to disagree on that."). Indeed, the Government informed the Court that DHS's definition of meaningful notice would likely be providing such notice "shortly before" an alien is removed using the notice Plaintiff O.C.G. admitted to receiving as an example. Tr. of Mar. 28, 2025 Hr'g. 59:2-17; *see also* ECF No. 8-4 at ¶ 9 ("After I was taken out of the prison the

3

immigration officer told me that I was being deported to Mexico."). The Government even went so far as to suggest that the Court could make legal findings and "allow the agency to draft a proposal" for the parties to discuss and the Court to decide "whether [the proposal] would be enough process." Tr. of Mar. 28, 2025 Hr'g. 59:14-17. The Court did not heed the Government's warning, nor did it ask to review the agency's process for compliance with this injunction. *See* ECF No. 64.

Accordingly, Defendants implemented the Court's preliminary injunction order. Ripa Decl. ¶ 7. ICE provided notice "shortly before" removing these criminal aliens and that notice was "meaningful" and sufficient to comply with this Court's injunction (ECF No. 64) as written. These criminal aliens needed only state that they had a fear of removal to South Sudan to receive the other procedures required by the Court's April 18, 2025 injunction (ECF No. 64). The aliens did not do so. Therefore, DHS attempted to remove these aliens—who have committed the most reprehensible violations of our nation's laws—to a place where they no longer pose a threat to the United States.

The opportunity afforded to these aliens to raise a fear claim was not only meaningful but entirely reasonable in the removal context. For example, the expedited removal process under 8 U.S.C. § 1225(b) permits the government to *immediately* remove certain aliens "without further hearing or review," 8 U.S.C. § 1225(b)(1)(A)(i), subject to only a *limited* window to establish a "credible fear of persecution," *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) (citation omitted). In the expedited removal context, there is no statutory or regulatory requirement to provide aliens with a certain amount of time to assert a fear. 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. §§ 253.3(b)(2), 1003.42(e); *see also* Ripa Decl. ¶ 13 describing expedited removal procedures). And even when an alien in expedited removal does assert a fear, if the fear is deemed non-credible, the statute

4

provides that review before an immigration judge "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days." 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42(e). The Supreme Court has upheld the constitutionality of the statutory expedited removal scheme. *Thuraissigiam*, 591 U.S. at 107 (rejecting due process challenge to expedited removal). Comparison to the expedited removal process is directly on point, because both class members and expedited removal aliens have already been determined to be removable and would be making a fear claim in the first instance. Accordingly, Defendants provided a "meaningful opportunity" for these six criminal alien class members to assert a fear of removal to South Sudan and the Court should reconsider its decision to the contrary and requirement that DHS give class members ten days to express a fear after notice. Ripa Decl. ¶¶ 7, 9-12.

## II. The Court's Orders Impermissibly Interfere with the President's Article II Foreign Affairs and Commander-In-Chief Powers.

Even if the Court had not erred with respect to "meaningful notice," the Court's Orders would still merit reconsideration because they are plainly inconsistent with the President's Article II authority to manage foreign policy. "[T]he historical gloss on the executive power vested in Article II of the Constitution has recognized the President's vast share of responsibility for the conduct of our foreign relations." *American Ins. Ass'n v. Garamendi,* 539 U.S. 396, 414 (2003). The President possesses in his own right certain powers conferred by the Constitution on him as Commander–in–Chief and as the Nation's organ in foreign affairs. *Id.* at 416. The federal courts have no authority to direct the Executive Branch to conduct foreign relations in a particular way, or engage with a foreign sovereign in a given manner. That is the "exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). Such power is "conclusive and

5

preclusive," and beyond the reach of the federal courts' equitable authority. *Trump v. United States*, 603 U.S. 593, 607 (2024).

The Court's Orders require, *inter alia*, Defendants "to maintain custody and control of class members currently being removed to South Sudan or to any other third country." ECF No. 116. "This requirement has already had, and will continue to have, negative consequences to important U.S. strategic interests, including in Libya, South Sudan, and Djibouti." Rubio Decl. ¶ 3.

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

█ Because cooperation with other nations is required to transport and distribute international humanitarian aid, it is almost certain the Court's interjection will result in delayed or reduced humanitarian efforts across the region in a time of severe humanitarian crisis. Rubio Decl. ¶ 9. It is therefore critical that the Executive Branch be permitted to maintain effective foreign policy engagements in the region without judicial interference. *Id*.

**III. The Court's Orders Impermissibly Interfere with the President's Ability to Faithfully Execute Immigration Laws.**

Furthermore, the Court's Orders impermissibly disrupt the President's ability to faithfully execute the nation's immigration laws. Courts have "long recognized" questions of immigration policy as "more appropriate to either the Legislature or the Executive than to the Judiciary." *Matthews v. Diaz,* 426 U.S. 67, 81 (1976). As a result, courts "review immigration decisions of

6

political branches only with the greatest caution where our action may inhibit their flexibility to respond to changing world conditions." *East Bay Sanctuary Covenant v. Trump,* 932 F.3d 742, 756 (2018) (quoting *Diaz,* 426 U.S. at 81) (cleaned up). While courts may review actions of the political branches to determine "whether they exceed the constitutional or statutory scope of their authority," the scope of the Executive's authority regarding the removal of aliens to third countries *after they have received the full benefit of removal proceedings* is exceedingly broad. Here, both the political branches are in accord in that neither the statute nor regulations require the procedures mandated by this Court's injunction. And, because aliens, *particularly* the criminal aliens at issue, are only entitled to the process guaranteed by Congress, this Court should have wholly declined to issue relief in this case. *See Knauff v. Shaughnessy,* 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").

