# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D., et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. Department of Homeland Security, et al., <br><br> Defendants. | Civil Action No. 25-10676-BEM |

**DECLARATION OF SECRETARY OF STATE MARCO RUBIO**

I, Marco Rubio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2. The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and

1

relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3. The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that the Orders by this Court, including on April 30 and May 20, 2025, cause significant and irreparable harm to U.S. foreign policy. The May 20 Order requires Defendants "to maintain custody and control of class members currently being removed to South Sudan or to any other third country, to ensure the practical feasibility of return if the Court finds that such removals were unlawful." This requirement has already had, and will continue to have, negative consequences to important U.S. strategic interests, including in Libya, South Sudan, and Djibouti.

4. In Libya, the Court's Orders have interfered with quiet diplomatic efforts and exacerbated internal political and security divisions in Libya. As factions opposed to Prime Minister Dabaiba sought to capitalize on public reports of potential migration removals to Libya for political gain, Libya's Government of National Unity (GNU) publicly rejected the use of Libyan territory for accepting deportees; rival authorities based in Benghazi also denied any agreement with the United States to accept deportees. In the context of this political unrest, GNU-aligned forces took action against the two largest armed groups in the Libyan capital on May 12-13, sparking the most serious street fighting in Tripoli since 2022. As of May 21, the situation in Tripoli remains unsettled, as GNU-aligned forces and their opponents seek to consolidate political and military support. On May 19, a senior Libyan official informed the Department that the unrest in Tripoli had forced a postponement in the announcement of a significant commercial deal to expand activities of a U.S. energy company in Libya.

5. In South Sudan, the Orders threaten to derail significant efforts to quietly rebuild a productive working relationship with the government in Juba. Before the Court's intervention, the government in South Sudan, which previously refused to accept the return of one of its own nationals, had taken steps to work more cooperatively with the U.S. government. Cooperation between the U.S. and South Sudan is critical, both in terms of removals but also to advance the U.S. government's humanitarian efforts in the country. Without South Sudan's cooperation, moving humanitarian relief – food, medicine, etc. – into the region becomes more difficult. It is almost certain the Court's interjection will result in delayed or significantly reduced humanitarian efforts.

6. The May 20 Order also causes harm in Djibouti. Djibouti is strategically located in the Horn of Africa. The country sits astride the world's busiest shipping lanes and is adjacent to at least seven regional conflicts and the presence of multiple terrorist organizations, including ISIS, al-Shabaab, and the Houthis. For this reason, the U.S. military's Combined Joint Task Force – Horn of Africa (CJTF-HOA) is based in Djibouti and represents the only U.S. military base on the African continent. Ongoing security actions in the Red Sea and across the Horn of Africa are complex and reflect deep ongoing diplomatic negotiations with our Djiboutian hosts.

7. United States government aircraft use the CJTF-HOA facilities for a range of tasks, all negotiated with the Djiboutians. A flight bringing 8 individual removals from the United States for resettlement in South Sudan used the CJTF-HOA logistical facilities, for which we had consulted and gained approval from the Djiboutians. The Order interrupted the transit process and required that the aircraft and the 8 individuals removed, including convicted felons, temporarily remain in Djibouti. That action required our government to re-engage the Djiboutians to explain that the mission they had approved had subsequently changed.

8. This situation both diverted attention from and further complicated ongoing security cooperation, including counter-terrorism operations and both United States and multinational military movements.

9. Disruptions at CJTF-HOA as a result of the May 20 Order would have broader, negative implications. For example, such disruptions could interfere with humanitarian assistance across the region in a time of severe humanitarian crisis. Some parts of the region are suffering from famine. It is therefore critical for the United States to maintain effective foreign policy engagements in the region without judicial interference.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of May 2025.

_____
Marco Rubio
Secretary of State