UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D., *et al.*,<br>Individually and on behalf of all others<br>similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. Department of Homeland Security,<br>*et al.*,<br><br><br>*Defendants*. | Civil Action No. 1:25-cv-10676-BEM |

**DECLARATION OF ACTING DEPUTY EXECUTIVE ASSOCIATE DIRECTOR
GARRETT J. RIPA**

Pursuant to 28 U.S.C. § 1746, I, Garrett J. Ripa, declare as follows:

1. I am the Acting Deputy Executive Associate Director ("D-EAD") for Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2. As the D-EAD, I lead ERO in its mission to protect the homeland through the arrest and removal of aliens who undermine the safety of our communities and the integrity of our immigration laws. I am responsible for a budget of approximately $4.7 billion and lead more than 8,600 employees assigned to 25 ERO field offices and

    headquarters, in more than 200 domestic locations and 30 overseas locations. I oversee the eight Assistant Directors that lead ERO's headquarters divisions, including: Enforcement, Removal, Non-Detained Management, Custody Management, Field Operations, ICE Health Service Corps, Law Enforcement Systems and Analysis, and Operations Support.

3. I began my career with the United States Government in 1996 as a Detention Enforcement Officer in Miami, Florida, with legacy U.S. Immigration and Naturalization Service. Over time, I have also held the positions of Deportation Officer, Supervisory Detention and Deportation Officer, Assistant Field Office Director, and Field Office Director of the Miami ERO Field Office at DHS ICE.

4. I am aware of the orders issued in the above-captioned matter.

5. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

6. On April 18, 2025, this Court issued a Preliminary Injunction requiring that, prior to removing any class member to a country not explicitly listed on the alien's order of removal: (1) DHS must provide written notice to the alien—and the alien's immigration counsel, if any—of the third country to which the alien may be removed, in a language the alien can understand; (2) DHS must provide meaningful opportunity for the alien to raise a fear of return for eligibility for Convention Against Torture ("CAT") protections; (3) DHS must move to reopen the proceedings if the alien demonstrates "reasonable fear"; and (4) if the alien is not found to have demonstrated

"reasonable fear," DHS must provide a meaningful opportunity, and a minimum of fifteen days, for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

7. To implement the requirement that it provide a class member a "meaningful opportunity . . . to raise a fear of return for eligibility for CAT protections," ICE generally provides an alien twenty-four hours, depending on exigency, following service of the Notice of Removal for the alien to raise a fear of torture if they are removed to the third country or express an intent to file a CAT claim. A class member's fear claim need not be adjudicated within the twenty-four hours; that timeframe is simply the time given for aliens to express a fear of torture, which is then referred to U.S. Citizenship and Immigration Services for adjudication.

8. For the aliens on the flight at issue, ICE ERO provided them with written notice of the country of removal in a language they understood; ICE ERO explained the written notice to them; ICE ERO confirmed that they understood the notice; and none raised a fear of removal to South Sudan.

9. At approximately 10:45 a.m. on May 19, 2025, ████████████, ████████ ████████████, ████████████, ████████████, ████████, ████████, ████████, and ████████████ were housed in the same holding cell at the Port Isabel Service Processing Center in Los Fresnos, Texas. Available records and recent interactions with the aliens reflect that each understood the English language.

10. Between 5:46 and 5:48 p.m. on May 19, 2025, each alien was informed that he would be removed to South Sudan via service of a "Notice of Removal" in the English

language listing South Sudan as the county of removal. The form was explained to each alien in English. Each alien individually affirmatively indicated they understood the contents of the form and refused to sign. ERO also emailed the "Notice of Removal" to the attorney for ▮▮▮ At no time did any of the above-referenced aliens express a fear of being removed to South Sudan.

11. Based upon my nearly thirty years as an immigration officer at various levels, any alien who is being told that he or she is being removed to a third country would reasonably be expected to immediately notify ICE of any fear of removal to that third country and certainly within twenty-four hours. It usually takes minutes rather than hours for an alien to express fear.

12. Aliens in this situation would have gone through a removal process where they would have been advised of asylum, withholding of removal, and CAT protections. Some would have already sought these protections in the past.

13. In the expedited removal process, including under the Biden Administration's *Securing the Border* regulation, DHS is not limited in how quickly it can execute a removal. Although expedited removals may take more than 24 hours, many are executed in even shorter periods. There, fear claims are and were raised almost immediately.

