**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **D.V.D, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,**<br><br>**Defendants.** | ) | **Civil Action No. 25-10676-BEM** |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTIONS FOR RECONSIDERATION AND STAY**

**MURPHY, J.**

Defendants have mischaracterized this Court's order, while at the same time manufacturing the very chaos they decry. By racing to get six class members onto a plane to unstable South Sudan, clearly in breach of the law and this Court's order, Defendants gave this Court no choice but to find that they were in violation of the Preliminary Injunction.

Even after finding that violation, however, the Court stayed its hand and did not require Defendants to bring the individuals back to the United States, as requested by Plaintiffs. Instead, the Court accepted *Defendants' own suggestion* that they be allowed to keep the individuals out of the country and finish their process abroad. In the interest of full transparency, the Court quotes at length from the hearing transcript:

> **THE COURT**: [Plaintiffs' counsel] is suggesting that the only remedy is for the plane to return here so that these individuals be given an opportunity to raise any objections they have to being sent to South Sudan. Do you have another suggestion as to what a remedy that would allow these people to have the process that they are due might be?
>
> **MR. ENSIGN**: If I may, we think any remedy should be narrowly tailored to the violation. And so, you know, if Your Honor believes they weren't given a meaningful opportunity to express a fear under CAT [Convention Against Torture], that **the remedy should first be limited to giving them such a meaningful opportunity. If they were to do so, then they would be given that reasonable fear interview.** But bringing them back would be a much broader remedy than necessary because this Court only requires compliance with procedures and, to the extent that Your Honor believes those procedures were not followed, the Government should be allowed to provide those procedures, and that should satisfy the due process as interpreted by this Court.
>
> **THE COURT**: Thank you, Mr. Ensign. So let's say that -- I agree with you that I want to make the most narrowly tailored order to address the violation of my preliminary injunction that is possible. **What you're suggesting is that they can have a reasonable fear interview where they are now.** Is that a practical possibility?
>
> **MR. ENSIGN**: Your Honor, I don't know. I'd have to speak to my client, but **I think that would need to be at least one of the compliance options that's presented, because that would be a much more narrowly tailored remedy that is actually tailored to the violation that Your Honor has found.**[1]

After this exchange, Defendants spent several hours conferring internally as to the feasibility of this option, ultimately deciding that it was doable:[2]

> **THE COURT**: I'm very much considering this, but, if this is the route we go, **my inclination would be to say, if you want to do all of these [interviews] where they are, you have to do them appropriately; if you don't want to, you can always bring them home of your own volition and do it there. And so I'm not going to mandate that the Department do anything overseas, but in an effort to craft as circumscribed a remedy as possible, I'm inclined to say if the Department wants to figure that out, I'm inclined to let them.**

[1] Tr. of May 21, 2025 H'rg at 44:8–45:14 (emphases added).

[2] Tr. of May 21, 2025 H'rg at 119:10–21. ("[I.C.E. Assistant Director Charles]: I know it's possible and the Department can work it out. We've been working on it for the last couple of hours to make sure that we can do it, and it is possible to do it.").

> **MR. ENSIGN**: **And we appreciate that, Your Honor.** And, you know, to the extent that it poses challenges that are not -- that would be insurmountable, we would quickly inform the Court and figure out -- use one of the options to comply with the Court's orders.[3]

Since that hearing, merely five days ago, Defendants have changed their tune. It turns out that having immigration proceedings on another continent is harder and more logistically cumbersome than Defendants anticipated. However, the Court never said that Defendants *had* to convert their foreign military base into an immigration facility; it only left that as an option, again, *at Defendants' request*. The other option, of course, has always been to simply return to the status quo of roughly one week ago, or else choose any other location to complete the required process.

To be clear, the Court recognizes that the class members at issue here have criminal histories. But that does not change due process. "The history of American freedom is, in no small measure, the history of procedure." *Malinski v. New York*, 324 U.S. 401, 414 (1945) (Frankfurter, J., concurring). "It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 179 (1951) (Douglas, J., concurring). The Court treats its obligation to these principles with the seriousness that anyone committed to the rule of law should understand.

It continues to be this Court's sincere hope that reason can get the better of rhetoric. The orders put in place here are sensible and conservative. Accordingly, and for the reasons stated herein, Defendants' motions for reconsideration and for stay pending appeal are DENIED.

