UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
D.V.D.; M.M.; E.F.D.; and           )
O.C.G.,                             )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )    Civil Action
                                    )    No. 1:25-cv-10676-BEM
U.S. Department of Homeland         )    pages 1 to 99
Security; Kristi Noem,              )
Secretary, U.S. Department          )
of Homeland Security, in her        )
official capacity; Pamela           )
Bondi, U.S. Attorney General,       )
in her official capacity;           )
and Antone Moniz,                   )
Superintendent, Plymouth            )
County Correctional Facility,       )
in his official capacity,           )
                                    )
        Defendants.                 )
                                    )
```

BEFORE THE HONORABLE BRIAN E. MURPHY
UNITED STATES DISTRICT JUDGE


MOTION HEARING
(Sealed Portion Removed)

May 21, 2025
11:00 a.m.


John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts 02210


Jessica M. Leonard, CSR, FCRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
jessica@wickedsteno.com

APPEARANCES:

On Behalf of the Plaintiffs:

        NATIONAL IMMIGRATION LITIGATION ALLIANCE
        By:  Trina Realmuto
        10 Griggs Terrace
        Brookline, MA 02446
        617-819-4447
        trina@immigrationlitigation.org

On Behalf of the Defendants:

        DEPARTMENT OF JUSTICE
        By:  Matthew Patrick Seamon
        Ben Franklin Station
        Washington, DC 20044
        202-598-2648
        Matthew.seamon2@usdoj.gov


        U.S. DEPARTMENT OF JUSTICE
        OFFICE OF IMMIGRATION LITIGATION
        By:  Drew Ensign

        U.S. DEPARTMENT OF JUSTICE,
        OFFICE OF IMMIGRATION LITIGATION
        By:  Elianis N. Perez
        PO Box 868
        Washington, DC 20044
        202-616-9124
        Elianis.perez@usdoj.gov


        U.S. DEPARTMENT OF JUSTICE,
        OFFICE OF IMMIGRATION LITIGATION
        By:  Mary Larakers
        PO Box 868
        Washington, DC 20044
        202-353-4419
        mary.l.larakers@usdoj.gov




                Proceedings reported and produced

by computer-aided stenography.

**P R O C E E D I N G S**

THE CLERK:  All rise.

This court is now in session, the Honorable Brian Murphy presiding.  Civil Action No. 1:25-cv-10676, *D.V.D. et al. v. The U.S. Department of Homeland Security*.

If Counsel in the courtroom can please identify yourselves, starting with Plaintiffs' counsel.

MS. REALMUTO:  Good morning, Trina Realmuto from the National Immigration Litigation Alliance here with my colleagues Kristin McLeod-Ball and Thomas Arango, joined by our co-counsel, Anwen Hughes from Human Rights First.

THE COURT:  Good morning.

MR. SEAMON:  Good morning.  Matthew Seamon for the defendants, and I'm joined by several co-counsel.

THE COURT:  Do you want to introduce them?

MR. SEAMON:  Certainly.  So Drew Ensign, Elianis Perez, and Mary Larakers for the U.S. Department of Justice as well as Joseph Mazzara, the acting General Counsel of DHS, who's joining us, as well as the Acting Assistant Director of Field Operation Divisions of ICE, Marcos Charles.

THE COURT:  Excellent, thank you.  Please be seated.

I apologize for the delay.  I know we had some difficulty getting your colleague on the line.

Give me just one second.  I want to be able to pull up my notes.

Do we have Mr. Mazzara on the line now?  Or no?

MR. SEAMON:  My understanding is that he's now on the line, yes.

THE CLERK:  Evidently nobody can hear us.  I don't know why.

Okay.  All set now.

THE COURT:  Can the people online hear us now?

THE CLERK:  Yes.

Can I just confirm, maybe just with Ms. Perez, that you can hear us okay.

Perfect.  Thank you.

THE COURT:  And Mr. Mazzara is online?  You said he's not visually online, but he's on the phone?

MR. SEAMON:  Yes, that's my understanding.  He is appearing only on the phone.  He does not have video because of his location.  Correct.

THE COURT:  Okay.  I understand that.

Sir, could you speak to acknowledge that you can hear us and that you're on the line?

MR. MAZZARA:  Yes, Your Honor, I'm on the line.

THE COURT:  Great.  Thank you.

Because we're going to be asking some factual questions of Mr. Mazzara and Mr. Charles, Ms. Beatty, could I ask that you swear both of them in.

(Joseph Mazzara and Michael Charles were sworn.)

THE COURT:  That's somewhat confusing.  I heard you both affirm that you swore to tell the truth.  I don't think we need to go farther than that.

Mr. Seamon, then, I'll leave it to you to sort of start the conversation in terms of where we ended yesterday.  I know you weren't a part of all of those proceedings, but I suspect you were updated and are aware of some of the questions the Court has this morning.  So I'll turn it over to you to speak directly, or, if you want to turn it over to one of your colleagues, I'm happy to have you do that too.

MR. SEAMON:  Thank you, Your Honor.

Yes, as you referenced, because I was not present yesterday, I think my co-counsel are going to take the lead on questions relating to the TRO that was filed yesterday.  I'll take the lead with respect to the TRO that was filed on Sunday or Monday.

So wherever Your Honor would like to start, whether you want to start with that TRO or the more recent one.  I know you have many questions from yesterday; so if we wanted to start there, I would turn it over to my co-counsel.

THE COURT:  So just to set the table of the items I think we need to address today:

We have the TRO from yesterday and the South Sudan deportations;

We have the issue of N.M. and if he was in Burma.

We'll get to that in one moment;

We have the addition of the Department of Defense as a necessary party to the case;

We have the defendants' admission of error in the Brian Ortega declaration;

We have the defendants' admission of error in violating my order to proceed by pseudonym; and we have the TRO concerning O.C.G.

That's the order I think we should take them in, which puts you last, and you have to be here in person; but I think, because Mr. Charles and Mr. Mazzara -- I know Mr. Mazzara may not be available the whole time and they are probably not directly needed for the second half of those things, I think it makes sense to start with the South Sudanese people.

So, Ms. Perez, you took the labor yesterday.  Will you be doing the same today?

MS. PEREZ:  Yes, Your Honor.

THE COURT:  So why don't we start with your -- the answer to the questions that we had raised at the end of the hearing yesterday.  And I'll give you a chance to speak generally, and then I will probably have some follow-up questions.

MS. PEREZ:  Yes, Your Honor.

So pursuant to the Court's order, the individuals on the plane remain in ICE's custody.  The plane has landed.

However, Your Honor, there's some very serious operational and safety concerns because these ICE officers have been on the plane with seven individuals that have been convicted of the most serious and violent crimes.

Five of those individuals, Your Honor, have been convicted of murder and two have sexual offense convictions, one against a child.  So, Your Honor, we ask that, if the Court is going to grant any relief, that the Court be cognizant of these concerns.

And if the Court wants specific details about the flight and its location and operation status, we ask that the Court dismiss the public because of the sensitive nature of those details.

THE COURT:  I would like those details.  I am sympathetic to your request.

Ms. Beatty, talk to me about how that's most easily accomplished.

(The Court confers with the courtroom deputy.)

THE COURT:  Ms. Perez, given that you're not physically present, there's some difficulty with excusing everybody but you.

Is Mr. Seamon in possession of the information that you are?  Ms. Perez?

THE CLERK:  I don't know why she's muted.

THE COURT:  Ms. Perez, can Mr. Seamon, if I went into

my lobby and discussed it with him, just the attorneys here, would he have the information?

Well, you seem to be muted.

Let me ask you directly.  I don't know why I'm asking her.  Would you have that information?

MR. SEAMON:  I believe I have some of the information; I'm not sure that I'm in possession of all of it because of how things were moving quickly last night and this morning.

THE COURT:  Do you have Ms. Perez's phone number?

MR. SEAMON:  I do.

THE COURT:  And do you have the phone number for the other gentlemen from the Department of Homeland Security?

MR. SEAMON:  I do not.  But I can obtain them.

THE COURT:  Okay.  Let's take a three-minute recess. I'll give you a chance to get those phone numbers.

What I'm going to do is the attorneys and I are going to go into the -- you included, of course -- go into the lobby. I want to give an opportunity to have the court reporter set up in there, but we will do it all under seal.  We'll cover what is concerning to the Department, and then we'll come back out here.

And to the extent that you don't have an answer, you can phone a friend.

MR. SEAMON:  Thank you, Your Honor.  I appreciate it.

MR. ENSIGN:  Your Honor, this is Drew Ensign also

appearing on behalf of the Government.  Unfortunately, audio wasn't working during appearances earlier, but I wanted to make my appearance and let you know I'm here.

THE COURT:  Excellent.  Thank you.  I appreciate you letting us know.

MS. REALMUTO:  Your Honor, I would note this is the second time Mr. Ensign has tried to appear in this court without filing an appearance, and so I'd just like to note that for the record because the rest of us have to file an appearance before we can appear in court.

THE COURT:  So noted.  Thank you.

We'll take a five-minute recess and I'll ask you all to join me in my lobby.

** THE FOLLOWING IS UNDER SEAL. **

** END OF SEALED PORTION.**

THE COURT:  Thank you all for your patience and going through that process.

Is the Zoom up again, Ms. Beatty?

THE CLERK:  Yes.  People had their videos off.  That's why you don't see them.  As they turn their videos on, you'll see them.

THE COURT:  So I think that does a good job in setting the table in terms of what happened, and I'm going to summarize

what I have learned, and then offer each side an opportunity to explain to me their position on whether or not this is a violation of my order.

We've agreed to keep certain facts under seal, but I don't think those facts are necessary to resolve the legal question that is before the Court.

What the order said -- what my preliminary injunction order said -- is that, prior to someone being deported to a country other than the country listed on their deportation order that they must be given a meaningful opportunity to be heard to raise Convention Against Torture claims as to that third country.

What a meaningful opportunity to raise such concerns means was left without a great degree of specificity because I did not want to inject myself into the day-to-day operations of the Department to such a degree that I would delineate the exact form and nature of both the notice and the opportunity to be heard.

However, what due process is, and what an opportunity to be heard is, has a long history in front of this court, in front of the First Circuit, in front of the Supreme Court, a long history that is familiar to every attorney that has appeared in this court, is aware what an opportunity to be heard is.

I also ordered that the notice that was given be done

in writing and in the language -- the primary language of the person who received that notice.

What I have learned is that notice was given some time in the evening of May 19.  I am not entirely clear on whether that is 5:45 or a later time that was included in the notation given to at least one of the attorneys, but it was provided to these individuals in the evening of May 19.

The next morning they were taken from that locked facility, for which they, obviously, could not leave and seek advice or counsel, and they were taken and transported to the airport and put onto a plane.

The time that they left that facility is again unclear.  We're going to get an exact answer on that shortly, but it was, at the latest, sometime in the 10:00 hour and, at the earliest, sometime before 9:00 a.m.

It is plain to me that an opportunity to be heard -- of several hours that were not during business hours, where you could not consult with your attorney, where you could not consult with your family, or where, in this case, if, for example, you had never heard of South Sudan and you had to go look it up, it was impossible for these people to have a meaningful opportunity to object to their transfer to South Sudan.

That time frame, even if it had been 24 hours, as the Supreme Court said recently in the *AARP* decision, would be

plainly insufficient. I had not delineated the exact amount of time that had to be given to an individual to raise a concern against the Convention Against Torture, but the Department's actions in this case are unquestionably violative of this Court's order.

Now, the degree to which they are violative of -- the degree to which that violation implicates criminal obstruction, criminal, in this case, I think, is perhaps left for another day. That's not a question that I need to resolve today, whether or not the behaviors by the Department were criminally contemptuous. We will address how we will deal with this going forward.

But based on what I have learned, I don't see how anybody could say that these individuals had a meaningful opportunity to object. And I will offer by way of example just a few quick thoughts.

South Sudan, as some of you may know, is the world's newest country. It is an independent country as of, I believe, only 2018. And if someone is going to be taken to another country, to have a meaningful opportunity to object to it, they must be given some opportunity to see how their life conditions would be dealt with in that country.

I don't know a lot about South Sudan. I have reviewed some of the materials that have been submitted, but I'm not familiar with their policy on all sorts of things. I don't

know if there is rampant discrimination based on race or gender, or anything else, or sexual orientation. I'm not saying there is, but I don't know.

