# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| D.V.D., *et al.*,<br>Individually and on behalf of all others<br>similarly situated,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>U.S. Department of Homeland Security,<br>*et al.*,<br><br>       *Defendants*. | Civil Action No. 1:25-cv-10676-BEM |

## <u>DECLARATION OF MELLISSA B. HARPER</u>

Pursuant to the authority of 28 U.S.C. § 1746, I, Mellissa B. Harper, declare that, to the best of my knowledge, information, and belief, and under the penalty of perjury, the following is true and correct:

1.      I am the Acting Deputy Executive Associate Director for the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). I have held this position in an acting capacity since May 29, 2025. As the Acting Deputy Executive Associate Director, I oversee the mission of ERO's eight headquarters divisions: Enforcement, Removal, Non-Detained Management, Custody Management, Field Operations, ICE Health Service Corps, Law Enforcement Systems and Analysis, and Operations Support.

2.      I began my career in federal law enforcement in 2001 as an immigration inspector for the legacy Immigration and Naturalization Service. After the creation of DHS, I went to U.S. Customs and Border Protection and later to ICE as a Deportation Officer. In 2011, I was promoted to Supervisory Detention and Deportation Officer. In 2015, I was promoted to Assistant Field Office Director. From 2017-2020, I served as the Unit Chief for the Juvenile and Family Residential Management Program. In 2020, I was selected as the Deputy Assistant Director of the Fugitive Operations Division. In 2022, I was selected as the Field Office Director for the New Orleans Field Office.

3.      I am familiar with the circumstances and conditions regarding the care and custody of the aliens who were on the flight at issue in this case while they are being held in Camp Lemonnier, Djibouti.

4.      The aliens are currently being held in a conference room in a converted Conex shipping container on the U.S. Naval base in Camp Lemonnier, Djibouti. This has been identified as the only viable place to house the aliens.

5.      The only U.S. government personnel authorized to maintain care and custody of the aliens upon their arrival in Djibouti were the three ICE officers who accompanied the plaintiffs on this removal operation. The team of ICE officers that was originally assigned to this mission was replaced and expanded on May 27, 2025. However, having to switch teams creates additional problems as ICE must identify officers that are available to work in the same potentially deleterious conditions. Notwithstanding staffing challenges, the current group of ICE officers responsible for administering these duties is expected to be replaced soon.

6.      There are currently eleven ICE officers assigned to guard and maintain custody of the aliens and two ICE officers assigned support the medical staff. The eleven ICE officers are

divided into groups of two and work twelve-hour shifts. Five officers are assigned to the day shift, and six officers are assigned to the night shift. Officers within each shift may only take breaks when another officer assumes the assigned officer's responsibilities during the break.

7.      ICE officers do not have the capacity to maintain constant surveillance, custody, and care of the aliens for prolonged periods of time. The surveillance and security that ICE officers are expected to provide includes escort service to a designated area to distribute medications, as needed; to the same location for medical consultations between aliens and the medical staff, as needed; and the restroom for each alien upon an alien's request. The alien-designated restroom has sinks, six toilet stalls, and six showers. The designated restrooms are located in a separate trailer, which is forty to fifty yards from the unit in which the aliens are housed. The ICE officers conduct pat-downs and searches for contraband during movements to the restroom, or for any other outside activity. Only one alien is allowed to use the toilet or shower at a time, and one officer is required to escort the alien. Aliens are permitted to shower every other day, and showers occur at night due to the heat. From the onset of these ICE operations, the daily temperature outside has exceeded 100 degrees Fahrenheit during the day.

8.      The conference room in which the aliens are housed is not equipped nor suitable for detention of any length, let alone for the detention of high-risk individuals. Notably, the room has none of the security apparatus necessary for the detention of criminal aliens. If an altercation were to occur, there is no other location on site available to separate the aliens, which further compromises the officers' safety.

9.      ICE officers are currently sharing very limited sleeping quarters, consisting of a trailer with three sets of bunk beds and six beds in total. Storage space is limited to an individual locker for each officer.

10.    There is limited lighting in the area, which makes visibility difficult and creates a significant security risk for both the officers and aliens.

11.    Currently, U.S. Department of Defense (DOD) resources are being used for the care of these aliens, causing disruption to the station's operations and consuming critical resources intended for service members. DOD operators have expressed frustration, particularly about the proximity to DOD quarters of aliens with violent criminal records . ICE medical staff has also received limited medication and medical supplies for both officers and the aliens from DOD.

12.     ICE personnel had to interrupt the flight and disembark in Djibouti without being on anti-malaria medication for at least 48-72 hours prior to arrival, as recommended by medical professionals. They were not able to start taking antimalarials until after arrival in Djibouti. There continues to be an unknown degree of exposure despite taking the antimalarial as full efficacy of the medication is unknown currently. Antimalarials, as well as certain vaccinations, are among the precautionary recommendations by the Centers for Disease Control and Prevention and the World Health Organization (WHO) due to the high risk of exposure for travelers.

13.    Djibouti utilizes burn pits as a way disposing of trash and human waste. The burn pits are located within five miles outside the base and turned on at night. These pits create a smog cloud in the vicinity of Camp Lemonnier, making it difficult to breathe and requiring medical treatment for the officers, who have experienced throat irritation. Some officers have taken extra precaution by sleeping with N-95 masks. The burn pits are most active on Thursdays and Fridays creating the thickest smoke. Due to the temperature in Djibouti being over 100 degrees Fahrenheit during the day and in the 90s at night with usually no breeze, the smoke from the burn pits lingers.

14.     Within 72 hours of landing in Djibouti, the officers and detainees began to feel ill. The medical staff did not have immediate access to medication necessary to treat their symptoms. Our flight nurse has since been able to obtain some but not all of what is necessary for the proper care and safety of the both the officers and the detainees. It is unknown how long the medical supply will last.

15.     ICE officers continue to feel ill with symptoms such as coughing, difficulty breathing, fever, and achy joints. These symptoms align with bacterial upper respiratory infection, but ICE officers are unable to obtain proper testing for a diagnosis. Medical staff have provided officers with Augmentin, Azithromycin, Doxycycline, Prednisone, Albuterol Inhaler, Zyrtec,Tylenol, Motrin, Benadryl, Mucinex, Sudafed, nasal spray, and eye drops to help manage the symptoms.

16.     Upon arrival in Djibouti, officers were warned by U.S. Department of Defense officials of imminent danger of rocket attacks from terrorist groups in Yemen. The ICE officers lack body armor or other gear that would be appropriate in the case of an attack.


I declare under penalty of perjury that the foregoing is true and correct.

Signed this 4th day of June 2025.

MELLISSA B HARPER

Digitally signed by MELLISSA B HARPER
Date: 2025.06.05 10:50:49 -04'00'

_____
Mellissa B. Harper
Acting Executive Deputy Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement