**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

D.V.D., et al.,

              Plaintiffs,

    v.                                    Case No. 1:25-cv-10676-BEM

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

              Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF PRESS MOVANTS'**
**MOTION TO INTERVENE AND UNSEAL COURT RECORDS**

"Secrecy breeds suspicion" and is contrary to "our Nation's tradition of doing justice out in the open, neither 'in a corner nor in any covert manner.'" *Doe v. MIT*, 46 F.4th 61, 68-69 (1st Cir. 2022) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 567 (1980)). In contrast, "[p]ublic access to judicial records and documents allows the citizenry to 'monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system.'" *Id.* (quoting *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987)). For these reasons, Proposed Intervenors, seven news organizations that have reported on this case (the "Press Movants"),[1] respectfully move to intervene for the limited purpose of seeking access to certain court records that have been sealed in this matter. Transparency in the legal process is particularly important where, as here, the eyes of the public are on a case that raises profound questions of separation of powers, civil liberties, and foreign relations.

---

[1] The Press Movants are The New York Times Company, American Broadcasting Companies, Inc. d/b/a ABC News, Cable News Network, Inc., Dow Jones & Company, Inc., publisher of The Wall Street Journal, National Public Radio, Inc., Reuters News & Media Inc., and WP Company LLC d/b/a The Washington Post.

On May 21, 2025, the Court held a hearing on Plaintiffs' emergency request to enjoin the government from deporting them or any member of the class without due process. Part of the hearing was held under seal, at the government's request, during which the government provided the Court with the "specific details" of Plaintiffs' deportations. Later, after the Court found that the government had violated its preliminary injunction order, the government moved for reconsideration, submitting under seal a declaration by Secretary of Defense Pete Hegseth (the "Hegseth Declaration"). The government's requests to seal the hearing and the Hegseth Declaration were granted by the Court without any explanation on the record. At the same time that the government was asking this Court to conduct certain proceedings away from public view, however, other government officials were releasing at least some of that same purportedly sensitive information to the public, as the Court later recognized. Since then, the government has continued to disclose more and more information about the deportees and the conditions in which they are being held.

As the U.S. Supreme Court has long recognized, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U.S. at 572 (1980). Here, the continued sealing of these court records is particularly confounding because it appears the government has already disclosed at least some of the contents of the records in question. It is therefore unclear whether any other information remains to be disclosed, or, if so, what interest the government could possibly articulate in continuing to seal it. The Press Movants therefore respectfully request that the Court grant their limited intervention and promptly unseal these records.

## BACKGROUND

## I.    THE COURT'S PRELIMINARY INJUNCTION

In March 2025, Plaintiffs filed this lawsuit, seeking an emergency injunction after learning that the government was allegedly removing non-citizens to countries other than their places of origin without due process. ECF Nos. 1, 6. The Court granted Plaintiffs' motion for a temporary restraining order ("TRO"), enjoining the government from removing Plaintiffs or "any individual subject to a final order of removal from the United States to a third country, i.e., a country other than the country designated for removal in immigration proceedings, UNLESS and UNTIL" they are provided with written notice of and "a meaningful opportunity" to object to the country to which they are being removed. ECF No. 34 at 1-2. On April 18, 2025, the Court converted its TRO into a preliminary injunction, directing that

> prior to removing any alien to a third country, i.e., any country not explicitly provided for on the alien's order of removal, [the government] must: (1) provide written notice to the alien—and the alien's immigration counsel, if any—of the third country to which the alien may be removed, in a language the alien can understand; (2) provide meaningful opportunity for the alien to raise a fear of return for eligibility for CAT protections; (3) move to reopen the proceedings if the alien demonstrates "reasonable fear"; and (4) if the alien is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days, for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

ECF No. 64 at 46-47 (footnotes omitted). Both the Court's TRO and its preliminary injunction are on appeal. *D.V.D. v. Dep't of Homeland Sec.*, No. 25-cv-1311 (1st Cir. Mar. 28, 2025); *id.*, No. 25-cv-1393 (1st Cir. Apr. 22, 2025).

On May 7, Plaintiffs filed a second motion for a TRO to prevent non-citizens from being removed to third countries without prior written notice and a meaningful opportunity to object, ECF No. 89, which the Court effectively granted as well, ECF No. 91 at 1.

