UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G.,<br><br>  Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity,<br><br>  Defendants. | Case No. 25-cv-10676-BEM |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION ON BEHALF OF CLASS MEMBERS E.A.H., J.M.R., T.N., J.M.G., K.M., D.D., N.M., AND T.T.P. TO ENFORCE ORDER ON REMEDY (DKT. 119)
AND
ALTERNATIVE MOTION FOR INDIVIDUAL TEMPORARY RESTRAINING ORDERS AND PRELIMINARY INJUNCTIONS**

I.     INTRODUCTION

This emergency motion is filed on behalf of class members E.A.H., J.M.R., T.N., J.M.G., K.M., D.D., N.M., and T.T.P. in the wake of the Supreme Court's order staying this Court's preliminary injunction (PI) pending appeal without any reasoning. As these men are currently being held in a shipping container at a U.S. naval base in Djibouti, emergency action is necessary to preserve and protect their statutory, regulatory, and due process rights to seek protection from torture in South Sudan.

Defendants violated the PI by attempting to remove class members to South Sudan without providing meaningful notice or any opportunity to assert claims for protection under the Convention Against Torture (CAT). Dkt. 118 at 1. In response to this violation, the Court issued a narrow and equitable remedy, requiring Defendant Department of Homeland Security (DHS) to retain custody of the class members and to provide the protections that they would have received but for the violation, namely, reasonable fear interviews with access to counsel and a motion to reopen filed by either DHS or the class member depending on the outcome of the interview. Dkt. 119 at 1–2. The Court explicitly stated that this remedy was not intended to define future compliance, but rather to redress a discrete violation of the injunction. *Id.* at 2.

Plaintiffs now move to enforce that previously ordered remedy. At the time DHS violated the injunction, it remained fully operative, and the Court had authority to fashion an appropriate remedy. Federal courts routinely enforce remedial orders issued in response to such violations, even when the underlying injunction is later stayed or vacated.

In the alternative, Plaintiffs move the Court to issue individual injunctive relief for these eight class members. Individual injunctive relief remains available consistent with § 1252(f)(1). All eight individuals—none of whom have final removal orders to South Sudan—are being

deprived of basic procedural rights and access to protection that Congress and the Constitution require. Absent injunctive relief, these class members face imminent risk of deportation to a volatile country where they likely will face indefinite detention and other forms of torture.

## II. STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

### A. This Court's Preliminary Injunction

On March 23, 2025, Plaintiffs filed a Complaint, Motion for Class Certification, Motion for Temporary Restraining Order and Preliminary Injunction and Stay of Administrative Action, and a Motion for Leave to Appear under Pseudonyms. *See* Dkt. 1; Dkts. 2-8.

On April 18, 2025, this Court granted Plaintiffs' motions for class certification and a PI. Dkt. 64. The Court ordered that, for all class members, prior to any third-country removal, noncitizens and their counsel, if any, must receive written notice of the country of removal in a language the noncitizen understands and a meaningful opportunity to assert a claim for CAT protection related to that third country. *Id*. at 46-47. Specifically, the Court ordered that if a noncitizen demonstrates a reasonable fear of removal to the third country, DHS must move to reopen proceedings to allow an immigration judge (IJ) to adjudicate the CAT claim; but if the DHS finds that the noncitizen does not demonstrate reasonable fear, they have 15 days to move to reopen proceedings. *Id*.

### B. Defendants' Violation of the Preliminary Injunction and This Court's Remedial Order

On May 20, Plaintiffs filed an emergency TRO on behalf of N.M. and T.T.P. and all similarly situated individuals, based on reports that DHS was removing class members to South Sudan without the PI's protections. Dkt. 111. Plaintiffs subsequently learned that the individuals Defendants sought to remove to South Sudan, namely, N.M., T.T.P., and the six other class members bringing the instant motion, received "fewer than 24 hours' notice, and zero business

2

hours' notice, before being put on a plane and sent to a country" that is the subject of a "Do not travel" warning from the U.S. Department of State. Dkt. 118 at 1; *see also* Dkt. 135 at 11 n.15 (individuals received "at most, sixteen" hours' notice). The notice was provided only in English. *See, e.g.*, Dkt. 130-2 ¶ 10. All the men refused to sign the notice, but DHS did not treat the refusal as an expression of fear. *Id.* DHS provided no opportunity to contact counsel or to present a claim for withholding of removal or protection under CAT against removal to South Sudan. Dkt. 135 at 12-13.

