Declaration of Léonie NEWHOUSE, PhD

I, Dr. Léonie S Newhouse declare as follows:

1. I am submitting this declaration in support of EAH, JMR, TN, JMG, KM, NM, TTP [here after "the deportees"] in their application for protection from removal to South Sudan, under the Convention Against Torture (CAT).

2. I am currently a tenured Assistant Professor of Human Geography at Durham University, and formerly a Senior Research Fellow at the Max Planck Institute for the Study of Religious and Ethnic Diversity, where I led the African Urban Diversities research group. My postdoctoral research at MPI (2014-2018) focused on the experiences of foreign nationals living in South Sudan. I hold a BS from the University of California, Berkeley, and an MSc in Forced Migration Studies from the University of Oxford. I completed my PhD in geography at the University of Washington Seattle in 2012, focusing on refugee return migration to South Sudan in the period running up to and just following South Sudan's Independence in 2011.

3. My area of research focuses on contemporary political and economic dynamics in South Sudan, with a particular focus on the lived experiences of displaced people and economic migrants in South Sudan. My research documents how a range of populations, including foreign nationals, navigate the economic and political constraints facing the country. As the economy is deeply intertwined with elite politics, corruption and state capture, my research of necessity also concerns military and political developments in the county.

4. My research has been funded by the Royal Geographical Society, Durham University, the Max Planck Institute, the National Science Foundation and the Bucerius Foundation. My research has been published widely in peer reviewed academic journals including: *Transactions of the Institute of British Geographers, Geoforum, Environment and Planning A: Economy and Space, Journal of Peasant Studies and African Geographical Review.* I have advised diplomatic staff, consular mission, and UN and humanitarian agencies on foreign nationals living in South Sudan. My CV is attached.

5. This declaration is based on my expertise, which is built on decades spent following the political, military and economic developments in the country, in addition to my on-the ground fieldwork in South Sudan since 2009. I have spent over two years in South Sudan during this period, most recently in 2023, and continue to maintain personal and research connections in the country. My research is based on interviews and participant observation with non-elite south Sudanese residents in rural and urban areas, as well as with foreign nationals living in South Sudan. To the best of my knowledge, I am the only academic researcher who has undertaken sustained periods of research focusing on the experiences of (non-refugee) foreign nationals in South Sudan. I have conducted over 200 interviews as part of that research, which is further underpinned by insights stemming from long term ethnographic research, secondary sources such including situation reports, data

EXHIBIT B

repositories, and analysis from a wide range of UN bodies, Human Rights organizations, and well international and local humanitarian and development organizations and community based organizations. I maintain ongoing research relationships with South Sudanese based scholars, as well as continued close contact with humanitarian and UN workers, foreign nationals living in the country, and a wide range of South Sudanese nationals resident in the country, in refugee camps outside the country and in the diaspora.

6. My declaration is organized as follows. In the first section, I outline the current political situation in South Sudan. In section two, I discuss the specific risk for the deportees in question in South Sudan. I first discuss the most likely scenario where the deportees are detained by the NSS at the airport or shortly thereafter, next I consider what might happen in the less likely case of their release into the community. In section three I discuss specific attributes of individual deportees that might have bearing on their treatment by authorities in South Sudan. In section four, I lay out conditions for Foreign nationals in South Sudan, including their legal standing in the country and more general social conditions bearing on their treatment. In the final section, I reflect on the credibility of any assurances offered by South Sudanese government regarding the treatment of the deportees.

7. On this basis, I believe that I have relevant expertise relating to the treatment of foreigners in South Sudan, and conditions that would confront the deportees if they were deported to South Sudan.

## I. General Conditions in South Sudan

8. South Sudan gained its independence on July 9, 2011. Since 2013, the country has been in continuous national conflict, that persists to this day. In 2013, the country became destabilized as a result of elite competition over political succession in the ruling party SPLM during the run up to the first scheduled elections. At stake was control over the state apparatus, and oil revenues. In December of the same year, a civil war broke out between the two main rival factions: those loyal to President Salva Kiir Mayardit (mainly Dinka), and those aligned with the current First Vice President Riek Machar Teny whose rebel forces drew from Nuer areas, but whose call for a more federal decentralized political system found support among other ethnic factions. Intense fighting in Juba, in which elites from both factions sought to instrumentalize ethnic animosity, escalated to total civil war during the period of Dec 2013 to mid 2015, and once again from 2016 to 2018.

9. The civil war has been characterized by rapidly shifting political alliances, indiscriminate violence against civilian populations, and ethnically targeted attacks. Sexual violence against women, men and children has been used by armed actors against civilians. While organized loosely into two main factions, individual military commanders often maintain independent control of the soldiers serving under them. Communities have organized ethnic militias (such as the White Army, the Arrow Boys) which can be well armed, and which operate outside of direct control by

political and military elites. Political elites have deliberately sown ethnic hatred in order to instrumentalize ethnic tensions in the prosecution of this war, including through deliberate attacks against civilians, massacres, targeted sexual violence and torture. Furthermore, armed factions have deliberately targeted civilian populations aligned to rival factions in cycles of escalating retribution. The war has displaced around 4 million people and has killed hundreds of thousands.

10. Human rights organizations such as Human Rights watch and Amnesty International have repeatedly documented major human right violations in South Sudan by both government forces aligned to President Salva Kiir, the opposition [IO] led by Riek Machar Teny, and to other military groups, including arbitrary detentions, targeted killings, abductions and forced disappearances. Operatives associated with Kiir's National Security Service and Military Intelligence are known to operate outside the country's borders and have abducted and forcibly repatriated a number of dissident South Sudanese nationals for detention, torture and disappearances.

11. While the Revitalized Agreement on the Resolution of the Conflict in South Sudan (R-ARCSS) between the two major factions led by Kiir and Machar was signed in 2018, there has been slow progress toward implementing its key benchmarks on disarmament, demobilization and the integration of fighting forces into a unified national army. Violence has continued in many areas, and disappearances, arbitrary detentions, and extra-judicial killings by military and state security forces aligned to the president have continued.

12. President Salva Kiir has overseen a major expansion of the National Security Services (NSS). The powers of the NSS were further extended as part of R-ARCSS in 2018, and again in 2024.  Over this period, the NSS have grown to be an important parallel military, intelligence and police power under the direct control of the president. The NSS and associated organizational units, such as the Internal Security Bureau (ISB), act outside of the law and with impunity to pursue the presidents aims. They have become primary actors in violence against civilians, forced disappearances, torture and extrajudicial killings. The NSS also embeds personnel within key government and commercial offices and civil society organizations. Freedom of association is limited, as all gatherings over three people must seek approval of the NSS or risk detention. The NSS is particularly active in the capital Juba, where operatives maintain surveillance of hotels and bars, enforce evening curfews and undertake sweeps targeting the street homeless, who are often interrogated and detained in military barracks, police cells and other locations, with real risk of torture and violence. The NSS regularly denies due process for detainees, while they remain wholly unaccountable due to a lack of meaningful judicial or legislative oversight and legal immunities for agents.

13. The South Sudanese government faces a dire fiscal context. Oil revenues have stalled sue to the conflict in neighbouring Sudan, and efforts on the part of the government to sell off future oil have lost credibility. Most civil servants and members of the official armed forces have been paid only sporadically, if at all since 2023. Many of the government's most powerful actors have been placed under international

sanctions, and the country has been under a UN arms embargo since 2018. The government is under huge political and financial pressures to secure funds to finance the armed forces in particular, and the civil service more generally. This leaves the government vulnerable to the demands of those willing to offer such funding, including other governments.

