# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity, <br><br> Defendants. | Civil Action No. 25-cv-10676-BEM |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# I.    INTRODUCTION

Although the Supreme Court has stayed preliminary relief for class members, the critical underlying question remains: do Defendants—the U.S. Department of Homeland Security (DHS), the DHS Secretary, and the U.S. Attorney General—have a policy or practice of unlawfully removing members of the certified class to third countries without meaningful notice or an opportunity to seek protection from removal to countries where they are likely to be persecuted or tortured? The answer is clear: they do. Accordingly, Plaintiffs seek partial summary judgment to declare unlawful and set aside the policy or practice under Count I (5 U.S.C. § 706(2)(A), (2)(C)), Count III (Due Process Clause of the Fifth Amendment, 5 U.S.C. § 706(2)(D)), and Count IV (Declaratory Judgment Act) of the Complaint. *See* Dkt. 1 ¶¶ 99-107, 112-17, 118-22.

# II.    BACKGROUND

## A.    Defendants' Legal Obligations

Congress authorized *only* the DHS Secretary with "enforcement [of final removal orders] and all other laws relating to immigration . . . of [noncitizens] . . . ." 8 U.S.C. § 1103(a)(1). Paragraphs (b)(1) and (b)(2) of 8 U.S.C. § 1231 govern the countries to which DHS is authorized to remove noncitizens with final removal orders.[1] The statutory scheme consists of "four consecutive removal commands." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005). DHS must attempt to remove the individual first to the country of choice (designated on the removal order), then their country of origin, next a country to which they have a lesser

---

[1]    References to the Attorney General in § 1231(b) refer to the Secretary of DHS for functions related to carrying out a removal order and to the Attorney General (as delegated to the immigration judges (IJs) and Board of Immigration Appeals (BIA)) for functions related to selection of designations and decisions about fear-based claims. *See* 6 U.S.C. § 557.

connection, and finally, if, and only if, removal to any of those countries is "impracticable, inadvisable, or impossible," may DHS remove a person to another country "whose government will accept" them. *Id*. (citing 8 U.S.C. § 1231(b)(2)).[2]

Before removal to **any** country where a noncitizen fears persecution or torture, U.S. law guarantees the right to raise a claim under the withholding of removal statute, 8 U.S.C. § 1231(b)(3) and/or Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment (CAT). First, 8 U.S.C. § 1231(b)(1) and (b)(2) make *any* country of removal "[s]ubject to paragraph (3)." Paragraph (3), entitled "Restriction on removal to a country where [noncitizen's] life or freedom would be threatened," reads:

> *Notwithstanding paragraphs (1) and (2)*, the Attorney General may not remove [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion.

*Id*. § 1231(b)(3)(A) (emphasis added);[3] *see also Jama*, 543 U.S. at 348. Congress also enacted the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) to implement CAT, instructing that the U.S. government may not "expel, extradite, or otherwise effect the involuntary return of *any person* to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Pub. L. 105-277, Div. G, § 2242(a),

---

[2]    For noncitizens placed in removal proceedings upon "arriv[ing] in the United States," the designated country is the one from which they departed, or, alternatively, to which they have a connection. *Id*. § 1231(b)(1)(A)-(C). Another country is permitted only if removal to each of those countries "is impracticable, inadvisable, or impossible." *Id*. § 1231(b)(1)(C)(iv).

[3]    Withholding of removal is a "mandatory" protection for noncitizens who are ineligible for asylum but can establish that they are more likely than not to face persecution in the designated country. *Id*. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16, 1208.16; *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999). Withholding of removal contains exceptions for, inter alia, individuals who have committed certain serious crimes. *See* 8 U.S.C. § 1231(b)(3)(B).

112 Stat. 2681, 2681-822 (1998) (emphasis added) (codified as statutory note to 8 U.S.C. § 1231). Congress directed that the government "shall prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT]," *id.* § 2242(b), 112 Stat. at 2681-822, which the government did, *see, e.g.*, 28 C.F.R. § 200.1 (explaining that a Title V removal order "shall not be executed in circumstances that would violate Article 3 of [CAT]").[4]

The statute and regulations implement Congress' designation scheme to ensure that noncitizens receive meaningful notice and an opportunity to present a fear-based claim. In standard removal proceedings under 8 U.S.C. § 1229a, the regulations mandate that the immigration judge (IJ) "shall notify" the individual of the designated country of removal, and "shall also identify for the record" all alternative countries to which the person may be removed. 8 C.F.R. § 1240.10(f). If individuals who have been deported subsequently return to the United States without inspection, DHS officers may reinstate their prior removal orders. *See* 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8. The reinstatement regulations contemplate notice of a designated country. *See* 8 C.F.R. § 241.8(e) (referring to "the country designated in [the reinstatement] order"). Likewise, DHS officers can issue an administrative removal order to nonpermanent residents with an aggravated felony conviction. *See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1. In this process, the noncitizen may designate "*the* country to which he or she chooses to be deported," 8 C.F.R. § 238.1(b)(2)(ii), and the "deciding [DHS] officer shall designate *the* country of removal," *id.* § 238.1(f)(2) (emphasis added). Consistent with the United States' commitment to *non-refoulement*, DHS must provide individuals who express a fear of return to the designated country an opportunity to demonstrate a reasonable fear of persecution or torture to an asylum

