## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D., et al.,<br>individually and on behalf<br>of all others similarly<br>situated,<br>　　　　Plaintiffs,<br><br>　　　　　v.<br><br>U.S. Department of Homeland<br>Security, et al.,<br>　　　　Defendants. | No. 25-cv-10676-BEM |

## MEMORANDUM AND ORDER ON PRESS MOVANTS' MOTION TO INTERVENE AND UNSEAL COURT RECORDS

CABELL, U.S.M.J.

## I. INTRODUCTION

The named plaintiffs in this class action case are noncitizens with final removal orders. They challenge the practice of the defendants[1] of designating them for removal to countries not included in their removal orders without first providing them notice and an opportunity to seek protection based on a fear of prosecution or torture. (D. 1, ¶ 1) (D. 64, pp. 6-7, 31, 36). Presently pending is a motion by the New York Times Company and other news organizations to intervene and unseal certain court

---

[1] The defendants are the Department of Homeland Security ("DHS"); Kristi Noem, Secretary of DHS; Pamela Bondi, the United States Attorney General; and Antone Moniz, Superintendent of the Plymouth County Correctional Facility.

records.[2]    (D.  159).    Specifically,  they  seek  to  unseal  a declaration by Secretary of Defense Pete Hegseth and the redacted testimony  of  Marcos  D.  Charles,  a  DHS  official,  from  a  May  21, 2025 hearing (the "subject records").[3]  The defendants oppose the motion.    (D.  189).    For  reasons  set  out  below,  the  motion  is allowed  as  to  Charles'  redacted  testimony  and  denied  as  to  the Hegseth  declaration  except  for  paragraphs  one  and  two  of  the declaration.

## II.  <u>THE PARTIES' ARGUMENTS</u>

The movants argue that they have a First Amendment and a common law right of access to the subject records.  They contend further  that  the  defendants  publicized  the  information  in  the subject  records,  thereby  undercutting  any  argument  for  their continued nondisclosure.  Separately, the movants contend that the defendants  cannot  show  a  compelling  or  overriding  interest  to justify the records' continued nondisclosure under the common law and  the  First  Amendment.   Lastly,  they  point  to  the  absence  of  a reason on the docket, or one stated during the May 21 hearing, as a  basis  to  initially  seal  the  subject  records.   Given  the  absence

---

[2] In addition to the New York Times Company, the movants are:  the American Broadcasting Companies, Inc. d/b/a ABC News; Cable News Network, Inc.; the Dow Jones & Company, Inc.; National Public Radio, Inc.; Reuters News & Media Inc.; and WP Company LLC d/b/a The Washington Post (the "movants").

[3] To be clear, the redacted testimony is set out in a transcript as opposed to an audiovisual recording.  (D. 189-1, 144).  Charles' full title is the Acting Assistant Director for Field Operations at Enforcement and Removal Operations at U.S. Immigration and Customs Enforcement ("ICE") within DHS.

of a stated reason to seal the records in the first place, so they argue, "the Court should promptly unseal them."  (D. 163).

In opposition, the defendants acknowledge that there is a presumption of public access to judicial records under the common law.  They argue primarily that compelling interests (protecting national security and foreign affairs as well as preventing disclosure of sensitive law enforcement information) outweigh any public right of access under the common law and the First Amendment.  (D. 189).  As to the First Amendment, they add that neither the First Circuit nor the Supreme Court has recognized a right to access documents in a civil case.  Moreover, the subject records fail to satisfy the two considerations, described infra, that give rise to a qualified First Amendment public right of access.

## III.  <u>LEGAL STANDARD</u>

### A.  <u>Common Law Right of Access</u>

"The common law presumes a right of public access to judicial records."  *Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 9 (1st Cir. 1998) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)) (additional citation omitted); *accord In re Boston Herald*, 321 F.3d 174, 189 (1st Cir. 2003) ("The common law presumption is limited to 'judicial records.'"); *see Nixon*, 435 U.S. at 597 ("[C]ourts . . . recognize a general right to inspect and copy

public records and documents, including judicial records and documents.").

Relative thereto, judicial records are often defined as "materials on which a court relies in determining the litigants' substantive rights." *Boston Herald*, 321 F.3d at 189 (citation omitted). Stated otherwise, "[R]elevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 409 (1st Cir. 1987). Notably, there is no requirement to show that the court actually relied on the document for the document to constitute a judicial record. *See United States v. Kravetz*, 706 F.3d 47, 58 (1st Cir. 2013) (rejecting approach "that would turn on whether the documents at issue actually played a role in the court's deliberations"); *Tourangeau v. Nappi Distributors*, No. 2:20-cv-00012-JAW, 2022 WL 768688, at *4 (D. Me. Mar. 14, 2022) ("[I]f a party submits a document to assist the court in adjudicating a pending motion, it is a relevant document under *Kravetz* regardless of whether the judge actually relies on the document in resolving the case.").

