## DECLARATION OF MIA UNGER

I, Mia Unger, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney licensed to practice in the State of New York, the Southern District of New York, and the Second Circuit Court of Appeals. My business address is 111 Livingston St., 11th Fl., Brooklyn, NY 11201. I have been employed as a Staff Attorney at The Legal Aid Society since 2014. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have worked in immigration law for approximately 15 years. I have worked full-time as an immigration attorney with the Legal Aid Society since September 2014. I have represented hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and in applications and petitions for immigration benefits or relief before U.S. Citizenship and Immigration Services (USCIS). In December 2024, I transitioned out of the Immigration Law Unit of the Legal Aid Society's Civil Practice and into the Immigrant Justice Team of the Legal Aid Society's Criminal Defense Practice.

3. I represent OE, who came to the United States from Jamaica on an immigrant visa as a child nearly 50 years ago. He lived as a lawful permanent resident in the United States for many years but was ordered removed in 2009 because of his criminal record. OE completed his sentence and was released on parole in 2021. U.S. Immigration and Customs Enforcement (ICE) did not deport him. Instead, ICE required him to report under an Order of Supervision, which he complied with until he was taken into ICE custody earlier this year. OE was deported from the United States on July 14, 2025. He was deported to the Kingdom of Eswatini, a country with which he had no ties, despite holding a valid passport from Jamaica, his country of birth.

4. I was contacted by the New York-based family of OE in mid-July, after he disappeared from the ICE Online Detainee Locator on July 14, 2025, and his family stopped hearing from him. I signed a retainer with OE's son on July 22, 2025 and began representing the family to support them in locating OE and seeking his repatriation to Jamaica, his country of birth and the country from which he had a valid passport.

5. OE's family and I suspected OE was in Eswatini because of a post on X by U.S. Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin dated July 15, 2025, with his photograph. However, OE never told his family where he was being sent and did not call them from Eswatini until August 1, 2025, the day after a habeas corpus petition was filed in the High Court of Eswatini on behalf of OE and the four other men deported to Eswatini from the United States. OE's family was very distraught since the time he disappeared from the Online Detainee Locator, and particularly during the two and a half weeks before his first phone call. I remember a conversation with OE's son and aunt when they told me they didn't know if he was alive or dead.

EXHIBIT D

6. I made several efforts to contact the Eswatini and U.S. governments to request confirmation that OE was in Eswatini, get information about him, and request communication with him. For example, on July 25, 2025, I called and emailed the Ministry of Justice in Eswatini, but I could not reach anyone, and my email was returned as undeliverable. On July 25, 2025, I also called and emailed the Eswatini Embassy in the United States and was told that my request and contact information would be forwarded to the Capital, but I never heard back. On July 29, 2025, I spoke with Carly Van Orman, a Spokesperson and Public Affairs Officer for the U.S. embassy in Eswatini. She took my name and contact information and said she would forward it to the relevant people, however I never heard back from anyone in the U.S. or Eswatini governments.

7. Throughout the course of OE's time in Eswatini, I was in regular contact with the Jamaican Embassy in Washington, D.C. and I knew that representatives of the Jamaican government at the embassies in the United States and in South Africa were working towards OE's repatriation.

8. I was in communication with two attorneys in Eswatini who tried to visit OE and the other four men deported with him at the Matsapha Correctional Complex in Eswatini, where various international news articles said they were being held. The first attorney was an American living in Eswatini and his request to meet with men was denied. The second attorney was Sibusiso Magnificent Nhlabatsi, an Eswatini attorney whose request to meet with the men was also denied multiple times. Along with the U.S.-based attorneys for the other men, I asked Mr. Nhlabatsi to file a petition for habeas corpus with the High Court of Eswatini seeking access to the five men on July 31, 2025.

9. As noted above, the day after the habeas petition was filed, OE was allowed his first phone call to his family. The call occurred via video on WhatsApp. Over the course of the next few weeks, OE called his family multiple times, at unpredictable days and hours. The family told me the calls were short and were not private. The prison guards could be seen in the background. Through these calls, OE's family learned that OE was not eating well and was losing weight.

