## DECLARATION OF DERRICK J. HENSLEY

I, Derrick J. Hensley, make the following declaration based on my personal knowledge, and declare under the penalty of perjury under the laws of the United States, and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am an attorney practicing law in Hillsborough, North Carolina. I have practiced immigration law as a part of my practice since 2012, representing hundreds of noncitizens in matters with the U.S. Citizenship and Immigration Services, removal proceedings before the Executive Office for Immigration Review (EOIR), consular processing with the U.S. Department of State, and in the federal courts.

2. I began representing V.B., a citizen of El Salvador on July 22, 2025, on a *pro bono* basis via a referral from the American Bar Association hotline set up at Naval Station Guantánamo Bay. We established and maintained our attorney-client relationship by phone. I make this declaration based on my phone conversations with V.B. while he was in Guantánamo, as well as based on my communications with him since his deportation to México in September 2025.

3. Proceeding *pro se* in removal proceedings, in March 2025, V.B. won protection under the Convention Against Torture (CAT) from El Salvador. His claim was based having been repeatedly framed and falsely charged as a gangster by Salvadoran police and enduring years of unlawful imprisonment and torture in jail. V.B.'s innocence of the charges for which he was jailed in El Salvador and proven lack of gang affiliation were established in removal proceedings and were factors that lead the immigration judge (IJ) to grant him CAT protection.

4. At the conclusion of the removal hearing, the IJ explained that the reason she could not grant him asylum was due to due to the Circumvention of Lawful Pathways rule, which barred her from granting asylum because V.B. did not use the CBPOne App to schedule his entry. The IJ further explained that V.B. could expect to be released promptly, as he had received CAT protection. V.B. verbally waived appeal. Nevertheless, instead of releasing V.B., the Department of Homeland Security (DHS) maintained V.B. in custody under their then-quite-new 3rd-country removal protocols.

5. V.B. remained at Port Isabel Detention Center in south Texas until he was transferred to Guantánamo Bay Naval Station - JTF Camp 6, around June 2025. That coincided with a bulletin posted to the DHS' website listing him as among "the Worst of the Worst" that falsely claimed that he had committed crimes. Not only had V.B. been exonerated of, or in one case had expunged, all crimes in El Salvador, the crimes listed on the DHS bulletin were not even the

1

EXHIBIT I

same crimes.

6. To the best of my knowledge and belief, during V.B.'s time in Guantánamo, he was never provided with either written or verbal notice of DHS' intention to deport him to a third country. As his attorney, I wrote letters and emails, and left voicemails, seeking to contact his deportation officer or anyone making arrangements to deport him. I never received a response from anyone at the Department of Defense or DHS about his case except the bare minimum replies by email at the court-ordered Legal.GTMO email address that had been set up, and that email address only responded about the limited themes of handling documents that I had sent him or scheduling calls with him.

7. Because nobody would tell either of us what countries they were actually considering, we broadly discussed some of the more 'plausible' options, as we could not cover in depth all of the countries in the world. After I began discussing different countries with V.B., he articulated which countries to which he was afraid of being deported. Some countries that were being discussed in the media or rumored around the base were countries about which he knew nothing, not even the name (for example, Eswatini and South Sudan). So for some of those countries, I attempted to inform him, doing some research on my own about countries of which I myself was unfamiliar.

8. Based on our preliminary discussions, I submitted to DHS a list of countries to which he was afraid to be deported and countries that he would agree to be deported. I asked DHS to notify me before attempting to effectuate any removal, and to provide V.B. with fear interview before his removal to any country to had not agreed to be deported. I also asked what information about V.B. would be provided to the receiving foreign government, and what assurances about his treatment the foreign government had provided.

9. Because I knew from other attorneys that México remained a common destination for removals, we specifically discussed México. V.B. was afraid of being deported to México because of fear of the cartels, likelihood of refoulement to El Salvador, and other concerns he had based on his experiences transiting the country twice on his way to the USA. V.B. knew that the Mexican government frequently mistreated Central American migrants like him, extorted them, deported them without process, or else worked with the cartels and other bad actors to traffic migrants into labor or sexually abuse them. Of all the third countries we discussed, V.B. was the most afraid of being sent to México.

10. Aware of the March 30 Memorandum about third-country removals, I informed V.B. that my articulations of fear would probably not be deemed sufficient by DHS and that the burden would stay on him to voice his objections before he

would be removed.

11. As time dragged on, with no responses or apparent movement, on September 12, 2025, I filed a Petition for a Writ of *Habeas Corpus* with the U.S. District Court for the District Court of Columbia, seeking to have V.B. released from his excessive detention because we had no reason to believe that his removal was imminent. The case number was 1:25-cv-03136-AHA. We also asked that DHS communicate with us and provide V.B. a process that comported with the law and Constitution before any third country removal.

