# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G.,<br><br>  Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY;<br>Kristi NOEM, Secretary, U.S. Department of<br>Homeland Security, in her official capacity; Pamela<br>BONDI, U.S. Attorney General, in her official<br>capacity; and Antone MONIZ, Superintendent,<br>Plymouth County Correctional Facility, in his official<br>capacity,<br><br>  Defendants. | Civil Action No. 25-cv-10676-BEM |

# PLAINTIFFS' REPLY IN SUPPORT OF PARTIAL SUMMARY JUDGMENT
# AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

The Court should grant partial summary judgment for Plaintiffs, and nothing in Defendants' response compels otherwise. Plaintiffs have statutory, regulatory, and constitutional rights to meaningful notice and opportunity to present a fear-based claim prior to any third-country removal. Defendants' third-country removal policy, as embodied by their memoranda issued March 30, 2025, entitled "Guidance Regarding Third Country Removals" (March 30 Memo) and July 9, 2025 (July 9 Guidance), is inconsistent with these rights and deprives Plaintiffs of the rights and protections to which they are entitled. The Court has jurisdiction to review Defendants' policy, including whether the process and provision regarding diplomatic assurances, on their face, satisfy due process and statutory mandates. They do not.

Defendants' policy, on its face and in practice, does not provide meaningful notice and an opportunity to be heard. Defendants' contrived reading of 8 U.S.C. § 1231(b) violates the plain language of the applicable statutes and Supreme Court precedent. Plaintiffs therefore request that the Court declare Plaintiffs' rights and enter a final judgment as to Counts I, III, and IV in their favor and set aside Defendants' third-country-removal policy under the Administrative Procedure Act (APA) as detailed in Plaintiffs' motion, Dkt. 193, and proposed order, Dkt. 193-1.

The Court also should deny Defendants' motion to dismiss Counts I-IV for lack of jurisdiction. Their motion recycles previously rejected arguments that 8 U.S.C. § 1252 and the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) bar judicial review, and no intervening case law undermines this Court's prior holdings. In addition, the Court should reject Defendants' effort to dismiss Plaintiffs' re-detention and Freedom of Information Act (FOIA) claims (Counts V and VI) because they present valid legal challenges to the February 18, 2025, Directive, the March 30 Memo, and the July 9 Guidance upon which this Court can grant relief.

## II.    STANDARD OF REVIEW

Plaintiffs previously set forth the summary judgment review standard. *See* Dkt. 194 at 8. As to evidence on summary judgment, courts "have great flexibility" and "may consider any material that would be admissible or usable at trial." *Asociación de Periodistas de Puerto Rico v. Mueller,* 680 F.3d 70, 78 (1st Cir. 2012) (citation modified). "Where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits— may properly address those issues." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 n.1 (7th Cir. 1996) (quotation omitted); *see also Alifax Holding Spa v. Alcor Scientific Inc.*, No. 14-440 S, 2018 WL 11371589, at *2 (D.R.I. Oct. 16, 2028) (agreeing and citing cases).

In reviewing a motion to dismiss under Rules 12(b)(1) and (6), courts "accept[] as true all well-pleaded facts, analyz[e] those facts in the light most hospitable to the plaintiff's theory, and draw[] all reasonable inferences for the plaintiff." *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383-84 (1st Cir. 2011); *see also Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995). Where, as here, a defendant launches a factual jurisdictional attack under Rule 12(b)(1),[1] a court instead "weigh[s] the evidence and satisf[ies] itself as to the existence of its power to hear the case." *Toddle Inn Franchising, LLC v. KPJ Assocs., LLC*, 8 F.4th 56, 61 n.5 (1st Cir. 2021) (citation omitted). Then, the court "enjoys broad authority" to "consider extrinsic

---

[1]    *See*, *e.g.*, Dkt. 231 at 12 (contesting Plaintiffs' factual claims by asserting that a noncitizen "knows to which specific countries they fear removal;" "can [] move to reopen their proceedings to seek protection from removal to additional countries at any time;" "can assert fear of removal to any country at any time;" "can make [a third-country fear claim] through the administrative process;" and "know[s] this process is available"); *id.* at 14 ("CAT claims . . . can be raised in the administrative process"); *id.* at 17 ("Plaintiffs essentially admit that if they were detained, their removal would be reasonably foreseeable"); (Plaintiff E.F.D. "has already received the relief requested in [Count V]").

evidence." *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

## III.    ARGUMENT

**A.    The Court Should Grant Plaintiffs' Partial Summary Judgment Motion.**

**1.    Plaintiffs' Claims Are Meritorious.**

**a.    Defendants' third-country-removal policy is not insulated from this Court's review.**

Defendants' primary defense of using blanket diplomatic assurances to conduct third-country removals is that this Court may not "second-guess" such assurances "in either substance or scope, given their 'foreign policy' ramifications." Dkt. 231 at 25 (quoting *Munaf v. Geren*, 553 U.S. 674, 702 (2008)). But neither case upon which they rely—*Munaf* nor *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009)—authorizes DHS's generalized assurance scheme. Unlike in those cases, the executive has not "determine[d]" that any country will not torture a *particular* person, so whether such a determination would be "conclusive" is not at issue. Dkt. 231 at 25. Plaintiffs challenge "the overall process and whether such [blanket] assurances, on their own terms, satisfy the Constitution," Dkt. 64 at 42, as well as the statutory and regulatory scheme.[2] Nothing in *Munaf* or *Kiyemba* forecloses this Court from conducting that inquiry.

*Munaf* involved the transfer of two criminal defendants within Iraq for prosecution, reasoning that "[t]hose who commit crimes within a sovereign's territory may be transferred to that sovereign's government for prosecution." 553 U.S. at 700. This posture matters because the well-established principle that a "sovereign nation has exclusive jurisdiction to punish offenses

---

[2]    For this reason, Defendants' argument that Plaintiffs are improperly casting a substantive due process argument as a procedural one, Dkt. 231 at 26, misses the mark. Plaintiffs do not challenge the substance of any specific diplomatic assurance; rather, they focus on the process employed by Defendants in effectuating third-country removals—including the process where a diplomatic assurance has been offered—as violating the law.

against its laws committed within its borders" necessarily requires that "exemptions from [such] territorial jurisdiction" be agreed upon following sensitive foreign policy discussions between sovereigns. *Id.* at 701 (citation omitted). Plaintiffs are not similarly situated.[3] *Kiyemba*, for its part, addressed *individualized* diplomatic assurances after an assessment of "whether a particular country is likely to torture a particular detainee." 561 F.3d at 514; *cf. id.* at 519 (Kavanaugh, J., concurring) (noting that "more fundamentally, this is a case involving transfer of wartime [noncitizen] detainees"). Neither decision even contemplates the use of categorical diplomatic assurances in immigration cases.

Defendants rely on *Munaf* to argue that "[t]he decision that a foreign government's categorical assurance against torture is sufficient to be accepted for all [noncitizens] is itself a 'foreign policy' judgment the Judiciary 'is not suited' to question." Dkt. 231 at 26 (quoting 553 U.S. at 702). But the record supports Plaintiffs' challenge to Defendants' use of diplomatic assurances and demonstrates they do not comply with the law. These "assurances" have robbed class members of the ability to hold DHS to its obligation to first attempt to remove them to their designated country before any third-country removal. *See, e.g.*, John Eligon, *Jamaican Citizen Deported to African Prison by U.S. Returns Home*, New York Times (Sept. 23, 2025); *Mexico Accepts Return of Man Deported to South Sudan from US*, Al Jazeera (Sept. 6, 2025); Ximena Bustillo, *The White House is Deporting People to Countries They're Not From. Why?* NPR (June 1, 2025).[4] Assurances have not protected class members against chain refoulement. *See* Dkt. 216-1 at 3-4; *accord* Dkt. 132.[5]

---

[3]     *Munaf* expressly declined to address FARRA because the petitioner did not raise a FARRA claim in his petition and the issue had not been fully presented. 553 U.S. at 703 & n.6.
[4]     *See also* Exh. F ¶¶ 3-15; Exh. E ¶¶ 6, 12; Dkt. 99-2 ¶ 4.
[5]     *See* Exh. G ¶¶ 9-12 & Atts.; Exh. H ¶¶ 12-13; Exh. I ¶12; Exh. K ¶¶ 7-9; Exh. S ¶¶ 4, 7; Exh. T ¶ 7; Exh. L ¶¶ 20-21, 23.

