## SECOND DECLARATION OF TIN THANH NGUYEN

I, Tin Thanh Nguyen, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.	I am an attorney in private practice at the Law Office of Tin Thanh Nguyen, PLLC, which is located at 6769 Albermarle Rd., Suite B, Charlotte, NC 28212. I also have an office in Viet Nam. I am over the age of 18, and I am competent to testify regarding the matters described below.

2.	I have practiced immigration law since 2007, representing hundreds of noncitizens in their immigration proceedings, both before U.S. Citizenship and Immigration Services as well as the Executive Office for Immigration Review.

3.	I also represent clients before the National Visa Center, Embassies, and U.S. Consulates around the world, mainly in Ho Chi Minh City, Viet Nam; Phnom Penh, Cambodia; and Vientiane, Laos.

4.	I am a member of the Federal Bars of the Eastern and Western Districts of North Carolina where I regularly file petitions for Writs of Mandamus. I have represented different Vietnamese nationals in the U.S. District Court for the Northern District of Alabama in Birmingham, AL and in the U.S. Middle District of Georgia in Columbus, GA on petitions for Writ of Habeas Corpus.

5.	For nearly twenty years, I have specialized in immigration and deportation cases involving Vietnamese, Cambodian and Laotian nationals. I have represented hundreds of Southeast Asians in the diaspora who are subject to final orders of removal and were released from immigration custody on an Order of Supervision (OSUP) because the Governments of Viet Nam, Cambodia, and Laos did not issue travel documents for their nationals.

6.	I currently represent eight clients who have been subjected to third-country removal by the U.S. government: two are in South Sudan and the other six are in Eswatini. Since their removal to South Sudan and Eswatini, I have been working to get them repatriated to Viet Nam, Cambodia, and Laos. The process has been slow and difficult, and so far, no one has been successfully repatriated yet. I make this declaration based on my conversations with my clients and their families, my communications with counsel who are also representing them or have represented

**EXHIBIT A**

them, my review of immigration-related documents for these clients, and my outreach to various governments and international actors and organizations.

## South Sudan - July 5, 2025

7.	I represent TTP, a Vietnamese national, and TN, a Laotian national, who were both removed to South Sudan over the Fourth of July weekend. TTP is forty-three years old. He was born in Viet Nam in 1982. He entered the United States in 1991 when he was nine years old. He had been living in the United States for thirty-four years. After completing his criminal sentence in March 2025, he immediately went into Immigration Customs Enforcement (ICE) custody because he had been ordered removed to Viet Nam in 2009. He remained in ICE custody until the end of May when he was deported from the United States.

8.	TN is forty-eight years old. He was born in Laos in 1976. He entered the United States in 1980 when he was three years old. He had been living in the United States for forty-five years. He was ordered removed in 2005 while serving time for a criminal conviction for which he served his full sentence. He was released on an order of supervision in 2023 and re-detained by ICE in March 2025.

9.	I began my representation of TTP and TN after they were deported to South Sudan. Since their deportation, I have made repeated outreach efforts to the governments of Viet Nam and Laos about their cases, with little success. I've also contacted the government of South Sudan, requesting they reach out to their home countries. On or around October 20, 2025, I learned that the United Nations International Organization for Migration (IOM), which has an Assisted Voluntary Return (AVR) program to help repatriate individuals and is involved in the repatriation efforts for two of my clients in Eswatini, is not involved in the repatriations of the men in South Sudan. I have learned through my conversations with IOM officials that their organization can only get involved if the government where the men are located officially requests its assistance with repatriation, and that the agency then liaises with the home countries to obtain the necessary paperwork to facilitate the return. For that reason, in my outreach to the South Sudanese government, I have requested that they directly reach out to IOM for assistance and support. On November 7th, I received confirmation from the South Sudanese Ambassador in Washington, D.C., Dr. Santino Fardol W. Dicken, that his government has formally asked IOM for help.

10.	I have spoken to TTP and TN only once for fifteen minutes on September 6th when I received a WhatsApp call from an unknown number from South Sudan.

However, I am able to relay messages to them through their relatives who speak to them more frequently.

11.     TTP's wife has shared with me that he is very anxious to finally be free. He has completed his criminal sentence but continues to be confined. He is frustrated about not getting any information about his situation since he does not have access to in-person legal counsel or any international humanitarian agencies. This uncertainty has taken a severe mental, emotional, and physical toll on him. His wife reports that he has lost a lot of weight since his deportation from the United States. The fear of not knowing what his future holds is deeply distressing and weighs heavily on his spirit.

