## DECLARATION OF ALMA LEONIE DAVID

I, Alma Leonie David, make the following declaration based on my personal knowledge and declare under the penalty of perjury under the laws of the United States and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge:

1. I am a practicing attorney licensed to practice by the State of California. My business address is: Novo Legal Group, 4280 Morrison Rd, Denver, CO 80219, USA. I have been of counsel to Novo Legal Group since April 2021. I am over the age of 18, and I am competent to testify regarding the matters described below.

2. I have practiced immigration law exclusively since November 2008. I began my career as an Associate and Partner at several immigration firms in Seattle, Washington, where my practice focused on removal defense and, in particular, on representing individuals seeking protection from persecution and torture before the Executive Office for Immigration Review (Immigration Court and Board of Immigration Appeals) and federal courts of appeal. I have represented hundreds of clients in their removal proceedings, as well as dozens in affirmative applications for asylum, U and T visas, and Adjustment of Status before U.S. Immigration and Citizenship Services (USCIS). From 2015-2019, I served as an EOIR-appointed National Qualified Representative for immigration detainees deemed mentally incompetent to represent themselves in removal proceedings at the Northwest Detention Center in Tacoma. From 2018-2021, I was the immigration appellate attorney for Prisoner Legal Services New York (PLS) with a focus on appeals for detained clients. I also provided litigation mentorship and training to the staff attorneys in PLS' immigration unit. Since 2021, I have been of counsel to Novo Legal Group, which has offices in Washington and Colorado, and I provide legal writing services to private attorneys on a contract basis. Throughout my career, I have dedicated time and energy to pro bono work with various nongovernmental organizations (NGOs).

3. I currently represent eight (8) clients who were deported from the United States to third countries. One (1) of those clients was deported to South Sudan; the other seven (7) were deported to Eswatini.

## SOUTH SUDAN - EAH

4. I represent EAH, who was born in Cuba and ordered removed to Cuba. I began representing EAH on a pro bono basis on July 2, 2025, when his prior counsel took a leave from work.

5. EAH entered the United States with his parents in 1980 when he was one year old. He came into legacy Immigration and Naturalization Service (INS) custody in 1999 after he completed serving a criminal sentence. He was a lawful permanent resident (LPR) and was ordered removed to Cuba by an Immigration Judge in Miami, Florida on September 16, 1999. He was released from INS custody in 2001. The U.S. Department of Homeland Security (DHS) took EAH back into custody in 2025. He was transferred to several immigration detention centers and eventually to the one in Port Isabel, Texas.

6. The following information about EAH was reported to me by EAH during telephone and video calls that I have had with him since I took on representation as well as from his prior counsel.

7. On May 19, 2025, DHS notified EAH that they intended to deport him to South Africa. They presented him with a document stating this, and he refused to sign it. Later that same day, DHS told him that he would be deported to South Sudan instead, and he refused to sign that document, as well. On the night of May 19, 2025, DHS presented EAH with a document stating he would be transferred to Louisiana, and he signed this form to indicate his consent. He and the other men with him were told to get ready to leave. The following morning, May 20, DHS took EAH and the men with him to the airport. A DHS supervisor with the last name Chavez told the men they were going to Ireland. EAH asked if that was where they would be dropped off, and Supervisor Chavez answered affirmatively. The flight did stop in Ireland, but only to refuel. EAH and the other men were then flown to Djibouti where they arrived at the U.S. military base. When they arrived there, his impression was that the base personnel were both surprised and displeased about their arrival.

8. On June 24, 2025, while still in Djibouti, EAH had an interview with a DHS officer about his fear of torture in South Sudan. This interview had been ordered by the district court in *D.V.D. v. DHS*. Prior to the conclusion of the interview, the DHS officer informed EAH and his counsel that they had received an order to discontinue the interview immediately. The interview was never completed, and neither EAH nor his prior attorney were provided with a decision.

9. On July 2, 2025, I took over representation of EAH and entered a Notice of Appearance (Form G28) with DHS. I spoke with him for the first time on July 2, 202 and then several more times prior to the evening of July 4, 2025, when EAH's removal to South Sudan was imminent. Throughout the day on July 4, each time I spoke to EAH, he sounded increasingly frantic, and he reiterated to me several times his fear that he would be jailed in South Sudan and would never see freedom again. The last time I spoke with him from Djibouti was shortly after 5 pm Eastern Time on July 4, 2025. I found out later that evening that a military plane carrying EAH and the other men departed Djibouti and landed in Juba, South Sudan in the early morning hours of July 5, 2025 Central Africa Time.

10. In the days leading up to EAH's deportation to South Sudan, I had reached out to a number of individuals for advice on what I could do for him once he arrived there. Beginning on July 5, 2025, I attempted to obtain information on EAH's whereabouts and what I could do to advocate for his release from government custody from various sources. I communicated with academics who study South Sudan, a South Sudanese civil society organization representative, a local human rights attorney, a journalist/writer with many years of experience working in South Sudan, as well as representatives of the International Committee of the Red Cross (ICRC), Amnesty International, the Commission on Human Rights in South Sudan, and the International Organization on

2

Migration (IOM). I also filed a report with the United Nations Working Group on Enforced or Involuntary Disappearances and informed representatives of the Cuban government in Washington, D.C. and in Addis Ababa, Ethiopia, of EAH's situation. I also sent letters to the Director of Legal Affairs of the South Sudanese National Security Service (NSS) to request information on and access to my client.

11. Neither the Director of Legal Affairs of NSS nor anyone from the Cuban government has responded to my communications about EAH. IOM responded to me in July and October to say it was not involved in the situation with EAH, that South Sudan had not requested its involvement, and that – should South Sudan request their involvement – that request would be evaluated in line with its mandate. ICRC responded in July to confirm that it had been informed EAH and the other deportees were in South Sudanese government custody and referred me to the American Society of the Red Cross. Once EAH contacted me, his case fell outside of the Red Cross' mandate for tracing requests.

