## DECLARATION OF JACQUELINE M. BROWN

I, Jacqueline M. Brown, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of California. My business address is 2130 Fulton Street, San Francisco, CA. I have been employed at the Immigration & Deportation Defense Clinic at the University of San Francisco, School of Law, since 2015.  I am an Associate Professor and currently the clinic's Director. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since 2005, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts and with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3. I began representing NM, a citizen of Burma, on May 14, 2025, and I have continued to represent him after the U.S. Department of Homeland Security (DHS) deported him to South Sudan, even though that was not previously designated as a country of removal or identified in prior proceedings as a country to which he would be removed.

4. On August 17, 2023, after appearing pro se on an application for protection under the United Nations Convention Against Torture (CAT), NM's CAT application was denied and he was ordered removed to Burma.

5. On May 20, 2025, DHS attempted to deport NM to South Sudan without meaningful notice or an opportunity to apply for fear-based protection. Because of an order issued pursuant to a preliminary injunction in *D.V.D. v. U.S. Department of Homeland Security*, he was detained at a military base in Djibouti until July 5, 2025.

6. NM had a fear of persecution and torture in South Sudan based on his inability to read or write in any language, and his inability to speak English or any other language spoken in South Sudan.  He was afraid that he would be a target for violence in South Sudan due to his status as a foreigner or due to the characterizations of his criminal conviction and that he would not be able to obtain protection there. He was more afraid after the publicity regarding third country deportations to South Sudan when his picture was publicized by DHS and subsequently appeared all over the internet.  He was equally afraid that the police or other government officials would arbitrarily detain him.

7. While he was in Djibouti, I met with him many times by video-conference with the assistance of a Karen interpreter.  NM articulated his fear when we were preparing for a reasonable fear interview with USCIS; he was sent to South Sudan before he had that interview.

EXHIBIT D

8. After the Supreme Court issued decisions in *D.V.D.* staying the preliminary injunction and a remedial order addressing the situation of NM and other men being held in Djibouti, NM was deported to South Sudan without any decision on his eligibility for withholding of removal or protection under CAT regarding that country.

9. Since he arrived in South Sudan on July 4, 2025, I have rarely been able to speak with him. For several weeks, I had no idea where he was or how he was being treated. I often wondered if he was still alive. From our limited conversations, I believe that he is being detained indefinitely and without charge by South Sudanese government officials, as he had feared before he was deported.

10. NM has called me unscheduled a few times, usually in the middle of the night when I do not have access to an interpreter. I have not been able to call him or schedule any calls. He has also occasionally been able to call a family member who has relayed information to me. He has stated that he and the other men he was deported with are being held in some kind of building, with an armed guard watching them, in poor conditions. He has described intense heat and relentless mosquitoes, as well as debilitating boredom. His mental health has deteriorated, and he has had suicidal thoughts. He feels helpless, especially since nobody has provided any information about how long he will be held in that facility. He has not met with any officials of the South Sudanese or the Burmese government about his repatriation or his release, at least as of November 5, 2025, which was the last time he called his relative.

11. I have been working with Godfrey Bulla, a human rights attorney in South Sudan, who has been attempting to obtain unmonitored access to NM and EAH, another man from the group being held with him. I understand that Mr. Bulla has tried on several occasions to obtain permission from the Ministry of Foreign Affairs and International Cooperation to meet with the men, but these requests have all been denied.

12. EAH's attorney, Ms. Alma David, and I have also communicated with Amnesty International about the situation of our clients. On September 9, 2025, Amnesty released an "Urgent Action" about our clients, requesting its members write to the South Sudanese Minister of Foreign Affairs and International Cooperation to urge them to: immediately disclose the whereabouts of NM and EAH, grant them consistent and unmonitored access to their legal representatives, including local counsel, and immediately clarify the legal grounds of their detention. (*See* https://www.amnesty.org/en/documents/afr65/0252/2025/en/).

13. I believe that DHS obtained some type of travel document or passport for NM but never provided it to him. When NM was in Djibouti, he stated that he believed DHS had a passport made for him. At his last check-in with ICE in February 2025, an official showed him what he described as a small book. Since he is illiterate, he was unable to read it, but he stated that it had his picture in it. For several months, he was moved around the country to various detention facilities, and the whole time he was being told that they were going to deport him to Burma. It was not until hours before his removal that he was told he was being sent to South Sudan.

14. My client expressed a fear of returning to Burma, a country he fled as a child to escape persecution due to his Karen ethnicity.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 12th day of November, 2025 at San Francisco, CA.

_____
Jacqueline M. Brown