## DECLARATION OF ANWEN HUGHES

I, Anwen Hughes, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney licensed to practice in the State of New Jersey. My business address is Human Rights First, 121 W. 36th St., PMB 520, New York, NY 10018. I have been employed in various capacities as a refugee lawyer at Human Rights First (formerly the Lawyers Committee for Human Rights) since 1999, currently serving as Director of Legal Strategy for Refugee Programs. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration and refugee law since 1999. In that time, I have represented hundreds of noncitizens directly in removal proceedings before the Executive Office for Immigration Review (EOIR), before the federal courts, and in asylum and other applications for immigration benefits and relief filed with U.S. Citizenship and Immigration Services (USCIS). I have overseen the representation of many hundreds more in cases where lawyers in private practice working pro bono through Human Rights First's representation program served as counsel of record.

3. I am also one of the class counsel in *D.V.D. v. DHS*. I undertook to represent two class members, J.M.G. and D.D., after U.S. Immigration and Customs Enforcement (ICE) attempted to deport them and six others to South Sudan at the end of May 2025. J.M.G. is a Mexican national and D.D., is a Sudanese national by birth who had been resettled in the United States as a young child as a refugee from Sudan, and who had been ordered removed to Sudan. This declaration is based on my communications with J.M.G. and D.D. and their families, and with officials of the U.S. and Mexican governments about J.M.G.'s situation.

4. J.M.G. is a citizen of Mexico who was ordered removed by an immigration court in 2005. A Mexican consular official had visited J.M.G. in prison, and it was J.M.G.'s understanding that he would be removed to Mexico upon completing his criminal sentence.

5. On May 20, 2025, ICE attempted to deport J.M.G. to South Sudan. I began representing J.M.G. individually while he was in Djibouti.

6. There is no indication that ICE contacted any Mexican consulate in the United States to request travel documents for J.M.G. or to arrange for his return to Mexico. ICE attempted to deport J.M.G. to South Sudan and later successfully deported him there without any travel documents or identification documents.

7. While J.M.G. was being held in Djibouti, I was in touch with his family, as were Mexican consular officials. Having gathered enough evidence of J.M.G.'s

identity and nationality to issue him a travel document to enable his return to Mexico, my understanding is that Mexico's embassy in Washington, D.C. made a request to the Department of Homeland Security (DHS) for the Mexican embassy in Addis Ababa to be given remote consular access to J.M.G. for purposes of conducting an interview that would allow Mexico to process travel documents for him.

8. After the Supreme Court ruled in *D.V.D.* on July 3, 2025, DHS deported both J.M.G. and D.D. from Djibouti to South Sudan. J.M.G. and D.D. and the other men were detained upon arrival by the South Sudanese security services in a house where they and the other men were held under armed guard.

9. After J.M.G. and D.D. were flown to South Sudan neither I nor their family members, with whom I remained in close contact throughout, had any word from them for over a month. The families of both were frantic. On July 28, I filed complaints on behalf of both, at the request of their relatives, with the U.N. Working Group on Enforced and Involuntary Disappearances, based on their incommunicado detention at an unknown location.

10. It was not until August 12 that J.M.G. and D.D. the other detainees were allowed periodic contact with their families. Communication with counsel was more difficult. Local lawyers in South Sudan did not have access to the men. J.M.G. was only able to call me twice, once on August 27, and once on Labor Day, September 1.

11. During the weeks when J.M.G. was being held incommunicado, I remained in contact with the Mexican Foreign Ministry and with Mexico's ambassador to Ethiopia, whose consular district covers both Djibouti and South Sudan, about steps to secure J.M.G.'s release and his prompt extrication from South Sudan.

12. The Mexican embassy in Addis Ababa was not granted a consular interview with J.M.G. until a month after requesting one and after repeated follow-up. After that consular interview was completed, the Mexican Foreign Ministry was able to issue J.M.G. an actual passport, but it took over three more weeks before J.M.G. was finally released on September 6 to the Mexican ambassador to Ethiopia, who traveled to Juba to pick him up and bring him Addis Ababa. He then was flown back to Mexico. Mexican government representatives accompanied him on all the legs of this trip.

13. The South Sudanese authorities detained D.D. until the end of July, despite the fact that D.D., who had never set foot in South Sudan before this and had no criminal charges pending against him anywhere, had acquired South Sudanese citizenship as a result of South Sudan's independence in 2011.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 7th day of December, 2025 at Ann Arbor, Michigan.

_____
Anwen Hughes