<u>**DECLARATION OF PATRICK TAUREL**</u>

I am over 18 years of age and am competent to testify. I hereby swear and affirm that the following is based on my own personal knowledge and is true and correct, and that my testimony, under oath and penalty of perjury pursuant to 28 U.S.C. § 1746, is as follows:

1.      My name is Patrick Taurel. I am an attorney and am licensed to practice law in the District of Columbia and the state of New York. I am admitted to practice before the United States District Courts for the District of Columbia, Western District of Michigan, and District of Colorado. I am also admitted to practice before the United States Courts of Appeals for the Fourth, Ninth, and Tenth Circuits. I am a Partner at the law firm Grossman Young and Hammond, LLC ("GYH").

2.      Together with my colleagues at GYH, I represent eleven individuals before the United Nations Committee Against Torture who were removed, along with three other men and women, from the United States to Ghana on September 5, 2025. I am also one of the attorneys who represented five of the fourteen individuals who were deported that day in litigation before the U.S. District Court for the District of Columbia in an effort to obtain an order compelling the U.S. government to take action preventing Ghana from sending these individuals back to their countries of origin where U.S. immigration judges had already ruled that it is more likely than not that they would be subject to persecution or torture. *See D.A. v. Noem*, No. 1:25-cv-3135 (TSC).

3.      I and my colleagues have gathered information on the experiences of all fourteen individuals on that September 5 flight by speaking directly with those individuals, as well as their family members and immigration attorneys (for those who have such counsel). None of the individuals are Ghanaian. Their countries of origin are Nigeria, The Gambia, Togo, Mali, and

EXHIBIT G

Liberia. To the best of my knowledge, at least ten of the fourteen individuals aboard the removal flight on September 5, 2025, had been granted fear-based protection from removal to their countries of origin. I am submitting this declaration to explain how U.S. authorities deported the fourteen individuals without notice or opportunity to contest their removal, describe the conditions our clients faced in Ghana, and explain how Ghanaian authorities removed all but one of the fourteen individuals out of Ghana and, in at least four cases, into countries where they have an established fear of persecution and torture.

4.      On September 5, 2025, all fourteen individuals were taken from their immigration detention cells in the United States and were told by officers with U.S. Immigration and Customs Enforcement (ICE) that they were being transferred or deported. They were placed in shackles that bound their ankles, wrists, and waist. At least four of the fourteen also reported being placed in a WRAP restraint, a full-body restraint device.[1] All fourteen individuals were loaded onto a military cargo plane at an airport in Alexandria, Louisiana. At least three of the fourteen were told by U.S. immigration authorities that they were being removed to Ghana only shortly before or while being loaded onto the plane. Others received no notice of their removal to Ghana until after the plane took off. Several of the fourteen individuals expressed fear of removal to Ghana, but U.S. officials simply told them they were following orders to effectuate their deportations to Ghana, and once in Ghana, they would be sent on to their countries of origin. Only one of the fourteen individuals removed, Z.Y.B., had any ties to Ghana. All fourteen individuals were deported without travel documents.

---

[1] Jason Dearen, Jim Mustian, and Dorany Pineda, *Takeaways from the AP's investigation into ICE's use of a full-body restraint device known as the WRAP*, AP (Oct. 22, 2025), https://apnews.com/article/immigration-deportations-trump-administration-civil-rights-takeaways-1dcc225e67c1dafba86b6ec4cc7da50e.

5.      Upon arrival at the airport in Accra, Ghana, three of the fourteen individuals, including, K.S., were separated from the rest of the group and taken to holding rooms inside the airport. K.S. is from The Gambia. K.S. was held at the airport for five days, where he repeatedly expressed his fear of being returned to The Gambia, a country from which the United States had previously granted him protection under the United Nations Convention Against Torture (CAT) based on his sexual orientation. But Ghanaian officials told him that his final destination was The Gambia, based on orders from ICE officials and their Ghanaian counterparts. He was refouled to The Gambia on September 10, 2025, and he is currently in hiding in fear for his life. Attached to this declaration as **Exhibit A** is the declaration of K.S. about his experience.

