## DECLARATION OF HANNAH BRIDGES

I, Hannah Bridges, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of Virgina. My business address is 4103 Chain Bridge Road Suite 300 Fairfax, VA 22030. I have been employed as an attorney at Murray Osorio PLLC since November 2024. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since I started practicing in November 2024, representing noncitizens, and especially detained noncitizens, in removal proceedings before the Executive Office for Immigration Review (EOIR).

3. I make this declaration based on my communications with my client R.K., her son, and other counsel who are also representing them, as well as my own review of her immigration-related documents and outreach to government officials.

4. I began representing R.K., a citizen of Sierra Leone, in July 2025 when she was unexpectedly detained at a U.S. Immigration and Customs Enforcement (ICE) check-in. Before I began representing her, she was ordered removed to Sierra Leone around 1996. She later reentered the United States and received a reinstatement order in 2010. She has been attending ICE check-ins for nearly two decades.

5. R.K. was detained at one of her regular ICE check-ins in July 2025. After she was detained in July, she spent several days in an ICE hold room in Baltimore, Maryland. ICE then transferred her to Richwood Correctional Center in Louisiana. She requested a reasonable fear interview (RFI), and after passing this interview she was later placed in withholding only proceedings in front of the Jena, Louisiana Immigration Court. At a hearing on September 17, the immigration judge granted her application for withholding of removal, and both parties waived appeal.

6. About a week later, I contacted a deportation officer to determine whether she would soon be released from detention. The deportation officer told me by email that R.K. would continue to be detained and that they were actively pursuing third country removal but did not indicate that any country had been designated for a third country removal.

7. On September 30, 2025, I submitted a request for a fear screening interview regarding R.K.'s fear of deportation to the following countries: Mexico, Belize, Costa Rica, Guatemala, Honduras, Nicaragua, Panama, Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, Venezuela, Cuba, Dominican Republic, Haiti, Ghana, Nigeria, Eswatini, Rwanda, and South Sudan. I also reserved her right to claim fear toward any other country where the U.S. Department of Homeland Security (DHS) may attempt to remove her. I sent the request to the deportation officer I had been in contact with, the New Orleans ICE Enforcement and Removal Operations Field Office, and the U.S. Citizenship and Immigration Services (USCIS) District 3 Asylum Division. I did not

receive any response from the deportation officer nor the New Orleans Field Office. The USCIS District 3 Asylum Division responded to provide that no referral for an interview had been received in their office and that a referral must take place before they can schedule an interview. On October 24, 2025, I also submitted a parole request to the deportation officer by email based on the equities in R.K.'s case, including that she has long worked as a nurse with legal authorization and also provides care for her elderly U.S. citizen parents who are struggling without her assistance. I did not receive any response to this parole request.

8. On or around November 4, 2025, I spoke with R.K. who said she received a regular review of her custody status by ICE that day. During this meeting, ICE told R.K. that DHS had not designated any additional country for removal and did not have travel documents to deport her to any other country. She did not receive or sign any notice relating to third country removal.

9. Also on November 4, 2025, the day before she was deported, R.K. spoke to an ICE employee in the commissary who told her she was on a list of individuals to be released from detention. She called her son, who added me to the call, and reported this news to us. I warned them that I had not received any word on her parole request but sent follow up inquiries to the deportation officer.

10. On November 5, the day R.K. was deported, a supervisory deportation officer responded to my follow up email and stated that ICE's system did not show any scheduled movements or transfers for R.K. No one else responded to my emails or repeated phone calls to the New Orleans Field Office.

11. On November 5, R.K. was deported to Ghana. On November 6, when we tried to reach her at the Richwood Correctional Center, neither R.K.'s son nor I could contact her or find out what had happened to her. Approximately 24 hours later, she called her son and informed him she had been deported to Ghana. She had had no opportunity to raise a fear claim about deportation to Ghana and did not know where she was being sent before being placed on a plane for deportation. On November 7, a deportation officer confirmed R.K. had been removed to Ghana on November 5. R.K. told her son that she was being taken to the Sierra Leonean embassy in Ghana within the next day.

12. On November 11, 2025, at around 8 AM EST, our legal team at Murray Osorio was able to connect her with some other deportees and additional attorneys working on similar cases, including attorneys from the team working on a lawsuit filed in Ghana over the legality of the U.S.-Ghana third country deportation agreement. During that call, immigration officials from Ghana came to the hotel and were trying to remove R.K. Part of the legal team from the Ghana case rushed to the hotel and encountered uniformed military officers, several plain-clothed national security operatives, and about eight uniformed immigration officers attempting to remove R.K. The attorneys requested that they produce any court order, ministerial directive, or legal authority permitting the removal. They were unable to do so but insisted they were acting on instructions. The officers persisted in trying to remove R.K., who resisted by holding on to fixed objects,

and on to an attorney's leg for nearly 40 minutes. Eventually, the immigration officers overpowered her, dragged her across the floor, and placed her in their vehicle. Prior to her removal from the hotel, the attorneys on the call were able to get some basic details from her so that she could be added to a petition that was filed with the United Nations Committee Against Torture.

13. R.K. pleaded with the immigration officials not to send her to Sierra Leone and to allow her to seek protection in Ghana. Just like what happened in the U.S. before her removal to Ghana, she was not given any opportunity to present a case for protection in Ghana despite her pleas. She was held overnight at the airport and then flown to Sierra Leone, where she went into hiding.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 4th day of December 2025 at Fairfax, Virginia.

_____
Hannah Bridges

3