## DECLARATION OF ███████

I, ███████, declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that the statements that follow are true and correct to the best of my knowledge and belief:

1. I am a citizen of Iran. I applied for asylum in the United States last year and was granted withholding of removal to Iran in April 2025. Despite this, on October 16, 2025, U.S. Immigration and Customs Enforcement (ICE) deported me to Nicaragua, where Nicaraguan immigration officers deported me to Venezuela, with a stop in Cuba. Venezuelan authorities then put me on a plane to Tehran, Iran against my will. The flight had a transit in Istanbul, Turkey where I succeeded in leaving the airport. I am currently living in a rented room in Istanbul, trying to find a way to safety and to reunite with my wife, an asylum seeker in the United States, and our baby daughter who is a U.S. citizen.

2. Last summer, I fled Iran for the United States, arriving in this country in October 2024. I was fleeing political persecution in Iran. I had been detained and tortured in Iran, and my wife had been beaten by government agents while she was pregnant, causing her to miscarry. I crossed the U.S. southern border and asked for asylum.

3. My wife, then pregnant with our first child, had fled to the United States for the same reasons, a few months before I did, on a visa, and had applied for asylum with the Asylum Office, where her case was (and is) pending. I hoped to join her and our baby and that we could find protection here as a family.

4. I was detained throughout my immigration court proceedings, as ICE denied my requests for parole. As a result of the abuse that my wife and I suffered and the oppression we saw all around us in Iran, led us both to renounce Islam. We were drawn to Christianity. My wife and our baby were baptized in the church they now belong to in the United States, which supported my parole application. Throughout my detention in the United States, I was never allowed to hold my child.

5. On April 24, 2025, the immigration judge granted me withholding of removal to Iran. The judge did not grant me asylum only because I crossed the border without inspection. ICE did not appeal the grant of withholding of removal.

6. Around a month after the immigration judge granted me withholding of removal, and while I was still detained, an ICE officer told me that ICE was going to send me to Nicaragua. I asked the officer for a document showing that Nicaragua was prepared to accept me, and to consult with my lawyer, but ICE denied that. I told the ICE officer at that time that I was afraid to go to Nicaragua because Nicaragua has a very strong diplomatic relationship with Iran.

7. Some weeks later, I had a "reasonable fear interview" about my fears of being sent to Nicaragua. I told the interviewer that I was afraid of Nicaragua because the Nicaraguan government has a very strong diplomatic relationship with Iran, that Iranian President Ebrahim Raisi had visited Nicaragua, that each of these two countries has an embassy in the other, and that as a result Nicaragua would deport me to Iran. (I also told the officer that the two countries where I had been robbed by armed groups on my way to the United States were Nicaragua and Mexico.)

8. The interviewer told me that first, this was not a fear interview but a torture interview, and second, the Nicaraguan government was not going to jeopardize its relationship with the United States by deporting me to Iran.

9. In August 2025, I was still detained at the South Texas Detention Center in Pearsall, Texas and I still had not received a decision on my fear interview. I filed a habeas petition with the local federal court.

10. On October 15, guards at the detention center came to me and told me that my detention was over and that I was going to be released. At intake, I was allowed to change back into the clothes I had when I was detained, but then they put handcuffs and shackles on me. I asked the guards why, and they told me I had no choice.

11. I was placed in a van and driven for about 15 hours. On October 16 in the morning, I arrived in what I later learned was Louisiana, where I was taken to what looked like a military airport.

12. ICE put me on a plane that was full of citizens of Nicaragua; I was the only Iranian on the plane. I told the ICE officers that my family was here in the United States and that my child was born here, and I asked them to give me documents showing that they were going to take me to Nicaragua. They did not answer me.

13. There were nine or ten agents of the U.S. government on the plane, some of whom had the letters "ERO" on their uniforms. While the plane was still on the ground in Louisiana, with the doors closed and waiting for takeoff, they changed from their uniforms into plain clothes. One of them took off my handcuffs for about a brief period during the flight, but I was otherwise handcuffed and shackled all the way to Nicaragua, as were the Nicaraguan passengers.

14. When the plane landed in Nicaragua, Nicaraguan immigration officers came on board and the first name they called was mine. They took me to a rundown building at the airport that they used as an immigration office. They had me sitting there in handcuffs for three or four hours, with a Nicaraguan immigration officer in front of me staring at me in an intimidating way. Then another Nicaraguan officer came, who told me that I needed to leave Nicaraguan territory that day. I told them that I had been in the United States with

2

withholding of removal, that the United States had sent me to their country, and that I wanted to stay there. I asked them to let me talk with ICE while the plane was still there.

