# United States Court of Appeals
## For the First Circuit

No. 26-1212

D.V.D.; M.M.; E.F.D.; O.C.G.,

Plaintiffs, Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary of Department of Homeland Security (DHS); TODD BLANCHE,* United States Attorney General; ANTONE MONIZ, Superintendent of the Plymouth County Correctional Facility,

Defendants, Appellants,

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Brian E. Murphy, U.S. District Judge]

Before

Montecalvo, Howard, and Aframe,
Circuit Judges.

Sarah E. Welch, Counsel to the Assistant Attorney General, with whom Matthew P. Seamon, Acting Assistant Director, Mary L. Larakers, Senior Litigation Counsel, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Drew C. Ensign, Deputy Assistant Attorney General, and Brett A. Shumate, Assistant Attorney General, were on brief for appellants.

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Todd Blanche is automatically substituted for former Attorney General Pamela J. Bondi.

Matt A. Crapo, Christopher J. Hajec, Edwin E. Pieters, and Federation for American Immigration Reform, on brief as amicus curiae supporting appellants.

Trina Realmuto, with whom Kristin Macleod-Ball, Mary Kenney, Olivia Callan, National Immigration Litigation Alliance, Matt Adams, Leila Kang, Aaron Korthuis, Glenda M. Aldana Madrid, Northwest Immigrant Rights Project, Anwen Hughes, and Human Rights First, were on brief for appellees.

Daniel Bowman, Rachel A. Romaniuk, Esther G. Gold, and Osborn Maledon, P.A., on brief for Florence Immigrant & Refugee Rights Project, Political Asylum / Immigration Representation (Pair) Project, and National Immigrant Justice Center, on brief as amici curiae supporting appellees.

Amanda Lee-DasGupta, Mary S. Van Houten Harper, Michael D. Hausfeld, Anjali Dhillon, Hausfeld LLP, Blaine M. Bookey, Center for Gender & Refugee Studies, University of California College of Law, San Francisco, and Melissa Crow, Center for Gender & Refugee Studies, Washington, D.C., on brief for Center for Gender & Refugee Studies, Human Rights Watch, Asian Americans Advancing Justice-Atlanta, Al Otro Lado, and Amica Center for Immigrant Rights, as amici curiae supporting appellees.

---

September 18, 2026

---

**AFRAME**, **Circuit Judge**. The U.S. Department of Homeland Security ("DHS") appeals a final judgment in favor of a class of noncitizens with final removal orders who, pursuant to DHS policy documents issued in March and July of 2025 (collectively, "the Guidance"), face removal to countries neither designated in their removal orders nor identified in writing during prior removal proceedings as potential countries of removal.[1] Following the parties' lead, we call these removals "third-country removals."

The final judgment contains five declarations that, together, construe applicable law to require DHS to take three actions when executing third-country removals that are not contemplated by the Guidance: (1) to seek first to remove class members to countries they have designated or of which they are subjects, nationals, or citizens; (2) to provide class members with effective notice of DHS's intention to remove them to a specified third country; and (3) to provide class members with a meaningful opportunity to contest removal to that third country on the ground that they have a reasonable fear of being persecuted or tortured there. See 28 U.S.C. § 2201(a). The judgment also

[1] Other defendants-appellants include DHS Secretary Markwayne Mullin; U.S. Attorney General Todd Blanche; and Plymouth County Correctional Facility Superintendent Antone Moniz, who is the legal custodian of named plaintiff E.F.D. All these defendants-appellants are sued in their official capacities. To simplify, we refer to defendants-appellants collectively as "DHS."

vacates and sets aside the Guidance as unlawful under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A), (C).

For reasons we shall explain, the representative plaintiffs lack Article III standing as to their "sequencing" claim. This requires us to vacate the two declarations regarding DHS's obligation first to seek to remove class members to countries they have designated for removal or of which they are subjects, nationals, or citizens. Otherwise, we affirm the judgment.

**I.**

The district court has published three thorough memoranda and orders addressing the many issues involved in this litigation. D.V.D. v. U.S. Dep't of Homeland Sec. ("D.V.D. III"), 821 F. Supp. 3d 102 (D. Mass. 2026); D.V.D. v. U.S. Dep't of Homeland Sec. ("D.V.D. II"), 786 F. Supp. 3d 223 (D. Mass. 2025); D.V.D. v. Dep't of Homeland Sec. ("D.V.D. I"), 778 F. Supp. 3d 355 (D. Mass. 2025). Interested readers should consult those orders for additional background. Here, we confine our discussion to matters relevant to our disposition of this appeal.

On March 23, 2025, four noncitizens -- D.V.D., M.M., E.F.D., and O.C.G. -- filed this lawsuit as a putative class action under, as is relevant here, the APA. See 5 U.S.C. § 706(2)(A), (C). The complaint principally alleged that DHS had adopted a new, unlawful policy of removing noncitizens with final removal orders to "third countries" -- i.e., countries not mentioned in

their final removal orders -- without providing them with effective notice and a meaningful opportunity to claim that they reasonably feared persecution or torture in those countries. We refer to such claims collectively as "fear-based claims."

In support of this allegation, the plaintiffs relied upon, inter alia, a February 18, 2025, directive issued by U.S. Immigration and Customs Enforcement ("ICE"), an agency housed within DHS. The directive, which was attached to the complaint, instructed ICE officers to "review for removal" cases involving noncitizens who had been granted protection from removal to one or more specific countries based on a fear-based claim. The directive ordered officers to "determine the viability of removal to a third country and accordingly whether the alien should be re-detained."

The plaintiffs sought class certification and provisional relief. On March 28, 2025, the district court granted the plaintiffs a temporary restraining order, which DHS promptly appealed and moved this Court to stay. Two days later, on March 30, 2025, while that appeal and motion to stay were pending, DHS issued a policy document titled "Guidance Regarding Third Country Removals." Under this policy document, prior to any third-country removal,

> DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured. If the United States has received such assurances, and if the

> Department of State believes those assurances to be credible, the alien may be removed without the need for further procedures. If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.
>
> DHS will first inform the alien of removal to that country. Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country. . . .
>
> Immigration officers will refer any alien who affirmatively states a fear of removal to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture (CAT) for the country of removal.
>
> In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer. This screening may be done remotely. USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal. If USCIS determines that the alien has not met this standard, the alien will be removed.
>
> If USCIS determines that the alien has met this standard . . . , USCIS will refer the matter to the Immigration Court [either in the first instance or through a motion to reopen, as appropriate] . . . . Alternatively, ICE may choose to designate another country for removal.

Thus, the March 30, 2025, policy document does not require DHS to give noncitizens notice before their removal to a third country from which the State Department believes it has received credible diplomatic assurances that noncitizens removed

to that country will not be persecuted or tortured.[2] And it contemplates only minimal notice before removal to a third country which has not given the State Department such assurances. After DHS issued the March 30, 2025, policy document, this case largely focused on that document's lawfulness and on certain jurisdictional and remedial issues implicated by the plaintiffs' challenge.

On April 7, 2025, this Court denied DHS's motion for a stay of the temporary restraining order pending appeal. On April 18, 2025, the district court granted the plaintiffs' motion for class certification and granted in part their motion for a preliminary injunction. The court certified the following class:

---

[2] Nor does the March 30, 2025, policy document provide protection against "chain refoulement." Chain refoulement occurs when a country removes someone to a second country, which, in turn, sends the person to a third country to which the original removing country could not, often because of a finding that the person likely would be persecuted or tortured if removed there. The class alleges that many of its members have been subject to chain refoulement. See generally S. Comm. on Foreign Rels., Minority Rep., At What Cost? Inside the Trump Administration's Secret Deportation Deals 5 (2026) (stating that "[a]s of January 2026, more than eighty percent of the migrants sent to third countries paid by the United States to take them in have already returned to their country of origin or are in the process of doing so"). For example, the class points to named plaintiff O.C.G. as an example of chain refoulement under DHS's third-country removal policy. An immigration judge granted O.C.G. withholding of removal to Guatemala, his country of citizenship, meaning U.S. immigration authorities could not remove him to Guatemala based on a likelihood that he would be persecuted there. Under DHS's third-country removal policy, O.C.G. was removed to Mexico, and from there Mexico deported him to Guatemala.