  The relief it has issued, requiring mandatory notice and reopening periods to even the most reprehensible of criminals, greatly interfere with the President's ability to faithfully execute immigration laws. Reaching agreement with foreign governments to accept the return of deported aliens requires careful and delicate negotiations. Rubio Decl. ¶¶ 4, 5; Ripa Decl. ¶¶ 17, 22. This process can be particularly arduous with regard to the many countries that are recalcitrant in accepting the return of their nationals. Ripa Decl. ¶ 17. It can be even more difficult when dealing with dangerous criminals, like the criminal aliens at issue here (including convicted rapists), because countries are naturally hesitant to accept them. *Id.* ¶¶ 17, 22.

  The Court's Orders also impose a myriad of logistical burdens that greatly impede ICE's ability to effectively carry out the removal of aliens from the United States. Ripa Decl. ¶ 29, 30. Aliens scheduled for removal are located throughout the country, which requires the coordination

of officers in multiple offices across the nation. *Id.* ¶ 24. On any given flight, there may be aliens being removed to numerous foreign nations. *Id.* This requires ICE to coordinate multi-leg flights through multiple countries. *Id.* Given the complicated nature of these operations, charter flights can take 30 days or more to coordinate. *Id.* In order to remove aliens on one flight, ICE must contact and receive permission from each country for each landing. *Id.* ICE must secure country clearance for all flights and visas for all ICE officers on the flight. *Id.* In addition, all stakeholders in country must be notified including, for example, the U.S. Department of State, in-country ICE Homeland Security Investigations and Enforcement and Removal Operations ("ERO") attachés. *Id.* ICE also must coordinate with local foreign law enforcement when releasing an alien into their home country. *Id.* Not all countries will allow ICE to land a plane with third-country nationals onboard, which adds significant logistical difficulties and a significant cost to the American people. *Id.* Chartering flights and making logistical arrangements after agreement is reached requires preparation and precaution, particularly for dangerous aliens. *Id.* But the Court's Orders—especially those portions imposing mandatory notice and reopening periods—effectively requiring new immigration proceedings with attendant delay—risk upsetting all those carefully laid plans by, for example, scuttling sensitive international agreements for the acceptance of aliens or the landing of flights and upsetting complicated and costly logistical arrangements. *Id.* The Court's Orders, in other words, threaten to force the Government to start all over—with the possibility of once again being thwarted in the next attempt at removal.

      In interfering with the President's ability to execute the laws related to removal, the Court's Orders also create serious safety risks. If removal cannot be timely effectuated, DHS may be forced, in compliance with *Zadvydas v. Davis*, 533 U.S. 678 (2001), to release the alien into the community while continuing to pursue removal options. Ripa Decl. ¶ 18, 28. This is true even for

8

convicted rapists like those on the flight at issue in this case. *Id.* ¶ 18. Indeed, multiple criminal aliens on the removal flight at issue in this case earlier had to be released into the community due to DHS not having the ability to remove them. *Id.* In threatening to undo the Government's removal plans, the Court's Orders risk forcing release of dangerous aliens into the public if the Government is not able to timely remove the aliens when the Court's imposed proceedings have concluded. *Id.* ¶ 28.

For all of these reasons, the Court's Orders impose an improper burden on Defendants' ability to faithfully execute immigration laws.

### IV.     Alternatively, The Court Should Stay its Orders Pending Appeal

If the Court declines to grant reconsideration, a stay pending appeal is clearly merited here. Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). As discussed above, Defendants are likely to prevail on the merits of the appeal because the Court erred in concluding the Defendants failed to provide "meaningful opportunity" and impermissibly infringed on the Executive Branch's Article II foreign relations authority, command-in-chief power., and ability to faithfully execute immigration laws. Moreover, the Orders are already causing irreparable harm to important U.S. strategic interests in Libya, South Sudan, Djibouti, and throughout the region. Moreover, the equities clearly favor Defendants.

9

## CONCLUSION

For the foregoing reasons, Defendants ask that the Court reconsider its Orders (ECF Nos. 116, 118, 119). Alternatively, Defendants request this Court stay the Orders pending appeal. In order to allow a meaningful appeal, Defendants respectfully request a prompt ruling on this motion.

Respectfully submitted,

| | |
|---|---|
| YAAKOV M. ROTH<br>Acting Assistant Attorney General | /s/*Matthew P. Seamon*<br>MATTHEW P. SEAMON<br>(California Bar #309249)<br>Senior Litigation Counsel |
| DREW ENSIGN<br>Deputy Assistant Attorney General | U.S. Department of Justice, Civil Division<br>Office of Immigration Litigation<br>P.O. Box 868, Ben Franklin Station |
| ELIANIS N. PEREZ<br>Assistant Director | Washington, DC 20044<br>(202) 598-2648<br>(202) 305-7000 (facsimile) |
| MARY L. LARAKERS<br>Senior Litigation Counsel | Matthew.Seamon2@usdoj.gov |

## LOCAL RULE 7.1 CERTIFICATION

I, Matthew Seamon, certify that pursuant to L.R. 7.1(a)(2), counsel for Defendants conferred with counsel for Plaintiffs, who oppose this motion.

|  |  |
|---|---|
|  | /s/ *Matthew P. Seamon* |
|  | Matthew P. Seamon |
| Dated: May 23, 2025 | Senior Litigation Counsel |

## CERTIFICATE OF SERVICE

I, Matthew Seamon, Senior Litigation Counsel, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

|  |  |
|---|---|
|  | /s/ *Matthew P. Seamon* |
|  | Matthew P. Seamon |
| Dated: May 23, 2025 | Senior Litigation Counsel |