14. Outside the context of expedited removal, the removal process, beginning with encounter and ending with removal, can take months to several years.

15. Much of this timeline is tied to the immigration court process and its constant delays and backlogs. Once in immigration proceedings, an alien has the opportunity to

challenge their removability from the United States. If removability is established, the alien then has a right to seek relief or protection from removal.

16. An alien ordered removed by an immigration judge may appeal to the Board of Immigration Appeals and, if the immigration judge's order is not overturned, may file a Petition for Review (PFR) with the relevant U.S. Court of Appeals. In multiple jurisdictions, the filing of a PFR automatically triggers a stay of removal for the duration of the process, which could take years and continuously taxes ICE resources.

17. Once an alien is the subject of an executable final removal order, ICE can move forward with the removal process. This process can be arduous, particularly with regard to the many countries that are recalcitrant in accepting the return of their nationals. It can be even more difficult when dealing with dangerous criminals, whose countries—and other countries—are hesitant to accept their nationals where those individuals are convicted rapists and murderers, like those who were on the flight at issue.

18. If removal cannot be timely effectuated, DHS may be forced, in compliance with *Zadvydas v. Davis*, 533 U.S. 678 (2001), to release the alien into the community while continuing to pursue removal options. This is true even for convicted rapists and murderers like those on the flight at issue in this case. In fact, multiple aliens on the flight at issue were forced to be released into the community and continued to terrorize American citizens despite their prior heinous crimes due to an inability to remove them.

19. For example, ███████████████, a twice convicted violent criminal, was released from ICE custody in May of 2021 because ICE was unable to secure his removal to

Cuba due to that country's recalcitrance in accepting the return of its nationals. In 1999, ▮ held a .38 caliber gun to a victim's head and pulled the trigger twice. Fortunately, the gun misfired, causing ▮ to pistol whip the victim instead. Despite having an administratively final order of removal, ▮ was released into the community, allowing him to reoffend despite his attempt at murdering an innocent person. In 2007, ▮ was convicted of strongarm robbery and kidnapping, resulting in a sentence of over 15 years. Despite his violent nature, ▮ was released from ICE custody in 2021 because there was no likelihood of removal in the reasonably foreseeable future given the Cuban government's recalcitrance at accepting their citizens. It was not until four years later, in May of 2025, that ▮ was brought back into ICE custody, such that he was in the community for four years despite having convictions for attempted murder, robbery with a deadly weapon, and kidnapping.

20. On October 10, 2008, ▮ was convicted of arson and was sentenced to fifteen years of probation. A short time later, on November 8, 2010, ▮ was convicted of trafficking cocaine and sentenced to three years in prison. He was released on December 15, 2015, because there was no significant likelihood of removal in the reasonably foreseeable future given that Cuba refused to accept the return of its citizens from the United States. After his release, ▮ went on to commit a string of dangerous crimes to include possession of a firearm by a convicted felon resulting in additional jail time. In 2022, ▮ was convicted of attempted murder and sentenced to four years in prison.

21. In 1995, ▓▓▓▓▓▓▓▓▓▓ was convicted of first-degree murder, attempted murder, and second-degree robbery against a sixty-four-year-old German tourist and her husband after robbing them in the mountains near Idyllwild, California. He shot and killed the wife and shot the husband in the face, who managed to survive. Nonetheless, on February 11, 2023, ICE was forced to release him into the community because he could not be removed, as the government of Laos refused to issue a travel document. ICE was only able to take him back into custody on March 31, 2025.

22. Where ICE cannot remove an alien to the country designated by the IJ, it will focus resources in appropriate cases on removal to a third country. This process is time consuming, operationally burdensome, and requires delicate engagement with foreign officials, often necessitating direct engagement by the U.S. Department of State to convince a foreign government to accept for removal a dangerous criminal alien with no or limited ties to that country.

23. If ICE, or another arm of the U.S. Government, is able to obtain an agreement by a third country to accept an alien, it then often must rearrest the alien in the community, which may require Special Response Teams (SRTs), which are specially trained to engage with violent criminals and conduct other high-risk operations. Deployment of such teams diverts significant additional resources. However, such precautions are necessary when seeking to re-arrest dangerous criminals at large in our communities.