---

[3] Tr. of May 21, 2025 H'rg at 112:1–25 (emphases added).

## I. <u>Background</u>

### A. <u>General Background</u>

This action concerns the procedures that the Government must take before removing non-citizens to "third" countries. The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, determines the country or countries to which an individual can be removed. *Id.* § 1231(b). In the first instance, the Government generally must remove a non-citizen to their country of origin or to the country designated on their Order of Removal. *See id.* § 1231(b)(2)(A)–(D). If those options prove "impracticable, inadvisable, or impossible," the Government may remove the non-citizen to any other country whose government will accept them, *i.e.*, to a "third" country. *Id.* § 1231(b)(2)(E)(vii). The Government's power to designate third countries for removal is subject to certain limitations set by Congress. *Id.* § 1231(b)(2). In particular, the Government may not remove a non-citizen to a country where they are likely to be tortured. *See* note to 8 U.S.C. § 1231 (codifying the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA")). A non-citizen's claim that he or she qualifies for this type of protection is called a "CAT" claim, referring to the Convention Against Torture, an international agreement implemented by Congress through FARRA. *See id.*

### B. <u>Case Background</u>

On March 23, 2025, Plaintiffs filed this action, claiming that Defendants were removing people to third countries without giving any opportunity to show that they were at risk of persecution or torture. *See generally* Dkts. 1, 6–8. On April 18, 2025, the Court issued a Preliminary Injunction, which required Defendants to tell class members about their third-country removals in advance and to give them a "meaningful opportunity" to show or explain why they qualify for CAT protection. *See* Dkt. 64 at 46–47.

Twice, well-founded allegations of non-compliance or imminent non-compliance led this Court to amend or clarify the Preliminary Injunction. *See* Dkts. 86, 91. Neither of those changed the substance of the Preliminary Injunction, which continued to require Defendants to give written notice of the third-country removal and a meaningful opportunity to make a CAT claim. *See id.*

### C. Present Issues

On May 21, 2025, Plaintiffs again moved for a temporary restraining order and preliminary injunction, alleging that Defendants were violating or had already violated the Preliminary Injunction by removing an unknown number of individuals to South Sudan without advanced notice and without an opportunity to demonstrate CAT eligibility. *See generally* Dkts. 111–12. Shortly thereafter, the Court called a hearing by remote videoconference. Dkt. 115. Defendants' attorneys had very little information, and the Court ordered Defendants to maintain custody of the individuals while everybody figured out what was happening. Dkt. 116.

The Court held an in-person hearing the next day, May 21, 2025. Dkts. 114, 117. An hour prior, Defendants held a press conference where they revealed the names and criminal histories of the individuals on the plane, at least six of whom turned out to be class member Plaintiffs in this case.[4] At the hearing, the Court learned that these individuals were being held at a foreign military base in Djibouti.[5] The Court heard sworn testimony from the I.C.E. Acting Assistant Director for

---

[4] *See Immigration and Customs Enforcement Officials Hold News Conference*, CSPAN (May 21, 2025), https://www.c-span.org/program/news-conference/immigration-and-customs-enforcement-officials-hold-news-conference/660241; *see also* Press Release, Department of Homeland Security, DHS Reacts to Activist Judge Ruling to Halt the Deportation of Barbaric Criminal Illegal Aliens Including Murderers, Rapists, and Pedophiles, (May 21, 2025), https://perma.cc/ZAR7-8KWE.

[5] Defendants requested that the country location of the individuals be kept under seal but have since made that information public. *See* Dkt 131-1; *see also* Haley Britzky, et al., *Deported migrant detainees are holding at a US Naval base in Djibouti amid court fight, officials say*, CNN (May 22, 2025 2:12 PM), https://perma.cc/W2FN-C6X8.

Field Operations at Enforcement and Removal Operations, Marcos Charles, and acting General Counsel of Department of Homeland Security, Joseph Mazzara. Dkt. 117.