And if I was in any of those groups and I was going to be deported to South Sudan, I would need an opportunity to investigate that and to be able to articulate a well-founded fear about why being returned to South Sudan would be -- would result in torture or death.

The Department did not do it in this case. They did not offer any opportunity to object. There are protestations to the contrary, where I have been told -- and I will certainly give them an opportunity to speak again here -- that they believe that they complied with my order because they don't know of any of these people yelling at any of the jailers that they were afraid to go to South Sudan.

That's plainly insufficient. I don't think there's any interpretation of the preliminary injunction that I issued that would comport with the behavior that the Department showed here.

That is my preliminary impression based on the conversation we just had. I will give Ms. Perez and then Ms. Realmuto an opportunity to explain to me why my understanding of that is incorrect.

MS. PEREZ: Thank you, Your Honor.

As Your Honor clearly stated earlier, as you were

speaking -- that the preliminary injunction that you issued didn't delineate a specific time period where notice had to be given -- and, as we highlighted yesterday in the Supreme Court's decision in the *Thuraissigiam* -- that the Court there found that the expedited removal procedures were, indeed, constitutional, when an individual did not express fear and that individual had an opportunity to do so, that that individual could be removed in less than 24 hours.

And here we believe that, you know, the individuals had an opportunity -- that the Department of Homeland Security said that they could have expressed fear at any point to any of the deportation officers up to and including when they were loading the plane -- and none of that occurred.

We understand that the Court disagrees with that analysis, and we understand that the Court believes that there has been a violation of the injunction.

But I just wanted to highlight, Your Honor, that I think that part of any misunderstanding on the -- from the Department of Homeland Security may have had to do with the fact that the Court's preliminary injunction motion wasn't specific enough, and so we ask that the Court please take that into consideration when issuing its order.

THE COURT:  I appreciate that, Ms. Perez.  And it was -- Ms. Larakers had correctly pointed out the difficulty of the language that I adopted at the time of the temporary

restraining order.  Her omniscience in knowing this would be a problem has perhaps proved prescient.

But my difficulty, Ms. Perez, is I understand that there may be debate about whether a meaningful opportunity to raise an objection is 14 days or 21 days or 30 days.  Are you telling me that the Department believes that these individuals had a meaningful opportunity to object when they had to do it not during business hours?  They couldn't have called their attorneys if they wanted to.

MR. ENSIGN:  Your Honor, this is Drew Ensign.

We believe so.  Notably, the reasonable fear that is used in the Court's order is a concept that's borrowed, I believe, by analogy, to expedited removal.

And expedited removal, people are given much less opportunity than the individuals here were given to express -- to manifest fear.  And so -- and, as has been discussed previously, the Supreme Court has upheld that in that in *Thuraissigiam* against due process challenge.

So we do believe that was a meaningful opportunity.  And, indeed, by comparison to expedite removal, it's a much more meaningful opportunity than is given in what the Supreme Court has upheld.

THE COURT:  Thank you, Mr. Ensign.  I appreciate that.

I'm familiar with that case.  The facts of it are not remotely similar to someone who's been held in custody for

weeks.  That was someone who'd been picked up feet from the border.

So I don't think that the Supreme Court precedent you're pointing to is remotely on point.  And I think the Supreme Court's guidance given just last week is much more on point.  But I appreciate your raising that.

I'm going to Mr. Charles, who was tasked with getting us an exact time that the individuals departed from the facility that they were held at on the way to the airport.

MARCOS CHARLES:  Thank you, Your Honor.

They left the Port Isabel facility at 9:35 a.m.

THE COURT:  Excellent.  Thank you, Mr. Charles.  I appreciate your time both when we were in a closed session and now.  I don't believe that we need you to stay.  You're welcome to if you would like to.  I'll give the attorneys all one last opportunity if there's anything else that anyone wants Mr. Charles for.

MR. SEAMON:  Nothing from me, Your Honor.

THE COURT:  Ms. Realmuto.

MS. REALMUTO:  Very briefly.

You actually took the words out of my mouth.  I wanted to make the point that the *AARP* decision came down on May 16 -- talking about 24 hours not being sufficient -- and that this incident happened on May 20.  So, clearly, the Supreme Court's guidance has to instruct how the preliminary injunction is

interpreted.

And then other courts -- as the Government is aware, for example, in *D.B.U v. Trump* -- also indicated that you need a minimum of 21 days in order to have sufficient notice to object to your deportation.

I would have said the same thing about the *Thuraissigiam*.  That's a challenge to the flaws in the credible fear process regarding a different scheme that is not technically covered by this case.

However, I would note that the removals in those cases are to the countries where the person has just had their credible fear claim.  And if the Government were to change the country, then the same rationale would apply that is applying in the Court's preliminary injunction.

And, finally, I wanted to note for the Court's edification that the requirement that a non-citizen must manifest their fear was struck down as arbitrary and capricious in the *Las Americas Immigrant Advocacy Center* case from the District of Columbia on May 9, and that's a recent ruling.

And so this concept that the person has to manifest a fear instead of being asked if they have a fear, instead of having the opportunity to affirmatively decline on a form, or a checklist form, which has been used traditionally, is -- is, we believe, incorrect.

And with that I'll sit down.

THE COURT:  Thank you.

Ms. Perez, is there any reason we can't release Mr. Charles, in your mind?

MS. PEREZ:  With regard to Mr. Charles, no.  I don't think -- yes, we can release him.

But if Your Honor would give me an opportunity to respond to Plaintiffs' argument, I would like that.

THE COURT:  Of course.  Just one minute.

Mr. Charles, I appreciate your help today.  I'm not requiring you to stay on this call.  If you want to, you're welcome to, but you're now free to go if you have other things you need to be doing.  And I thank you for your time.

MARCOS CHARLES:  I thank you, Your Honor.  I'd like to remain for the response because I'm curious myself.

THE COURT:  Sure.  You're very welcome.

Ms. Perez.  I think you're still muted, Ms. Perez.

MS. PEREZ:  I'm sorry.  As Your Honor already knows, the Supreme Court has explicitly held that due process is flexible, and we have to look at the facts of each particular case in order to determine what due process requires.

In these cases, I understand that the Court is relying on *AARP* and has also said that the *Thuraissigiam* is probably not on point here, but I will I want to highlight that the individuals in *AARP* had not gone through removal proceedings.

Those individuals -- it has nothing to do with Title 8

removals, and it has to do with them having the ability to file habeas petitions with -- is technically going to require more than 24 hours.

In *Thuraissigiam*, those individuals do not have removal proceedings and do not have an opportunity -- the same opportunity that the individuals in this class have had.  These individuals have gone through removal proceedings.

They've had an opportunity to express fears.  And, as Ms. Larakers has highlighted before, during the removal proceedings, they've had several opportunities to do so.

And here, Your Honor, I understand that the Court does not agree that 24 hours is enough, but these individuals are not -- they know what the system requires because they have been through the system.

So to infer that because they have not expressed fear that there's still fear, I think that, you know, we cannot just infer that.  They know that they can express fear if they have a fear of not going to a particular country, which they didn't do and we believe that they had an opportunity to do so.

THE COURT:  Thank you, Ms. Perez.

I hear your points, I'm familiar with the cases that you've read.  I don't agree.  I find that my preliminary injunction order has been violated.

I now turn to the next stage of the analysis, which is what the Court can do to remedy that violation.

And I'll let Ms. Realmuto begin as to what an appropriate remedy is that you're seeking here and how we would go about effectuating it.

MS. REALMUTO:  Well, Your Honor, I think the remedy that we're seeking is the one that we've continued to seek, which is that we bring these individuals back to the United States and give them the process that's due and that should have been afforded to them in the first instance under the preliminary injunction.

And I would argue that that process can only take place on U.S. soil because it's essential that they have an opportunity to have notice, to investigate the situation in South Sudan, to consult with counsel, and to present their decision about whether or not they're afraid to go to South Sudan -- I think that anyone who investigates the situation in South Sudan would have a fear of being placed in a war-torn country -- and then, for them to have the reasonable fear process that's afforded under this Court's order.

And I think whatever opposing counsel is going to say about these individuals, they are no less deserving of protection from torture than any other human being on the planet.

THE COURT:  Thank you.

Ms. Perez, I recognize you disagree with my finding that there is a violation, but that is my finding, and so now I

am forced to come up with a remedy.

Ms. Realmuto is suggesting that the only remedy is for the plane to return here so that these individuals be given an opportunity to raise any objections they have to being sent to South Sudan.

Do you have another suggestion as to what a remedy that would allow these people to have the process that they are due might be?

MR. ENSIGN:  Your Honor, this is Drew Ensign.

If I may, we think any remedy should be narrowly tailored to the violation.  And so, you know, if Your Honor believes they weren't given a meaningful opportunity to express a fear under CAT, that the remedy should first be limited to giving them such a meaningful opportunity.  If they were to do so, then they would be given that reasonable fear interview.

But bringing them back would be a much broader remedy than necessary because this Court only requires compliance with procedures and, to the extent that Your Honor believes those procedures were not followed, the Government should be allowed to provide those procedures, and that should satisfy the due process as interpreted by this Court.

THE COURT:  Thank you, Mr. Ensign.

So let's say that -- I agree with you that I want to make the most narrowly tailored order to address the violation of my preliminary injunction that is possible.

What you're suggesting is that they can have a reasonable fear interview where they are now.  Is that a practical possibility?

MR. ENSIGN:  Your Honor, I don't know.  I'd have to speak to my client, but I think that would need to be at least one of the compliance options that's presented, because that would be a much more narrowly tailored remedy that is actually tailored to the violation that Your Honor has found.

THE COURT:  Well, Mr. Charles has elected to stick around, and so we might turn to him again.

Mr. Charles, if I said -- those seven people -- they are to be given credible fear interviews, is that something that the Department could do as a matter of practicality where they are now?

MARCOS CHARLES:  I would have to call over and find out, Your Honor.  Currently, they're sitting on a plane.  And it would depend on communication availability and length of time.

THE COURT:  Okay.  I am sympathetic to Mr. Ensign's request that I make the most narrowly tailored option possible.  So, Mr. Charles, you may have regretted not taking me up on your option to leave earlier, but I'm going to now ask you to go make that call and find out, if I were to order that they have credible fear interviews where they currently are, if that's something that could be practically effectuated.

I have another -- we have quite a number of other matters I'm going to turn to.

So, Mr. Ensign, I'm not saying that is the answer.  I want to know if that's a possibility; so I'm going to give Mr. Charles a chance to do that.

I'm going to turn to my next line of inquiry to talk to Ms. Perez and Ms. Realmuto about, and then we'll turn back to talk about what the remedy should be when Mr. Charles gets back on the line.

Mr. Charles, how long do you think you need?

MARCOS CHARLES:  It should take me no more than 30 minutes, Your Honor.

THE COURT:  Okay.  I think you know how to reach plenty of people involved here; so you're welcome to just hop back on the Zoom and announce your arrival.  I think we have plenty of people on here.  So just feel free to turn on your microphone, and we'll turn back to you when you come back.

MARCOS CHARLES:  Thank you, Your Honor.

THE COURT:  Ms. Perez, I'm going to turn back to you because I viewed what you said a moment ago as an invitation to clarify what a meaningful opportunity to object means.

And given that the Department has violated it and we had to already -- I had thought that the idea -- and I do think that the idea that 24 hours is plainly insufficient was apparent from Supreme Court case law, was apparent from due

process analyses that existed many other places in the law, and, perhaps most poignantly, is clear based on the history of this case where we had talked about the plainly insufficient time period given to O.C.G. -- which is something we'll get to in a minute -- that there was some litigation in this case around the possibility of people being transferred to Libya, all of this, in my mind, assumed a collective agreement that one day was plainly insufficient.

I am not going to say whether -- I'm not going ask you your personal belief right now.  I understand you're representing your client.  But I am inclined now to clarify, and I'm not sure if the clarification -- I am going to think about how that clarification will lie.

I'm not sure if that's ascension for the violation of this order, where I'm going to proscribe what the minimum due process is.  I'm not intending to modify my preliminary injunction, because I know it is up on appeal and I don't want to make that process any more complicated.

But I have the power to say, until this case is finally resolved -- either I get direction from the First Circuit or the Supreme Court or somewhere else -- that for the status quo, to the degree that there is ambiguity about what due process means, I am inclined to delineate it.

I could guess what Ms. Realmuto is going to suggest but -- I'll give her a chance anyway in a moment -- but,

Ms. Perez, I'm going to ask you for a suggestion.