## II.    THE PARTIALLY SEALED MAY 21, 2025 EMERGENCY HEARING AND THE GOVERNMENT'S PUBLIC PRESS CONFERENCES

Less than two weeks later, Plaintiffs moved for emergency injunctive relief a third and fourth time. *See* ECF Nos. 104, 111. Despite publicly noticing the hearing on Plaintiffs' motions for May 21, the Court held an emergency hearing with the parties on May 20. *See* ECF No. 116. The case docket still does not provide notice that a hearing would be held in this matter on May 20, and the District's public calendar does not reflect a hearing in this matter on that date, either. *See* Decl. of Christopher A. Hatfield, Ex. A (copy of public calendar for May 20, 2025).

The Court and the parties reconvened the following day, May 21, to continue the hearing on Plaintiffs' motions. *See* ECF No. 117. In response to the very first substantive question of that day's proceedings, the government asked the Court to "dismiss the public" from the hearing "because of the sensitive nature of th[e] details" it was prepared to share with the Court. ECF No. 145 ("May 21, 2025 Hr'g Tr.") at 7:10-13. The Court responded, "I would like those details. I am sympathetic to your request." *Id*. at 7:14-15. The Court then closed the courtroom and "conduct[ed] a sealed hearing with counsel and Marcos Charles." ECF No. 117. When the hearing resumed in open court, the Court announced, without elaboration, that "[w]e've agreed to keep certain facts under seal." May 21, 2025 Hr'g Tr. at 10:4. There is no information in the public record about how long the sealed portion of the proceeding lasted, or that any member of the press or public was given an opportunity to object to the closure before the proceedings were sealed. *Id*.; May 21, 2025 Hr'g Tr. at 9:14-16.

The Court subsequently disclosed some of the details it had learned during its closed session with the parties, including that the deportees received notice of their third-country removal on "the evening of May 19," were "taken from that locked facility" at 9:30 "[t]he next

morning," after which point they were unable to "seek advice or counsel," and were "transported to the airport and put onto a plane." May 21, 2025 Hr'g Tr. at 11:3-15; *id.* at 16:11. No other details about the flight, from where it departed, or its present location were shared in open court.

Meanwhile, nearly contemporaneously with the partially sealed May 21 hearing, the government held a press conference about the deportation flight to South Sudan, divulging many of the details that government counsel was then asking the Court to keep under seal. *See* Press Release, *DHS Sets the Record Straight on Media Frenzy over Deportation Flights for Worst of the Worst Including Murderers, Rapists, and Pedophiles*, Dep't of Homeland Sec., (May 21, 2025), https://www.dhs.gov/news/2025/05/21/dhs-sets-record-straight-media-frenzy-over-deportation-flights-worst-worst. For example, the government shared during that news conference the full names and criminal histories of the eight men who were on the plane, as well as the fact that the flight departed from Texas. *Id.*; *see, e.g.*, Beatrice Peterson et al., *Judge rules DHS violated court order in deporting 8 migrants to South Sudan*, ABC News (May 21, 2025), https://abcnews.go.com/Politics/8-migrants-south-sudan-deportation-flight-officials-confirm/story?id=122033692; *Immigration and Customs Enforcement Officials Hold News Conference*, C-SPAN (May 21, 2025), https://www.c-span.org/program/news-conference/immigration-and-customs-enforcement-officials-hold-news-conference/660241.

By the next day, the government had publicly confirmed that the plane was in Djibouti, and that the deportees were being held at the U.S. Navy base, Camp Lemonnier. *See* Haley Britzky et al., *Deported migrant detainees are holding at a US Naval base in Djibouti amid court fight, officials say*, CNN (May 22, 2025), https://www.cnn.com/2025/05/22/politics/deported-migrant-detainees-us-naval-base-djibouti. Based on the information being shared publicly by the government, the press was able to confirm that the aircraft used was "the same private jet [that]

was used by the U.S. government" to fly "basketball star Brittney Griner back to the United

States." *See, e.g.*, Alan Feuer et al., *Judge Finds U.S. Violated Court Order With Sudden*

*Deportation Flight to Africa*, The New York Times (May 21, 2025),

https://www.nytimes.com/2025/05/21/us/politics/south-sudan-deportation.html.