After convening an emergency hearing, this Court ordered Defendants to "maintain custody and control" of the individuals "to ensure the practical feasibility of return if the Court finds that such removals were unlawful." Dkt. 116 at 1. The next day, immediately prior to a continued hearing, DHS publicized the names, photographs, and criminal histories of the eight men. Dkt. 135 at 5; *Immigration and Customs Enforcement Officials Hold News Conference*, at 5:07, CSPAN (May 21, 2025), https://tinyurl.com/mtcvptf3. At the hearing, the Court found that Defendants' actions with regard to the South Sudan attempted removals violated the PI, *see* May 21, 2025 Hearing Transcript at 43:3-4, and memorialized the violation in a written order, *see* Dkt. 118. The Court further explained that a "meaningful opportunity" to seek CAT protection requires a minimum of 10 days between notice and removal. *Id.* at 2. The Court allowed Defendants to choose where to provide the PI's protections—either in the United States or abroad, provided that the class members receive the same access to counsel, interpretation, and telephone as they would have had but for the violation. Dkt. 119; *see also* Dkt. 135 at 1-3.

Plaintiffs' counsel first reached out to Defendants' counsel to provide contact information for attorneys willing to represent the men on May 22 and subsequently followed up seeking

3

information regarding how to contact them on several occasions.[1] After several weeks with minimal progress on implementing the order, Defendants finally reported to the Court on June 9 that they had provided the men with contact information for their attorneys, *see* Dkt. 153, and, on June 16, that they had provided "contact information" for the eight men, including "an ICE point of contact who can arrange communication" with them, Dkt. 172. To date, three of the men have received reasonable fear interviews but not decisions, three others have interviews scheduled this week, and N.M. and D.D. are still awaiting interviews.

### C. The Eight Men Targeted for Deportation to South Sudan, Including N.M. and D.D., Are Class Members

All eight men—the same eight men who bring the instant motion—were and remain members of the certified nationwide class: they were issued final removal orders pursuant to 8 U.S.C. §§ 1229a or 1238(b) designating countries other than South Sudan as countries of removal. *See* Dkt. 129-1; Exhibit A (Hughes Declaration) ¶ 4.

In ordering a remedy for the violation of the PI, the Court referenced only "six individuals" who "must be given a reasonable fear interview," Dkt. 119 at 1, because Defendants had claimed that neither N.M. nor D.D. was a class member. With regard to N.M., Defendants claimed that he was not a class member because, after coming into contact with his attorney, they decided to instead deport him to Burma, the country to which he was originally ordered removed. *See, e.g.*, May 20, 2025 Transcript at 15:10-13; May 21, 2025 Transcript at 56: 3-6 (inquiring why "it was impossible, impractical, or ill advisable to bring him to Burma on May 19, but, once he had an attorney, that impossibility and practicality or inadvisability somehow changed"); *see also* Dkt. 125 ¶ 7. With regard to D.D., Defendants claimed that he was from South Sudan. *See* May 21, 2025 Transcript.

---

[1]   The emails are on file with Plaintiffs' counsel, available upon the Court's request.

4

However, following the Court's order referencing only six class members, information surfaced that unequivocally demonstrates that both N.M. and D.D. are, in fact, class members also entitled to this Court's remedy.[2] On May 19, DHS served N.M. and his immigration counsel with notice of removal to South Sudan. *See* Dkt. 112 at 3-4; Dkt. 112-1 ¶ 7 & Exh. E. However, after the emergency hearing, Defendants claimed that "[u]pon further investigation after contact from [N.M.'s] counsel, it was realized that [N.M.] was in fact in possession of a travel document to Burma" and that it was then "decided that he would instead be removed to Burma." Dkt. 125 ¶ 7. N.M. remains with the rest of the group; he has *not* been removed to Burma. *See, e.g.*, Dkt. 150 ¶ 1 (explaining that "eight" noncitizens remain detained in Djibouti); Dkt. 153 ¶ 1 (stating that "[a]ll detainees that arrived in Djibouti remain there"). Neither N.M. nor his counsel has been informed whether Burma has issued travel documents that would allow him to travel to Burma, and DHS has not cancelled the notice of removal to South Sudan. Thus, there is no reason to believe that DHS is still actively planning to remove him to Burma; instead, N.M. remains a class member who is at risk of removal to South Sudan.