14. The failure to pay salaries has fuelled a spiralling inflationary crisis and exacerbated rent-seeking, bribe seeking and extortion among public officials and security sector.

15. In the past six months, political tensions related to slow progress of the 2018 peace process, and deepening economic crisis have escalated rapidly. President Kiir has undertaken several rounds of government reshuffling in ways that violate the R-ARCSS power sharing arrangements. Tensions have been rising in response.

16. In March 2025, a barracks for forces allied to the President came under attack by an ethnic militia—the White Army—in Nasir, Vice President Machar's home area. The attack led to significant casualties, and a siege on a high-ranking commander. In response Kiir called in air strikes against the civilian population [over several days in mid-March] with the support of the Ugandan Military.  In the aftermath, a UN helicopter seeking to deescalate the situation was shot down, killing those on board, including the UN pilot. Shortly thereafter [March 26] Kiir placed Machar, who has held the position of first vice president under the terms of the peace agreement, under house arrest in Juba. In the wake, power-sharing has fully collapsed.

17. Many experts assess the current power sharing arrangements and the agreement on which they were based to have collapsed, with renewed violence and full-scale war likely immanent, in the immediate to near term.

**II. Specific risks to deportees as a group:**

18. In this section I detail the clear risk to the deportees as a group of facing torture if deported to South Sudan. I outline the risks of torture in the case that the men are detained by the National Security Services (NSS) or other authorities on arrival at the Juba Airport, or shortly thereafter during their required registration with immigration authorities and the police, and 2) in the case where the deportees are not detained and released into the community.

**Detention at the Airport, or in subsequent interactions with authorities in the days following**

19. Given the publicized circumstances of this case, and the criminal histories of the deportees, it is extremely likely that these individuals will face detention on arrival by the NSS at Juba Airport, or be detained as a result of subsequent legally required interactions with immigration authorities or police in the days immediately following their arrival. Arrest by the NSS at the airport  or shortly thereafter will likely result in detention in Juba, at one of the NSS's known prisons or secret 'ghost houses'.

**Risk of torture in detention:**

20. If detained, it is likely that the deportees will face torture, or conditions that amount to torture in South Sudanese prisons, jails, and/or informal network of NSS secret detention sites known as 'ghost houses'. There are consistent and credible reports of routine torture in South Sudanese jails, prisons and secret detention sites across the country. While sites maintained by the NSS are particularly associated with torture, abuses of detainees are not confined to these locations.

21. Reported treatment in detention by South Sudanese authorities includes:
    a. Beatings, whippings, being hung upside down, electrocution, burning, exposure to the elements, piercing with needles, rape, sexual violence and humiliation.
    b. Lack of access to legal counsel or legal processes. People are regularly held incommunicado at undisclosed locations.  In many cases no charges are filed and there is no way to challenge detention.
    c. Indefinite detention without charge—sometimes for years.
    d. Withholding of food, water, and medical attention/treatment in order to secure admissions of guilt or to extort money.

22. Deaths in custody are common, with bodies showing marks of beatings and torture disposed of in rivers, ditches and roadsides.

23. Except in a small number of highly publicized cases, there have been few attempts to hold abusive officials, soldiers or military commanders accountable. These are controlled by political elites who may use such mechanisms for strategic political purposes. Public records and data relating to prisons  and detention are not routinely collected. South Sudan. While the media do report on some cases of arbitrary arrest and abuse in detention, it is important to recognize the South Sudanese journalists and media houses are regularly targeted by officials for arrest, and intimidation. The government has been known to shut-down daily newspapers  and local radio stations for unfavourable coverage, and to collect print runs from the streets for destruction. While there was a reduction in the number of arrests and detentions of journalist last year, this is from a fairly high level.

**Detention by the NSS**

24. Since its expansion by Kiir in 2018 and 2024, the National Security Service has become a powerful security apparatus and military force under the direct control of the Office of the President. [1] Due to its close association with the president, its

---

[1] There is extensive documentation of the powers and abuses of the NSS in numerous reports including : HRW https://www.hrw.org/report/2020/12/14/what-crime-was-i-paying/abuses-south-sudans-national-security-service; Amnesty international, https://www.amnesty.org/en/documents/afr65/3577/2021/en/  and reports to the UN Security Council and Panel of Experts https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2017_326.pdf ; https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2019_301.pdf ; and the Sentry https://thesentry.org/wp-content/uploads/2022/12/UndercoverActivities_TheSentry_Dec2022.pdf

officers act with near total impunity. It has an extensive network of agents across the country, and maintains surveillance of ports of entry into South Sudan, including Juba Airport. There are consistent and credible reports linking the NSS to torture, kidnapping, disappearances and extrajudicial killings. Within a more general context of impunity for abuses against prisoners and detainees, there are several detention facilities in the capital that are associated with the NSS [Blue House, Riverside and Hai Jellaba, and in private houses] where torture is routine. The treatment of prisoners and detainees at NSS headquarters— known as Blue House—is so notorious that it has become a public short-hand used to refer to torture.

25. Many of the country's highest profile detainees have been held incommunicado at Blue House, with their international reputations and media attention offering no protection against abuses. While the cases of politicians, civil society activists and journalists receive more public attention, Blue House has a 'criminal section' where those accused of non-political crimes or picked up off the street are detained. Conditions are overcrowded and detainees are routinely extorted for cash by withholding food, water and medical care. In at least one case that I am familiar with, withholding of medical care led to permanent blindness. Ex-detainees report that political and non-political detainees are routinely subjected to severe physical abuse including beatings, lashings, waterboarding, sodomy, electric shock and piercing with needles. Psychological abuses have also been reported, including mock trials. These reports have been substantiated by the US State Department[2], Amnesty International and Human Rights Watch.

26. The NSS is also known to operate mobile killing squads. These operate with impunity and have been known to target South Sudanese people from the diaspora and foreign nationals. NSS has also been linked to the detention, torture and rape of a UN-backed Ceasefire Monitoring and Verification team in 2018.

## II. Risks of Torture if Deportees are released into the community:

27. While I view the possibility of the deportees being released into the community after entry into the country as unlikely given their criminal histories, I wish to detail here the risks they would face should this occur.

28. Juba, and South Sudan more generally is a difficult place to navigate for those unfamiliar with the country, and for those without local connections. The cost of living in Juba is extremely high, with secure, but basic hotel rooms [e.g. running water, electricity for a few hours a day, secured access] starting at USD100. Even unsafe, unguarded hostels start at USD15.

29. For more permanent accommodation, renting a room, or a home often requires a national ID card or proof of status, and local guarantors, with payment often expected in full up front for an entire year. Given these individuals will be arriving without any preparation or ties to the country, it is unlikely that they will be able to

---

[2] https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/south-sudan/

find housing, and will find themselves at risk of destitution and homelessness. Their criminal backgrounds, lack of language skills, and lack of connections will further limit their ability to find work even in the informal sector, thus compounding their risk of destitution.