---

[4]    Individuals are eligible for CAT protection no matter the basis of their removal order. *See* 8 C.F.R. §§ 208.16-208.18, 208.31, 241.8(e), 1208.16-1208.18.

officer, and those who pass this threshold are eligible to apply for withholding under 8 U.S.C. § 1231(b)(3) and/or CAT protection in withholding-only proceedings. *See id*. §§ 241.8(e), 238.1(f)(3); *see also id.* §§ 208.31, 1208.31.

B.    **Statement of Undisputed Facts**

1.    **Initiation of the Case and Temporary Restraining Order**

On March 23, 2025, Plaintiffs filed a complaint challenging DHS's failure to provide meaningful notice and an opportunity to raise fear-based claims prior to removal to a third country. Plaintiffs also moved for a temporary restraining order (TRO), preliminary injunction (PI), and class certification. In response, Defendants claimed *no* notice or opportunity to make a fear-based claim was required before a third-country removal. Mar. 28, 2025, Hr'g Tr. 29:10-18; Dkt. 40 at 4. The Court issued a TRO requiring Defendants to provide written notice and a meaningful opportunity to submit and have adjudicated a CAT application prior to any third-country removal. Dkt. 34 at 2; Dkt. 40 at 5-7.

2.    **Defendant DHS's March 30, 2025 Memorandum**

On March 30, Defendants issued a memorandum entitled "Guidance Regarding Third Country Removals" (March 30 Memo). Dkt. 43-1. It applies to individuals with final orders of removal under 8 U.S.C. §§ 1229a, 1231(a)(5), or 1228(b). The Memo allows removal to a third country without any notice or process if DHS has received "credible" "diplomatic assurances that [noncitizens] removed from the United States will not be persecuted or tortured." Dkt. 43-1 at 1-2. Otherwise, DHS must "inform the [noncitizen] of removal to that country." *Id*. at 2. Only if a noncitizen "affirmatively states" fear, without any prompting, will DHS refer the individual for a screening interview before an asylum officer, generally within 24 hours. *Id.* If the individual does not establish a likelihood of persecution or torture, DHS will remove them. *Id*. If the

individual meets this standard, the officer will refer individuals not previously in proceedings to an IJ; for all others, the officer will notify U.S. Immigration and Customs Enforcement (ICE) to consider filing a motion to reopen. *Id.*

### 3.    Removal of Class Members to El Salvador Following the TRO

On March 31, at least four alleged class members were removed from the continental United States to El Salvador, via Naval Station Guantánamo Bay (NSGB), without receiving the TRO's procedural protections. *See* Dkt. 49 at 18-19; Dkt. 57 at 20, Dkts.72, 72-1. A second flight from NSGB to El Salvador, also carrying class members, departed on April 13, 2025. *See* Dkt. 81; Apr. 28, 2025, Hr'g Tr. 27:8-9. Defendants stated to this Court that "DHS did not violate" the TRO because the U.S. Department of Defense (DoD) carried out those removals. Dkt. 72 at 3; *see also* Dkt. 72-1 ¶¶ 12, 18, 27, 51 (stating that class members were "removed to El Salvador by the [DoD] on a flight where no DHS personnel were onboard" and that "DHS did not direct the [DoD] to remove" these individuals). On April 30, this Court clarified the PI, ordering that Defendants cannot "cede custody or control" to another agency "in any matter that prevents [a noncitizen] from receiving" the protections of the PI. Dkt. 86.

### 4.    Class Certification and Preliminary Injunction

At an April 10 hearing on Plaintiffs' motions, this Court again confirmed Defendants' position "that there is no constitutional or statutory infirmity to send [class members] to a country where they have an individualized uncontroverted fear of death." Apr. 10, 2025, Hr'g Tr. 14:9-16; *see also id.* at 12:5-15. On April 18, this Court certified the following class:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

*See* Dkt. 64 at 23, 48. The Court also issued a PI, ordering that, prior to any third-country removal, noncitizens and their counsel, if any, receive written notice of the country of removal in a language the noncitizen understands and a meaningful opportunity to assert a claim for CAT protection. *Id*. at 46-47. If the noncitizen demonstrates a reasonable fear of removal, DHS must move to reopen proceedings to allow an IJ to adjudicate the CAT claim; if the noncitizen does not so demonstrate, they must be given 15 days to move to reopen proceedings. *Id*. at 47.