Judicial records must also be relevant. *See In re Providence Journal Co., Inc.*, 293 F.3d 1, 9 (1st Cir. 2002) (Common law "presumptive right of access attaches to those materials 'which properly come before the court in the course of an adjudicatory

4

proceeding *and which are relevant* to that adjudication.'") (citation omitted; emphasis added); *accord Standard Fin. Mgmt.*, 830 F.2d at 409-410 (concluding that subject material (financial statements) "were relevant and material to the matters *sub judice*"); *accord Kravetz*, 706 F.3d at 59 n.9 ("We do not hold that an irrelevant document, that neither was nor should have been relied on, is nevertheless a judicial document and thus necessarily presumptively subject to disclosure."). Also of note, the common law presumption "extends to records of civil proceedings." *Tourangeau*, 2022 WL 768688, at *10 (citing *Standard Fin. Mgmt.*, 830 F.2d at 408 n.4).

In the event the common law right of access applies, "only the most compelling reasons can justify non-disclosure of judicial records." *Providence Journal*, 293 F.3d at 10 (citing *Standard Fin. Mgmt.*, 830 F.2d at 410). In that regard, "When addressing a request to unseal, a court must carefully balance the presumptive public right of access against the competing interests that are at stake in a particular case . . . ." *Kravetz*, 706 F.3d at 59 (citation omitted); *accord Siedle*, 147 F.3d at 10 (When a party "objects to an unsealing order, a court must carefully balance the competing interests that are at stake in the particular case."). The defendants, as the parties objecting to disclosure, have the burden of proof in this regard. *Standard Fin. Mgmt.*, 830 F.3d at 411 ("The objectors—those seeking to keep the datum hidden from

view—must carry the devoir of persuasion" that compelling interest(s) warrant keeping documents sealed).

Lastly, the common law right of access does not extend to discovery documents. *See Anderson v. Cryovac, Inc.,* 805 F.2d 1, 13 (1st Cir. 1986) ("[T]he common law presumption does not encompass discovery materials."). By like token, documents that "play no role in the adjudication process" fall short of constituting judicial records. *See Standard Fin. Mgmt.*, 830 F.3d at 408.

## B. <u>First Amendment Right of Access</u>

The Supreme Court recognizes "a qualified First Amendment right of access to certain" documents. *Boston Herald*, 321 F.3d at 182 (citing *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980)). The applicable analysis "examine[s] two 'complementary considerations' to determine if a constitutional right of access applies to particular documents . . . ." *Id*. The first complementary consideration is "whether the place and process have historically been open to the press and general public." *Press-Enterprise Co. v. Superior Court of Cal. for Riverside Cnty*., 478 U.S. 1, 8 (1986). The second complementary consideration is "whether public access plays a significant positive role in the functioning of the particular process in question." *Boston Herald*, 321 F.3d at 182 (citing *Press-Enterprise*, 478 U.S. at 8). Respectively, these two considerations are referred to as the

6

considerations of experience and logic. *See Press-Enterprise,* 478 U.S. at 9.

"If the particular proceeding" or document "in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches." *Id.*; *see Boston Herald*, 321 F.3d at 184 (Courts apply *Press-Enterprise* "standards to a particular class of documents or proceedings and determine whether the right attaches to that class."). Like the common law right of access, the First Amendment right of access "is not absolute." *Press-Enterprise*, 478 U.S. at 9 (citation omitted). Thus, if the "inquiry into these considerations . . . yield[s] affirmative answers," *Boston Herald*, 321 F.3d at 182 (citation omitted), the constitutional right of access can "be overcome only by an overriding interest based on findings that [sealing] is essential to preserve higher values and is narrowly tailored to serve that interest," *Press-Enterprise*, 478 U.S. at 9-10 (quoting *Press-Enterprise Co. v. Superior Court of Cal. for Riverside Cnty.*, 464 U.S. 501, 510 (1984) ("*Press-Enterprise I*")).[4]    This

---

[4] The court accepts arguendo the movants' implicit position that the defendants have the burden to show both an overriding interest and the narrow tailoring to serve that interest. *See* (D. 163, p. 13) (stating "government has failed to articulate a compelling reason for keeping the Sealed Records secret, and it cannot show how maintaining these records under seal is narrowly tailored to serving any sufficiently compelling interest it might identify"); (D. 163, p. 11) (quoting *Providence Journal*, 293 F.3d at 10-11). Even so, the result is the same anent unsealing the Hegseth declaration. As discussed, Charles' testimony is subject to production under the common law, therefore bypassing a First Amendment analysis, including the burden to prove an overriding interest.

"requirement . . . makes the First Amendment standard even more stringent than the common-law standard." *Providence Journal*, 293 F.3d at 11.