10. During their calls, OE's family gave him my name and phone number as well as the name and phone number of Mr. Nhlabatsi, the attorney we were partnering with in Eswatini. However, OE was not allowed to call me or Mr. Nhlabatsi. I only spoke to OE once while he was in Eswatini. On September 5, 2025, the International Organization for Migration (IOM) allowed him to call his family, and he used the opportunity to call me without telling them he was calling his lawyer. He told me that the Eswatini prison guards would not allow him to call me.

11. The Eswatini government opposed the habeas petition filed by Mr. Nhlabatsi. It claimed that OE and the four other men refused to meet with Mr. Nhlabatsi. However, I asked OE's family to ask him if he was told Mr. Nhlabatsi was there to meet with him, and OE told his family that he was never told about any attorney visitor. Since his repatriation, OE has also told me that he was never told about any attorney visitor.

12. I sent multiple emails to various people at IOM in the month of September 2025 because I knew IOM was working on coordinating OE's repatriation. The only person who responded to me was Frantz Celestin, Regional Director for IOM East. Mr. Celestin said he could not discuss OE's case with me without "a formal request" from OE or a power of attorney. I explained that it was impossible to get - under the circumstances where OE was being denied access to counsel.

13. OE left Eswatini on September 21, 2025, and was repatriated to Jamaica on September 22, 2025, with the assistance of IOM. He entered Jamaica using the same passport he had throughout his time in ICE custody and throughout his deportation to Eswatini.

14. Since OE's repatriation to Jamaica, we speak regularly, and I have learned more about his deportation to Eswatini. The paragraphs that follow are what I have learned from OE through our conversations over the past few weeks. I write this declaration in lieu of OE because he has had limited access to technology, particularly in the aftermath of Hurricane Melissa.

15. On or about March 14, 2025, OE reported to ICE in New York City under his longstanding Order of Supervision and was asked to obtain a Jamaican passport and return in June. On or about June 12, 2025, OE reported to ICE with a Jamaican passport and was taken into ICE custody, where he remained for about a month, moving between New York, Louisiana, and Texas.

16. On or about June 26, 2025, while in ICE custody in Louisiana, OE was put in a holding cell with many other Jamaican men, which they presumed meant they were about to be deported to Jamaica. After several hours, all the men were called to leave the cell except for OE. An officer showed OE a paper with a list of names, and OE saw that his name was there, but was crossed out. He returned to his dormitory, but the other Jamaican men from the holding cell did not. Eventually, he was transferred to El Paso, TX.

17. On July 14, 2025, OE was taken from the El Paso Processing Center and put on a plane with four other men of different nationalities. There were also Special Response Team (SRT) officers on the flight, but they did not tell OE where he was going. The first flight, on a private jet, made one stop to refuel and eventually landed after several more hours. OE overheard an officer say they were in Djibouti. In Djibouti, he was put on a second plane, this time a military aircraft, with the same four men who had been deported from the United States, the same SRT officers, and also many uniformed military officers. No one told him where he was going, until the second flight was close to landing in Eswatini on or about July 16, at which point one of the SRT officers said where the plane was landing. OE didn't recognize the name and it was loud on the military aircraft, but he said he realized later that he had said "Eswatini." An SRT officer asked OE to sign some paperwork, but he refused. After landing, one of the Eswatini officers said they were in Uganda. The following day, an officer at the prison confirmed that OE was in Eswatini.

18. OE had no prior connection to Eswatini. He was not aware of conditions in Eswatini.

3

19. OE was held in a maximum-security prison in Eswatini for nine-and-a-half weeks. OE was not told why he was sent to Eswatini or why he was imprisoned. He was never charged with any crime in Eswatini. His mental and physical health suffered during his time there. For example, he was depressed, anxious, and hopeless, and lost a significant amount of weight.

20. During his time in detention in Eswatini, OE was denied access to legal counsel. He repeatedly asked to call me and Mr. Nhlabatsi, but the prison guards said no. On at least one occasion, the Officer-in-Charge said he would have to get permission from the U.S. Embassy for him to call me. As noted above, the only call OE ever made to me from Eswatini was when IOM gave him a private call to his family and he called me instead, unbeknownst to them.

21. The High Court of Eswatini granted the habeas petition on October 3, 2025, after OE had already left Eswatini (the four other men deported with him from the United States remain there). However, the Eswatini government appealed, and the decision was stayed.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 14th day of November 2025 in Brooklyn, New York.

_____
Mia Unger