12. Out of the blue and with no advanced notice to anyone, on or about September 21, 2025, agents at JTF Camp 6, took V.B. to a room known for administering punishments, and held him there for about three hours. Later, they transported him to the airstrip. V.B. was shackled at the hands, feet, and waist. V.B. was put on a flight to Arizona. At the time, he had no idea of why he was being flown or his ultimate destination.

13. V.B. asked repeatedly for information on his destination but was refused any information during the trip. Only after V.B.'s arrival in Florence, Arizona, was he informed of where he was, and then he was informed of DHS' intention to remove him to México. V.B. had been travelling all day in chains and was exhausted.

14. The V.B. expressed fear of going to México and was separated from the rest of the group. Overnight into the wee hours, he was approached more times by officers, and each time he reiterated his fear of México, but they did not refer him for a fear interview with an asylum officer. Instead, the officers threatened him in various ways, including threats to cover his head or blindfold him, beat him, and tear gas him. They also threatened criminal charges for resisting deportation and threatened that he would be sent to a criminal prison in México if he did not walk himself to the bus. V.B. was also told that he simply had no choice but to go because of an order from the U.S. President.

15. V.B. never signed anything agreeing to a removal to México, he was not provided any paperwork about the removal to México, and never at any point verbally agreed to go to México. The only thing V.B. did was, in response to the threats, walk to the bus, rather than suffer further threats and abuse or otherwise be physically forced to the bus. This was some hours before dawn, and they drove to the border once they had him onboard.

16. Early in the morning, DHS deported V.B. to México, a country to which he had no prior connection by family, law, or affinity. He was placed in the custody of the Mexican government, believed to be the INM (Instituto Nacional de Migración).

17. Mexican officials drove him an estimated 33-hours by bus to Villahermosa, Tabasco State, México. The bus only stopped twice to change drivers. The conditions were deleterious due to the bathroom odors. V.B. explained to the guards that he had been granted CAT protection, but they told him he would likely be deported to El Salvador anyway.

18. I found out about V.B.'s deportation on Monday, September 22, 2025, at which point he was just beginning his bus ride southward. We had concerns early in the day because the online ICE Detainee Locator had changed to state that he was not in custody. We made several phone calls – to no avail – but did receive a response from the Legal.GTMO email address confirming that he had been removed earlier that day.

19. I attempted to connect with advocacy and civil society organizations to provide V.B. with potential recourse and try to prevent any potential refoulement to El Salvador.

20. When the bus arrived in Villahermosa, V.B. was detained by the INM. V.B. stated again to those agents that he had CAT protection and feared the Salvadoran government, which had tortured him and would torture him again. Nevertheless, Mexican officials contacted the Salvadoran consulate. V.B. was brought to speak with members of the Salvadoran consulate, and they asked him if he wanted to return to El Salvador, and he answered no.

21. The INM agents stated their intent to deport V.B. to El Salvador; they informed him of a purported agreement between Presidents Sheinbaum (of México) and Trump as to why he had to be sent back to his home country.

22. On September 26, 2025, I filed an Emergency Motion for Temporary Restraining Order and for Issuance of Order to Show Cause. On September 29, 2025, the TRO was denied based on lack of jurisdiction because V.B. was in México and no longer in U.S. custody.

23. On or about September 25, 2025, the nonprofit organization, *Al Otro Lado*, which I had contacted to ask for assistance, took action. By and through attorneys in México City, they filed a civil rights lawsuit called an "*Amparo*" on behalf of V.B., seeking to stop his imminent deportation, in the Tabasco State's Federal Court. Upon information and belief, that *Amparo* lawsuit remains pending, and provides him temporary protection from deportation to El Salvador pending resolution.

24. On September 27, 2025, INM agents released V.B. onto the streets of Villahermosa.

25. V.B. was scared and faced grave difficulties in meeting his basic needs. Thankfully, his fiancée in the United States has been able to send him money so that he could get a phone, food, and a place to sleep. But the dangers for him in Villahermosa are grave.

26. V.B. then also sought assistance from another nonprofit, Asylum Access México, in assisting him with protecting himself from further deportation to El Salvador by applying for Asylum. When he later went to file his case, the officials mocked him and told him what a great president he had in President Nayib Bukele of El Salvador.

27. On Sunday, October 12, there was a shooting in front of the hotel where V.B. was staying, which was filled with many other migrants. A migrant was shot by the gunmen, and an apparent bystander was also hit. The police came and had everyone leave the hotel.

28. At first, the police threatened to call immigration to detain or deport them all; however, instead, they took V.B.'s phone and money. V.B. was too scared to make a report or try to get his possessions back from the police. Again, left with absolutely no money or means of communication, he slept on the floor of someone else's room in another hotel.

29. V.B. obtained another cell phone with money provided by his fiancée and called me on October 13. He told me he is trying to lay low because the area of Tabasco he is in is extremely dangerous, but that is the only place in the country he knows and travel is also dangerous and risks losing his connections to pursue asylum and avoid refoulement to El Salvador. It is an untenable situation.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this the 10th day of November 2025 at México City, México.

Derrick J. Hensley, Esq.