Defendants also err in asserting that the CAT regulation does not require individualized assurances. Dkt. 231 at 26 n.4. The regulation addresses how "*an* alien" would be treated if "*the* alien were removed to" a given country, 8 C.F.R. § 1208.18(c)(1) (emphasis added); *see also* Dkt. 64 at 42-43. Notably, it does not authorize even individualized assurances with respect to withholding of removal; it addresses only CAT claims. Defendants do not provide any basis for, or even attempt to defend, using diplomatic assurances in the withholding context. And with respect to CAT, Defendants fail to explain how their practice does not violate the regulation which instructs that "the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable." 8 C.F.R. § 1208.18(c)(2). The regulations do not permit the Attorney General to abdicate all responsibility as to diplomatic assurances forwarded by the Secretary of State. Moreover, Defendants' protestation that the Immigration and Nationality Act (INA) contains provisions that "make the Executive's decisions conclusive and unreviewable" in some situations is inapposite. Dkt. 231 at 26. Plaintiffs' argument is that the law *requires* a hearing to adjudicate withholding and CAT claims, Dkt. 194 at 13-17.

That the Third Circuit found that 8 U.S.C. § 1252(a)(4) required a challenge to a CAT termination to be raised on a petition for review—not a habeas petition—does not undermine this Court's jurisdiction to review claims that Defendants' policies foreclose any meaningful possibility of applying for CAT, let alone seeking judicial review of any denied application. *See Khouzam v. Att'y Gen.*, 549 F.3d 235, 245 (3d Cir. 2008) (habeas challenging "the Government's termination of his deferral of removal [under CAT] based on diplomatic assurances"). The Third Circuit's review of the process and the reliability of the *individualized* diplomatic assurance refutes Defendants' claim that challenges to diplomatic assurances with respect to CAT in removal proceedings are akin to the determination at issue in *Munaf* that must be left to the

political branches. *See* Dkt. 231 at 26-27. Nor do Defendants attempt to explain *how* the fact that *Khouzam* "arose in the context of a petition for review," Dkt. 231 at 25, undermines that case's *merits* analysis directly supporting Plaintiffs' claims here, 549 F.3d at 257-58. Defendants also err in relying on 8 C.F.R. § 1208.30(g)(2)(iv)(A), barring administrative review by the Board of Immigration Appeals over adverse credible-fear determinations, as that regulation merely implements the statute which expressly limits review to immigration judges (IJs). In contrast, § 1252(a)(4) specifies that judicial review is available for negative CAT determinations.[6]

### b.    Plaintiffs share the same statutory and due process rights.

Defendants aver that Plaintiffs' claims fail because a subset of the class, by virtue of not having been initially "admitted" into the United States before the issuance of their final order of removal, have no constitutional due process rights "beyond what the political branches have provided" and therefore cannot challenge Defendants' third-country-removal policy. *See* Dkt. 231 at 27-30. But this argument ignores two core points: (1) Plaintiffs' claims are based on their *statutory* entitlement to protection from removal to a country where they would face persecution or torture; and (2) Plaintiffs seek the most basic procedural protections—notice and an opportunity to be heard—which the Supreme Court has recognized they are entitled to.

Contrary to Defendants' assertion, Plaintiffs do *not* "ask this Court to create an entirely new process without any statutory basis." *Id*. at 29 n.5. Rather, Plaintiffs rely entirely on existing statutes, regulations, and agency procedures. Congress requires Defendants to first pursue removal to the designated country of removal, before following a detailed procedure for attempting removal to other countries. *See generally* 8 U.S.C. § 1231(b)(1)-(2). Congress forbids

---

[6]    The fact that some statutes explicitly preclude judicial review only supports Plaintiffs' positions that they are entitled to judicial review, especially absent any statute expressly barring review of CAT and withholding determinations.

Defendants from removing Plaintiffs to a country where their "life or freedom would be threatened" on account of certain protected grounds. *Id.* § 1231(b)(3). And Congress prohibits Defendants from removing Plaintiffs to a country where they are likely to be tortured. *See* FARRA, Pub. L. 105-277, Div. G, § 2242(a), 112 Stat. 2681, 2681-822 (1998)). As this Court previously recognized, "*Congress* clearly established the right to deferral or withholding of removal based on a legitimate fear-based claim." Dkt. 64 at 38 (emphasis added). Consequently, "[p]rocedural due process imposes constraints on governmental decisions" that would "deprive" Plaintiffs of this right, *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976), which is "a matter of statutory entitlement for persons qualified to receive" it, *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *see also, e.g.*, *Meachum v. Fano*, 427 U.S. 215, 226 (1976) ("A person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government." (citation modified)); *Smith v. Mass. Dep't of Corr.*, 936 F.2d 1390, 1396 (1st Cir. 1991) ("[L]iberty interests may be created by state law and thus acquire the protection of the Fourteenth Amendment [Due Process Clause]."); Dkt. 194 at 18-19.

The Supreme Court's recent decisions in *Trump v. J.G.G.*, 604 U.S. 670 (2025) (per curiam), and *A.A.R.P. v. Trump*, 605 U.S. 91 (2025) (per curiam), affirm that noncitizens are entitled to basic due process in immigration proceedings. *See also* Dkt. 194 at 10. Contrary to Defendants' attempt to distinguish these cases as based on statutory procedures that afforded the noncitizens some limited judicial review in Alien Enemies Act (AEA) cases, Dkt. 231 at 29 n.5, the Court's reasoning was rooted in the Constitution: "'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings," and therefore "the detainees are entitled to notice and opportunity to be heard 'appropriate to the

nature of the case.'" *J.G.G.*, 604 U.S. at 673 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993),

and *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

Similarly, *A.A.R.P.* left clear that procedural due process protections applied, entitling

affected noncitizens to meaningful notice and an opportunity to seek relief "before removal," for

the Court has "long held that 'no person shall be' removed from the United States 'without

opportunity, at some time, to be heard.'" 605 U.S. at 94-95 (quoting *J.G.G.*, 604 U.S. at 673, and

*Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)).[7] As this Court found, "the same constitutional

guarantees apply to withholding-only relief." Dkt. 64 at 39. Further, the Supreme Court "has held

that the Due Process Clause protects [a noncitizen] subject to a final order of deportation," which

includes all class members here. *Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001) (citing *Wong

Wing v. United States*, 163 U.S. 228, 238 (1896)).

Critically, while due process is flexible and "may vary depending upon status and

circumstance," *Zadvydas*, 533 U.S. at 694, Plaintiffs here seek the most basic of due process

protections: meaningful notice and an opportunity to be heard. *See, e.g.*, *Mathews*, 424 U.S. at

333 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful

time and in a meaningful manner." (citation modified)); *Mullane*, 339 U.S. at 314 ("An

elementary and fundamental requirement of due process in any proceeding which is to be

accorded finality is notice reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their

---

[7]      Notably, *Yamataya* concerned a noncitizen alleged to have arrived in the United States
"in violation of law." 189 U.S. at 87. Even in that context, the Court held that basic due process
principles applied. *Id.* at 100 ("[T]his court has never held, nor must we now be understood as
holding, that administrative officers, when executing the provisions of a statute involving the
liberty of persons, may disregard the fundamental principles that inhere in 'due process of law'
as understood at the time of the adoption of the Constitution.").

objections."); *Gaffney v. Silk*, 488 F.2d 1248, 1250 (1st Cir. 1973) (identifying "the essential requisites of procedural due process" as "notice, reasons, and a hearing").