12.     TN has reported to his sister that he is extremely frustrated, isolated, bored, and lonely from his situation in South Sudan. He deeply misses his family in the United States, and the separation is taking a toll on him mentally. He is ready to be released and repatriated to Laos.

### Eswatini (1st Group - July 16, 2025)

13.     My first two clients who were deported to Eswatini are DTN, a Vietnamese national, and PC, a Laotian national. They were deported to Eswatini along with nationals from Cuba, Yemen, and Jamaica around July 16, 2025. Both clients explained to me that they were not told that they were being deported to Eswatini until their plane was about to land in the country, and that all five men aboard the plane refused to sign the third-country removal notice to Eswatini they were belatedly given on the plane.

14.     At the time of their apprehension and removal, both DTN and PC had been living in the United States for a long time. DTN is thirty-four years old. He was born in Viet Nam in 1991. He came to the United States when he was fourteen months old and had been living in the United States for thirty-three years since 1992. He was ordered removed in 2018 because of a criminal conviction for which he served his full sentence and had been out on supervised release for two years when Immigration and Customs Enforcement (ICE) took him back into custody in May 2025.

15.     PC is forty-five years old. His family fled Laos in the late 1970s and sought protection in a refugee camp in Thailand where he was born in 1980. He entered the United States in 1987 when he was seven years old. He had been living in the United States for thirty-eight years. He was ordered removed in 2015 because of a

criminal conviction for which he served his full sentence and had been out on supervised release for about ten years when ICE arrested him in June 2025.

16.     I began representing DTN upon his deportation to Eswatini and request by his wife. Community organizers in the Vietnamese diaspora had been in contact with DTN since his detention in May 2025. On July 13, 2025, DTN informed the organizer and his wife that he was going to be transferred from El Paso to Louisiana, and then finally deported to Viet Nam. DTN's wife, however, did not hear from him for over twenty-four hours and learned from the ICE hotline that he had been deported, but did not know where. She only learned of his deportation to Eswatini when she saw Tricia Mclaughlin's, Assistant Secretary for Public Affairs for the Department of Homeland Security (DHS), post on X (formerly Twitter) on July 16, 2025, announcing that ICE had deported five men to Eswatini, which included a photo of her husband. After verifying his identity, I spoke to DTN's wife and mother on the phone.

17.     I started representing PC a couple of weeks after his deportation to Eswatini. The post on X did not include names, but only a photograph with criminal convictions and nationality.  On July 29, 2025, I shared the photograph of PC to different social media group pages for the Lao community in the United States, asking if anyone recognized him. Within 24 hours, I located his family, and spoke with his sister and she requested that I represent him.

18.     Being able to actually speak to the men directly to help them with their repatriation has been an ordeal. Another US lawyer, Alma David, who is representing other deported men in Eswatini, introduced me to an American attorney licensed and based in Eswatini. He learned that the five men were being held at the Matsapha Correctional Complex outside of Mbabane.

19.     On or around July 18, 2025, I asked him to visit in-person DTN and make contact with the other four men so that I can learn their identities, contact their family members in the United States, and find counsel for them. Generally, attorneys are allowed to visit prisoners from Monday through Friday. On Monday, July 21, 2025, the Attorney attempted to visit DTN and the others at Matsapha Correction Complex but correctional staff refused him access. He spoke with prison officials who assured him that the men were in good care. He then followed up with WhatsApp calls and messages to a prison official.  However, he never received a response or permission for an in-person visit at the prison.

20.     Since the Attorney was leaving the country to visit his family in the United States, he referred us to his trusted colleague, Sibusiso Magnificent Nhlabatsi,

a well-respected human rights attorney in Eswatini. Attorney Nhlabatsi made his first attempt to visit the five men on July 25, 2025. On that day, he waited from 8 am until 1 pm before the prison officials refused him access. The prison officials said that the normal prison rules do not apply to the five men because they are in a "special situation."

21. Attorney Nhlabatsi filed a petition for Habeas Corpus with the High Court of Eswatini seeking access to the men on July 31, 2025. Despite multiple, subsequent assurances by the government that he would be permitted to visit our clients, every time he has shown up to the prison to see the men, he has been denied access and given various reasons for the refusal. On August 5th, Attorney Nhlabatsi attempted to visit the men in prison for a second time. The prison officials told him that he was allowed to see them virtually, but not in person. On August 12th, Attorney Nhlabatsi attempted his third in-person visit. Again, he was made to wait for a long time and told that the men reportedly did not wish to see him. The prison officials eventually refused him access.