12. EAH called me for the first time from South Sudan around 3:00 am Eastern Time on August 12, 2025. Since that time, I have spoken to him nine times, each time for between two and 12 minutes. With the exception of one short call, all of my communication with EAH has taken place in the presence and earshot of guards, whom I believe to be armed, as well as of other detainees. I can hear and see others in EAH's immediate vicinity when speaking to him.

13. This is what I have learned from those calls: Since arriving in Juba on July 5, 2025, EAH has been detained in a building that is neither a prison nor a residence. He does not know where this building is, other than that it is in Juba. He has not been informed why he is detained. The building has multiple rooms and a common area, bathroom, and kitchen. Each of the men sleeps in their own room, which is locked at night. During the day, they are permitted to be in the common area. They are guarded, depending on the day, by 5-10 officers armed with AK-47 rifles. There is no tv, radio, books or paper and nothing for the men to do in the house. In late August, the guards provided a chess board for the men, which is now their only form of entertainment/activity. Also starting in August, the men were occasionally allowed to go into the courtyard while guarded, but because there are so many mosquitos, they do not go outside frequently. Until early September, the men only had electricity for 3 hours per day, from 6-9 pm. Some days they had no electricity. At night, it was very hot, and they were bitten by many mosquitos. Then, in late August, EAH and another man contracted malaria. EAH became so sick that he had to be taken to the hospital. After that, the men had electricity from 6 pm until daybreak for a couple of weeks and could run an air conditioner to avoid being stung by as many mosquitos.

14. Since mid-September, conditions have deteriorated. While the men still have electricity from 6 pm until 2:30 am most nights, there are stretches of several days at a time where they have no electricity at all. EAH's phone access has been more restricted – since September 15, he has been allowed three short phone calls. On at least two occasions, EAH has become so frustrated about the conditions of his detention that he has voiced his anger to the guards. On both occasions, he was met with threats of harm by the guards. He is feeling depressed and hopeless about the fact that there is no sign of change or

progress in terms of his release from detention or relocation to another country. During our latest call he told me that he had asked the guard if he could please have a radio for Christmas because he is so bored that his mental health is declining. The guard told him he did not think this was allowed. I also wrote a message to the guard at the WhatsApp number from which EAH calls me to ask if I could arrange for someone in Juba to meet him to provide books or paper and pens for the men, and the guard responded to say this was not allowed.

15. Godfrey Bulla, a human rights attorney in South Sudan, who has agreed to be my co-counsel on an attempt to obtain confidential/unmonitored access to counsel for EAH, has on multiple occasions attempted to obtain permission from the Ministry of Foreign Affairs and International Cooperation (which is where he was told his requests must be directed) to meet with EAH for a legal visit, but his requests have all been denied.

16. One of the other deportees, NM, is represented by Jacqueline Brown, an immigration attorney who directs the immigration clinic at USF School of Law. As a result of Ms. Brown's and my communication with Amnesty International, on September 9, 2025, Amnesty International released an "urgent action" about EAH and NM, requesting its members write to the South Sudanese Minister of Foreign Affairs and International Cooperation to urge him to disclose the whereabouts of EAH and NM; to grant them consistent and unmonitored access to their legal representatives, including their lawyer in Juba; to immediately clarify the legal grounds for their detention; and to not violate the principles of non-refoulement by forcibly sending them to a country where they are at real risk of persecution or serious human rights violations.

17. Since October 9, I have been informed on more than one occasion by South Sudan's ambassador to the United States, Dr. Santino Fardol Dicken, that – despite the efforts of South Sudan's Minister of Foreign Affairs and International Cooperation to engage the Cuban Ministry of Foreign Affairs in negotiations about EAH's repatriation to Cuba – no progress has been made in that regard.

18. In mid-November, because I had heard from attorney Tin Nguyen, who represents two of the men detained in South Sudan, that Ambassador Dickens had confirmed to him that South Sudan had requested IOM's assistance with regard to the deportees, I asked Ambassador Dickens whether IOM had agreed to provide support, and he responded that they had not. I have written to various contacts at IOM, including their country director for South Sudan, since that time to inquire myself whether IOM can assist my client or if there is any information that would be useful for me to provide to IOM about my client, but I have not received any response.

19. I have been attempting to obtain EAH's signature on a legal document. I have asked the guard from whose number EAH calls me, both via WhatsApp text message and via message relayed orally to him during calls with EAH, how I can get a two-page document to EAH for his signature and then have someone scan or fax the signed document back to me. The guard has informed me on multiple occasions that this transaction will have to go through the Ministry of Foreign Affairs, and that he will

4

provide me the email address or other contact information to which I can send the document once the Ministry has provided that information to him.

20. As of today, EAH remains detained in South Sudan in an unknown location and without having been informed of the legal basis for his detention.

## ESWATINI - KSW

21. I represent KSW, who was born in Yemen and ordered removed to Yemen. I began representing KSW in July 2025, although I did not speak to him until August 28, 2025. I was retained on his behalf on a pro bono basis by a close family member of his and have spoken with him and his family members several times since

22. KSW entered the United States on an immigrant visa around 1977 when he was 12 years old. He was an LPR and was ordered removed to Yemen by an Immigration Judge in Detroit, MI in 2002, while he was in criminal custody. Following completion of his criminal sentence in 2019, he came into DHS custody. As DHS was unable to obtain a travel document for him and once his detention became prolonged, he was released from DHS custody in 2020. He reported to U.S. Immigration and Customs Enforcement (ICE) regularly under an Order of Supervision (OSUP). In June 2025, DHS agents arrested him outside his home in Dearborn, MI.