6.      E.A., another of the three individuals separated from the rest of the group, is from Nigeria. She was held at the airport in Accra for approximately 12 hours. During this time, E.A. repeatedly expressed her fear of return to Nigeria and explained that she had been granted deferral of removal to Nigeria under the Convention Against Torture because of her opposition to female genital mutilation. Ghanaian officials told E.A. they could not permit her to stay in Ghana. E.A. was driven by Ghanaian authorities to the Ghana-Togo border. There, Ghanaian authorities gave her the equivalent of approximately $120 and paid a taxi driver to take her through Togo and onward to Nigeria. E.A. is currently in hiding in Nigeria. Attached to this declaration as **Exhibit B** is the declaration of E.A. regarding her experience.

7.      The remaining eleven individuals were taken to a remote military camp known as Bundase Training Camp or Battle Training Camp.[2] Conditions at the camp were deplorable. There was no reliable power, internet, or running water. Food and water quality was poor, and

---

[2] The individuals originally believed the name of the place where they were being held was called Dema Camp.

there were snake and mosquito infestations. They were constantly monitored by armed guards. Attached to this declaration as **Exhibit C** is the declaration of one of our clients, D.A., regarding his experience at the camp.

8.      The eleven individuals were held at Bundase Training Camp for nearly two weeks. During this time, Ghanaian authorities reported to media outlets that all fourteen deportees had been or would be deported to their countries of origin.

9.      On Thursday, September 18, 2025, Ghanaian officials removed D.A., T.L., I.O, A.A., R.A., and S.O. from Bundase Training Camp and forced them into Togo.

10.     On Friday, September 19, 2025, Ghanaian officials removed D.T., B.G., J.K., and D.S. from Bundase Training Camp and drove them to the Togolese border where they were subsequently forced into Togo.

11.     R.A. and S.O. are Togolese and both had previously been granted withholding of removal to Togo under the Immigration and Nationality Act (INA) by U.S. immigration judges based on their fear of persecution due to their opposition to female genital mutilation. Both are now in hiding and afraid that they will be persecuted or killed. R.A. has lost access to communication because her phone number had been cloned and she received several threats.

12.     D.T. is Malian. An immigration judge previously granted D.T. withholding of removal to Mali under 8 U.S.C. § 1231(b)(3) because she fears persecution due to her opposition to female genital mutilation. After she was forcibly removed to Togo by Ghanaian authorities, she was kidnapped and sexually assaulted in Togo. She was able to escape and is now in hiding in Mali.

13.    On or about September 20, 2025, Ghanaian authorities released Z.Y.B. into Ghana to a family member after first attempting to send him to Togo, his country of origin, where he fears persecution and torture because of his political opinion and religion.

14.    T.L., I.O., and A.A. are Nigerian and are currently in Togo. They are hiding with limited access to funds or other resources. They do not have legal status and are in an extremely precarious situation in Togo. Immigration judges had granted T.L. and I.O. CAT protection to Nigeria, and an immigration judge had granted A.A. withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT protection to Nigeria because of his sexual orientation.

15.    D.S., whose country of origin is The Gambia, and J.K., whose country of origin is Liberia, are also in hiding in Togo. An immigration judge had granted D.S. withholding of removal to The Gambia under 8 U.S.C. § 1231(b)(3) because of his sexual orientation. An immigration judge had previously awarded J.K. asylum due to his political opinion.

16.    All fourteen individuals are afraid for their safety and well-being in countries to which Ghanaian authorities deported them, after the United States removed them to Ghana.

17.    My firm recently learned of another flight that departed the United States on or around November 6, 2025, and subsequently arrived in Accra, Ghana. We learned of this flight through legal advocates of some of the deportees on board. The group of deportees was initially transferred to a hotel in the Greater Accra Region and held under armed guard. On November 11, 2025, one individual on that flight, R.K., was forcibly removed by Ghanaian immigration authorities from the hotel and ultimately deported to her country of origin, Sierra Leone. R.K. repeatedly told Ghanaian officials she had a documented fear of return to Sierra Leone, and an immigration judge had granted her withholding of removal under 8 U.S.C. § 1231(b)(3) because of her political opinion.