15. The Nicaraguan immigration officer told me that I could not speak with ICE, and that the Nicaraguan government had already agreed with the U.S. government that I would be sent to Nicaragua so that Nicaragua could send me back to Iran.

16. I showed Nicaraguan immigration all the documents I had on me, including the order from the U.S. immigration judge granting me withholding of removal to Iran. The immigration officers ignored me.  One of the officers there spoke good English. I speak basic English, and there were some moments when we used phone translation.

17. They told me to sign a form saying that I was willingly accepting deportation to another country. I refused to sign, so one of the officers who was assigned to me and was with me a lot of the time kicked the chair out from under me, causing me to fall to the floor. Another officer kicked me in the stomach. Because of this abuse, I signed the form, and they photographed me as I signed it. Nicaraguan immigration officers photographed me at several points while I was under their control; I could hear the click of the camera.

18. They held me at the airport in Nicaragua from late morning until around 10 o'clock that night. During all that time they unlocked my handcuffs three times: once to get my signature the form they forced me to sign saying I was willing to be deported to another country, once to let me use the bathroom, and once when they said they were giving me between $250 and $300 U.S. in cash in $20 and $50 bills, saying that this was for me to feed myself and make sure I didn't die on the way to Iran. They said that I had about a 15- or 16- hour flight to Iran, and that I would be stopping at several airports in different countries. I refused the money, but they put the cash on the table in front of me, with a piece of paper of some kind that I did not sign. They took a picture of me with the money on the table in front of me and they uncuffed my hands for this photograph.

19. At around 10 p.m., the Nicaraguan officers took off my handcuffs, put me in a car with a Nicaraguan officer on either side, and drove me to the gate where the officers stayed next to me until I got onto the next plane. I was not handcuffed on the plane.

20. From Nicaragua, the plane flew to Caracas, Venezuela, with a stop in Havana, Cuba. In Havana, I was not allowed off the plane. I was the only passenger on the plane as f23 Havana. There, more passengers got on, and we continued to Caracas. Attached to this declaration is a copy of the electronic ticket Nicaraguan immigration gave me for the flight from Managua, Nicaragua to Caracas, Venezuela.

21. When I got to Venezuela, I thought I would be able to get off the plane to call my family, because that was the end destination of my ticket.  I got in line for passport control, but there were flight attendants from the flight from Nicaragua who had left the plane after

me, and when I was standing in line to get to passport control, I saw one of them go talk to one of the agents at Venezuelan passport control, and that person sent two Venezuelan officers to pull me out of line. The Nicaraguans had some documents about me that they gave to the Venezuelan officers.

22. Two Venezuelan immigration officials took me to Turkish Airlines. There was a security gate before we got to the Turkish Airlines departure area, and one of the flight attendants from the flight from Nicaragua photographed me when the Venezuelan officials took me to that one-way gate into the secure area where I would be boarding the Turkish Airlines flight. The Venezuelan officers put me on a Turkish Airlines flight to Tehran, Iran, with transit in Istanbul, Turkey.

23. Also attached to this declaration is a copy of the electronic ticket I was given for the flight from Caracas to Tehran, which departed on October 18. The upper righthand corner shows the date of issuance of the ticket, which was October 15. When I saw that, I realized that my deportation to Tehran had been arranged while I was still in ICE custody in the United States.

24. By the time the plane got to Istanbul, I had decided that no matter what anyone did to me, I was not going to let myself be sent back to Iran. But when I got off the plane, I was able to follow the other passengers to passport control and leave the airport.

25. I was able to contact the U.N. High Commissioner for Refugees, which has been trying to assist me. I am desperate to be reunited with my wife and child in the United States, not only because my child was born in the United States, but also because Turkey has a strong political relationship with Iran and has over the last couple of years sent Iranians back to Iran against their will. These cases have been documented by the international media and by human rights organizations whose reports I have seen. As a result, I do not feel very safe in Turkey.

Executed on this 28 day of November 2025 at Istanbul, Turkey.

## Certificate of Interpretation

I, Shawn Wise Akbari, hereby certify that I am fluent in English and Persian and that I translated the above English-language declaration orally to █████████ and that he has signed his name with full understanding of its contents.