> All individuals who have a final removal order issued in proceedings under Section 240 [8 U.S.C. § 1229a], 241(a)(5) [8 U.S.C. § 1231(a)(5)], or 238(b) [8 U.S.C. § 1228(b)] of the [Immigration and Nationality Act ("INA")] (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

The court also imposed on DHS several requirements designed to provide class members, prior to any third-country removal, with written notice that they face removal to a specified third country and a meaningful opportunity to raise certain fear-based claims about their removal to that country.

On April 22, 2025, DHS appealed the preliminary injunction and moved this Court to stay the injunction pending appeal. On May 16, 2025, we denied the motion for a stay. About a month later, however, the U.S. Supreme Court granted DHS a stay pending our disposition of the preliminary-injunction appeal and its disposition of any subsequent petition for a writ of certiorari. Following the Supreme Court's action, on July 9, 2025, DHS reaffirmed by memorandum its intention to follow the March 30, 2025, policy document. See Memorandum from Todd M. Lyons, Acting Director, ICE, to All ICE Employees, Third Country Removals Following the Supreme Court's Order in Department of Homeland Security v. D.V.D., No. 24A1153 (U.S. June 23, 2025) ("ICE must

adhere to [former] Secretary of Homeland Security Kristi Noem's [policy document.]"). The memorandum also clarified that ICE "will generally wait at least 24 hours following service of the Notice of Removal before effectuating removal" of a noncitizen to a third country from which the State Department has not received credible diplomatic assurances that individuals removed from the United States would not be persecuted or tortured. As mentioned above, we refer to the March 30, 2025, and July 9, 2025, policy documents together as "the Guidance."

On February 3, 2026, this Court held oral argument on DHS's appeal of the preliminary injunction. At argument, the class renewed an earlier request that we terminate the appeal and remand for the district court to dissolve the preliminary injunction, in accordance with the district court's indicative order, and issue merits rulings on pending motions to dismiss filed by DHS and for partial summary judgment filed by the class. On February 20, 2026, we granted the class's request, terminated DHS's appeal of the preliminary injunction, and remanded.

On February 25, 2026, the district court entered a memorandum and order dissolving the preliminary injunction and resolving the class's claims. As is relevant here, the court first rejected several challenges to its jurisdiction. The court then held that, under applicable law, third-country removals pursuant to the Guidance are unlawful in three ways.

First, third-country removals under the Guidance are inconsistent with the requirements of 8 U.S.C. § 1231(b)(2)(A)-(D), and related regulations, which require DHS first to seek to remove class members to a class member's designated country of removal and subsequently to a country of which they are a subject, national, or citizen, before removing them to third countries under 8 U.S.C. § 1231(b)(2)(E), the statutory provision authorizing third-country removals. We refer to compliance with this statutory hierarchy as "sequencing."

Second, third-country removals under the Guidance do not comport with the notice-and-hearing requirements implicit in 8 U.S.C. § 1231(b)(3), and related regulations, which require DHS to withhold the removal of eligible class members to countries, including third countries, where their "life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group, or political opinion." We refer to the claims of class members who would invoke § 1231(b)(3), and related regulations, as "fear-of-persecution claims."

Third, third-country removals under the Guidance do not comport with the notice-and-hearing requirements imposed by the Fifth Amendment's Due Process Clause with respect to the rights of those seeking relief under the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G,

Title XXII, § 2242, 112 Stat. 2681, 2681-822 (codified as Note to 8 U.S.C. § 1231), and related regulations, which implement Article 3 of the international Convention Against Torture ("CAT") by prohibiting removal of all class members to countries where they likely would be tortured. We refer to claims of class members who would invoke the FARRA/CAT, and related regulations, as "fear-of-torture claims." As noted already, we refer collectively to these claims as "fear-based claims."

Based on these determinations, the district court issued a final judgment containing the declaratory and APA-based relief described above. Reduced to its essence, the judgment declared applicable law to require DHS to engage in statutory sequencing when removing all class members and to provide every class member with effective notice and a meaningful opportunity to raise any fear-based claim regarding their removal to a third country. The judgment also set aside the Guidance as unlawful under the APA insofar as it authorizes removals that do not comply with these requirements.

This appeal followed.

**II.**

In its briefing, DHS first contests the scope of the district court's remedial order and then challenges the court's jurisdictional, merits, and class-certification rulings. To facilitate our analysis, we address the issues in a different

order. We start with class certification, next discuss the jurisdictional challenges, then address the merits, and conclude with questions of remedy.

**A. Class Certification**

DHS argues that the district court erred in certifying the class. We review that decision for abuse of discretion. See, e.g., Nightingale v. Nat'l Grid USA Serv. Co., 107 F.4th 1, 11 (1st Cir. 2024) (class-certification orders are reviewed for an abuse of discretion). While this case was pending in the district court, DHS did not seek an interlocutory appeal of the court's class-certification order, see Fed. R. Civ. P. 23(f) (authorizing petitions for permission from a court of appeals to challenge an order granting or denying class certification), or a prejudgment decertification of the class, see Fed. R. Civ. P. 23(c)(1)(C) (authorizing amendment of an order granting or denying class certification before final judgment). We now face an appeal of a final judgment providing class-based relief. We therefore focus on whether the class-based relief provided in that judgment meets the requirements of Federal Rule of Civil Procedure 23.

Rule 23 imposes several requirements for class certification. First, under Rule 23(a), the party seeking certification must establish that

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Additionally, the class must satisfy at least one of Rule 23(b)'s requirements. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011). Here, the plaintiffs sought class certification pursuant to Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." As the Supreme Court has explained:

> The key to the [Rule 23](b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them . . . . In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.

Id. at 360 (citation modified).

The district court certified the class after finding that it met all four requirements of Rule 23(a) and satisfied the requirements of Rule 23(b)(2). The court concluded that numerosity was uncontested, that commonality and typicality were satisfied by

the fact that all putative class members were asserting a common right to notice and a meaningful opportunity to present a fear-based claim before removal to a third country, and that the identified representatives would fairly and adequately represent the class. Then, following the development of a summary-judgment record, the court issued a final judgment which, as we have explained, declared DHS's legal obligations to engage in statutory sequencing and to provide class members with notice and a meaningful opportunity to raise fear-based claims. The court provided this relief, along with vacatur of the Guidance, to all class members after determining that all class members were entitled to such relief and that no class member was entitled to any relief that differed from that provided to all other class members. The district court thus acted consistently with Rule 23, given the class's claims and the remedies sought. Id.

DHS's principal arguments to the contrary present variants of two underlying assertions. The first is that all class members do not have the same downstream procedural rights and the same entitlement to assert the same fear-based claims. The second is that the representative parties are not identically situated to each other and the class in terms of whether they have been awarded relief based on a fear-based claim and whether they will raise such claims concerning removal to a third country. But as the district court recognized, whether all class members are similarly

situated along these lines does not matter for class-certification purposes. What matters is that all class members are similarly situated as to the specific allegations at the heart of this case: (1) entitlement to sequencing, and (2) entitlement to notice and an opportunity to assert fear-based claims before removal to a third country.[3] That some may claim fear of persecution under § 1231(b), others fear of torture under the FARRA/CAT, and still others fear of both does not affect the uniform relief granted by the district court.

DHS offers two additional class-certification arguments that warrant only brief discussion. The first is premised on the fact that the class includes noncitizens who have expedited removal orders, see 8 U.S.C. § 1225(b)(1), that have been reinstated, see § 1231(a)(5). DHS seeks to establish the divisibility of the class, and thus its impropriety, see Wal-Mart Stores, 564 U.S. at 360, by observing that expedited removal orders cannot be

[3] DHS observes, correctly, that the class includes some members who are ineligible to assert fear-of-persecution claims under § 1231(b)(3). That is because certain individuals are statutorily ineligible for such protection based on their history of engaging in persecution themselves, their criminal history, or the danger they pose to national security, among other factors. See 8 U.S.C. § 1231(b)(3)(B) (listing groups of noncitizens who are ineligible to raise a claim of likely persecution). But DHS does not dispute that every member of the class is entitled to assert a fear-of-torture claim under the FARRA/CAT. See 8 C.F.R. §§ 208.16(c), 208.17, 1208.16(c), 1208.17. Thus, while some class members may not assert fear-of-persecution claims, all class members may assert a fear-based claim of some sort.

challenged in a class action for declaratory relief because of § 1252(e)(1)(A). That provision prevents a court from granting declaratory relief with respect to expedited removal orders under § 1225(b)(1). DHS also points to the more general limits contained in § 1252(e)(1)(B), which circumscribe a court's power to certify classes of noncitizens with expedited removal orders. But the premise of this argument is incorrect. The class does not include noncitizens whose operative removal orders are expedited removal orders under § 1225(b)(1); it includes only noncitizens with such orders that have been reinstated pursuant to § 1231(a)(5). And § 1252(e)(1)(A) and (B) do not apply to reinstated removal orders under § 1231(a)(5). See 8 U.S.C. § 1252(e) ("Judicial review of orders under section 1225(b)(1)").