24. Once ICE takes these aliens into custody, ERO must build a manifest for the flight. Aliens scheduled for removal are located throughout the country, requiring the coordination of officers in multiple Areas of Responsibility. On any given flight,

there may be aliens being removed to numerous foreign nations. This requires ICE to coordinate multi-leg flights through up to four countries. Given the complicated nature of these operations, charter flights can take 30 days or more to coordinate. In order to remove aliens on one charter ICE must contact and receive permission from each country for each landing. ICE must secure country clearance for all flights and visas for all ERO officers on the flight. In addition, all stakeholders in country must be notified, for example, U.S. Department of State, in-country ICE Homeland Security Investigations and ERO attachés. When flights are contracted, ICE must contract with additional pilots and crews in order to complete multi-leg flights. ICE also must coordinate with local foreign law enforcement when releasing an alien into their home country. Not all countries will allow ICE to land a plane with third-country nationals onboard, which adds significant logistical difficulties and a significant cost to the American people.

25. The dangerous aliens that were included on the flight at issue in this case needed appropriate levels of security staffing. This additional staffing included ICE SRT officers, who have the expertise, training, and equipment to respond to emergency situations and act to adequately protect the flight crew and ICE personnel. SRT members may be required to address a detainee acting in a violent manner who needs to be subdued for the safety of other detainees and the flights officers on board.

26. Given the planning and resource requirements for special removal charter flights, costs may be exorbitant for removal of even just a few dangerous aliens. For example, the average cost for a special charter to the African continent using the smallest available charter plane is over $1.3 Million. This figure is an approximation that only

accounts for total flight hours of between 30-40 and associated costs under the contract with the charter company and also includes the cost of requiring multiple SRT officers onboard.

27. Arrangements for a country to accept an alien, particularly a third country national, as well as country clearances, related operational requirements, and charter flight schedules are often time limited. For that reason, scheduling delays can result in the need to revisit any or all parts of the process. In addition to operational implications, additional costs associated with delays, or layovers due to unforeseen circumstances would substantially increase the total financial burden of such flights on the government.

28. With the requirements imposed by the court in its April 18, 2025 order, ECF No. 64; April 30, 2025 order, ECF No. 86; May 7, 2025 order, ECF No. 91; and now its May 21, 2025 order, ECF No. 119, the already extraordinary process is unreasonably delayed and will in many cases need to be restarted. With the new requirement that an alien be given a "minimum of ten days, to raise a fear-based claim for CAT protection prior to removal[,]" ICE will be forced to dedicate sparce detention beds to criminal aliens when it is already prepared to execute their lawful removal orders at both a significant expense to the United States and the preclusion of using those detention beds to detain other dangerous aliens and aliens posing a flight risk who are not yet subject to a final order of removal. The process imposed by the court creates a vicious cycle that would require ICE to relitigate enforceable removal orders when attempting to remove aliens who have no right to remain in the United States, but hail from countries who refuse to cooperate with the acceptance of their criminal citizens,

and has the potential to result in ICE being forced to release them back into the communities under *Zadvydas*.

29. With this process, assuming the alien does raise a fear claim in this time (which more will when they learn it will delay their removal and potentially derail them operationally) we are left with two options, neither good. Either aliens are found to have a reasonable fear and DHS is required to seek to reopen their often long-completed proceedings, or they are found not to have a fear and DHS must give them *yet another* fifteen days to seek to reopen their own proceedings. In short, even a frivolous fear claim could delay removal for twenty-five days, if not indefinitely, depending on the circumstances. Travel documents are not valid indefinitely, and ICE often has only a short window to remove an alien. This means that any delay could lead to ICE having to engage in the entire process again, wasting valuable government resources, straining detention capacity, and/or release these dangerous criminals once again.

30. Ultimately, this court-created process, overlaid atop the framework that Congress established and ICE developed to meet operational realities, adds an onerous and duplicative procedure for removal of aliens who have already received the benefit of comprehensive removal proceedings in the United States, who have been found to be removable from the United States, and who have been found to have no valid claim of protection in that process, and who have had access to recourse of Article III courts. Such a burden will significantly impede DHS's ability to effectively enforce immigration laws and remove dangerous criminals from the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 23rd day of May 2025

Garrett Ripa
Acting Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security