Based on that testimony, Plaintiffs' submissions, and Defendants' submissions in connection with the instant motion, the Court has made factual findings, substantially reflecting its understanding of the events immediately following the May 21, 2025, hearing:

Sometime on May 19, 2025, Defendants informed eight individuals in I.C.E. detention that they were being removed to South Africa. *See* Dkt. 112-1 at 4–5; Dkt. 112-3 at 4. Later that day, no earlier than 5:46 p.m., Defendants told them instead that they were being removed to South Sudan. *Id.*; Dkt. 130-2 ¶ 10.[6]

The U.S. Government has issued stark warnings regarding South Sudan, advising its citizens not to travel to there because of "**crime**, **kidnapping**, and **armed conflict**." *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphases in original). The U.S. Department of State further warns that "[v]iolent crime, such as carjackings, shootings, ambushes, assaults, robberies, and kidnappings are common throughout South Sudan, including [its capital,] Juba. Foreign nationals have been the victims of rape, sexual assault, armed robberies, and other violent crimes." *Id.*

The following day, no later than 9:35 a.m., the class members left detention and were brought to a nearby airport.[7] Tr. of May 21, 2025 Hr'g at 39:17. After leaving the detention center, class members definitively had no communication access. *Id.* at 19:10–18. Thus, these individuals received fewer than 16 hours' notice before being removed, most of which were non-waking hours, none within the business day. During the interim, they had limited, if any, ability to communicate

[6] All refused to sign their notices of removal. Dkt. 130-2 ¶ 10.

[7] One attorney was told by I.C.E. at 8:27 a.m. that her client had already been removed. Dkt. 112-1 ¶¶ 8–10.

with family or legal representatives and little, if any, opportunity to access information that would have allowed them to determine for themselves the repercussions of being removed to South Sudan.[8] The plane was in the air by noon. *Id.* at 17:2–3.

Based on this information, the Court found that Defendants had violated the Preliminary Injunction and crafted a remedy based on Defendants' requests made during the hearing. *See* Dkt. 119.[9] The Court further issued a clarification as to the Preliminary Injunction, Dkt. 118, based on Defendants' representations that the initial iteration of the Preliminary Injunction "wasn't specific enough." *See, e.g.*, Tr. of May 21, 2025 Hr'g at 37:23–38:3 ("I just wanted to highlight, Your Honor, that I think that part of any misunderstanding on the -- from the Department of Homeland Security may have had to do with the fact that the Court's preliminary injunction motion wasn't specific enough, and so we ask that the Court please take that into consideration when issuing its order.").

**D. <u>Procedural Posture</u>**

On May 23, 2025, at 9:03 p.m., Defendants moved the Court to reconsider its finding that Defendants violated the Preliminary Injunction and to vacate its orders accordingly.[10] Dkt. 130 at 2. In the alternative, Defendants seek a stay of those orders pending appeal. *Id.*

The removals at issue were brought to this Court's attention originally via Plaintiffs' May 20, 2025, motion for temporary restraining order and preliminary injunction. Dkt. 111. Had

---

[8] Acting Director Charles testified that detainees generally have access to a telephone or tablet for communication purposes while in custody. Tr. of May 21, 2025 Hr'g at 20:4–17. However, he could not confirm whether these specific individuals did or at what time their access was cut off. *Id.* As stated, at least one attorney attempted but was unable to meet with her client during the short window. *See generally* Dkt. 112-1.

[9] The Court reserved ruling on whether such a violation warranted a finding of contempt. *See* Tr. of May 21, 2025 Hr'g at 35:12–17.

[10] Defendants characterize Dkt. 118 as an order. The Court believes it is more properly a clarification but need not muddy the waters.

the Court not found that Defendants' actions were already covered by the Preliminary Injunction, *see* Dkt. 64, it would have issued the same remedy in the form of a new temporary restraining order or preliminary injunction. In other words, the Court believes that it already ruled prospectively that Defendants' May 20, 2025, actions were unlawful, but even if not, the Court would find them unlawful now, to the same effect. Accordingly, the Court will supplement its analysis to address those factors as necessary below.

## II. Legal Standard

### A. Motion for Reconsideration

A district court "has the inherent power to reconsider its interlocutory orders." *Fernández–Vargas v. Pfizer*, 522 F.3d 55, 61 n.2 (1st Cir. 2008). A motion for reconsideration is allowed where "the original decision was based on a manifest error of law or was clearly unjust." *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009). However, "[u]nless the court has misapprehended some material fact or point of law," a motion for reconsideration "is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected." *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006).