So I had -- again, I give great credit to Ms. Larakers for highlighting this point at the very inception of this case: that a meaningful opportunity is subject to different understandings.  I didn't think it was subject to understandings as different as they appear to have been today, but, for the sake of clarity, I am going to clarify.

And so what would your suggestion be, Ms. Perez, around -- at a minimum, there will be a period of time between when notice is given and the deportation occurs.  What is your suggestion --

Or Mr. Ensign.  I'm not sure who's -- either one of you is welcome to speak.

-- what's your suggestion about what comports with due process and is reasonable?

MR. ENSIGN:  Your Honor, we don't have a specific suggestion.

I mean, our understanding is from the expedited removal context where we think that would be meaningful opportunity.  We recognize Your Honor disagrees, but that certainly our perspective.

I think the nature of any narrowly tailored remedy would be that, if 24 hours isn't sufficient, that Your Honor would shape it as to whatever your understanding would be that is a minimum to satisfy due process.

I'm not aware of a specific benchmark to propose. Certainly, our position is that 24 hours is sufficient. We recognize you disagree, but we don't have a specific proposal in light of this Court's disagreement with that position.

THE COURT: So I appreciate that, Mr. Ensign, and I know you weren't told to be prepared with this. And so I recognize that I'm asking a lot of you. But let me explain my reasoning.

My reasoning is, generally speaking, Courts analyze whether or not something comports with the constitutional due process on a case-by-case basis, where the Court says, "No, that doesn't comport" and "Yes, that does comport." And you can see this in a variety of contexts.

But that doesn't really work in this scenario and the reason that I had drafted my preliminary injunction in the way that I had is because I had hoped that the Department would exercise its discretion to fashion something that comported with constitutional requirements of due process.

Exactly what that is, though, is very hard to say. And so I am giving you an opportunity to offer me some advice on that. I suspect that Ms. Realmuto is going to say a month or maybe a month and then a month with an attorney.

There's lots of cases that fall back to 21 days. My order had fallen back to the most conservative limited number of days that I could see any justification for, which was 15

days.

If you could point me to any authority -- and I recognize you're on the spot now, and so -- I'm not resolving this all in the next five minutes; so, if you could point me to any authority or if the Department wants to take a position about what reasonable due process is, I would welcome that input. But, you know, I'd -- I'd welcome that.

So what I intend to do is I will be clarifying my preliminary injunction. I will be --

And don't worry, Ms. Realmuto. I know I haven't given you a chance to speak, but I intend to.

-- I'm going to be clarifying what the minimum amount of time is that the Department has to let go between the time that notice is given and the time that the person is deported.

If the Department wants to take a position on that, I give you until the end of the day today. That -- we will be crafting something. I would give you more time, but I'm in this position where people may currently be getting loaded onto planes with plainly insufficient notice.

So if you want to take me up on that opportunity, you may. If you don't, you don't have to. But I'm going to be fashioning something that clarifies this, because what is absolutely clear to me is that not only is 24 hours plainly insufficient, this was only 17. And this is undeniably insufficient; And to the point where I believe it to be

obviously insufficient.

But the exact place where that line should be drawn, I don't know.  And so, if the Department wants to take a position and tell me by the end of the day, I'd welcome that input.

MR. ENSIGN:  Thank you, Your Honor.  We'll certainly run that by our clients and present that option to them and get that back to you if we have a specific proposal.

THE COURT:  Thank you.

And, Mr. Ensign, this needn't be a treatise.  If you say, "We propose 14 days because of x case," that's really -- that would be valuable input.  So feel free to weigh in.  I'm not requiring you to, but I would welcome that input.

MR. ENSIGN:  Thank you, Your Honor.

THE COURT:  Ms. Realmuto, the same question to you is -- we now are forced to modify the order, to specify. What is the specification that you were suggesting to the Court about?

MS. REALMUTO:  30 days, Your Honor.  We believe that's reasonable because it gives the individual time to locate or talk to an attorney.  As we know, many of these individuals are unrepresented, and it takes time to find counsel.

An attorney can advise the person about the reasonable fear of process and then can discuss with the person the country conditions and the designated country, the newly designated country, so the person can make an informed decision

about whether or not they have a fear.

We believe 30 days is appropriate, and, as I mentioned before, the District of Colorado in the *D.B.U v. Trump* case issued an order on April 22 saying that 21 days was sufficient to give people notice under the Alien Enemies Act. And so we would say no less than 21 days in this context.

And then, I would also note that, to the extent the Court is going to engage in modifying the preliminary injunction, we believe it is worth mentioning that the statute at 1252(b)(1)(C) and (b)(2)(E) talks about these third-country designations when removal to the country of origin or nationality is not possible.

And so, where a country is willing to accept an individual, as, we know, many of these countries are, I think that the Government can't be shopping for third countries to far-flung nations as a punitive measure. And so it might be worth reiterating what the law requires.

We'd ask that the Court require that officers affirmatively ask and document if the person has a fear and if they decline and that the Government not treat the refusal to object by individuals who are refusing to sign as anything other than objection to the country that the Government is seeking to deport them to.

THE COURT: Thank you.

Does anyone else care to be heard on that issue?

MR. ENSIGN:  Your Honor, if I could respond.

THE COURT:  You may.

MR. ENSIGN:  Several things, Your Honor.

We think that the *AA* cases are clearly distinguishable.  That is a time period in which to file a habeas petition in the Court.  This is a fundamentally different context where all you have to do is verbally articulate a fear and that's it.  There's no further steps required to satisfy that first step of manifesting a fear.

And so we think that's a very different context that can't be -- that you simply can't engraft onto what is just the very beginning stage of the process that Your Honor's order has articulated.

Certainly, we think 30 days is wildly excessive for what is just the screening step.  Your Honor's only provided, I believe, 15 days for people to reopen if their reasonable fear claim interview is rejected.  But 30 days for the screening step would be clearly excessive, and it would absolutely thwart Congress's intent that removals can be carried out expeditiously.

That's why, in the expedited removal context, the people are given, you know, much less time, measured in hours or perhaps even minutes, to manifest a fear, which we think is the same sort of screening concept that would apply here.

We'd also note that the statute at issue,

8 U.S.C. 1231, does not limit third-country removals to where it is impossible. I believe the statutory language is that it can be done where it's impossible, impractical, or inadvisable. Any of those are sufficient to permit a third-country removal. Impossibility is not a requirement to carry out a third-country removal, and that's in the statutory language of 1231.

THE COURT: I appreciate that clarification, Mr. Ensign. It raises the question that I've not received a satisfactory answer to, which is around N.M. If N.M. was told he was going to be taken to South Sudan on May 19, presumably, he was only told that because it was either impossible, impractical, or -- I can't remember the third word you just used, but -- inadvisable.

So, presumably, on May 19 it's impossible, impractical or inadvisable to take N.M. back to his country of origin. And what we were told is that the position of the Department changed only because he had a lawyer, and then, instead of deporting him to South Sudan, the Department elected to send him to -- back to his home country.

How is that possible?

MR. ENSIGN: Your Honor, I don't know the specific thought process behind that decision. That's something we can certainly look into and provide by declaration. But, certainly, DHS's position is that they have complied with this Court's preliminary injunction.

THE COURT: Sure. I would love an answer to that by way of declaration. Because it would seem -- well, I can ask you, but I assume I know the answer, which is the Department does not treat people differently solely because they have an attorney, correct?

MR. ENSIGN: Your Honor, I don't know the calculus that would go into that. I mean, I hesitate to speculate specifically as to what the decision, you know, was, and that -- that's something that we can certainly provide by declaration. But I don't know the factors underlying that specific decision.

THE COURT: Sure. How much time do you need for that declaration?

MR. ENSIGN: Your Honor, I think we're anticipating -- we would like to -- we should be in a position to submit it today, but there's some possibility it would need to be tomorrow; so I'd ask for tomorrow if possible, and we will certainly shoot to get it today if that's acceptable to the Court.

THE COURT: Sure. By the end of today to about 5:00 tomorrow. And the declaration I would like to address how that is possible. That it was impossible, impractical, or ill advisable to bring him to Burma on May 19, but, once he had an attorney, that impossibility and practicality or inadvisability somehow changed. And why that was.

If you want to do that under seal because you want to involve some names or anything along those lines, I orally grant you the right to do it under seal if you so choose.

All right.  Thank you.  Thank you all for that.  I will work on fashioning the modification to further clarify.

My next question is --  and I think, Mr. Ensign, this is for you.  I had an opportunity to -- only because we had these technical breaks -- to follow the news conference that the Department had and some of the responses.  And what South Sudan was quoted as saying is that, If anybody is deported to South Sudan, we will immediately send them back to their home countries.

My understanding is that these people are only going to South Sudan because they're -- sending them back to their home countries is impossible, impractical, or inadvisable.  If South Sudan is immediately going to send them there anyway, how is this not just chain refoulement?

MR. ENSIGN:  Your Honor, I don't have any information on that.  I have not been following the news during the hearing; so I have not seen that.  That's certainly something we could ask the client to address for you.  I have not seen that.

My understanding is that they would have been accepted, but I have not seen whatever news has come out, you know, and whatever those statements might be.  I have not --

I've not spoken to the client about that. That's -- that's something we can certainly do, but that's not something that I have seen.

THE COURT: Okay. It was -- I had more of a break than you did because I was back there, waiting to be invited into the room; so I had an opportunity to look at some of this news coverage.

But I am correct, am I not, that if somebody has a final order of deportation to a country and has a withholding of removal to that country, for whatever reason, that it is the policy of the Department that they cannot deport that person to another country with the agreement that they'll just go to the country that the Department is not allowed to deport them to directly, right? So-called chain refoulement.

MR. ENSIGN: Your Honor, I believe that's correct. I want to confirm, but I believe that's correct.

And, certainly, it's the policy of the United States not to remove anyone to a location where they ultimately believe that they will be tortured. That's been the policy of the United States for at least two decades, and it continues to be the policy of the United States.

THE COURT: Okay. So I hate to pile on the declaration requirements for the day, but I would like a declaration by the end of the day today that addresses, if the leadership in South Sudan is saying that their intention is to

immediately send these people back to their home countries -- home countries that the United States is saying they cannot go to because it would be unsafe for them -- how deportation to those countries would be in accordance with the law.

And so the -- I ask for that on a very brief basis only because I will simultaneously be trying to craft the most narrowly tailored remedy for the violation of my preliminary injunction as possible, and, obviously, what happened to these individuals, once that remedy is exhausted, matters a great deal.

So, Mr. Ensign, is that something you could have completed by 5:00?

MR. ENSIGN:  Your Honor, we will certainly aim to do so and should be able to do so.

THE COURT:  All right.  Thank you.

This brings me to my next concern, which was brought up a number of times yesterday, and that is, once this order is clarified, which I will do very shortly, hopefully today, I want to ensure that everybody who was involved in the ICE chain of custody is familiar with it.  And I want to do that for a couple of reasons.

Mr. Ensign, I don't think you were on the call yesterday.  There was a number of people on the screen; so maybe I missed you.  But I know Ms. Perez was.

And I brought up a number of times yesterday that I

wanted to ensure that everybody involved in the deportation process was familiar with the requirements of my preliminary injunction.  And that is for several reasons.

The first is I want it to be followed and the only way I can ensure that everybody is following the preliminary injunction is to ensure that they know about it.

The second is -- and I'm sure a number of you are aware -- that Federal Rule of Civil Procedure allows me to hold people in contempt, who are aware of this order, even if they are not parties, meaning everybody who is involved in an illegal deportation risks criminal contempt, from the lowest-level person all the way up.  But this requires that they all are aware of my order.

And so I want one of you -- Ms. Perez, Ms. Larakers, Mr. Ensign -- to prepare an affirmation to be submitted under the pains and penalties of perjury with this Court about how you are notifying everybody involved in the deportation process.

I don't know what that is, but, when this is submitted, I want to have, with a great degree of confidence -- know that everybody involved in the deportation process is aware of the modified order, which -- I'm probably not modifying the order.  I'm probably sending a clarifying order as a result of the non-compliance that happened today.

So, Mr. Ensign, who is the best person to pen such a

submission?

MR. ENSIGN:  Your Honor, offhand, I don't know, but, certainly, if the directive is that the clarification needs to go to the people that are implementing it, that is something that we can figure out and submit a declaration as to how that will be carried out.

THE COURT:  I suppose I can leave it to you about which of the attorneys submits that declaration, but I want it to be an attorney who has an appearance on this case, who is signing something under the pains and penalties of perjury, and who is aware it obligates their candor to this Court.