## III. THE COURT'S REMEDIAL ORDERS

On the evening of May 21, the Court issued an order concluding that the government had

"violated the Preliminary Injunction entered in this case by failing to provide six non-citizen

class members a 'meaningful opportunity' to assert claims for protection under the Convention

Against Torture before initiating removal to a third country." ECF No. 118 at 1. It found that

even "[g]iving every credit to Defendants' account, the non-citizens at issue had fewer than 24

hours' notice, and zero business hours' notice, before being put on a plane and sent to" South

Sudan. *Id*. The Court further clarified that, by "meaningful opportunity," as used in its

preliminary injunction, due process requires "a minimum of ten days, to raise a fear-based claim

for CAT protection prior to removal" to a third country. *Id*. at 2.

The Court issued a second order that evening—an Order on Remedy for Violation of

Preliminary Injunction—requiring that, as to the deportees on the plane in Djibouti,

> [each] must be given a reasonable fear interview in private, with
> the opportunity for the individual to have counsel of their choosing
> present during the interview, either in-person or remotely, at the
> individual's choosing. Each individual must be afforded access to
> counsel that is commensurate with the access that they would have
> received had these procedures occurred within the United States
> prior to their deportation[.]

ECF No. 119 at 2. The Court left to "DHS, in its discretion," whether "to provide this process to

the six individuals either within the United States—should it choose to return them to the United

States—or abroad." *Id*. at 2.

On May 23, the government moved the Court to reconsider its May 21 remedial orders, describing the second one in particular as "highly burdensome," including because "Defendants are currently detaining dangerous criminals in a sensitive location without clear knowledge of when, how, or where this Court will tolerate their release." ECF No. 130 at 1. In support of its request, the government submitted a declaration from Secretary of Defense Pete Hegseth (the "Hegseth Declaration"), but moved to file the document under seal. *See* ECF No. 131. According to the government, the Hegseth Declaration "contain[ed] highly sensitive information concerning topics of national security," the disclosure of which "would adversely affect the interests of the United States." *Id*. The Court granted the government's motion to seal the same day, without explanation on the docket or in an accompanying written order. *See* ECF No. 134.

On May 26, the Court denied the government's motion for reconsideration, writing that

> Defendants have mischaracterized this Court's order, while at the same time manufacturing the very chaos they decry. . . . Defendants gave this Court no choice but to find that they were in violation of the Preliminary Injunction. Even after finding that violation, however, the Court stayed its hand and did not require Defendants to bring the individuals back to the United States, as requested by Plaintiffs. Instead, the Court accepted *Defendants' own suggestion* that they be allowed to keep the individuals out of the country and finish their process abroad. . . . Since that hearing, merely five days ago, Defendants have changed their tune. It turns out that having immigration proceedings on another continent is harder and more logistically cumbersome than Defendants anticipated.

ECF No. 135 at 1-3 (emphasis in original). In the same order, the Court recounted the factual basis underpinning its May 21 orders, including in it information it had learned during the sealed proceedings on May 21, such as the fact that the plane had departed for South Sudan around noon local time on May 20 and had landed at a foreign military base in Djibouti. *Id*. at 5-7. The Court noted that this was the same information that the government had requested "be kept under seal," *id*. at 5 n.5 (citing to the Hegseth Declaration, ECF No. 131-1), but that the government

had "since made that information public," *id.* at 5 & n.5 (citing to the government's May 21 press conference and CNN reporting of a subsequent press conference).

Despite this acknowledgment that the information contained in the Sealed Records was already public, the Hegseth Declaration and the full transcript of the May 21 proceedings remain under seal. *See* ECF No. 131-1, 145. For the reasons below, the Press Movants now respectfully move to intervene and unseal the sealed portions of the transcript of the May 21, 2025 hearing, ECF No. 145,[2] and the Hegseth Declaration, ECF No. 131-1 (together, the "Sealed Records").