As to D.D., Defendants claim that he is not subject to third country removal. However, he was ordered removed to *Sudan*, not South Sudan, and so removal to South Sudan *is* a third country removal. Notably, South Sudan became an independent state on July 9, 2011, just ten days before an immigration judge issued D.D.'s removal order on July 19, 2011. *See* U.S. Department of State, Office of the Historian, *A Guide to the United States' History of Recognition, Diplomatic, and Consular Relations, by Country, since 1776: South Sudan*, https://history.state.gov/countries/south-sudan (last visited Jun. 18, 2025); Hughes Decl. ¶ 4.

---

[2] In light of N.M. and D.D.'s status as class members, on June 12, 2025, Plaintiffs' counsel emailed Defendants' counsel to request confirmation that both individuals will be referred for reasonable fear interviews. Defendants' counsel has not responded to this inquiry.

Thus, South Sudan was not designated as a country of removal in the proceedings and D.D. had no opportunity to seek protection related to fear of deportation to South Sudan in his original proceedings.

### D. The Supreme Court's Stay of the Preliminary Injunction

On May 27, 2025, Defendants sought a stay of the preliminary injunction from the U.S. Supreme Court, and, on June 23, 2025, the Court granted the stay. *DHS v. D.V.D.*, No. 24A1153 (S. Ct. Jun. 23, 2025). However, the Supreme Court did not rule on or in any way address the government's jurisdictional arguments or the merits of Plaintiffs' claims, including whether the eight Plaintiffs who now file this motion were entitled to notice and an opportunity to seek protection before removal to a third country. *Id*.

### III. ARGUMENT

#### A. The Court Should Enforce the Previously Ordered Remedy

This Court retains the authority to enforce compliance with its previously ordered remedy. DHS was required to immediately comply with this Court's order when it was in effect, for it is a "basic proposition that all orders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458 (1975); *see also, e.g.*, *Pasadena City Bd. of Ed. v. Spangler*, 427 U.S. 424, 439-40 (1976) (explaining that "outstanding injunctive orders of courts [must] be obeyed until modified or reversed by a court having the authority to do so"); *Reich v. United States*, 239 F.2d 134, 138 (1st Cir. 1956) ("It is too well settled to require a lengthy citation of cases that an injunction, temporary or permanent, must be obeyed as long as it is in force and effect."). This principle is also codified in the Federal Rule of Civil Procedure 62(c), making clear that a preliminary injunction on interlocutory appeal is "not stayed after being entered," absent a court order. *See also* Fed. R. App. P. 8(a)(1)(C), (a)(2)(A) (requiring

6

motion from party seeking to stay an injunction). It is equally well-established that violations of a court order are subject to enforcement "even though the order is set aside on appeal, or though the basic action has become moot." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 294 (1947) (citation and footnote omitted). *Cf. In re Grand Jury Proceedings*, 875 F.2d 927, 935 (1st Cir. 1989) ("It is no defense to a charge of criminal contempt that the violated order was subsequently revoked.").

Instead of immediate compliance, and despite DHS's assurances that reasonable fear interviews could be provided abroad, Defendants repeatedly delayed a remedy for over four weeks, as all eight class members continue to await their interview. *Accord* Dkt. 135 at 14 ("It cannot be said enough that this is the result Defendants asked for."). Indeed, Defendants did not provide the eight class members with any means to access their lawyers until after two weeks following their arrival in Djibouti. *See* Mattathias Schwartz, N.Y.Times, How the Trump Administration Banished Eight Men to Legal Limbo in Africa (June 6, 2025).

Consistent with these principles, a stay of the preliminary injunction pending appeal does not render this Court's remedial order unenforceable. *See, e.g.*, *Nat'l Maritime Union v. Aquaslide "N" Dive Corp.*, 737 F.2d 1395, 1399 (5th Cir. 1984) ("[E]ven an injunction that is ultimately invalidated for lack of jurisdiction is, while the jurisdictional question is pending, a 'lawful order,' violation of which is punishable as contempt."); *cf. Fafel v. Dipaola*, 399 F.3d 403, 411 (1st Cir. 2005) ("If a court has an 'arguable basis' for concluding that it has subject-matter jurisdiction, the judgment it enters may not be collaterally attacked as 'void.'" (quotation omitted)). This is particularly so because DHS's violation of the injunction necessarily deprived class members of their constitutional rights, and the purpose of the Court's remedy was to address that past harm. Where, as here, "a right and a violation have been shown, the scope of a