30. Furthermore, South Sudan remains largely disconnected from the international financial system, with only a handful of places equipped to take payments by bank cards or credit cards in the country. Access to overseas funds is difficult and expensive, restricted to money transfer offices such as Western Union and Dahabshiil, which operate during limited hours, and which can restrict the amount of funds that can be received. While there are some banks that operate ATMs, these are usually restricted to access to funds held in local accounts in the country. The Canadian Government and UK FCDO advise all travellers to carry sufficient recently issued, unblemished US Dollars for the entirety of planned presence in the country, due to the difficulty of accessing money there. Such restrictions on accessing money would leave the deportees destitute and unable to pay for basic necessities such as food, water and accommodation.

31. Given these conditions, deportees would risk homelessness upon arrival, or shortly thereafter. In Juba, it is not generally considered safe to be on the street at night. Curfews are a regular tool used to control the population during times of heightened political tension. A curfew is currently in force in Juba from 8pm to just before sunrise. These are enforced by police and security services, roadblocks, and sweeps where those walking or sleeping in the street have been taken into custody. Curfew or not, those on the streets after dark face risk of harassment by police and soldiers, arbitrary arrest and violence. There are no services—such as homeless shelters, soup kitchens, or even places to access safe drinking water. Churches generally restrict assistance to members. As mentioned above, there are no consular services for nationals of Vietnam, Myanmar [Burma], Mexico, Laos or Cuba to which the men could turn for support.

32. Without cash, assets or connections to the country, facing destitution and without other means of earning money, the deportees would likely be forced to rely on non-payment of hotel bills, theft, begging or sex work for survival, putting them in direct contact with the regular police, and at immediate risk of detention.

33. Treatment in detention by regular police forces, whether in Juba or elsewhere can amount to torture: criminals are regularly severely beaten, humiliated, held without charge, held incommunicado, denied access to a lawyer and extorted for cash in exchange for access to basic necessities including clean water, soap, and food. While the requirement to bring detainees before a judge within 24 hours exists on paper, it is rarely complied with. There is no maximum length of custody, with documented cases of indefinite detention without charge ranging from a few days to over a year. Many arrested for crimes (whether genuine or as a pretext for extortion) have died in police custody, due to physical mistreatment, poor conditions or lack of medical care.

34. The deportees may also be at risk of harm from criminal gangs that operate in Juba, and from gangs, bandits and other armed actors active across the country. Violence is endemic in South Sudan, and armed gangs, militias and criminals murder, rape and loot homes, hotels, and cattle, sometimes with the acquiescence or active participation of public authorities or rank and file soldiers.

35. If the men attempted to leave Juba, either by commercial flights or overland travel, they would need to secure a travel permit from the South Sudanese authorities. These would need authorization from the NSS. It is unlikely that permission to travel would be granted. Additionally, such a request would once again put the deportees in contact with the NSS, who as previously noted, act with near total impunity, putting them at further risk.

**Detention by other security forces outside of Juba:**

36. If the deportees attempted to leave Juba by road, with or without the required permit, they would face detention at any number of NSS, and military checkpoints that control movement throughout the country. Roadblocks and checkpoints maintain their own detention sites, and foreign nationals traveling are particularly singled out for intensive checks. Interactions at roadblocks are tense, and regularly lead to people being removed from vehicles under threat of arms sometimes by force. People removed from vehicles at checkpoints and detained have disappeared.

37. Roadblocks and checkpoints are an important way that local authorities and military commanders control access to and movement through territories under their control. Some of these will be in close communication with the state security apparatus, while others can operate with considerable autonomy from central political authorities or and military chains of command.

38. There are a large number of unofficial roadblocks maintained by local communities, and by other armed actors including those aligned with first vice president Machar, where their status as foreigners would raise suspicion, particularly in the current volatile political context. Many foreign nationals have left the country, which is likely to heighten both scrutiny and suspicion of those that do remain.

39. In summary, the deportees would face repeated checks at multiple checkpoints along any route out of the country by government officials of all stripes, each one carrying the risk of detention. They would be singled out because of their foreign nationality, with their lack of documentation and language skills further raising suspicions. Their lack of familiarity with the South Sudanese context increases the likelihood that interactions at checkpoints would lead to detention and physical violence. Conditions in these sites of detention are detailed below.

40. While the NSS detention facilities in Juba are well known for torture, it is worth stating that people are routinely tortured in local jails and other places of detention across the country. Treatment in these detention sites include severe physical assaults, sexual humiliation and sexual assault on men and women, extreme forms of

physical restraint and exposure [such as shackling to walls and trees], psychological abuse, and slavery. Jails are often controlled by local political or military leaders who act independently from political and military lines of command, and with impunity.[3]

41. To offer some examples, just in the past month, several cases or arbitrary arrest by local officials have been reported in local news. Arbitrary arrests in the past month have been both political and non-political in motivation. These in including the detention of a UN radio journalist (Rumbek), university lecturers (Lakes State), and a mass arrest of over 60 unemployed youth in Western Equatoria). Local political elites regularly use detention as a tool to pursue personal (non-political) disputes. For example, Aweil County Commissioner has been accused of illegally detaining two local farmers for over a week in connection with a local land dispute. In such cases, beatings and other forms of violence are common, occasionally leading to death. For example, on 1 June 2025, a 12-year-old boy in Torit accused of gang activity, was arrested and beaten by armed men aligned with the governor of Eastern Equatoria State. He later died in custody[4].

42. There is a long history of beatings, torture and extrajudicial killing carried out in rural areas by local authorities, including those aligned to the ruling party [SPLM], the official opposition [IO] and other armed actors. In rural areas where I have worked [Eastern Equatoria], local political operatives have worked actively with military intelligence and the NSS to compile lists of people deemed suspicious, and to target named individuals with arrest, torture and in several cases death. The main overland routes leaving South Sudan for Kenya and Uganda pass through Eastern Equatoria. Colleagues working in other regions have reported similar levels of surveillance, both by local authorities aligned to the president and to vice president Machar's IO.

43. In rural areas, local authorities do not have dedicated facilities used as jails, with army barracks, disused storerooms and metal shipping containers used to hold detainees. In some cases, people are chained to trees or walls and exposed to the elements. Many sites of detention lack any sanitation. Often prisoners are not provided with food, unless family members provide it. Detention facilities are often overcrowded, lack sanitation and access to clean water, leading to significant illness, including malaria, cholera, monkey pox, and typhoid fever.[5]

44. Detention in shipping containers has been used as punishment or to extract confessions or bribes from detainees. Shipping containers can reach extreme temperatures dangerous to human health, and this has resulted in the death of detainees on more than one occasion.

45. Low level civil servants, including rank and file soldiers and prison guards have not been paid regularly for more than 18 months. This introduces the possibility of the

---

[3] https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/south-sudan/
[4] https://www.radiotamazuj.org/en/news/article/torit-boy-dies-in-custody-family-blames-governors-guards.
[5] https://www.radiotamazuj.org/en/news/article/lakes-state-health-ministry-declares-mpox-outbreak-among-prison-inmates

use of tactics such as the denial of access to water, soap, food or deliberate exposure a means to extract financial resources from the deportees, given their connection to the USA and an assumption that they or their families will have the financial resources to pay bribes or ransoms.