### 5.    Attempted Removals in Violation of the Preliminary Injunction

On May 7, DHS sought to remove thirteen class members, none of them Libyan, to Libya. *See* Dkt. 89 at 1-5; Dkt. 99-2; Dkt. 99-3, Dkt. 99-4. Plaintiffs filed an emergency motion for a TRO, noting DHS did not comply with the PI. Dkt. 89 at 1-5. The Court held that the anticipated removals "would clearly violate this Court's [PI]." Dkt. 91 at 2. DHS returned the individuals to ICE custody. *See* Dkt. 99-2 ¶ 37; Dkt. 99-3 ¶ 12.

On May 20, DHS attempted to remove eight class members to South Sudan. Dkt. 130-2 ¶ 10. Plaintiffs filed an emergency TRO motion after the men were already in the air, but before they arrived in South Sudan. Dkt. 111. The Court then ordered Defendants to maintain custody of them and to provide additional information regarding provision of the PI protections. Dkt. 116 at 1. Further declarations and testimony demonstrated that Defendants provided the men on the flight with fewer than 24 hours' notice of their removal, outside of business hours, and on a form that was only in English. *See* Dkt. 118 at 1; Dkt. 130-2 ¶ 10; May 21, 2025, H'rg Tr. 34:9-17. Each "refused to sign" the notice, but DHS did not treat the refusal as an expression of fear. Dkt. 130-2 ¶ 10.

The Court concluded that Defendants' actions violated the PI, clarified that a "meaningful opportunity" to seek CAT protection requires a minimum of ten days between notice and

removal, and issued a remedial order. Dkts. 118, 119.

### 6.    The Supreme Court Rulings and Defendants' Current Policy

After this Court issued the April 18 PI, Defendants appealed and moved for a stay of the injunction in the First Circuit. The First Circuit denied that motion on May 16, citing "concerns regarding the continuing application of the [March 30] Guidance" and "the irreparable harm that will result from wrongful removals in this context." Order at 1-2, *D.V.D. v. DHS*, No. 25-1393 (1st Cir. May 16, 2025), Dkt. 17. On May 27, Defendants filed an emergency application for a stay of the PI with the Supreme Court, which the Court granted on June 23. *DHS v. D.V.D.*, 145 S. Ct. 2153 (2025). The Court's order renders the PI unenforceable through the pendency of the First Circuit's disposition of the appeal and through any judgment rendered by the Supreme Court following a subsequent timely filed petition for certiorari. *Id.*

Plaintiffs immediately filed an emergency motion to enforce the remedial order on behalf of the eight class members, Dkt. 174. This Court denied it as "unnecessary" because its May 21 remedial order "remained in full force and effect." Dkt. 176. On June 24, Defendants filed a motion for clarification before the Supreme Court, which the Court granted. *DHS v. D.V.D.*, No. 24A1153, 2025 WL 1832186, at *1 (U.S. July 3, 2024).

On July 9, 2025, ICE issued guidance regarding how to implement DHS's now-operative March 30 Memo. Dkt. 190-1 (July 9 Guidance). The July 9 Guidance is identical to the March 30 Memo except that, in cases where diplomatic assurances do not exist, it provides that an officer will serve a "Notice of Removal" with interpretation. *Id.* at 1. DHS may effectuate removal 24 hours serving notice; however, "[i]n exigent circumstances," with approval from chief counsel of DHS or ICE, DHS may execute removal to the third country with a mere six hours' notice if ICE provides the noncitizen "means and opportunity to speak with an attorney."

### III.    STANDARD OF REVIEW

Partial summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view all facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (citation omitted). "An issue is 'genuine' if a rational factfinder could resolve it in favor of either party, and a fact is 'material' if it has the capacity to change the outcome of the suit." *Rodriguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 779 (1st Cir. 2025).

### IV.    ARGUMENT

**A.    The Law Requires DHS to First Pursue Removal to the Designated Country**

In executing removal orders, DHS does not have unfettered discretion to decide where to send noncitizens. First, DHS must seek removal to the country selected by the noncitizen during removal proceedings. 8 U.S.C. § 1231(b)(2)(A). Where a noncitizen declines to designate a country, the IJ must do so. 8 C.F.R. § 1240.10(f).[5] If the designated country confirms within 30 days of inquiry that it will accept the person, DHS must remove the person there, unless such removal is "prejudicial to the United States." 8 U.S.C. § 1231(b)(2)(C). In such cases, the statute next provides for the possibility of removal to an "alternative country" in which the person is a "subject, national, or citizen" unless the country does not timely confirm or is unwilling to accept them, *id.* § 1231(b)(2)(D). If, and only if, a person is "not removed to a country under [8 U.S.C. § 1231(b)(2)(A)-(D)]," DHS may seek removal to an enumerated list of five "additional" choices, all countries to which the noncitizen has some sort of connection—by birth, former