## C. **Prior Publication**

Regarding prior publication, there is no "bright line rule banning the protection of public documents." *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 69 F.4th 1, 16 (1st Cir. 2023) (citation omitted). Although there is no blanket or bright line rule, the defendants' argument that compelling reasons, such as national security, justify keeping a matter sealed may carry less force for a document that contains publicly disclosed information. *See Kravetz*, 706 F.3d at 63 (noting, albeit in context of examining privacy of medical records as subject to sealing, that defendant's prior publication of information he subsequently seeks to protect "may lose some force in light his prior publication . . . .").[5]

---

[5] The movants' argument to deny the motion outright because the "information contained in the sealed records has already been made public" is therefore unconvincing. Further, the decision in this district which they cite to support the argument, *Skyhook Wireless, Inc. v. Google, Inc.*, Civil Action No. 10-11571-RWZ, 2015 WL 10022962, at *1 (D. Mass. Mar. 3, 2015), is distinguishable. Not only does the *Skyhook* decision predate *Nargol* by almost a decade, but the parties in *Skyhook* filed unredacted versions of the documents they sought to seal on the public docket. *See id.* Here, in contrast, the defendants publicly disclosed some of the information but they did not file unredacted versions on the public docket.

IV.  <u>BACKGROUND</u>

The six-count complaint includes claims under:  the Due Process Clause of the Fifth Amendment; the Administrative Procedure Act, 5 U.S.C. § 706; the Declaratory Judgment Act, 28 U.S.C. § 2201; and the Freedom of Information Act, 5 U.S.C. § 552. The foundation for the claims is the defendants' policy or practice of failing to provide noncitizens who have final removal orders with meaningful notice and opportunity to present a fear-based claim prior to their deportation to a third country.[6]  (D. 1, ¶¶ 1, 99-130).

In April 2025, the court issued a preliminary injunction. The terms of the injunction require the defendants to provide to aliens meaningful notice and an opportunity to be heard prior to their removal to a third country.[7]  In allowing the plaintiffs' motion for a preliminary injunction, in part, the court ordered that:

> prior to removing any alien to a third country, i.e., any country not explicitly provided for on the alien's order of removal, Defendants must:  (1) provide written notice to the alien—and the alien's immigration counsel, if any—of the third country to which the alien may be removed, in a language the alien can understand; (2) provide meaningful opportunity

---

[6] A third country is "any country not explicitly provided for on the alien's order of removal . . . ."  (D. 64, p. 46); *see* (D. 64, pp. 5-6) (explaining third-country removals).

[7] The injunction plays an important role.  This is because the defendants' purported violation of the preliminary injunction led to the May 21 hearing during which Charles testified.  Separately, the complaint describes the named plaintiffs as noncitizens whereas the injunction refers to them as aliens.  The different terminology is immaterial.

for the alien to raise a fear of return for eligibility for
CAT protections; (3) move to reopen the proceedings if the
alien demonstrates "reasonable fear"; and (4) if the alien is
not found to have demonstrated "reasonable fear," provide
meaningful opportunity, and a minimum of 15 days, for that
alien to seek to move to reopen immigration proceedings to
challenge the potential third-country removal.

(D. 64, pp. 46-47) (footnotes omitted); *see also* (D. 86).

On May 18 and 20, one or more named plaintiffs filed emergency
motions for a temporary restraining order and a preliminary
injunction. (D. 104, 111). On May 20, the court convened an
emergency hearing at 4:25 p.m. without providing notice of the
hearing on the docket.[8] At the time of the May 20 hearing, the
defendants were in the process of flying eight aliens, including
six class members, purportedly to South Sudan. (D. 151, ¶¶ 3-5)
(D. 189-1, p. 13). Pertinently, the court ordered the "Defendants
to maintain custody and control of [the] class members currently
being removed to South Sudan or to any other third country, to
ensure the practical feasibility of return if the Court finds that
such removals were unlawful." (D. 116) ("the maintaining custody
order").

The court continued the May 20 hearing to the following day.
As noted, Charles testified at the May 21 hearing. The subject of
his redacted testimony concerns the details of the defendants' May
20 transport of the eight aliens. (D. 189-1, p. 13). On a granular

---

[8] The movants correctly note that the district court's May 20 public calendar
also fails to show a hearing. (D. 163-1, 163-2).

level, Charles' redacted testimony consists of:  the departure airport as one of either two Texas airports, the amount of time for the aliens to travel from their housing at the Port Isable Detention Center ("PIDC") in Texas to the two presumed departure airports, certain characteristics of the aliens' cells at PIDC, the location of the plane on the ground, the planned initial and subsequent destinations for the aliens, the flight as chartered or commercial, the time of arrival at an airport prior to boarding for "these types of transfers," and the existence of a standard data field identifying the native language of aliens in ICE's computer systems.  (D. 189-1, D. 144).