Defendants primarily rely on *DHS v. Thuraissigiam*, 591 U.S. 103 (2020), to argue broadly that noncitizens "seeking initial entry" have no more due process rights than "whatever the procedures authorized by Congress" are, Dkt. 231 at 27 (citation modified), but *Thuraissigiam* is readily distinguished: it involved the due process rights of persons seeking admission *into* the country.[8] There, the petitioner—who was apprehended immediately after physically entering the United States—filed a habeas petition to challenge the negative determination in his case, seeking as a remedy a "new opportunity to apply for asylum." 591 U.S. at 115. The Court concluded that neither the Suspension Clause nor the Due Process Clause afforded him a right to judicial review. In reaching its conclusion as to due process, the Court held that a noncitizen "in [petitioner's] position"—a noncitizen apprehended shortly after entering unlawfully—"has only those rights *regarding admission* that Congress has provided by statute." *Id.* at 140 (emphasis added). The Court's focus on due process rights "regarding admission" or application to reside in the United States is critical here because *Thuraissigiam* relied heavily on the government's "plenary authority to decide which [noncitizens] to *admit*." *Id.* at 139 (emphasis added). This "plenary" power addresses Congress's authority to determine who may be permitted to lawfully enter the United States. *See, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) (addressing Congress's power "to forbid the entrance of foreigners" or regulate their admission); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S.

---

[8]    Defendants defend only their process for assessing CAT claims in the third-country-removal context as "authorized by Congress," Dkt. 231 at 27, 30, and do not claim that Congress left the Executive Branch with such unfettered discretion as to withholding of removal. Thus, even under Defendants' own framing—which is wrong—their third-country-removal process does not comport with Congress's intent for withholding claims. *See id*. at 30.

206, 216 (1953) (concerning a noncitizen's "right to enter the United States").[9]

Here, Plaintiffs do not challenge the process for admission into the United States but the exact opposite: the absence of protections prior to removal. They are not "seeking initial entry," Dkt. 231 at 27 (quoting *Thuraissigiam*, 591 U.S. at 139), or a "more robust process toward admission," *Velasques Rincon*, 2025 WL 3122784, at *7, but instead simply ask that they be removed in accordance with the INA, FARRA, and the minimum requirements of due process. Accordingly, because they do not "challenge any part of the process by which [their] removability will be determined," they do "not purport to invoke any rights regarding admission," distinguishing their case from *Thuraissigiam*. *Id*. at *5 (citation modified). Their challenge thus does not "implicate[] Congress's 'sovereign prerogative . . . to decide which [noncitizens] to *admit*." *Id*. (quoting *Thuraissigiam*, 591 U.S. at 139); *see also, e.g.*, *Zadvydas*, 533 U.S. at 695 (explaining, in case challenging procedures concerning noncitizens with a final order of removal, that the case did not concern "the political branches' authority to control entry into the United States"). Defendants' argument seeking to apply *Thuraissigiam* more broadly "is untethered to the claim in *Thuraissigiam* and the Court's reasoning," for its "discussion of due process is necessarily constrained to challenges to admissibility to the United States." *Padilla v. ICE*, 704 F. Supp. 3d 1163, 1171 (W.D. Wash. 2023); *see also Sampiao v. Hyde*, No. 1:25-cv-

---

[9]    Defendants also cite *Kaplan v. Tod*, 267 U.S. 228 (1925), Dkt. 231 at 27, but that case was "focused primarily on issues of statutory construction," not constitutional analysis, *Velasques Rincon v. Hyde*, No. 25-12633-BEM, -- F.Supp.3d --, 2025 WL 3122784, at *5 n.13 (D. Mass. Nov. 7, 2025). Similarly, *U.S. ex rel. Turner v. Williams*, 194 U.S. 279 (1904), is inapposite because it affirmed the government's power to exclude noncitizens seeking admission in an unrelated context: the constitutionality of a law providing for the exclusion of an alleged anarchist. *Id*. at 292. Finally, *Wong Yang Sung v. McGrath*, 339 U.S. 33 (1950), supports Plaintiffs' procedural due process claim, where Congress has provided for certain procedures and protections from removal to countries dangerous to the noncitizen. *Id*. at 49 ("The constitutional requirement of procedural due process of law derives from the same source as Congress' power to legislate and, where applicable, permeates every valid enactment of that body.").

11981-JEK, -- F.Supp.3d --, 2025 WL 2607924, at *9 (D. Mass. Sept. 9, 2025) (distinguishing *Thuraissigiam* where, inter alia, petitioner was not "seeking initial entry" into the United States).

### c.    The Policy Violates the Statutes, Regulations, and Due Process.

Defendants argue only that their third-country-removal policy satisfies due process, ignoring that Plaintiffs also challenge the policy under the INA, FARRA, and implementing regulations. *See* 8 U.S.C. § 1231(b)(3); FARRA § 2242(a); 8 C.F.R. §§208.16(a), (b), (c)(2), (c)(3), (c)(4), 1208.16(a), (b), (c)(2), (c)(3), (c)(4), 208.17(b), 1208.17(b), 292.5(a), 1292.5(a); *see also* Dkt. 194 at 9-15. Defendants' sole—but erroneous—argument in defense of the March 30 Memo is that it satisfied the *Mathews v. Eldridge* test. But not only does the Memo fail to satisfy due process as this Court and multiple other courts have found, it also violates Plaintiffs' statutory and regulatory rights. *See* Dkt. 194 at 9-15.[10]

First, Defendants mischaracterize the significant interest at stake for Plaintiffs. Dkt. 231 at 33, 35. Plaintiffs' interest is in meaningful notice and an opportunity to contest a third-country

---

[10]    *See, e.g.*, *Vu v. Noem*, No. 1:25-cv-01366-KES-SKO (HC), 2025 WL 3114341, at *8 (E.D. Cal. Nov. 6, 2025) ("If ICE follows this policy, petitioner would have no meaningful opportunity to present [a third-country-removal] claim in any court before he is removed to a third country."); *Cruz-Medina v. Noem*, No. 25-cv-1768-ABA, -- F.Supp.3d --, 2025 WL 2841488, at *7 (D. Md. Oct. 7, 2025) ("[R]egulations . . . entitle noncitizens to *de novo* review by an immigration judge of negative asylum officer determinations . . . ."); *Kumar v. Wamsley*, No. C25-2055-KKE, 2025 WL 3204724, at *5 (W.D. Wash. Nov. 17, 2025) (agreeing "that ICE has deprived [the petitioner] of and is continuing to deprive him of . . . baseline procedural protections via its third country removal policy"); *Sagastizado Sanchez v. Noem*, No. 5:25-CV-00104, -- F.Supp.3d --, 2025 WL 2957002, at *12 (S.D. Tex. Oct. 2, 2025) (faulting Defendants' policy for failing to require IJ review); *A.A.M. v. Andrews*, No. 1:25-cv-01514-DC-DMC, 2025 WL 3485219, at *7-9 (E.D. Cal. Dec. 4, 2025) (same); *Esmail v. Noem*, No. 2:25-cv-08325-WLH-RAO, 2025 WL 3030589, at *7 (C.D. Cal. Sept. 26, 2025) ("[W]here ICE's stated policy is that it will only provide a reasonable fear interview when a noncitizen affirmatively asserts such fear, this fails to comport with due process."); *Nguyen v. Scott*, No. 2:25-cv-01398, -- F.Supp.3d --, 2025 WL 2419288, at *18-19 (W.D. Wash. Aug. 21, 2025) (concluding "that removal to a third country under ICE's current policy, without meaningful notice and reopening of his removal proceedings for a hearing, would [likely] violate due process").

removal based on a fear of persecution or torture *before* that harm materializes. Dkt. 1 ¶¶ 37-52, 102-105, 114-15, 120-21. This is the interest about which the Supreme Court expressed concern and the government falsely claimed that DHS provides a process to protect. *See* Tr. of Oral Arg. at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) (No. 19-897); Tr. of Oral Arg. at 33, *Riley v. Bondi*, 606 U.S. 259 (2025) (No. 23-1270).