22. When I've spoken to my clients, DTN and PC, they have told me they have never refused Attorney Nhlabatsi access and, in fact, desire to speak to him. On October 3, 2025, the High Court granted Attorney Nhlabatsi's Habeas Corpus petition seeking access to the men. However, the government of Eswatini appealed that decision to the Supreme Court of Eswatini and the matter is pending. As a result, Attorney Nhlabatsi has not been able to meet with DTN, PC, or any of the other men.

23. About three weeks after this group of men arrived in Eswatini, my clients were finally able to make WhatsApp calls to their relatives. These calls were short video calls that were monitored and would occur weekly. Shortly after they first began calling their families, I messaged the number they called from in order to advise that I was the attorney for DTN and PC and asked that my clients be permitted to call me. However, neither of my clients was allowed to call me until late September. Now, DTN and PC call me about once a week, or every other week, usually together. They are in a room where the video from the call is projected onto a larger screen for a guard to be able to monitor what is happening.

24. During our calls, my clients have told me that the uncertainty of what will happen to them and the monotony of being in a maximum-security prison have really been wearing them down mentally and physically. Both DTN and PC have been feeling depressed, losing weight and losing their hair. PC has been particularly distressed by his arbitrary imprisonment. On his WhatsApp calls, he appears agitated,

and frustrated, and is often frowning and holding his head down. He has shared that he feels like a caged animal with no end in sight. He feels hopeless.

25. DTN and PC have both expressed frustration over being in government custody when they have already served their sentences and have not committed any offenses in Eswatini. They don't understand why they are being held in a high security prison.

26. DTN and PC are both eager to be released. I have been working to get DTN and PC repatriated. I've made numerous outreach requests to the governments of Vietnam and Laos, both through their embassies in the United States and South Africa as well as to their respective Ministries of Foreign Affairs in Hanoi and Vientiane. Both men have local sponsors willing to host them once they arrive and I have shared their information with their governments.

27. When I was first retained to represent DTN, I also contacted IOM immediately to let them know what was happening, but I did not receive a response. Eventually, after many messages, IOM has recognized my role as legal counsel for both DTN and PC and informed me it has accepted both men into its AVR program. From my conversation with IOM, I know that the government of Eswatini has reached out to the governments of Vietnam and Laos and is waiting to hear back from them regarding next steps for repatriating DTN and PC.

### **Eswatini (2nd Group - October 6, 2025)**

28. I also represent three other Vietnamese nationals—KVV, CCP, and TTL—and a Cambodian national—PR—who were removed to Eswatini on October 6, 2025. Two of the Vietnamese nationals' families had contacted me as their family members were in the air. They both told me that their family member had been given only about an hour's notice before being removed, and that the group appeared to be comprised of about 10 men. One of my clients had told ICE that he was afraid of being deported to Eswatini, but the officers ignored him.

29. When they landed, DTN and PC surprisingly were able to call me and let me know about the arrival of that second batch of deported men. On that same day, the men were able to contact their families. And over the next few days, I was able to speak to all four of my clients in this new group.

30. KVV is forty-nine years old. He was born in Viet Nam in 1976. He entered the United States in 1984 when he was eight years old. He had been living in

the United States for forty-one years. He was ordered removed in 2007 because of a criminal conviction for which he completed his sentence and had been out on supervised release for eighteen years when ICE arrested him in March 2025.

31. CCP is forty-nine years old. He was born in Viet Nam in 1976. He entered the United States in 1984 when he was eight years old. He had been living in the United States for forty-one years. He was ordered removed in 2022 because of a criminal conviction for which he served his full sentence. He had been out on supervised release for three years when ICE re-detained him in June 2025.

32. TTL is fifty-three years old. He was born in Viet Nam in 1972. He entered the United States in 1990 when he was eighteen years old. He had been living in the United States for thirty-five years. After completing his criminal sentence, he immediately went into ICE custody and was placed in removal proceedings. An immigration judge ordered him removed to Viet Nam in May 2025. He remained in immigration custody until he was deported to Eswatini.

33. PR is forty-two years old. His family fled the genocide in Cambodia and lived in a refugee camp in Thailand, where he was born in 1982. In 1985, at the age of three, he entered the United States and had resided there for forty years. After completing his criminal sentence in January 2025, he was immediately transferred to ICE custody, where he remained until his deportation to Eswatini. While serving his sentence, he was ordered removed in 2010 to the designated country of Thailand—a country of which he is neither a citizen nor national.