23. KSW was moved to various DHS detention facilities before being flown to Eswatini. He did not know where he was being taken until he was on the flight to Eswatini around July 15, 2025. DHS presented him with a document allegedly about his destination on the plane, but he did not sign it. His family did not know where he was after he disappeared from the ICE detainee locator around July 13, 2025 until July 31, 2025, when I informed them that he had been deported to Eswatini after having identified him from the photo Assistant Secretary of DHS, Tricia McLaughlin, posted on X. KSW was finally permitted to call his family on August 1, 2025.

24. On July 16, 2025, when I saw the news of the third country removals to Eswatini, I communicated with some trusted colleagues, including Tin Nguyen, who was already in touch with the family of one of the deportees. We also were put in touch with Mia Unger, who had been retained by the family of another deportee.

25. I connected us with an American attorney who lives in and has practiced law in Eswatini and he has informed me of his actions. He had determined that the men were all being held at the maximum security prison housed at Matsapha Correctional Centre in Mbabane Eswatini. This attorney reached out to the U.S. Embassy in Mbabane to inquire about the process for requesting a legal visit with the five deportees. On July 18, the Political and Economic Officer for the U.S. Embassy informed him that all conditions of confinement, as well as any questions regarding access, communication, and visitation by family members or legal counsel, were the responsibility of the government of Eswatini. On July 21, he attempted to visit the men at Matsapha Correctional Centre, where he met with Officer-in-Charge Kunene and Deputy Officer-in-Charge Dlamini. Attorney visits are

5

permitted at the prison Monday through Friday. His in-person attempt for a legal visit was on a Monday. The prison officials informed him that the deportees were well cared for but explained that he could not visit them because they were out exercising. When pressed, the officials later stated that they needed permission for in-person visitation and would request it from the Commissioner General at His Majesty's Correctional Services, Phindile Dlamini, who was visiting the prison that afternoon. The attorney subsequently followed up with Officer Kunene via phone calls and WhatsApp messages on July 22, 23, and 24th. He never received permission for a legal visit. As the attorney was leaving Eswatini for an extended period, he connected us with his trusted colleague, attorney Sibusiso Magnificent Nhlabatsi, a human rights lawyer, who runs the Legal Clinic at the University of Eswatini and is the founding director of the Institute for Democracy and Leadership (IDEAL) and the Eswatini Litigation Centre. Mr. Nhlabatsi agreed to be our co-counsel in Eswatini.

26. Mr. Nhlabatsi has informed me of his efforts and kept me advised of the ensuing litigation. He first attempted to visit the five men on July 25, 2025, but was told by senior prison administration officers that the prison was not following regular visitation procedures for these inmates, that he could not visit the men that day, and that the prison would inform him on a later date if he could visit them.

27. On July 31, 2025, Mr. Nhlabatsi filed a petition for habeas corpus in the High Court of Eswatini, requesting that he be granted access to the men, for purposes of a legal consultation, either at the prison or in court. The habeas litigation has been cumbersome, and although the Constitution of Eswatini is clear on a detainee's right to counsel, the government of Eswatini has fought hard to keep Mr. Nhlabatsi from visiting our mutual clients. Even though the Commissioner of Correctional Services and Attorney General represented in court that Mr. Nhlabatsi would be permitted to visit with the men at Matsapha Correctional Centre on August 5 and then again on August 12, on each occasion, Mr. Nhlabatsi was made to wait for a long time and then presented with a pretext for denying him access. At various points in the litigation, the government opposed Mr. Nhlabatsi's request to hold a legal consult with the men, including by alleging that our clients refused to meet with Mr. Nhlabatsi (which our clients' families confirmed with our clients is patently untrue), that Mr. Nguyen was not actually an attorney but one of the detainees, that the men have U.S. attorneys who are not us. I filed a declaration in the case confirming that my clients wished to consult with Mr. Nhlabatsi After numerous delays, the judge of the High Court - on October 3, 2025, granted Mr. Nhlabatsi's request to visit the men at Matsapha Correctional Centre for purposes of a legal consultation. The government immediately appealed to the Supreme Court of Eswatini, which stayed the High Court's judgment. While on October 3, 2025, the judge had issued a short form order, on October 27, 2025, he issued a full written opinion. As far as I am aware, the appeal remains pending before the Supreme Court of Eswatini. The record of proceedings must be filed within three months of the October 3 decision, and then a briefing schedule will issue and so the appeal will not be decided until the first months of 2026. Meanwhile, the men remain without access to an in-person legal consultation from counsel in Eswatini about their rights there.

6

28. On August 11, 2025, I began sending messages to the WhatsApp number from which my clients' family members had received a call from Eswatini (which turned out to be the personal number of the Chief Officer of the prison, Jabulani Kunene) to request a call with my clients. My messages went unanswered. When I spoke with KSW for the first time on or around August 28, 2025, he called me on speakerphone on a WhatsApp video call from that same number. I asked him if he was somewhere private where we could have a confidential conversation, and he panned the camera so that I could see that he was sitting at a table with the other detainees, the Chief Officer, and another guard. I asked KSW if he could go somewhere where we could have a private conversation, and the Chief Officer said loudly in the background that this was not allowed, and that "this is not like in America." I responded that he could surely understand that it was important for me to be able to speak with my client in private and asked how that could happen. The Chief Officer told me only attorneys who come to meet with inmates in person can have conversations that are observed but not listened to by a guard. I reminded him that Mr. Nhlabatsi had indeed tried on multiple occasions to meet in person with my client and the other men and had been turned away, and the Chief Officer told me that this had occurred because Mr. Nhlabatsi had not applied for permission to visit the men from the U.S. Embassy in Eswatini. He stated this twice: that Mr. Nhlabatsi had to obtain authorization from the U.S. Embassy in order to visit the detainees.