18.    In the middle of the night on or around November 11, 2025, the remaining eight individuals from the November 6 deportation flight were forcibly removed by armed Ghanaian authorities from the hotel to a detention camp. As of November 14, 2025, one of those individuals, M.M., was removed by Ghanaian authorities and placed on a plane to The Gambia, his country of origin. M.M. repeatedly told Ghanaian authorities that he had won protection from removal to The Gambia. An immigration judge had granted M.M. withholding of removal under 8 U.S.C. § 1231(b)(3). He is now in hiding in The Gambia, afraid for his life. On November 14, 2025, another individual, M.G., was moved from the detention camp to an immigration cell at the airport in Accra. As of November 17, 2025, M.G. was removed to Senegal, his country of origin. He had been granted withholding of removal to Senegal under the Convention Against Torture and had told Ghanaian authorities he had a documented fear of torture in Senegal.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 5, 2025 in Bethesda, Maryland.

_____                    12/05/2025
Patrick Taurel                                                    Date

6

Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

D.A., T.L., I.O., D.S., and K.S.;

      *Plaintiffs*,

v.

KRISTI NOEM, Secretary of Homeland
Security, in her official capacity; TODD
LYONS, Acting Director, U.S. Immigration
and Customs Enforcement, in his official
capacity; PAMELA BONDI, Attorney
General, in her official capacity; and MARCO
RUBIO, Secretary of State, in his official
capacity

      *Defendants*.

Civil Action No. _____

## DECLARATION OF PLAINTIFF K.S.

I am over 18 years of age, am currently in The Gambia, and competent to testify. I hereby

swear and affirm that the following is based on my own personal knowledge and is true and

correct, and that my testimony, under oath and penalty of perjury, is as follows:

1.      My name is K.S. I am using a pseudonym for safety reasons. I am over 18 years

old. I am currently in The Gambia in hiding, after being deported from the United States to

Ghana and then to The Gambia.

2.      I have read this declaration and confirmed that everything written here is true and

correct to the best of my knowledge. Because I am currently in hiding in The Gambia, I would be

unable to go to the court to testify.

3.      On March 7, 2025, I won deferral of removal under the Convention Against

Torture from my home country of The Gambia due to the specific risks of torture and death I

face there on account of my sexuality. On April 7, 2025, that decision was rendered final. U.S. Immigration and Customs Enforcement ("ICE") continued to hold me in detention at the Moshannon Valley Detention Center for five months after my relief became final.

4.      On September 4, 2025, I was transferred by ICE to the Alexandria Staging Facility in Louisiana. I was given an ID that consisted of a piece of paper on GEO Group letterhead and titled LaSalle Processing Center Subject Profile, with my name, A number, headshot, and country of origin, with the level "high" and arrival date "9/4/25."

5.      Late on September 5, 2025, I was removed from my cell, handcuffed, and told that I was going on a plane. I was denied requests to speak with my lawyer and was not given any travel documents.

6.      I was chained at the hands, waist, and ankles and placed on a military cargo plane with none of my belongings, along with 13 other people from West African countries (10 men and 4 women in total). Four of the people were put in straitjackets because they refused to get on the plane without speaking to their attorneys. We were not told where we were going.

7.      While on the plane, there were six ICE officers and some military personnel with the 14 of us. The plane stopped in the U.S. Virgin Islands to refuel and then made its final stop in Ghana. While at the fuel stop in the U.S. Virgin Islands, the apparent head ICE official on the plane, a bald Caucasian/Latino man, told me that those on the plane were being sent to Ghana and that Ghana would send us to our home countries.