Dated this 30 day of November 2025

_____
Shawn Wise Akbari

Shawn Wise Akbari
655 S. Fair Oaks Ave
Sunnyvale, CA 94086
(713) 265-8196

1



ELECTRONIC TICKET

PASSENGER ITINERARY RECEIPT        TICKET NBR: 3080250420383
RECIBO DE ITINERARIO DE PASAJEROS   BOLETO NRO:

MANAGUA OFICINA COMERCIAL AERO ISSUE DATE/FECHA DE EMISION: 16 OCT 2025 16:08
AEROP INTER A.SANDINO CARRETER    ISSUE AGENT/AGENTE EMISOR: MGA00V0LJ
MANAGUA
MANAGUA, NICARAGUA
OFFICE ID: NI-19601-0
TELEPHONE/TELEFONO: +50522769180 / +50558457325
MAIL INFO:

ISSUING AIRLINE/LINEA AEREA EMISORA  : CONVIASA
ADDRESS/DIRECCION                    : AV. INTERCOMUNAL AEROPUERTO INTERNACIONAL DE
MAIQUETIA EDO. LA GUAIRA VENEZUELA TELF +58 0500 266 8427

RIF                                  :
TICKET NUMBER/NRO DE BOLETO          :
NAME:
FOID:

BOOKING REF./CODIGO DE RESERVA: C1/KRKAMZ

| FROM/TO<br>DESDE/HACIA | FLIGHT<br>VUELO | CL<br>CL | DATE<br>FECHA | DEP<br>HORA | ARR<br>HORA | FARE BASIS<br>BASE TARIFARIA | NVB | NVA | BAG<br>EQP. | ST<br>ESTATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| MANAGUA<br>HAVANA | V05945 | R | 16OCT | 2215 | 0215 | RMGAPOW | | | 23K | OK |
| x HAVANA<br>CARACAS | V03497 | R | 17OCT | 0415 | 0715 | RMGAPOW | | | 23K | OK |

PARA MAYOR INFORMACION INGRESAR AL SIGUIENTE LINK
HTTP://WWW.CONVIASA.AERO/ES/GUIAPASAJERO/CONDICIONES

ENDORSEMENTS/ENDOSOS-RESTRICCIONES : NON END NON TRANSF NON REF VALIDO 12 MESES APLICA
PENALIDAD POR CAMBIO
TOUR CODE                          :
FORM OF PAYMENT/FORMA DE PAGO      : CASH

FARE CALC./CALCULO DE TARIFA: MGA V0 X/HAV V0 CCS 202.00NUC202.00END ROE1.000000
(ADT)

AIR FARE/TARIFA : USD   202.00
TAX/IMPUESTOS   : USD     2.00 6B    3.00 6S    1.25 C2
                          2.02 EU   30.30 NI   60.60 YQ
TOTAL           : USD   301.17

Fecha de emisión: 15 Octubre 2025

## Try CheckMyTrip, your free digital travel assistant



### mes 17 Octubre 2025



**Turkish Airlines TK 224**

| | | | |
|---|---|---|---|
| Salida | 17 Octubre 10:00 AM | Caracas, (Simón Bolívar Intl) (+) | |
| Llegada | 18 Octubre 04:50 AM | Istanbul, (Istanbul Airport) (+) | |
| Duración | | 11:50 (Sin paradas) | |
| Estatus de la reserva | | Confirmado | |
| Clase | | Económico (Y) | |
| Equipaje permitido | | 2 Pieza(s) para ▮▮▮ | |
| Equipo | | BOEING 787-9 | |
| Flight meal | | Comida | |

### sábado 18 Octubre 2025



**Turkish Airlines TK 876**

| | | | |
|---|---|---|---|
| Salida | 18 Octubre 03:55 PM | Istanbul, (Istanbul Airport) (+) | |
| Llegada | 18 Octubre 07:35 PM | Tehran, (Imam Khomeini Intl) (+) | |
| Duración | | 03:10 (Sin paradas) | |
| Estatus de la reserva | | Confirmado | |
| Clase | | Económico (Y) | |
| Equipaje permitido | | 2 Pieza(s) para ▮▮▮ | |
| Equipo | | BOEING 737-800 (WINGLETS) | |
| Flight meal | | Comida | |

### Detalles de billete

Billete electrónico ▮▮▮ para ▮▮▮

### Información ecológica

El cálculo de la emisión promedio de $CO_2$ es 673,73 kg/persona

Fuente: Calculadora de emisiones de carbono de la OACI

http://www.icao.int/environmental-protection/CarbonOffset/Pages/default.aspx

### Localizador(es) de reserva de la aerolínea

TK (Turkish Airlines): TVJ565

o de protección de datos: sus datos personales se procesarán de acuerdo con la política de privacidad del proveedor correspondiente y, si se rese aliza a través de un proveedor del sistema de reservas ("GDS"), con su política de privacidad. Estas políticas se pueden consultar en http:// lsdatatravelcenter.com/privacy o desde el operador o GDS directamente. Debe leer esta documentación, que se aplica a su reserva y describe, por plo, cómo se recopilan, almacenan, usan, publican y transfieren sus datos personales. (También aplicable para itinerarios que incluyen múltiples

Página 1 de 2