DHS also contests the adequacy of the representative parties because "the class is not limited to a defined set of aliens . . . but instead purports to include '[a]ll' aliens in the future who will be removed to a third country." DHS asserts, without further elaboration, that this fact renders the representative parties inadequate because "if this Court or the Supreme Court rules against [the plaintiffs] on the merits, every alien in the future will be bound by the judgment and thus precluded from bringing his own challenge to the Guidance or similar third-country removal policy in the future." But because

final judgments rarely bind non-parties to a lawsuit, see Smith v. Bayer Corp., 564 U.S. 299, 312-13 (2011), it is difficult to see how future parties would be bound by a judgment for DHS. In any event, DHS neither presented this argument to the district court nor argues to this Court that the alleged mistake constitutes plain error. Accordingly, we regard the argument as waived. See, e.g., United States v. Martínez-Mercado, 132 F.4th 61, 68-69 (1st Cir. 2025).

**B. Jurisdictional Issues**

DHS argues that the district court lacked jurisdiction over the class's APA claims pursuant to several provisions of the INA that either strip or channel federal-court jurisdiction. We address the applicability of these provisions seriatim.

**1. 8 U.S.C. § 1252(g)**

DHS first argues that this lawsuit is entirely precluded by § 1252(g), a jurisdiction-stripping provision added to the INA by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). See Reno v. Am.-Arab Anti-Discrimination Comm. 525 U.S. 471, 472-73 (1999) ("AADC"). Section 1252(g), captioned "Exclusive jurisdiction," states in relevant part that "[e]xcept as provided in [§ 1252] . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g).

The district court rejected DHS's § 1252(g) argument, reasoning that this section reaches only claims based on DHS's exercise of prosecutorial discretion and not policy challenges such as those brought by the class. DHS contests this ruling by advancing the same but-for reading of the statute that it unsuccessfully pressed below. DHS starts with an assertion that the class's claims are barred by the statute because "a claim about where an alien will be removed is, ipso facto, a 'claim' 'arising from the decision or action' to 'execute [a] removal order[].'" "Indeed," the argument continues, "if the government were not 'execut[ing a] removal order' against an alien, the alien would not even be a member of the class here, much less have standing to challenge the Guidance." "By definition then," the argument concludes, "each and every class member necessarily is raising a claim arising out of the government's action to execute his removal order."

As an initial matter, an essential premise of DHS's argument -- that third-country removals pursuant to the Guidance are "decision[s] or action[s]" to "execute" the class's "removal order[s]" -- is flawed. Removal orders are not mere directives that noncitizens be removed from the country; such orders also must "identify a country, or countries in the alternative, to which the alien's removal may in the first instance be made, pursuant to the provisions of [§ 1231(b)]." 8 C.F.R. § 1240.12(d); see also

id. § 1240.10(f) ("The [immigration judge] shall also identify for the record a country, or countries in the alternative, to which the alien's removal may be made pursuant to [§ 1231(b)(2)] if the country of the alien's designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the alien declines to designate a country."). Further, removal orders explicitly require DHS to observe § 1231(b)'s other constraints on its authority when it cannot remove a noncitizen to the country or countries identified in his or her removal order. Id. § 1240.12(d) ("In the event that [DHS] is unable to remove the alien to the specified or alternative country or countries, the [removal] order . . . does not limit the authority of [DHS] to remove the alien to any other country as permitted by [§ 1231(b)]." (emphasis added)); see also id. §§ 208.16(f), 241.15, 1208.16(f).

The class does not contest its removability. Nor does it challenge the validity of its removal orders, seek to delay or thwart the execution of those orders, or deny that its members can be removed lawfully to third countries based on those orders. Rather, the class seeks a declaration that its members cannot lawfully be removed to third countries, as permitted by § 1231(b), without first being provided effective notice and a meaningful opportunity to raise fear-based claims concerning those countries. The class contends that carrying out removals without providing these two essential components of due process ignores legal

requirements implicit in the scheme permitting their removal to a country not identified in their removal orders. See Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

We address the merits of the class's argument below. For now, it suffices to observe that a claim directed at DHS's adoption of policies involving identification of a country of removal not contemplated by the removal order does not arise from the decision or action to "execute" that order. § 1252(g). If anything, it arises from the decision or action not to execute the country-designation aspect of the removal order when removing class members. Thus, the challenge here is not to DHS's decision or action to "execute" class members' removal orders even under DHS's but-for reading of § 1252(g). See Ibarra-Perez v. United States, 154 F.4th 989, 997 (9th Cir. 2025) (explaining that removal to a country not mentioned in one's order of removal is not "execution" of the removal order under § 1252(g)).[4]

[4] This conclusion is reinforced by the "familiar principle of statutory construction" that, "[w]hen a statute is 'reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that

In any event, as the district court recognized, DHS's but-for reading of § 1252(g) is foreclosed by Supreme Court precedent. The Supreme Court has held that § 1252(g) does not strip jurisdiction over all cases involving claims challenging removals; rather, it only does so when the claim involves one of the "three discrete actions" listed in § 1252. See AADC, 525 U.S. at 482. To harmonize § 1252(g) with other provisions of the INA following enactment of the IIRIRA, the Court has read the statute to strip jurisdiction only over challenges to decisions or actions to deny requests for discretionary relief from removal (such as deferred action) and instead to commence proceedings, adjudicate cases, or execute removal orders against noncitizens. See id. at 482-85; see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 19 (2020) (reaffirming that § 1252(g) does not cover "all claims arising from deportation proceedings"); INS v. St. Cyr, 533 U.S. 289, 311 n.34 (2001) (similar); Jennings v. Rodriguez, 583 U.S. 281, 294 (2018) (plurality opinion) (stating that AADC did not interpret § 1252(g) "to sweep in any claim that can technically be said to 'arise from' the three listed actions"

---

executive determinations generally are subject to judicial review.'" Kucana v. Holder, 558 U.S. 233, 251 (2010) (quoting Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 434 (1995)); see also id. ("We have consistently applied [the interpretive principle quoted above] to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction.").

but instead "to refer to just those three specific actions themselves"); Jennings, 583 U.S. at 355 (Breyer, J., dissenting) (agreeing with the plurality's understanding on this point). And, as we have stated, this is not a case involving requests by noncitizens for discretionary relief from the execution of their removal orders.

Circuit precedent also conflicts with DHS's but-for reading of the statute. In Kong v. United States, 62 F.4th 608 (1st Cir. 2023), we considered whether § 1252(g) barred a noncitizen's Federal Tort Claims Act claim that arose from his arrest and detention for the purpose of removing him to Cambodia. Id. at 608-09. We held that it did not. In so ruling, we confirmed that while "[the petitioner's] claim of improper detention 'arose from' the government's decision to execute his removal" in a but-for sense, id. at 613, reading § 1252(g) to bar his claim would be contrary to the Supreme Court decisions discussed above, see id. at 612-13.