### B. Motion for Stay Pending Appeal

"Deciding a motion for a stay pending appeal requires an exercise of the court's equitable discretion." *Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, 527 F. Supp. 3d 40, 58 (D. Mass. 2021) (citing *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 15–16 (1st Cir. 2020)). The Court considers the following factors, substantially like those considered on a motion for preliminary injunction: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

Likelihood of success is the essential element. *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) (calling it the "sine qua non" for a stay pending appeal).

### C. Motion for Temporary Restraining Order or Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The last two factors "merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Likelihood of success "weighs most heavily" in the preliminary injunction analysis. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). "The standard for issuing a TRO is 'the same as for a preliminary injunction.'" *Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (quoting *Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013)).

## III. Discussion

### A. Motion for Reconsideration

#### 1. Defendants Violated the Preliminary Injunction

Defendants characterize this last week's events as a big misunderstanding, brought on by the Court's failure to specify what constitutes a "meaningful opportunity" to present fear-based claims. Dkt. 130 at 3–4. Indeed, at the March 28, 2025, hearing, Defendants' counsel did raise the issue and, by way of example, pointed out that Defendants would likely consider the opportunity Plaintiff O.C.G. received to have been "meaningful." *See id.* Defendants now argue that the parties and the Court were essentially on notice that Defendants might apply that same standard prospectively, as a way of complying with the Preliminary Injunction. *Id.* at 4. The fatal

flaw with this argument is that, prior to May 20, 2025, the Court had already twice found that O.C.G.'s process was likely insufficient.[11]  Dkt. 40 at 6; Dkt. 64 at 42 n.43.  Moreover, as of March 28, 2025, Defendants were claiming that O.C.G. was notified of his removal in *January*, roughly *three weeks prior* to his actual removal in February.  Dkt. 31 at 4.[12]  It is therefore impossible to justify Defendants' position that O.C.G.'s case reasonably stood as a benchmark of compliance with the due process protections this Court has determined to be required.

Defendants effectively tell this Court that it should have at least tried to micromanage the Department of Homeland Security as it fulfills its required obligations, but that is not the role of the courts.  *See Martinez v. Bondi*, 132 F.4th 74, 84 (1st Cir. 2025) (explaining that the appropriate remedy for improper agency action, "except in rare circumstances, is to remand to the agency for additional investigation or explanation").  Rather, this Court has strived to give Defendants as much flexibility as possible within legal bounds.  At the end of the March 28, 2025, hearing, the Court presented Defendants with a good-faith opportunity to define the process provided under the Preliminary Injunction:

> **THE COURT**: . . . In the meantime, I take your point about the Court ordering what "meaningful" means to heart.  And so I would consider a motion to reconsider, if you wanted to narrow what that procedure looked like, or you wanted [to] come to an agreement about what it looked like, or you wanted to tell me, [t]his is what we're defining as meaningful, and I would like you to reconsider and adopt this.  I'm open to all of those things because you raise a very good point.  And so, to the extent that the guidance that the Court is giving you is nothing more than a meaningful opportunity and you want some more direction or you want to narrow that with some more specificity, I would welcome a motion to consider.

---

[11] At those times, the Court declined to order O.C.G.'s return based on Defendants' then-assertion that O.C.G. disavowed any fear of his removal.  Dkt. 40 at 6 & n.11; Dkt. 64 at 47–48.  That factual dispute has since been resolved in O.C.G.'s favor, and the Court has accordingly ordered Defendants to facilitate his return.  Dkt. 132.

[12] Defendants' brief states that O.C.G. was asked whether he had a fear of being sent to Mexico in January.  Dkt. 31 at 4.  The declaration cited states that O.C.G.'s removal was scheduled on or about January 31, 2025, and that O.C.G. was asked whether he had a fear of being sent to Mexico on or around February 21, 2025, the day of his removal.  Dkt. 31-1 ¶¶ 12–13.  While inconsistent either way, a natural reading is that O.C.G. was at least notified of his removal at time of scheduling.

> If you file a motion to consider, I can hear you. I think you're in D.C.; so I can hear you, even by Zoom, within 24 hours.