So, Mr. Ensign, you have a large team there; so I'm not sure which of those people will do it.  I want it done within a week of the time that I issue my decision offering the details on how my preliminary injunction will be clarified.

Is my request clear?

MR. ENSIGN:  It is clear, Your Honor.  Thank you.

THE COURT:  I think -- and unless Mr. Charles is back -- is Mr. Charles back?

Otherwise, I think, what I'm going to now turn to the remaining issues that don't necessarily -- that -- everyone is welcome to stay, of course -- but maybe are more narrowly tailored to the people in the room.

But I'm happy to turn back to Mr. Charles as soon as he arrives.  So if someone can make me aware, when that

happens, we'll turn back to it.

But now, I think, we should move on to the remaining issues we have that this hearing was initially scheduled for. I guess we're back to about the time it was scheduled for; so maybe we haven't lost much.

So let's turn to the first of those issues, which is the Department of Defense as a necessary party.

I will let Ms. Realmuto begin.

And then, Mr. Seamon, I don't know if this is yours or Ms. Perez's or --

MR. SEAMON:  I believe this will be me, Your Honor.

THE COURT:  Okay.

MS. REALMUTO:  Thank you, Your Honor.

As submitted in our filings, we believe that the Department of Defense should be joined as party to this.  And that is largely predicated on the Huettl declaration and the Government's response to our allegations about the TRO violations.

We find it absolutely implausible that DHS did not direct the deportations of the four individuals that we have identified -- and we know that there are more individuals that were -- on those planes deported from Guantanamo to El Salvador, that, just because DHS was not on the plane, the Government is alleging that the TRO was not violated.

The way it works in Guantanamo, as we've indicated and

we believe that further discovery will demonstrate, is that, once a person arrives in Guantanamo, they are in physical custody of the Department of Homeland Security.

And so, for the Government to say that these individuals just magically appeared on the tarmac and magically boarded flights that were carried by the Department of Defense to El Salvador and then placed in a maximum security prison without any DHS direction is absolutely preposterous; and it's not credible.

And the reason that it's important the Department of Defense be joined is because they are implicated in this case. They are carrying out deportations even though they claim that that is not their job.

And so either the Department of Homeland Security is directing the Department of Defense to carry out these deportations and lying about that or the Department of Defense is, on its own, taking people and carrying out deportations.

Either way, it's critical that we don't have a department of the U.S. Government carrying out deportations in violation of this Court's order.  And, clearly, the easiest way to ensure that this doesn't happen is to put them as a party. And so that would alleviate -- eliminate the Government's excuse that they're not responsible for violating this because DOD is not a party.

I would emphasize again, however, that the TRO

explicitly instructed that it applied to all the defendants, all of their agents, everyone they were acting in concert with, and so that's a question for later, after we finish the discovery on the TRO violations, that we can get into. But we think it's clearly apparent that the Department of Defense was involved.

Moreover, as last week's -- I believe it was last week's -- TRO to Libya indicates, those individuals and -- as we submitted in our filing, and the declarations from the attorneys representing individuals in those filings were brought to an airport and were put on military planes. There was clearly a military involvement and presence that was going to be carrying out those deportations to Libya.

But for our ability to have this Court clarify its preliminary injunction to indicate that that would be a violation of the injunction, we don't know if that plane would have taken off and if the Department of Defense and those military personnel would have carried out those deportations. Again.

So we think that -- sorry, they were not on the plane. They were sitting outside of the plane. They didn't technically board the plane. Excuse me.

THE COURT: Thank you.

MS. REALMUTO: We don't know that that would have been prevented. And so that is yet another indication as to why

it's so critical that the Department of Defense is a party covered by these orders.

And we also think that the Government, the Department of Justice, is well suited to represent yet another entity of the U.S. Federal Government.  That is their job.  That is their client.  They take the position that their client is the United States.  The Department of Defense is part of the United States.

And, for all of those reasons, we believe that -- either they are a required party or a necessary party or permissively could be joined in this case -- for all of those reasons, we believe it's appropriate for the Court to order the Department of Defense be a defendant to the case.

THE COURT:  Thank you.

Mr. Seamon.

MR. SEAMON:  Thank you, Your Honor.

Defendants oppose joinder at this time for a few different reasons, the most principal being that the plaintiffs have still not moved for joinder.

I understand the Court ordered the parties to submit responses to the Court's question about joinder.  So I don't want to get tied up on a formalism, but we do believe the federal rules are important here and, if they want to add DOD as a party, they should seek to do so either by moving under the joinder rule or moving to amend their complaint under

Rule 15.

We also don't believe that Plaintiffs met their burden to show either permissive or mandatory joinder here. The Department of Defense -- their complaint still does not level any claims against the Department of Defense. We don't believe it meets the requirement for permissive joinder.

And with respect to mandatory joinder, DOD does not need to be a party in order to allow the Court to provide full and effective relief.

Defendants believe that the Court's previous clarification, with respect to DHS's responsibilities when it comes to turning over individuals to other agencies, is the appropriate remedy and a completely -- a complete remedy that resolves any concerns that the Court may have or may have had with respect to the compliance -- DHS's compliance with the injunction.

And, put simply, Your Honor, Defendants' position is, to the extent that Plaintiffs want to make DOD a defendant to this action, they should move to amend -- they actually don't even need to move to amend their complaint. Defendants have not answered; so I believe they have one amendment as of right.

They should amend their complaint, add DOD as a party, bring some factual and legal allegations into their complaint against DOD, and that would put both the Court and Defendants in the position to test the sufficiency of those allegations

under Rule 12 and would be most helpful, I think, to the parties and to the Court moving forward with respect to what responsibilities DOD may or may not have in relation to this case.

I think clarity is better for everyone, and the only way clarity can be achieved is with an amended complaint, to the extent that that is what Plaintiffs wish to do.

THE COURT:  Thank you.

So I'm inclined to say that the defendants have the better of this argument.  I think it is possible that the Department of Defense could be joined -- it is possible that I could add them sua sponte, because it certainly has come up in the manner that you've described.

I am confident that the defendants understand that utilizing the DOD in the immediate future in the manner they did in the past clearly violates the court order.  They've said as much, and they've said they won't do so.  So I take the defense at their word that the problem that presented itself under Guantanamo Bay will not repeat itself.

But I invite you to bring a motion to amend your complaint.  If you want to bring the Department of Defense in, file a motion to amend the complaint.

Okay.  The next issue is the Brian Ortega declaration and the submission to the Court saying that that declaration was false.  This is somewhat similar but, in my mind, not

directly related to whether or not we grant the TRO acceptance, as far as it changes the facts.

But Mr. Seamon, I -- how was this mistake made?  I read the submissions, of course.  I understand what they said.  But someone made this entry into the -- and that person is identifiable by the Department.  Has someone talked to this person and said, How did this now-admittedly erroneous entry be made?

MR. SEAMON:  Yes, Your Honor, and I can't speak to the nitty-gritty details.  Counsel for DHS has spoken to the two officers who were involved -- my understanding, two officers who were involved -- in making the relevant entries into the electronic database system.

I don't believe Defendants have fully figured out what occurred other than the fact that, you know, DHS, as with any agency of the U.S. Government as well as any business, relies on their own internal records and is able to presume that they are, at least, as a general matter, full, complete, and accurate.

We now understand that that was not the case in this particular instance, and the defendants apologize for that.  We regret the error very deeply.

THE COURT:  Is the person who -- let me just set the table -- that this was a declaration under oath that went to a preliminary injunction of extreme importance.  And it was a

declaration upon which I relied.

To learn of its falsity, its admitted falsity -- and I give you credit for your candor in coming forward with its falsity, though that seemed to have only occurred once discovery seemed to have uncovered it.

But despite all that, I'm very concerned that there's been information put forward to this Court, and that the Court has relied on, that is demonstrably untrue.  And that requires some investigation to preserve the integrity of the Court.

You spoke to these two individuals.  Is one of these two individuals the one that made the entry in the computer system?

MR. SEAMON:  Again, my understanding, Your Honor, is that it was two separate entries, one stating, essentially, that the particular individual we're speaking of here had been validated, confirmed via records check, to be the individual that he was supposed to be and that he was going to be asked about fear of return to the third country and then a second entry by a different officer confirming that that process had taken place and that the individual had been loaded onto the bus.

Obviously, the -- much of the substance of those two entries was correct.  The questioning about the fear claim was the part that was incorrect.

THE COURT:  But how do you know it's incorrect?

MR. SEAMON:  Because, in preparation for the deposition that this Court ordered as well as the discovery that this Court permitted into this issue, DHS counsel spoke to these officers and was preparing them.

THE COURT:  And they said, "We didn't do that"?

MR. SEAMON:  Both of them said that they have no memory of doing this.

To be candid, Your Honor, we have also not been able to identify an officer who specifically remembers telling Mr. O.C.G. that he was being removed to Mexico.  We understand he says in his declaration that he was informed.  We also have just not been able to identify a particular individual who remembers doing that specifically.

THE COURT:  So the individual that --

MR. SEAMON:  I don't want to speculate about how that could happen, but I just will say my general understanding, just having immigration background, is that oftentimes these kind of announcements and advisals are done in kind of a group setting; so it is possible that part of the confusion here was just that no individual officer was speaking specifically to O.C.G. with respect to notifying him of his removal to Mexico.

THE COURT:  So the individual that made the entry -- was he one of those two individuals?  Or is he a third party?

MR. SEAMON:  Yes, I believe the -- well, I guess I have to ask Your Honor to clarify.

THE COURT:  There's a series of initials.

MR. SEAMON:  There's two individuals that DHS spoke to, where we uncovered this error, were the two individuals -- my understanding is that they were the two individuals who entered those two things into the EARM database.

THE COURT:  That is what I was getting at.  So there's a series of letters and numbers that, presumably, refer to an individual.  Those series of letters and numbers, which are the two entries, are the two people that DHS spoke to?

MR. SEAMON:  That is my understanding, yes.

THE COURT:  Did they go so far as to say, That's not true?  That entry isn't true?

MR. SEAMON:  I don't believe that that is the situation.  My understanding is that they just -- they do not have any memory of doing that.  They have no memory of asking Mr. O.C.G. if he had a fear of return to Mexico.

And for that reason, we filed the errata and, obviously, withdrew our other declaration because we no longer believe that we can claim as defendants that that was asked, because we don't have the support for it any longer in light of these erroneous entries.  But I don't believe we have factual information to say definitively that he was not asked.

THE COURT:  Has anyone looked at the metadata on when those entries were made?

Ms. Realmuto, have you looked at them?

MS. REALMUTO:  I would love to see that metadata.  I think that would indicate when that statement was added and if it was added after this lawsuit was filed.

THE COURT:  So I -- I recognize you played no role in any of this; you just happen to be the individual in front of me now.  But this is a really big deal.  It's a really big deal to lie to a Court under oath.  It's an extraordinarily big deal to do so when you have matters of national importance the Court is being forced to consider.

So I could not take this more seriously.  I have a number of options before me, and I'm not -- I guess I'll seek your input on both of them.

So what I was considering doing is having an evidentiary hearing, having those two individuals as well as a computer expert, who can talk about the metadata, and Mr. Ortega get on the witness stand and see if we can get to the bottom of how this happened and whether it was --

Because, obviously, there is a huge difference between inadvertence and deliberate obfuscation or, even worse, deliberate post hoc lying and which of those -- because the case matters.  Because it matters how this Court will react to it.

So option one is to do that.

Option two is to just tell you all to do it amongst yourselves.  Go depose these two individuals, go seek the

metadata, and come back with a position to this Court.

So what are you suggesting?

MS. LARAKERS:  Your Honor, if I may --

THE COURT:  Sure.

MS. LARAKERS:  Your Honor, if I can just back up for a moment -- and I apologize.  We're all, like, involved in trying to correct errors as soon as possible, as we learn of them, in our duty of candor to the Court.  So I just want to say that, first and foremost.

To provide a little background, as Brian Ortega's declaration stated, he relied on EARM entries that were in the system.  Based on our immigration practice, there is normally no reason to assume that an EARM entry would be incorrect.  Those entries are supposed to be correct.

And, certainly, in the short time frame that Brian Ortega wrote that declaration, there's no indication that he would intentionally misrepresent anything to the Court.  To the extent that the EARM entry was incorrect, we have no indication that he knew that at the time.