## ARGUMENT

I. **THE COURT SHOULD PERMIT PRESS MOVANTS TO INTERVENE FOR THE LIMITED PURPOSE OF SEEKING ACCESS TO THE SEALED RECORDS**

The Supreme Court has held that, because the public has a right of access to judicial records and proceedings, "representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion." *Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 609 n.25 (1982) (cleaned up). To effectuate the Supreme Court's instruction, the First Circuit and the district courts comprising it have regularly allowed members of the press and public to intervene in civil cases, pursuant to Federal Rule of Civil Procedure 24, for the limited purpose of seeking to unseal court records or proceedings. *See, e.g.*, *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 783 (1st Cir. 1988); *Dahl v. Bain Capital Partners, LLC*, 891 F. Supp. 2d 221, 223 n.1 (D. Mass. 2012); *see also, e.g.*, *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 508 (1st Cir. 1989) (citing with approval *In re Washington Post*

---

[2] Though the Press Movants request a transcript of the sealed portions of the May 21, 2025 proceeding, it bears note that "[s]uch a transcript would not fully implement the right of access because some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript." *United States v. Antar*, 38 F.3d 1348, 1360 n.13 (3d Cir. 1994). "Documentary access" is therefore "not a substitute for concurrent access, and vice versa." *Id.*

*Co.*, 807 F.2d 383 (4th Cir. 1986), wherein the Fourth Circuit reiterated that the press and public have a right to intervene for the purpose of objecting to the closure of proceedings and sealing of documents); *Abrego Garcia v. Noem*, Case No. 8:25-cv-00951, ECF No. 180 (D. Md. June 4, 2025) (granting press motion to intervene pursuant to Rule 24 and unsealing records in whole or in part). This Court should follow this consistent line of authority and permit the Press Movants to intervene here for the limited purpose of seeking access to the Sealed Records.

## II.    THE COURT SHOULD GRANT PUBLIC ACCESS TO THE SEALED RECORDS

The Sealed Records are subject to the First Amendment and common law right of access, and neither the parties nor the Court has offered any explanation, on the record, as to why they are not currently available to the public. To the contrary, the government has disclosed some or all of the contents of the Sealed Records – and even if that were not the case, the government has not articulated a sufficient interest in continuing to keep the Sealed Records secret.

### A.    The Sealed Records Are Subject to Both the Common Law and First Amendment Rights of Access

The common law and First Amendment both provide a powerful right of access to court records and proceedings. Here, both rights of access apply to the Sealed Records.

Under the common law, the presumption attaches to "documents which properly come before the court in the course of an adjudicatory proceeding and which are relevant to the adjudication." *Standard Fin. Mgmt. Corp.*, 830 F.2d at 412-13; *Bradford & Bigelow, Inc. v. Richardson*, 109 F. Supp. 3d 445, 447 (D. Mass. 2015) ("[O]nce a document . . . is filed with the court, there is a presumptive right of public access."). The Sealed Records easily pass this test.

The May 21 hearing was an "emergency hearing" on the Plaintiffs' motions for injunctive relief to prevent the government from removing individuals in violation of the Court's April 18 preliminary injunction. *See* ECF Nos. 111, 112, 115, 116, 117. The "specific details

about the flight and its location and operation status"—including the time at which the individuals received notice of their removal to a third country, whether they had access to counsel, the time they left the detention facility and boarded the plane, and the flight's departure time—provided by the government entirely under seal formed the factual basis for the Court's order finding that the government had violated the preliminary injunction. *See generally* May 21 Hr'g Tr.; ECF Nos. 118, 135. The government submitted the Hegseth Declaration in support of its request that the Court reconsider the remedial measures imposed by the May 21 orders, *see* ECF Nos. 118, 119, 131, which the Court denied, *see* ECF No. 135. The Sealed Records were therefore part of and relevant to an adjudicatory proceeding. The common law right of access applies to them accordingly.

So, too, does the First Amendment. The First Circuit has "recognized a qualified First Amendment right of public access to certain documents filed in civil litigation," *MIT*, 46 F.4th at 67 (citing *Courthouse News Servs. v. Quinlan*, 32 F.4th 15, 20 n.8 (1st Cir. 2022)), and, although the court has not decided whether that includes dispositive motion papers, it has strongly indicated that it would, *see Anderson v. Cryovac, Inc.*, 805 F.2d 1, 8 (1st Cir. 1986) (noting that media access "to materials considered in rulings on dispositive pretrial motions" was "consistent with a public right of access" under the First Amendment). Because the Sealed Records pertain to the Court's consideration and resolution of a dispositive motion—Plaintiffs' request for emergency injunctive relief and the government's request for the Court to reverse itself—the First Amendment right of access applies to them as well.