7

district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971); *cf. Brown v. Plata*, 563 U.S. 493, 545 (2011) (explaining that equitable decree required "appropriate modification" and "remedy" in light of "ongoing constitutional violation"); *Hutto v. Finney*, 437 U.S. 678, 687 (1978) ("In fashioning a remedy [for past constitutional violations], the District Court had ample authority to go beyond earlier orders and to address each element contributing to the violation.").

Here, the eight class members continue to be subject to harms that the Court sought to prevent in issuing its PI and, later, by ordering a remedy for Defendants' violation of the PI. *See* Dkt. 64 at 44 ("Here, the threatened harm is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable."); *see also* Dkt. 135 at 16 (finding that the risk of irreparable "becomes tangible as class members were nearly dropped off in a war-torn country where the Government states that '[f]oreign nationals have been the victims of rape, sexual assault, armed robberies, and other violent cries'" (quoting U.S. Department of State, *South Sudan Travel Advisory* (Mar. 8, 2025))).

Critically, nothing in the Supreme Court's stay order does invalidates the preliminary injunction, it only stays it. Courts have long affirmed the principle that a "[d]istrict [c]ourt unquestionably ha[s] the power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction." *United Mine Workers of Am.*, 330 U.S. at 290; *see also United States v. Shipp*, 203 U.S. 563, 573 (1906) (explaining that a court "necessarily had jurisdiction to decide whether the case was properly before it," and with it, the authority to issue orders to preserve the status quo "[u]ntil its judgment declining jurisdiction should be announced"). In *A.A.R.P. v. Trump*, the Supreme Court similarly "grant[ed] temporary

8

injunctive relief to preserve [its] jurisdiction while the question of what notice is due is adjudicated." 145 S. Ct. 1364, 1368 (2025). Accordingly, in adjudicating Plaintiffs' motion for a preliminary injunction, this Court had the authority to both determine its own jurisdiction and issue injunctive relief necessary to preserve the status quo. *See* Dkt. 64 at 11-23 (analyzing jurisdictional issues); *id*. at 46-47 (granting injunction in part and denying mandatory injunction sought on behalf of individual Plaintiff which would "alter[] . . . the status quo" (quotation omitted)). Furthermore, as the Court already has correctly recognized, it unquestionably has subject matter jurisdiction over the Plaintiffs' claims. *Id*. at 11 n.14 (citing *Biden v. Texas*, 597 U.S. 785 (2022)).

In sum, the Supreme Court's order does not undermine either the procedural or substantive validity of the Court's preliminary injunction when it was in effect, and it cannot be disputed that DHS was required to promptly comply with this Court's May 20 order remedying that violation. Defendants should not be permitted to evade the ordered remedy simply because they delayed compliance. *See, e.g.*, *Coleman v. Brown*, 922 F. Supp. 2d 1004, 1054 (E.D. Cal. 2017) (emphasizing that parties may not "continue to violate . . . the Constitution" because "they believe a court's order is incorrect"). Based on well-established jurisdictional principles, as well as this Court's broad authority to remedy past constitutional violations, the Court should enforce its May 21, 2025 order requiring Defendants to remedy their violation of the preliminary injunction.

    **B.**    **In the Alternative, the Court Should Issue Injunctive Relief to the Eight Class Members Bringing this Motion; Class Members E.A.H., J.M.R., T.N., J.M.G., K.M., D.D., N.M., and T.T.P. Satisfy the Requirements for a TRO and/or PI**

To obtain temporary and preliminary injunctive relief on behalf of the eight class members in Djibouti, Plaintiffs must demonstrate that (1) they are likely to succeed on the

9

merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Brox v. Hole*, 83 F.4th 87, 91 (1st Cir. 2023). Irreparable harm and likelihood of success are the factors that "weigh heaviest in the analysis." *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010). When the government is a party, the balance of equities and public interest merge. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021); *Nken v. Holder*, 556 U.S. 418, 434 (2009). The TRO and PI are requested to preserve the status quo and, thus, do not qualify as a mandatory injunction. However, even if they were considered a mandatory injunction, Plaintiffs satisfy that standard as "[w]hether a mandatory preliminary injunction should issue typically depends on the exigencies of the situation, taking into account [the] four familiar factors" under the *Winters* test. *W. Holding Co., Inc. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014).