46. Ambushes on vehicles on the country's road networks occur weekly. Due to the entrenched economic crisis, property crimes have become more common and are more likely to escalate to violence, particularly given the proliferation of small arms, other weapons and military uniforms among wide swaths of the population. For these reasons, it is also often difficult to distinguish criminal actors from those associated with the country's police, military and intelligence services. As foreign nationals and members of the diaspora, the deportees are likely to be at heightened risk of ransom requests in particular—both targeted and opportunistic—owing to an assumption that they, or their families, will have access to financial resources and hard currency. As previously mentioned, many foreign nationals are reluctant to report such crimes to the police because of the likelihood that authorities will acquiesce in such ransom demands, or indeed make additional demands.

### III. Risks to Individual Deportees on account of their personal circumstances:

47.  In this section consider how individual personal characteristics of the deportees may impact on their treatment, including those with serious medical conditions, serious mental health conditions, those with cognitive impairments or diminished capacity, those with substance abuse issues and those with a history of sexual abuse.

**Specific risks to those with serious medical conditions:**

48. In general, the standard of medical care in South Sudan is low, with most medical facility lacking regular access to drugs, supplies, and electricity. While this is the situation that all south Sudanese people face, it is worth noting that any deportee with complex medical needs will face challenges in receiving appropriate care.

49. As noted above, conditions in South Sudanese jails, prisons and other sites of detention lack basic sanitation, and medical care is routinely denied to detainees as a form of punishment. This poses a risk for any of the deportees suffering from chronic diseases which are managed through medication, as with-holding medicine maybe used as a tactic of punishment, or to extract confessions or bribes from detainees or their families. Furthermore, pressure techniques used authorities in detention, such as sleep deprivation and withholding of food may have particularly serious life threatening effects on those with chronic illnesses, such as epilepsy and diabetes.

50. Many diseases carry stigma, that those with symptoms may be subjected to treatments ranging from social shunning, to physical abuse, particularly when a disease is associates with traditional beliefs around witchcraft, spirit possession, and moral pollution due to the breaking of a taboo. For example in many communities, seizures are ascribed to spirit possession, with many sufferers beaten, or shackled to

drive out the possession, or to protect others from contagion.[6] In other places, people do not distinguish between epilepsy and serious mental illness. People with epilepsy therefore are at heightened risk of physical violence and extreme forms of physical restraint. Sufferers are often taken to prisons and jails out of fear of contagion.

51. Any deportees with serious chronic medical issues are at heighten risk of detention and mistreatment, with the deliberate withholding of medicines or treatment likely. They are also more susceptible to serious harms such as permanent disability and even death in detention as a result.

**Specific risks to those with serious psychiatric conditions:**

52. Support for the treatment and management of psychiatric conditions is extremely limited in South Sudan. The only public medical facility offering care in the country is a 12 bed unit at Juba Teaching hospital. The availability of drugs for treatment is both inconsistent and limited.[7] People with serious psychiatric conditions are often brought to prisons by police or members of the local community. In urban areas, they are regularly held in unsegregated cells with accused/convicted criminals. In rural areas, they are often shackled in public places or tied to trees.

53. Psychiatric conditions and serious mental health conditions are extremely stigmatized in South Sudan, and like epilepsy are often viewed as resulting from spirit possession, as punishment for moral transgressions, or witchcraft. Sufferers are regularly beaten or shackled to drive out the possession, or to protect others from contagion.

54. In urban areas, those with psychiatric conditions struggle to secure or maintain housing, with many living on the street, where they are exposed to violence from criminals, and harassment and arrest by public authorities.

55. Any deportee with a serious psychiatric condition would face heightened risks of contact with police, local authorities and other armed actors and subsequent detention. The use of physical violence is likely, as is the use of shackles or other restraints. They are also at heightened risk of ongoing physical violence, ongoing physical restraint and /or exposure (in rural areas) if held in detention as punishment for unorthodox or erratic behaviours.

**Specific risks to those with cognitive impairments / diminished capacity:**

56. Deportees with cognitive impairments would also be at heightened risk of contact with the police, military and other armed actors, of being detained or arrested in the

---

[6] https://www.theguardian.com/global-development/2024/mar/25/cure-nodding-syndrome-south-sudan-children-neurological-disorder-blackfly-onchocerciasis-river-blindness-link
[7] https://www.aljazeera.com/features/2019/1/18/in-south-sudan-stigma-and-underfunding-plague-mental-health-care

wake of such contact, and of heighten risk of physical harm and violence in detention.

57. As should be clear from this statement, South Sudan is a complex environment to navigate, with a proliferation of security authorities, armed actors, and a suspicious and well-armed populace. Even for those highly experienced with the country, navigating day to day interactions and ensure safety is a complex effort that requires a high degree of forethought, contingency planning, situational awareness and ability to make high-stakes decisions quickly.

58. As part of my responsibility as a researcher, for every visit to South Sudan, I develop an in depth risk assessment and emergency protocol to ensure my own safety and the safety of my team. These routinely run to more than 30 pages, and include detailed contingency plans for kidnapping, emergency evacuation, as well as proof of life protocols.

59. It is my view that any deportee with cognitive impairments of diminished capacity would be at extreme risk of physical violence and even death due to the incapacity to be able to read situations and judge their outcomes in interactions with security officials, local authorities and the general population. A failure to appreciate the gravity of these situations would likely be read by authorities as deliberate provocation or defiance, and punished accordingly.  For example, activities that are viewed as normal day to day activities, such as taking photographs, are highly sensitive in South Sudan, with engaging in photography in a public place likely garner attention from police or  plain clothes security operatives, leading to detention. As noted above, this would increase  the likelihood of severe beating, lashings, electrocution, sexual assault and humiliation, physical restraint and exposure for people with cognitive impairments.

**Specific risks to those with substance abuse issues:**

60. The UK FCDO notes that there are severe penalties for using or trafficking drugs in South Sudan, including the death penalty and life imprisonment.[8]

61. Any deportee with active substance abuse issues, or who engages in illegal drug use in the country would be at heightened risk of arrest and detention if released into the community, where they would face conditions outlined in paragraphs 25, 33, 40 and 42-45.

**Specific Risks to those with history of sexual offenses**

1. Some of the deportees have a publicly known history of sexual exploitation and assault, and may face additional risks if deported to South Sudan. Vigilante and mob violence directed at those accused of sexual improprieties, particularly when those people are foreign nationals, is a common occurrence. The threat of vigilante violence is compounded by the population's lack of faith in the justice system, and

---

[8] https://www.gov.uk/foreign-travel-advice/south-sudan/safety-and-security

the proliferation of firearms. I have personally witnessed multiple incidents in which an accusation based unsubstantiated rumours of improper sexual contact have led to lynchings which put those facing accusations in the hospital with grave bodily injuries.

2. Should their crimes become publicly known, individuals with a history of sexual offenses would face heightened risks of violence, torture and even death. This risk is heightened by their complete lack of familiarity with the cultural context and norms related to sexuality in the country, which would make them susceptible to unintentional actions that may be perceived as improper. While sexual violence is common in South Sudan, this does not mean that there is a permissive environment for those perceived to have committed sexual improprieties, with severe beatings of accused perpetrators (and their family members) a regular occurrence. Such confrontations can escalate to murder.[9] If detained, they may also face additional risks of violence from prison guards and fellow detainees.

## IV. Conditions for foreign nationals in South Sudan [general]

**Legal Standing and Status:**

3. Foreign Nationals in South Sudan must obtain a visa and register with a local police station within 3 days of arrival. Registration is often an occasion for security or immigration officials seek bribes or payoffs, particularly from those unfamiliar with the system. Any irregularity may be used as a pretext for requesting additional fees under threat of detention.