---

[5]    The IJ must "afford [the noncitizen] an opportunity" to make a designation and "identify for the record a country [of removal], or countries in the alternative" if the designated country "will not accept [the noncitizen] into its territory, or fails to furnish timely notice of acceptance, or if the [noncitizen] declines to designate a country." 8 C.F.R. § 1240.10(f).

residence, or travel path to the United States. *Id.* § 1231(b)(2)(E)(i)-(v). DHS is only authorized to remove the noncitizen to a country to which they have a lesser or no connection where removal to *each* of the five countries in § 1231(b)(2)(E)(i)-(v) is "impracticable, inadvisable, or impossible*." Id.* § 1231(b)(2)(E)(vi); *Jama*, 543 U.S. at 341-42. Policy guidance from the Department of Justice Office of Legal Counsel confirms this sequencing, stating that only after "the country of the [noncitizen's] citizenship or nationality declines to accept the [noncitizen]" may DHS attempt to deport them to a different country. Memorandum Opinion for the Deputy Attorney General: *Limitations on the Detention Authority of the Immigration and Naturalization Service* at 76 n,11 (OLC Feb. 20, 2003), https://www.justice.gov/file/145816-0/dl.[6]

The predictability of the country of removal is critical because noncitizens make decisions about whether to fight removal and to seek relief or protection based on where they may be removed. The statute's plain language prohibits pursuit of removal to third countries when the designated country or country of citizenship is willing to accept the noncitizen. Except under the limited circumstances enumerated in § 1231, DHS must first seek removal to the designated country. Thus, this Court should declare that § 1231(b) requires DHS to first seek removal of class members to the designated country of removal (or alternative country of removal) and set aside Defendants' policy or practice inconsistent with that statutory mandate.

## B.    Class Members Have Rights to Notice and an Opportunity to Present a Claim for Withholding of Removal or CAT Protection Prior to Removal to a Third Country

### 1.    Class Members Have Rights to Meaningful Notice of the Third Country

The U.S. Constitution, statutes, regulations, and treaties enshrine Defendants' obligation

---

[6]    While not presently applicable, 8 U.S.C. § 1231(b)(2)(F) governs wartime removals when the standard provisions are "impracticable, inadvisable, inconvenient, or impossible." Even then, the removal is limited to countries politically or geographically close to the noncitizens' home country and broader removals require that country's consent. 8 U.S.C. § 1231(b)(2)(F).

not to remove class members to any country where they would likely be tortured or killed, including a third country not designated in their removal orders. *See supra* Section II.A. But that obligation—and noncitizens' corresponding right to present their fear-based claims—is meaningless without providing noncitizens meaningful notice of the country to which they will be removed. Defendants' policy and practice demonstrate that they fail to provide class members the required notice in the context of third-country removals.

As the Supreme Court recognizes, statutory rights require due process to make those rights effective, including in the context of removal proceedings. *See Meachum v. Fano*, 427 U.S. 215, 226 (1976); *infra* Section IV.C.2. "The fundamental requisite of due process of law is the opportunity to be heard," which includes "timely and adequate notice." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citation modified); *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). Due process protections apply in the context of immigration proceedings. *See, e.g.*, *Trump v. J.G.G.*, 604 U.S. _, 145 S. Ct. 1003, 1006 (2025). As a result, where a removal is planned, a noncitizen must receive notice "within a reasonable time and in such a manner as will allow [the noncitizen] to actually seek . . . relief in the proper venue before such removal occurs." *Id.*; *A.A.R.P. v. Trump*, 605 U.S. __, 145 S. Ct. 1364, 1368 (2025) (instructing that "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster").

As these decisions indicate, rushed notice provided mere hours before, or during, physical removal is not adequate notice; the notice must meet certain basic benchmarks. *See,*

*e.g.*, *id.*; *Mullane*, 339 U.S. at 315 ( "The means employed [of providing notice] must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."); *see also* Section IV.C. Thus, due process requires written notice in a language that the noncitizen understands. *See Mullane*, 339 U.S.at 313 (describing "service of written notice within the jurisdiction" as "the classic form of notice").

Where an individual is represented by counsel, notice should also be provided to the individual's attorney. *Cf.* 8 C.F.R. § 292.5(a) ("Whenever a person is required by any of the provisions of this chapter to give or be given notice . . . such notice . . . shall be given by or to . . . the attorney or representative of record, or the person himself if unrepresented."). And, importantly, it must be provided sufficiently in advance of deportation that the individual has a meaningful opportunity to seek fear-based protection—especially if removal is to a country about which they have no knowledge and thus may necessitate consulting an attorney and/or researching country conditions before making any request for protection. *Cf. Mullane*, 339 U.S. at 315 (explaining that adequate notice "must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance") (citations omitted).