A portion of the information in this redacted testimony is publicly disclosed.[9]  The departure airport is publicly disclosed to the extent the group departed "from Texas."  (D. 163, p. 5) (hyperlink to DHS press release).  The group departed the airport at noon on a chartered flight.  (D. 189-1, p. 17) (D. 130-2, ¶ 24).  Lastly, the plane with the eight aliens landed at a United States military base (Camp Lemonnier) in Djibouti, an east African country.[10]  (D. 163, p. 5) (hyperlink to CNN article).

---

[9] The movants identify the following publicly-disclosed information:  (1) the names and criminal histories of the eight aliens; (2) the departure of the plane from Texas; (3) the time of the departure; (4) the location of the plane at a foreign military base in Djibouti, i.e., Camp Lemonnier; and (5) the final intended destination as South Sudan.  (D. 163, p. 12).  The disclosed information in numbers one and three is not part of Charles' redacted testimony.

[10] The court's May 26 opinion denying the defendants' motion for reconsideration notes that the six class members left PIDC for the airport no later than 9:35 a.m.  (D. 135, p. 6).

In addition to these disclosures, other information about the plane, its occupants, the destination, the custody of the occupants, and other details were shared with the public by government officials. To elaborate, in a May 21 press release, DHS identified the names and pictures of the eight aliens and their criminal convictions. (D. 163, p. 5) (hyperlink to DHS press release).

ICE also held a press conference shortly before the May 21 hearing. At the press conference, ICE likewise distributed the names of the aliens on the plane, their pictures, and information about their criminal cases. (D. 163, p. 5) (hyperlink to press conference). ICE also confirmed that South Sudan was not their final destination. (D. 163, p. 5) (hyperlink to press conference).

To continue, the court issued two orders on May 21 relative to the six class members on the plane. First, the court determined that the "Defendants violated the Preliminary Injunction . . . by failing to provide [the] six non-citizen class members a 'meaningful opportunity' to assert claims for protection under the Convention Against Torture before initiating removal to a third country." (D. 118, p. 1) ("the first order"). Second, the court provided a remedy for the violation. (D. 119) ("the second order"). The remedy required inter alia that the six class members "be given a reasonable fear interview in private," subject to certain additional requirements. (D. 119).

On May 23, the defendants filed a motion to reconsider the first and second orders as well as the maintaining custody order. (D. 130).  The court denied the motion in a 17-page opinion explaining, among other things, the defendants' clear violation of the preliminary injunction.  (D. 135).

Critically, in support of the motion for reconsideration, the defendants filed a motion to seal the Hegseth declaration.  (D. 131).  As represented therein, the plaintiffs did not oppose the motion to seal.  The court granted the motion the same day.  (D. 134).  In granting the unopposed motion, as argued by the movants, the court did not issue a written opinion or an explanation for the ruling on the docket.[11]  (D. 163, pp. 7, 11, 14).

Relative to the Hegseth declaration, on a general level, it addresses difficulties complying with court orders, including the maintaining custody order.  Somewhat more specifically, the declaration describes the difficulties of holding the aliens at Camp Lemonnier beyond May 23.  Anent prior publication or disclosure, the information in the Hegseth declaration is not publicly available.

---

[11] The movants' argument is meritless.  The motion itself explains the basis of the ruling:  protecting "highly sensitive information concerning topics of national security."  (D. 131); *see Kravetz*, 706 F.3d at 60 ("Often . . . the court's justification for sealing may be inferred from the substance of the parties' motions.").  The motion further explains that "[t]he disclosure of the sensitive details in th[e] declaration would adversely affect the interests of the United States."  (D. 131).

## V. <u>DISCUSSION</u>

### A. <u>Intervention</u>

The movants seek to intervene for the limited purpose of obtaining access to the subject records. For the following reasons, permissive intervention under Federal Rule of Civil Procedure 24(b) is warranted.

The "court's discretion to grant or deny motions for permissive intervention is very broad." *T-Mobile Ne. LLC v. Town of Barnstable*, 969 F.3d 33, 42 (1st Cir. 2020). In exercising that "discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). The "'delay or prejudice' standard referenced in Rule 24(b) captures 'all the possible drawbacks of piling on parties.'" *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 308 F.R.D. 39, 52 (D. Mass. 2015) (quoting *Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 782 (D.C. Cir. 1997), in parenthetical).

Here, the circumstances do not invoke any delay or prejudice because the intervention is limited to a single issue: unsealing the subject records. Moreover, neither the defendants nor the named plaintiffs object to intervention as delaying or prejudicing the adjudication of their rights. In fact, the named plaintiffs do not oppose the motion. (D. 167). Similarly, the defendants do

not take a position regarding intervention. Accordingly, as noted, intervention is appropriate.

**B.  Common Law Right Of Access**

  **1.  Judicial Records**

As noted, the common law presumption of access applies only to judicial records. Hence, the initial determination is whether Charles' redacted transcript and the Hegseth affidavit constitute judicial records. They do.