Second, Defendants claim that the risk of erroneous deprivation is eliminated by "[t]he combination of" the process provided in prior removal proceedings and the March Memo. Dkt. 231 at 31-32. But Defendants cannot identify any law requiring preemptive identification of all countries in which Plaintiffs might fear torture in their removal proceedings. It is not possible to anticipate every country that may be designated in the future, let alone identify those countries' present and future conditions. *See* Tr. of May 21, 2025 Hr'g at 98-99 (addressing Form I-589); *see also* Dkt. 64 at 40; Dkt. 99-3 ¶ 5; *cf.* Dkt. 210-1; Dkt. 8-4 ¶ 4; Dkt. 59-12, Att. 1.[11]

Motions to reopen also do not eliminate the risk of erroneous deprivation. Notably, only individuals in proceedings under § 1229a have a statutory right to seek reopening. *See* 8 U.S.C. § 1229a(c)(7). Proceedings under § 1231(a)(5) and § 1228(b) have no such statutory right. And motions to reopen in § 1229a proceedings generally are subject to time and numerical limits. *See* Dkt. 57 at 12-16.[12] Even setting legal barriers aside, detained class members cannot file the motions without meaningful advance notice of the intended third country for removal. *See* Dkt. 64 at 14 n.20; *see also* Dkts. 8-11 & Atts., 59-9, 59-10, 59-11, 59-12 & Att., 59-13 & Att. 99. As

---

[11]    *See also* Exh. F, Exh. M; Exh. Y.

[12]    "With a few narrow exceptions, the [INA] limits petitioners to a single motion to reopen filed within ninety days of a removal order." *Charles v. Garland*, 113 F.4th 20, 23 (1st Cir. 2024) (citing 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2)). Many class members' removal orders became final years ago, and many have already used their one motion, leaving no statutory right to reopening. *See also* Dkts. 59-9, 59-10, 59-11.

a matter of policy, Defendants do not provide notice of third-country removal to an individual where diplomatic assurances exist. Dkt. 43-1; Dkt. 190-1. Even when notice is required, Defendants' policy is that such notice may be provided only hours before the third-country removal takes place. *See* Dkt. 190-1 at 1-2 (providing ICE policy to effectuate removal within 6 to 24 hours after notice); *see also* Dkt. 130-2 ¶ 7.

Third, relying on case law requiring class members to show an individualized threat of persecution or torture, Dkt. 231 at 33-34, Defendants oddly claim that, because withholding of removal or CAT protection require this individualized showing of persecution or torture (not generalized country conditions), Plaintiffs "will be able to identify [a fear-claim] well before any designation of a country" and should bear the burden "to proactively identify" countries where they fear persecution or torture. *Id*. at 34. But that inquiry is relevant only to an individual's merits claim, not the process to which they are subject, and that merits assessment belongs to a qualified adjudicator. Moreover, this fails to acknowledge that most noncitizens are not intimately aware of country conditions in every other country of the world, and country conditions are often fluid, creating emerging risks that did not exist in years past. Defendants also do not dispute that country conditions are relevant to protection claims nor that class members need the opportunity to *learn* about the relevant country-conditions before assessing whether they have a fear of persecution or torture. *Negeya v. Gonzales*, 417 F.3d 78, 84 (1st Cir. 2005) (finding "State Department reports are . . . highly probative" in assessing fear-claims).

Fourth, Defendants' comparison of their policy to the expedited-removal statute, 8 U.S.C. § 1225(b)(1), is inapposite. Dkt. 231 at 34-35. The March 30 Memo excluded individuals subject to expedited removal, demonstrating that Defendants acknowledge different rules apply. *See* Dkt. 43-1 at 1 n.1. Moreover, Defendants' basic recitations of the expedited removal statute and

process do not in any way suggest or support the notion that individuals in those proceedings are not entitled to the same or similar mandatory procedural protections before DHS deports them to a third country for which they had no notice or opportunity to raise a fear-claim.

Finally, Defendants' unsupported claim that the risk of erroneous deprivation of Plaintiffs' rights is low, *see* Dkt. 231 at 35, is belied by: O.C.G.'s experience, Dkt. 132; the record in this case, *see* Dkt. 7 at 14-15, Dkt. 57 at 20; the record with respect to removals to El Salvador, Libya, and South Sudan, *see* Dkts. 86, 91, 118; and class members' ongoing experiences since the March 30 Memo took effect. Exhs. A-Y. This includes no notice or opportunity to contest removal under the guise of diplomatic assurance prior to removal to countries where class members have been indefinitely detained under armed guard by foreign governments, subjected to chain *refoulement* back to countries from which they have received protection, disappeared and held incommunicado, and physically attacked by immigration agents in the United States and other countries. *See, e.g.*, Exhs. A-F; Exh. G & Atts.; Exhs. H-N, Q-T, V-X; *see also "You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison*, Hum. Rts. Watch & Cristosal (Nov. 12, 2025); *cf.* Exh. O & Atts.

### d.    Defendants misinterpret and misapply 8 U.S.C. § 1231(b)(2).

Defendants do not have free rein to remove Plaintiffs to any country whose government will accept them. As the Supreme Court recognized, Congress required DHS to make decisions about removal countries in a specified sequence. *Jama v. ICE*, 543 U.S. 335, 341 (2005); *see also* 8 U.S.C. § 1231(b)(2)(A)-(E); Dkt. 194 at 8-9. Pursuant to this statutory sequence, and contrary to Defendants' claim, Dkt. 231 at 36, DHS cannot consider whether it is "impracticable, inadvisable, or impossible" to remove the individual to a particular country unless and until it reaches the final stage of the sequence and only after exhaustion of all other options. In other

words, DHS cannot simply remove class members to random countries to which they have no connection (under the guise that it is "impracticable, inadvisable, or impossible" to remove them elsewhere). DHS must comply with the statutory sequence.

DHS must first attempt to remove the noncitizen to the country designated in the underlying proceedings by the individual, which generally is the country designated by the IJ. 8 U.S.C. § 1231(b)(2)(A)-(B). DHS may disregard this designation *only* when the individual does not make a timely designation, the designated country is unwilling to accept or fails to indicate that it will accept the person, or where removal would prejudice the United States. *Id*. § 1231(b)(2)(C). If removal is not possible under § 1231(b)(2)(A)-(C), DHS then must seek removal to a country where the person is a subject, national, or citizen unless the country is unwilling or fails to timely indicate that it will accept them. *Id*. § 1231(b)(2)(D). If removal under this provision is not possible, DHS next must consider removal to one of six options specified in § 1231(b)(2)(E)(i)-(vi). Only if removal to *each* of the specified countries in § 1231(b)(2)(E)(i)-(vi) is "impracticable, inadvisable, or impossible" may DHS consider removal to a country that will accept the individual. *Id*. § 1231(b)(2)(E)(vii). DHS violates the statute where it skips any of these steps and instead jumps to the last step. Consequently, DHS *must* remove a person to a country that is willing to accept the individual absent a determination of prejudice to the United States, even if "logistical and foreign policy considerations . . . make removal to [that] particular country impracticable or inadvisable." Dkt. 231 at 36.