34. On October 16th and 29th, I reached out to IOM with my clients' information—including refugee documents, birth certificates, and sponsors' information—to explain their situation and get the repatriation process started. IOM advised me that the government of Eswatini had not yet requested its involvement, and that it could do nothing to help until it heard from the government first.

35. On October 27, 2025, I called the Embassy of Eswatini to the United States in Washington, D.C.. The Embassy staff advised me to write an E-mail to Ambassador Groening requesting that he directly communicate with IOM to help individuals in the second group.

36. I also contacted the governments of Viet Nam and Cambodia, again via their Embassies and Ministries of Foreign Affairs, and informed them of the situation. Last I heard, the government of Cambodia was working to schedule an interview with

PR in Eswatini to confirm his identity and nationality to begin the process of repatriation.

37.     On November 12, 2025, I received a WhatsApp call from PC. He informed me that an IOM official visited him and the others. It was the first time that IOM had met with anyone from the second group. I later received confirmation from PR, KVV, CCP, and TLL's relatives that they had met with IOM and signed documents requesting AVR.

38.     While this process is ongoing, I am assessing all available options to secure my clients' release from custody and, at a minimum, to ensure they have access to legal counsel in Eswatini.

39.     My clients from the second group deported to Eswatini have now been imprisoned for over a month. It is the beginning of summer and the rainy season in Eswatini. It's very hot and humid, and the prison does not have air conditioning. All of my clients are feeling miserable because of their situation, and the heat and humidity make the conditions of their indefinite imprisonment even more unbearable.

40.     According to KVV's fiancée, he appears older and skinnier from his one month in Eswatini. He is not doing well mentally and physically. He misses his loved ones in the United States and wants to be released from the prison and repatriated. His biggest fear is that he will not be able to return to Viet Nam and remain exiled in Eswatini.

41.     PR's sister says that he is extremely frustrated by his arbitrary imprisonment in Eswatini. After completing his criminal sentence, he remained in ICE custody for an additional nine months before being deported to Eswatini. The uncertainty surrounding his situation has taken a toll on his mental health, and he is eager to be released from custody and finally repatriated.

42.     CCP has been complaining to his sister that mosquitoes have become increasingly bothersome. He is constantly bitten throughout the day and night, and neither he nor the others have been provided with mosquito repellent or nets. Sleeping at night is miserable, as he covers himself completely with a blanket to avoid bites despite the heat of the summer season. In addition to these physical discomforts, the uncertainty surrounding the length of his imprisonment in Eswatini has caused significant mental exhaustion and distress.

43. TTL is terrified that he will be imprisoned in Eswatini forever. He has repeatedly told me that the prison there never lets people go, but he is trying to stay calm by exercising daily. TTL reports that resources in the prison are scarce, particularly medication. He has dentures that require adhesive cream to eat comfortably, but it has not been provided to him. The doctor and medical staff occasionally visit, and he requests medicine to ease the pain in his mouth, but his requests remain unmet.

### Notice and Travel Documents

44. I don't have any indication that the U.S. government had requested travel documents for any of my clients. In TTP's case, I have seen text messages showing that the deportation officer in that case had not submitted a request to Viet Nam for travel documents when the government put him on a plane to South Sudan. In DTN, KKV, CCP, and TLL's cases, it's unclear and highly improbable that ICE requested a travel document from Viet Nam prior to their deportation. Their family members in Viet Nam have confirmed to me that they were never interviewed or contacted by local police, which is the final step to verify a Vietnamese national's identity before the Ministry of Public Safety decides to issue a travel document.

45. In PR's case, I know that ICE did not request a travel document from Cambodia, but may have requested one from Thailand, where he is not a citizen or national. PR's refugee documents from the United Nations High Commission for Refugees (UNHCR) clearly shows that he is from "Kampuchea" (now Cambodia) -- and not from Thailand.

46. The U.S. government deported TN despite having a travel document to repatriate him to Laos. On June 26, 2025, in an E-mail to his sister that she shared with me, an officer at the Embassy of Laos DR in Washington, D.C. confirmed that he was "sure the Lao Government has agreed to accept him to Laos and his Travel Document was issued." The E-mail clearly disproves the U.S. government's claim that the Government of Laos refused to issue a travel document to TN, and that it had no choice but to deport him to a third-country.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, executed on November 13, 2025 in Charlotte, North Carolina.

_____
Tin Thanh Nguyen