29. Since that time, I have spoken via WhatsApp with KSW on multiple occasions. Each time, the call has taken place in the presence and earshot of at least one guard. Beginning at the end of September or beginning of October, KSW calls me from a small room in which some type of conferencing equipment is affixed to the wall, and the client sits on a chair, several feet away. The sound quality in the room is terrible, and the door of the room is left open so that a guard can stand in the doorway to observe and listen to the call. As a result, in order to hear each other, KSW and I have to speak very loudly and even so, I only understand about half of what KSW is saying. The calls last about five minutes, and then the guard tells KSW that his time is up. The calls with him and my other clients are not scheduled, and the time difference between Eastern Time and South Africa Standard Time is substantial, so he calls me anytime between 6 am and 11:30 am my time, depending on the day. He has once called on a weekend. I always answer the phone when I see that the call is coming from Eswatini, because I know the detainees are only provided with limited access to calls.

30. Since I first spoke with KSW, he has lost quite a lot of weight and his face looks gaunt. He is 70 years old, and when I first spoke with him, he was quite energetic. Now when I speak with him, he appears tired and low-energy. He has told his family and me that he is not given much food, and the food he gets is usually rice with a vegetable. If the men want to eat meat, they have to buy it with their own money, which requires their relative to send money to Mr. Nhlabatsi and Mr. Nhlabatsi to travel to Mbabane (a 30-40 minute drive from his office) to collect the money and deposit it in his bank account so that he can deposit it on the men's account via a mobile money service.

31. Around the same time that KSW was permitted to call his family for the first time, he reported to them that representatives from the International Organization on Migration

(IOM) had come to visit him and had brought him some clothes. I knew that IOM was likely providing the men with access to Assisted Voluntary Returns (AVR) to their countries of origin, so I tried to engage with IOM about KSW's case, as his family had told me that they feared it was not safe for him to return to Yemen. Eventually, IOM was willing to talk with me about his case and informed me it does not currently perform AVRs to Yemen. While IOM occasionally assists individuals who opt into their AVR program but cannot actually be returned to their countries of origin with relocation to a third country, that requires the individual to have legal authorization to enter and remain long-term in that third country. KSW's sister and her husband, who live in a country that is not Yemen or the United States or Eswatini, have informed me that they would be willing to have KSW come and live with them if he could obtain the right to legally enter and live in that country. In mid-October, I provided their contact information to IOM, so that IOM can support them in the processes of applying for legal status for KSW in that country and also of applying for a Yemeni national identity document for KSW, as KSW's sister and her husband, both of whom are elderly, informed me that they have no idea how to even begin either process. So far, IOM has not contacted KSW's sister or her husband. Even should IOM support the family in applying for legal status in this other country, based on my cursory review of its very restrictive immigration requirements, I have very little hope that KSW will be granted legal immigration status there. While IOM was briefly responsive to my emails about KSW's case, since the end of October, it has not responded to my multiple attempts to communicate about his case, including my email saying that I have received a copy of KSW's expired Yemeni passport, which would likely be useful in any attempt to obtain an identity or travel document for him from the Yemeni authorities.

32. The last two times I spoke with KSW, within the past week, he let me know that it did not appear IOM was still willing to support his sister's application for a visa and that she would have to hire a lawyer to help her. He also reported that he asked the IOM officer who visited him to call me and that the officer said he could not but would pass that request on to his boss.

33. Mr. Nguyen, Ms. Unger and I also connected with an individual at Amnesty International whose area of focus includes Eswatini. On September 19, 2025, Amnesty International released an "urgent action" calling on Eswatini's Minister of Justice and Constitutional Affairs to officially disclose the five men's whereabouts, immediately grant them regular and confidential access to their lawyers, and provide the legal grounds for their detention.

34. Since arriving at Matsapha Correctional Centre, KSW has not been informed by anyone why he is detained, what his current legal status is in Eswatini, how long he should expect to be detained, what must happen in order for him to be released from the prison, or what will happen to him if IOM cannot relocate him.

## ESWATINI - RMDP

35. I represent RMDP, who was born in Cuba and ordered removed to Cuba. I began representing RMDP at the end of July. I have spoken to him and his family members and friends on multiple occasions.

36. RMDP came to the United States in 1980 at the age of 12. He came into legacy INS custody in 1996 after serving a criminal sentence. He was ordered removed to Cuba in 1996 by an Immigration Judge in Miami, Florida. INS was unable to effectuate his removal to Cuba, and he remained in INS detention for five years. He was released from INS custody in 2001 and placed under an OSUP. He came into DHS custody again briefly in 2012 following completion of a criminal sentence but was released again under his OSUP. He attended his ICE check-ins and had work authorization. At his check-in in June 2025, he was taken into DHS custody in Miami. He was moved to various detention centers until he was deported to Eswatini. He was not informed he was being deported to Eswatini until he was already on the plane, when DHS presented him a document about his destination. He refused to sign it. The plane stopped in Puerto Rico and then at another location. The flight to Eswatini was on a military plane.

37. RMDP is afraid to return to Cuba. His mother was politically engaged against the Castro regime and was imprisoned there for 18 months as a result. RMDP believes that that he is at risk of harm in Cuba as a result of his mother's political activity, his own opposition to communist ideology, and his own criminal history and former gang (Latin Kings) affiliation, which DHS has broadcast (inaccurately) on X with his photo.

38. RMDP has a large circle of family members and close friends in the United States, including United States citizen children, and I am in frequent communication with many of them.

39. Because RMDP informed IOM that he cannot return to Cuba, he is not in IOM's AVR program. As such, IOM can only provide him with limited assistance, such as humanitarian aid in the form of clothes, personal hygiene products, and so forth, as well as psychosocial support, should he request it. No other international agency, including UNHCR, has had access to him or the other detainees.

40. On October 15, 2025, feeling increasingly desperate about his illegal and indefinite imprisonment in Eswatini and frustrated by the fact that his basic human rights were not being respected, RMDP began a hunger strike demanding an end to his arbitrary detention and a chance to see his children again.