8.      The plane landed in Accra, Ghana, on September 6, 2025. Ghanaian immigration officials asked those of us who were on the plane for our paperwork, but we did not have any paperwork. The Ghanaian officials stated that ICE had not sent any paperwork for us and asked us why we had been deported from the United States. One other man, one woman, and I were

then detained by Ghanaian immigration officials in a room at the airport. On that same day, Ghanaian immigration officials told the other man he would be dropped off at the Nigerian border and took him out of the room. The woman was taken the next day, I believe, also to Nigeria. I was held in the room at the airport for five days with no access to phones, no showers, and no change of clothes.

9. During those five days, I spoke repeatedly with two Ghanaian immigration officials, named Ibrahim Liang Hani and A. Amon. I explained to them my fear of returning to the Gambia, the basis for my fear, and the fact that I'd won protection from being returned to The Gambia under the Convention Against Torture. I told them that I wanted to stay in Ghana for my safety. The official Ibrahim just told me that my final destination was The Gambia, based on orders from ICE officials and his Ghanaian superiors.

10. On September 8, 2025, Ghanaian officials wrote up travel documents for me in front of me for me to be sent to The Gambia. On September 10, 2025, I was placed on a Pan African Airlines flight, accompanied by two Ghanaian immigration officials, one male and one female.

11. When we landed in The Gambia, the Ghanaian immigration officials presented the travel documents to Gambian immigration officials, who refused to accept them, believing the documents to be invalid. One Gambian official recognized me and allowed me to enter The Gambia despite the lack of valid documents, telling me that he believed I would just remain detained if I were to return to Ghana.

12. The official asked me to make a written statement about the Ghanaian officials making fake travel documents, which I did. I was then released into The Gambia, without any

formal paperwork or processing. I borrowed a phone and called my sister, asking her to pick me up at the airport.

13.     I am now living in hiding with the help of my sister. I am seeking a way out of the country as soon as possible for the sake of my life.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 11, 2025.

_/s/ K.S._____                    September 11, 2025_____
Signature                                                   Date

Exhibit B

## DECLARATION OF E.A.

I, E.A., am over 18 years of age, am currently in Nigeria, and competent to testify. I hereby swear and affirm that the following is based on my own personal knowledge and is true and correct, and that my testimony, under penalty of perjury, is as follows:

1.      My name is E.A. I am using a pseudonym for safety reasons. I am currently in Nigeria after being deported from the United States to Ghana, and then on to Nigeria. I am currently in hiding in Nigeria.

2.      I have read this declaration and confirmed that everything written here is true and correct to the best of my knowledge.

3.      In 2002, an immigration judge granted me deferral of removal to Nigeria under the Convention Against Torture ("CAT") because of my fear of persecution and torture based on my refusal to undergo female genital mutilation.

4.      I was released from ICE custody under an Order of Supervision, and I dutifully reported to ICE for annual check-ins for two decades. In 2022, ICE told me I did not have to report anymore.

5.      On July 15, 2025, at 9:35 a.m., there was a loud knock on my door. Several ICE officers said they were looking for me. They arrested me and took me to an immigration detention facility in Conroe, Texas for processing. I stayed there for six weeks.

6.      While in Conroe, Texas, I continued to tell ICE officers and my ICE case manager that I could not go back to Nigeria. My ICE case manager confirmed they could not send me directly to Nigeria.

7.      On August 26, 2025, I was told to pack up my belongings because I was being transferred, but no one told me where I was going. I asked one of the officers where I was going,

1

and the officer responded that I was being sent to Nigeria. I told the officer that I can't be sent there because I have CAT protection, but she said that's the information she has for me. I was then taken from the facility in Texas to a facility in Louisiana.

8.      On the way to Louisiana, I asked an officer what was happening, and the officer said that I was being taken to a facility where a flight would be waiting for me. I asked her where I would be going on the flight, and she said Nigeria.

9.      I arrived at the detention center in Basile, Louisiana and met a couple of other women who also had protection from Nigeria. I was processed and held at this facility for a little over a week.