Moreover, we explained, reading § 1252(g) to foreclose the petitioner's claim also would conflict with prior circuit precedent rejecting a but-for reading of the statutory phrase "arising from" in the context of § 1252(b)(9), a jurisdiction-channeling provision of the INA that we discuss below. See Kong, 62 F.4th at 613-17 (analyzing Aguilar v. U.S. Immigr. & Customs Enf't Div. of the Dep't of Homeland Sec., 510

F.3d 1, 9-12 (1st Cir. 2007)). Finally, we noted that construing § 1252(g) to permit the petitioner's claim to proceed was consistent with cases from other circuits. Id. at 617-18 (citing Arce v. United States, 899 F.3d 796, 800 (9th Cir. 2018) (holding that a challenge to removal in violation of a judicial stay order was not barred by § 1252(g)), Madu v. Att'y Gen., 470 F.3d 1362, 1368 (11th Cir. 2006) (explaining that a challenge to the legality of detention was distinct from a challenge to the government's discretionary decision to execute a removal not barred by § 1252(g)), and Garcia v. Att'y Gen., 553 F.3d 724, 729 (3d Cir. 2009) (stating that § 1252(g)'s jurisdictional bar does not apply when a petitioner "is not challenging the discretionary decision to commence proceedings, but is challenging the very authority to commence those proceedings")); see also Ibarra-Perez, 154 F.4th at 997 (holding post-Kong that § 1252(g) did not bar a noncitizen's claim that "he had a right to meaningful notice and an opportunity to present a fear-based claim before he was removed to [a third country]").[5]

---

[5] DHS cites E.F.L. v. Prim, 986 F.3d 959, 965 (7th Cir. 2021), and Rauda v. Jennings, 55 F.4th 773, 777-78 (9th Cir. 2022), for the proposition that "[§] 1252(g) is not limited to only the discretionary aspects of the [three actions specified in the statute]; its text reaches 'any' action taken to 'execute removal orders.'" But these cases differ fundamentally from the present action. Both involved requests from noncitizens that courts delay the execution of their removal orders while certain administrative petitions they had filed remained pending. See E.F.L., 986 F.3d at 961-62; Rauda, 55 F.4th at 775-76. In both cases, the

Again, the class is not challenging DHS's discretionary decision or action to proceed with the removal of class members. Nor is it challenging DHS's authority to remove class members to third countries. Rather, the class is challenging the lawfulness of DHS conducting third-country removals without first providing class members with effective notice and a meaningful opportunity to raise any fear-based claims they might have about removal to a particular third country. Accordingly, under Supreme Court and circuit precedent, the class's claims are not barred by § 1252(g). As the district court recognized, the mere fact that the class's potential fear-based claims would not have arisen but for DHS's decision or action to remove class members does not bring the claims within § 1252(g)'s bar on jurisdiction.

**2. 8 U.S.C. § 1252(a)(4) and FARRA § 2242(d)**

DHS next argues that the district court erred by rejecting its argument that 8 U.S.C. § 1252(a)(4) and § 2242(d) of

noncitizens sought to avoid the jurisdictional bar by casting their requests as challenges to the government's authority to remove them while their petitions were pending, and in both cases, the court rejected their recharacterization efforts and emphasized that § 1252(g) precludes all challenges to the government's decision to execute a removal order, regardless of how the challenge is framed. See E.F.L., 986 F.3d at 964-965; Rauda, 55 F.4th at 777-78. Here, as we have explained, the class does not challenge the decision to execute their removal orders. Rather, it seeks a declaration that class members are entitled to effective notice and a meaningful opportunity to raise fear-based claims if the government seeks to carry out their removals to countries not contemplated by their removal orders.

the FARRA strip it of jurisdiction over the class's fear-of-torture-related claim. That claim, again, is that the Guidance violates the APA insofar as it authorizes third-country removals without giving class members effective notice and a meaningful opportunity to assert, under the FARRA/CAT, a fear-of-torture claim with respect to the third country. Section 1252(a)(4) states in relevant part that "[n]otwithstanding any other provision of law (statutory or non-statutory), including [§] 2241 of [T]itle 28, . . . a petition for review filed with the appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of any cause or claim under [the CAT]." Section 2242(d) of the FARRA states in relevant part:

> [N]othing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under [the FARRA/CAT] or this section, or any other determination made with respect to [the FARRA/CAT's policy to refrain from sending any person to a country where there are substantial grounds for believing the person would be in danger of being subjected to torture], except as part of the review of a final order of removal . . . .[6]

[6] In framing its jurisdictional challenge to the district court's FARRA/CAT ruling, DHS quotes § 2242(d) as stating that "no court shall have jurisdiction to review . . . any . . . determination made with respect to the application of [the FARRA/CAT] . . . except as part of the review of a final order of removal." These ellipses render the quotation materially inaccurate. Section 2242(d) in fact states that "no court shall have jurisdiction to review <u>the regulations adopted to implement this section</u>." (emphasis added). Only after this underscored language does the statute state what we quote in the text. And the provision we quote in the text does not purport to oust courts

The district court rejected DHS's jurisdiction-stripping argument, insofar as it is premised on § 1252(a)(4), because the class's APA claim is not a "cause or claim under [the FARRA/CAT]." See Am. Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260 (1916) ("A suit arises under the law that creates the cause of action."). DHS challenges this ruling with the following argument: "But [the] CAT, a non-self-executing treaty, does not itself create any justiciable cause of action. If the court were correct, [§] 1252(a)(4) would not apply to any claims and would effectively be rendered meaningless. That cannot be right."

This argument is confusing. Congress enacted § 1252(a)(4) as part of the REAL ID Act of 2005 to clarify, as the text of the statute says, that noncitizens may not raise CAT claims in habeas corpus petitions under 28 U.S.C. § 2241. See, e.g., Nasrallah v. Barr, 590 U.S. 573, 580-81 (2020); Kapoor v. DeMarco, 132 F.4th 595, 606-10 (2d Cir. 2025). The statute will continue to do this work irrespective of anything we decide here. Thus, we do not render § 1252(a)(4) meaningless by agreeing with the district court. And the court was clearly correct in holding that § 1254(a)(4) did not deprive it of jurisdiction. As the court

of jurisdiction found elsewhere; it merely disclaims that it should serve as a source of jurisdiction. See Saint Fort v. Ashcroft, 329 F.3d 191, 201 (1st Cir. 2003).

stated, the class's fear-of-torture-related claim arises under the APA, not the FARRA/CAT, so § 1252(a)(4) does not apply.

Turning to FARRA § 2242(d), the district court rejected DHS's jurisdiction-stripping argument insofar as it is premised on that section because the relevant portion of the statute, quoted above, says only that it does not provide jurisdiction; it does not purport to repeal jurisdiction elsewhere provided. See Saint Fort v. Ashcroft, 329 F.3d 191, 201 (1st Cir. 2003). DHS challenges this aspect of the court's ruling with the following argument:

> But [the court's] myopic reading overlooks that [§] 2242(d) states that "nothing" in [the] FARRA supplies jurisdiction to review CAT claims "except" as part of a final order of removal. That language is best read to mean that CAT claims may be reviewed only via a petition for review. The court's contrary reading . . . violates the INA's command that a petition for review is the "sole and exhaustive means" to review CAT claims "[n]otwithstanding any other provision of law." 8 U.S.C. § 1254(a)(4).

DHS's argument is built from two premises: first, that the class's fear-of-torture-related claim is a CAT claim, and second, that the district court construed the INA to permit CAT claims to be asserted outside the petition-for-review process. Neither premise is accurate. As we have just explained, the class's fear-of-torture-related claim arises under the APA, not the FARRA/CAT. Moreover, the court clearly appreciated the

distinction; it did not express any view on whether the INA permits a "cause or claim under [the FARRA/CAT]" to be asserted outside the petition-for-review process as that is not an issue in this case. The court correctly ruled that § 2242(d) of the FARRA did not deprive it of jurisdiction over the class's fear-of-torture-related claim because that claim arises under the APA, not the CAT.[7]

**3. 8 U.S.C. § 1252(a)(5) and (b)(9)**

DHS's final jurisdictional argument is that, even if applicable law does not strip the federal courts of jurisdiction