Tr. of Mar. 28, 2025 H'rg at 68:13–69:3. Defendants' counsel thanked the Court for that opportunity, *id.* at 69:4–5, but then declined to take it.[13]

Consistent with this approach, the Court has repeatedly asked Defendants to weigh in on the particulars of its remedies, and Defendants have consistently refused. *See* Dkt. 64 at 47 n.49 ("The Court has been forced to decide on an appropriate time limit because Defendants were unable, unwilling, or incapable of meaningfully engaging in a discussion about what process was required to provide aliens with a meaningful opportunity to contest a finding that their fear was reasonable."). Even in this latest round of back-and-forth, nearly two months later, the Court again asked Defendants for input on the appropriate length of time to raise a fear-based claim—Defendants again refused to engage.[14] Tr. of May 21, 2025 Hr'g at 48:14–49:10 ("[Mr. Ensign]: Certainly, our position is that 24 hours is sufficient. We recognize you disagree, but we don't have a specific proposal in light of this Court's disagreement with that position.").[15] The Court then suggested that Defendants could provide additional authority after the hearing, *id.* at 50:21–51:10—Defendants did not. From this course of conduct, it is hard to come to any conclusion other than that Defendants invite lack of clarity as a means of evasion.

---

[13] Defendants moved for an indicative ruling as to whether the Court would find that subsequent guidance issued by the Department of Homeland Security mooted Plaintiffs' claims. Dkt. 43. That guidance did not address or attempt to clarify the substance of what constitutes a meaningful opportunity—indeed, its thrust was that, in certain circumstances where the United States has received diplomatic assurances, no opportunity would be had at all. *Id.* at 2–3; *see also* Dkt. 64 at 42–43 (finding that the procedures outlined in the guidance were insufficient). For the remainder, Defendants offered no clarity as to what "opportunity" they would propose as acceptable.

[14] Tellingly, Defendants still do not propose any suggestion for how to define what constitutes a meaningful opportunity. *See* Dkt. 130 at 4–5. Defendants say that the Court "did not heed the Government's warning" that it should be allowed to draft a proposal for the Court's review. *Id.* at 5. That is incorrect; the Court expressly welcomed such a proposal. *See* Tr. of Mar. 28, 2025 H'rg at 68:13–69:3. The Government did not submit any proposal.

[15] Of course, the individuals here had fewer than 24 hours; they had, at most, sixteen. *See* Tr. of May 21, 2025 Hr'g at 12:20–22.

Defendants' argument might be stronger if this were at all close, but the Court breaks no new ground in finding that the events of May 20, 2025, did not include a meaningful opportunity for the class members to present fear-based claims. Defendants' own submission shows that it is I.C.E.'s general practice to provide 24 hours' notice prior to removal.[16] Dkt. 130-2 ¶ 7. Here, the class members "had fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane" to South Sudan. Dkt. 118 at 1. Class members appear not to have had any access to counsel—indeed, a declaration submitted by Plaintiffs alleges that I.C.E. *canceled* at least one attorney's pre-scheduled meeting with her client.[17] Dkt. 112-1 ¶¶ 8–10. Class members likewise had no opportunity to learn anything about South Sudan, a nascent, unstable country to which the United States has recently told its citizens not to travel because of "**crime**, **kidnapping**, and **armed conflict**."[18] The Court notes that class members were flown out on chartered flights, which Defendants state can take "30 days or more to coordinate." Dkt. 130-2 ¶ 24. Then the Court is left to consider, why were these individuals told less than sixteen hours in advance? *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *see also A.A.R.P. v. Trump*, 605 U.S. —, 2025 WL 1417281, at *2 (May 16, 2025) ("Under these circumstances, notice roughly 24

[16] Indeed Mr. Ensign, Deputy Assistant Attorney General for the Office of Immigration Litigation of the Department of Justice's Civil Division, suggested 24 hours was sufficient, apparently before realizing the notice here was significantly short of even this proffered minimum. Tr. of May 21, 2025 Hr'g at 49:8 ("Certainly, our position is that 24 hours is sufficient.").

[17] One attorney states that, at 8:27 a.m., she was informed that her client had already been removed to South Sudan. Dkt. 112-1 ¶ 8–10. But Defendants claim that the class members did not leave detention until 9:35 a.m. Tr. of May 21, 2025 Hr'g at 39:17.