It's unfortunate that we didn't learn of the error in the EARM data entry until recently.  And to the extent that the Court wants further factual development on that, we would only ask that we just be given time to give the Court time further factual development on that, because we do not want to say anything in this hearing that could potentially be untrue.

At this point in time, counsel, like, for the defendants -- both Matthew Seamon and I -- would be really uncomfortable with making any further representations on exactly how the error occurred on -- because we have not spoken to those officers personally.  That's been done through ICE counsel.

So we want to be really careful not to make any misrepresentations and any representations at all as to exactly how that EARM entry was incorrectly -- was incorrectly noted.

So to the extent that this Court wants further factual development, we understand and we're willing to do whatever the Court orders, but, as attorneys in this court, we cannot definitively provide any more information than what we provided in the declaration right now because we have not personally spoken to those -- to the individual or individuals who made those EARM entries.

THE COURT:  Thank you.  I appreciate that.  And to be clear, I don't think it's irresponsible of anybody on defense counsel to rely upon Mr. Ortega's declaration when he says that that's what it was that was true.  So I'm not sitting here faulting your submission of that declaration.

But my concern is that that declaration was of such great import and the Department ran away from it only when the veracity of its statements were about to be tested.  Hours before the veracity of the statements were about to be tested.

It was, I believe, it was 5:37 in the evening before a deposition for the next morning.

That doesn't appear, to me, that that is replete with forthrightness.  And it raises the question to me that there was some malfeasance occurring.  Not on your part, Ms. Larakers -- that's not what I'm saying.  But within the Department itself.

And I don't know that, but, given the overwhelming series of errors that this case, in its short life, has already experienced, I have some serious questions about that.

And so, what I'm inclined to do -- and, Ms. Realmuto, I will give you an opportunity to tell me if you want me to proceed in a different way -- is to say you can go depose those three individuals, Mr. Ortega and the two individuals in question; you can hire a computer expert to examine the metadata and explore when those entries were made and by whom and from what location.

My understanding is that -- well, that's about all I know about metadata, but I assume you will have somebody who knows more helping you.

If, for some reason, you don't want to do that via depositions and you'd rather have it done in the courtroom, I'm not necessarily opposed to that, but I think it is probably more efficiently handled as a matter of discovery.

MS. REALMUTO:  With the Court's permission, I would

like the opportunity to consult with the rest of the team before we affirmatively state our position, but for now, I mean, for now, we accept the deposition option.

And if for some reason we feel strongly that there's a better reason to do an evidentiary hearing, we'll file a notice with the Court on the docket and hope that you would consider it at that time.  But, for the time being, we'll go forward with the depositions.

MS. LARAKERS:  And, Your Honor -- Your Honor, I will just say that, at this point in time, there are several EARM entries that we're looking at.  We don't know whether it's one officer or two who made those EARM entries.  It could be two; it could be one.  There were several officers' names mentioned in the submissions that we made to opposing counsel.

But we will -- based on your instruction just now, we can go back and determine whether it is one officer that made those EARM entries or two and then, also, Brian Ortega's, as we understand Your Honor to say.

And, on behalf of DHS, I will -- and them writing declarations, I will just note that, as everyone is well aware, you know, this TRO was filed; Defendants quickly responded to that TRO and submitted a fulsome declaration in that short period of time, and, to the extent that any of the -- it's entirely possible, and perhaps even probable, that any errors were merely based on time and the amount of litigation that DHS

is currently handling at a very, very fast pace.

And, certainly, I don't intend to make, you know, excuses on behalf of DHS. However, I do want to provide that context, because DHS, like any other very large agency, any other large business operation, at the base of that, are humans who make human errors. And just because those human errors are made does not necessarily mean there's any malfeasance involved.

And, certainly, we will get to the bottom of that. And we can't make any representations right now, but I do just want to make that point on behalf of DHS and, really, just in my experience -- that -- that officers the vast majority of time are just really trying to do their best and, you know, as attorneys in this case, we are just trying to do our best to respond to court orders and fulsomely, in a timely manner, and do all within our power to submit correct things to the Court, Your Honor.

And we do understand the seriousness of submitting a declaration under oath that ended up being correct and are intent on correcting that as soon as possible.

THE COURT: Thank you. I appreciate all of that. And, please -- to be absolutely clear, I'm certainly not making a finding of malfeasance. I am just making a grave concern expressed and giving the opportunity for the parties on both sides to get to the bottom of that error.

MS. REALMUTO:  Can I make two quick points?

One, I would just note that the statement in the EARM record that he didn't express a fear is inconsistent with their position that he doesn't have to express a fear; nobody has to express a fear.

But, secondly, just for the record -- because we do practice in immigration court -- I will say that those EARM records are regularly submitted and immigration courts to try to prove that people are non-citizens and deportable.

And so, from our perspective, it is a seriously important to get to the bottom of whether or not these records can be relied on; and we believe the First Circuit recently said that they cannot.

THE COURT:  Thank you.

I think that resolves the Brian Ortega declaration issue.

That leaves us with the question about the violation of the pseudonym rule and the TRO.  I'm cognizant that we've been at this for some time.  I'm inclined to take a break of at least a half hour so that you can go get something to eat.

We are still waiting on Mr. Charles, unless he's appeared, if he's going to come back.  I'd like to give him a chance.  If he is back, rather.

Okay.  Mr. Seamon, I assume you can stay in touch with him.  I don't need him to be present.  If you can get the

answer to the question and tell the Court, that will be -- that will take care of it.

I'm inclined to take a half hour break, but my office is just a few blocks away.  If any of you would like a longer break --

MR. SEAMON:  Half hour's fine with me.

THE COURT:  -- we'll reconvene at 2:15.

(A recess was taken from the 1:45 to 2:30 p.m.)

THE COURT:  Good afternoon.

Picking where we left off, I see we have Mr. Charles.

I had asked you to look up the proprietary of a reasonable fear interview while these individuals are where they are.

Are you able to give us an update on that?

MARCOS CHARLES:  Can you hear me, Your Honor?

THE COURT:  We can, yes.  Thank you.

MARCOS CHARLES:  I'm waiting for finalization, but we're still looking into it.  I should have something, hopefully, in the next few, but I'm still awaiting final approval and -- make sure we have everything in line to make it happen.

THE COURT:  Okay.  Well, let me -- I'm going to go ahead and give you that time that you need.

And we're going to move on to the remaining issues that we have.

MS. REALMUTO:  Your Honor, will I have an opportunity later to raise some concerns about the reasonable fear interviews on the plane?

THE COURT:  Yes.  That decision is not made at all. Before we spend a lot of time discussing it, I wanted to make sure it was in the realm of possibility, but, when we find out it's in the realm of possibility, it has a lot of complicating factors that will have to be ironed out and I -- yes, we will come back to it.

Okay.  The next issue is the filing that was done that wasn't properly redacted.  I recognize the confession on behalf of the defendants in that case.  I take them at their word that that was just inadvertent.  I don't know that that's something that requires any action from this Court.  I think it was remedied as quickly as it was brought to their attention.

Ms. Realmuto, if you have something else you wanted to add about that, I'd give you the opportunity.

MS. REALMUTO:  I understand it was inadvertent.

It was from, you know, Friday night until the Court corrected it on its docket, and then Plaintiffs' counsel worked to correct it on the CourtListener docket.  And so, by Sunday around 10:30, we think we had eliminated all trace of the reference -- we hope -- although we believe it may still be floating out there.

The reason we raised it is because we think it goes to

the TRO's factor of irreparable harm and we think that increases the specter of irreparable harm.  So we raised in the that context.

THE COURT:  Okay.  So why don't I have you start there.  Because the reason I didn't consider including O.C.G. in the initial TRO and then the initial preliminary injunction is because there was a factual question about what process he's received.

Given the confession of error by the Government relative to the Brian Ortega declaration, there is no longer a question of fact about whether or not he received any process prior to being returned to Mexico and then refouled to Guatemala.

What we did not get to, and I want to get to now, is that issue of irreparable harm.  So it's now been several months since O.C.G. has been there.

What can you tell me about the danger of his current position; about the need to remedy this immediately as opposed to in due course; and about the mechanisms in which you would imagine that happening?

MS. REALMUTO:  Sure.  Absolutely.

I mean, I am grateful to say that he is still alive.

He remains in hiding.  His location is known to Plaintiffs' counsel.  It is not a good situation.  He is in the country in which an immigration judge found that it was more

likely than not that he would be persecuted.

So I think that the fact that I can't stand up here today and say to you, "Well, he's been shot and arrested and beaten up," is largely the product of the fact that he has been fortunate thus far.  But that doesn't mean that he is any less at risk than what the immigration judge previously found.

Our proposal would be an order to facilitate return to work with opposing counsel to ensure that that return can happen as expeditiously as possible.

We think that this case is not unlike the recent decision out of the District of Maryland in the *J.O.P.* case, which involved a violation of a settlement agreement in which a class member was deported and the Court issued an order facilitating return.

And we think that -- well, the reasons that we briefed -- I'm happy to get into the Court's authority to order return, but it certainly -- it certainly is something that, you know, the Supreme Court in *Abrego Garcia* indicated is possible.

We know, from our experience as immigration lawyers, that it happens all the time in the petition for review context.  We don't think this is an extraordinary remedy.

In fact, we think it's just the only remedy, given that he was deprived of the process in which he was entitled -- not just that, but he begged to talk to his attorney.  And so his violation and the fact that the Government was aware of his

fears in Mexico makes this situation all the more egregious.

And so I think that an expeditious facilitation of his return would not be very difficult.  ICE flies flights to Guatemala all the time.  We could get him on a charter flight back to the United States.  That's generally how it's done.  We can make other arrangements if necessary.

And I think that he is waiting with baited breath to hear back about what happens at this hearing so that he can return to a place of safety for his situation.

THE COURT:  Thank you.

Mr. Seamon, is this yours?  Or is this --

MR. SEAMON:  This one is me, Your Honor.

And, before I get started, I do want to just touch on one, kind of, housekeeping issue.  I do want to reference some things that occurred in Mr. O.C.G.'s underlying immigration proceedings.

Those are confidential and sensitive, and, particularly on the Government's side, we typically do not divulge those things -- either transcripts or audio recordings or in open court like, I understand, we are right now -- without some sort of waiver from the plaintiff to whom that proceeding pertains.

So I just want to put on the record and make sure Plaintiffs' counsel is all right if I reference -- and I think it's all things that are in their pleadings, but reference his

proceedings to the extent that we continue to refer to him solely by a pseudonym and without revealing any identifying information, including any information about the details of his fear claim.  It would be kind of the natures of advisals that the IJ provided.

THE COURT:  Any objection?

MS. REALMUTO:  No objection.

MR. SEAMON:  Thank you.  And I appreciate that.

THE COURT:  I appreciate your clarity.

MR. SEAMON:  Certainly.

Defendants ask the Court to deny Plaintiff O.C.G.'s motion for temporary restraining order and preliminary relief.

What Plaintiff is seeking is an extraordinary and very drastic remedy, particularly in District Court, and the defendants do not believe that he has shown a likelihood of success on the merits of his claim for two different reasons.

The first being, for many of the same reasons that Defendants have already discussed at length in our opposition to the previous PI motion and TRO motion in this case, we do not believe that the Court has jurisdiction to hear these kinds of claims.

And secondly, we continue to believe that the procedures that O.C.G. received during his underlying immigration proceedings comport with the requirements of due process.

THE COURT: Well, you're not claiming that -- given what I've found is due process, you're not saying the removal to the third-party country comports with what I have said is required under due process?

MR. SEAMON: That is correct, Your Honor. But I think that gets at my point, and I'll go right to that, which is, you know, this is a very different situation and, unlike the *Abrego Garcia* case and the *J.O.P.* case where you had the removal was a violation of a court order -- or, at least, that's what the Courts have found -- that was not the case with respect to Mr. O.C.G., and this lawsuit was not filed for, I think, at least a month or nearly a month after his removal.

So this is not a situation where we have an alleged violation of a court order such that the removal order was not legally executable at that time.

So that is why we believe that, unlike those other cases, Mr. O.C.G. received the procedures that Defendants continue to believe and -- I understand, we're arguing that on appeal, et cetera -- continue to believe comport with due process.

But I would like to address jurisdiction and, at the risk of overstaying my welcome here, I won't belabor too much, because I will concede that it is many of the same arguments that this Court has already heard, and we acknowledge that Your Honor disagrees with them and that it's subject to an

appeal.