### B.    The Government Cannot Overcome the Presumption of Public Access Under the First Amendment or Common Law

Once the presumption of public access attaches, the burden to overcome it "rests with 'those seeking to keep the datum hidden from view,' not with the party seeking access." *Dahl*,

891 F. Supp. 2d at 224 (quoting *Standard Fin. Mgmt. Corp.*, 830 F.2d at 411).  Under the

common law, "only the most compelling reasons can justify non-disclosure." *Id.* at 224 (quoting

*Standard Fin. Mgmt. Corp.*, 830 F.2d at 410).  Under the more rigorous First Amendment

standard, "the presumption in favor of access can only be overcome 'by an overriding interest

based on findings that [sealing] is essential to preserve higher values and is narrowly tailored to

serve that interest.'" *In re Providence Journal Co.*, 293 F.3d 1, 10-11 (1st Cir. 2002) (quoting

*Press-Enterprise Co. v. Super. Ct.*, 464 U.S. 501, 510 (1984)).

　　　　The Court should grant access to the Sealed Records because the government cannot

satisfy either of these standards.  The government has already disclosed some or all of the

information in question, and neither the parties nor the Court have articulated on the public

record how withholding the Sealed Records is necessary to advance a compelling interest or

narrowly tailored to that interest.  Indeed, the public docket is devoid of *any* explanation why the

Court granted the government's requests for sealing.  The records should therefore be unsealed.

### 1.    The government has disclosed the contents of the sealed records

　　　　Because the government has already disclosed the contents of the Sealed Records, there

are no grounds on which to keep them sealed.  As several courts have explained, "[o]nce

information is published, it cannot be made secret again." *Skyhook Wireless, Inc. v. Google,*

*Inc.*, 2015 U.S. Dist. LEXIS 176173, at *3 (D. Mass. Mar. 3, 2015) (quoting *In re Copley Press,*

*Inc.*, 518 F.3d 1022, 1025 (9th Cir. 2008)); *see also Gambale v. Deutche Bank AG*, 377 F.3d 133,

144 (2d Cir. 2004) (courts "simply do not have the power, even were we of the mind to use it if

we had, to make what has thus become public private again").

　　　　As the Court detailed in its Memorandum and Order on Defendants' Motions for

Reconsideration and Stay, *see* ECF No. 135, at nearly the same time as the government was

asking the Court to close the courtroom so that it could provide "specific details about the flight

and its location and operation status," May 21, 2025 Hr'g Tr. at 7:10-13, the government was also holding press conference after press conference revealing precisely the same information. *See* ECF No. 135 at 5 & n.5. This information includes, but is not limited to:

- the names and criminal histories of the individuals on the flight;
- that the flight departed from Texas;
- the departure time of the flight;
- that the plane was now at a foreign military base in Djibouti; and
- the plane's final destination was supposed to be South Sudan.

*See supra* at 5-6 (citing reporting by The New York Times and CNN). Since then, the government has continued to release information about the circumstances in which the deportees are being held in Djibouti, undercutting any argument that the information is sensitive or that its release would compromise national security. *See, e.g.*, ECF No. 151 ¶¶ 4-7 (informing the Court that the deportees are "currently being held in a conference room in a converted Conex shipping container" at the naval base, guarded by 11 ICE officers, who work 12-hour shifts, and giving a description of the units where the deportees are held and the measurements of distance between various facilities on the naval base).

Given that information contained in the Sealed Records has already been made public—and the government continues to disclose more details about the flight, the deportees, and the naval base at which they are being held—the Court should grant public access to the Sealed Records in their entirety.

### 2. The government cannot overcome the presumption of public access to the sealed records under either the First Amendment or common law

Even if the government had not already disclosed the contents of the Sealed Records, the common law and First Amendment rights of access would still require unsealing. The

government has failed to articulate a compelling reason for keeping the Sealed Records secret, and it cannot show how maintaining these records under seal is narrowly tailored to serving any sufficiently compelling interest it might identify.

The government has not offered the Court anything beyond boilerplate assertions of "national security" to support its need to "dismiss the public" from the courtroom or file the Hegseth Declaration under seal. *See* May 21, 2025 Hr'g Tr. at 7:10-13; ECF No. 131. Without more, however, such assertions cannot establish "the existence of special circumstances adequate to overcome the presumption of public accessibility." *Standard Fin. Mgmt. Corp.*, 830 F.2d at 413. Nor is it plausible that these details could compromise national security at this point: the flight landed more than two weeks ago, and the government has already shared "the specific details about the flight and its location and operation status," May 21, 2025 Hr'g Tr. at 7:10-13, which further undermines any claim the government could make that unsealing the Sealed Records "would adversely affect the interests of the United States," ECF No. 131.