        **a.**     **Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

The eight class members are likely to prevail on their claims that they are entitled to notice and a meaningful opportunity to seek withholding of removal and CAT protection prior to removal to a third country and that they did not receive the required protections before Defendant DHS attempted to deport them to South Sudan. Indeed, this Court has already recognized that class members generally are likely to prevail on the merits of their claims *and* that these men in particular did not receive a meaningful opportunity to seek CAT protection. *See* Dkt. 64 at 37-44; Dkt. 118 at 1. The Supreme Court's recent decision, which did not provide a basis for its decision, does not require revisiting these determinations as to individual class members, like the eight men who bring this motion.

This Court already has held that Plaintiffs "have demonstrated a likelihood of success on

the merits" and are likely to prevail on their claim that Defendants' failure to provide notice and a meaningful opportunity to apply for CAT protection violates their statutory and regulatory rights as well as their Due Process rights. *See* Dkt. 64 at 44. As a result, the Court recognized that Defendants should provide, as preliminary relief, written notice to noncitizens and their immigration counsel of third country removal, as well as a meaningful opportunity to raise a claim for CAT protection, including reopening if the noncitizen demonstrates reasonable fear *and* providing a 15 day stay of removal if the noncitizen does not pass a credible fear screening to allow them to seek reopening themselves. *Id.* at 46-47. Moreover, in the context of Defendants' attempt to deport to the eight class members, the Court also recognized that a meaningful opportunity to seek CAT protection includes at least 10 days after notice of third country deportation and that Defendants should maintain custody of the class members to ensure that they would receive a remedy in this case. Dkts. 116, 118, 119. The Court should order that Defendants continue to provide the eight class members the previously ordered protections.[3] *See* Dkt. 135 at 16 (finding that Plaintiffs were entitled to TRO or PI as an alternative to the court's remedy).

Furthermore, the eight class members seek a meaningful opportunity to seek withholding of removal pursuant to 8 U.S.C. § 1231(b), as this Court previously ordered for the Named Plaintiffs, Dkt. 34. As Plaintiffs explained in their original Motion for a TRO and/or PI, the same legal arguments which warrant ensuring that they have a meaningful opportunity to seek CAT protection also mandate a meaningful opportunity to seek withholding of removal. *See, e.g.*, Dkt.

---

[3] As explained in their initial motion for a TRO and PI on behalf of the men Defendants attempted to remove to South Sudan, this Court has the authority to order the men returned to the United States and should do so at this juncture given DHS' failure to comply afford them the previously ordered remedy. *See* Dkt. 112 at 8-11 (citing, inter alia, *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) and federal court decisions ordering the facilitation of return of individuals wrongly removed).

7 at 10-13 (explaining that the relevant statutory, regulatory, and constitutional provisions prohibit third country deportations to countries where persons face persecution or torture).

Moreover, the Court has already recognized that Defendants did not provide the required protections to the individual class members on whose behalf Plaintiffs bring this motion.[4] As this Court explained, they did not receive "a 'meaningful opportunity' to assert claims for protection under the Convention Against Torture before . . . removal to a third country." Dkt. 118 at 1; *see also id.* (noting that this is not a "hard case" in terms of determining whether a violation occurred because, taking the facts as Defendants present them, Plaintiffs "had fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane" to a country under a Department of State "do not travel" notice); *see also* Dkt. 135 at 6-7 (detailing lack of notice, limited, if any, ability to communicate with family and/or counsel, and limited, if any, opportunity to access relevant information). This was patently insufficient. As the Supreme Court recently stated, "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *A.A.R.P.*, 145 S. Ct. at 1368. Likewise, being told that a person is being removed as they are being placed on a bus carrying out removal "does not pass muster." *Id.*

Nothing in the Supreme Court decision staying the PI in this case requires a different conclusion. The decision did not address, let alone come to a different conclusion regarding the merits of Plaintiffs' claims that they are entitled to notice and a meaningful opportunity to present fear-based claims, nor regarding whether Defendants provided the required meaningful opportunity prior to attempting to conducting third country removals to South Sudan.