4. Proof of Yellow Fever vaccination is required for all entries. This requirement has been used as a pretext for harassing, detaining or refusing entry to foreign nationals on arrival at Juba airport.

5. It is possible for foreign nationals to apply for permission to work in South Sudan, but this generally requires an employer to sponsor the application. The cost per year for these ranges from USD1,000-5,000. Work permits must be renewed each year. Naturalization is possible in South Sudan after 10 years of legal residence, however those with criminal records are barred from naturalization. There are legal provisions in the 2011 Nationality Act for naturalized citizens to be stripped of their nationality.

6. South Sudan's Passport and Immigration Act of 2011 has provisions [Chapter VII, Articles 27-31] that allow deportation in instances where a court has convicted an alien of an offense punishable with imprisonment in excess of 6 months [Article 28.1] or where and alien is declared by the minister to be an undesirable [Article 28.2]. Being declared undesirable is at the discretion of the minister, in consultation with a political committee, and is not subject to review or challenge in the courts [Article 30]. Aliens subject to deportation may be detained until deportation [Article 31]. Records related to cases of deportations from South Sudan are not publicly available,

---

[9] https://www.radiotamazuj.org/en/news/article/2-men-killed-woman-beaten-over-adultery-in-ikotos-county

making it difficult to assess whether the country has abided by its commitments on non-refoulement.

7. As far as I am aware, there are no separate detention facilities for migrants or non-nationals, meaning it is likely that  if detained, the individuals concerned would be held within the general population of detained people in South Sudan. As noted by the US State Department, it is rare in South Sudan for prisoners to be separated according to important distinctions including adults and children, men and women, pre-trail and post-trial detainees, violent / non-violent offenders and those with psychiatric conditions.[10]

8. There are no consular services in South Sudan for nationals of Vietnam, Myanmar [Burma], Mexico, Laos or Cuba.

9. While South Sudan has signed on to the CAT, it routinely violates its provisions as documented in numerous reports to the UN Security Council, statements by the OHCHR, the ICRC,  as well as reports by Human Rights Watch and Amnesty International.

**Social Conditions with bearing on the treatment of foreign nationals in South Sudan**

10. The US State Department and the UK Foreign Commonwealth and Development Office [FCDO] advise against all travel to the country, and advise any nationals currently there to leave, citing risks including deliberate targeting by criminals, kidnapping, carjacking, shootings, ambushes, assaults, violence and intimidation by armed actors including security services, as well as arbitrary detention, extortion and sexual violence against people of all genders at checkpoints and roadblocks operated by soldiers and other armed actors.

11. The rule of law is week in South Sudan, and even well connected and well-resourced foreign nationals are subject to surveillance and harassment by security forces, rank and file soldiers and local police. Those associated with large organizations undertaking humanitarian or development work are better insulated from some forms of harassment but can face other kinds of targeted attacks including ambushes, armed robberies, rape and kidnapping. South Sudan is one of the deadliest places to undertake humanitarian work in the world. Violence against other foreign nationals is less well documented, owing to their lack of institutional and consular support as well as media disinterest, however violence against foreigners not working in the field of humanitarian and development aid is more prevalent and pervasive.

12. The presence of foreigners in the country is a contentious issue, with many South Sudanese suspicious of their presence.  Many view foreigners present in the country for work or for business as taking economic advantage of the local populations.

---

[10] https://www.radiotamazuj.org/en/news/article/jailers-lock-women-in-cell-with-men-in-gangura-western-equatoria

Violence directed at foreigners is common and pervasive, both at the hands of state security agents and the population more generally through vigilantism.

13. Vigilante violence is a particular risk for foreigners in South Sudan, with particular situations highly likely to spark off episodes. These include: road accidents where a person or livestock is injured or killed; theft or suspicion of theft; close contact (or rumours of close contact) between foreign nationals and South Sudanese women, girls and children. While violence associated with breaking of sexual taboos is not exclusive to foreigners, foreigners are more likely to transgress local norms of behaviour, be unaware of traditional mechanisms to resolve such transgression, and to be dealt with more violently. I have personally witnessed incidents of violence against foreign men who were perceived as becoming too closely involved with South Sudanese women, with one being beaten severely and ending up in the hospital, and another forced to leave town under cover darkness due to credible threats of harm by male relatives on the woman concerned. While not involving a foreigner, a recent case in Ikotos county shows how quickly accusations of adultery can escalate into violence.[11]

14. For most foreign nationals, the legal system and the courts offer little protection, whether in civil matters, or in relation to criminal acts. Most foreign nationals adopt a strategy of avoidance where possible and caution and deference to South Sudanese nationals, and authorities even when they-themselves have been wronged, or been victims of crimes, as they fear retaliation by vigilantes, powerful relatives, the police and the courts. This is substantiated by US State Department report for 2022 noting "multiple reports of arrests, including of foreigners, in civil cases, where a complainant exerted influence upon the police to arrest someone as a negotiation tactic." Even when consular services are available in the country, the government routinely fails to notify relevant embassies when they have detained foreign nationals.

15. In my research with migrants in the capital, they reported facing two interrelated forms of harm: extortion and theft and physical violence. Extortion and theft were often based on the explicit and credible threat of direct physical violence or the weaponization of the courts, military and police.

16. Physical violence against foreigners is common, including unprovoked attacks. I personally have witnessed banal incidents (such as the perception that someone has jumped a queue, or accidentally running into someone in a crowded market) escalate to armed threats and physical violence. Many respondents reported incidents of armed intimidation, extortion, and violence that they attributed to their status as non-nationals. Even other African nationals are easily distinguished by their appearance and unfamiliarity with Juba Arabic, the local lingua franca. As all of the foreign national deportees are non-African, they will stand out even more. The majority of foreign nationals mentioned their inability to speak Juba Arabic as leading

---

[11] https://www.radiotamazuj.org/en/news/article/2-men-killed-woman-beaten-over-adultery-in-ikotos-county

to bad outcomes—including theft of trade goods, extortion, beatings—particularly in interactions with police, officials and soldiers. Street traders reported beatings and theft of trade goods, and are often threatened by armed members of the public, and harassed and extorted by a wide range of low level government officials including traffic wardens, health inspectors among others.

17. For wealthier foreign businesspeople, payoffs to police, traffic wardens and officials are routine, with the payment of bribes, 'fees' or 'compensation' viewed as one way to insulate oneself from violence. Cultivating friends close to powerful people in the government, was another option to reduce their risk of physical violence, though neither strategy was always successful.  Paying bribes, even when requests were illegal, was seen as preferable to engaging with the official legal system, due to the likelihood of being detained, and the prevalence of beatings and other forms of physical violence while in detention.

18. Most foreigners I spoke to during fieldwork periods in 2009-10; 2011; 2015 and 2023 had personal experiences of targeted violence, and armed threats at the hands of South Sudanese police, rank and file soldiers, and civilians. Several had close acquaintances who had been severely beaten, shot, tortured or killed.

19. When traveling by road, outside of the capital, foreigners are actively targeted for extortion at official and non-official roadblocks, under threat of detention and physical violence. They are disproportionally targeted for road ambushes, which often result in life threatening injuries and death.