Unsurprisingly, then, courts have held that due process requires meaningful notice before any third country deportation. For example, the Ninth Circuit held that failing to timely inform a noncitizen of the fact that he may need to seek protection from removal to a third country "violated a basic tenet of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence." *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999). Similarly, the Seventh Circuit rejected as "fail[ing] miserably"

the government's contention that last-minute notice at a hearing sufficed. *Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998). As another court recognized, "[a] noncitizen must be given sufficient notice of a [third country] that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1009-10 (W.D. Wash. 2019). Indeed, Defendants twice have conceded that, in analogous situations, third-country removals required advance notice. *See* Transcript of Oral Argument at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021); Transcript of Oral Argument at 33, *Riley v. Bondi*, 606 U.S. __, 2025 WL 1758502 (2025).[7]

Defendants fail to provide meaningful notice both under their policy and in practice. As they affirmed to this Court, Defendants contend that they may remove a class member to a third country with "no notice" so long as DHS does not already "know that there's someone standing [in the third country] waiting to shoot him." *See* Mar. 28, 2025, Hr'g Tr. 29:10-18. This position is borne out by their policy as articulated in the March 30 Memo and July 9 Guidance. *See infra* Section IV.C; *see also* Apr. 10, 2025, Hr'g Tr. 12:5-15 (affirming that, under the Memo, DHS is not "giving any notice" to class members). The July 9 Guidance further underscores that no notice will be provided in cases where diplomatic assurances are present and that, in all other cases, a mere 6- to 24-hours' notice suffices. Dkt. 190-1 at 1.

Defendants' practices implement this unlawful policy. For example, Plaintiff O.C.G. was notified of his removal to Mexico *as he was being deported*. *See, e.g.*, Dkt. 8-4 ¶¶ 9-10; Dkt. 132 at 5; Dkt. 103 at 1. Similarly, the eight class members deported to South Sudan had "at most,

---

[7]     Defendants twice drafted documents to ensure that individuals received written notice at least 15 days in advance of third-country removals. *See* Dkt. 1 ¶ 41; Dkts. 1-2, 1-3. The form they have now chosen to use differs dramatically from those drafts. *Compare* Dkt. 1-2 and 1-3, *with* Dkt. 190-1 at 1.

sixteen" hours' notice, and zero business hours' notice, before being put on a plane and sent to a country" that is the subject of a "Do Not Travel" warning by the State Department. Dkt. 118 at 1; May 21, 2025, Hr'g Tr. 12:20-22. Similarly, Defendants attempted to remove class members to Libya without providing notice in their language or notice to counsel. *See supra* Section II.B.5.

In sum, this Court should declare that class members have a right to meaningful notice and hold unlawful and set aside Defendants' policy and practice of failing to provide such notice.

### 2. Class Members Have Rights to a Meaningful Opportunity to Present a Claim for Withholding or CAT Protection to the Immigration Court

Immigration statutes and regulations, due process, and international law all entitle class members to a meaningful opportunity to present a fear-based claim for withholding of removal and/or CAT protection to an IJ prior to removal to a country other than the previously designated country of removal. Defendants' policy and practice deny class members that opportunity.

The withholding of removal statute bars removal of any noncitizen—including all class members—to a country in which the individual's "life or freedom would be threatened" based on a protected ground. 8 U.S.C. § 1231(b)(3)(A); *see also supra* Section II.A. The CAT statute and regulations likewise prohibit third-country removal to a country where an individual is "likely to be tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2); *see also* 8 U.S.C. § 1231 (note). These prohibitions are mandatory—i.e., Defendants have "no discretion to deny relief" to an eligible noncitizen. *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

Determinations regarding eligibility for withholding of removal and CAT protection must be made after an evidentiary hearing. *See* 8 U.S.C. § 1231(b)(3)(C); 8 C.F.R §§ 208.16(b), (c)(2), (c)(3), 1208.16(b), (c)(2), (c)(3).[8] Specifically, § 1231(b)(3)(C) requires an IJ to assess whether

---

[8]     Providing an IJ hearing to present a withholding or CAT claim prior to removal also implements the United States' obligations under international law. *See* United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150; United Nations

the applicant has sustained their burden of proof and to make credibility determinations "in the manner described in [8 U.S.C. § 1158(b)(1)(B)(ii) and (iii)]."[9] Only IJs have the authority to hold such hearings. *See generally* 8 U.S.C. § 1229a; *see also* 8 C.F.R. §§ 208.16(a) (requiring a USCIS officer to refer withholding cases to an IJ to make final eligibility determinations),1208.16(a) (same), 208.16(c)(4) (requiring that USCIS refer cases within its jurisdiction to an IJ to decide CAT relief); 208.17(b) (detailing information IJ must provide after granting CAT protection), 1208.17(b) (same). Courts repeatedly have held that an individual cannot be removed to a country that was not properly designated by an IJ if they have a fear of persecution or torture in that country. *See Andriasian*, 180 F.3d at 1041; *Kossov*, 132 F.3d at 408-09; *cf. Protsenko v. U.S. Att'y Gen.*, 149 F. App'x 947, 953 (11th Cir. 2005) (permitting designation of third country where individuals received "ample notice and an opportunity to be heard").[10]

It is also well-established that a meaningful opportunity for a hearing on a protection claim is a fundamental Fifth Amendment due process protection. *See Mathews v. Eldridge*, 424 U.S. 319, 333-35 (1976); *see also supra* Section IV.B.1. That opportunity must permit the individual to prepare a claim, including the time to research and secure supporting evidence.