As stated previously, "relevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies." *Standard Fin. Mgmt.*, 830 F.2d at 409; *see In re Boston Herald*, 321 F.3d at 189 (citation omitted); *accord Nargol,* 69 F.4th at 15. Notably, Charles presented his testimony as part of an adjudicatory proceeding. Specifically, the court was hearing evidence to decide whether the defendants violated the preliminary injunction and, if so, the nature of the remedy to rectify the violation.

Further, his redacted testimony is relevant to the defendants' violation of the preliminary injunction and the appropriate remedy to rectify the violation. To provide one of several examples, given the timeline recounted by Charles, it is less probable that the defendants provided the six class members meaningful notice and opportunity to raise fear-based claims prior

to their being boarded on the plane to a third country.  Per the foregoing, the redacted portion of Charles' testimony in the transcript constitutes a judicial record to which the common law presumption applies.

As to the Hegseth declaration, it too was presented in the course of adjudicatory proceedings, namely, the reconsideration of three orders material to key issues in this case.  Further, the declaration is relevant primarily to the order of maintaining custody and control of the aliens after their arrival in Djibouti. (D. 116).  In that regard, the substance of the declaration methodically explains the obstacles of holding the aliens at Camp Lemonnier after May 23.  Consequentially, the Hegseth declaration is a judicial record.

### 2.  <u>Balancing the Competing Interests</u>

As previously indicated, the court must now "weigh the presumptively paramount right of the public to know against the competing . . . interests at stake . . . 'in light of the relevant facts and circumstances of the particular case.'" *Standard Fin. Mgmt.*, 830 F.2d at 410 (citations omitted); *accord Kravetz*, 706 F.3d at 59 (citations omitted).  As earlier noted, "only the most compelling reasons can justify non-disclosure of judicial records." *Standard Fin. Mgmt.*, 830 F.2d at 410 (citation omitted). Moreover, where, as here, the government is a party, its involvement accentuates "the appropriateness of making court files

accessible." *Id.*  This is because "the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *Id.*  It is also appropriate to consider "the degree to which the subject matter is traditionally considered private rather than public." *In re Boston Herald*, 321 F.3d at 190 (quoting court's parenthetical of *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995)).

Examples of judicial records "to which courts ha[ve] denied public access" include "records used to gratify private spite or promote public scandal" and "business information that might harm a litigant's competitive standing."  *Kravetz*, 706 F.3d at 61 (internal ellipses and citations omitted).  Because the defendants "must carry the devoir of persuasion," *Standard Fin. Mgmt.*, 830 F.2d at 411, the court turns to the compelling reasons they espouse.  Those interests are protecting national security and foreign affairs as well as preventing disclosure of sensitive law enforcement information.

As to national security interests and protection of foreign affairs, "[t]he Government has a compelling interest in protecting both the secrecy of information important to [the country's] national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Snepp v. United States*, 444 U.S. 507, 510 n.3 (1980); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (noting,

albeit not in context of unsealing records, Court's recognition of government's "'compelling interest' in withholding national security information from unauthorized persons in the course of executive business"). Indeed, "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (citations omitted). Concomitantly, "[p]rotection of the foreign policy . . . . is a governmental interest of great importance . . . ." *Id*.

A.    <u>**The Hegseth Declaration**</u>

Turning to the Hegseth declaration, the balancing warrants keeping the seven-paragraph declaration sealed except for the first and second paragraphs.

To begin, paragraphs four through six of the declaration address matters affecting national security and the disclosure of those matters would negatively affect that interest. Concomitantly, a sealed declaration by Bryson Ellis, a Department of Defense official, correctly identifies four areas addressed in the Hegseth declaration that affect national security interests. (D. 189-2, ¶ 5).

Taking the four areas affecting national security interests in the order Ellis lists them in paragraph five, Hegseth addresses: the first area in paragraph four of his declaration; the second area in paragraph five (fourth sentence) of his declaration; the third area in paragraph four (third sentence) as well as in

paragraph five of his declaration; and the fourth area in paragraph six and in paragraph five (fifth sentence) of his declaration.[12] (D. 137, ¶¶ 4-6).  What is more, as the Deputy Assistant Secretary of Defense for African Affairs in the Office of the Under Secretary of Defense for Policy in the Department of Defense, Ellis' responsibilities include overseeing security cooperation in Africa.  (D. 189-1, ¶ 1).  Against the backdrop of that role, he articulates a severe and impactful risk that would result from releasing the Hegseth declaration to the public.  (D. 189-2, ¶ 5). Deferring to these assessments and finding them well-taken, the defendants have decidedly and unduly weighty national security interests that justify keeping private paragraphs four through six in the Hegseth affidavit.