### 2.    This Court can set aside Defendants' third-country-removal policy.

Defendants do not explain how an order setting aside their third-country-removal policy under the APA runs afoul of § 1252(f)(1), nor could they. Given the plain text of § 1252(f)(1), it is unsurprising that "all courts that have addressed the issue"—including after *Garland v.*

*Aleman Gonzalez*, 596 U.S. 543 (2022)—"have rejected the government's construction of the statute." *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 826 (N.D. Cal. 2025). "DHS reads too much into the *Aleman Gonzalez* opinion. There are meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (per curiam) (citation omitted); *see also Las Americas Immigrant Advocacy Ctr. v. DHS*, 783 F. Supp. 3d 200, 232-33 (D.D.C. 2025); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022).

The discussion in *National TPS Alliance* is particularly instructive as to the differences between an injunction and vacatur. 773 F. Supp. 3d at 826-29; *id*. at 827 ("[I]t is clear that there are material differences between a vacatur and an injunction"). Thus, "[n]o court has adopted the construction of § 1252(f)(1) advanced by the government." *Id*. at 826. To the extent Defendants continue to insist that § 1252(f)(1) prohibits APA vacatur, at least two courts of appeals have made clear that § 1252(f)(1)'s bar on class-wide injunctions permits relief under the APA. *See Texas*, 40 F.4th at 220; *Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 989-90 (9th Cir. 2025); *see also Biden v. Texas*, 597 U.S. 785, 800 (2022) (explaining how Congress limited § 1252(f)(1) to district-court decisions that "'enjoin or restrain the operation of' certain sections of the statute, and entitled that provision a '[l]imit on injunctive relief'"); *Brito v. Garland,* 22 F.4th 240, 251-52 (1st Cir. 2021) (holding that § 1252(f)(1) does not bar court's authority to grant class-wide declaratory relief); *Guerrero Orellana v. Moniz*, No. 25-cv-12664-PBS, -- F.Supp.3d --, 2025 WL 3033769, at *12 (D. Mass. Oct. 30, 2025) (same).

### 3. This Court has jurisdiction over Counts I-IV notwithstanding the PI appeal.

As the First Circuit stated, district courts are generally "'free to carry forward' while an

appeal in an earlier phase of the case is pending and, if appropriate, 'order permanent relief after the merits are resolved.'" Dkt. 218 (quoting *Contour Design, Inc. v. Chance Mold Steel Co.*, 649 F.3d 31, 34 (1st Cir. 2011)). Defendants incorrectly claim that *Contour* has been "abrogated" by *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023). Dkt. 231 at 20-22. However, the First Circuit *specifically applied Contour Design in this case*. Dkt. 218. Any attempt to read the ruling as discouraging this Court's "forg[ing] ahead to final judgment without the court of appeals' input," Dkt. 231 at 22, is belied by the plain language of the First Circuit's order, Dkt. 218.

*Contour Design* also remains controlling because *Coinbase* is limited to the arbitration context. Dkt. 231 at 21. In *Contour Design*, the First Circuit held that the district court could have "enter[ed] a permanent injunction based on the trial record" (as opposed to the preliminary injunction it was reviewing) because "[a]n appeal from the grant or denial of a preliminary injunction does not divest the trial court of jurisdiction or prevent it from taking other steps in the litigation while the appeal is pending." 649 F.3d at 34 (citation omitted). In *Coinbase*, by contrast, the Supreme Court reviewed an interlocutory appeal taken under the Federal Arbitration Act, 9 U.S.C. § 16(a), where the issue was whether the case belonged in district court at all or instead in binding arbitration. 599 U.S. at 740. The Court held that, in that situation, "the entire case is essentially 'involved in the appeal.'" 599 U.S. at 741 (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)).[13]

---

[13]    *Griggs* stated a general rule that a notice of appeal "divests the district court of its control *over those aspects of the case involved in the appeal*." *Griggs*, 459 U.S. at 58 (emphasis added). The First Circuit "has recognized that the filing of a notice of appeal does not divest the district court of all authority" and "the divestiture rule 'is rooted in concerns of judicial economy, crafted by courts to avoid the confusion and inefficiency that would inevitably result if two courts at the same time handled the same issues in the same case.'" *United States v. Carpenter*, 941 F.3d 1, 6 (1st Cir. 2019) (citation omitted). Notably, *Contour* recognized no inconsistency or conflict with *Griggs* when it was decided. *See generally Contour*, 649 F.3d 31.

Importantly, the Court did *not* hold that every interlocutory appeal automatically halts litigation—its reasoning and holding are limited to the arbitration context. *See Coinbase*, 599 U.S. at 740 ("The *sole* question before this Court is whether a district court must stay its proceedings while the interlocutory appeal *on arbitrability* is ongoing." (emphasis added)); *see also Cal. ex rel. Harrison v. Express Scripts, Inc.*, 139 F.4th 763, 768 (9th Cir. 2025) (concluding that "the *Coinbase* holding [is limited] to the arbitration context").

Here, unlike in arbitration cases and contrary to Defendants' assertions, Dkt. 231 at 21-22, the entire case is not involved in the PI appeal. Rather, the PI appeal concerns only Plaintiffs' CAT claims. *See* Dkts. 64, 180. Even if the Court of Appeals resolves the PI appeal on the merits, as opposed to the issue of availability of class-wide injunctive relief, resolution of the PI appeal will not resolve the entire case, which requests procedural protections both under CAT *and* withholding of removal under the INA—the PI did not address the withholding of removal claims.[14] Similarly, there is no "significant reason to doubt" this Court's jurisdiction based on the Supreme Court's stay of the PI, Dkt. 231 at 22, where the Court provided no rationale and the PI concerned only the CAT claims. By contrast, Plaintiffs' partial summary judgment motion seeks declaratory judgment and relief under the APA. *See* Dkt. 193-1.

**B.    This Court Has Jurisdiction Over Counts I-IV.**

**1.    Section 1252(g)**

Defendants further err in asserting that 8 U.S.C. § 1252(g) bars jurisdiction. Dkt 231 at 7-

---

[14]    For this reason, Defendants' reliance on *Newsom v. Trump* is inapposite. Dkt. 231 at 22-23. There, the court stayed a TRO after finding that the National Guard deployment was likely lawful; the plaintiffs then moved for a PI challenging a subsequent, related executive action under the same statute. *Newsom v. Trump*, No. 25-cv-04870-CRB, 2025 WL 2609917, at *1-2 (N.D. Cal. Sept. 9, 2025). Because the merits of the TRO and PI were "inextricably tied up," there was a risk that the district court would be "assert[ing] jurisdiction over a case simultaneously with the Ninth Circuit." *Id.* at *2 (citing *Griggs*, 459 U.S. at 58).

10. Section 1252(g) governs jurisdiction over actions "arising from" three discrete discretionary acts: "to commence proceedings, adjudicate cases, or execute removal orders." Here, contrary to Defendants' assertions, *id.*, Plaintiffs do not challenge DHS's discretionary decisions to execute removal or even the decision to remove Plaintiffs to a third country. Rather, Plaintiffs challenge DHS's failure to provide meaningful notice and an opportunity to apply for protection from any newly designated country of removal, a problem illustrated by the record in this case.[15] These protections are statutory obligations.

Section 1252(g) does not bar challenges to such mandatory, nondiscretionary decisions or actions. *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 482-87 (1999). Despite § 1252(g)'s seemingly broad language, its reach is "much narrower" when considered against the statutory and historical context. *Id.* at 482. What Congress sought to channel and otherwise insulate from litigation was the immigration authorities' "exercise of [their] *discretion*" with respect to the three specified actions. *Id.* at 483-84 (emphasis added); *see also id.* at 485 ("Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations . . . .").