41. I was deeply concerned about this development from the outset, because Mr. Nhlabatsi informed me that the prison authorities in Eswatini are entirely unaccustomed to hunger strikes and will not know how to handle the situation of a prisoner who refuses to eat and whose health begins to decline as a result.

42. Of course, his children, other family members, and close friends have been extremely concerned as well. In an effort to draw attention to RDMP's plight and to obtain accountability from his legal custodians, RMDP's close family friend and I reached out to three trusted journalists at the Associated Press, Reuters, and Agence France Presse news agencies and informed them of the hunger strike. The news agencies contacted the government of Eswatini for a position, and on October 22, 2025, the government released a press statement claiming that RDMP was fasting as part of a religious practice and that the government, in the interest of upholding religious freedom, would not intervene.

43. I also spoke with our contact at Amnesty International to inform him of the hunger strike.

44. When I spoke briefly with RMDP on October 22, he informed me that he had not seen a doctor or any kind of medical professional since he had stopped eating on October 15. He also informed me that the prison authorities had told him they would involve the U.S. Embassy in his situation. He told me that representatives of the government of Eswatini had visited him in prison.

45. On October 24, Amnesty International released a statement about RDMP's hunger strike, which said that it exposes the human cost of the unlawful transfer agreement between the United States and Eswatini and of RDMP's unlawful detention without due process. Amnesty International urged the government of Eswatini to ensure confidential access to lawyers and families of all detainees and to disclose the legal basis for their detention. It further urged the Eswatini authorities to promptly release RDMP and the other deportees or establish lawful grounds for their detention before a competent court.

46. I sought to obtain regular updates on RMDP's condition from the Correctional Services. I reached out to the Legal Officer at Matsapha Correctional Centre, to request such updates and that RMDP be provided with a visit by a medical and a mental health professional. The Legal Officer provided what I can only characterize as a dismissive response, stating that my concern that my client was on hunger strike was unfounded but that he would forward my request to head of the department. When I reiterated my requests, the Legal Officer informed me that only the governments of the United States and of Eswatini could help me, and that he was not a government spokesperson and thus could not answer my requests and had only responded as a matter of courtesy.

47. I also reached out to IOM to request that the organization bring a medical professional to Matsapha to examine RMDP and asked them to raise concerns about his health to their counterparts in the government of Eswatini. IOM informed me they would raise my concerns and then, on October 29, reported that they had been informed that RMDP was being attended to by health professionals within the facility and that he would be transported to a medical and mental health provider outside the prison on November 3.

48. I subsequently contacted the Legal Officer again to reiterate my request for a medical update, to which he responded that he recommended that I contact RMDP or his family directly or request that the government of Eswatini invite me to its weekly briefings with IOM.

10

49. I contacted the Assistant Commissioner of Correctional Services to ask him for copies of any medical reports about RMDP, to permit me to have scheduled, confidential conversations with RMDP, and to permit an in-person visit between RMDP and his attorney in Eswatini, and he referred me to the same Legal Officer with whom I had already been in contact.

50. IOM reported to me that they had been informed that I should direct any further requests for access to RMDP to the same Legal Officer and had been assured that all communication between detainees and their lawyers were private and confidential. I inquired with IOM about who would be able to invite me to the weekly briefings the Legal Officer had mentioned and was informed it would likely have to the Prime Minister's office.

51. On November 6, I contacted the Legal Officer again to reiterate a request for a scheduled, confidential phone call with RMDP, permission for an in-person visit with a lawyer, and an update on his health, including copies of any reports from health professionals he had seen in the past week. The Legal Officer responded to say that I must communicate these requests, including any requests for health reports and physical visits by anyone (whether by me or someone at my instruction) to the United States and Eswatini governments through the appropriate diplomatic channels. He agreed to relay my message regarding my request for private phone calls to the head of the department but assured me that calls were already private. He agreed to request senior management to inform the IT team to make a headset available for future calls. I responded to let the Legal Officer know that the United States government had already disavowed all responsibility for the men deported to Eswatini and asked him to clarify if his position was that RMDP and the other men were not actually in the legal custody of the Correctional Services. I also let him know that I have seen and heard the guards sitting in the room with my client during calls and that a guard had previously participated in my conversation with a client.

52. The Legal Officer responded to say that I had "the wrong narrative" about the detained men, who were not prisoners. He urged me to contact the Ministry of Foreign Affairs and Home Affairs through the Embassy of Eswatini in the United States to get all of the answers about the status of RMDP and the other men and how Correctional Services fit into the picture.

53. I spoke with RMDP on November 7. He informed me that, about two weeks prior, a psychologist had met with him and had conducted a detailed interview, which she also recorded on her cell phone. The psychologist had come on behalf of the U.S. Embassy, though she had not informed him of that at the time; he was later told this by an official at the prison. On November 3, he had been taken to see a doctor and a psychologist outside of the prison for an evaluation, and the security officer who had accompanied him had reported that the psychologist's report would also be forwarded to the U.S. Embassy. RMDP further reported that he had developed some lumps under his skin on his abdomen, which he had been told were indicative of liver disfunction and that a prison

official had told him he would be taken to the hospital for a medical check-up on November 10.

54. That same day, I called the Embassy of Eswatini in Washington D.C., where I was connected to a woman who was identified to me as the secretary to the Ambassador, though she refused to spell her name for me when I asked her to. I informed her that I was very concerned about my client RMDP, who was currently on hunger strike at the Matsapha Correctional Centre in Eswatini, and that I had been informed by the Correctional Services that I had to direct my request for health information and access to my client to the Embassy. She advised me to send an email to embassy@eswatini-usa.com explaining my concerns, and that the Ambassador would see my email when he returned to the office on November 12. I asked her if there was a way to get a message to him sooner than that, and she reiterated her recommendation that I send an email to the above listed address. I sent an email explaining my concerns and requesting that RMDP be provided with medical care in a timely manner; that I be provided with copies of the psychologist's report taken at the prison, as well as of the doctor's and psychologist's report from the visits on November 3; that I be provided with regular updates on his condition; and that he be permitted an in-person visit with his attorney in Eswatini, as I am not currently able to visit him in person.