10.     On September 5, 2025, I was told to pack up my belongings. Around this time I noticed my commissary account was closing, so I knew I would be deported soon. I was picked up by a transport van at 3:00 a.m. along with several others and put on a U.S. military cargo plane at an airport in Alexandria, Louisiana. When I boarded the plane, I was told we were being taken to Ghana. I was shackled at the wrists, waist, and both feet for the entire 18-hour flight to Ghana. The only time I was unshackled was when I had to go to the bathroom, and then I was only allowed to have one hand uncuffed. We stopped at an island to refuel. I continued to tell the ICE officers transporting us that I could not be sent to Nigeria and that I had CAT protection from Nigeria. In response, the ICE officers said they were just following their orders to pick up 14 individuals from Alexandria, Louisiana to be deported. The military crew on the plane said the same thing – that they were just completing their mission. The military members were in a military uniform while ICE agents were in plain clothes.

11.     When we arrived early in the morning in Ghana, I was taken to a small room in the airport and given a mat to lie on. Ghanaian authorities did not have travel documents for me.

2

I repeatedly told Ghanaian immigration authorities that I could not be sent back to Nigeria, and in response they would only tell me that they'd worry about that later. I even asked if I could stay in Ghana because I cannot go back to Nigeria, and the Ghanaian officials said that would not be possible because they did not have a visa or any travel document permitting me to stay. I was held at the airport for 12 hours and only fed once.

12.      Later that day, Ghanaian officials informed me I would be taken to Nigeria. Ghanaian officials placed me in a van by myself with no other detainees, and I was accompanied by a female Ghanaian official and a driver who drove me to the Ghana-Togo border. At the border, Ghanaian authorities gave me 1500 Cedis, which equates to $120.70. Ghanaian authorities paid a taxi driver to take me through Togo, where I was then transferred to another taxi that dropped me off at the Nigerian border.

13.      I am currently afraid for my life and am in hiding in Nigeria. I am trying to leave Nigeria as soon as I can for my safety.


I declare under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

Executed on this 30th day of September, 2025, in Nigeria.


____/s/ E.A._____          ____09/30/2025_____
E.A.                                            Date

**Attestation of Assent**

I, Jaclyn Dennis, hereby certify that I have read the above declaration to E.A. in English, which is her primary language, and that she has given me permission to sign her initials on her behalf with full understanding of its contents.

Dated this 30th day of September, 2025, in Alexandria, Virginia.


_____                    ____September 30, 2025____
Jaclyn Dennis                                                    Date

4

Exhibit C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

D.A., T.L., I.O., D.S., and K.S.;

      *Plaintiffs*,

v.

KRISTI NOEM, Secretary of Homeland
Security, in her official capacity; TODD
LYONS, Acting Director, U.S. Immigration
and Customs Enforcement, in his official
capacity; PAMELA BONDI, Attorney
General, in her official capacity; and MARCO
RUBIO, Secretary of State, in his official
capacity

      *Defendants*.

Civil Action No. 1:25-cv-03135

## DECLARATION OF PLAINTIFF D.A.

I am over 18 years of age, am currently detained in Dema Camp, Ghana and am competent to testify. I hereby swear and affirm that the following is based on my own personal knowledge and is true and correct, and that my testimony, under oath and penalty of perjury, is as follows:

1. I am using a pseudonym, D.A., for safety reasons. I am currently detained in Ghana in Dema Camp after being deported from the United States to Ghana on September 5, 2025.

2. I have read this declaration and confirmed that everything written here is true and correct to the best of my knowledge. Because I am currently detained in Ghana, I would be unable to go to court to testify.

3. I was granted withholding of removal by an immigration judge in the Otero Immigration Court on April 30, 2025 on account of the likelihood that I would be persecuted or killed

1

if removed to Nigeria. My wife is a U.S. citizen. She filed an I-130 petition on my behalf for me to receive a family visa. That petition was approved four months ago.

4.  I am currently detained in Dema Camp in Ghana, where myself and other people who were also deported from the United States are being imprisoned. We are constantly surrounded by military guards.