[7] DHS concludes its case for treating the class's fear-of-torture-related claim as jurisdictionally barred with two brief additional arguments. First, DHS argues that the district court erred in failing to recognize that the claim is barred under the provision of the FARRA § 2242(d) stating that "no court shall have jurisdiction to review the regulations adopted to implement this section." DHS contends that this bar applies because the class's fear-of-torture-related claim "seek[s] additional procedures with respect to [the] CAT beyond those prescribed by the Executive in the applicable regulations," and thus constitutes a challenge to the regulations. We reject this characterization of the class's claim. The class does not seek to engraft "additional procedures" onto the FARRA/CAT regulations; rather, it contends that effective notice and a meaningful opportunity to raise fear-of-torture claims are implicitly guaranteed by those regulations as they currently exist and that the Guidance is unlawful because it conflicts with these existing regulations. Second, DHS argues that the court erred in failing to apply § 2242(d)'s jurisdictional bar to the fear-of-torture-related claim because the claim challenges a "determination made with respect to the application of the policy set forth in subsection (a)," which in turn implements the CAT. But § 2242(d)'s jurisdictional bar does not apply to challenges to such determinations; it applies only to challenges to the CAT regulations. See supra note 6. DHS's argument is thus built on a misconstruction of the statute.

to entertain the class's claims regarding its ability to assert fear-based claims in connection with third-country removals, the district court could not entertain those claims because they may only be asserted in petitions for review of final orders of removal in the courts of appeals. DHS relies upon two jurisdiction-channeling provisions in the INA: § 1252(a)(5) and (b)(9). Section 1252(a)(5), captioned "Exclusive means of review," states in relevant part that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal." Section 1252(b)(9), captioned "Consolidation of questions for judicial review," states in relevant part:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien . . . shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction . . . to review such an order or such questions of law or fact.

Focusing primarily on § 1252(b)(9),[8] the district court rejected DHS's alternative, jurisdiction-channeling argument for

[8] The district court focused on § 1252(b)(9) because DHS did not develop an argument for application of § 1252(a)(5) that was independent of its § 1252(b)(9) argument. Because DHS takes the same approach on appeal, we follow suit. But in doing so, we note that § 1252(a)(5) would seem to be inapposite because, for

reasons the court described as "functional" and "categorical." The functional reason is that class members cannot, as a practical matter, anticipatorily raise in their removal proceedings fear-based claims about removal to a country not identified in those proceedings. See Aguilar, 510 F.3d at 11 (construing § 1252(b)(9) not to bar "claims that cannot effectively be handled through the available administrative process"); id. at 12 (expressing "hostility toward requiring exhaustion when adequate relief could not feasibly be obtained through the prescribed administrative proceedings"). The categorical reason is that the Supreme Court has interpreted § 1252(b)(9) to contain "targeted language" that does not oust the district courts of jurisdiction unless the suit seeks "review of an order of removal, the decision to seek removal, or the process by which removability will be determined." Regents, 591 U.S. at 19 (citation modified); see also Jennings, 583 U.S. at 294 (plurality opinion), 355 (Breyer, J., dissenting).

While there is considerable force to the district court's functional analysis,[9] we think it sufficient to reject

reasons we have already explained, this case does not involve a challenge to a final order of removal.

[9] The district court set forth in depth its reasoning, based on the summary-judgment record, that administrative exhaustion is impractical for noncitizens raising fear-based claims concerning removals to third countries not identified until

DHS's § 1252(b)(9) argument on the purely legal, "categorical" grounds that the court alternatively identified. DHS attempts to distinguish this case from Regents and Jennings by saying that, unlike those cases, this case can be characterized as one that involves an "action" to remove class members. But DHS fails to grapple with the fact that, like Regents and Jennings, this is not a case that seeks review of an order of removal, the decision to seek removal, or the process by which removability is determined. Rather, this is a case about the procedures DHS must follow when, after it decides to remove a person, it chooses to remove them to a country not identified in the removal order. Thus, this case challenges action that post-dates any of the three contexts identified in Regents and Jennings as triggering § 1252(b)(9)'s limitations. Regents, 591 U.S. at 19; Jennings, 583 U.S. at 294 (plurality opinion), 355 (Breyer, J., dissenting). Accordingly, § 1252(b)(9) did not prohibit the district court from addressing the class's claims.

**C. The Merits**

As explained above, the district court held the Guidance unlawful for three reasons. First, it held that the Guidance is unlawful because it authorizes DHS to conduct third-country removals without first engaging in statutory sequencing: that is,

---

after the conclusion of their removal proceedings. See D.V.D. III, 821 F. Supp. 3d at 131-35.

without first seeking to remove class members to the countries they designate, see 8 U.S.C. § 1231(b)(2)(A)-(C), or, failing that, to countries "of which [they are] subject[s], national[s], or citizen[s]," id. § 1231(b)(2)(D). Second, it held that the Guidance is unlawful for failing to provide eligible class members, see supra note 3, with effective notice and a meaningful opportunity to raise any fear-of-persecution claims they might have about removal to a third country, as they are entitled to do under § 1231(b)(3) and related regulations. Third, it held that the Guidance is unlawful for failing to provide class members with notice and a meaningful opportunity to raise any fear-of-torture claims they might have about removal to a third country under the Fifth Amendment's Due Process Clause. DHS contests each of these rulings.

### 1. Sequencing

The complaint in this case did not contain allegations that DHS unlawfully failed to engage in sequencing prior to carrying out third-country removals. Rather, the issue appears to have first arisen during the summary-judgment stage of the proceedings. DHS presents several arguments about this procedural irregularity, including an argument that none of the representative plaintiffs possessed Article III standing to litigate the issue. We agree with DHS that this claim must be

dismissed, and the declarations based on this claim vacated, because the representative plaintiffs lack Article III standing.

Each of the representative plaintiffs alleges or implies that they have a final order of removal designating their country of citizenship as the one to which they will be removed. Each also alleges or implies that their country of citizenship is the only country designated for removal in their final removal order. Each further alleges or implies either that their country of citizenship will not take them or that they have successfully secured protection from removal to their home country based on a fear-based claim. And none alleges or implies that, during their removal proceedings, they designated a country other than their country of citizenship, see § 1231(b)(2)(A),[10] that DHS

[10] In relevant part, § 1231(b)(2)(A)(i) states that a noncitizen who has been ordered removed "may designate one country to which the alien wants to be removed." Section 1231(b)(2)(A)(ii) in turn provides that DHS "shall remove the alien to the country the alien so designates," subject to limitations described in § 1231(b)(2)(B) that are not germane.

disregarded, see § 1231(b)(2)(C),[11] in favor of their country of citizenship, see § 1231(b)(2)(D).[12]

Taken together, these allegations fail to establish that DHS has disregarded the statutory sequencing requirements of § 1231(b)(2)(A)-(D) -- which, again, were the subjects of the district court's declaratory judgments regarding sequencing -- in seeking to remove the representative plaintiffs from the country. The representative plaintiffs have therefore failed to plead facts suggesting that they were injured by DHS's allegedly unlawful sequencing practices. Accordingly, we dismiss the class's sequencing claim for lack of Article III standing. See Spokeo, Inc. v. Robins, 578 U.S. 330, 338 n.6 (2016) (observing that "named plaintiffs who represent a class must allege and show that they

---

[11] In relevant part, § 1231(b)(2)(C) authorizes DHS to disregard a noncitizen's designation of a preferred country of removal under § 1231(b)(2)(A)(i) if the noncitizen fails to designate a country promptly; if the government of the selected country does not inform DHS "finally, within 30 days after the date [DHS] first inquires, whether the government will accept the alien into the country"; if the government of the selected country "is not willing to accept the alien into the country"; or if DHS "decides that removing the alien to the country is prejudicial to the United States."

[12] In relevant part, § 1231(b)(2)(D) states that "[i]f an alien is not removed to a country designated under [§ 1231(b)(2)(A)(i)], [DHS] shall remove the alien to a country of which the alien is a subject, national, or citizen" unless the country is not responsive to DHS's inquiry whether the country will accept the alien, or is not willing to accept the alien.

personally have been injured" to satisfy the demands of Article III (citation modified)).

### 2. Fear of Persecution

The district court's fear-of-persecution ruling was based on two subsidiary conclusions. First, the court construed § 1231(b) and related regulations, which are the provisions of law that authorize the removal of class members with final removal orders, to require DHS to provide eligible class members with effective notice and a meaningful opportunity to raise any fear-of-persecution claim before a third-country removal. Second, the court deemed the Guidance unlawful because it authorizes third-country removals without providing such notice and opportunity.