[18] *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphases in original).

hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster.”). Given the totality of the circumstances, it is hard to take seriously the idea that Defendants intended these individuals to have any real opportunity to make a valid claim.

Defendants’ comparison to expedited removal is a red herring.[19] Plaintiffs’ class excludes non-citizens removed pursuant to expedited removal. *See* Dkt. 64 at 23 (defining the class to include “individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA”). Expedited removal usually involves individuals “apprehended at or near the border” or who are denied admission at ports of entry, before due-process rights attach. *Dep’t of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 106–08 (2020). By contrast, CAT claims emerging from standard removal proceedings, reinstatements of prior removal orders, and administrative removals, *see* Dkt. 64 at 23, have greater protections, including judicial review. *See* 8 U.S.C. §§ 1229a, 1231, 1228, 1252; 8 CFR §§ 208.31, 1208.31, 1208.16.[20] The comparison is thus inapposite.[21]

---

[19] It also goes more toward the merits of the case than the question of whether Defendants violated the Preliminary Injunction. Nevertheless, the Court addresses the argument insofar as it informs what a reasonable person could understand a meaningful opportunity to be and insofar as it bears on the Court’s findings in the alternative regarding Plaintiffs’ motion for preliminary relief.

[20] The Court notes, as have scholars in this area of the law, that it is somewhat of an anomaly that reinstated removal orders are subject to judicial review, while expedited removal orders—which may form the basis for reinstatement—are not. *See* Jennifer Lee Koh, *When Shadow Removals Collide: Searching for Solutions to the Legal Black Holes Created by Expedited Removal and Reinstatement*, 96 WASH. U.L. REV. 337, 368–72 (2018). Nevertheless, that is how it works.

[21] Even applying the law of expedited removals, however, the events of May 20, 2025, would have been unlawful. On May 9, 2025, the District Court for the District of Columbia struck down the final agency rule that required non-citizens to affirmatively manifest fear of return or removal in order to be given a fear-screening interview, as opposed to the previous rule which “required officials to provide individual advisals to each noncitizen [and] affirmatively ask questions designed to determine if the noncitizen qualifies for a credible fear interview.” *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep’t of Homeland Sec.*, — F.Supp.3d —, 2025 WL 1403811, at *16–17 (D.D.C. May 9, 2025). By Defendants’ own admission, these class members were not affirmatively asked any questions regarding their fear of removal. Tr of May 21, 2025 Hr’g at 21:5–9. Accordingly, insofar as Defendants contend that the law of expedited removals informed their understanding of what constitutes a meaningful opportunity, that analogy fails them on its face.

### 2. The Court's Remedy Was Flexible and Narrow

Despite Defendants contention to the contrary, this Court has never "direct[ed] the Executive Branch to conduct foreign relations in a particular way, or engage with a foreign sovereign in a given manner." Dkt. 130 at 6. Rather, this Court's order, remedying Defendants' flagrant violation of the Preliminary Injunction, merely outlines the procedural rights owed to class members, Dkt. 119 at 1, and grants Defendants full flexibility about how and where it can accomplish that:

> DHS, in its discretion, may elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad, if at all relevant times DHS retains custody and control over the individuals in conditions commensurate to those the individuals would be housed in were they still in DHS's custody within the United States.

*Id.* at 2.

It cannot be said enough that this is the result Defendants asked for. *See, e.g.*, Tr. of May 21, 2025 H'rg at 103:18–21 ("I think we certainly agree that any remedy should be narrowly tailored. I don't know that return to the United States would be required to carry those [interviews] out. You know, I think that those could potentially be conducted abroad."). This Court sought to fashion a remedy to address the constitutionally inadequate nature of the class members' removals, while not limiting Defendants' ability to effectuate those removals in the most expeditious manner possible—subject, of course, to constitutional requirements. In doing so, the Court offered Defendants a method of compliance that both guaranteed the procedural rights due to the class members but was less exacting than having to turn around a chartered plane. The Court considered Defendants' prerogative in the sensitive and political areas of immigration and foreign policy and offered Defendants complete discretion to provide these interviews in the time and manner they deemed best.