But we do want to make the point that we understand that the Court has already decided that it has jurisdiction to hear Plaintiffs' legal claims and issue relief for class members who are currently still in the United States.  It is quite another to order the return of an individual who DHS has removed, pursuant to a lawful removal order, like I said, weeks before this lawsuit was filed.

First, with respect to 1252(g) which precludes judicial review of the execution of removal order, that is what Plaintiff is seeking to challenge here.  And, as the Supreme Court said in *American-Arab Anti-Discrimination Committee* case, the whole purpose of 1252(g) was prevent the deconstruction, fragmentation, and prolongation of removal proceedings.

And while aliens and class members within the U.S. have not reached the culmination of that process -- they have not been removed -- for Mr. O.C.G., that process has completed, and he has been removed.  So we do feel that the 1252(g) argument is particularly strong here compared to even the rest of the class members.

We also believe that 1252(a)(5) and (b)(9), which are those claim channeling provisions -- which, again, Your Honor has expressed disagreement with our view and has found that, at least with respect to the class generally -- that the motion to reopen the process that we have highlighted is logistically

difficult such that it does not provide efficacious meaningful judicial review.

The distinction here, Your Honor, is that Mr. O.C.G. had some opportunities that is not necessarily true of all class members, the first being that, in his underlying proceedings, the immigration judge explicitly told him and his immigration counsel that while his removal order was to Guatemala and that is why he was seeking that withholding relief -- because he was in withholding-only proceedings -- the IJ says on the record that DHS could safely relocate him to a different country even if he is granted withholding to Guatemala.

And that is consistent with the third-party removal statute, consistent with the third-party removal regulations, and also consistent with the Form I-589, the application for withholding as well as CAT and asylum which explicitly asks individuals to list whether they fear torture in their home country or any other country.

So despite all of those procedures and all of those warnings that, we believe, Mr. O.C.G. received here, he still did not seek to apply for withholding from Mexico during that process, and we believe that that makes him fundamentally different from many other class members who -- at least as a general matter, we cannot say for certain whether they got those same kinds of express advisal and warnings from the IJ on

the record in their proceedings.

And then, secondly, and perhaps more importantly, unlike many other individuals in this class, Mr. O.C.G. had an opportunity to file a statutory withholding -- or a motion to reopen in the 90 days following the entry of his removal order, and he could have done that even from abroad.

And, again, that is different from some individuals who -- in the class who may have older removal orders and who are outside of their 90-day period.

There is no indication that Mr. O.C.G. has sought to do so, and he has not alleged that it would be impossible for him to do so.  And I would note that he still has the opportunity to file a sua sponte motion to reopen from abroad even now, as we stand here today.

So, again, we believe that that strengthens the Government's (a)(5) and (b)(9) arguments and make very clear that, because he has had and still continues to have this avenue to judicial review available to him -- and I'll note, because he's in the Ninth Circuit, his removal order is from the Ninth Circuit, he can even seek judicial review of an IJ's denial of his motion to reopen.

So he has a very clear path to judicial review that, again, is --

THE COURT:  What happens?  So assume from Guatemala he files a sua sponte motion to reopen and they reopen it.  And

then he asks for a designation that he can't be removed to Mexico, where he was removed.

Play out the rest of the chain there.  I understand what you're saying, and I'm -- I recognize that he is differently situated, but how does the story end?

MR. SEAMON:  I want to make very clear I don't want to speculate about what would specifically happen in this instance, because it can depend.

But, generally speaking, there is an administrative process by which individuals can apply with ICE to have their return to the country facilitated so that they can attend to removal proceedings.  This happens most commonly in the context of a petition for review.

So after an individual prevails or -- does not prevail on their claim in immigration court, does not prevail with the Board of Immigration Appeals, they file that petition for review, generally speaking, they can be removed from the United States while that petition for review is pending.  They do not need to be physically in the United States in order to participate in the petition for review process.

If they are ultimately successful and the resolution of the PFR -- as it would be, if they are successful -- is to remand the proceedings back to the Board of Immigration Appeals and/or the immigration court, that would be an instance where an individual would apply with ICE to facilitate their return

to the country.

Because, generally speaking -- again, I don't want to say categorically, but, generally speaking, individuals do have to be in the United States in order to attend --

THE COURT:  But that seems substantively different -- that seems like a substantively different procedural posture to be in than the one O.C.G. is in.

MR. SEAMON:  I guess, let me play out, kind of, my situation.  I gave the PFR example because I believe it is the more common one or, at least, the one that I'm more familiar with.

The same thing would happen with a motion to reopen. The individual can file a motion to reopen, in many circumstances, from abroad.  And to the extent that they prevail and their proceedings are reopened, that would be the opportunity for them to apply to ICE and seek to have their return to the United States facilitated so that they could attend and participate meaningfully in those proceedings in the United States.

It is directly comparable to the PFR context, I would say.

THE COURT:  So if he brought a sua sponte motion to reopen and it was granted -- and that just means it's open, right?  There's no decision.  It's granted and -- you're saying that, if he were to do that, then ICE would return him to the

United States from Guatemala?

MR. SEAMON:  I don't want to categorically state anything, because I don't want to speculate about the future, but, yes; there is an entire administrative process by which individuals apply to -- I believe it's ICE ERO, Enforcement of Removal Operations, to seek their permission and cooperation to facilitate their return to the United States.  This is an administrative process that exists.

And that's really the point that we're making.  Because this -- and that is the key thing for 1252(a)(5) and (b)(9).  If there is a meaningful way to seek judicial review, that is what individuals have to do.  Even if they do not do it, that does not allow them to circumvent the plain channeling provisions of (a)(5) and (b)(9).

THE COURT:  I'm going to let you finish, but could I ask Ms. Realmuto to respond on this point?

So you have not done this, right?  No one's --

MS. REALMUTO:  No.  Because it's bonkers.  He already won protection from Guatemala.  He is in Guatemala.  If he files a motion to reopen to say "Protect me from going to Mexico," the immigration judge is going to say "You're not in Mexico."

I mean, this process, this return process that he is talking about -- the Government takes the position it only applies to the PFR context.  And we have to go to District

Court to fight to get people brought back in if they prevail on the motion to reopen.

But here, unlike regular removal proceedings, when you're challenging some fundamental problem in the removal proceeding, the problem here is that he won his removal proceeding and then he was deprived of the procedural protections he needed to be afforded before the order was -- when the order was executed.

And Mr. Ensign just previously told us that the Government doesn't approve of chain refoulement. And that is exactly what happened to O.C.G. -- he got deported to Mexico, given the Hobson choice, and then deported to Guatemala.

So I beg to differ that his situation is anything remotely close to somebody who's gone through the removal proceeding process and is challenging an error in their removal proceeding. He is challenging something that happened after removal proceedings are closed, and, for those reasons, we absolutely dispute that (b)(9) or (a)(5) applied.

And this Court has already held and the First Circuit has twice affirmed that -- and, of course, 1252(g) applies only to discretionary determinations. That's been held by the First Circuit and the Supreme Court. And violating the constitution, the INA, and the FARRA is just simply not discretionary.

So there's -- the fundamental premise that he somehow

was lawfully deported we refute, because he could not have possibly been lawfully deported when he was deprived of due process and he had a valid claim -- and the Government knew he had a valid claim -- of removal to Mexico.

MR. SEAMON:  I would start by disputing that the Government knew he had a valid claim of removal to Mexico. That has never -- to my knowledge, that has never been tested. He's never sought that relief.  Unless I'm unfamiliar --

THE COURT:  Well, it was raised in the immigration proceeding.

MR. SEAMON:  His -- the harm that occurred to him in Mexico, yes, was raised.  And -- but like I said, the immigration judge noted that, even if he were to receive withholding from Guatemala, which he ultimately did, that is a country-specific form of relief.

So to say that that somehow makes his removal order invalid to a third country simply isn't true.  I understand the due process that the parties disagree with but, again, this is -- it is not demonstrably true that he has a valid claim to Mexico -- a valid withholding claim from Mexico.  We simply don't know because he's never made one.

THE COURT:  But he couldn't -- I think what I struggle with is, when we had both the TRO hearing and the BIA hearing -- I recognize you weren't there for that.  But there was a lot of time and energy spent on discussing how one might

raise a fear of a third party while in immigration proceedings as an initial matter.

It seems like O.C.G. did.  Like, when you look at the transcript of that hearing, he certainly was describing a fear of Mexico that the immigration judge, understandably, said, We're not here to talk about Mexico.

And so O.C.G. kind of undermines a lot of the position taken by your colleagues around raising this earlier in the process.  And so what I'm struggling with -- I struggle with that it's sort of -- O.C.G. seems to be the proof that what you said might work in the immigration court won't.

Because he did talk about Mexico.  He described the terrible things that happened to him in Mexico, and the immigration judge said, We're not talking about Mexico; we're talking about Guatemala.

And then we sent him to Mexico.

MR. SEAMON:  I have two points to make for that, Your Honor, the first one being that O.C.G. is a little bit different for another reason, which is that he was in withholding-only proceedings.  So it was -- he already had a final order of removal to Guatemala.  That was final because it had been reinstated.

So I understand Your Honor's point that, when you're withholding-only proceedings, it tends to be focused on that country to which you already have a removal order.

That is different, though, than the majority of people or many people, at least, in the class who have not had their previous order reinstated.  So they are just coming from first-instance removal proceedings.

And, like I said, the instructions on the application form say, you know, Do you have a fear of torture in your country -- or your home country might be the language -- or any other country?

And that is the point that I'll make with respect to Mr. O.C.G.  You're correct, and my understanding of the audio recordings from his proceedings is that, yes, he discussed what happened to him in Mexico.  And we're not disputing that.

However, he never listed Mexico on his I-589, or, at least, there's been no indication of that.  His attorney -- and he did have the benefit of an attorney in his proceedings -- never sought to file a new application to seek that relief.

And our position is, again -- and this is what's important for 1252(a)(5) and (b)(9) -- that process is still available to them while they are still in proceedings.  And, to the extent they are out of the proceedings, there is the process for them to reopen them to make that new claim.

And there is no requirement in (a)(5) or (b)(9) that it be the preferred or the most convenient method of seeking judicial review.  It just requires that it be available and, in the First Circuit, because of *Aguilar*, efficacious.  And we

believe that the path that was available to O.C.G. and continues to be available to O.C.G. now satisfies that requirement.

And then, I would like to turn to one final jurisdictional argument, which is FARRA, Section 2242(d), which also prohibits O.C.G.'s claim as well as the claims of the class, as we said previously.

But I want to make something very clear.  This part of FARRA provides that no court shall have jurisdiction to review the regulations adopted to implement the Convention Against Torture.  And that is certainly what's O.C.G. is seeking here. He's seeking an order to facilitate his return so that he can get additional procedures, which the Court has ordered with respect to the class related to the implication of CAT.

But the law is clear that no court, including this one, has jurisdiction to review DHS's implementation of the CAT procedures.

And I want to emphasize something because I think it may have got lost in our prior briefing:  that this 2242(d) argument is not a claim channeling provision.  This is separate from 1252(a)(5) and (b)(9), and it's also separate from 1252(a)(4), which is the claim channeling provision for withholding CAT claims that channels challenges to the denial of that relief into the immigration court process and, ultimately, the petition for review.

2242(d) does not do that; so it does not depend upon the availability of relief under 1252(a)(4) in order to operate.  It simply says that no Court has jurisdiction to review the implementation of CAT.  So we believe that that is completely fatal to Plaintiff O.C.G.'s motion here as well as, obviously, to the class.

And like I said, with respect to the merits, Defendants acknowledge that the Court disagrees with us on this, but we do continue to assert that Mr. O.C.G. received all of the procedures that he was entitled to under due process and, moreover, received all of those before this lawsuit was even filed and before this Court had informed Defendants that more was required.

So for all of these reasons, we believe that the motion should be denied.

THE COURT:  Thank you.

Do you want to talk at all about irreparable harm?  Because, in terms of the stage that we're at -- this is still a preliminary injunction as to O.C.G. -- the irreparable harm prong is the one that I'm struggling the most with.

I recognize your jurisdictional arguments.  I didn't adopt them, but courts above me will decide whether my interpretation of them is right or wrong.  But irreparable harm is separate and aside from that.

And I don't know what to do with the fact that it's

been several months and he's been fine, and how I'm supposed to deal with that, in terms of analyzing whether, as a prudential matter, I should issue this order now or wait until the -- until the resolution of this case.