Moreover, because the information contained in the Sealed Records has been publicly disclosed, the government cannot show how wholesale sealing of the Hegseth Declaration is "narrowly tailored" to achieve any interest the government may identify. At a minimum, those portions of the Hegseth Declaration and the hearing transcript containing information that is already public must be promptly unsealed and placed on the public docket. *See, e.g.*, *Gambale*, 377 F.3d at 144 (courts "simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again"). But the Court should further unseal the rest of the Sealed Records as well, because selective disclosure only "breeds suspicion" and, as noted above, is contrary to "our Nation's tradition of doing justice out in the open." *MIT*, 46 F.4th at 68-69.

### 3. The lack of on-the-record reasons for sealing the documents further requires that they be unsealed

Before a court may restrict public access to judicial records or proceedings, it must "articulate on the record [its] reasons for doing so" with enough specificity "to permit a reviewing court to determine whether sealing was appropriate," *United States v. Kravetz*, 706 F.3d 47, 60 (1st Cir. 2013). Here, no reasons have been given on the public record to explain why the Sealed Records remain inaccessible, which further justifies unsealing them.

With respect to the May 21, 2025 transcript, the docket reflects only that the Court "conduct[ed] a sealed hearing with counsel." ECF No. 117. On the record, the Court stated that it was "sympathetic to [counsel's] request" to close the courtroom, but it made no findings on the closure request before proceeding into closed session. May 21, 2025 Hr'g Tr. at 7:14-15. Upon reopening the proceedings, the Court further stated that it and the parties had "agreed to keep certain facts under seal," May 21, 2025 Hr'g Tr. at 10:4.

With respect to the Hegseth Declaration, the public record likewise offers no explanation for sealing. *See* ECF No. 134 (sealing Hegseth Declaration with no accompanying written order). Because the public docket does not provide any reason why the Sealed Records were initially sealed or why they remain sealed to this day, the Court should promptly unseal them.

\*     \*     \*

Because the right of access applies to the Sealed Records, the government cannot show that it has a sufficiently compelling interest in continued sealing or that continued sealing is narrowly tailored, and no findings have been made on the record to justify that they are being kept secret, the Court should promptly unseal these records and place them on the public docket. At the least, that information which has already been publicly disclosed must be promptly unsealed and placed on the public docket. Moreover, in the event that the parties file additional

records or seek to hold additional proceedings under seal in this matter, the Press Movants respectfully request that the press and the public be afforded adequate notice of the proceedings and an opportunity to object to any closure prior to sealing being imposed.[3]

## CONCLUSION

For the foregoing reasons, the Press Movants respectfully request that the Court grant their motion to intervene and unseal the Sealed Records (ECF Nos. 131-1, 145). To the extent the parties file additional records or seek to hold additional proceedings under seal in this matter, the Press Movants further request that the Court provide reasonable notice, an opportunity to object, and on-the-record findings to support the granting of any such sealing request.

Dated: June 13, 2025                    Respectfully submitted,

                                        BALLARD SPAHR LLP

                                        /s/ *Christopher A. Hatfield*
                                        Christopher A. Hatfield (BBO No. 688386)
                                        Maxwell S. Mishkin
                                            (*pro hac vice* forthcoming)
                                        1909 K Street NW, 12th Floor
                                        Washington, DC 20006
                                        Tel: (202) 661-2263 | Fax: (202) 661-2299
                                        hatfieldc@ballardspahr.com
                                        mishkinm@ballardspahr.com

                                        Isabella Salomão Nascimento
                                            (*pro hac vice* forthcoming)
                                        2000 IDS Center, 80 South 8th Street
                                        Minneapolis, MN 55402
                                        Tel: (612) 371-3281 | Fax: (612) 371-3207
                                        salomaonascimentoi@ballardspahr.com

                                        *Counsel for the Press Movants*

---

[3] If the Press Movants had the opportunity to object to closure of the May 21 hearing, for example, they could have informed the Court about the contents of the government's same-day press conference, potentially obviating the need for the proceeding to be closed at all.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of June, 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will serve all parties of record in the case.

*/s/ Christopher A. Hatfield*
Christopher A. Hatfield