---

[4] While the Court made this holding with respect to six individuals, as Plaintiffs have explained, Plaintiffs N.M. and D.D. are also class members who experienced and are continuing to experience the same harm.

### b.     Class Members Are Able to Demonstrate Irreparable Harm Absent Emergency Injunctive Relief.

The world's youngest country, South Sudan descended into civil war just two years after its independence in 2011. A 2018 peace deal finally collapsed last month, with the result that Defendants seek to remove the eight class members into a country that is now returning to full-blown and catastrophic civil war. Florence Miettaux, "*'They Came for Us, to Take our Shelters and Kill Us:' How Violence Returned to a Shattered South Sudan*," https://www.theguardian.com/global-development/2025/may/16/violence-south-sudan-politicians-arrested-bombings The Guardian, May 16, 2025 (quoting the U.N. Mission in South Sudan (UNMISS), which stated that they were "left with no other conclusion but to assess that South Sudan is teetering on the edge of a relapse into civil war").

Conditions in South Sudan have long been poor and dangerous even for the South Sudanese: the country is the source of one of the "most significant" refugee crises on the African continent, with 2.3 million of its own nationals currently refugees or asylum seekers in neighboring countries and an additional two million internally displaced. United Nations High Commissioner for Refugees (UNHCR), *South Sudan: Global Appeal 2025 Situation Overview* (Nov. 2024), https://web.archive.org/web/20250522134934/https://reporting.unhcr.org/sites/default/files/2024-11/South%20Sudan%20Situation%20Overview.pdf. Protracted displacement in South Sudan "has been fueled by a prolonged civil war, compounded by food insecurity, climate change and large return movements from the crisis in Sudan," whose own bloody and ongoing civil war has driven 640,000 South Sudanese to flee back to South Sudan between April 2023 and October 2024. *Id.*

13

In "reaffirm[ing] its call on States to refrain from forcibly returning South Sudanese nationals or habitual residents of South Sudan to any part of the country," the United Nations Mission in South Sudan has documented numerous human rights violations including "the killing, injuring and abducting of civilians, conflict-related sexual violence, arbitrary arrests and detention, extrajudicial executions and restrictions to fundamental freedoms," as well as "crisis or worse levels of hunger" for two thirds of the country's population. UNHCR, *Position on Returns to South Sudan—Update IV* at 7, 11, 15 (May 2024), https://www.refworld.org/policy/countrypos/unhcr/2024/en/147589. "Across the country, governmental authorities use summary executions to punish persons accused of being involved in violent activities or of committing crimes," with a spike in extrajudicial executions in Warrap State in 2022. *Id.* at 7-8. Armed actors, including government forces "have beheaded civilians and burned homes while men, women, and children remained inside." *Id.* at 8. South Sudan's National Security Service (NSS), the country's intelligence agency, effectively operates outside the law, maintaining its own detention facilities separate from the National Prison Service where "detainees are subjected to torture and ill-treatment and kept in poor conditions. *Id.*; *see also* Dkt. 112-2 at 9.

Since March, in response to armed attacks by non-governmental forces, the South Sudanese government has intensified its aerial bombardment of Upper Nile State using improvised incendiary weapons that have killed and horribly burned civilians, including children, and destroyed civilian infrastructure. Human Rights Watch, *South Sudan: Incendiary Bombs Burn, Kill Civilians* (Apr. 9, 2025), https://www.hrw.org/news/2025/04/09/south-sudan-incendiary-bombs-kill-burn-civilians. The 2018 peace agreement that was supposed to have ended South Sudan's five-year civil war "has now totally collapsed," as the government of

14

President Salva Kiir arrested opposition leader and First Vice President Riek Machar and bombed the bases of Machar's SPLM-IO movement around the country. Augustine Passilly and Mamar Abraham, *Army Barrel Bombs Spark Exodus as South Sudan Peace Deal Crumbles,* The New Humanitarian (May 20, 2025), https://www.thenewhumanitarian.org/news-feature/2025/05/20/army-barrel-bombs-spark-exodus-south-sudan-peace-deal-crumbles.