**V. Credibility of the Government of South Sudan's Assurances of Safety for the deportees:**

20. Most observers of South Sudan anticipate a return to full scale war in the immediate to near term. While Kiir currently appears to hold the upper hand in his rivalry with Machar, it is publicly known that his health is failing. Recent political realignments and shuffling of high-ranking military, security and political appointees have largely been read as an attempt to secure his succession. However, the financial resources on which Kiir and those aligned to him built their political and military allegiances have dwindled, leaving big questions about whether his extremely fragile coalition will hold. Machar remains under house arrest, but attempts by Kiir to fully co-opt Machar's political party and military allegiances have not yet been wholly successful. That said, the most serious threats to Kiir's political power may be from within his own ranks, particularly as he is perceived to be in a weakened position. The government does not have full effective command authority over all factions within the army, and alternative centres of power are also emerging within the army military intelligence and the NSS. The country is a tinder box.

21. A return to conflict would likely be a messy and bloody affair, with individual military commanders switching allegiances depending on which faction looked best placed to succeed, or which faction offered the most attractive set of conditions for themselves and their soldiers. This round of fighting may be particularly intense, as both Machar

and Kiir appear weakened, with rivalries over succession /generational change likely to complexify the dynamics of fighting. As with previous periods of war, many local communities are likely to organize self-defence units. This mix would likely result in widespread indiscriminate violence, and tit for tat attacks against civilian populations associated with rival commanders/ethnic communities.

22. Any assurances related to the treatment of the deportees made on the part of the South Sudanese government should be view with a high degree of scepticism given the likelihood of political breakdown, fragmentation, and civil conflict.

23. It is also worth noting that, should a return to war occur and the deportees find themselves in the hands of other political factions or armed actors, the risks of torture, inhuman and degrading treatment would not diminish, as commanders and factional leaders in previous rounds of fighting have shown similar pattern of abuses, extrajudicial killing, torture, attacks on civilians, sexual violence and humiliation, forced recruitment and complete disregard for human rights.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 12 June, 2025 in Durham, England.

[Dr. Léonie S Newhouse]

## DR. LÉONIE S NEWHOUSE

LEONIE.S.NEWHOUSE@DURHAM.AC.UK

DEPARTMENT OF GEOGRAPHY, DURHAM UNIVERSITY, LOWER MOUNT JOY, SOUTH ROAD DURHAM, DH1 3LE

### ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2018- present | Assistant Professor in Human Geography, Department of Geography, Durham University, UK. |
| 2017 - 2018 | Senior Research Fellow, Department of Socio-Cultural Diversity, The Max Planck Institute for the Study of Religious and Ethnic Diversity, Göttingen, Germany. |
| 2014 - 2017 | Research Fellow, Department of Socio-Cultural Diversity, The Max Planck Institute for the Study of Religious and Ethnic Diversity, Göttingen, Germany. |
| 2013 - 2014 | Visiting Assistant Professor, African Studies, The Pennsylvania State University, State College, PA. |
| 2013 | Lecturer, Department of Geography, University of Washington, Seattle, WA. |

### EDUCATION

| | |
|---|---|
| 2012 | Ph.D, Department of Geography, University of Washington. |
| 2006 | MSc. in Forced Migration at the Refugee Studies Centre, Oxford University. |
| 2002 | B.S. Environmental Economics and Policy, College of Natural Resources, UC Berkeley. |

### AREAS OF SPECIALIZATION

Humanitarian Economies; African Urbanisms; Migration & Displacement; Post-Conflict Recovery; Land Rights.

### FUNDED PROJECTS

| | |
|---|---|
| 2025 | The Weight of Work: Portraits of Work in Kakuma and Kalobeyei (£8,000) Royal Geographical Society's Thesiger Oman Fellowship. |
| 2023 | Eating Alone: Care under Pressure in South Sudan (£8,750) pilot project with R. Lorins, E. Atem, N. Kindersley, A. Sebit, Y. Monyak, Research Development Fund, Department of Geography, Durham University. |
| 2019 | Kakuma Portraiture Project (£5000) Research Development Fund, Department of Geography, Durham University. |
| 2017-2020 | Academy for African Urban Diversity 2017-2020 (€60,000) Founder & Project Lead on training and mentorship scheme for Early Career Scholars of Urban Africa. MPI MMG. Göttingen, Germany. |
| 2016 | Inhabiting the Corridors: Surging Resource Economies and Urban Life in East Africa Workshop & Publication 2016 (€40,000) Co-Lead with AM Simone. MPI MMG. Göttingen, Germany. |
| 2014-2018 | Imaginaries of Opportunity: Precarious Labor and Migrant Flows in the Shadow of Humanitarian Urbanism. PI. (€40,000) Post-Doctoral Project. MPI MMG. Göttingen, Germany. |
| 2011 | Urban Attractions: returnee youth, Mobility and the Search for a Future in South Sudan's Regional Towns ($5000) UNHCR funded project. |
| 2009-10 | Returning to the South: A Political Economy of Refugee return Migration in South Sudan. PI. National Science Foundation (USA) & Bucerius Foundation (Germany). |

### PUBLICATIONS [PEER REVIEWED]

| | |
|---|---|
| 2024 | Creative fictions: Incentive work and humanitarian labour in South Sudan. *Transactions of the Institute of British Geographers*, https://doi.org/10.1111/tran.12682 |
| 2021 | On not seeking asylum: Migrant masculinities and the politics of refusal. *Geoforum*, *120*, 176-185. |
| 2018 | "Other Paths, Other Destinations: towards a manifold reading of mobility across border" in Movements: Journal for Critical Migration and Border Regime Studies 4(1). |
| 2017 | "Uncertain Futures and Everyday Hedging in a Humanitarian City," *Transactions of the Institute for British Geographers. Ahead of print doi:10.1111/tran.12188* |
| 2016 | "Assembling land control after displacement: some reflections from rural Southern Sudan" *Journal of Peasant Studies 44(5) 1000-1021.* doi: 10.1080/03066150.2016.1191472 |
| 2015 | "More than mere survival: violence, humanitarian governance and practical material politics in a |

|      | Kenyan refugee camp" for Geographies of Humanitarian Violence theme issue *Environment and Planning A*, V 47(11) 2292–2307. doi: 10.1068/a140106p |
|------|------|
| 2015 | *with P*. Lopez, L. Bhungalia, ´Geographies of Humanitarian Violence' Introduction to theme issue on humanitarian violence in *Environment and Planning 47(11) 2232-2231.* doi:10.1177/0308518X15613330 |
| 2012 | "Footing it, or why I walk" African Geographical Review, 31(1), 67-71.  doi: 10.1080/19376812.2012.679461 |