---

Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223; Refugee Act of 1980, Pub. L. 96-212, § 203(e), 94 Stat. 102, 107 (codified as amended at 8 U.S.C. § 1231(b)(3)); United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. III, 1465 U.N.T.S. 85, 114; FARRA at 2681-822 (codified at Note to 8 U.S.C. § 1231); United Nations Committee Against Torture, General Comment No. 4 (2017) on Implementation of Article 3 of the Convention in the Context of Article 22, CAT/C/GC/4, ¶ 12 (Sept. 4, 2018); *see also INS v. Stevic*, 467 U.S. 407, 421 (1984).

[9]    Those sections address the sufficiency of an applicant's testimony to meet their burden, when corroborating evidence may be required, and the factors IJs review to assess credibility. *See also* 8 U.S.C. §§ 208.16(b), 1208.16(b).

[10]    Even in proceedings before a DHS officer under 8 U.S.C. §§ 1231(a)(5) or 1228(b), if an asylum officer finds a reasonable fear of persecution, the cases must be referred to an IJ for a hearing on their fear claim. *See* 8 C.F.R. §§ 208.31(e), 1208.31(e); *see also supra* pp. 3-4.

*Andriasian*, 180 F.3d at 1041; *see also Kossov*, 132 F.3d at 408. Finally, an opportunity to present a fear-based claim is only meaningful if the noncitizen remains in the United States before removal proceedings are reopened. *See Aden*, 409 F. Supp. 3d at 1010 (holding that merely giving petitioner an opportunity to file a discretionary motion to reopen "is not an adequate substitute for the process that is due in these circumstances" and ordering reopening).

Thus, this Court should declare class members' right to a meaningful opportunity to raise a protection claim before any third-country removal and set aside Defendants' policy or practice of failing to provide such an opportunity.

**C.    The March 30 Memo and July 9 Guidance Are Unlawful**

Plaintiffs challenge Defendants' failure to provide "meaningful notice and the opportunity to present a fear-based claim prior to deportation to a third country." Dkt. 1 ¶ 6. The March 30 Memo and July 9 Guidance simply underscore that their failure is not incidental but embedded in Defendants' policy and practice. *See* Dkt. 43-1. Specifically, they (1) allow for removal to a third country with no notice where the United States has received blanket diplomatic assurances that persons removed there will not be persecuted or tortured, (2) provide between 6- and 24-hours' notice where no such assurances exists, (3) do not require officers to affirmatively inquire about a person's fear of removal, and (4) require a person to demonstrate complete eligibility for withholding or CAT relief during a "screening" interview within 24 hours of receiving notice. *Id.*; Dkt. 190-1 at 1-2. These so-called procedures fall far short of the Immigration and Nationality Act (INA), FARRA, and due process.

**1.    Blanket Diplomatic Assurances Lack Legal Foundation**

Blanket diplomatic assurances violate statutory and constitutional requirements. First, Defendants rely on such assurances to permit removal without prior notice, leaving the

noncitizen unaware of where they will be removed. *See* Dkt. 43-1 at 1-2; Dkt. 190-1 at 1. This deprives a person of any meaningful opportunity to challenge the removal on the grounds that, inter alia, DHS has an obligation to remove the person to the country designated in the removal order. *See supra* Section II.A.; *J.R. v. Bostock*, No. 2:25-CV-01161-JNW, 2025 WL 1810210 (W.D. Wash. June 30, 2025) (enjoining third-country removal where designated country was willing to accept noncitizen). In such circumstances, a noncitizen does not have "sufficient time and information to reasonably be able to contact counsel . . . and pursue appropriate relief," *A.A.R.P.*, 145 S. Ct. at 1368. Instead, they will be on a plane before they ever learn where they might be removed.[11]

Second, Defendants use blanket diplomatic assurances in place of the *individualized* assessments required by the INA, FARRA, and due process. The Memo explains that the assurances process applies to both withholding and CAT claims. *See* Dkt. 43-1 at 1 n.2. But the INA requires a hearing to "determin[e] whether [a noncitizen] has demonstrated that [their] life or freedom would be threatened" before a "trier of fact" who must "make credibility determinations" and ensure the noncitizen "sustain[s]" their "burden of proof." 8 U.S.C. § 1231(b)(3)(C); *see also* 8 C.F.R. § 1208.16(b); *supra* Section IV.B.2. Similarly, FARRA and the CAT regulations require an inquiry into whether "there are substantial grounds for believing *the person* would be in danger of being subjected to torture." FARRA § 2242(a) (emphasis added); *see also, e.g.*, 8 C.F.R. §§ 208.16(c), 208.17(a), 208.31, 1208.16(c), 1208.17(a), 1208.31. Defendants' blanket assurances policy directly contradicts this individualized framework.