The Hegseth declaration also addresses foreign policy interests, specifically in paragraphs three and seven.  (D. 137, ¶¶ 3, 7) (D. 189-2, ¶¶ 3-4).  Like the national security interests, the foreign policy interests are compelling and forceful, and they warrant continued nondisclosure.[13]

---

[12] The discussion above is somewhat general to avoid disclosing the substance of the Hegseth declaration because it will remain sealed.  *See United States v. Langford*, CR-08-CO-245-S, 2009 WL 10671719, at *4 (N.D. Ala. Aug. 14, 2009) (recognizing that "should a court say too much the very secrecy which the sealing was intended to preserve could be impaired").  The Ellis declaration is also sealed.

[13] This is not to suggest that continued non-disclosure is without an end date. *See Providence Journal*, 293 F.3d at 15 (stating four concerns about non-dissemination order, one of them being that "order contains no provision as to whether the court intends to unseal retained memoranda at some point after the trial has ended (and if so, when)").  At present, non-disclosure is appropriate

To elaborate, Ellis identifies two ways in which disclosure of the information in the Hegseth declaration might harm United States foreign policy interests. (D. 189-2, ¶ 3, lines 7-9). Further, the circumstances in the region, as Ellis notes, could exacerbate the negative impact of publicly releasing the information. (D. 189-2, ¶ 3, fifth sentence). Again, the court credits Ellis' logical position. Importantly, Hegseth details the significance of the subject of the foreign policy interest. (D. 137, ¶ 7). He also explains why the subject is critical to maintaining a beneficial relationship between the United States and Djibouti. And, he provides an example of negative consequences that may flow from acting inconsistently anent that subject. (D. 137, ¶ 7, fourth and fifth sentences).

Relatedly, the subject is generally withheld from public disclosure. (D. 189-2, ¶ 4). In that regard, a statute that Ellis cites, 10 U.S.C. § 130c, is customarily used to shield from disclosure the subject that Hegseth addresses, according to Ellis. (D. 189-2, ¶ 4) (D. 137, ¶¶ 3, 7); *see* 10 U.S.C. § 130c(b) (shielding sensitive information of foreign governments provided national security official makes certain determinations). As before, the court credits Ellis' position given the logic of his

---

up to the time of trial. To avoid intruding upon trial proceedings, the court defers to the trial judge anent whether continued nondisclosure of the subject records at trial is warranted.

reasoning.  Per the above, the defendants satisfy their burden of persuasion by a *wide* margin.

Against these well-founded and markedly weighty interests, the court balances the presumption in favor of public access to judicial records.  *See Nixon*, 435 U.S. at 602 (noting "on respondents' side is the presumption—however gauged—in favor of public access to judicial records").  Relative thereto, "[p]ublic access to judicial records and documents allows the citizenry to 'monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system.'"  *Standard Fin. Mgmt.*, 830 F.2d at 410 (citation omitted).  The government is also a party which gives rise to the public's right to know the actions of the executive branch and bolsters the public's right to inspect the Hegseth declaration.  *See id.*

It cannot be said, however, that unsealing is warranted in every case involving the common law presumption of public access and a government party.  Even putting this aside, the damage of disclosure cannot be understated.  It also bears repeating that the information in the Hegseth declaration has not been publicly disclosed.  On balance and per the foregoing, the presumptively paramount public right of access gives weigh, quite readily, to the paramount national security and foreign policy interests at stake.

Lastly, on a sentence-by-sentence basis, the court considered the possibility of redacting the Hegseth declaration. While most of the declaration shall remain sealed, the third sentence in paragraph two warrants disclosure. By way of explanation, the sentence purports to be a roadmap of the broader declaration by setting out the purpose of the declaration. It is not. Further, the sentence sets out wide and general categories of harm that the declaration does not develop. Further still, Ellis does not address the sentence by explaining its sensitivity as a matter of national security and/or foreign policy interests. Given the breadth of the categories of harm, this court also fails to see the damage posed by disclosing this sentence.

Likewise, as a whole, the first and second paragraphs are subject to disclosure. They do not convey anything involving national security or foreign policy interests. Rather, they identify Hegseth's position and make a routine assertion that Hegseth based his statements on personal knowledge and information available to him. They also point to the orders of the presiding judge as causing irreparable harm. Consequently, the first and second paragraphs shall not be redacted.

### B.  **Charles' Redacted Testimony**

Next, the common law right of access does not protect Charles' redacted testimony. As noted, the defendants bear the devoir of persuasion to show a compelling interest to justify nondisclosure.

*See Standard Fin. Mgmt.*, 830 F.2d at 411.  However, unlike their showing regarding the Hegseth declaration, they did not file any affidavits and did not address the substance of the redacted testimony.