Defendants do not acknowledge that *AADC* limited § 1252(g)'s application to discretionary decisions. Nor do they acknowledge that notice and the opportunity to be heard are *nondiscretionary* protections that they themselves have told the Supreme Court are obligatory. *See supra* p. 12 (citing transcripts). Defendants also fail cite binding circuit precedent cabining § 1252(g)'s application to discretionary decisions. *See Kong v. United State*s, 62 F.4th 608, 618 (1st Cir. 2023) ("Kong's FTCA claim does not arise from the discretionary decision to execute removal but instead arises from the government's alleged violations of law . . . in failing to abide

---

[15]     In addition to the existing record, Exhs. A-O and Q-Y illustrate these problems.

by its own regulations.").[16]

Defendants ignore this binding precedent and instead cite inapposite out-of-circuit cases involving attempts to stay removal pending some future *discretionary* action—not to enforce antecedent, mandatory obligations. Dkt. 231 at 8-9. In *Rauda v. Jennings*, 55 F.4th 773, 777-78 (9th Cir. 2022), *Tazu v. Att'y Gen.*, 975 F.3d 292, 295, 297 (3d Cir. 2020), and *Hamama v. Adducci*, 912 F.3d 869, 874-77 (6th Cir. 2018), petitioners sought to stay execution of their removal orders to await adjudication of motions to reopen removal proceedings, a "well-understood discretionary form[] of review." *Santos-Zacaria v. Garland*, 598 U.S. 411, 427 (2023); *accord Kong*, 62 F.4th at 618 (distinguishing *Tazu*). Likewise, in *E.F.L. v. Prim*, 986 F.3d 959, 961, 964-65 (7th Cir. 2021), and *Camarena v. Dir., ICE*, 988 F.3d 1268, 1272-74 (11th Cir. 2021), petitioners sought stays to await adjudication of a discretionary petition under the Violence Against Women Act and a provisional unlawful-presence waiver, respectively. Defendants' reliance on *Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017), conflicts with *AADC* and *Kong* and pre-dates the Supreme Court's reaffirmation of *AADC*'s "narrow construction of § 1252(g)." *Kong*, 62 F.4th at 613 (citing *Jennings v. Rodriguez*, 583 U.S. 281 (2018)).

Recently, in *Ibarra-Perez v. United States*, the Ninth Circuit held, in the context of a third-country removal, that § 1252(g) did *not* bar the noncitizen's claim that "he had a right to meaningful notice and an opportunity to present a fear-based claim before he was removed to [a

---

[16]    In *Kong*, the court held that § 1252(g) did not apply to the plaintiff's damages claim predicated on his post-final-removal-order arrest and re-detention, recognizing that "§ 1252(g) was passed with the understanding that collateral challenges to the legality of a petitioner's detention" were not covered by the statute. 62 F.4th at 615. Likewise, here, Plaintiffs' claims—challenging Defendants' designation of new countries for removal outside of the immigration proceedings and circumventing due process rights and the statutory/regulatory scheme—are separate from, and collateral to, DHS's discretionary authority to execute removal orders.

third country]." 154 F.4th 989, 997 (9th Cir. 2025); *id.* ("From the beginning, we have been clear
that § 1252(g) does not prohibit challenges to unlawful practices merely because they are in
some fashion connected to removal orders."). Compliance with the INA and FARRA and the
Constitution is mandatory, not discretionary. Accordingly, § 1252(g) does not bar jurisdiction.

   2.   **Sections 1252(a)(5) and (b)(9)**

   Sections 1252(a)(5) and (b)(9) also do not bar jurisdiction. Dkt. 231 at 10-13. Plaintiffs
do not seek "judicial review of an order of removal entered or issued," 8 U.S.C. § 1252(a)(5), as
they challenge only DHS's post-proceeding designation and removal to a third country. Because
the challenged practice arises entirely after removal proceedings conclude, it does not comprise
part of a "final order" under 8 U.S.C. § 1252(b)(9) reviewable only by "a petition for review
filed with an appropriate court of appeals." *Id.*; *see also id.* § 1252(b)(4)(A) ("[T]he court of
appeals shall decide the petition only on the administrative record on which the order of removal
is based"); *Ibarra-Perez*, 154 F.4th at 1000 (recognizing that a third-country-removal challenge
concerns actions "taken after [] removal proceedings before the IJ and BIA had ended" and thus
"neither [§ 1252(a)(5) nor (b)(9)] applies.").

   Defendants dispute that their reading of these provisions is foreclosed by binding
precedent. Both the Supreme Court and First Circuit have rejected such an "expansive
interpretation of § 1252(b)(9)," explaining that it would be "absurd" to construe the provision to
bar any claim that might tangentially relate to a removal proceeding. *Jennings*, 583 U.S. at 293;
*see also Kong*, 62 F.4th at 614 (observing that "the phrase 'arising from' is not 'infinitely
elastic'" (quoting *Aguilar v. ICE*, 510 F.3d 1, 10-11 (1st Cir. 2007)); *see also, e.g.*, *DHS v.
Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (rejecting the contention that § 1252(b)(9)
barred review of a challenge to the termination of the Deferred Action for Childhood Arrivals

21

program because "the parties are not challenging any removal proceedings"). Prior to those decisions, the First Circuit similarly held that section "1252(b)(9) is a judicial channeling provision, not a claim-barring one." *Aguilar*, 510 F.3d at 11.

Here, Plaintiffs had no opportunity to present their claims for protection in the underlying proceedings because DHS did not provide any notice or initiate third-country removal until *after* the final order was issued. Plaintiffs do not challenge "an order of removal," "the decision . . . to seek removal," or "any part of the process by which their removability will be determined." *Jennings*, 583 U.S. at 294. Thus, "§ 1252(b)(9) does not present a jurisdictional bar." *Id.* at 295.

Furthermore, Defendants assert that these provisions apply because class members can raise fear-claims to undesignated countries in existing proceedings or through a motion to reopen because they "know which specific countries they fear" and "need not wait any DHS designation before seeking protection." Dkt. 231 at 12. If that were true, it would render the statutory designation-scheme redundant and violate the United States' commitment to *non-refoulement*. Moreover, as previously explained, and as the record establishes, requiring class members to guess all the countries where they could be deported, persecuted, and tortured during removal proceedings is nonsensical, impractical, and, with respect to some countries, impossible.[17] Defendants' reliance on motions to reopen is equally flawed because they are generally subject to time and numerical limits and class members have no practical ability to file them absent meaningful advance notice. *See supra* pp. 12-13.

### 3.    FARRA § 2242(d) and Section 1252(a)(4)

Defendants err in arguing that FARRA and 8 U.S.C. § 1252(a)(4) deprive this Court of

---

[17]    For example, one of the men DHS removed to South Sudan was ordered removed to Sudan in July 2011, just *ten days* after South Sudan became a state. *See* Dkt. 175-1.

jurisdiction over Counts I-IV. Dkt. 231 at 13-15. FARRA generally limits challenges to regulations implementing CAT or "other determination[s]" respecting CAT, "except as part of the review of a final order of removal." FARRA § 2242(d). Section 1252(a)(4) likewise channels review of CAT decisions made in removal proceedings to the petition for review (PFR) process.

Those provisions do not apply here. First, Plaintiffs seek to *enforce* FARRA and the regulations implementing CAT. Second, Plaintiffs do not challenge the outcome of a CAT case. Class members' removal proceedings already have ended, and thus they cannot use the PFR process to contest Defendants' decision to remove them to a third country. *See supra* pp. 21-22.