55. I also reached out to the political advisor at the U. S. Embassy in Eswatini, introducing myself and explaining my concerns and requesting a copy of the psychologist's report commissioned by the U.S. Embassy and requesting a brief phone call to discuss my concerns, as I had not been able to reach anyone who was taking responsibility for my client's well-being. The political advisor responded to me to acknowledge my message and recommend I contact the government of the Kingdom of Eswatini about the matter referenced therein.

56. I spoke with RMDP again briefly on November 10, 2025. He let me know that he was suffering from pain in his abdomen and back and that he had not been taken to the hospital after all. When he had asked the prison staff about a hospital visit, they had told him they did not know anything about this.

57. I reached out to the Legal Officer of the Correctional Services to inform him that RMDP was in pain and requesting him to ensure he receive timely medical attention for what could potentially be a symptom of organ failure. He responded to say that he would forward my message to his superiors.

58. I also reached out again to the political advisor at the U. S. Embassy in Eswatini to inform him that my client was in pain and had not seen a doctor and to request that he intervene. He did not respond.

59. I called the Embassy of Eswatini in Washington, D.C. again, where I was transferred to a different woman, who identified herself as the Assistant to the Ambassador. I relayed my concerns to her, and she told me she had written them down and that I should also send another email to the same email address as before to summarize my concerns. She told

12

me that the Ambassador was returning from official business in Brazil and reiterated that he would be in the office on November 13 and would be presented with all of his emails printed out, as well as the messages that had been left for him by callers.

60. On November 11, RMDP called me briefly to inform me that he had been taken to see a doctor, who had taken his blood and examined him and told him that he was healthy and that the skin lumps were caused by drinking a lot of water and that his abdominal pain was caused by being hungry. When RMDP asked if his liver could be the cause of his pain, he was told he would need an ultrasound of his liver. RMDP reported he continued to suffer from abdominal pain.

61. On November 14, I called the Embassy of Eswatini and was told by the Counselor/Deputy Chief of Mission that the Ambassador had "called the capital" and was told that the governments of Eswatini and Cuba have begun a conversation about the Cuban nationals deported to Eswatini through the appropriate diplomatic channels, so I should refer any questions about RMDP to the Embassy of Cuba in South Africa. I informed the Counselor that this was potentially good news for one of my Cuban clients, but not for RMDP, who is afraid to return to Cuba. I let her know that it would be very helpful if I could speak with the Ambassador to provide him with the full picture of RMDP's situation and that of my other clients, and she said she would relay that message to the Ambassador. I have not received any communication from the Embassy since.

62. Also on November 14, RMDP called me to let me know that he was scheduled to go for an ultrasound of his abdomen on November 17, as he continued to be in pain.

63. On November 17, having not heard from RMDP, I wrote to the Legal Officer to inquire about RMDP's condition. The Legal Officer let me know that he was not at the facility, but that RMDP had been seen at the hospital and that he would send me an update the following day.

64. On November 17, the Legal Officer wrote to me to inform me that, as of November 15, RMDP had begun gradually eating again and was eating a diet prescribed by a doctor. The next day I spoke with RMDP, and he confirmed that he had begun eating.

65. IOM is the only non-governmental body that has access to the men, and intervening in any manner in RDMP's hunger strike did not fall within their mandate. Similarly, while I have not directly reached out to the International Committee for the Red Cross (ICRC) office in South Africa that covers Eswatini, contacts at two other organizations, with whom I had unofficial conversations about RMDP's case, did reach out to trusted contacts at ICRC and also the Red Cross Society in Eswatini and were informed that neither organization conducts detention visits.

66. I was and remain deeply concerned about RMDP's well-being and safety. He has communicated to me on multiple occasions that he feels anguish over his detention, as there is no obvious resolution in sight – he cannot safely return to Cuba, there is no current pathway for him to return to the United States to reunite with his family, and he

13

remains imprisoned in Eswatini without a justification for his detention or any insight or suggestion as to how and when it might end. He understands that the United States government is paying a lot of money to the Eswatini government to have received him, but he does not understand, nor does he accept that this means his basic human rights must be violated. What his hunger strike exposed was that the prison staff do not know how to cope with an inmate on hunger strike and will likely not intervene until it is too late. It exposed that the United States government will not intervene or do anything to prevent one of the deportees' severe health decline or death. And it highlighted that the government of Eswatini at the highest level, where decisions about anything related to the agreement between the two countries regarding third country nationals appear to be made, was either not being informed of RMDP's hunger strike or did not wish to jeopardize its agreement or any future agreements with the United States by responding to RMDP's hunger strike, lest they give the impression that a hunger strike is an effective way for other third country nationals to avoid detention upon deportation to Eswatini.

67. Since he has concluded his hunger strike, I have spoken with RDMP several times. He is slowly gaining back the weight he lost, which his family members estimate to have been about 30 lbs, based on his appearance. During our last call on December 2, he told me that the prison officials have organized a type of excursion for the detainees, which RMDP characterized as a propaganda tour: apparently the men will be taken to a tourist site, which is a cultural installation where one can watch local tribe members perform traditional dances. The deportees were told that they will take photos at the site with the performers, which they can then send to their family members to show them that they are having a good time in Eswatini and that there is nothing to worry about. RMDP expressed to me that he felt very conflicted about this trip because on the one hand, he did not want to participate in what he understands to clearly be propaganda; on the other hand, he is desperate to get out of the prison, even if just for a day.