5.  I am originally from Nigeria. In Nigeria, I was a member of one of Nigeria's main political parties, the P.D.P. In 2018, I started being violently targeted by members of the ruling political party, the A.P.C. In November 2018, members of the A.P.C. beat me and other party leaders with plank woods, iron rods, and machetes. The attacks escalated from then and happened several times until I left Nigeria.

6.  I fled Nigeria in 2019 after being tortured by the military and police officers for the Nigerian Department of State Services. They tortured me and kept me locked in a dog cage for three days until they let me go and told me they would kill me if they ever saw me again. After this incident I had to leave Nigeria to save my life.

7.  Nothing in Nigeria has gotten better since I left. The situation in the country has become worse. The political party that targeted me is still in power.

8.  On September 5, 2025, I was taken along with several other people in the middle of the night from my cell from the detention center in Alexandria, Louisiana. I did not know where we were going. I asked the officers where we were going, and they only told us that we were being transferred. They shackled us at the waist, hands, and feet. I asked yet again where we were going and said I was afraid for my life, and needed to speak with my lawyers.

2

9.  The officer finally told me that we were going to Ghana. I told him that I am afraid of going to Ghana and that I cannot go to Ghana.

10. He told us "whether you like it or not, your ass is getting on that plane." He then straitjacketed me extremely tightly, tying me from my shoulders to my feet.

11. I was put onto a military plane with the other people who were taken from their cells. I remained straitjacketed for several hours until I pleaded with the officers to remove it so that I could use the restroom. I begged the officers over and over again to take off the straitjacket so that I could use the restroom, otherwise I would urinate on myself. They finally removed the restraints on my legs after pleading with them for a long time, but left the restraints on my upper body.

12. Because the straitjacket was so tight on my legs, I now have difficulty walking. My legs are extremely swollen to the point that I can only limp to move around.

13. While on the plane, the leader of the ICE officer who put me into a straitjacket said that he was ordered to make sure we all get to Ghana.

14. I told the officers repeatedly that I was afraid for my life. He told me that he didn't care, and that when we got to Ghana we would then go to our respective countries of origin.

15. I asked this ICE officer and the other officers on the plane for their names, but they refused to tell us. They only told us that they are following orders to deport us to Ghana, and from Ghana to send us to our countries of origin.

16. We eventually arrived in Ghana and were taken to Dema Camp, where I have been detained since then.

17. I fear for my life if I were to go back to Nigeria. If I go back to Nigeria, I will be tortured and possibly killed.

18. I have been terrified of returning to Nigeria since government officers a few days ago told us we would be sent back to our home countries imminently.

19. On September 12, 2025, around 8:00PM GMT, a Ghanaian military commander came to Dema Camp and informed me and the other people detained here that government officials from our countries would be coming to the camp to see us tomorrow morning. The commander told us that they gave our governments our names and information. We were told we will be removed the next day, on September 13, 2025.

20. Conditions are horrible at Dema Camp. Since the morning of September 12, there has been no reliable power, Internet, or running water. Ghana is not safe for any of us. But I am even more afraid of returning to Nigeria. I have been wearing the same clothes that I left the United States in over a week ago. We are constantly surrounded by military guards.

21. On September 13, 2025, around 2:30PM GMT, officials from the Nigerian Consulate came to Dema Camp to collect more of our information. We told both the Nigerian and Ghanaian officials that we cannot go back to Nigeria due to our fear of persecution and torture. I told them that I was granted protection from an immigration judge and could not be deported to Nigeria. I told the Ghanaian and Nigerian officials that we are not protected in Ghana, either.

22. Both the Nigerian officials and Ghanaian officials told us that they do not care, and that we will be sent back to Nigeria anyway. Officials told us that no matter what, we would be removed from Dema Camp by Monday.

23. We are all afraid for our lives. We are not safe here, and now they are planning to hand us over to our country's government for further persecution and torture. We don't know what our futures hold.

24. We urgently need help. We do not want to meet with government officials of our countries or to be returned to those countries.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 13, 2025.

/s/ _____                    September 13, 2025_____
Signature                                      Date

5