The district court reached the first conclusion because, as a statutory matter, DHS exercises the power to remove class members under § 1231(b), including the power to conduct third-country removals under § 1231(b)(2)(E),[13] "[s]ubject to

[13] Section 1231(b)(2)(E), titled "Additional removal countries," is the INA's source of authority for the third-country removal of a noncitizen who is not removed to a country the noncitizen designates under § 1231(b)(1)(A), or to a country of which the noncitizen is a subject, national, or citizen under § 1231(b)(2)(D). Section 1231(b)(2)(E)(i) to (vi) provide a list of six additional countries with which the noncitizen has lesser connections and to which the noncitizen may be removed -- e.g., "the country from which the alien was admitted to the United States." § 1231(b)(2)(E)(i). The subsection concludes with § 1231(b)(2)(E)(vii), a catchall provision authorizing a third-country removal to "another country whose government will

[§ 1231(b)(3)]." Id. § 1231(b)(1)-(2). Again, § 1231(b)(3) categorically prohibits DHS from removing eligible class members to a country (including a third country) if DHS decides that they would face persecution there based on a protected characteristic. The court also emphasized that § 1231(b)(3) contemplates that a "trier of fact" would be the one to decide a fear-of-persecution claim on an individualized basis following a formal process involving the introduction of evidence and credibility determinations. See § 1231(b)(3)(C); 8 C.F.R. §§ 208.16, 1208.16 (establishing standards and procedures for the adjudication of claims for withholding of removal under § 1231(b)(3) and the FARRA/CAT). Finally, the court invoked the assumption of "congressional solicitude for fair procedure, absent explicit statutory language to the contrary," Califano v. Yamasaki, 442 U.S. 682, 693 (1979), and the related constitutional-avoidance canon, see id.; see also, e.g., Zadvydas v. Davis, 533 U.S. 678, 689 (2001) (observing that the Supreme Court has "read significant limitations into other immigration statutes in order to avoid their constitutional invalidation"), in support of reading a requirement of effective notice and a meaningful opportunity to present a fear-of-persecution claim into the applicable statutory and

accept the alien into that country" only if it is "impracticable, inadvisable, or impossible to remove the alien to" any of the countries listed in § 1231(b)(2)(E)(i)-(vi).

regulatory framework, see A.A.R.P. v. Trump, 605 U.S. 91, 94-95 (2025) (confirming that the Fifth Amendment guarantees noncitizens due process of law in the context of removal proceedings).

The district court reached the second conclusion -- that the Guidance is unlawful -- because, as we have explained, the Guidance guarantees class members no notice at all of an impending third-country removal when the country to which the noncitizen is to be removed has provided credible (in the State Department's judgment) diplomatic assurances that noncitizens removed there from the United States will not be persecuted or tortured.[14] And as to countries that have not provided such diplomatic assurances, the Guidance contemplates inadequate notice, generally only twenty-four hours or less, of an impending third-country removal prior to the effectuation of removal. Cf. A.A.R.P., 605 U.S. at 95 (stating that notice roughly twenty-four hours before removal under the Alien Enemies Act, devoid of information about how to

[14] Even setting aside issues of notice and a meaningful opportunity to raise a fear-of-persecution claim, it is difficult to see how the Guidance conforms to the detailed statutory and regulatory regime governing such a claim. For nothing in that regime contemplates the substitution of blanket diplomatic assurances for the detailed and individualized procedures governing such a claim. In this respect, 8 C.F.R. §§ 208.18(c) and 1208.18(c) do contemplate, in the FARRA/CAT context, that individualized diplomatic assurances obtained by the Secretary of State can in some circumstances substitute for an administrative order providing the noncitizen with FARRA/CAT protection.

exercise due process rights to contest the removal, does not satisfy due process).[15]

DHS presents three arguments that the district court erred in construing applicable statutory and regulatory law to require effective notice of an impending third-country removal and a meaningful opportunity to bring a fear-of-persecution claim regarding removal to that third country.[16] First, DHS asserts that

---

[15] We note that neither the public record nor the record in this case discloses what countries, if any, have provided the State Department with the diplomatic assurances contemplated by the Guidance and what countries, if any, have declined to do so. We also note that, although it does not affect our analysis, we have some difficulty seeing how a receiving country can credibly provide blanket assurances that all removed noncitizens will not be persecuted or tortured there unless it intends to provide them with some sort of affirmative protection against rogue agents and non-state actors, who can be persecutors within the meaning of § 1231(b)(3), see Paye v. Garland, 109 F.4th 1, 11-12 (1st Cir. 2024), and torturers within the meaning of the FARRA/CAT, see Escobar v. Garland, 122 F.4th 465, 481 (1st Cir. 2024).

[16] In passing, DHS also takes issue with the district court's reliance on the statutory references to the "trier of fact" and "credibility determinations" in § 1231(b)(3)(C), arguing that the provision containing those references "was added in 2005" and is "inapposite because it obviously refers to proceedings under the existing regulations . . . which even the district court agrees do not speak to third country removals." And DHS further contests the inference the court drew with respect to the interrelationship between § 1231(b)(2)(E) and § 1231(b)(3), arguing that the provisions in § 1231(b) conditioning removal authority on § 1231(b)(3) "mean[] nothing more and nothing less than if an alien has been granted withholding of removal to a particular country, the government may not, when applying the sequencing provisions in [§] 1231(b)(2), remove an alien to that country." But DHS does not elaborate either argument, both of which are so underdeveloped that we find them difficult to understand. We therefore regard them as waived. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort

"the [district] court did not identify any text in Section 1231(b)(2) or 1231(b)(3) creating such an entitlement." But the statute need not state the particulars of these procedural rights for their existence to be evident in the structure of § 1231(b) and in the specific guarantees provided by § 1231(b)(3). Indeed, immigration statutes are often construed to mean more than what they plainly say -- especially when the government's proposed reading raises serious due process concerns and where there is no clear basis for concluding that Congress intended that problematic reading. See, e.g., Zadvydas, 533 U.S. at 689-99 (reading "an implicit limitation" into a post-removal statute such that the noncitizen could not be detained indefinitely but rather only for the "period reasonably necessary" to accomplish the noncitizen's removal).

Here, the district court conducted a conventional analysis of § 1231(b)(2) and (c) that led it to adopt a sensible interpretation of statutory meaning that avoids constitutional problems. For, as the court concluded, an individual's right to contest removal to a country based on a fear of persecution in that country means little if one does not receive prior notice of the intended removal destination and a meaningful opportunity to

---

at developed argumentation, are deemed waived.") In any event, we see no basis for untethering the provisions authorizing removal in § 1231(b) from the explicit and implicit requirements and limitations of § 1231(b)(3).

contest that destination. Section 1231(b)(3) applies broadly to prevent persecution, while DHS's proposed interpretation would deny access to that protection to a substantial swath of noncitizens who are sent to third countries with no notice of their destination. We decline to adopt such an interpretation.

Second, DHS argues that § 1231(h) prohibited the district court from recognizing the requirements and limitations it construed § 1231(b)(2) and (3) to contain. Section 1231(h) states that "[n]othing in [§ 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." In making this argument, DHS acknowledges that § 1231(h) cannot be read to mean that judicial review is unavailable to enforce any right created by § 1231(b)(2) and (3). DHS recognizes that § 1252(a)(5) and (b)(4), discussed above, "authorize[] judicial review of certain withholding of removal determinations in a petition for review, and thus must allow for some determination of rights under Section 1231(b)(3) in the Court of Appeals." But, DHS continues, "there is no corollary exception to Section 1231(h) for district court review and determination of such rights." Thus, DHS concludes, "[s]ections 1231(h), 1252(a)(5), and 1252(b)(4) are . . . best harmonized to mean that any procedural or substantive rights under the withholding statute may be determined <u>only</u> in a petition for review

. . . and are not legally enforceable in any <u>other</u> type of suit (like this one)."