Defendants describe the hardship of having to carry out impromptu immigration proceedings on foreign soil. Dkt. 130 at 7–9. But that was—and continues to be—Defendants' daily choice. "To say more would be to paint the lily." *Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 783 (1st Cir. 2025) (Selya, J.).

**B. Motion for Stay Pending Appeal**

As a threshold matter, the Court finds this request for a stay perplexing. The order remedying Defendants' violation of the Preliminary Injunction is as flexible as possible, leaving the details of when, where, and how entirely in Defendants' hands. *See* Dkt. 119 at 1–2 ("Each of the six individuals must be given a reasonable fear interview . . . DHS, in its discretion, may elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad."). It is the narrow remedy Defendants requested.[22] In short, there is very little to stay, absent completely blessing Defendants' violation.

As to the clarification to the Preliminary Injunction, Dkt. 118, that addresses a problem *raised by Defendants*. *See* Dkt. 130 at 4–5; Tr. of May 21, 2025 Hr'g at 37:23–38:3 ("[T]he Court's preliminary injunction [] wasn't specific enough."). Defendants ask this Court to reverse its clarification but offer nothing to put in its place. That would do little more than return us to the same spot as before.

As to the request itself, for the reasons stated on the record and further outlined in Dkt. 118 and in Section A, *supra*, Defendants have not "made a strong showing that [they] [are] likely to succeed" in demonstrating that there was no violation of the Preliminary Injunction or in

[22] See *supra* at 2.

challenging the appropriateness of the Court's relief. *See Hilton*, 481 U.S. at 776. Accordingly, Defendants' motion for stay pending appeal is DENIED. *See Acevedo-Garcia*, 296 F.3d at 16.[23]

### C.   Motion for Temporary Restraining Order or Preliminary Injunction

In the alternative, the Court finds that it would grant Plaintiffs' motion for temporary restraining order or preliminary injunction. Likelihood of success and irreparable harm clearly weigh in Plaintiffs' favor, although Defendants raise serious concerns regarding the public interest, which justify the Court's limited remedy.

#### 1.   Likelihood of Success

For the reasons stated on the record and further outlined in Dkt. 118 and in Section A, *supra*, the Court finds that Plaintiffs are likely to succeed in showing that the May 20, 2025, attempted removals were unlawful.

#### 2.   Irreparable Harm

The Court further finds that the class members at issue were, and continue to be, at risk of irreparable harm in the absence of injunctive relief. The Court has already outlined the risks faced by class members generally. *See* Dkt. 64 at 44–45. Here, that risk becomes tangible as class members were nearly dropped off in a war-torn country where the Government states that "[f]oreign nationals have been the victims of rape, sexual assault, armed robberies, and other violent crimes."[24]

---

[23] The Court notes an additional reason to deny this motion. Stays are tools of equity, *Common Cause*, 970 F.3d at 15–16, and are thus subject to equitable doctrines. Here, the unclean hands doctrine bars equitable relief. *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241, 245 (1933) ("He who comes into equity must come with clean hands."). Discretion cautions against granting preliminary, extraordinary relief where a party has, at best, sought to get around an injunction through clever compliance.

[24] *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV.

### 3. Balance of Equities and Public Interest

Defendants' last set of arguments, Dkt. 130 at 6–9, when stripped of rhetoric, sound primarily in the public interest and in the hardship that the government faces in complying with Congress's immigration laws. This Court shares Defendants' concerns about the limited role courts should play in directing the Executive Branch and continues to be open to solutions for how to craft narrow and effective relief. This Court has also taken into consideration Defendants' determination that the class members at issue pose a security threat and has withheld action accordingly. For example, against Plaintiffs' requests, the Court did not dictate the terms of the class members' detention, respecting safety concerns raised by Defendants. *See* Dkt. 116; Tr. of May 20, 2025 Hr'g at 43:23–44:8. Likewise, the Court did not order the class members' return to the United States and otherwise gave Defendants remarkable flexibility with minimal oversight. Dkt. 119 (ordering weekly status reports). All of this is to say that the Court has reviewed the totality of the situation, including the criminal histories of the individuals and the undoubted operational costs, and has weighed those factors in ordering as narrow relief as the Constitution will tolerate.

## IV. Conclusion

For the foregoing reasons, Defendants' motions for reconsideration and for stay pending appeal are DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: May 26, 2025