And so I want to share those thoughts with you so you have an opportunity to address that. I recognize that you're preserving all those other arguments, and understood. But as to my current thinking, irreparable harm is a point on which I'm somewhat hung up.

MR. SEAMON: Thank you, Your Honor, and I appreciate you sharing those thoughts and giving me the opportunity to respond.

Defendants' response to irreparable harm is twofold. The first being that, you know, we would cite to the line of cases that --

THE COURT: Which case? Oh, I'm sorry. Did you say "the line of cases"?

MR. SEAMON: I don't know them off the top of my head. I apologize. The line of cases saying that when the movant for preliminary relief cannot show likelihood of success on the merits, the other factors fall away. And we believe that's the case here.

We would also point out that, with respect to irreparable harm, Mr. O.C.G. in his declaration concedes that Mexico gave him the choice to seek asylum there or to be

returned to Guatemala, and he chose to go to Guatemala.  So to the extent that that is a self-inflicted harm, we don't believe that qualifies as irreparable harm for turn purposes of preliminary relief.

THE COURT:  Thank you.

MS. REALMUTO:  A couple points.

I mean, a self-inflicted harm?  He chose not to stay in a country where horrible things happen to him?  Where he was going to be detained and he'd have to wait months in detention to apply for asylum, when he was scared of the country he was in?

He specifically asked not to be sent to Mexico at his master calendar hearing.  The regulations that the Government is relying on are standard.  They're set by the immigration judge.

But I want to put to bed this issue about the application form, the instructions to the I-589 application form.  They convey an expectation that the country or countries of proposed removal will be known to the applicant at the time of the application.

And I would direct the Court's attention to page 3 of those instructions, where it says, to qualify for withholding, you must establish as more likely than not that -- blah-blah-blah -- that your freedom would be threatened on account of race, religion, nationality, membership in a

particular social group or political opinion, quote, "in the proposed country of removal."  So it's known to the person.

Likewise, the form specifies that the application for asylum is also considered to be an application for withholding under 1231(b)(3) and may also be considered an application for CAT protection or, if the evidence you present indicates that you may be tortured, quote, "in the country of removal."

And so at no point in the history that it's been used has this form to be understood to be an invitation to present protection claims vis-à-vis all the member states in the United Nations and in the world, in the country.  So I really want to put that to bed.

With respect to the Government's point about FARRA, O.C.G. is the named plaintiff in this case.  He is entitled to withholding, not just CAT protections.

With respect to the Government's argument that this is somehow a challenge to the regulations, it is not.  We are seeking the protections for O.C.G. that are due him under withholding statute and the Convention Against Torture.

And, finally, with respect to irreparable harm, he's not just in hiding.  He's not able to live his life.  And that is irreparable harm under any stretch of imagination.  And it's particularly hard when you have an immigration judge, having heard his claim about what happened to him in Guatemala, say, It's likely that you're going to be persecuted or tortured.

And so how can he not be suffering irreparable harm when he isn't living in a situation where he could be persecuted or tortured?  That's not just in hiding.  That's like being deprived of the ability to live your life.

And so we don't think it's a close call with respect to irreparable harm.  We don't think he has to wait years to go to the PFR process or even to wait to the end of this case.  He's a named plaintiff.  The Government admits they didn't provide him the procedural protections that this Court has said is required.

It's indisputable at this point that his deportation was not lawful because, even before the Court's temporary restraining order, the statute, the regulations and the Convention Against Torture all required that the Government provide him with notice and an opportunity before they change the country of deportation and deport him to a place where he has not just indicated he has a fear but he also testified and the Government was aware that he had a fear.

So we hope that the Court will order that the Government facilitate his return.

THE COURT:  Thank you.

I think that that resolves all of the issues I wanted to discuss, with exception of a remedy for the preliminary injunction.  I think we were waiting for -- Mr. Seamon, have you heard from Mr. Charles?

MR. SEAMON:  I have not.  With the Court's permission, I can check my e-mail on my phone real quick --

THE COURT:  Sure.

MR. SEAMON:  -- but I did not hear anything prior to us starting our afternoon session after lunch, and I haven't looked at my email since then.

THE COURT:  Ms. Larakers, are you trying to --

MR. SEAMON:  My co-counsel probably are better able to answer that question.

MS. LARAKERS:  I believe he has the answer, Your Honor.  He was popping on and off to see when he would be needed.  And I think my colleagues Elianis and Drew are going to handle this next part.

But, Marcos, if you're there, if you can pop back on.

MS. PEREZ:  Your Honor, I believe -- I just spoke with Mr. Charles.  He's going to need a little bit more time.

THE COURT:  Okay.  Do you want -- what's "a little bit more time"?  Do you want a ten-minute recess?

MS. PEREZ:  Can we start with 15 minutes?

THE COURT:  Sure.  That seems reasonable.

MS. PEREZ:  Thank you.

THE COURT:  Why don't we go 18 minutes.  We'll reconvene at 3:20.

(A recess was taken from to 3:02 to 3:30 p.m.)

THE COURT:  Are we all set?

THE CLERK:  Go ahead.

THE COURT:  So I take it we don't yet have an answer from Mr. Charles.  But since the hour grows late and I don't -- I recognize people are sitting on a plane on a tarmac waiting on a decision from me, I want to move forward with the conversation about what the options are.

And so I'm going to assume that what they're saying is an option, what Mr. Charles had suggested, I think, at the behest of Mr. Henson -- that that's a possibility and we could do a credible fear interview on the plane.

My understanding -- and I'm going to give everyone an opportunity to broaden my understanding -- is that implicit in a credible fear interview is an opportunity to, at a minimum, place a phone call to a friend, a family member, or a lawyer.  And I'm going to assume, given the state that we live in, that that also could be accommodated on the plane.

And then, I want to think about how that would play out.  So if they have a credible fear interview and the Department finds there is a credible fear, I assume you have to bring them back.

If they have a credible fear interview and they express no fear and they say they are happy to continue on the flight rather than return to incarceration in the United States, which seems not improbable, then that doesn't present a problem.

If they say they do have a fear but the Department does not find it credible, implicating the 15-day waiting period, I presume they'd have to be brought back to the United States for that too.

But I am cognizant of Mr. Ensign's argument that I should tailor this remedy as narrowly as possible.  And so I guess, given all of that, I would ask the Government to speak first.

Mr. Ensign, I don't know if you want to take this or if this is going to be Mr. Seamon or --

MR. ENSIGN:  Certainly, Your Honor.

You know, I think we certainly agree that any remedy should be narrowly tailored.  I don't know that return to the United States would be required to carry those out.  You know, I think that those could potentially be conducted abroad.

THE COURT:  So assume, for the purpose of this conversation, that Mr. Charles is going to come back and say we can do them with the personnel that's there, via Zoom -- some way we could facilitate a credible fear interview where they are right now.

So if that is possible, what are you suggesting follows from that?

MR. ENSIGN:  That the remedy be directed at that -- that, to allow people that meaningful opportunity of what the Court decides, to raise -- to manifest or express a fear, that,

if they do so, they get the reasonable fear interview.

If that reasonable fear interview is positive, that the remedy be directed to permit them to do the procedures that attend to that and, if it's negative, that they be given 15 days in order to seek reopening if they want to, themselves.

If that reopening was granted, that may require physical presence, but I don't think the motion to reopen, itself, would trigger any sort of physical presence requirements for IJ proceedings.

THE COURT:  So in that instance, in the scenario where the 15 days is implicated -- and if you don't have an answer for this, I understand that -- I presume no one's considering 15 days on the tarmac.

Is the Department in a position to offer some housing where they are?  What -- help me craft a remedy that's as limited as possible.  Would you be able to accommodate putting them somewhere other than the back of the plane?

MR. ENSIGN:  Your Honor, I would think so.  I can't speak with certainty.  That would be -- that seems like a reasonable assumption that we would -- and one that we could correct if it's -- if that turns out to be incorrect.  But certainly we would like the option to do that.

THE COURT:  Okay.  What I'm contemplating -- and I'm going to give you an opportunity to tell me why this is not to be considered -- is that they have a reasonable fear interview

that occurs where they are now, that that occurs after having the opportunity to place phone calls for some period of time -- one or two hours.

If the credible fear interview is deemed credible, then, I suppose, if the Department wanted to house them where they are and continue that process there, they could.  But I rather doubt it.  I suspect that they then would get transported back.

But if the credible fear is found to be not credible, that the Department has to arrange for housing where they are for 15 days, to give them an opportunity to reopen along with, obviously, some access to a phone so that they'd have the opportunity to do so.

Mr. Ensign, I recognize you're not saying you want any of those things, but is -- all of those things seem possible?

MR. ENSIGN:  Your Honor, certainly, as you know, we would object to any remedy.  But, as to that, certainly, as to the last aspect, I think it could be 15 -- we would ask for it to be 15 days either at their location or some other immigration detention arranged by DHS, that they would have the flexibility to determine where that detention would be pending that 15 days so that they could reopen.

THE COURT:  Sure.  I think that certainly is reasonable.  So if I -- if this is the route that we go and the Department says -- and the 15 days arises -- and, again, we

don't know that it will.  But if the 15 days arises and the Department decides to fly them back here at their own behest, that's certainly fine.

So I would imagine crafting it along those lines, to say DHS has to arrange for appropriate housing at a detention facility of their choosing.

MR. ENSIGN:  Understood, Your Honor.  That would be a better remedy from our perspective.

THE COURT:  Okay.

Ms. Realmuto, I don't suspect that you like the --

MS. REALMUTO:  No.

THE COURT:  -- road I'm going down.  I'm going to give you an opportunity to explain too.

MS. REALMUTO:  Thank you.

I think our position is it's a legal and logistical nightmare.  These individuals, who have been the subject of a violated preliminary injunction, are now being penalized and given less protection than individuals who have not been the subject of a violation.  And we're concerned that this remedy would incentivize further violations --

THE COURT:  But if I order a reasonable fear interview, aren't they getting more due process protection?

MS. REALMUTO:  They are getting -- we're talking about a reasonable fear interview -- and we have some serious confidentiality privacy concerns about where this reasonable

fear interview is going to take place, who is going to conduct this reasonable fear interview.

But most importantly, how are they going to have access to counsel?  Which they are entitled to have in order to discuss the reasonable fear process.  How are they going to investigate and learn about the conditions in South Sudan?  How are they going to present evidence that they have a reasonable fear?

I mean, in some sense, categorically, the State Department's report should speak for itself.  Everyone has a reasonable fear of going there because they're warning Americans not to go there.

And so for non-citizens who are being deprived -- phone a friend?  What if they're going to call their loved one, their family member?  And their family member is going to call an attorney, but the attorney needs to speak directly with the client.

And so -- and then, we're talking about logistical things about housing them abroad.  I mean, the easy thing here is to return them to a facility in the United States where counsel is accessible.

And the Government's suggestion -- I mean, the other piece of it, right, is interpretation.  How are we going to get interpreters on that time zone, attorneys on that time zone?  And, I assume it's going to be conducted by USCIS officers.

Remotely?  With three interpreters?  I think it's -- we think it's a logistical nightmare.

We're also concerned about where the Government -- if the Court does order this remedy, what detention facility are they going to find?  Are they going to put them in CECOT in El Salvador?

THE COURT:  What I am contemplating envisions continued detention by the Department, not by another sovereign.  A detention by the Department could be the Holiday Inn.

MS. REALMUTO:  That's good, although it really doesn't assuage our concerns, because the attorney-client relationship means that you have to have access to the client, right?  And you have to discuss with them what the claim is, and you have to know what the conditions in Sudan are.

And I don't think that having this interview take place on a plane, at the back of the plane or wherever this is going to happen, is an easier remedy than just ordering that plane to return to the United States, house them in the facility, and then give them the protections that the PI requires.

These individuals are being -- are getting lesser protections and are under harsher conditions -- with the interpreters and not having access to counsel -- simply because the Government elected to violate the PI.  And so what's

going -- how does -- that's not a deterrent to future violations of the PI.  I mean --

THE COURT:  I am cognizant of your concerns.  And I want to talk to you a little bit about the access to counsel, one.

But as to the prudential concern that this is implicitly endorsing a violation of the PI, I think the ten hours we've spent together over the last two days is probably messaged at very different level of approvement from this Court, as will the various orders that I've issued throughout this in addition to the modification that I will make and the mandatory notification.

I don't think that permitting this is encouraging the Department to act like this again.  I hope everybody looks back on this experience and concludes that there would have been a much more straightforward way to do this by just following the order in the original time that they began this undertaking.