Moreover, individuals like the eight class members are extremely likely to face unique risks of torture and persecution based on their status of deportees, in light of the publicity engendered by Defendants' public release of their names, histories, and photographs. An expert on the treatment of foreign nationals in Sudan has explained that "it is extremely likely" that the eight Plaintiffs will be detained immediately upon or soon after arrival in South Sudan by NSS, at which point it is likely they will face conditions amounting to torture. *See* Exhibit B (Newhouse Declaration) ¶ 19. This could include "[b]eatings, whippings, being hung upside down, electrocution, burning, exposure to the elements, piercing with needles, rape, sexual violence and humiliation," as well as denial of access to legal counsel, indefinite detention, and purposeful withholding of food, water, and/or medical care. *Id*. ¶ 21; *see also id.* ¶ 22 (noting that "[d]eaths in custody are common, with bodies showing marks of beatings and torture disposed of in rivers, ditches and roadsides"). NSS, which runs the facilities where the men are likely to be held, operates "with near total impunity," and is regularly and credibly linked to "to torture, kidnapping, disappearances and extrajudicial killings," including "mobile killing squads" known to target foreign nationals. *Id*. ¶¶ 24-26. Even in the unlikely event that the class members were not taken into custody, they would likely face irreparable harm in the form of, at a minimum, inability to find housing or lawful work, which itself is likely to result in police and/or gang harassment, arrest, and subsequent abuse in detention. *Id*. ¶¶ 27-35.

15

As a result, any of the eight Plaintiffs who are removed to South Sudan face a strong likelihood of irreparable harm.

### c. The Balance of Hardships and Public Interest Weigh Heavily in the Eight Class Members' Favor.

The final two factors for a preliminary injunction—the balance of hardships and public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the eight class members face weighty hardships: deprivation of statutory rights to protection and removal to a country where they are likely to face imprisonment, torture or even death. "[T]he balance of hardships tips decidedly in plaintiffs' favor" when "[f]aced with such a conflict between financial concerns and preventable human suffering." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

This Court has already held that Defendants' failure to provide notice and a meaningful opportunity to apply for protection under CAT violates Class Members' statutory and regulatory rights as well as their Due Process rights. *See* Dkt. 64. Nothing in the Supreme Court's stay order addresses the Court's analysis on the merits. *See DHS v. D.V.D.*, No. 24A1153, Slip Op. at 1 (S. Ct. Jun. 23, 2025). And it is always in the public interest to enforce the law. Because Defendants' policy and practice "is inconsistent with federal law, . . . the balance of hardships and public interest factors weigh in favor of a preliminary injunction." *Moreno Galvez v. Cuccinelli*, 387 F. Supp. 3d 1208, 1218 (W.D. Wash. 2019); *see also Moreno Galvez v. Jaddou*, 52 F.4th 821, 831-32 (9th Cir. 2022) (quoting approvingly district judge's declaration that "it is clear that neither equity nor the public's interest are furthered by allowing violations of federal law to continue"). This is because "it would not be equitable or in the public's interest to allow the [government] . . . to violate the requirements of federal law, especially when there are no adequate remedies

available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (citation omitted; alteration in original).

Accordingly, the balance of hardships and the public interest overwhelmingly favor injunctive relief to ensure that Defendants comply with federal law and honor the eight class members' statutory and constitutional rights.

## IV. CONCLUSION

Plaintiffs respectfully ask this Court to order Defendants to maintain custody of E.A.H., J.M.R., T.N., J.M.G., K.M., D.D., N.M., and T.T.P., find that D.D. and N.M. are class members, order Defendants to either return the class members or fully comply with this Court's previously ordered remedy (Dkt. 119), including to enjoin and restrain Defendants from removing them to South Sudan (and any other third country) until Defendants have complied with all terms of the Order on Remedy for Violation of Preliminary Injunction, Dkt. 119.

Respectfully submitted,

s/*Trina Realmuto*

Trina Realmuto\*
Kristin Macleod-Ball\*
Mary Kenney\*
**NATIONAL IMMIGRATION LITIGATION ALLIANCE**
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4649
trina@immigrationlitigation.org

Anwen Hughes\*
Inyoung Hwang\*
**HUMAN RIGHTS FIRST**
121 W. 36th St., PMB 520
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

Matt Adams\*
Leila Kang\*
Aaron Korthuis\*
Glenda M. Aldana Madrid\*
**NORTHWEST IMMIGRANT RIGHTS PROJECT**
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org

*Attorneys for Plaintiffs and Class Members*
\* *Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

 s/ *Trina Realmuto*
Trina Realmuto

DATED: June 23, 2025