### OTHER PUBLICATIONS

| | |
|------|------|
| 2017 | "Precarious circulations of aspirations In Juba" in Tavengwa & Newhouse (eds) *The Corridor,* published by *CityScapes Magazine,* Cape Town South Africa. |
| 2017 | with Simone, AbdouMaliq "*Inhabiting the corridor: surging resource economies and urban life in East Africa: An Introduction*" in Tavengwa & Newhouse (eds) *The Corridor,* published by *CityScapes Magazine,* Cape Town South Africa. |
| 2017 | *(ed)* with Tavengwa, T. *The Corridor: how the East African corridor spanning the Indian Ocean from Somalia to South Africa is being radically re-shaped,* a special supplement published by *CityScapes Magazine,* Cape Town South Africa, in association with the African Centre for Cities. |
| 2015 | "Come Tommorrow" Blog for the MPI MMG webpage. Available at: www.mmg.mpg.de/online-media/blogs/2015/newhouse-come-tomorrow/ |
| Jan 2012 | "Urban attractions: returnee youth, mobility and the search for a future in South Sudan's regional towns" UNHCR Policy Development and Evaluations Service (PDES), *New Issues in Refugee Research: Research Paper No 232.* |
| Dec 2011 | A review of J. Hyndman *Dual Disasters: Humanitarian Aid After the 2004 Tsunami*, Sterling VA: Kumarian Press, 2011, for *Environment and Planning D: Society and Space.* Available at *http://societyandspace.com/reviews/reviews-archive/hyndman-jennifer-2011-dual-disasters-reviewed-by-newhouse/* |
| Oct 2006 | "The Medium of Testimony: Testimony as Re-Presentation" *Refugee Studies Centre Working Paper No. 37*; with Kishan, Godin and Muraskin (equal contribution). |

### Teaching

| | |
|------|------|
| 2018-2025 | Modules taught in Department of Geography, Durham University include Geographies of Humanitarianism and the Human, Geographies of Development, Introduction to Geographical Research, Social Research in Geography, Scientific Research in Geography at the Undergraduate level Climate Risk and Society, and Social Dimensions of Risk and Resilience at the Masters Level. |
| 2009 -14 | Courses Taught in the African Studies Program, The Pennsylvania State University include Introduction to Contemporary Africa, and Poverty in Africa. At the University of Washington, I have taught or contributed to Introduction to Human Geography; Geographies of International Development and Environmental Change; Introduction to Globalization; Migration in the Global Economy; Immigration and Multiculturalism in Europe in the department of Geography and have contributed to teaching on Human Right in Culture and Practice, Global Poverty and Human Rights and Climate Justice Seminar in the Law Societies and Justice program. |

### PhD Summer Schools  & Post-Graduate Short Courses

| | |
|------|------|
| 2024 | Northern Ireland and North East Doctoral Training Partnership (NINE-DTP) Summer School |
| 2018 | Academy for African Urban Diversity 2018 (Hosted at the Max Planck Institute's Harnack House, in Berlin, Germany) |
| 2017 | Academy for African Urban Diversity 2017 (Hosted at the African Centre for Migration and Society at University of Witwatersrand, Johannesburg, South Africa) |
| 2016 | Re-ordering Diversity: Humanitarian Assistance in the Context of Forced Migration and Displacement, University of Tübingen |
| 2015 | Social Science Research Methods, Center for Peace and Development Studies University of Juba, South Sudan |
| 2015 | Social Science Research Methods, Institute Superieur de Tourisme, Goma, DR Congo |
| 2009 | Migration and refugees in the Middle East; American University Cairo, |

## DISCIPLINARY MENTORING & LEADERSHIP

| | |
|---|---|
| 2017-2020 | Co-Founder (with Prof. Loren Landau & Dr. Henrietta Nyamnjoh): Academy of African Urban Diversity (AAUD), a six year series of summer-schools and professional development workshops for doctoral students focusing on Urban Africa. Collaborative program between Max Planck Institute for Religious and Ethnic Diversity (Göttingen, Germany,) the African Center for Migration and Society at the University of Witwatersrand (Johannesburg, South Africa) and the African Center for Cities at the University of Cape Town (South Africa). |
| July 4-8, 2016 | PhD Summer School Instructor: Re-ordering Diversity: Humanitarian Assistance in the Context of Forced Migration and Displacement, University of Tübingen. Seminars: Social Science Research in the Humanitarian Arena; Ethical Considerations in Refugee Research. |
| Summer 2015 | Short Course Instructor, Research Methodologies in Social Science, Institute Superieur de Tourisme, Goma, Democratic Republic of Congo. Training for Instructional Staff. |
| | Visiting Lecturer, Center for Peace and Development Studies, Juba University. Shared course: Research Methodologies (required for post-graduate diploma students in Diplomatic Studies, Strategic Studies, Humanitarian Studies and Peace & Development Studies.) |

## PROFESSIONAL SERVICE

| | |
|---|---|
| Reviewer | **Journals:** American Anthropologist; Annals of the AAG; Antipode,  Current Anthropology, Diasporas, Environment and Planning F; Gender Place and Culture; Geoforum; Geopolitics; Journal of East African Studies, Journal of Ethnic and Migration Studies, Journal of Peasant Studies; Journal of Refugee Studies, Political Geography, Security Dialogue; Social and Cultural Geographies; Transactions of the IBG, Urban Studies. |
| | **Grants:**  European Research Council, subject area expert, Consolidator Grant. ESRC, subject area expert. |
| Ethics Advisor | Deputy Chair Research Ethics Committee, Department of Geography, Durham University. 2019-2022. |
| | MobileDeaf, ERC Funded project of Assistant Prof. Annelies Kusters, Heriot-Watt University in Edinburgh. 2017-2022. |
| | 'Refugee Needs and Aspirations' Research Group, Max Planck Institute for the Study of Religious and Ethnic Diversity. 2016. |
| Search Committees |  Interview panel member, Department of Geography, Durham University, in 2021, 2022, 2023, 2024 & 2025. |
| | Search Committee Member (5 hires), Department of Socio-Cultural Diversity, Max Planck Institute for the Study of Religious and Ethnic Diversity. 2017. |
| | Search Committee Member, for Refugee Research Group (4 hires), Max Planck Institute for the Study of Religious and Ethnic Diversity. 2015. |
| | Selection Committee Member, Ottenberg-Winans Fellowship, African Studies Program, University of Washington. |
| Colloquia/ Clusters | Economy and Culture Cluster Convenor, Department of Geography, Durham University. 2023-2025. |
| | Convener / African Diversities Colloquium, Max Planck Institute for the Study of Religious and Ethnic Diversity.  Summer Term 2016. |
| | Committee member / African Studies Colloquium Committee, University of Washington.  2012-2013 Academic Year. |
| | Committee member / Department of Geography Colloquium Committee, University of Washington. 2008-2009 Academic Year. |
| Professional Bodies & Accreditation | |
| | Fellowship of the UK HEA, 2023. |