---

[11]    Notably, it was *five weeks* after Defendants placed eight class members on a flight to South Sudan that they suddenly stated that South Sudan provided diplomatic assurances as to them, and even then, Defendants did so without testimony or proof. *See* Reply in Supp. of Mot. to Clarify at 4, *DHS v. D.V.D.*, No. 24A1153 (U.S. June 24, 2025).

Third, even assuming diplomatic assurances were permissible in rare circumstances, they (1) must be individualized and (2) apply only to CAT claims—not withholding protection under the INA. Specifically, the assurances must be "obtained from the government of a specific country" and must guarantee "that [a noncitizen] would not be tortured there if *the* [noncitizen] were removed to that country." 8 C.F.R. §§ 208.18(c)(1), 1208.18(c)(1) (emphasis added). The regulation's use of "a definite article with a singular noun" mandates an individualized inquiry. *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021); *see also, e.g.*, Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 10 (2005) (testimony of U.S. Attorney General Alberto Gonzales that "each case" involving assurances is "very fact specific"). Moreover, no regulation permits diplomatic assurances to substitute for an opportunity to seek statutory withholding of removal; the INA prohibits such assurances by requiring individualized inquiries regarding persecution to be presented before IJs. *See* 8 U.S.C. § 1231(b)(3)(C); *see also supra* Section IV.B.2.[12]

Fourth, because it is the foreign *state* issuing assurances, they do not provide meaningful guarantees against persecution or torture by *non-state* actors. *Cf. Paye v. Garland*, 109 F.4th 1, 12 (1st Cir. 2024) (recognizing that non-state actors can be a persecutor for purposes of withholding of removal); *Escobar v. Garland*, 122 F.4th 465, 481 (1st Cir. 2024) (similar, for torture claims); *Murillo Morocho v. Garland*, 80 F.4th 61, 71 (1st Cir. 2023) (vacating denial of CAT protection where the BIA failed to properly consider risk of non-state torture). Nor do assurances address chain refoulement (such as in Plaintiff O.C.G.'s case). Dkt 132 at 5.[13]

---

[12]    The statute specifies that the "Attorney General" must have the "trier of fact" determine whether a noncitizen satisfies the burden of proof and determine credibility. 8 U.S.C. § 1231(b)(3)(C). This obligation and authority is delegated to IJs. *See* 8 C.F.R. 1003.10.
[13]    The Memo allows reliance on assurances the State Department "believes" to be credible, Dkt. 43-1 at 1, but the regulations require *the Attorney General*—"in consultation with the

Finally, by providing "no notice and no hearing whatsoever," the Memo deprives a noncitizen of the opportunity "to see the written diplomatic assurances" or receive "information pertaining to the Government's reasons for crediting those assurances." *Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 257 (3d Cir. 2008). Nor does it give the individual any "opportunity to make arguments" that the assurances may not be credible, much less any right to "an individualized determination" about their credibility. *Id.* As the Third Circuit recognized in *Khouzam*, such deficiencies deprive a noncitizen of due process. In short, the blanket diplomatic assurances the Memo relies on conflict with the statutory and regulatory scheme and deprive noncitizens of due process. This alone is sufficient to vacate the policy and to declare it unlawful.

### 2.    Defendants' Policy Does Not Provide Meaningful Notice or Opportunity to Be Heard

Where no diplomatic assurances exist, the March 30 Memo and July 9 Guidance fail to provide meaningful notice and an opportunity to raise withholding and CAT claims. Defendants have represented to this Court that they believe the statute and due process require *no notice whatsoever*, *see* Dkt. 44 at 29:12-18, as exemplified by O.C.G.'s removal, *see* Dkt. 132 at 5. Since the commencement of this case, Defendants have asserted that mere hours' notice is sufficient, *see, e.g.*, Dkts. 99-2, 99-3, 118, and in testimony have declared that at most 24 hours' notice is required, *see* Dkt. 130-2 ¶ 7. Their policy also now states as much. Dkt. 190-1 at 1-2. It also fails to provide the notice in a noncitizens' language, *see id.* (sample notice), or to a noncitizen's attorney, as required by regulation, *see* 8 C.F.R. §§ 292.5(a), 1292.5(a).