To be sure, they allege that Charles' testimony contains sensitive national security, foreign affairs, and law enforcement information worthy of protection.  (D. 189, p. 11).  The defendants additionally note that unsealing "could put officers at risk," and, as support, cite a New York Times article about a July shooting of a police officer outside a Texas detention center.  (D. 189, p. 13 & n.2).  Relatedly, they maintain that the redactions go beyond a concern for an increase of protestors at locations operated by ICE.  Nonetheless, their argument fails to persuade.

First and foremost, the defendants offer little, if any, detail about why the subjects of Charles' redacted testimony (the departure airport, the amount of time to travel from PIDC to the two presumed departure airports, the location of the plane, the planned destinations for the aliens, characteristics of the aliens' cells at PIDC, the flight as chartered, the time of arrival at an airport for these types of transfers, and the existence of a standard data field anent the native language of aliens in ICE's computer systems), should remain sealed.  In fact, the defendants

do not mention any of these subjects.[14]    *See generally Standard Fin. Mgmt.*, 830 F.3d at 412 (noting, albeit in context of ability to show harm after defendants disclosed financial documents to plaintiff, that they only made a "broad generalization" and "filed no affidavits" and "offered no meaningful details" regarding harm caused by disclosing the documents thus failing to overcome "presumption of public accessibility").

Moreover, the argument is not adequately developed. As well, the defendants could have developed the argument under seal, if necessary. The argument is therefore waived. *See Duval v. United States Dept. of Veterans Affairs*, 69 F.4th 37, 45 n.5 (1st Cir. 2023) (deeming "argument waived for lack of development"); *United*

---

[14] The defendants' reliance on a statement in *Fitzgibbon v. C.I.A.*, 911 F.2d 755, 762 (D.C. Cir. 1990) ("It is not the province of the judiciary . . . to determine whether a source or method should be (or should not be) disclosed."), is unconvincing. First, *Fitzgibbon* addressed an exemption, albeit for intelligence sources and intelligence methods, under the Freedom of Information Act as opposed to unsealing purportedly sensitive information. Second, in *Fitzgibbon*, unlike here, the high ranking government official (the Director of Central Intelligence) attested to the risks posed by disclosure:

> Six foreign intelligence services are directly involved, including services of both allied and non-allied countries . . . Disclosure would significantly reduce the quantity of substantive intelligence information provided to this Agency inasmuch as other nations will not entrust their most sensitive secrets to an organization unable to protect them. The loss of the information and assistance that these services provide to the United States would substantially damage United States security interests.

*Id.* at 762-763 (reversing court's prior disclosure order and sealing the information) (internal brackets omitted). Here, there is no attestation or declaration by a government official regarding the disclosure of the subject(s) of the redacted testimony as harmful. Rather, there are only broad allegations of harm to national security, foreign affairs, and law enforcement information worthy of protection.

States v. Freitas, 904 F.3d 11, 21 (1st Cir. 2018) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))). In any event, cognizant of the substance of the redacted testimony, disclosing the testimony would not impactfully put officers at risk.

In sum, exercising the court's discretion, see In re Gitto Global Corp., 422 F.3d 1, 6 (1st Cir. 2005), the defendants do not satisfy their burden of showing a compelling interest that outweighs the presumption favoring public access. Accordingly, Charles' redacted testimony shall be filed on the public docket.

## C.  <u>First Amendment Right of Access</u>

With Charles' redacted testimony subject to production and the Hegseth declaration withheld under the common law right of access, the matter reduces to whether the First Amendment right of access compels production of the Hegseth declaration. Three, independent reasons establish that it does not.

First, as pointed out and emphasized by the movants and the defendants, the "public right of access to materials considered in *rulings* on *dispositive* pretrial motions" is "a position at the *farthest* reaches of the *first amendment right* to attend judicial proceedings."[15] *Anderson*, 805 F.2d at 8 (emphasis added) (citing

---

[15] The movants argue that the sealed records relate to a dispositive motion to which the First Amendment applies whereas the defendants disagree. (D. 163, p. 10) (D. 189, p. 6).

*In the Matter of Cont'l Ill. Secs. Litig.,* 732 F.2d 1302 (7th Cir. 1984), and *Joy v. North,* 692 F.2d 880 (2d Cir. 1982)).   A preliminary injunction motion is not a "dispositive" motion as that term is employed in *Anderson*.[16]   *See In re Nat'l Sec. Agency Telecomms. Records Litig.*, MDL Docket No. 06-1791 VRW, 2007 WL 549854, at *1 (N.D. Cal. Feb. 20, 2007) (concluding that preliminary injunction motion is not dispositive).  As reasoned in *National Security*, albeit in discounting a party's reliance on a Ninth Circuit case,[17] a preliminary injunction motion *considers* the merits whereas a summary judgment motion *adjudicates* the parties' substantive rights and serves as a substitute for trial.  *See id.* at *3-4.  The court fully concurs with the distinction that a ruling on a preliminary injunction considers the merits but does not decide the merits.   Put differently, a summary judgment adjudication rules on the merits of a claim.   In contrast, a preliminary injunction adjudication considers the likelihood of success on a claim.