Defendants' expansive reading of FARRA § 2242(d) and § 1252(a)(4)—to bar any possible challenge implicating CAT—is wrong. FARRA § 2242(d) states that jurisdiction is limited only as to challenges to the *regulations* that "implement" FARRA's CAT protections. Plaintiffs do not seek review of any regulation; to the contrary, Plaintiffs challenge Defendants' failure to comply with the regulation. *See, e.g.*, Dkt. 194 at 13-17.

Defendants claim FARRA § 2242(d) bars challenges to procedures to implement CAT. Dkt. 231 at 13-14. But FARRA § 2242(d)'s remaining clause—limiting challenges to "determination[s] made with respect to the application of [CAT]," *id.*—addresses only "judicial review of a determination respecting an application" for CAT, not "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 491-92 (1991) (citation modified). When addressing a similar statute in *McNary*, the Supreme Court found such language simply "describ[es] the process of direct review of individual denials." *Id.* at 492; *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 63-64 (1993) (permitting challenges to agency policies notwithstanding a statute limiting judicial review of individual application denials).

Defendants also contend Plaintiffs are out of luck because if "an action does not fit within [the PFR review process], the result is that judicial review is simply not available." Dkt. 231 at 14 (citing *United States v. Fausto*, 484 U.S. 439, 454-55 (1988), and *Riley v. Bondi*, 606 U.S. 259, 272 (2025)). Not so. The governing statutes channel only challenges to CAT regulations and individual CAT determinations, not policy or practice claims like those brought by Plaintiffs. "Statutory review scheme[s]" like the one here "do[] not necessarily extend to every claim concerning agency action." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). Instead, the Court must ask "whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Id.* at 186 (citation omitted). And where the claim challenges an "illegitimate proceeding," later review "come[s] too late to be meaningful." *Id.* at 191. The same principles apply here, as FARRA § 2242(d) and § 1252(a)(4) limit only specified categories of claims and should not be read to "foreclose all meaningful judicial review"—which Defendants' reading would do. *Id.* at 190 (citation omitted).[18]

Contrary to Defendants' contention, this Court correctly read *Jennings v. Rodriguez* as clarifying that § 1252 "cannot be read to strip jurisdiction over claims that could not have been raised in the removal proceedings." Dkt. 231 at 15 (citing Dkt. 64 at 19). There, as here, the Supreme Court confronted statutory text channeling "all questions of law and fact . . . arising from any action taken or proceeding brought to remove [a noncitizen]" to the PFR process. *Jennings*, 583 U.S. at 292 (quoting 8 U.S.C. § 1252(b)(9)). The Court rejected "uncritical literalism" that would "depriv[e] [a] detainee of any meaningful chance for judicial review." *Id.*

---

[18] Unlike *Fausto*, the statute here shows no "congressional intent to preclude review." 484 U.S. at 452 (citation modified)*. And *Riley* cuts the other way: the court reaffirmed that judicial review *does* exist for individual CAT claims. It merely "follow[ed] the statutory text" to explain how such individual claims must be pursued. *Riley*, 606 U.S. at 272.

at 293 (citation omitted); *see also Aguilar*, 510 F.3d at 17 (stating § 1252 does not bar pattern or practice claims if there would be "a total denial of meaningful judicial review").

**C.    Counts V and VI are Claims Upon Which this Court Can Grant Relief.**

**1.    The Court can grant relief on Plaintiffs' re-detention claim.**

Count V asserts that Plaintiffs E.F.D., D.V.D., and M.M. all have statutory and regulatory rights and "have a liberty interest in remaining free from physical confinement where removal is not reasonably foreseeable, they have not violated the conditions of their release, *and where re-detention is unlawful because Defendants have not created a lawful mechanism to ensure that noncitizens receive meaningful notice and an opportunity to present a fear-based claim before deportation to a third country*." Dkt. 1 ¶ 129 (emphasis added); *see also id.* ¶¶ 123-30. Nothing has changed in this regard because all three remain under threat of re-detention and DHS still has not created a lawful third-country-removal mechanism. Indeed, now that Plaintiff O.C.G. has been returned and released, Count V is equally applicable to him.[19]

The Court should reject Defendants' assertion that the re-detention claim is "not ripe and necessarily fail[s] to state a claim upon which relief can be granted." Dkt. 231 at 16.[20] It is ripe because Plaintiffs face the prospect of re-detention to effectuate a third-country removal based on an unlawful policy. Defendants erroneously argue that because Plaintiffs are not currently in custody, "their detention-based *Zadvydas* claim based on a hypothetical lack of [significant likelihood of removal in the reasonably foreseeable future] is not ripe for this Court to consider."

---

[19]    After O.C.G.'s return pursuant to Dkt. 132, DHS notified him of its intent to deport him to Mexico (again). After O.C.G. demonstrated a reasonable fear, DHS moved to reopen proceedings to designate Mexico. The IJ granted reopening and release on bond. DHS placed an ankle shackle on O.C.G. even though the IJ did not order it. Ex. O, Atts. 1 & 2.

[20]    Plaintiff E.F.D.'s court-ordered release from custody, *see* Dkt. 231 at 17, likewise does not eliminate the threat of re-detention against him. Nor does it prevent DHS from subjecting him to the March 30 Memo, which Plaintiffs submit is unlawful.

Dkt. 231 at 16. When the case was filed, Plaintiffs D.V.D. and M.M. feared imminent re-detention and Plaintiff E.F.D. was detained. *See* Dkt. 1 ¶¶ 67, 73, 77. And by Defendants' own acknowledgment, they have "successfully removed class members to third countries." Dkt. 231 at 17. Indeed, Plaintiffs not only have alleged that Defendants have a Directive to actively review and re-detain for the possibility of third-country removal, Dkt. 1 ¶ 60, but also have presented ample evidence that Defendants are aggressively detaining noncitizens to attempt to effectuate third-country removals and that their third-country-removal policy permits them to carry such removals out with less than 24 hours' notice (if any notice is even provided). *See, e.g.*, Dkt. 43-1; Dkt. 190-1; Exh. O & Atts.; Exh. I ¶ 3; Exh. N ¶ 6; Exh. F ¶ 7; Exh. H ¶ 11; Exh. U ¶ 8..

This is enough to show that their feared injury of being arbitrarily re-detained to be subjected to an unlawful third-country-removal policy is sufficiently imminent. *Cf. Esmail v. Noem*, No. 2:25-CV-08325-WLH-RAO, 2025 WL 3030589, at *5 (C.D. Cal. Sept. 26, 2025) (finding standing to challenge third-country removal because "a noncitizen with a removal order" is "inherently subject to [the March 30 Memo and July 9 Guidance]"and therefore "sufficiently demonstrate[s] that he is realistically threatened by a repetition of the violation at issue" (citation modified)); *Y.T.D. v. Andrews*, No. 1:25-CV-01100 JLT SKO, 2025 WL 2675760, at *11 (E.D. Cal. Sept. 18, 2025) ("[T]here is a sufficiently imminent risk that Petitioner will be subjected to improper process in relation to any third country removal to warrant imposition of an injunction requiring additional process.").

To assess ripeness, courts analyze "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (citation modified). "[A] very strong showing on one axis may compensate for a relatively weak showing on the other." *Pesce*

26

*v. Coppinger*, 355 F. Supp. 3d 35, 43 (D. Mass. 2018) (citation omitted). Whether a claim is reviewable turns on whether it "involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." *California v. Trump*, 786 F. Supp. 3d 359, 378 (D. Mass. 2025) (quoting *Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 20 (1st Cir. 1992)). To that end, "[t]hat an event has not occurred can be counterbalanced . . . by the fact that a case turns on legal issues not likely to be significantly affected by further factual development." *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (citation modified). Here, the law has long held that, once a noncitizen is past the 90-day removal period, *see* 8 U.S.C. § 1231(a)(1), if "removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." Dkt. 1 ¶ 126 (quoting *Zadvydas*, 533 U.S. at 699). What process the statutes, regulations, and Due Process Clause require prior to class members' re-detention is a legal question for this Court to consider. As for hardship, Plaintiffs face the prospect of losing their liberty without adequate process if this Court "den[ies] judicial review," and so this Court's intervention as to what process they are due prior to any re-detention to effectuate an alleged third-country removal would be of significant "practical assistance in setting the underlying controversy to rest." *Barnstable Cnty. v. 3M Co.*, No. CV 17-40002, 2017 WL 6452245, at *6 (D. Mass. Dec. 18, 2017) (citation omitted).