68. On December 2, along with Cornell Law School's Transnational Disputes Clinic and the Global Strategic Litigation Council, I filed a complaint with the African Commission on Human and People's Rights (ACHPR) against the Kingdom of Eswatini on behalf of KSW, RMDP, and another man (OE), who had also been deported to Eswatini before being repatriated to Jamaica, his country of origin. Among other things, the complaint challenges Eswatini's unlawful and prolonged detention of the 14 current so-called third country deportees detained there and alleges that their arbitrary and indefinite detention violates the Kingdom of Eswatini's obligations to safeguard basic rights, including the rights to liberty, due process, and meaningful access to legal counsel.

### ESWATINI - EW

69. I represent EW, who was born in the Philippines and ordered removed to the Philippines. I began representing EW in mid-October 2025. I was retained on his behalf, on a pro bono basis, by his family. I spoke with EW for the first time on November 4, 2025.

70. EW came into DHS custody in 2024 after serving a criminal sentence. He was ordered removed to the Philippines by an Immigration Judge in Tacoma, WA. However, the

14

government of the Philippines does not recognize him as a Filipino citizen, and DHS was unable to obtain a travel document for him. Although his father is a U.S. citizen who served in the U.S. Armed Forces in the Philippines – as were his grandfather and great grandfather – EW does not appear to have derived U.S. citizenship from his father.

71. EW was transferred from DHS custody in Tacoma to the Adelanto Detention Center in California. There, he filed a pro se petition for habeas corpus to secure release from his prolonged immigration detention. Soon thereafter, he was deported to Eswatini.

72. I have been in contact with EW's family members, an immigration attorney with whom he previously consulted, as well as a lawyer who understands Filipino citizenship law. It appears that EW is stateless.

73. I have tried to engage IOM on EW's case. So far, IOM has not responded to me about EW.

74. I have sought the technical guidance of UNHCR, owed to their mandate on the 1951 Refugee Convention, the 1967 Protocol, and the 1954 and 1961 Statelessness Conventions.

75. I have also reached out to the Embassy of the Philippines in Pretoria, South Africa, to alert them of EW's situation and to request assistance. On December 4, I received a response from the Consular Officer, who provides assistance to nationals of the Philippines, acknowledging my request, reiterating that EW is not a citizen of the Philippines, but requesting a variety of documents, including the order of the Immigration Judge ordering EW removed, in order to assess whether the Embassy might be able to build a case for his repatriation to the Department of Justice under the framework of Statelessness and Humanitarian Assistance, as the Philippines is a signatory to the 1954 Convention Relating to the Status of Stateless Persons.

### ESWATINI - JFCA

76. I represent JCFA, who was born in Cuba and ordered removed to Cuba. I began representing him in October 2025.

77. JCFA came to the United States in 2003 and was ordered removed to Cuba by an immigration judge in Miami, Florida in 2018 while he was in criminal custody. He finished serving his criminal sentence in 2022. In 2025, he was detained by DHS. He was transferred to various DHS detention centers. He was told by DHS that Cuba had refused his repatriation and that he would be deported to a different country. He requested to be deported to Mexico, as he had heard that Cubans were being deported there. Instead, he said that shortly after he filed a petition for habeas corpus to challenge his prolonged detention, he was deported to Eswatini.

78. I am in contact with JCFA's family members both in Cuba and in the United States. His family members in Cuba have informed me that they requested help in securing his

15

release from prison in Eswatini and repatriation to Cuba from the Cuban Ministry of Foreign Affairs and the Directorate of Immigration and were told that because he has been absent from Cuba for 20 years, he had lost his right to return.

79. JCFA suffers from problems with his prostate and, upon arrival to Eswatini, had blood in his urine. It is unclear to me currently whether he has received appropriate medical attention for this issue.

80. JCFA wishes to be repatriated to Cuba, and I have requested that IOM assist him with an AVR process and have indicated that I can provide a copy of his Cuban birth certificate and identification document to IOM. On or about October 17, I was told that because the government of Eswatini has not requested support from IOM regarding the deportees who arrived in October, IOM could not assist JCFA. I asked IOM to confirm that this is true, as the agreement between the United States and Eswatini states that it is the United States that will engage IOM to assist with relocation of the deportees to Eswatini; I was initially informed that it is the government of Eswatini that must request support and provide IOM with authorization to operate in its territory. In mid-November, IOM met with JCFA for the first time, and I believe they have met with him again since then, but I have not spoken to JCFA since early November. I have written to IOM multiple times to reiterate his request for its assistance with an AVR process and that I remain ready to provide a copy of his birth certificate and ID document. IOM has not responded to me.

81. JCFA's family in Cuba has told me that in his phone calls with them, he has become increasingly agitated because he feels trapped. He does not understand how he can be imprisoned in a country where he has done nothing wrong and why he is being kept so far away from his family and everything that is familiar to him.

**ESWATINI - FBP**

82. I represent FBP, who was born in Cuba and ordered removed to Cuba. I began representing FBP in late October. I am in contact with FBP's long-time partner in the United States.

83. FBP came to the United States in 1980 alone, at the age of 16. He came into DHS custody following his completion of a criminal sentence and was ordered removed to Cuba in 1998 by an Immigration Judge in Oakdale, Louisiana. He was in DHS custody for several years until he was released under an OSUP, pursuant to which he attended regular check-in appointments with DHS and had valid employment authorization. He came into criminal custody again around 2017 but was not taken back into immigration custody following completion of his sentence.

84. In 2025, FBP was arrested by DHS at his check-in appointment. He was transferred to various detention centers, including Pine Prairie and Angola Prison. He was informed by DHS that Cuba refused his repatriation several times. Shortly after he filed a pro se petition for habeas corpus, FBP was deported to Eswatini.