DHS fails to explain why § 1231(h) should be read to permit judicial review under § 1252(a)(5) and (b)(4), but preclude judicial review under non-INA statutes that authorize claims based on a failure to comply with the requirements and limitations of § 1231(b)(2) and (c), such as the APA and the all-purpose habeas statute, 28 U.S.C. § 2241. In any event, we need not explore this mystery, or the meaning of § 1231(h), any further. The Supreme Court has made clear that § 1231(h) does <u>not</u> bar such claims under such statutes. <u>Zadvydas</u>, 533 U.S. at 687-88 (holding that § 1231(h) "simply forbids courts to construe [<u>§ 1231</u>] 'to create any . . . procedural right or benefit that is legally enforceable'" and "does not deprive an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is [unauthorized by § 1231(a), which governs the detention of aliens who have been ordered removed]"); <u>see generally</u> <u>Jama</u> v. <u>Immigr. & Customs Enf't</u>, 543 U.S. 335 (2005) (reviewing on the merits a habeas petition under § 2241 challenging the lawfulness under § 1231(b)(2)(E)(iv) of removing a noncitizen to his country of birth when that country did not accept him in advance); <u>see also</u> <u>Pavlovich</u> v. <u>Gonzales</u>, 476 F.3d 613, 615 n.1 (8th Cir. 2007) (rejecting as "flatly contrary to <u>Jama</u>" an argument that § 1231(h) prohibits noncitizens from claiming error in a removal-country designation

under § 1231(b)(2)); Texas v. United States, 515 F. Supp. 3d 627, 634 (S.D. Tex. 2021) (holding that § 1231(h) does not preclude an APA claim based on an alleged violation of § 1231(a)(1)(A)).

Third, and finally, DHS argues that, because withholding of removal to a country based on a fear-of-persecution claim is dependent on the government deciding that the noncitizen's life or freedom would be threatened there, see § 1231(b)(3)(A), the government "has discretion to fashion procedures to make that decision." And, the argument continues, "while the government has provided a robust process in connection with issuance of removal orders, . . . it has opted for a more streamlined process for covered third-country removals" -- i.e., removals pursuant to the procedures contemplated by the Guidance.

This argument assumes what the class disputes: that the duly enacted statutes and regulations applicable to fear-of-persecution claims leave room for the "more streamlined" third-country removal process that the Guidance authorizes, i.e., removals without notice and a meaningful opportunity to assert fear-of-persecution claims. But the question in this case is not whether, if the government were starting from scratch, it could by statute or regulation lawfully adopt the streamlined process for third-party removals contemplated by the Guidance; the question is whether that process is consistent with the applicable statutes and regulations that presently govern fear-of-persecution claims.

As the district court properly concluded, it is not. The statute and regulations prescribe hearing-related procedures for fear-of-persecution claims with no exception for third-country removals. We reject DHS's efforts to create such an exception from whole cloth.

For the reasons stated, the Guidance conflicts with the statutory and regulatory provisions governing fear-of-persecution claims insofar as it authorizes third-country removals without the provision of effective notice and a meaningful opportunity to assert such claims. The Guidance is therefore unlawful under the APA. See 5 U.S.C. § 706(2)(A), (C).

### 3. Fear of Torture

After concluding that the statutory and regulatory provisions governing fear-of-persecution claims should be read to require effective notice and a meaningful opportunity to present such claims before a third-country removal, and that third-country removals under the Guidance are unlawful because the Guidance fails to provide for either, the district court turned to whether these procedures also are required under the FARRA/CAT.[17] Here again,

---

[17] Recall that some class members cannot assert fear-of-persecution claims under § 1231(b)(3). See supra note 3. These class members are therefore ineligible for declaratory or APA-based relief based on the incompatibility between the Guidance and § 1231(b)(3) and related regulatory provisions. These class members are, however, eligible to assert fear-of-torture claims under the FARRA/CAT. See id. Accordingly, we separately address

the court concluded that they are required. But the court did not arrive at this conclusion based on an interpretation of the FARRA/CAT and related regulations. Rather, the court bypassed the statutory/regulatory question to resolve the issue based on the Fifth Amendment's Due Process Clause.[18]

By order dated March 16, 2026, we granted DHS's emergency motion for a stay pending appeal and directed the parties to address in their briefing, inter alia, the following question: "Whether the appeal with respect to class members ineligible for statutory withholding of removal under § 1231(b)(3) can be resolved without regard to any question of procedural due process under the Fifth Amendment to the Constitution." DHS did not address the issue in its opening brief and devoted a single paragraph to the issue in its reply brief, which inaccurately described the district court as having "properly rejected" the argument that the FARRA/CAT, its implementing regulations, and international law require effective notice and a meaningful

---

whether APA-based relief is warranted due to the Guidance's violation of the requirements of the FARRA/CAT.

[18] The district court declined to address the question of statutory and regulatory meaning because, "[a]lthough an argument could be made that the same constitutional-avoidance logic [grounding the court's reading of § 1231(b)(3) and related regulations] should apply to [the right to seek relief under the FARRA/CAT] 'absent explicit . . . language to the contrary,' Califano, 442 U.S. at 693, there is less direct, affirmative textual support for it." D.V.D. III, 821 F. Supp. 3d at 148.

opportunity to present a fear-of-torture claim before a third-country removal.[19]

In any event, we conclude that, as with § 1231(b)(3), the FARRA/CAT and its implementing regulations require that noncitizens be provided with effective notice and a meaningful opportunity to present a fear-of-torture claim before DHS may remove them to a third country. In reading these requirements into the relevant statutory and regulatory provisions, we do not imply doubt about the merits of the district court's due process analysis, whose force only bolsters our conclusion that this situation calls for application of the constitutional-avoidance canon and an assumption of "congressional solicitude for fair procedure, absent explicit statutory language to the contrary." Califano, 442 U.S. at 693; see Zadvydas, 533 U.S. at 689. Where, as here, there is no explicit language in the FARRA/CAT or related regulations that precludes our doing so, see Califano, 442 U.S. at 693, we think it preferable to avoid a serious constitutional problem and instead to follow the established practice of "read[ing] significant limitations into . . . immigration statutes in order to avoid their constitutional invalidation." Zadvydas, 533 U.S. at 689, 696-99 (analyzing whether there was "any clear indication of congressional intent" to adopt a

[19] The district court did not "reject" the argument. It bypassed it. See supra note 18 and accompanying text.

constitutionally problematic interpretation of a statute and concluding there was not).

As with § 1231(b)(3), such a construction of the FARRA/CAT and its related regulations coheres with the FARRA § 2242(d)'s textual contemplation of an administrative hearing and judicial review of "claims raised under [the FARRA/CAT]" and "determination[s] made with respect to the application of [the FARRA/CAT's policy of not removing any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture]." See FARRA § 2242(d); see also 8 U.S.C. § 1252(a)(4) and supra note 6. Also, such a construction avoids drawing a different inference in the FARRA/CAT context than in the § 1231(b)(3) context about whether the provisions governing the adjudication of fear-based claims (both persecution and torture) in 8 C.F.R. §§ 208.16 and 1208.16 imply that noncitizens must be given effective notice and a meaningful opportunity to be heard on any such claim before DHS may remove them to a third country. Cf. Clark v. Martinez, 543 U.S. 371, 380 (2005) (stating that textual provisions must be given consistent readings from context to context). Finally, and most fundamentally, just as we observed with respect to § 1231(b)(3), an individual's right to avoid removal to a country where one is likely to be tortured means little if one is not given prior notice of an intended third-country removal to that country and a

meaningful opportunity to assert their fear of torture if removed to that location. Our reading of the statute and regulations thus avoids a serious constitutional problem.

In a single paragraph in its reply brief, DHS contests our reading of the FARRA/CAT and related regulations with three undeveloped assertions. First, DHS states that § 2242(d)'s use of the term "determination" is an insufficient textual basis for reading the FARRA/CAT and related regulations to require the provision of effective individualized notice and a meaningful opportunity to assert one's rights. But as explained above, our contrary conclusion is based on far more than extrapolation from the word "determination."

Second, DHS argues that the FARRA/CAT's implementing regulations "plainly refer to applications for protection submitted during removal proceedings" and "clarify that nothing in the [regulations] should be construed as preventing removal to a third country." These assertions miss identify the question before us. The issue we confront is whether noncitizens are entitled to notice and a meaningful opportunity to raise a fear-of-torture claim in connection with any such third-country removal. We see no reason to read the regulations to treat noncitizens with final removal orders less favorably than noncitizens still in removal proceedings with respect to the ability to assert such a claim.