However, I think Mr. Ensign is right that, when I am looking at crafting a violation -- a remedy for a violation of an order -- that it should be constrained as possible.

I agree with you that this seems like a logistical challenge.  But it is one that the Department can elect to rise to or it can elect to bring them back.  And that is up to the Department.  Right?

I don't know what languages -- all of those things are

logistical problems everywhere.  They're not going to be on these clients' shoulders to solve; they're going to be on the Department's.

And so, yes, it has to be -- they have to have a private facility; they have to have interpreters; it has to be in their native language.  All of the due process protections that apply to proceedings that happen here would have to happen there.

Access to counsel -- we don't believe that any of these people have counsel of record.  I am going to, at a minimum, order access to a phone and the ability to call people.

If you want, one of the things I might contemplate is saying there is a lawyer who is class counsel, who is willing to talk to you, and this is her number -- "her" being you.  Or someone else, I suppose, that you designate.

MS. REALMUTO:  There are a lot of us.

THE COURT:  Right.  And if you think it is important to make sure they have access to counsel who understand the gravity of the situation here and the intricacies of the process they went through to find themselves sitting on a tarmac since last night, that's something I'd contemplate.

Is that something that you'd -- I think that's a very minimal request.  So if you want that to be included, I would --

MS. REALMUTO:  As class counsel, I think we have to have that included.  I would say that we also are all very busy with this case and other cases.  And so we would also potentially reach out to other counsel that can take on each of these individual cases and represent them, but we certainly are happy to be the first point of contact.

We don't speak all of the languages that I imagine these individual speaks; so that will be a hurdle for us as well.  And this is going to take time.  So if these reasonable fear interviews are anticipated to happen the next day or two on a plane, I don't think that we can swing that.

On an airplane?  Is that where this is going to happen?

THE COURT:  Mr. Ensign, I'm inclined to ask you where they would happen, but I'm pretty sure you're going to say, "I don't know."

MR. ENSIGN:  Unfortunately, that's correct, Your Honor.  We can dig into those details, but those are not ones that are at my fingertips right now.

THE COURT:  That's fair enough.  I would be inclined to say that the interviews have to happen in an appropriate place with an appropriate degree of privacy, and my expectation would be that the Department can figure that out, if that's renting a room at a Holiday Inn and doing the interview there or --

Does this seem like an insurmountable part of the order for you, Mr. Ensign?

MR. ENSIGN:  Not offhand, Your Honor, and, if it were to be, we can quickly inform the Court if we discover obstacles of that sort.

THE COURT:  I'm very much considering this, but, if this is the route we go, my inclination would be to say, if you want to do all of these where they are, you have to do them appropriately; if you don't want to, you can always bring them home of your own volition and do it there.

And so I'm not going to mandate that the Department do anything overseas, but in an effort to craft as circumscribed a remedy as possible, I'm inclined to say if the Department wants to figure that out, I'm inclined to let them.

MR. ENSIGN:  And we appreciate that, Your Honor.  And, you know, to the extent that it poses challenges that are not -- that would be insurmountable, we would quickly inform the Court and figure out -- use one of the options to comply with the Court's orders.

MS. REALMUTO:  Your Honor, I would request that, if you go this route, that you allow attorneys to be present at those reasonable fear interviews because they're happening under extraordinary circumstances.

THE COURT:  Okay.

Any other concerns you would want included in my

order?

MS. REALMUTO:  For N.M., we would request the opportunity to share with N.M.'s counsel the information we've learned about N.M. at the sealed session, including N.M.'s location as well.

THE COURT:  So I'm pretty sure that's -- well --

MS. REALMUTO:  I mean, N.M., as we know, is part of the -- left the United States without getting procedural protections that N.M. was entitled to.  So we believe --

THE COURT:  I'm not sure who to ask.

Mr. Ensign, Ms. Perez, Mr. Seamon, is there any objection to allowing counsel to share the contents of the sealed proceeding with N.M.'s counsel?

MR. ENSIGN:  Your Honor, I think that would have to be subject to the same sort of protective provisions in order to -- that bind everyone else that is -- that information.  But if it was their counsel and subject to the same restrictions on disclosure that everyone else that was that sealed proceeding is subject to, I think that's something we could accept.

THE COURT:  Is that acceptable to you?

MS. REALMUTO:  Well, I mean, sure.  Their clients were in the sealed session, and so we would just share with the person that has a G-28 on file for N.M.

THE COURT:  And he's subject to the confidentiality we agreed to.

MS. REALMUTO:  Absolutely.

THE COURT:  Yes.

Thank you, Mr. Ensign.

Thank you, Ms. Realmuto.

Anything else you want to add for consideration?

MS. REALMUTO:  Just that we would want counsel to have at least 72 hours notice of the reasonable fear interview, if possible.  And we would want, when you say "access to a phone," privacy for those conversations; the ability to e-mail documents in support of the claim; the interview is to take place during normal business hours; and, in the event that we have to go to the motion to reopen process, we want clearly delineated court for to take place.

THE COURT:  Clearly delineated --

MS. REALMUTO:  Sorry, if the -- we would want you, if they passed the reasonable fear, to order them they be brought back for the motion to reopen proceeding.

THE COURT:  Okay.

Mr. Ensign, do you want to comment on any of those requests?

MR. ENSIGN:  A couple, Your Honor.  As to business hours, that might be a challenge due to time zones, and it's unclear business hours -- yeah.  So we would ask for flexibility as to that.

As to the reopening issue, we think return would only

be triggered if that reopening motion were granted, not the mere filing of it.

And, finally, Your Honor, we'd ask that, to the extent the Court is going to enter an injunction, that it would be stayed pending appeal.

THE COURT:  So to the extent that I'm going offer a remedy for the violation of the preliminary injunction, you'd ask me to stay that?

MR. ENSIGN:  That's correct, Your Honor.

THE COURT:  Even though that would mean -- that would mean my existing order, which is in effect right now and remains in effect until I issue a subsequent order, would remain.  My existing order, which is that they would have to remain in DHS custody where they are.

MR. ENSIGN:  Your Honor, certainly, to the extent there's any new injunction, we would ask for a stay pending appeal as FRAP 8 requires us to do.

THE COURT:  Well, I don't think this is a -- so I guess I'm confused on two fronts.  The first is, I'm not sure that this is -- I'm not sure that I'm issuing another injunction.  I'm issuing a remedy for a violation of the injunction.

To the extent that I stay it, that would seem to confound your problems in that the easiest thing for the Department to do is to resolve -- is resolve the due process

violation that I've found occurred and, to the extent that I've stayed -- if I were to consider staying it, you're not able to even do that.

So it would leave the Department with no choice but to hold all of these people where they are right now until you got an answer from the First Circuit on whether or not they would overturn me.

Is that -- I guess that seems like a worse outcome for you and it seems to hamstring the Department more. So I want to make sure I understand what you're asking for.

MR. ENSIGN: Your Honor, I think we would conceptualize it differently.

I think, to the extent that this Court is to order anything that requires DHS to do something tomorrow that it didn't need to do a week ago -- that that would be an injunction or an order modifying an injunction and to the -- or otherwise an injunctive-like order and we would ask for a stay of that pending appeal in order so that we could seek a stay of that from the First Circuit if necessary -- you know, if appropriate.

THE COURT: So if I follow the timing that's been laid out here, which would be that the reasonable fear interview happens no later than 72 hours from now, that gives you 72 hours to seek a stay and --

MS. REALMUTO: 72 hours after finding counsel, if that

would be okay.

THE COURT:  Well, I'm unlikely to do that because they may never find counsel.

MS. REALMUTO:  We'll try to find them counsel, but 72 hours is going to pass quickly.

THE COURT:  I appreciate that comment.  That's too general a term that could stretch into weeks and months and years.

Well, Mr. Ensign, let me put it this way:  If my order says that you are to have these reasonable fear interviews no sooner than 72 hours from now, I suppose nothing would preclude you from saying you're going to do them two or three or four weeks from now.

But the order will maintain the status quo, meaning the individuals will remain in DHS custody where they are, and DHS may not surrender custody of them to anybody else.

I guess I'm -- since I'm setting the floor on when you can conduct the reasonable fear interview and not the ceiling, if I say you have to do them no sooner than 72 hours from now and you'd rather not do them at all and seek a stay, I'm not sure anything would stop the Department from saying, "We're going to continue to hold these people at a hotel where you are while you seek a stay."

I'm trying to address your concern.  I think that does it, right?

MR. ENSIGN:  Your Honor, without knowing all the possible permutations -- I can't speak definitively to them. In the event that a stay put us in a worse position than we would otherwise be, we could otherwise just disavow the stay, but we would request a stay pending appeal of any new requirements that are coming from this Court.

THE COURT:  Okay.  I'll take that under consideration and see, when I write this up, what it looks like.

To the extent that any of the things that I lay out pose immediate difficulties, because we're operating under -- you know, it is 4:00.  I'm going to try to get you an answer by 5:30.

Mr. Ensign, I know I gave you till 5:00 to offer any additional guidance as to a remedy.  Do you anticipate taking advantage of that opportunity?  Or should I press forward?

MR. ENSIGN:  Your Honor, I would have to confer with my clients before that.  But we will do so expeditiously, if we have additional things that we want to share with this Court, and would do so by 5:00 p.m.

THE COURT:  Okay.  Great.

So if you want to weigh in further, my -- well, I can't imagine I will have written this up before 5:00 p.m.  So you will certainly have until then --

THE CLERK:  Mr. Charles is back.

THE COURT:  Well, Mr. Charles is back to tell us

whether or not any of this is conceivable.

Mr. Charles, are you there?

MARCOS CHARLES:  I am, Your Honor.

THE COURT:  Mr. Charles, what can you share with us about the possibility of a reasonable fear interview where they -- the seven people -- are?

MARCOS CHARLES:  It is possible, sir.

THE COURT:  Okay.  Do you have any confounding details or any other details you could share with us about how it would occur?  Or you just know it's possible and the Department can work it out.

MARCOS CHARLES:  I know it's possible and the Department can work it out.  We've been working on it for the last couple of hours to make sure that we can do it, and it is possible to do it.

I think right now -- I just don't know.  We're going to have to look at how long it would take us to get it done and keeping people there that long with the -- the cooperation with DOD is going to be key.

THE COURT:  You just joined us, but my intention would be to do this in the alternative:  The Department always has the ability to just decide to bring them back to the United States and hold them here.  That will always be in their prerogative, but I'll make that clear in my order.

With that being said, I think I've addressed all of

the topics that I raised at the beginning of the day.

Mr. Seamon, have I missed any?

MR. SEAMON:  I don't believe so, Your Honor.

I did have one final housekeeping item that I'd love to raise, which is my understanding is Defendants' answer deadline is coming up this Monday.  In light of the number of things on the parties' and the Court's plate as well as the pending appeal and the question, potentially, of DOD, we would ask that the answer deadline be either continued for 60 or 90 days or stayed pending further order from the Court.

THE COURT:  Do you anticipate filing a motion to amend?

MS. REALMUTO:  I haven't had a chance to talk to my team, but, for what it's worth, we're still doing a TRO compliance discovery including depositions of DOD.

THE COURT:  Do you have objection to me continuing it?

MS. REALMUTO:  We have no objection, and we would prefer to extend that till we complete the --

THE COURT:  Why don't we extend that for six weeks.  And come back to me if you need more time.

MR. SEAMON:  That would be wonderful, Your Honor.  Thank you.

THE COURT:  Ms. Realmuto, is there anything else that I can do for you today?

MS. REALMUTO:  I don't think so, Your Honor.  Thank

you.

THE COURT:  For all of the remaining attorneys online, is there anything else you need me to address today?

MS. PEREZ:  No, Your Honor.

THE COURT:  All right.  Thank you everyone, I'll take the remaining matters under advisement.  I'll do my best to memorialize them promptly so that we don't cause any unnecessary delay.

I thank you all for your hard work today.  I recognize the past two days have been a lot for everybody involved; so I appreciate your attention to detail and your working with me to move this forward.

Thank you all.  I hope you have a great evening.

(Whereupon the hearing was adjourned.)

CERTIFICATE OF OFFICIAL REPORTER


I, Jessica Leonard, Certified Shorthand Reporter and Federal Certified Realtime Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 27th day of May, 2025.


/s/ Jessica M. Leonard

Jessica M. Leonard, CSR, FCRR

Official Court Reporter