## Conferences & Invited Talks

| | |
|---|---|
| Feb 2025 | "Incentive Work and Humanitarian Labor" Center for Global Development, Northumbria University, Newcastle, UK. |
| July 2021 | "Rethinking Infrastructure of Care through vernacular theory" Panel 73. Building Caring Cities and Infrastructures II 14-16h, July 25, 2024 Santiago, Chile, RC21 [International Conference of Urban and Regional Development]. |
| Aug 2019 | "Staffing and Status: Humanitarian Labor Regimes in Kenya, Royal Geographical Society-Institute for British Geography Annual Meeting, London |
| May 2018 | Book review symposium: *Myth of Self-Reliance: Economic Lives Inside a Liberian Refugee Camp (Berrghahn Books)* with Amanda Hammar & Naohiko Omata. University of Copenhagen. |
| April 2018 | Paper: "Uncertainty in Action: mediating indeterminacy in South Sudan and Kenya" *Association of American Geographers Conference,* April 10-14, 2018, New Orleans. |
| Jan 2018 | Public Lecture "Uncertainty in Action: mediating indeterminacy in South Sudan and Kenya" Friedensau  Adventist  University, Friedensau (Germany). |
| Aug 2017 | Panel Discussion "The cost of Decolonizing the discipline" convened by Patricia Lopez and Abigail Neely at the Royal Geographical Society-Institute for British Geography Annual Meeting. August 28 2017, London. |
| July 2017 | "I am here for business: on not seeking asylum in Juba, South Sudan" paper presented in panel 55: *Violent conflict and the politics of rural-urban transformation* at the European Conference of African Studies, July 1, 2017, Basel, Switzerland. |
| Mar 2017 | "Other Paths, Other Destinations: Towards a Manifold Reading of Mobility Across Borders" Invited talk in the series:  *Borders, Citizenship & Mobility: An Interdisciplinary Workshop on the Geopolitics of Encounter*, King's College London. March 28, 2017, London. |
| Feb 2017 | Invited talk at the African Centre for Migration and Society at the University of Witwatersrand. February 27, 2017, Johannesburg. |
| Dec 2016 | "Uncertain futures and everyday hedging in a humanitarian city" Invited talk, Feminist Geographies Collective: work-in-progress workshop, Department of Geography University of Texas, Austin. Dec 7 2016. |
| Dec 2016 | Paper: "The regional option: circulations, risks and reward in East African migrant imaginaries," in Session: Cities in Africa: Meeting the Challenges for the Future I, African Studies Association, Annual Meeting, Dec 1-3, 2016, Washington DC. |
| Aug 2016 | Paper: "The art of the pitch and the uses of difference in urban South Sudan" in Session Mobilizing Value across Time and Space (2), RGS-IBG Annual International Conference 2016, Aug 30- Sept 2, 2016, London. |
| Mar 2016 | Session Convener (with Jamie Shinn, Texas A&M) "Uncertain futures and everyday hedging I & II" empirical paper session. Discussants: AbdouMaliq Simone, Alex Schafran. *Association of American Geographers Conference,* March 29-April 2, 2016, San Francisco, California. |
| Mar 2016 | Paper: Seeking the uncertain: possible futures and everyday hedging in Juba, South Sudan. *Association of American Geographers Conference,* March 29-April 2, 2016, San Francisco, California. |
| Nov 2015 | "Considering Humanitarianisms: temporality, enrollment and the human." Invited Panelist: Forum on Humanitarian Interventions and New Wars. Conference: *Migration - Peace - Human Security*, November 20-22, 2015, University of |
| Oct 2015 | Institute Round Table on the Refugee 'Crisis' in Germany (panelist), Max Plank Institute for the Study of Religious and Ethnic Diversity, Göttingen, Germany. |
| Apr 2015 | Academy of Urban Superdiversity, Berlin, Germany a project of the Max Planck Institute for the Study of Religious & Ethnic Diversity.  Junior researcher participant. |
| Nov 2014 | "Because of Women's Rights: Negotiating gender and politics in South Sudan" Paper Session: Gendering state and society: Making meaning of gender advocacy and female political participation in Sub-Saharan Africa, National Women's Studies Association Conference, November 13-16, 2014, San Juan, Puerto Rico. |
| Apr 2014 | "Brewing and drinking: negotiating the gendered terrain of labor and value in rural South Sudan" |

|  | Paper Session: Reinventing the Rural: Gender, Development, and Contested Landscapes, *Association of American Geographers Conference,* April 8-12, 2014, Tampa, Florida. |
|---|---|
| Mar 2014 | Democracy Roundtable panelist 'A wider look at Democracy in Africa,' Democracy Institute, the Pennsylvania State University, State College PA.  March 31, 2014. |
| Feb 2014 | " 'Going to the Bush'—Landscapes of local knowledge, power and resistance in South Sudan." Paper Session: Rebel Landscapes, *Dimensions of Political Ecology Conference,* Feb 27-March 3, 2014, Lexington Kentucky. |
| Oct 2013 | Coffee Hour Talk, "Can my mother forget about me? Land, authority and belonging in post-conflict South Sudan" Department of Geography, The Pennsylvania State University. October 11, 2013 |
| Apr 2013 | Session Convener (with Jesse McClelland) "Post-colonial Urbanisms: African Connections and Innovations I, II, & III." Two empirical paper session, and a panel discussion on African Urbanism with Martin Murray and Garth Meyers. *Association of American Geographers Conference,* April 9-13, Los Angeles, California, USA. |
| Apr 2013 | "Materializing Difference: The Socio-spatial Legacy of Refugee Camps" Paper Session: On the Question of Violence in the Humanitarian Present II. *Association of* American Geographers Conference, April 9-13, Los Angeles, California, USA. |
| Nov 2012 | "Land, Labor and Return Migration: Thinking through work in post-conflict South Sudan," University of Washington's Department of Geography Colloquium Series, November 30, 2012, Seattle Washington, USA. |
| Feb 2012 | "A new life at the end of the food chain: food aid caring across distance, and shifting practices in the 'global domestic' " Association of American Geographers Conference, Feb 24-28, 2012, New York City, New York. Session title: Dis/articulations: Commodity circuits and the uneven geographies of capitalism. |
| Apr 2011 | Session Convener "Interrogating Humanitarian Practice: Panel Discussion," *Association of American Geographers Conference,* April 12-16, 2011, Seattle, Washington, USA. |
| Apr 2010 | "Emerging sovereignties: return migration and the post-conflict state in Southern Sudan" *Settling into Motion* Scholars Conference, April 28-30, Berlin, Germany. |
| Apr2010 | "Remembering place: return migration and the politics of place in South Sudan" at the *Association of American Geographers Conference,* April 14-18, 2010, Washington D.C., USA. |
|  | (panelist) "Fieldwork in an African Setting" *Association of American Geographers Conference,* April 14-18, 2010, Washington D.C., USA. |
| Oct 2009 | "Beyond Safety and Dignity: Geographic Perspectives on Refugee Return Migration" Wednesday Seminars, Center for Migration and Refugee Studies, American University in Cairo, October 2009, Cairo Egypt. |
| Aug 2008 | "Social Imaginaries: Gender, Islam and Asylum" at *Image and Imagination- Portraying Mobility in the Mediterranean*, August 29-31, 2008, Damascus, Syria. |
| Apr 2010 | "Emerging sovereignties: return migration and the post-conflict state in Southern Sudan" *Settling into Motion* Scholars Conference, April 28-30, Berlin, Germany. |
| Apr2010 | "Remembering place: return migration and the politics of place in South Sudan" at the *Association of American Geographers Conference,* April 14-18, 2010, Washington D.C., USA. |
|  | (panelist) "Fieldwork in an African Setting" *Association of American Geographers Conference,* April 14-18, 2010, Washington D.C., USA. |
| Oct 2009 | "Beyond Safety and Dignity: Geographic Perspectives on Refugee Return Migration" Wednesday Seminars, Center for Migration and Refugee Studies, American University in Cairo, October 2009, Cairo Egypt. |
| Aug 2008 | "Social Imaginaries: Gender, Islam and Asylum" at *Image and Imagination- Portraying Mobility in the Mediterranean*, August 29-31, 2008, Damascus, Syria. |
| Apr 2008 | "Feminism or Islamophobia? Gender, Islam and Asylum in Europe" at the *Association of American Geographers Conference,* April 15-19, 2008; Boston, USA. |
| Mar 2002 | (panelist) "What's Happening to Asylum" at *Think Twice,* March 22, 2002; Trinity College, Cambridge University, United Kingdom. |