As the Supreme Court has long explained, for statutory rights to be meaningful, "the minimum requirements of procedural due process . . . must be observed." *Meachum*, 427 U.S. at

---

Secretary of State"—to determine their reliability. 8 C.F.R. § 1208.18(c)(2).

226 (citation omitted); *Califano v. Yamasaki*, 442 U.S. 682, 693 (1979) ("[T]his Court has been willing to assume a congressional solicitude for fair procedure, absent explicit statutory language to the contrary."). This principle applies equally in the immigration context. Most recently, the Supreme Court reaffirmed that "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not" satisfy due process where noncitizens have a right to raise a defense to that removal. *A.A.R.P.*, 145 S. Ct. at 1368; *see also J.G.G.*, 145 S. Ct. at 1006 ("[N]otice must be afforded within a reasonable time and in such a manner as will allow [noncitizens] to actually seek . . . relief."). Yet that is precisely what the scheme Defendants have implemented lacks.

The Memo and Guidance's failures to provide an "opportunity to be heard," are equally insufficient and unlawful. The withholding statute and regulations require individualized proceedings before a neutral trier of fact to determine eligibility. FARRA imposes similar obligations. The Memo and Guidance, by contrast, require none: Defendants do not even have to ask whether a person fears persecution or torture in the third country. Dkt. 43-1 at 2; Dkt. 190-1 at 1. This effectively prohibits Plaintiffs' access to withholding and CAT's mandatory protections, as they "lack information about how to exercise [their] due process rights." *A.A.R.P.*, 145 S. Ct. at 1368; *see also Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, — F. Supp. 3d —, 2025 WL 1403811, at *16-17 (D.D.C. May 9, 2025) (invalidating rule requiring noncitizens to affirmatively manifest fear).

If, against all odds, a noncitizen communicates to a deportation officer (who often speaks a different language) a fear of removal to the third country (which they may have just heard of for the first time), "USCIS will generally screen the [noncitizen] within 24 hours of referral from the immigration officer." Dkt. 43-1 at 2; *see also* Dkt. 190-1 at 1. But this is not a preliminary

19

screening; instead, the noncitizen must demonstrate that they are "more likely than not [to] be persecuted . . . or tortured," which is the standard required to demonstrate full entitlement to protection. *Compare id., with* 8 C.F.R. § 1208.16(b)-(c). Requiring noncitizens to meet such stringent requirements with 24 hours' notice is patently unlawful and unworkable. Withholding and CAT claims generally feature hundreds of pages of evidence, including the noncitizen's own testimony (via declaration), expert affidavits, and country conditions evidence, like government reports and news articles. *See, e.g.*, *G.P. v. Garland*, No. 21-2002, 2023 WL 4536070, at *2 (1st Cir. July 13, 2023). It is impossible for a detained person to compile and present this evidence within hours of receiving notice of removal to a third country.[14] It plainly fails to offer "sufficient time and information to reasonably be able to contact counsel, file [supporting materials], and pursue appropriate relief." *A.A.R.P.*, 145 S. Ct. at 1368.

Moreover, DHS will remove noncitizens who do not meet this standard without any further review. Dkt. 43-1 at 2; Dkt. 190-1 at 2. There is no appeal to an IJ (who is statutorily designated to decide withholding claims), much less the BIA. *See id.* Nor does the Memo create a pathway to judicial review. *See id.*

The Court should thus declare the Memo unlawful and set it aside because it violates the withholding statute, FARRA, and due process by denying any real opportunity to be heard.

## V.    CONCLUSION

The Court should grant summary judgment to Plaintiffs on Counts I, III, and IV.

---

[14]    Rushed screenings serve no purpose: DHS itself found "no evidence" that heightened screening standards "resulted in more successful screening out of non-meritorious claims." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078, 18092 (Mar. 29, 2022).

Respectfully submitted,

s/*Trina Realmuto*

Trina Realmuto*
Kristin Macleod-Ball*
Mary Kenney*
**NATIONAL IMMIGRATION
    LITIGATION ALLIANCE**
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4649
trina@immigrationlitigation.org

Anwen Hughes*
Inyoung Hwang*
 **HUMAN RIGHTS FIRST**
121 W. 36th St., PMB 520
New York, NY 10018

Matt Adams*
Leila Kang*
Aaron Korthuis*
Glenda M. Aldana Madrid*
**NORTHWEST IMMIGRANT
    RIGHTS PROJECT**
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org

*Attorneys for Plaintiffs and Class Members*

*\* Admitted pro hac vice*

July 15, 2025


**CERTIFICATE OF SERVICE**


I, Trina Realmuto, hereby certify that on July 15, 2025, I caused a true and correct copy

of the foregoing document to be filed with the Clerk of Court by using the CM/ECF system,

which will send a notice of the electronic filing to counsel of record for all parties.


/s/ *Trina Realmuto*
Trina Realmuto
National Immigration Litigation Alliance