Bolstering the distinction are the two cases in *Anderson*. Both cases "recognized a right of access to reports considered by

---

[16] To be clear, the defendants filed the Hegseth declaration to support a motion to reconsider the defendants' violation of the preliminary injunction rather than in opposition to a motion for a preliminary injunction.  The distinction between a preliminary injunction motion (or opposition thereto) and a motion to reconsider a violation of a preliminary injunction is not impactful.

[17] *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172 (9th Cir. 2006).

a court in ruling on pretrial motions that were dispositive of the litigants' substantive rights." *Id.* at 11 (citing *Continental Illinois*, 732 F.2d at 1308-10, and *Joy*, 692 F.2d at 893). Tellingly, *Joy* involved the entry of summary judgment and *Continental Illinois* involved an agreed dismissal of the case "that had the same practical effect as a partial summary judgment." *Id.*

The second independent reason is that "neither [the First Circuit] nor the Supreme Court has recognized any right under the First Amendment to access documents filed in civil cases." *Courthouse News Servs. v. Quinlan*, 32 F.4th 15, 20 (1st Cir. 2022). Lacking such recognition, the First Amendment does not compel production of the Hegseth declaration in this civil case. That said, the parties in *Courthouse News* nevertheless agreed and the court therefore examined the First Amendment's right of "the public to access newly filed complaints" on the state court's electronic system.[18] *Id.* Hence, the court's pronouncement anent the failure to recognize the First Amendment right of access to documents in civil cases carries less force.

Third, even assuming that the complementary considerations of history and logic yield affirmative answers, there are overriding interests (protecting national security and foreign policy interests) that are narrowly tailored to serve these interests.

---

[18] That system delayed immediate access to newly filed civil complaints "until after court clerks process[ed] them." *Id.* at 17.

To begin, these two interests provide a basis to establish an overriding interest.[19]  *See Cent. Intel. Serv. v. Sims*, 471 U.S. 159, 175 (1985) (noting compelling interest in protecting information important to national security and "appearance of confidentiality" essential to effective operation of "foreign intelligence service") (citations omitted); *Haig,* 453 U.S. at 307 (emphasizing importance of nation's security as paramount) (citations omitted).  For the reasons stated in the first five paragraphs in section V(B)(2)(A) above, the national security interest and the protection of foreign policy are well-founded and markedly weighty interests when applied to the Hegseth declaration.[20]  Moreover, the damage that would result from the disclosure of the information related to national security and foreign policy interests, per Ellis' declaration, cannot be understated.  Each interest therefore amounts to an overriding interest vis-à-vis the First Amendment's qualified right of access to the Hegseth declaration.

Next, the Hegseth declaration is narrowly tailored to serve the national security and foreign policy interests.  To be sure, redacting ordinarily provides a basis to narrowly tailor a

---

[19] The movants adhere to the overriding interest analysis and the defendants adhere to a similar compelling interest analysis.  They do not suggest, and therefore waive, an argument that a different First Amendment analysis applies. *See Duval v. United States Dept. of Veterans Affairs*, 69 F.4th 37, 45 n.5 (1st Cir. 2023).

[20] It is therefore not necessary to repeat the discussion of these reasons here.

document.  *See Providence Journal*, 293 F.3d at 15 (finding "refusal to consider redaction . . . insupportable" and noting "[c]ourts have an obligation to consider all reasonable alternatives to foreclosing the constitutional right of access").  In that vein, as discussed previously, the first and second paragraphs of the Hegseth declaration are subject to disclosure.  Otherwise, redaction of paragraphs three through seven is not feasible.  To explain, these paragraphs are replete with information regarding national security and foreign policy interests, as ably outlined by Ellis and discussed above.  Having reviewed *each* sentence in paragraphs three through seven, any failure to redact would disclose information regarding national security or foreign policy interests.

As a final matter, and in support of nondisclosure of the sealed records, the defendants point out that the court entered a protective order.  (D. 189) (identifying docket entry 157 as the protective order).  Further, if the parties exchanged "the information sought by [the movants]," i.e., the sealed records, during discovery, it would be protected under that protective order, according to the defendants.  The docket entry they cite as the protective order (D. 157), however, is not a protective order.  Rather, it is an order that adopts a stipulation to *withdraw* a pending motion to enter a protective order pertaining to certain

discovery requests.  (D. 157).  Thus, to state the obvious, the defendants' argument is not well-taken.

**VI.**  **CONCLUSION**

In accordance with the foregoing discussion, the motion to intervene and unseal court records (D. 159) is **ALLOWED** as to intervention and **ALLOWED** in part and **DENIED** in part as to unsealing the subject records.

        /s/ Donald L. Cabell        
DONALD L. CABELL, U.S.M.J.

DATED:  November 7, 2025