Defendants also argue that Plaintiffs "cannot state a claim under *Zadvydas* unless and until they are detained for six months." Dkt. 231 at 17. But they point to no First Circuit case on this point. Defendants' argument also ignores that previous periods of detention are considered when assessing the length of detention post-order of removal. "Most courts to consider the issue have concluded that the *Zadvydas* period is cumulative, motivated, in part, by a concern that the federal government could otherwise detain [noncitizens] indefinitely by continuously releasing

and re-detaining them." *Abuelhawa v. Noem,* No 4:25-cv-04128, 2025 WL 2937692, at *4 (S.D. Tex. Oct. 16, 2025); *see also, e.g.*, *Villanueva v. Tate*, No. H-25-3364, 2025 WL 2774610, at *9 (S.D. Tex. Sept. 26, 2025) (citing cases).[21] At the motion to dismiss stage, this Court need not decide this issue, but Plaintiffs clearly have stated a ripe and viable re-detention claim.

> ## 2.    The Court can grant relief under the Freedom of Information Act.

This Court should reject Defendants' motion to dismiss Count VI, which seeks to prevent Defendants from relying on or using the February 18 Directive to re-detain Plaintiffs and class members, and any "other statements of policy or instruction or guidance," now including the March 30 Memo, July 9 Guidance, and list of countries that allegedly have provided diplomatic assurances (as referred to in the Memo and Guidance) because DHS has not proactively disclosed them. Under FOIA, agencies are prohibited from relying on or using any "statement of policy" and/or "staff manual or instruction that affects a member of the public" unless the material is "indexed and either made available or published as provided by [5 U.S.C. § 552(a)(2)(E)]" or "the party has actual and timely notice of the terms thereof." 5 U.S.C. § 552(a)(2)(E).

DHS must affirmatively publish the February 18 Directive, March 30 Memo, and July 19 Guidance, and the list of countries allegedly providing diplomatic assurances pursuant to § 552(a)(2) because they "constitute the 'working law' of the agency" that "have the force and effect of law." *N.L.R.B. v. Sears, Roebuck & Co.* (*Sears*), 421 U.S. 132, 153 (1975). Documents that "'determine [the agency's] interaction with outsiders' and ha[ve] 'real-world effects on the

---

[21]    *Thai v. Hyde* is inapposite. There, the court assumed without explanation that the starting point for assessing the petitioner's *Zadvydas* claim was his re-detention. 788 F. Supp. 3d 57, 61 (D. Mass. 2025). The court did not address any contrary argument; notably, the petitioner's *cumulative* period of detention was only three and a half months. *Id.* at 59, 61.

behavior of . . . agencies . . . fit comfortably within the working law framework" because they "reflect[] [the agency's] formal or informal policy." *Elec. Frontier Found. v. U.S. DOJ*, 739 F.3d 1, 8 (D.C. Cir. 2014) (quotation omitted).

The February 18 Directive instructs DHS officers to review all cases of individuals previously released from immigration detention for re-detention and removal to a third country. It is not simply a "restatement" of 8 U.S.C. § 1231(b), as Defendants argue, Dkt. 231 at 19; rather, it reflects DHS's policy of re-detaining and removing class members. Likewise, the Memo and Guidance and the list of countries providing diplomatic assurances all implement Defendants' third-country-removal policy. All have the full force of law and have a real-world effect on DHS's behavior, as well as on class members' liberty and safety.

This Court has broad equitable authority under FOIA. *See, e.g.*, *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 20 (1974) (finding "little to suggest" that FOIA was intended "to limit the inherent powers of an equity court"); *Columbia Packing Co. v. U.S. Dep't of Agric.*, 563 F.2d 495, 500 (1st Cir. 1977) (recognizing that the district court "was not without power to issue collateral injunctive relief if circumstances warranted"). Here, this Court can use its "broad equitable power" as the "enforcement arm" of FOIA, *see Bannercraft*, 415 U.S. at 19-20, to prohibit DHS from relying on or using the February 18 Directive for re-detention and the March 30 Memo and July 9 Guidance to carry out third-country removals unless it proactively publishes them as required by 5 U.S.C. § 552(a)(2)(E).

Defendants also err in characterizing Count VI as challenging the improper withholding of records. Dkt. 231 at 17-18. Rather, Plaintiffs challenge Defendants' *reliance on* and/or *use of* the February 18 Directive, March 30 Memo, and July 9 Guidance as violating 5 U.S.C. § 552(a)(2)(E). Because DHS has relied upon and/or used them without proactively disclosing

such statements of policies and/or staff instructions, DHS has violated § 552(a)(2)(E).

Finally, Count VI does not "run[] afoul of Section 1252(f)(1)." Dkt. 231 at 18. As an initial matter, § 1252(f)(1) does not cover § 552(a)(2)(E). Further, the relief requested does not "[p]rohibit[] ICE from *removing* [noncitizens] because the [February 18 Directive] was not preemptively disclosed." Dkt. No. 231 at 19 (emphasis added). Rather, it seeks to prohibit DHS from relying on or using the Directive to *re-detain*, and the memo and guidance to carry out third-country removals. Plaintiffs do not dispute DHS's authority to lawfully re-detain or conduct third-country removals under § 1231(b); rather, they challenge the lack of procedural protection in implementing that authority. The FOIA claim specifically contests reliance for that purpose.[22]

## IV.    CONCLUSION

The Court should grant summary judgment to Plaintiffs on Counts I, III, and IV and deny Defendants' motion to dismiss.


Respectfully submitted,


s/*Trina Realmuto*                          Matt Adams
Trina Realmuto                              Leila Kang
Kristin Macleod-Ball                       Aaron Korthuis
Mary Kenney                                Glenda M. Aldana Madrid
NATIONAL IMMIGRATION            NORTHWEST IMMIGRANT
  LITIGATION ALLIANCE              RIGHTS PROJECT
10 Griggs Terrace                          615 Second Avenue, Suite 400
Brookline, MA, 02446                       Seattle, WA 98104
(617) 819-4649                             (206) 957-8611
trina@immigrationlitigation.org      matt@nwirp.org

---

[22]    The Court should not dismiss Plaintiffs' FOIA claim now as most FOIA disputes are resolved on summary judgment. *ACLU of Maine Found. v. USCIS*, No. 2:20-cv-00422-JAW, 2022 WL 1747863 at *1 (D. Me. May 31, 2022); *Immigrant Legal Advocacy Project v. ICE*, No. 2:21-cv-00066-JAW, 2023 WL 2647602, at *1 (D. Me. Mar. 27, 2023) (same).

Anwen Hughes
Inyoung Hwang
HUMAN RIGHTS FIRST
121 W. 36th St., PMB 520
New York, NY 10018

*Attorneys for Plaintiffs and Class Members*

December 8, 2025

## CERTIFICATE OF SERVICE

I, Trina Realmuto, hereby certify that on December 8, 2025, I caused a true and correct

copy of the foregoing document to be filed with the Clerk of Court by using the CM/ECF

system, which will send a notice of the electronic filing to counsel of record for all parties.

/s/ *Trina Realmuto*
Trina Realmuto
National Immigration Litigation Alliance