16

85. FBP suffers from high blood pressure and takes medication for his condition. He has received some medication from the doctor at Matsapha. FBP is upset because he feels that his rights are being violated and that he is illegally imprisoned. He told me that he had asked the prison authorities to give him access to the law library, as he wanted to research what his rights are and how he can demand to be released from prison. He told me that the prison authorities appeared confused and told him they would have to inquire if the prison had such a facility.

86. IOM has come to visit FBP; the first time they came was on November 12. FBP has told me that because IOM appears to believe that it is unlikely that Cuba will accept his repatriation, it has asked him if there is another country where he may be able to live. FBP told IOM that he has a friend who, along with his wife, live in Mexico. FBP reported to me that IOM asked him to contact his friend in Mexico to inquire whether this friend can help FBP apply for and obtain a visa to live in Mexico, and that if so, IOM may assist him in arranging for and paying for his travel there. So far, FBP has been unable to reach his friend. Based on my limited knowledge of Mexican immigration law and the current public sentiment in Mexico about Cubans deported there, I believe it is unlikely that FBP will be able to obtain long-term legal status in Mexico.

87. I have written to IOM multiple times since late October to engage on FBP's case, but I have not received a response.

88. FBP's long-time partner is emotionally devastated by her partner's disappearance. While he was detained in Louisiana, she drove to each detention center to either visit him or to try to speak with DHS officers in person to understand why he had been detained and how she could secure his release. He was an integral part of her everyday life and of her family, and she reported to me that her grandchildren do not understand where the man they consider their grandfather went and that they have stopped wanting to visit her because they find the situation so upsetting. She is seeking mental health treatment because she does not know how to cope with the situation.

### ESWATINI - CM

89. I represent CM, who was born to a Haitian mother and Gabonese father in Haiti and ordered removed to Haiti. I began representing CM in November 2025.

90. CM fled Haiti when he was about ten years old and lived in the Bahamas until he came to the United States alone at the age of 13 in 1976 using what he believes was a Haitian passport with a visa that allowed him to work as a mess boy on a ship. He believes that he was granted asylum in the United States in 1984. He came into ICE custody following completion of a criminal sentence around 2003 and was ordered removed to Haiti in 2003 by an Immigration Judge in Orlando, Florida. He reported that he believed he was a citizen of both Haiti and Gabon, but that he did not have any documentation to substantiate citizenship in Gabon. ICE informed him that they had tried to obtain a travel document for him from Haiti but had been told that because he had been absent for too long, Haiti would not issue one. He was under an OSUP beginning in 2006 but was taken

17

    into criminal custody in at the very end of 2018, and was returned to DHS custody in 2025. DHS attempted to remove him to Congo but was not able to do so. He was in DHS custody until he was deported to Eswatini.

91. CM does not have any family members in the United States, and he has not spoken to his relatives in Haiti since he left when he was a child. He was diagnosed with cancer while in criminal custody in Pennsylvania and had to have surgery to remove a kidney; as a result of having only one kidney, he must eat a special and restrictive diet. Because the food he is provided with at Matsapha does not conform to this diet, he has been ill and had to be taken to a medical facility as he lost the ability to control his bowels. He reports that he was unable to eat for four days and then was able to tolerate plain rice. He is not in contact with anyone who could send money to put on his commissary account so that he could purchase some food from the commissary, such as chicken.

92. I also wrote to the Legal Officer at Matsapha to inform him of CM's medical condition and to request that they accommodate his dietary needs. The Legal Officer responded to tell me I was making false statements aimed at damaging Eswatini's good reputation, and that the medical problems CM was suffering had resulted from a complication stemming from the operation he had in the United States to remove his kidney. He asked me to avoid creating false narratives and instead help my clients to get back to their families so they could live a normal life like he and I.

93. CM was treated at the prison's medical unit for numerous days due to his kidney condition, and when I spoke with him on November 24, after he had returned from the medical unit, he was in a lot of pain. He was wearing a urine bag and reported that urinating was excruciatingly painful. I wrote to the Legal Officer again to request that CM be provided with pain medication, and he responded to say that he would investigate the situation. I spoke with CM again on December 3, at which point he appeared to be in less pain physically. He reported that he was taking medication.

94. I have written to IOM on multiple occasions to inform them of CM's medical condition and to request that they speak with him about accepting him into the AVR program if IOM is currently conducting AVRs to Haiti. I have not received a response from IOM. CM reported to me that IOM visited with him, but he appeared unsure what they would be able to do for him.

### ESWATINI - AAM

95. I represent AAM, who was born in Ethiopia and I believe was ordered removed to Ethiopia. I have only spoken with AAM twice so far, and due to a language barrier and the fact that he is a soft-spoken person and that in order to hear each other via the prison's communication system, one must speak at high volume, our communication has been labored. I have been able to confirm that he wants me to represent him, along with some basic biographical facts. He asked me to do whatever I can to get him out of Matsapha Correctional Centre. I was able to get a copy of his Notice to Appear (NTA) scanned to me by the Legal Officer, as AAM did not know his Alien Number (A Number), which I

required in order to request his file from EOIR. According to his NTA, AAM was admitted to the United States as a refugee in 2011. I believe he came into ICE custody in early 2025 following completion of a criminal sentence that began in 2013. I have written to the Legal Officer at Matsapha multiple times to request that he make a headset available to the detainees for their calls, as the inability to hear and understand each other on the very short calls with my clients, including AAM, renders it extremely difficult to have any kind of substantive exchange. The Legal Officer has responded to say that he has relayed my request to "those in charge." On December 3, I also requested that I be permitted to schedule a phone call with AAM (currently, the detainees call whenever they are given permission to use the phone, but there is not a way to schedule a call) with a telephonic interpreter, so that I can obtain more information from him.

96. AAM has confirmed that IOM has come to meet with him. I have written to IOM to engage on his case, but IOM has not responded to me.

Executed this 5th day of December 2025 at Red Hook, New York.

_____
Alma Leonie David