Third, DHS asserts that there is support for its position in 8 C.F.R. §§ 208.17(b)(2) and 1208.17(b)(2), which require immigration judges to inform noncitizens who have been granted deferral of removal to a country in which they are likely to be tortured that they "may be removed at any time to another country where [they are] not likely to be tortured." DHS contends that these regulatory provisions show that the provision of notice and a meaningful opportunity to raise a fear-of-torture claim is unnecessary as to that third country, arguing that "[t]here would be no reason for the regulations to note that protection under CAT is country specific, such that an alien can be removed to [a] third country, if the government had to start from the beginning each time it sought to remove an alien to a third country."

We see no redundancy. The class does not claim entitlement to restart the removal process from the beginning when DHS seeks to execute a third-country removal. Rather, it seeks only prior notice of the intended removal destination and a meaningful opportunity to raise any fear-based claims they might have regarding it. The regulatory provisions serve an antecedent purpose. They place affected noncitizens on general notice of the possibility of a third-country removal.

For the reasons stated, the Guidance conflicts with the statutory and regulatory provisions governing fear-of-torture claims insofar as it authorizes third-country removals without

effective notice and a meaningful opportunity to assert such claims in connection with such removals. The Guidance is therefore unlawful under the APA. See 5 U.S.C. § 706(2)(A), (C).[20]

**D. Scope of the Remedy and 8 U.S.C. § 1252(f)(1)**

Finally, DHS argues that the declaratory and APA-based vacatur relief ordered by the district court violates 8 U.S.C. § 1252(f)(1). Section 1252(f)(1), captioned "Limit on injunctive relief," states in relevant part:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions [authorizing third-country removals] . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

DHS contends that the practical effect of the court's declaratory judgments and vacatur of the Guidance is "to enjoin or restrain the operation" of § 1231(b)(2)(E) in violation of the statute.

[20] Because we affirm the district court's conclusion that the Guidance is unlawful under the APA on the ground that it violates the class's statutory and regulatory rights, and because we do not reach the question whether the Guidance also violates the Fifth Amendment's Due Process Clause, we do not address DHS's argument that the Guidance satisfies due process requirements because blanket diplomatic assurances can substitute for individualized process as a constitutional matter. Nor do we address DHS's argument that class members who entered the country clandestinely should be treated as not having been admitted pursuant to the so-called "entry fiction."

Insofar as DHS challenges the district court's declaratory judgments, circuit precedent directly forecloses its argument. In Brito v. Garland, 22 F.4th 240, 250-52 (1st Cir. 2021), we held that § 1252(f)(1) does not prevent a district court from providing declaratory relief to a class of noncitizens. We provided four principal reasons for our conclusion.

Our analysis started with the statute's caption and text, both of which reference only injunctions and neither of which suggests a ban on declaratory judgments. See id. at 251; see also AADC, 525 U.S. at 481 (observing that § 1252(f)(1) is "nothing more or less than a limit on injunctive relief"). We next emphasized that a declaratory judgment is a "milder remedy" than an injunction; it does not coerce a party, prohibit any future action, or "set the stage for a finding of contempt" -- a "distinction" we described as being "of special note in cases in which the government is a party." Brito, 22 F.4th at 251.

Third, we observed that "Congress knows how to prohibit declaratory relief when it so chooses," noting that "the preceding subpart in section 1252 prohibits courts from granting 'declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with [§] 1225(b)(1).'" Id. (quoting § 1252(e)(1)(A)); see id. ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally

presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (citation modified) (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 452 (2002))).

Finally, we distinguished a Supreme Court case on which DHS heavily relies, California v. Grace Brethren Church, 457 U.S. 393, 407-09 (1982), where the Supreme Court held that declaratory relief is unavailable under a statute that only expressly prohibits injunctive relief. We noted that Grace Brethren Church had limited relevance because it involved federalism concerns that are not present in the immigration-law context. See Brito, 22 F.4th at 251-52 (citing, inter alia, Steffel v. Thompson, 415 U.S. 452, 472 (1974) (stating that "[t]he only occasions where this Court has . . . found that a preclusion of injunctive relief inevitably led to a denial of declaratory relief have been cases in which principles of federalism militated altogether against federal intervention in a class of adjudications")).

We recognize that, after Brito, the Supreme Court decided Garland v. Aleman Gonzalez, 596 U.S. 543 (2022). DHS reads Aleman Gonzalez to have accorded such a broad construction of the statutory term "restrain" such that declaratory judgments (and vacaturs) of the sort at issue here fall within the sweep of § 1252(f)(1). Thus, DHS argues, we are not bound by Brito. See Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995) (prior panel holding does not bind a subsequent panel when

"authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind").

Aleman Gonzalez does not so clearly reject Brito's reasoning that we may disregard its holding. In fact, Aleman Gonzalez expressly reserves the question whether § 1252(f)(1) prohibits any form of relief that is similar to an injunction, including class-wide declaratory relief. See 596 U.S. at 551 n.2. Under the circumstances, we must follow Brito. See, e.g., United States v. Perez, 89 F.4th 247, 250 (1st Cir. 2023) (emphasizing that the exception to the law-of-the-circuit doctrine described above in the Williams parenthetical is "hen's-teeth-rare" and "applies only when the new authority provides a clear and convincing basis to conclude that the prior panel would have changed its mind" (citation modified)).

Insofar as DHS challenges the district court's vacatur order based on Aleman Gonzalez, we reach the same conclusion. Although Brito does not directly control, as it does in the declaratory-judgment context, we could not accept DHS's argument without ignoring the substance of Brito's analysis. First, as is the case with declaratory relief, neither the caption of § 1252(f)(1) nor the statutory text mentions vacatur, which the APA makes mandatory once a court finds agency action to be

unlawful. See 5 U.S.C. § 706(2) ("The reviewing court shall . . . hold unlawful and set aside [such] agency action."); see also Epic Sys. Corp. v. Lewis, 584 U.S. 497, 510 (2018) (observing that there is a strong presumption against repeals by implication such that "[a] party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow" (citation modified)); Kucana v. Holder, 558 U.S. 233, 251 (2010) (noting a presumption in favor of judicial review of executive action, particularly in the immigration-law context).

Second, as is the case with declaratory relief, vacatur is a milder remedy than an injunction. Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66 (2010) (describing an injunction as a "drastic and extraordinary remedy" and vacatur as "a less drastic remedy"); see also Texas v. United States, 40 F.4th 205, 220 (5th Cir. 2022) (noting that "a vacatur does nothing but re-establish the status quo absent the unlawful agency action" and "neither compels nor restrains further agency decision-making"). And third, as we have just said in addressing whether § 1252(f)(1) precludes declaratory relief, Congress knows how to be specific when it wants to bar remedies beyond injunctive relief. See § 1252(e)(1)(A).

Because faithful application of the reasoning in Brito requires that we do so, we reject DHS's argument that the district court's vacatur of the Guidance under the APA is barred by § 1252(f)(1). We note that this is the uniform position of courts that have considered the question after Aleman Gonzalez. See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin, 174 F.4th 81, 119-20 (D.C. Cir. 2026); Immigrant Defs. L. Ctr. v. Noem, 145 F.4th 972, 989-90 (9th Cir. 2025); Texas, 40 F.4th at 220. We also note that, in Trump v. CASA, Inc., 606 U.S. 831 (2025), where the Supreme Court held that district courts may not issue nationwide injunctions, the Court explicitly stated that its opinion does not "resolve[] the distinct question whether the [APA] authorizes federal courts to vacate federal agency action." Id. at 847 n.10.

**III.**

For the reasons stated, we **vacate** on standing grounds the two declarations pertaining to DHS's statutory obligation to seek to remove class members to countries they have designated, or of which they are subjects, nationals, or citizens, prior to removing them to third countries. We otherwise **affirm** the final judgment.

**So ordered.**[21]

---

[21] In the final section of its reply brief, DHS argues that the district court's final judgment does not require the government

to offer noncitizens who raise fear-based claims regarding a third-country removal an evidentiary hearing prior to removal. This issue is neither ripe nor fully joined. Any lingering questions about the meaning of the final judgment should be raised with the district court in the first instance.